1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 LUCENT TECHNOLOGIES, INC., and MULTIMEDIA PATENT TRUST | CASE NO. 06-CV-0684-H (CAB) |
| 12 | |
| Plaintiffs, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| 13 vs. | |
| 14 | [Doc. Nos. 180, 182, 196, 197, 199, 200] |
| MICROSOFT CORPORATION, | |
| 15 | |
| Defendant. | |
| 16 | |
| 17 AND RELATED CLAIMS | |

18      This case involves claims and counterclaims for patent infringement between

19  Lucent Technologies, Inc. ("Lucent"), Multimedia Patent Trust ("MPT"), and Alcatel-

20  Lucent (collectively with Lucent and MPT, "Plaintffs"[1]) on one side and Microsoft

21  Corporation ("Microsoft") on the other.  On January 4, 2008, according to the schedule

22  set by the Court, the parties filed motions for summary judgment.  (Doc. Nos. 180, 182,

23  197, 199-200.)[2]  The parties filed their oppositions on January 18, 2008.  (Doc. Nos.

24  225-26, 229, 232, 236.)  The parties filed their reply briefs on January 25, 2008.  (Doc.

25  Nos. 286-88, 291, 293.)  The Court also permitted Microsoft to file a late amended

26

27      [1]The Court uses this designation for convenience, though Alcatel-Lucent is not aligned as a plaintiff, strictly speaking.

28

     [2]Microsoft also filed a motion regarding Lucent's defense of laches, but the parties subsequently withdrew both the defense and the related motion.  (See Doc. Nos. 198, 249, 278.)

version of one of its motions and granted Plaintiffs additional time to respond to this motion.   (See Doc. Nos. 196, 209, 222-23, 290.)   The Court also authorized supplemental briefing to address any material discovered after the parties' last opportunity to brief an issue.  (See Doc. No. 326.)

On February 1, 2008, the Court held a hearing on this motion.  The following attorneys appeared on behalf of Lucent and MPT: Robert A. Appleby, Paul A. Bondor, James E. Marina, Michel P. Stadnick, Todd Friedman, Avi Lele, Jonas McDavit, Michael Bregenger, Carl Blickle, Karen Robinson, and Ephraim Starr.  Scott Partridge and Lisa Kelly appeared for Alcatel Lucent.  The following attorneys appeared for Microsoft: John E. Gartman, Christopher Scott Marchese, Alan Albright, Ross Garsson, Richard Weinblatt, Irene Hudson, Andrew Kopsidas, and John Helms.

### **Background**

On August 9, 2005, in Case No. 02-CV-2060, the Court granted summary judgment of invalidity by indefiniteness of claims 13 and 15 of United States Patent No. 5,227,878 ("Puri '878") because a transcription error by the United States Patent and Trademark Office ("PTO") omitted language from claim 13, on which claim 15 depends.  (See Order Granting Part Denying Part Microsoft's Mot. Partial Summ. J. Invalidity Puri '878, Case No. 02-CV-2060, Doc. No. 325.)   Lucent obtained a Certificate of Correction from the PTO, issued on October 25, 2005, and then brought this action on March 28, 2006.

While this case was pending, Lucent and Alcatel merged.  Lucent is now a subsidiary of Alcatel Lucent.  Prior to the merger, Lucent created MPT and assigned certain patents to it, including the Puri '878 patent.

In response to Lucent's action, Microsoft asserted counterclaims for infringement of ten of its patents against Lucent and Alcatel-Lucent: United States Patent Nos. 6,412,004 ("Chen '004"); 6,438,217 ("Huna '217"); 5,438,433 ("Reifman '433"); 5,917,499 ("Jancke '499"); 6,339,794 ("Bolosky '794"); 5,764,913 ("Jancke '913"); 6,565,608 ("Fein '608"); 5,941,947 ("Brown '947"); 5,838,319 ("Guzak

1  '319"); and 5,977,971 ("Guzak '971" and collectively with Guzak '319, "the Guzak

2  patents").  The Court previously ruled on the construction of disputed terms for all

3  eleven patents at issue.  (See Doc. No. 156, Claim Construction Order for U.S. Patent

4  Nos: 5,227,878; 6,412,004; 6,438,217; 5,438,433; 5,917,499; 6,339,794; 5,764,913;

5  6,565,608; 5,941,947; 5,838,319; and 5,977,971 ("Cl. Const. Order").)

**Discussion**

## I.   Summary Judgment Standard

8         Under Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant

9  summary judgment upon a claim "if the pleadings, the discovery and disclosure

10  materials on file, and any affidavits show that there is no genuine issue as to any

11  material fact and that the movant is entitled to judgment as a matter of law."  A party

12  moving for summary judgment bears the initial burden of establishing the absence of

13  a genuine issue of material fact for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317,

14  323 (1986).  The moving party's burden "may be discharged by 'showing'–that is,

15  pointing out to the district court–that there is an absence of evidence to support the

16  nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

17         Once the moving party meets the requirements of Rule 56, the party opposing

18  the motion must set forth specific facts showing that there is a genuine issue of material

19  fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-56 (1986).  The opposing

20  evidence must be sufficiently probative to permit a reasonable trier of fact to find in

21  favor of the opposing party.  See id. at 249-250.  Thus, the non-moving party cannot

22  oppose a properly supported summary judgment motion by "rest[ing] upon mere

23  allegation or denials of his pleadings."  Id. at 256.  If the non-moving party fails to

24  make a sufficient showing of an element of its case, the moving party is entitled to

25  judgment as a matter of law.  See Celotex, 477 U.S. at 322-23.

26         On a motion for summary judgment the court views the evidence in the light

27  most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654,

28  655 (1962).  However, "[w]hen opposing parties tell two different stories, one of which

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" for summary judgment purposes.  See Scott v. Harris, 127 S.Ct. 1769, 1776 (2007).

## II.    Motions Related to the Puri '878 Patent

### A.    Background for the Puri '878 Patent

The Patent and Trademark Office (PTO) issued the Puri '878 patent, entitled "Adaptive Coding and Decoding of Frames and Fields of Video," on July 13, 1993 to inventors Atul Puri and Rangarajan Aravind.  The application was filed on November 15, 1991.  Puri '878 relates generally to the compression and decompression of video signals, which allows transmission using less bandwidth.

Two apparatus claims are at issue here: claim 13 and related dependent claim 15. Claim 13 states, in its corrected form:

An apparatus for decoding a compressed digital video signal, comprising:

a means for receiving a compressed digital video bit stream; and

a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream.

(Puri '878 90:31-38.)  Claim 15 states:

The apparatus of claim 13, in which the decoding means comprises:

a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal; and

a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and

a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal.

(Puri '878 90:43-55.)  The Court previously construed the terms of these claims, including definitions of the structures related to the means-plus-function elements. (See Cl. Constr. Order, Doc. No. 156, App. A.)

Claim 13 did not issue in its current form.  The PTO, due to its own error, initially issued claim 13 without the phrase "and fields of the compressed video bit

stream" and without the word "digital" in the second means plus function limitation. Lucent previously asserted the Puri '878 patent in a suit against Microsoft without first seeking a correction.  There, the Court declined to correct the patent and determined that claims 13 and 15 were invalid for indefiniteness.  (Order Granting Part Denying Part Mot. Summ. J. Claims of Puri '878 Invalid Under § 112(2), Case No. 02-CV-2060, Doc. No. 325.)  After that ruling, Lucent obtained a certificate of correction from the PTO, pursuant to 35 U.S.C. § 254, which permits the Director to issue a certificate "[w]henever a mistake in a patent incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office . . . ."  The PTO issued the certificate of correction on October 25, 2005.

MPT now asserts that certain Microsoft products infringe claims 13 and 15, as corrected, in their implementation of MPEG-2 and VC-1 video compression standards. MPEG-2 and VC-1 are both standards for video compression technology used in common consumer video formats including DVD and HD DVD.  More specifically, MPT accuses Microsoft of infringing via software related to its Windows operating systems and Xbox 360 game console.  The accused software includes the MPEG-2 and VC-1 decoders associated with these products.

**B.     Anticipation, Obviousness, and Structural Equivalence of Decoders**

MPT moves for partial summary judgment that the asserted claims of the Puri '878 patent are neither anticipated nor obvious.  Microsoft moves for summary judgment that not all MPEG-2 and VC-1 decoders are structurally equivalent. Micrsoft also raises its argument regarding the equivalence of decoders in response to MPT's motions on anticipation and obviousness.

**1.     Microsoft's Motion Regarding Equivalence of Decoders**

Microsoft seeks summary adjudication that not all MPEG-2 and VC-1 decoders are structurally equivalent.  Specifically, it challenges the assertion of MPT's expert, Bernd Girod, that any decoder that complies with the MPEG-2 or VC-1 standard will have structures that are at least equivalent to the corresponding structures of claims 13

and 15.  (See Decl. John E. Gartman Supp. Microsoft's Mot. Summ. Adjudication Not Any and Every MPEG-2 VC-1 Decoder Structurally Equivalent Ex. A ("Girod Decl.").) Microsoft also seeks exclusion of Girod's testimony on this question of equivalence.

To determine infringement, the Court first construes the claim and then compares the claim to the accused product or device.  See, e.g., Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1356-57 (Fed. Cir. 2005); Terlep v. Brinkmann Corp., 418 F.3d 1379, 1381 (Fed. Cir. 2005).  For infringement, "the plaintiff must show the presence of every element or its substantial equivalent in the accused device or process." Terlep, 418 F.3d at 1385 (quoting Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1199 (Fed. Cir. 1994)).  For means plus function elements under 35 U.S.C. § 112 ¶ 6, the patentee must prove that the accused product performs the claimed function using a structure identical or equivalent to the structure identified by the Court's construction.  See, e.g., Cytologix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1178 (Fed. Cir. 2005).

Microsoft argues that Girod's declaration is legally insufficient because, to conclude that the accused products have the same or equivalent functions and structures as the patents, he relies on the products' compliance with either the MPEG-2 or VC-1 standards.  The Court disagrees.  MPT has responded adequately with evidence from Girod's testimony that presents a material question of fact regarding whether the accused products infringe the asserted claims.  His declaration offers an analysis of the structure and function of the accused products sufficient to survive summary judgment.  Girod bases his infringement analysis both on the implications of compliance with the standard and on review of the product source code as applied to the Court's construction.  (See, e.g., Girod Decl. at 50 (asserting, after review of both the standard and the product's source code, that "a computer with the MPEG-2 Decoder installed contains structure that performs the claimed function of "producing an adaptive motion compensated estimate . . . .").)

The Court recognizes that standards compliance is not necessarily equivalent to

an infringement analysis for claims under section 112 ¶ 6.  Nevertheless, analysis of standards implemented by a product may be relevant to infringement and provide support for the patentee's position, provided that standards compliance does not replace the ultimate legal standard for infringement.  The parties do not dispute that the accused software complies with these standards.  Microsoft only concedes, however, that the standards specify the syntax of a bit stream that a decoder must be able to decode.  Microsoft disputes whether compliance with the standards requires implementation by a particular type of hardware or software.  Nevertheless, MPT presents a material question of fact regarding infringement of claims 13 and 15, based on more than just compliance with the standards, and summary judgment of noninfringement is therefore inappropriate.

Finally, the Court also notes that to the extent that Microsoft's motion may be construed as an objection to the admissibility of Girod's expert testimony under Federal Rule of Evidence 702, it has reviewed the motion and found no reason to exclude Girod's testimony at this time.  As a result, the Court DENIES Microsoft's motion for summary adjudication that not any and every MPEG-2 or VC-1 decoder is structurally equivalent.

## 2.   Anticipation

An anticipation defense under 35 U.S.C. § 102 requires clear and convincing evidence that a single prior-art reference discloses all limitations of a claim.  See, e.g., Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004); Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1188-89 (Fed. Cir. 2002).  Anticipation is typically established by one skilled in the art who must "identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315 (Fed. Cir. 2002).  Such testimony cannot be merely conclusory.  Id. at 1315-16.  It is not the task of the district court "to attempt to interpret confusing or general testimony to determine whether a

case of invalidity has been made out, particularly at the summary judgment stage." <u>Id.</u> at 1316.

MPT meets its initial burden under <u>Celetox</u> to point out a lack of supporting evidence from Microsoft, which bears the burden of persuasion on this affirmative defense. <u>Celotex Corp.</u>, 477 U.S. at 325. In particular, MPT points out that Microsoft's expert report does not delineate how any single prior art reference discloses all limitations of the claim. Under <u>Celotex</u>, Microsoft must come forward with evidence sufficient to support a defense of anticipation, but it fails to do so.

Microsoft first attempts to apply its structural equivalence argument regarding MPEG-2 and VC-1 decoders in this context, arguing that if any MPEG-2 or VC-1 decoder infringes the claims, as MPT argues, then certain prior art references render the patents invalid. Jerry Gibson, Microsoft's expert, opines that "if MPT is permitted to disregard the specific structures identified by the Court in order to read claims 13 and 15 on the accused decoders, it is my opinion . . . that claims 13 and 15 are invalid." (Decl. John E. Gartman Supp. Microsoft's Opp'n Plfs.' Mots. Summ. J. ("Gartman Opp'n Decl.") Ex. I-1 ("Gibson Report") at 48-49.) The premise of this argument is inconsistent with the Court's claim construction.

Gibson does not identify how a single prior art reference discloses all elements of either claim. Gibson only cites to prior art setting forth some but not all elements, or makes conclusory statements regarding anticipation. For example, he contends that: (1) U.S. Patent No. 5,093,070 discloses the structure for adaptive motion compensated decoding; (2) U.S. Patent No. 4,710,810 discloses the structure for differential encoding and decoding of motion vectors; (3) two articles by inventor Puri disclose the structure for variable block size decision making; (4) U.S. Patent No. 5,428,693 discloses the structure for motion compensated predictive coding; (5) U.S. Patent No. 5,539,466 describes adaptive motion compensation and a prediction mode signal. (<u>See</u> Gibson Report 21, 33-34, 36, 38-39, 40-41 (analyzing prior art); Gartman Opp'n Decl Exs. I-2 to I-6 (copies of alleged prior art).) Gibson also analyzes specific claim

limitations and argues that they are disclosed by certain prior art references.  (See, e.g., Gibson Report 49-50 (arguing that the limitation of "selectively and adaptively performing motion compensated decoding . . ." is shown in prior art including "DigiCipher Description," "Columbia 91/131 Submission," "Ericsson 1985 Article," U.S. Patent Nos. 5,428,693 and 5,539,466, and "numerous MPEG submissions").  Nevertheless, Microsoft fails to indicate any analysis in which its expert lays out precisely how any one of these references discloses all the limitations of either claim.

Microsoft argues that Gibson's invocation of U.S. Patent No. 5,091,782 ("the Krause patent") is sufficient because that patent incorporates a 1985 Ericsson article by reference which, Gibson argues, anticipate the claims in combination if viewed as a single reference.  Even assuming that the Krause patent and Ericsson article may be considered a single reference, the cited portion of Gibson's analysis makes only generalized statements.  He fails to set forth how the combined references would disclose every claim element.  (See Gibson Report 14-20.)

Microsoft also attempts to rely on statements by Plaintiffs' expert Girod, but the Court concludes that Microsoft fails to present a question of fact based on Girod's testimony.  Even if Girod's testimony concedes that certain limitations are present in the prior art, as Microsoft argues, it has not explained how Girod's testimony establishes that every limitation was present in a single reference.

Finally, Microsoft argues that it can make an anticipation defense through fact witnesses in lieu of expert testimony, citing Lacks Indus. Inc. v. McKechnie Vehicle Components USA, Inc., 322 F.3d 1335, 1348-51 (Fed. Cir. 2003).  This does not change the fact, however, that it must put forward some specific evidence at this point sufficient to establish its defense, not merely conclusory or generalized assertions about the availability of evidence.  See Celotex Corp., 477 U.S. at 325.  Accordingly, the Court GRANTS Plaintiffs' motion for summary judgment that the Puri '878 patent is not invalid due to anticipation.

/ / /

### 3.    Obviousness

"The ultimate judgment of obviousness is a legal determination," and summary judgment may be appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors."  KSR Int'l Co. v. Teleflex Inc., 550 U.S. ___, 127 S.Ct. 1727, 1745-46 (2007) (citing Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966)).  Courts also consider secondary factors, including "'commercial success, long felt but unsolved needs, failure of others, etc.'" which may dislodge a determination of obviousness.  Id. at 1734 (quoting Graham, 353 U.S. at 17-18.)  District courts weigh expert testimony to determine if there is an open question of fact, though a merely conclusory affidavit will not preclude summary judgment.  See id. at 1745-46.

In KSR, the Supreme Court rejected a rigid application of the Federal Circuit's "teaching, suggestion, or motivation" test.  See KSR Int'l Co., 127 S.Ct. at 1734 (citing Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323-24 (Fed. Cir. 1999), as an example of this test).  Under this test, proof of obviousness required some teaching, suggestion, or motivation "found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art."  Id.  The Court determined that while "teaching, suggestion, or motivation" had "captured a helpful insight" into obviousness, it was incompatible with Supreme Court precedent when applied in a rigid and mandatory fashion.  Id. at 1741.  The Supreme Court observed that other more recent Federal Circuit decisions reflected a broader approach that may be consistent with its opinions.  Id. at 1743 (citing DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co., 464 F.3d 1356, 1367 (Fed. Cir. 2006); Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1291 (Fed. Cir. 2006)).

When determining obviousness, "neither the particular motivation nor the avowed purpose of the patentee controls."  KSR Int'l Co., 127 S.Ct. at 1741-42.  Instead, courts should determine whether the "objective reach of the claim"

encompasses obvious subject matter. Id. at 1742. This may include "noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." Id. "[T]he results of ordinary innovation are not the subject of exclusive rights under the patent laws." Id. at 1746. However, courts must avoid "falling prey to hindsight bias," "*ex post* reasoning," and "[r]igid preventative rules that deny factfinders recourse to common sense." Id. at 1742-43. Furthermore, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." Id. at 1740.

"A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR Int'l Co., 127 S.Ct. at 1740. A combination is likely nonobvious if the elements work together "in an unexpected and fruitful manner." Id. at 1740. In contrast, a patent is likely to be obvious if it merely yields a predictable result by substituting one element for another known in the field. Id.

An issued patent is presumed valid, so the burden of persuasion for invalidity defenses, including obviousness, is one of clear and convincing evidence  See, e.g., Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1355 (Fed. Cir. 2007); Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

Unlike anticipation, where a single reference must disclose all claim elements, a party asserting obviousness may rely on the prior art as a whole.  As with anticipation, Microsoft's expert offers numerous arguments that various elements of the Puri '878 patent were present in the prior art.  For example, he contends that: (1) U.S. Patent No. 5,093,070 discloses the structure for adaptive motion compensated decoding; (2) U.S. Patent No. 4,710,810 discloses the structure for differential encoding and decoding of motion vectors; (3) two articles by inventor Puri  disclose the structure for variable block size decision making; (4) U.S. Patent No. 5,428,693 discloses the structure for motion compensated predictive coding; (5) U.S. Patent No.

5,539,466 describes adaptive motion compensation and a prediction mode signal. (See Gibson Report 21, 33-34, 36, 38-39, 40-41 (analyzing prior art); Gartman Opp'n Decl Exs. I-2 to I-6 (copies of alleged prior art).) Gibson also analyzes specific claim limitations and argues that they are disclosed by certain prior art references. (See, e.g., Gibson Report 49-50 (arguing that the limitation of "selectively and adaptively performing motion compensated decoding . . ." is shown in prior art including "DigiCipher Description," "Columbia 91/131 Submission," "Ericsson 1985 Article," U.S. Patent Nos. 5,428,693 and 5,539,466, and "numerous MPEG submissions").

Gibson also asserts the Krause patent and Ericsson article. Unlike the anticipation context, the Court concludes that these references present a material question of fact on obviousness. The examiner initially rejected claims 13 and 15 as anticipated in light of the Krause patent. (See Gibson Report 14–17.) The applicants amended the second means plus function element of claim 13 as follows:

> a means response to a <u>motion compensation</u> [coding] type signal for selectively <u>and adaptively performing motion compensated</u> decoding <u>of</u> frames of the compressed digital video bit stream and fields of the compressed video bit stream.[3]

(Gartman Opp'n Decl. Ex. III-2 at CCMS_311949.) Microsoft argues that these additions of "motion [compensation/compensated]" and "adaptively" would have been obvious in light of other references. Gibson argues the Ericsson article describes a method for using motion compensation in an adaptive prediction scheme, thus rendering these modifications obvious. (See Gibson Report at 18.) The Court concludes that this evidence presents triable issues of fact on obviousness and DENIES Plaintiffs' motion that the Puri '878 patent is not invalid for reasons of obviousness. By providing these examples the Court does not limit Microsoft's ability to raise other prior art or other theories of obviousness.

/ / /

/ / /

---

[3]The amendment added the underlined text and removed the bracketed text.

### C.    Conception Date of Puri '878

Microsoft moves the Court for summary adjudication that the inventors of the Puri '878 patent conceived claims 13 and 15 no earlier than September 30, 1991. Microsoft clearly seeks this adjudication in relation to invalidity arguments, such as alleged anticipation under section 102(a).  Microsoft retains the burden of persuasion for invalidity.  In <u>Mahurkur v. C.R. Bard, Inc.</u>, 79 F.3d 1572 (Fed. Cir. 1996), the Federal Circuit clarified the allocation of burdens where the alleged infringer challenges the validity of a patent and the patentee seeks to avoid prior art by establishing an invention date earlier than the patent filing date.  The patentee has the burden of producing evidence showing an earlier invention date. <u>Id</u>. at 1576-77.  If the patentee fails to meet this burden, the patent's filing date is treated as the invention date. <u>Id</u>. at 1577.  If the patentee satisfies the burden of production, however, the alleged infringer still has the usual burden of persuasion for invalidity, namely clear and convincing evidence.  <u>Id</u>. 1577-78.[4]

Conception is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." <u>Hybridtech Inc. v. Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367, 1376 (Fed. Cir. 1986).  Conception is complete once "only ordinary skill could reduce it to practice, without extensive research or experimentation." <u>Burroughs Wellcome Co. v. Barr Labs., Inc.</u>, 40 F.3d 1223, 1228 (Fed. Cir. 1994).  Proof of conception requires corroborating evidence, to which Courts apply a "rule of reason" that examines "all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached." <u>Coleman v. Dines</u>, 754 F.2d 353, 360 (Fed. Cir. 1985).  "There is no particular formula that an inventor must follow in providing corroboration of his testimony of conception." <u>Singh v. Brake</u>, 222 F.3d 1362, 1367 (Fed. Cir. 2000).  This may include consideration of circumstantial evidence.  <u>Sandt Tech., Ltd. v. Resco</u>

---

[4]The unpublished cases cited by Microsoft for shifting the burden of persuasion either predate <u>Mahurkur</u> or make no reference to it.

Metal and Plastics Corp., 264 F.3d 1344, 1351 (Fed. Cir. 2001).

Applying these principles, the Court examines whether Plaintiffs have met their burden of production for evidence of conception prior to the filing date of November 15, 1991, including adequate corroboration. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that they have produced evidence sufficient to raise a triable issue of fact regarding whether conception occurred prior to Microsoft's proposed cut-off date of September 30, 1991.

Plaintiffs submit Appendix A to Puri '878 as a sample segment of source code implementing the invention, with "Sept 1991" entered in its initial comment field. (Puri '878 cols. 31-88). Inventor Puri testified that this code represented a "snapshot" of code, meaning that it was complete and functional. (Decl. Ephraim Starr Opp'n Microsoft's Mot. Partial Summ. J. Claims of Puri '878 Conceived No Earlier Than Sept. 30, 1991 Ex. A ("Puri Depo. Tr.") 309:4-310:14.) Puri further testified that writing such code was the second phase in a two-step process consisting of a research and development phase and an implementation phase. (Puri Depo. Tr. 310:16-311:11.) Puri estimated the length of the implementation phase at six months. (Puri Depo. Tr. 311:13-23.) The complexity of the code used to implementing the patent corroborates Puri's testimony of the need for an implementation phase following research and development.

Other documents and testimony, viewed in the light most favorable to Plaintiffs, also corroborate Puri's version of events. Plaintiffs' expert, Girod, also asserts that a six month implementation period is reasonable in light of the complexity of the code. (Decl. Bernd Girod Opp'n Microsoft's Mot. Summ. J. Claims 13 and 15 Conceived No Earlier Than Sept. 30, 1991 ¶ 7.) In November, 1991, Puri submitted, to an ISO standardization working group, an MPEG-2 video coding proposal containing elements, such as frame and field motion compensation, related to the invention. (Decl. Atul Puri Opp'n Microsoft's Mot. Summ. J. Claims 13 and 15 Conceived No Earlier Than Sept. 30, 1991 ("Puri Decl.") Ex. A.) Puri submitted another related proposal to

ISO in May, 1991. (Puri Decl. Ex. E.) On February 11, 1991, Puri and co-inventor Aravind produced research reports for the period of October, 1990, to January, 1991, which describe working on coding research related to MPEG-2. (Puri Decl. Exs. B-C.) Plaintiffs also submitted an internal AT&T document dated May 10, 1991, describing "[a] subset of ideas that could be tested for MPEG-2." This evidence, combined with the complexity of the code itself, presents a sufficient question of fact for the jury to consider whether the inventors conceived the patented invention prior to September 30, 1991. For these reasons, the Court DENIES Microsoft's motion for summary adjudication that the inventors conceived claims 13 and 15 of the Puri '878 patent no earlier than September 30, 1991, as there are triable issues of material fact.

### D.    Microsoft's Affirmative Defenses and Counterclaims

#### 1.    Laches

Microsoft asserts two distinct theories of laches: (1) "prosecution laches," resulting from unreasonable delay in prosecuting a patent, and (2) "traditional laches," resulting from unreasonable delay in bringing suit.

Prosecution laches is an equitable doctrine with origins in two Supreme Court cases from the 1920s. See Webster Electric Co. v. Splitdorf Elec. Co., 264 U.S. 463 (1924); Woodbridge v. United States, 263 U.S. 50 (1923); see also Symbol Techs., Inc. v. Lemelson Medical, Educ. & Research Found., 277 F.3d 1361, 1364 (Fed. Cir. 2002) ("Symbol Techs., Inc. I") (summarizing these cases). In both cases, the Supreme Court concluded that patentees were barred from enforcing claims secured after an unreasonable delay in prosecuting applications. Symbol Techs., Inc. I, 277 F.3d at 1364. Later, the Court expanded the prosecution laches defense to actions "involving new claims issuing from divisional or continuing applications that prejudice intervening adverse public rights." Id. at 1364-65 (discussing Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159 (1938); Gen. Talking Pictures Corp. v. W. Elec. Co., 304 U.S. 175 (1938)). A Court may apply prosecution laches even though the applicant complied with pertinent statutes and rules, provided that the delay was

unreasonable.  See id. at 1363-66

Microsoft cites no case, however, in which the courts have applied prosecution laches to an alleged delay in seeking a certificate of correction.  It points to Southwest Software, Inc. v. Harlequin, Inc., 226 F.3d 1280, 1296 (Fed. Cir. 2000) where the Federal Circuit observed that "it does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction."  The Federal Circuit made that observation, however, in holding that a certificate of correction does not have retroactive effect to causes of action arising before its issuance.  Id. at 1294-96.  The cases from which the prosecution laches defense originates all involved delays in the application process, not delays in seeking corrections.  See Symbol Techs., Inc. I, 277 F.3d at 1363-66.  Prosecution laches is only for "egregious cases of misuse of the statutory patent system."  See Symbol Techs., Inc. v. Lemelson Medical, Educ. & Research Found., 422 F.3d 1378, 1385 (Fed. Cir. 2005).  Delaying a certificate of correction does not change the term of a patent, thus avoiding the concern identified in Woodbridge that an inventor would "unduly . . . postpone the time when the public could enjoy the free use of the invention."  Woodbridge, 263 U.S. at 60.

The Court declines to extend prosecution laches beyond the existing precedent.  In doing so, the Court does not completely foreclose Microsoft's ability to assert the delay in correcting the patent when defending MPT's claims.  As the Federal Circuit explained Southwest Software, Inc., recipients of certificates of correction are limited by their inability to apply the corrected patent to causes of action arising before the certificate of correction.  See Southwest Software, Inc., 226 F.3d at 1294-96.

Furthermore, the Court concludes that other defenses premised at least in part on the delay, including traditional laches, survive summary judgment.  The Federal Circuit has described the traditional laches defense as follows:

> Laches may be defined generally as "slackness or carelessness toward duty or opportunity."  In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to

the adverse party and operates as an equitable bar. "[Laches] exacts of the plaintiff no more than fair dealing with his adversary." In refusing to enforce a patentee's claim of infringement, the Supreme Court invoked the maxim: "Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them."

A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (citations omitted). The application of laches is within the discretion of the district court, and it should be determined in a flexible manner without mechanical rules. Id. at 1032. This discretion notwithstanding, the defendant must prove two factors: (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) "the delay operated to the prejudice or injury of the defendant." Id.

In support of traditional laches Microsoft points to: (1) Plaintiffs' 12-year delay in seeking a certificate of correction, (2) Plaintiffs' delay in bringing suit against Microsoft, and (3) prejudice due to investment made during the period of time when the asserted claims were invalid and due to the cost associated in converting its products to avoid the corrected patent. Plaintiffs counter that the delay should be measured from the date they knew or should have known of the infringement, not the date the patent issued, and that the delay in seeking the certificate is irrelevant to this determination. At least in this context, the parties did not dispute that Microsoft offers sufficient evidence of prejudice.

Under A.C. Aukerman Co., Microsoft must establish a delay in filing suit, not merely a delay in seeking the correction, that was unreasonable and inexcusable as measured from when Plaintiffs knew or should have known of their claims. See id. at 1032. Nevertheless, given the equitable nature of laches, the Court may consider Plaintiffs' delay in seeking a certificate of correction as a factor relevant to applying the laches defense.

The facts are sufficient for Microsoft's traditional laches defense to survive summary judgment. There is no dispute that Plaintiffs did not seek a certificate of

correction from the PTO until approximately 12 years after the patent issued.  There is evidence that Lucent should have been aware of the error as early as 1996, and perhaps as early as the issuance of the patent.  Specifically, Microsoft offers evidence that Lucent obtained an analysis of claim 13 as it relates to the MPEG-2 standard as early as October 31, 1996.  (See Gartman Opp'n Decl. Ex. III-6 (letter from attorney Kenneth Rubenstein to Lucent's Intellectual Property Division Manager).)  Former Commissioner of Patents and Trademarks Gerald Mossinghoff opines that any such analysis should have uncovered the missing words of claim 13.  (Id. Ex. III-5 ¶ 33.) He also observes that, in general, "sophisticated patent-acquiring entities proofread granted U.S. patents against the prosecution history . . . ." (Id. ¶ 32.) Lucent attempted to assert the patent in its uncorrected form, and those infringement claims were pending for approximately two years before this Court.

Microsoft also offers evidence that Lucent actively asserted claim 13 in licensing negotiations as early as 2002 and was informed of the error in the claim language during the prior litigation.  The evidence of licensing negotiations includes presentations made for Apple Computer, eMachines, and Terayon Networks. (See Gartman Opp'n Decl. Exs. III-7 to III-9.) Defense counsel informed Lucent of the error both in correspondence from February, 2003, and statements in the Court's record from July, 2005.  (See Gartman Opp'n Decl. Exs. III-10 to III-11.)

Lucent obtained its certificate of correction on October 25, 2005, and it cannot seek damages for infringement before this date.  It brought the present suit on March 28, 2006.   The delay from the earliest possible cause of action is therefore approximately five months.  In light of the circumstances of this case, even this delay might be considered unreasonable.  Furthermore, any ultimate determination about availability of traditional laches would be better founded on a more extensive record as developed at trial.  The Court therefore GRANTS IN PART AND DENIES IN PART Plaintiffs' motion with respect to the laches defense.  Microsoft's traditional laches defense survives summary judgment, but its prosecution laches defense does

1  not.

2  ## 2. License

3  The Court previously rejected Microsoft's license defense in a related case

4  involving the same facts surrounding to the creation of MPT and assignment of patents

5  from Lucent to MPT. (See Order Granting Part Denying Part Parties' Mots. Summ. J.

6  Regarding Defs.' Affirmative Defenses and Countercls., Case No. 02-CV-2060, Doc.

7  No. 2109 at 4-12; Order Denying Defs.' Mots. Summ J. Granting Part Denying Part

8  Lucent's Mot. Summ. J. Trust-Related Claims Defenses, Case No. 07-CV-2000, Doc.

9  No. 282 at 4-5.) Microsoft concedes that it only raises these arguments to preserve any

10  rights it may have for an appeal. Accordingly, the Court adopts the rationale of its

11  prior order and GRANTS Plaintiffs' motion with respect to Microsoft's defense of

12  license.

13  ## 3. Equitable Estoppel

14  To bar a patent infringement suit, the defense of equitable estoppel requires three

15  elements: "1) the patentee, through misleading conduct, leads the alleged infringer to

16  reasonably infer that the patentee does not intend to enforce its patent against the

17  alleged infringer, 2) the alleged infringer relies on that conduct, and 3) due to its

18  reliance, the alleged infringer will be materially prejudiced if the patentee is allowed

19  to proceed with its claim." Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1371 (Fed.

20  Cir. 2001). Microsoft offers three theories of equitable estoppel, two of which the

21  Court previously rejected: (1) Lucent's failure to license its patents to MPEG LA

22  despite an alleged commitment to do so, and (2) Lucent's alleged attempt to defraud

23  Microsoft through the formation of MPT and assignment of patents to MPT.

24  (See Order Granting Part Denying Part Parties' Mots. Summ. J. Regarding Defs.'

25  Affirmative Defenses and Countercls., Case No. 02-CV-2060, Doc. No. 2109 at 4-12;

26  Order Denying Defs.' Mots. Summ J. Granting Part Denying Part Lucent's Mot. Summ.

27  J. Trust-Related Claims Defenses, Case No. 07-CV-2000, Doc. No. 282 at 4-5.) Based

28  on its prior orders, the Court rejects these theories.

1    Microsoft also raises Plaintiffs' delay in seeking a certificate of correction,

2    incorporating by reference the arguments it raised for its laches defense.  The parties'

3    dispute focuses on whether Microsoft relied to its detriment on the delay in seeking a

4    certificate of correction, and at least for the present purposes, MPT does not challenge

5    the first element of whether the conduct was misleading.  The Court concludes that

6    Microsoft has introduced evidence of reliance sufficient to create triable issues of

7    material fact.  There is no dispute that Microsoft invested substantial amounts in its

8    development of the products at issue here, including the Windows Vista operating

9    system, and the Xbox 360 game console.  Microsoft's investment took place, at least

10   in part, during a period when the Puri '878 was invalid due to indefiniteness, as the

11   Court previously determined.  Microsoft implemented MPEG-2 and VC-1 features in

12   these products based on its analysis of the market and the relevant patents as they

13   existed at that time.  There is a triable issue of whether Microsoft relied to its detriment

14   by making these investments to implement features that allegedly fall within the scope

15   of the corrected patent.  Accordingly, the Court DENIES Plaintiffs' motion with

16   respect to Microsoft's equitable estoppel defense.

17              **4.    Implied License**

18       An implied license may arise "by equitable estoppel, acquiescence, conduct, or

19   legal estoppel."  Windbond Elecs. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1374

20   (Fed. Cir. 2001).  The parties' briefs only address the theory of implied license by

21   equitable estoppel, and the Court understands that this is the only theory of implied

22   license offered.  An implied license by equitable estoppel has three elements, which are

23   similar but not identical to the more general defense of equitable estoppel discussed

24   above: "(1) the patentee, through statements or conduct, gave an affirmative grant of

25   consent or permission to make, use, or sell to the alleged infringer; (2) the alleged

26   infringer relied on that statement or conduct; and (3) the alleged infringer would,

27   therefore, be materially prejudiced if the patentee is allowed to proceed with its claim."

28   Id.

1    With respect to implied license, Microsoft merely incorporates its equitable

2  estoppel arguments by reference.  These are not identical defenses, however.  Implied

3  license by equitable estoppel requires some "affirmative grant of consent or permission

4  . . . ."  Id.  Equitable estoppel, in general, is broader and requires only some

5  "misleading conduct."  Ecolab, Inc. v. Envirochem, Inc., 264 F.3d at 1371.  The only

6  Microsoft theory not precluded by the Court's prior orders is its assertion of Plaintiffs'

7  conduct in failing to obtain a certificate of correction in a timely fashion.  The failure

8  to obtain a timely certificate of correction does not constitute an affirmative grant of

9  consent.  Therefore, the Court GRANTS Plaintiffs' motion with respect to the defense

10  of implied license.

11       **5.    Waiver**

12    The Court previously rejected two of Microsoft's grounds for its waiver defense:

13  (1) Lucent's conduct in MPEG standardization activities, and (2) the formation of the

14  MPEG LA patent pool.  (Order on Lucent's Mot. Summ. Adjudications Regarding U.S.

15  Patent No. 4,701,954, Case No. 02-CV-2060, Doc. No. 844 at 8-9.)[5]   Microsoft

16  concedes that it only raises these arguments to preserve any rights it may have for an

17  appeal, and the Court need not entertain further litigation on these issues.

18    Microsoft also raises a third theory of waiver unique to this case, namely, that

19  Lucent's delay in seeking a certificate of correction represented a conscious decision

20  sufficient to support a waiver defense.  The Court disagrees.  To establish the defense

21  of waiver, a party must make a clear showing of intent to waive that right.  See, e.g.,

22  Prieto v. Paul Revere Life Ins. Co., 354 F.3d 1005, 1013 n.12 (9th Cir. 2004).  Delay

23  in seeking a certificate of correction, in these circumstances, does not clearly establish

24  an intent to waive rights in the patent.  Accordingly, the Court GRANTS Plaintiffs'

25  motion with respect to the waiver defense.

26  / / /

27

28

_____

[5]Microsoft concedes that this order involved substantially the same facts and law, though it involved a different patent.  (See Microsoft's Opp'n Plfs.' Mots. Summ. J. at 21 n.14.)

### 6. Exhaustion

The Court previously rejected the premise of Microsoft's exhaustion defense in a related case involving the same facts surrounding to the creation of MPT and assignment of patents from Lucent to MPT. (See Order Granting Part Denying Part Parties' Mots. Summ. J. Regarding Defs.' Affirmative Defenses and Countercls., Case No. 02-CV-2060, Doc. No. 2109 at 4-12; Order Denying Defs.' Mots. Summ J. Granting Part Denying Part Lucent's Mot. Summ. J. Trust-Related Claims Defenses, Case No. 07-CV-2000, Doc. No. 282 at 4-5)  Microsoft concedes that it only raises these arguments to preserve any rights it may have for an appeal.  Accordingly, the Court adopts the rationale of its prior order and GRANTS Plaintiffs' motion with respect to Microsoft's exhaustion defense.

### 7. Unclean Hands

The equitable defense of unclean hands requires that "some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."  Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933).  Because of the "far-reaching social and economic consequences of a patent," a court may consider both public and private standards of equity in patent cases.  See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 816 (1945).  Conduct creating unclean hands includes a "willful act concerning the cause of action" or "bad faith relative to the matter".  See id. 814-15 (1945)  "Bad intent is the essence of unclean hands," and a merely negligent action is insufficient.  See Dollar Sys. v. Avcar Leasing Sys., 890 F.2d 165, 173 (9th Cir. 1989).

The parties discuss four theories of unclean hands brought by Microsoft: (1) Lucent fraudulently and intentionally withheld prior-art references during the prosecution of the Puri '878 patent, (2) Lucent attempted to defraud Microsoft through the creation of Multimedia Patent Trust, (3) Lucent fraudulently created the impression it would join MPEG LA, (4) MPT and its predecessors knew of the errors in claim 13 but failed to act to correct them in a reasonable period of time.

MPT's motion does not address the first of these theories, based on alleged withholding of prior art, so the Court does not reach it.  The Court's previous summary judgment rulings exclude the next theory, based on circumstances surrounding the creation of MPT, and the Court continues to apply its prior reasoning.  (See Order Granting Part Denying Part Parties' Mots. Summ. J. Regarding Defs.' Affirmative Defenses and Countercls., Case No. 02-CV-2060, Doc. No. 2109 at 4-15; Order Denying Defs.' Mots. Summ J. Granting Part Denying Part Lucent's Mot. Summ. J. Trust-Related Claims Defenses, Case No. 07-CV-2000, Doc. No. 282 at 4-7.) Furthermore, the third theory, relying on the alleged creation of a false impression that Lucent would joint MPEG LA, essentially recasts other arguments regarding the formation of MPT that the Court already rejected in its prior orders.

As to the final theory, regarding delay in correcting the patent, MPT argues that Microsoft's theory is at best one of negligence and therefore insufficient to establish an unclean hands defense.  In response, Microsoft asserts that Plaintiffs' conduct was more than merely negligent and that Lucent and MPT intentionally delayed seeking any correction to the patent.  Viewed in a light most favorable to Microsoft, the evidence is enough to survive summary judgment.

Accordingly, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion regarding the unclean hands defense.  The Court DENIES the motion with respect to Microsoft's theory regarding a knowing delay in seeking the certificate of correction.  The Court GRANTS the motion in all other respects.

### 8.    Patent Misuse

In general, patent misuse requires that "the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 868 (Fed. Cir. 1997). To evaluate patent misuse, a Court looks to see whether the alleged conduct is either patent misuse *per se*, based on prior precedent, or excluded from patent misuse under 35 U.S.C. § 271(d). Id. at 868-69. If neither of these categories applies, the Court next

examines whether the practice is either: (1) "reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims," in which case it cannot constitute patent misuse;  or (2) whether the practice "has the effect of extending the patentee's statutory rights . . . with an anti-competitive effect," in which case it can.  Id. at 869.  In the later case, courts must still apply the "rule of reason" to determine "whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  Id.  (quoting State Oil Co. v. Kahn, 522 U.S. 3 (1997)).  The Federal Circuit reversed a district court's use of jury instructions which permitted a finding of patent misuse based on merely "wrongful" enforcement of the patent.  C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1373 (Fed. Cir. 1998).

Microsoft offers four theories of patent misuse.  The Court already rejected the first, involving allegedly improper tying through package licenses.  (Order on Lucent's Mot. Summ. Adjudications Regarding U.S. Patent No. 4,701,954, Case No. 02-CV-2060, Doc. No. 844 at 9-10.)[6]  The Court continues to apply the reasoning of its prior order.

Microsoft next relies on Lucent's attempts to "force" Microsoft to license the patent for MPEG-2 applications even though, it argues, the Puri '878 is not essential to the standard.  Here, Microsoft focuses on Lucent's actions to seek and obtain an opinion from MPEG LA, which manages a pool of MPEG-2 patents, that the Puri '878 patent was essential to the MPEG-2 standard.  (See Gartman Opp'n Decl. Ex. III-6.) The opinion relied on the uncorrected version of the patent.  (Id.)  Microsoft offers two other theories related to the certificate correction.  First, that it was patent misuse to delay requesting the certificate of correction, and second, that it was patent misuse to continue asserting the Puri '878 patent after this Court ruled it invalid based on the

---

[6]Microsoft concedes that this order involved substantially the same facts and law, though it involved a different patent.  (See Microsoft's Opp'n Plfs.' Mots. Summ. J. at 23 n.17.)

1   uncorrected PTO error.

2       The Court concludes that these additional theories are insufficient to support

3   patent misuse.  Other than the general characterization of the test from Virginia Panel

4   Corp., Microsoft cites no authority that these particular actions constitute patent

5   misuse.     Furthermore, Microsoft makes largely conclusory allegations of

6   anticompetitive effect.  The Court concludes that, at best, this is precisely the sort of

7   vague characterization of misuse rejected by the Federal Circuit in C.R. Bard.  C.R.

8   Bard, 157 F.3d at 1373.  Accordingly, the Court GRANTS Plaintiffs' motion with

9   respect to Microsoft's defense of patent misuse.

10          **E.     Microsoft's California Section 17200 Claim**

11      The Court recently rejected Microsoft's unfair competition law claim in a

12  related case involving the same alleged misconduct involving the creation of MPT

13  and assignment of patents to MPT.  (See  Order Denying Defs.' Mots. Summ J.

14  Granting Part Denying Part Lucent's Mot. Summ. J. Trust-Related Claims Defenses,

15  Case No. 07-CV-2000, Doc. No. 282 at 5-6.)  There the Court held that Microsoft

16  lacks standing.  The Court also noted that a number of the purportedly misleading

17  statements involved securities transaction or other regulatory matters outside the

18  proper scope of a section 17200 claim.  Microsoft's attempts to distinguish the

19  present circumstances are unpersuasive.

20          **F.     Effect of Certificate of Correction for Puri '878**

21      The parties dispute whether, in these circumstances involving a certificate of

22  correction, Microsoft may assert intervening rights based on 35 U.S.C. § 252, which

23  involves reissues.  Microsoft argues that, due to the certificate of correction, the

24  doctrines of absolute and equitable intervening rights preclude recovery by MPT.  35

25  U.S.C. § 252 defines these two doctrines.  See generally BIC Leisure Pros., Inc. v.

26  Windsurfing Int'l Inc., 1 F.3d 1214, 1220-21 (explaining absolute and equitable

27  intervening rights).  The absolute intervening rights provision provides that "[a]

28  reissued patent shall not abridge or affect the right" to continue activities covered by

the reissued patent unless such activities infringed a valid claim of the original patent.[7] The equitable intervening rights provision provides that the Court "may provide" for continued activity where "substantial preparation was made before the grant of the reissue."[8]  On its face, 35 U.S.C. § 252 only refers to the effect of reissued patents, not certificates of correction.[9]  Microsoft nevertheless seeks to apply the intervening rights doctrines here, due to a change in the patent's scope.

The certificate added a limitation omitted from claim 13 by a PTO error, thus narrowing the scope of the patent.  The PTO issued the certificate pursuant to 35 U.S.C. § 254, which allows the Director to do so "[w]henever a mistake in a patent incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office . . . ."  35 U.S.C. § 251 provides for the reissue of a patent "[w]henever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim

---

[7]The entire provision from 35 U.S.C. § 252 states:

A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

[8]The entire provision from 35 U.S.C. § 252 states:

The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

[9]Congress expressly provided for intervening rights in two other contexts—reexamination and reinstatement after lapse for nonpayment of maintenance fees—thus supporting the argument that Congress intended to only provide intervening rights in those contexts where they are specifically authorized.  See 35 U.S.C. §§ 41(c)(2), 307(b).

. . . ." Microsoft argues, in essence, that although the intervening rights provisions of 35 U.S.C. § 252 do not expressly apply to certificates issued under 35 U.S.C. § 254, the Court should apply them since, like a reissuance under 35 U.S.C. § 251, the certificate changed the scope of a patent that was "through error . . . deemed wholly or partly inoperative or invalid, by reasons of a defective specification." 35 U.S.C. § 251.

The Federal Circuit does not appear to have addressed this question directly. A similar question reached the Third Circuit before formation of the Federal Circuit. In Eagle Iron Works v. McLanahan Corp., 429 F.2d 1375 (3d Cir. 1970), the alleged infringer argued that a certificate of correction pursuant to 35 U.S.C. § 255 should be treated as a reissuance since it allegedly altered the scope of the patent, thus making intervening rights available.[10]  The court stated that 35 U.S.C. § 255 did not authorize changes to a patent's scope and that "[w]here there is a change altering the scope of a patent, 35 U.S.C. § 252, regulating reissued patents, controls and under it intervening rights may be achieved." Id. at 1383.

There are several problems applying Eagle Iron Works here. First, 35 U.S.C. § 254 does not expressly limit the types of mistakes to the "clerical," "typographical," or "minor" variety, as in 35 U.S.C. § 255, which the court considered in Eagle Iron Works. Instead, 35 U.S.C. § 254 requires that the error be clearly disclosed by the PTO's records. Second, the Third Circuit ultimately concluded that the certificate of correction did not alter the scope of the patent, so this analysis was not essential to its holding. Eagle Iron Works, 429 F.2d at 1387. Third, Eagle Iron Works, is at most persuasive authority. See Southwest Software, Inc. v. Harelquin, Inc., 226 F.3d 1280, 1296-97 (Fed. Cir. 2000).[11]  Fourth, the Federal Circuit undermined Eagle Iron Works'

---

[10]Section 255 provides for correction of "a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent and Trademark Office," when the patentee shows that the mistake "occurred in good faith."

[11]In Southwest Software, Inc., the Federal Circuit rejected an argument that Eagle Iron Works should allow a certificate of correction under section 254 to be effective in a lawsuit brought before the certificate of correction issued. Southwest Software, Inc., 226 F.3d at 1296-97 (noting that Eagle Iron Works was not binding and declining to accept it as persuasive). The parties do not dispute that the certificate of correction applies only to causes of action arising after it issued.

premise that a certificate of correction cannot broaden a patent's scope, indicating that a certificate of correction under 35 U.S.C. § 255 may provide a broadening construction under some circumstances. See Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1372-73 (Fed. Cir. 2001) (stating that "[w]e interpret 35 U.S.C. § 255 to require that a broadening correction of a clerical or typographical error be allowed only where it is clearly evident from the specification, drawings, and prosecution history how the error should appropriately be corrected" and concluding that certificate of correction improperly broadened scope of patent). Finally, the Federal Circuit eliminated the concern expressed in Eagle Iron Works that a certificate of correction could have retroactive effect, by clarifying that certificates are only effective for causes of action after their issuance. See Southwest Software, Inc., 226 F.3d at 1293-97.

Given the lack of any controlling authority clearly authorizing the application of intervening rights to certificates of correction, and the plain language of the statute which only applies these rights to reissued patents, the Court declines to extend the intervening rights doctrines to this case. See, e.g., Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 ("We have have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"). Accordingly, the Court DENIES Microsoft's motion regarding the preclusive effect of the certificate of correction.

## G.    Alleged Failure to Provide Notice Prior to January 6, 2006

Microsoft moves for summary judgment that MPT cannot recover damages for alleged infringement prior to January 6, 2006, based on a failure to mark or provide notice of the patent. Here, Microsoft attempts to rely on a technical distinction that ignores the realities of this litigation. It argues that Plaintiffs must provide actual notice of infringement under 35 U.S.C. § 287(a) because they did not mark products covered by the Puri '878 patent. See Amsted Indus. Inc. v. Buckeye Steel Casings Co.,

24 F.3d 178, 187 (Fed. Cir. 1994).  The patentee must communicate "a specific charge of infringement by a specific accused product or device."  Id.  Microsoft interprets this as requiring a specific charge identifying the precise claims after the certificate of correction issued.  In their view, Plaintiffs provided no notice until January 6, 2006, when Lucent's counsel sent a letter to Microsoft's counsel regarding infringement of the patent as corrected.  (See Decl. John E. Garman Supp. Mot. Summ. J. MPT Can Recover No Damages Prior to Jan. 6, 2006 Ex. 4.)  Microsoft does not point to sufficient authority requiring that actual notice must communicate the precise claim language at issue.  Indeed, Amsted focused on the need to provide notice of infringement by a specific accused product, but nowhere did it require notice to precisely delineate every claim at issue.  See id. at 187-88.

Viewing the overall circumstances of the litigation involving these parties, there can be no doubt that Microsoft had actual notice of the charge of infringement raised here.  Microsoft and Lucent had already engaged in litigation over the Puri '878 patent in which Lucent attempted to proceed with infringement claims by having the Court order a correction of the patent.  Therefore, even if specific notice of the corrected claim language were required, the litigation between the parties provided Microsoft with actual notice of the correction.  Accordingly, the Court DENIES Microsoft's motion for summary judgment that MPT can recover no damages prior to January 6, 2006, due to a failure to mark or give notice.

### H.    Entire Market Value Rule and Accused Products

#### 1.    Legal Standard

The entire market value rule considers whether a patentee may recover damages based on the value of an entire apparatus containing several features, not all covered by the patent.  It applies for purposes of both reasonable royalties and lost profits.  See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1549 (Fed. Cir. 1995).  The Federal Circuit has allowed recovery based on the value of an "entire apparatus containing several features when the patent-related feature is the 'basis for customer demand.'"

Id. (quoting State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989)).  The patented and unpatented components must "function together . . . in some manner so as to produce a desired end product or result."  Id. at 1550.  The components "must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit."  Id.

The Federal Circuit has consistently upheld awards based on entire market value where the two elements indicated above were present: (1) sufficient consumer demand based on the patented feature, and (2) integration of the patented and unpatented components into a single functioning unit.  In Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1361 (Fed. Cir. 2001), the court held that the was evidence supporting an award based on the entire value of loudspeakers, although the patent related only to an elliptical port tube that reduced noise and improved bass performance.  The Court pointed to evidence including the infringer's decision to manufacturer and sell certain loudspeakers based on bass performance and the patent owner's efforts to market its loudspeakers based on the benefits of the patented invention.  Id.  Similarly, in Tech Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed. Cir. 1999), the Court upheld an award based on the entire value of radiator and condenser assemblies, though the patents involved only the manufacture of properly-balanced fans for use in the assemblies.  The patentee relied on evidence that the infringer had difficulty meeting customer balance specifications without the patented technology.  Id.  The Federal Circuit has also permitted application of the entire market value rule to a product where a patent only covered an important method of using the product.  Fonar Corp. v. Gen. Elec. Co., 107 F.3d 1543, 1552-53 (Fed. Cir. 1997).  Where a patent covered a method for improving the output of an MRI machine, the Federal Circuit concluded that substantial evidence supported the jury's use of the entire value of the machine, particularly where brochures for the machine touted the value of the improved method. Id; cf. Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374 (Fed. Cir. 2005) (holding that there was insufficient evidence to use value of

entire laundry machine where invention merely differentiated different coins put into the machine).

Microsoft contends that the Court should read the phrase "the basis for consumer demand," as "the [only] basis for consumer demand." A review of the cases like <u>Bose</u>, <u>Tech Air, Inc.</u>, and <u>Fonar Corp.</u> indicates, however, that the Federal Circuit has not strictly required that the feature be the "only" basis for consumer demand. For example, in <u>Tech Air, Inc.</u>, the fan technology provided proper balancing when used in the radiator and condenser assemblies, as desired by customers, but customers no doubt wanted these assemblies for their primary functions as well. <u>Tech Air, Inc.</u>, 192 F.3d at 1362. This is also reflected in the Court's own prior order from this litigation. When concluding that the royalty base for infringing audio encoders could not be based on an entire computer, the Court observed that "the evidence must show that these features were the basis of the customer demand or substantially created the value of the product." (Order on Microsoft's Mots. Judgment Matter Law Lucent's Mot. New Trial Lucent's Mot. Alter Amend Judgment, Case No. 02-CV-2060, Doc. No. 1975 ("Group 2 Post-Trial Order") at 32.)

MPT also argues that, whether or not the entire market value rule applies, it should be able to derive a royalty base using the entire product values using the factors identified in <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Court disagrees. In <u>Imonex Services, Inc.</u>, the Federal Circuit cautioned against allowing this type of argument to circumvent the requirements of the entire market value rule. "Any reliance on the so-called <u>Georgia-Pacific</u> factors, actually a <u>Georgia-Pacific</u> listing, had little or no relation to Imonex's entire-value calculation in different clothing." <u>Imonex Servs., Inc.</u>, 408 F.3d at 1380. Since the Court ultimately concludes that MPT has put forward sufficient evidence under the market value rule, however, this is not fatal to MPT's damages theory.

/ / /

/ / /

### 2. Windows Vista Operating System

MPT accuses Microsoft of infringing via MPEG-2 and VC-1 decoding software included with various version of the Windows Vista computer operating system ("Vista"). Microsoft sells Vista to original equipment manufacturers (OEMs) who install the operating system in personal computers intended for sale. The parties do not appear to dispute that the decoding software permits playback of video files, including video from DVDs and HD DVDs. MPT offers evidence of consumer demand for these features. For example, MPT provides evidence that 58% of consumers have used computers to playback DVDs, and approximately one third of computer users in one study indicated that HD DVD playback was a "must have feature." (Decl. Jennifer Schmidt Supp. MPT's Opp'n Microsoft's Mot. Summ J. Entire Market Value Rule Does Not Apply ("Schmidt Decl.") Ex. 8 at CCMS_178364, CCMS_180304.) Microsoft has used these features in its marketing, including promotions of the home theater capabilities of Vista and the benefits of Vista's media playback capabilities compared to the competing Apple Macintosh OS X operating system. (See, e.g., Schmidt Decl. Ex. 8 at CCMS_156431, CCMS_156773, CCMS_157845.) Viewing MPT's evidence in a light most favorable to it, there are triable issues of fact regarding both whether the decoder software operates as a single functioning unit with the computer and whether the video playback features substantially create the value of the product.

Microsoft counters that the patented feature only encompasses part of the playback technology. As noted above with other pending motions, however, MPT has presented a question of fact regarding whether the Puri '878 patent is essential to video playback using the MPEG-2 or VC-1 standards.

### 3. Windows Media Player

Microsoft includes a VC-1 decoder in its Windows Media Player 10 ("WMP-10") and Windows Media Player 11 ("WMP-11") software applications. These programs, usable on the Microsoft Windows Vista or Windows XP operating

systems, are available to consumers either for download or included with an operating system.  A VC-1 decoder provides playback of files from certain types of HD DVD discs.  Though WMP-10 and WMP-11 may be provided separately from the operating system, the analysis at this stage is essentially the same as that for the Vista decoding software already discussed.  Like the Vista software, WMP-10 and WMP-11 may operate in conjunction with the operating system to permit video playback on the computer.  As with Vista, there are triable questions of fact regarding whether these programs operate as a functional unit with the computer and contribute substantially to customer demand.

### 4.   Xbox 360 Video Game Console

Microsoft manufactures and sells the Xbox 360 video game console.  The standard Xbox 360 ships with an MPEG-2 decoder capable of playing back files from DVDs.  Microsoft also manufacturers and sells an HD DVD player peripheral for use with the Xbox 360.  The HD DVD player includes both MPEG-2 and VC-1 decoders that enable playback of video files from DVDs or HD DVDs.

MPT offers evidence that, when viewed in a light most favorable to MPT, indicates that DVD and HD DVD playback are important to customer demand for the Xbox 360 products.  For example, Microsoft has touted DVD playback to distinguish the Xbox 360 from its competitor, the Nintendo Wii, which does not ship with DVD playback capability. (Schmidt Decl. Ex. 8 at CCMS_159521.)  Similarly Microsoft has distinguished the Xbox 360 from another competitor, the Sony Playstation 3, based on the Xbox 360's ability to playback HD DVDs, while Sony's product supports the competing Blu-ray format.[12] (Id. at CCMS_128291.)  Microsoft's marketing materials indicate that providing the potential for HD DVD playback on the Xbox 360 was intended, at least in part, to help slow adoption of Sony's competing Blu-ray format.  (Id.)  Microsoft used various slogans marketing the Xbox 360 as more than just a console for video games such as going "beyond gaming."  (Id. at CCMS_128636-38.)

---

[12]Blu-ray and HD-DVD are competing technologies that aim to supersede DVD video with improved features, such as better audio and video quality.

### 5.   Conclusion

For these reasons, the Court DENIES Microsoft's motion regarding application of the entire market value rule.  The Court notes, however, that these conclusions, made with the favorable inferences appropriate to summary judgment, shall not prevent it from considering whether the trial record ultimately presents enough evidence to rely on the entire market value.  The evidence may demonstrate an appropriate functional unit for determining damages somewhere between the patented feature and an entire computer or console, such as the operating system, or a video playback program.  The Court also notes that these questions appear intertwined, at least in part, with the extent to which the asserted claims are or are not necessary to accomplish playback of video formats in commercial demand.  (Cf. Group 2 Post-Trial Order at 33-45 (concluding that there was insufficient evidence to support damages based on whole computer value where the evidence established that MP3 audio capabilities were commercially important while the patents were "not required or critical to practice the MP3 standard").)

### III.   Motions Related to the Patents Asserted by Microsoft

### A.   Alleged Anticipation of the Jancke '913 Patent

The anticipation defense under 35 U.S.C. § 102(b) applies where the invention was "in public use . . . more than one year prior to the date of the application . . . ."  The date one year before the application is also known as the critical date.   The allegedly anticipating public use must include every limitation of the patented invention. Netscape Communications Corp. v. Konrad, 295 F.3d 1315, 1321 (Fed. Cir. 2002). This invalidity defense requires clear and convincing evidence.  Id. at 1320.

A court looks "to the totality of the circumstances when evaluating whether there has been a public use within the meaning of section 102(b)."  Id. at 1320.  An experimental use is not an anticipating use under 35 U.S.C. § 102(b).  Id. Circumstances relevant to determining whether there was an anticipating public use include:

the nature of the activity that occurred in public; the public access to and

knowledge of the public use; whether there was any confidentiality obligation imposed on persons who observed the use; whether persons other than the inventor performed the testing; the number of tests; the length of the test period in relation to tests of similar devices; and whether the inventor received payment for the testing.

Id.

On June 9, 1998, the PTO issued the Jancke '913 patent, entitled "Computer Network Status Monitoring System," based on an application filed April 5, 1996. The critical date for the patent is therefore April 5, 1995. Claim 6 is the only one currently at issue. It states:

A method for monitoring and displaying status of a plurality of nodes in a computer network, said method comprising:

monitoring an operational state of each of said plurality of nodes in said computer network;

concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network;

superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status icons;

dynamically updating said display of said operational state for each of said plurality of nodes; and

generating a hierarchical list of objects available from a user selected one of said plurality of nodes.

(Jancke '913 5:16-38.)

Lucent argues that the asserted claims of the Jancke '913 patent are anticipated by public use of the Enterprise Manager feature of Microsoft's SQL Server 6.0 product ("SQL EM"). Microsoft conceded that SQL EM embodies the '913 patent, at least in its commercially released form.[13] (See Decl. Jonas R. McDavit Supp. Plfs.' Mots. Summ. J. ("McDavit Decl.") Ex. 20.) Other evidence also supports this admission.

---

[13]In its opposition, Microsoft attempted to raise a fact question by claiming that Lucent's anticipation argument ignored whether SQL EM includes the limitation on the generating step: "being operational from any one of said plurality of nodes in said computer network." Even if this were true, it does not change the fact that Microsoft admitted that SQL EM embodies the patent.

(See, e.g., Ex. 21¶ 235 (Microsoft's damages expert using SQL EM as example of product practicing the patent); McDavit Decl. Ex. 22 (testimony from Jancke regarding claim 6 and SQL EM).) Nevertheless, Microsoft opposes the motion on two grounds. First, it argues that there was no public use because SQL EM was only in beta form prior to the critical date, and Microsoft took sufficient steps to protect the confidentiality of the beta. Second, Microsoft argues that Lucent's evidence establishes at most that the final version of SQL EM embodied the patent, but it has not established that the beta versions contained all of the claim limitations.

The Court concludes that Microsoft has identified triable issues of fact regarding whether the beta test was public. For example, Microsoft introduces sample nondisclosure agreements used with the beta test and testimony indicating that the beta releases were not public and intended quality feedback rather than commercial purposes. (See, e.g., Gartman Opp'n Decl. Exs. V-1 (excerpts from deposition of Microsoft employee Voth); V-4 (sample non-disclosure agreements).) Having concluded that there are triable questions of fact regarding the extent to which the beta test was kept confidential, the Court declines to reach Microsoft's argument regarding differences between the beta and released versions. Accordingly, the Court DENIES Plaintiffs' motion for summary judgment that the Jancke '913 patent is invalid by anticipation.

### B.    Alleged Obviousness of the Guzak Patents

The Court provided the parties with an opportunity to file supplemental briefs regarding a possible clarification of the claim construction for the Guzak patents. The Court therefore declines to rule on this motion until such briefing is complete.

### C.    Motions for Noninfringement

#### 1.    Standard for Infringement

"Infringement, whether literal or under the doctrine of equivalents, is a question of fact." Terlep v. Brinkman Corp., 418 F.3d 1379, 1382 (Fed. Cir. 2005). The Court first construes the claim and then compares the claim to the accused product or device. Id. at 1381. Every element of the claim must be present in the accused device or

process, either literally or by a substantial equivalent. Id. at 1385. Under the doctrine of equivalents, a "substantial equivalent" is one that "performs substantially the same function in substantially the same way to achieve substantially the same result." See, e.g., Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994). For means plus function elements under 35 U.S.C. § 112 ¶ 6, the patentee must prove that the accused product performs the claim limitation's function using a structure identical or equivalent to the structure identified by the Court's construction. See, e.g., CytoLogix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1178 (Fed. Cir. 2005).

### 2. VitalSuite and Fein '608

The PTO issued the Fein '608 patent, entitled "Method and System for Customized Alert Messages," to inventors Ronald Fein, et al., on May 20, 2003. The application was filed on December 16, 1998. The patent relates to the use of alert messages in computer systems. Computer users may be familiar, for example, with windows or dialog boxes appearing to convey information when a particular event or problem occurs. (See Fein '608 1:14-25 (describing background of typical alert messages).) The patent purports to improve on this process by providing for customized messages, as compared to the typically static messages of prior systems. (See generally Fein '608 1:26-2:60 (describing benefits of the invention over prior systems).)

Microsoft asserts claims 7, 15, 21, and 25 against Lucent's VitalSuite products. Claim 7 depends on claims 1, 2, and 3, while claim 21 depends on claim 15. Claim 7 incorporates the limitation from claim 2 of "displaying an alert message in response to detecting one of the predetermined conditions." Claims 15, 21, and 25 include the limitation "displaying the alert message in response to the detected predetermined condition." The Court has construed alert message as a "message to advise a user about the occurrence of condition." (Cl. Constr. Order, Doc No. 156, App. H.) The Court concluded that no construction was necessary for "predetermined condition" or "detecting one of the predetermined conditions."

VitalSuite is a collection of software tools for network and application

- 37 -

management. It includes VitalSuite NET, or "VitalNET;" VitalSuite Real-time Event Analysis; VitalSuite Advanced Reporting Tool, or "VitalART;" and VitalSuite APPS, or "VitalApps." (See McDavit Decl. Ex. 28 (excerpt from VitalSuite user's guide).) VitalApps is further composed of VitalAnalysis and VitalHelp. VitalAnalysis tracks the availability and historical performance of TCP/IP-based business applications. VitalHelp assists in monitoring TCP/IP-based network applications. VitalSuite also includes VitalAgent clients that run on computers in the network, detect problems, and send alarms to the Help server. VitalSuite includes a Web Console graphical interface to its components, accessible through a browser such as Internet Explorer. The Web Console includes an Alarms/Applications page that lists alarms generated by the VitalAgent clients. The page presents these alarms, or "events," in a table format. A user may also click on one of the events, and the software will generate an "Event Details" window with further information. (See Mem. P. & A. Supp. Plfs.' Mot. Summ. J. at 32 (screenshots of the table alone and the table with an "Event Details" window open).)

Lucent contends that there can be no infringement because the software does not produce any messages "in response to" detecting a predetermined condition. Instead, it argues that because the Alarms/Application page and related Event Details windows require user intervention, they are produced in response to user input, not a predetermined condition.

The Court concludes that Lucent's argument fails for two reasons. First, its argument implicitly reads additional language into the claim construction. The claim language only indicates that the message must be produced in response to detecting a predetermined condition. It does not exclude the possibility that a message might also be produced in response to user input. Since the claims use the traditional "comprising" language, they do not exclude the possibility of other limitations. The parties do not dispute that the software generates a table of alarms based on the status of the system being monitored. They also do not dispute that the user may obtain additional details about these alarms. Whether these are truly created "in response to"

a predetermined condition remains a triable question of fact.[14]

Furthermore, even under Lucent's suggestion that there cannot be user intervention, the parties do not dispute that the software updates the table on the Alarms/Application page without user intervention. This would present a triable issue of fact, even under the approach sought by Lucent.

The Court has also reviewed the parties' arguments regarding Microsoft's theory of infringement under the doctrine of equivalents and concluded that it survives summary judgment. Lucent argues that Microsoft's supplemental expert report must be excluded as untimely. Given the totality of the circumstances in this litigation, the Court declines to exclude the report at this time. Therefore, the Court DENIES Lucent's motion for summary judgment that its VitalSuite product does not infringe the Fein '608 patent.

### 3.   VitalSuite and Guzak '319 Claims 12 and 17

The Court provided the parties with an opportunity to file supplemental briefs regarding a possible clarification of the claim construction for the Guzak patents. The Court therefore declines to rule on this motion until such briefing is complete.

### 4.   Accelerate Solution and Chen '004 Claim 2

The PTO issued the Chen '004 patent, entitled "Metaserver for a Multimedia Distribution Network," on June 25, 2002. The application was filed on March 27, 1997. The Chen '004 patent seeks to address traffic bottlenecks and related problems that can arise on networks, like the Internet, when many users direct their client computers to retrieve multimedia information, such as streaming audio or video, from a single source. The patent aims to provide a system that eliminates bottlenecks, provides fault tolerance, reduces network traffic, and allows integration of servers from different organizations. (See Chen '004 1:5-37.) In broad terms, the patent provides for a "metaserver" that organizes network traffic by routing client computers to

---

[14]At claim construction, the Court rejected an "automatically displayed" limitation that Lucent sought for the definition of an "alert message." The Court noted that the "in response to . . ." claim language was sufficient. (Cl. Constr. Order, Doc. No. 156, App. H.)

1   individual multimedia servers with these aims in mind.

2       Microsoft accuses Lucent's Accelerate Solution product of infringing claims 2,

3   25, 26, and 29, though only claim 2 is at issue on this motion.  Claim 2 depends on

4   claim 1, though the precise limitations of claim 1 are not at issue here.  Claim 1

5   describes a method for receiving requests for multimedia streams from a client

6   computer, monitoring the status of multimedia servers and the network, selecting at

7   least one of the multimedia servers that can deliver the multimedia stream, and

8   communicating the name of at least one eligible multimedia server to the client

9   computer.  (See Chen '004 11:56-12:9.)  Claim 2 further limits claim 1 as follows:

10      The method of claim 1, wherein selecting further includes:

11      using a minimum cost algorithm as said selection algorithm;

12      choosing a set of parameters including multimedia content, current load,
        geographic location, and a network distance from said at least one
13      multimedia server to said client computer; and

14      applying said minimum cost algorithm to said set of parameters.

15  (Chen '004 12:10-19.)

16      The Court previously construed a "minimum cost algorithm" as "a sequence of

17  well defined mathematical operations for determining the cost to the system for a

18  particular multimedia server or servers to provide a data stream to a particular client

19  and for selecting the multimedia server that can provide the data stream at minimum

20  cost."  (Cl. Constr. Order, Doc. No. 156, App. B.)  In accordance with the parties'

21  agreement, the Court construed "current load" as "a measure of the amount of

22  processing a computer system is currently performing in servicing client requests."  In

23  their claim construction briefs, the parties agreed that "geographic location" required

24  no construction, and their claim construction briefing did not address "network

25  distance."

26      Lucent argues that its product does not consider three of the parameters

27  identified by the minimum cost algorithm: current load, multimedia content, and

28  network distance.  Accelerate Solution comprises various hardware and software

    elements that provide support for telephone services involving both traditional voice

telephone systems and Internet Protocol ("IP") networks.  (See McDavit Decl. Ex. 39.) Lucent's expert identifies the Lucent Feature Server 3000 as the allegedly infringing metaserver in Lucent's product.  (See Decl. Karen Robinson Supp. Plfs.' Reply Supp. Mots. Summ. J. ("Robinson Decl.") Ex. 20.)

### a.    Current Load

Lucent argues that Accelerate Solution does not consider "current load" because it only considers predefined, static values that do not change during operation.  Its argument relies entirely on a citation in Microsoft's expert report to a product description which states: "Note that 'static' costs and weights assigned to the gateways are used to load balance the traffic for gateways with similar location codes." (McDavit Decl. Ex. 41 (citing CCMS_031043).)[15]  This is not a sufficient basis for summary judgment.  Viewed in the light most favorable to Microsoft, this indicates at most that the product considers some static factors, not that it fails to consider current load.  These propositions are not mutually exclusive.

Furthermore, Microsoft offers evidence that the product considers current load. First, the fact that "static" is placed in quotes in the cited description indicates possible ambiguity about its meaning.  Furthermore, the statement comes from a subsection of the product description entitled "Dynamic Route Selection Based on Geographic Location of a POP."  (See Gartman Opp'n Decl. Ex. VIII-1 at CCMS_031043.)  At the beginning of the parent to the same subsection, the product description states that "[t]he Network Server has a built-in route selector mechanism that allows a route list to be dynamically built upon a SIP and Media Server selection request."  (Id. at CCMS_031042.)  Microsoft also points to description indicating that the network server provides a reporting tool that allows an operator "to view a node's historical data as well as the current load or system health."  (Id. at CCMS_031112)  This description

---

[15]The product description in question is entitled "BroadWorks Network Server Product Description."  Since the parties do not appear to dispute its applicability, the Court understands that this relates to the accused network server product.

1    indicates that the Accelerate Solution product can monitor current load.[16]

2                    **b.    Multimedia Content**

3           For the next parameter, Lucent argues that its product only considers whether a

4    particular type of service is available on a server, not whether specific content is

5    available there.  Lucent's statements regarding multimedia content are conclusory.  For

6    example, Lucent provides a "see generally" citation to more than 100 pages of product

7    description.  The citations provided by Lucent support the fact that its product provides

8    streaming multimedia.  The citations, however, do not support a services/content

9    distinction of the type Lucent advocates, at least when viewed in the light most

10   favorable to Microsoft.  On this issue, the Court concludes that Lucent has failed to

11   meet its initial burden under <u>Celotex</u> to establish an absence of evidence for

12   Microsoft's claims.

13                   **c.    Network Distance**

14          Here, Lucent admits that Microsoft comes forward with evidence that the

15   product considers "geographic location," though it argues that Microsoft offers no

16   evidence that it considers "network distance."  There is no dispute that the product

17   description asserts, on several occasions, that the product seeks to locate the server

18   "closest" to the destination.   (<u>See</u>, <u>e.g.</u>, Gartman Opp'n Decl. Ex. VIII-1 at

19   CCMS_031015, VIII-3 at CCMS_031005).   These references do not adequately

20   distinguish between geographic distance or some either type of distance calculation

21   based on a network's configuration or status.   Viewed in a light most favorable to

22   Microsoft, this evidence supports its position that the product considers both "network

23   distance" and "geographic location," even accepting the distinction between these

24   terms that Lucent attempts to draw.  Therefore, the Court DENIES Plaintiffs' motion

25   for summary judgment that Accelerate Solution does not infringe claim 2 of the Chen

26   _____

27          [16]Microsoft also pointed to a statements that the Feature Server 3000 could monitor resource
     load when used in combination with the VitalSuite product, also discussed in this order.  Lucent
28   disputes, however, whether VitalSuite was ever sold in combination with Feature Server 3000.  The
     Court does not rely on Microsoft's representations regarding VitalSuite in reaching its conclusion
     regarding the Accelerate Solution product and claim 2 of the Chen '004 patent.

1  '004 patent.

2  ### 5.      Open Media Suite and Chen '004

3  Microsoft also accuses Alcatel Lucent's Open Media Suite product of infringing

4  the Chen '004 patent, also discussed in the previous subsection.  As with Accelerate

5  Solution, Microsoft asserts claims 2, 25, 26, and 29.  All of these claims involve three

6  similar steps, among other elements.  Claim 1, on which claim 2 depends, requires the

7  following steps:

8      monitoring the status of each said multimedia server and the status of said
        network;
9
       selecting from the metaserver database at least one eligible multimedia
10     server storing the requested mutimedia stream using a selection algorithm;
       and
11
       communicating a name of said at least one eligible multimedia server to
12     said client computer.

13  Claim 25 is also a method claim including "monitoring," "selecting," and

14  "communicating" steps.  For the present purposes, these elements of claim 25 are

15  essentially the same, although there are differences in the claim language.  Claim 26

16  is an apparatus capable of carrying out these steps, and claim 29 is a "computer

17  readable medium" having executable instructions comprising these steps.

18  Lucent argues that its Open Media Suite ("OMS") product cannot infringe

19  because it is allegedly unable to perform these steps without significant alterations by

20  the user.  OMS is a collection of components for providing video over data networks,

21  such as the Internet.  OMS includes the 5959 Open Video Server ("OVS") which

22  receives and responds to requests for video services in accordance with the Real Time

23  Stream Protocol ("RTSP").  OVS includes the capability to redirect clients requesting

24  servers according to an RTSP redirection procedure that may be specified by the

25  server's user.  The parties do not dispute that the RTSP redirector is disabled in OMS

26  by default.  They do dispute, however, the extent of modifications required to practice

27  the asserted claims using the RTSP redirector and related components.

28  Software code may infringe if it permits the user to practice the invention

without first modifying the code.  See Fantasy Sports Props., Inc. v. Sportsline.com,

1   Inc., 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("Accordingly, in order to infringe the

2   [asserted] patent, the code underlying [the accused product] must be written in such a

3   way as to enable a user of that software to utilize the [infringing function] without

4   having to modify that code.")  The parties dispute whether a user may practice the

5   asserted claims without modifying the source code of the RTSP redirector and related

6   products.  Viewing the evidence in the light most favorable to Microsoft, there is a

7   triable issue of fact.

8       Microsoft offers a Lucent product description indicating that OVS includes an

9   algorithm to perform redirection from one server to another, identified as

10  "rtsp_cm_redirect."  (Gartman Opp'n Decl. Ex. XIB-1 at CCMS_0049705-06.)  This

11  capability addresses the "key issue" of "how to connect clients to the 'right' server."

12  (Id. at CCMS_0049704.)  The same document also indicates that the "[t]he scenarios

13  in which redirections are triggered are field customizable." (Id at CCMS_0049705-06.)

14  Redirection may occur for reasons including "traffic congestion," "when a given server

15  reaches a designated streaming threshold," and when servers "are unhealthy or

16  unavailable." (Id.) These rules are "defined in a customizable PL/SQL algorithm" that

17  "can be customized so that, in addition to the local Alcatel 5959 OVS database, any

18  number of call-outs to other databases, procedures or applications can be made in order

19  to calculate whether a redirection is required." (Id.)  A user may invoke the algorithm

20  using factors including "IP topology and geographical server location, location of

21  requested content, congestion level of an Alcatel 5959 OVS server, [and] load

22  balancing between Alcatel 5959 OVS servers." (Id. at CCMS_0049709.)

23      Viewed in a light most favorable to Microsoft, this evidence indicates that a user

24  may implement a redirection algorithm including the disputed steps without modifying

25  the source code itself.  Therefore, the Court DENIES Plaintiffs' motion for summary

26  judgment that OMS does not infringe the Chen '004 patent.

27              **6.    APMS and Bolosky '794**

28      The PTO issued the Bolosky '794 patent, entitled "Wire Protocol for a Media

Server System," to inventors William J. Bolosky et al.  The original application was

filed December 8, 1995. The patent describes a protocol for establishing connections between a media server and a client.

Microsoft asserts claims 30 and 33 against Lucent's AnyPath Messaging System ("APMS"). Claim 30 is a method claim which states:

> In a distributed system having a media server for storing files holding data of multiple media, a client for requesting service from the media server, a control connection between the media server and the client for passing control information between the media server and the client and a data connection for passing data between the media server and the client, a method comprising the steps of:
>
> sending a write request message from the client to the media server over the control connection using a first transport protocol, said write request message requesting that data from the client be written into a file at the media server;
>
> sending a write request acknowledgment message from the media server to the client over the control connection to acknowledge the write request message;
>
> forwarding the data to be written from the client to the media server over the data connection using a second transport protocol distinct from the first transport protocol; and
>
> writing the forwarded data into the file at the media server.

(Bolosky '794 19:59-20:12.) Claim 33 states:

> In a distributed system having a media server storing files holding data of multiple media, a computer system comprising:
>
> a control connection generator for creating a bidirectional control connection between the media server and the computer system to enable control information to be passed between the media server and the computer system, the control connection utilizing a first transport protocol; and
>
> a data connection generator for creating a bidirectional data connection between the media server and the computer system to enable data to be passed between the media server and the computer system, the data connection using a second transport protocol distinct from the first transport protocol.

(Bolosky '794 20:23-38.)

As agreed by the parties, the Court construed "transport protocol" as "any standard protocol that is designed to operate in the fourth layer of the OSI reference model (and the second highest layer in the four and five layer TCP/IP reference models), for example, TCP, UDP, etc." (Cl. Constr. Order., Doc. No. 156, App. F.)

- 45 -

The parties also agreed that a "write request message" is "a request message that requests that data from the client be written into a file on the media server," and that a "write request acknowledgment message" is a "message that acknowledges that the write request was received." The Court construed "client" as an "entity on a computer that is capable of both requesting service from a media server and consuming data from a media server." (Id.) Under the Court's construction, a "control connection" is a "connection that facilitates exchange of control information," and a "data connection" is a "connection that facilitates the exchange of data between the media server and the client." (Id.)

The accused product, APMS, is a system for providing voice messages over both traditional public switched telephone networks ("PSTN") and IP networks, like the Internet. APMS includes various servers, including a telephony server in two varieties, depending on whether voice is being provided over an PSTN or IP network. APMS may communicate voice messages to various end user devices including traditional wireline phones, cell phones, pagers, FAXes, IP phones, and others. (See Gartman Opp'n Decl. Ex. IX-1 at LUCENT0124371 (diagram of APMS from Lucent's Technical Product Description).)

### a.    Claim 30 – Whether APMS Uses a Control Connection for the Required Messages

Lucent first argues that there can be no infringement of claim 30 because APMS allegedly does not send the write request and write request acknowledgment messages over a control connection, as required by the patent. The parties do not dispute that APMS uses two separate connections. First, there is a signaling connection, implemented using a standard known as Session Initiation Protocol ("SIP"), which is the alleged control connection. Second, there is a connection for sending media data, using a standard called Real Time Protocol ("RTP"), which is the alleged data connection. Lucent argues that Microsoft failed to identify suitable write request and write request acknowledgment messages over the control connection. The Court concludes that Lucent meets its initial burden under Celotex, requiring Microsoft to

come forward with evidence sufficient to survive summary judgment.  See Celotex Corp., 477 U.S. at 325 (moving party's initial burden "may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case").

In its opposition papers, Microsoft pointed to two messages identified in a figure from Lucent's technical documentation entitled "SIP-based Call Flow for AnyPath Message Deposit."    (Gartman Opp'n Decl. Ex. IX-3 at LUCENT0124061.) Specifically, Microsoft pointed to two messages labeled "INVITE" and "ACK" as request and acknowledgment messages. Lucent replied that these cannot constitute the two required messages because they both flow in the same direction, contrary to the claim language.  The Court agrees that messages flowing in the same direction could not fulfill the claim language.  The plain language of claim 30 requires that the write request message travels from the client to the media server, while the write request acknowledgment message travels from the media server to the client.

At oral argument, Microsoft attempted to patch this argument by pointing to two different messages from the same diagram as exemplary of write requests and acknowledgments in the implementation of APMS.  Microsoft relied instead on the messages labeled "INVITE" and "200 OK."   Even under this theory, the Court concludes that Microsoft fails to raise a material question of fact that APMS uses both required messages.  In the diagram under dispute the "INVITE" message, offered by Microsoft as an alleged write request message, passes between the "Originating SIP User Agent" and the "Subscriber SIP User Agent."  The "200 OK" message, offered as an alleged write request acknowledgment message, passes from the "AMS VOIP Telephony Servers" to the "Originating SIP User Agent."  The language of claim 30 clearly states that the same two entities exchange these messages, namely the client and the media server.  Furthermore, the write request acknowledgment message must "acknowledge the write request message."  The messages offered by Microsoft are not exchanged between the same two entities.  Furthermore, there is no indication that the "200 OK" message is specifically acknowledging the "INVITE" message put forward

by Microsoft, especially given that the "200 OK" message does not originate from the same entity that received the "INVITE" message.[17]

Microsoft has failed to present a triable issue of fact regarding whether APMS uses both write request and write request acknowledgment messages over a control connection. Therefore, the Court GRANTS IN PART Plaintiffs' motion to the extent it seeks summary judgment that APMS does not infringe claim 30 of the Bolosky '794 patent. This conclusion includes both literal infringement and infringement under the doctrine of equivalents.

### b.    Claim 30 – the "Client" Language

Lucent next argues that APMS does not infringe claim 30 because APMS does not contain a "client." This argument would add a requirement not present in the claim language. Claim 30 is a method claim, and infringement requires only that the accused infringer practices all of the steps, regardless of the apparatus used. See, e.g., Int'l Glass Co. v. United States, 408 F.2d 395, 400 (Ct. Cl. 1969). Furthermore the method of claim 30 is in the general context of a distributed system including a client, and the documentation for APMS indicates that it is to be used to provide services to a variety of types of clients, including traditional wireline phones and IP phones. (Gartman Opp'n Decl. Ex. IX-1 at LUCENT0124371.) The Court therefore rejects this argument, though the Court nevertheless concludes that APMS does not infringe claim 30.

### c.    Claim 33 – the "Computer System" Language

Lucent finally argues that APMS cannot infringe claim 33 because it does not include a "computer system" within the meaning of this apparatus claim. Lucent contends that the computer system of claim 33 must be construed analogously to claim 30. The claim language is clear enough on this point. Claim 30 is a method claim that makes use of both control and data connections. Claim 33 is an apparatus claim that includes a control connection generator and data connection generator. Microsoft

---

[17]The same diagram also indicates a second "INVITE" message, but this would not save Microsoft's position here. That message originates with yet another system component described as the "S-CSCF."

provides undisputed evidence that APMS uses two separate connections, based on the SIP and RTP standards. In light of this and other evidence offered by Microsoft, there are triable issues of fact regarding whether APMS provides both control and data connections and whether APMS includes an apparatus for generating these connections. The Court therefore DENIES IN PART Plaintiffs' motion to the extent it seeks summary judgment that APMS does not infringe claim 33 of the Bolosky '794 patent.

### 7.    8788 Media Resource Platform and Bolosky '794

Alcatel Lucent also moves for summary judgment that its 8788 Media Resource Platform ("8788 MRP") does not infringe the Bolosky '794 patent, just discussed with respect to the APMS product. 8788 MRP includes a media server, known as the 8688 Media Resource Function Module. Alcatel Lucent argues that there can be no infringement because its product does not use control and data connections with separate transport protocols, as required by the two claims at issue, 30 and 33.

The parties do not dispute that the product uses two separate application layer protocols, based on standards referred to as SIP and RTP. Much like the APMS product, the SIP connection is the alleged control connection, and the RTP connection is the alleged data connection. The transport protocols named in the Court's construction include the User Datagram Protocol ("UDP") and Transmission Control Protocol ("TCP"). There is no dispute that the product implements its RTP connection using only the UDP transport protocol. The parties dispute, however, whether the SIP connection uses only UDP, or both UDP and TCP, in the context of these claims. The parties agree that, at least in the abstract, the SIP standard supports implementation over both UDP and TCP. Nevertheless, if the 8788 MRP implements its SIP connection only using UDP, as Alcatel Lucent contends, then the 8788 MRP would only use one transport protocol for both connections, and it could not infringe the asserted claims.

Microsoft offers evidence sufficient to create a triable issue of fact. The SIP standard, which the 8788 MRP admittedly supports, mandates the use of TCP.

(See Gartman Opp'n Decl. X-3 at CCMS_039408 (excerpt from standard stating that "[a]ll SIP elements MUST implement UDP and TCP").) Furthermore, Microsoft offers a diagram from one of Alcatel Lucent's product descriptions indicating that the product communicates with other network devices using SIP, where "SIP" is accompanied by the designation "UDP/TCP." (Gartman Opp'n Decl. Ex X-5 at AL-C000107.) Alcatel Lucent's 30(b)(6) witness, Theirry Gouverneur, stated that the 8788 MRP only uses SIP over UDP, but Microsoft points to other deposition statements by Gouverneur that, when viewed most favorably to Microsoft, undermine this position. (See Gouverneur Depo. Tr. at 72:8-24 (stating that the product "doesn't support the SIP protocol" and that "TCP is not in the SIP protocol").)

Alcatel Lucent also concedes that 8788 MRP does use TCP for certain communications, though it argues that these are "internal," meaning not between the server and a client, thus placing them outside the scope of the claims. The Court does not rely on these statements with respect to claim 30, since that claim necessarily involves communications between a client and a media server. These TCP communications may be applicable to claim 33, however, which only involves generators for connections between a "computer system" and a media server. Unlike claim 30, claim 33's language does not implicate communication only between the the media server and the client. There is a triable issue of fact regarding whether these "internal" communications, and the related components of 8788 MRP, might meet the elements of claim 33. For the above reasons, the Court DENIES Plaintiffs' motion for summary judgment that the 8788 MRP product does not infringe the Bolosky '794 patent.

### 8.    OmniVista Air Control System and Jancke '913

Microsoft accuses Alcatel Lucent's OmniVista Air Control System ("Air Control System") of infringing claim 6 of the Jancke '913 patent. The Air Control System is a system for monitoring a network of wireless access points and providing wireless service to clients using the wireless network. At issue are icons used by the Air Control System to represent an access point's status. The icons depict a circle along

with a triangle covering part of the circle.  (See Bowling Decl. Ex. J at CCMS_048385.)  Each access point contains two radios, and the colors of the upper and lower halves of the circle correspond to the status of these two radios.  The triangle's color corresponds to the status of the radio with the worse operating status.

Claim 6 is a method claim including the step:

> superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status icons;

The Court previously concluded that the patent used "superimposing" in a manner consistent with its ordinary meaning.  (See Claim Constr. Order at 2 & App. G.)

Alcatel Lucent argues that Microsoft lacks any evidence that the Air Control System performs an act of superimposing.  Essentially, Alcatel Lucent argues that the Air Control System includes only predefined icons, and its code performs no act of superimposing.  Under Alcatel Lucent's theory, in order to superimpose status indicators, the code would need to take separate images and manipulate them to create a new icon.

The Court concludes that the ordinary meaning of "superimposing" does not necessarily exclude the display of a predefined compound icon in which one element has already been placed so that it appears to be on top of another.  This is also consistent with the specification.  The description of the preferred embodiment does not state that the example status indicators must be created during the monitoring process.  (See Jancke '913 Figs. 4-5 and associated text.)  It is consistent with the specification that the preferred embodiment merely retrieves the predefined status indicators from memory, thus "superimposing" the images by selecting and displaying the appropriate combination.  Therefore, the Court DENIES Plaintiffs' motion that the Air Control System does not infringe the Jancke '913 patent.[18]

---

[18] Alcatel Lucent objected to introduction of evidence related to the Air Control System's source code.  (Doc. No. 284).  The parties have resolved their dispute concerning access to the source code. In any event, the Court denies the motion to exclude evidence.

**D.    Alleged Failure to Mark for Fein '608**

For this issue, the parties do not dispute the essential facts, and the Court faces a purely legal question.  Microsoft concedes that it sells certain products that embody the Fein '608 patent.  The Fein '608 patent includes only method claims.  The question is whether, under these circumstances, Microsoft must mark its products or forego any damages before giving actual notice.

35 U.S.C. § 287(a) provides that a patentee may give notice to the public of its patent by marking its patented articles appropriately.  Where the patentee fails to do so, "no damages shall be recovered . . . except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice."  35 U.S.C. § 287(a). Filing an infringement action constitutes actual notice.  35 U.S.C. § 287(a).

Patents covering only a process or method, however, fall into an exception.  "It is 'settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method.'"  State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1073 (quoting Bandag, Inc. v. Gerrard Tire Co., 704 F.2d 1578, 1581 (Fed.Cir.1983)).  The Federal Circuit has applied the notice requirement where a patent contains both apparatus and method claims "to the extent that there is a tangible item to mark."  See Am. Med. Sys. v. Med. Eng'g Corp., 6 F.3d 1523, 1538 (Fed. Cir. 2003).  The parties direct the Court to no instance, however, where the Federal Circuit applied the marking requirement to a patent with only method claims or where the Federal Circuit created an exception when there is no dispute that method claims have a tangible embodiment.  See State Contracting & Eng'g Corp., 346 F.3d at 1074 ("We have not previously held that a patent containing only method claims is examined to see if something could have been marked in order to assess whether the notice provision applies, and we decline to do so now.") Similarly, the Court declines to create a new exception to the Federal Circuit's settled case law.

1              <u>**Conclusion**</u>

2          In conclusion, the Court makes the following rulings on the parties' motions

3   for summary judgment:

4

5   <u>Motions Related to Puri '878</u>

6   •     Microsoft's Motion that Not Any and Every MPEG-2 or VC-1 Decoder is

7         Structurally Equivalent — **DENIED**

8   •     Plaintiffs' Motion that Asserted Claims of Are Not Anticipated —

9         **GRANTED**

10  •     Plaintiffs' Motion that Asserted Claims of Are Not Obvious — **DENIED**

11  •     Microsoft's Motion that Claims 13 and 15 Were Conceived No Earlier Than

12        September 30, 1991 — **DENIED**

13  •     Plaintiffs' Motion that Microsoft Has No Defense of Laches — **GRANTED**

14        **IN PART AND DENIED IN PART**[19]

15  •     Plaintiffs' Motion that Microsoft Has No Defense of License — **GRANTED**

16  •     Plaintiffs' Motion that Microsoft Has No Defense of Equitable Estoppel —

17        **DENIED**

18  •     Plaintiffs' Motion that Microsoft Has No Defense of Implied License —

19        **GRANTED**

20  •     Plaintiffs' Motion that Microsoft Has No Defense of Waiver — **GRANTED**

21  •     Plaintiffs' Motion that Microsoft Has No Defense of Exhaustion —

22        **GRANTED**

23  •     Plaintiffs' Motion that Microsoft Has No Defense of Unclean Hands —

24        **DENIED**

25  •     Plaintiffs' Motion that Microsoft Has No Defense of Patent Misuse —

26        **GRANTED**

27  •     Plaintiffs' Motion Regarding Microsoft's Section 17200 Counterclaim —

28

---

[19]The Court grants the motion as to prosecution laches, but denies as to traditional laches.

1      **GRANTED**

2   • Microsoft's Motion Regarding the Effect of the Certificate of Correction —

3      **DENIED**

4   • Microsoft's Motion that MPT Cannot Recover Damages Prior to January 6,

5      2006 — **DENIED**

6   • Microsoft's Motion that the Entire Market Value Rule Does Not Apply to

7      Accused Products — **DENIED**

8

9 Motions Regarding Validity of Patents Asserted by Microsoft

10   • Plaintiffs' Motion that Jancke '913 is Invalid Due to Anticipation —

11      **DENIED**

12   • Plaintiffs' Motion that Guzak Patents are Invalid Due to Obviousness — The

13      Court does not rule on this motion at this time.  The Court's tentative ruling is

14      to DENY the motion.

15

16 Motions Regarding Infringement of Patents Asserted by Microsoft

17   • Plaintiffs' Motion for Noninfringement of Fein '608 — **DENIED**

18   • Plaintiffs' Motion that VitalSuite Does Not Infringe Guzak '319 Claims 12

19      and 17 — The Court does not rule on this motion at this time.

20   • Plaintiffs' Motion that Accelerate Solution Does Not Infringe Claim 2 of

21      Chen '004 — **DENIED**

22   • Plaintiffs' Motion that Open Media Suite Does Not Infringe Chen '004 —

23      **DENIED**

24   • Plaintiffs' Motion that APMS Does Not Infringe Bolosky '794 —

25      **GRANTED IN PART AND DENIED IN PART**[20]

26   • Plaintiffs' Motion that 8788 Media Platform Does Not Infringe Bolosky '794

27      — **DENIED**

28

---

[20]The Court grants as to claim 30, but denies as to claim 33 and other arguments raised in the motion.

1 • Plaintiffs' Motion that OmniVista Air Control System Does Not Infringe

2 Jancke '913 — **DENIED**

3 • Plaintiffs' Motion that Failure to Mark Precludes Pre-Notice Damages for

4 Fein '608 — **DENIED**

5

6 IT IS SO ORDERED.

7

8 DATED:  February 12, 2008

9

10 MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

11

12 COPIES TO:
All parties of record.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 55 -

06cv684