1  John E. Gartman (SBN 152300)
   Christopher S. Marchese (SBN 170239)
2  Shekhar Vyas (SBN 229853)
   Desa Burton (SBN 232292)
3  FISH & RICHARDSON P.C.
   12390 El Camino Real
4  San Diego, California 92130
   Telephone: (858) 678-5070
5  Facsimile:  (858) 678-5099

6  Stephen P. McGrath (SBN 202696)
   One Microsoft Way
7  Redmond, WA 98052
   Telephone: (425) 882-8080
8  Facsimile: (425) 936-7329

9  Attorneys for Defendant and Counter-claimant
   MICROSOFT CORPORATION
10

11              UNITED STATES DISTRICT COURT

12           SOUTHERN DISTRICT OF CALIFORNIA

13  MULTIMEDIA PATENT TRUST,              Case No. 06-CV-0684 H (CAB)

14          Plaintiff,                    **MICROSOFT CORPORATION'S**
                                          **MEMORANDUM OF**
15      v.                                **CONTENTIONS OF FACT AND**
                                          **LAW AND RULE 26(a)(3)**
16  MICROSOFT CORPORATION,                **DISCLOSURES**

17          Defendant.

18  MICROSOFT CORPORATION,                Date:     April 22, 2008
                                          Time:     9:00 a.m.
19          Counter-claimant,             Courtroom: 13
                                          Judge:    Hon. Marilyn L. Huff
20      v.

21  LUCENT TECHNOLOGIES INC., ALCATEL-
    LUCENT, and the MULTIMEDIA PATENT
22  TRUST,

23          Counter-defendants.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    POINTS OF LAW ............................................................................................. 1

    A.    The Law of Patent Infringement ......................................................... 1

        1.    Literal Infringement ................................................................ 1

        2.    Means Plus Function Limitations........................................... 2

        3.    Doctrine of Equivalents........................................................ 3

        4.    Infringement of Method Claims.............................................. 4

        5.    Indirect Infringement ............................................................. 4

            i.    Contributory Infringement ......................................... 4

            ii.    Inducing Infringement................................................ 5

    B.    The Law of Validity............................................................................. 6

        1.    Anticipation.............................................................................. 6

        2.    Printed Publication ................................................................. 7

        3.    Public Use ............................................................................... 8

        4.    35 U.S.C. § 102(e) ................................................................. 9

        5.    35 U.S.C. § 102(f) ................................................................. 9

        6.    35 U.S.C. § 102(g) ................................................................. 9

        7.    Obviousness .......................................................................... 12

        8.    Enablement............................................................................ 14

        9.    Non-Joinder of Inventor ...................................................... 14

    C.    35 U.S.C. § 254 Certificate of correction........................................... 15

    D.    The Law of Inequitable Conduct......................................................... 15

    E.    Unclean Hands ................................................................................... 17

    F.    Traditional Laches............................................................................... 17

    G.    Equitable Estoppel ............................................................................. 19

    H.    The Law of Patent Damages .............................................................. 19

i

**TABLE OF CONTENTS (cont'd.)**

Page

II.   MPT'S CLAIM OF INFRINGEMENT AGAINST MICROSOFT ................................. 20

A.   The U.S. Patent No. 5,227,878 ("the '878 Patent") ................................................. 20

1.   Statement of Material Facts .................................................................. 20

i.   The '878 Patent ........................................................................ 20

ii.   The Prior Art ........................................................................... 21

a.   U.S. Patent No. 5,091,782 (Krause '782 patent) ......................................................................... 21

b.   Staffan Ericsson, "Fixed and Adaptive Predictors for Hybrid Predictive/Transform Coding," IEEE Transactions on Communications, Vol. COM-33, No. 12, Dec. 1985 (LUC 1047117-128) ...................................... 22

c.   U.S. Patent No. 5,093,720 (Krause '720 patent) (CCMS 279960-973) ............................................. 23

d.   DigiCipher HDTV System Description, Submitted by General Instrument Corporation Videocipher Division, 6262 Lusk Boulevard, San Diego, California 92121, to the FCC, on behalf of The American Television Alliance, August 22, 1991 (Document No. TM 62004) (CCMS 274895-985 ................................................................. 24

e.   MPEG Submissions Prior to November 1991 ......................................................................... 27

(1)   Columbia University May, 23-24 1991 (MPEG 91/014) and August 15-16, 1991 (MPEG 91/131) ...................... 27

(2)   VADIS – Cost Algorithm Group 2 August 16, 1991 (MPEG 91/159) (GW-LT 278625-626) ............................................. 27

f.   Publications Authored on the European HDTV System ......................................................................... 28

(1)   M. Barbero, "Digital Coding of HDTV Based on Discrete Cosine Transform," ITU Technical Symposium, Geneva October 4-7, 1989 (CCMS 273558-563) ................. 28

ii

## TABLE OF CONTENTS (cont'd.)

Page

(2)   G. Barbieri, F. Molo, J.L. Tejerina, "A Modular and Flexible Video Codec Architecture for Application to TV and HDTV," 16th International TV Symposium Montreux Switzerland, June 17-22 1989 (CCMS 273597-608) ................................................. 31

(3)   U.S. Patent 5,006,929 to Barbero, et al., assigned to RAI Radiotelevisione Italiano, Turin, Italy – motion vector prediction (CCMS 277035-040) ................................................. 31

g.   U.S. Patent No. 4,710,810 – motion vector prediction (CCMS 279950-959) ...................................... 32

h.   MPEG-1: macroblock modes and differential motion vector prediction (MSLT_0602886-934) ........................................ 33

i.   A. Puri, et al., "Interframe Coding with Variable Block-size Motion Compensation," IEEE 1987 (CCMS 276015-024); and A. Puri, et al., "Adaptive Schemes for Motion Compensated Coding," SPIE Vol. 1001 Visual Communications and Image Processing 1988 (pp. 925-935) (CCMS 276035-046) .................................................... 34

j.   Prior and Simultaneous Work on Field/Frame Motion Compensation ................................ 35

k.   Japanese Patent Application Publication S58-137379 ...................................................... 41

l.   Japanese Patent Application Publication S59-128881 ...................................................... 45

2.   Teaching of the Claims (L.R. 16.1.f.2.e.1) ............................................. 48

3.   Statement of Non-infringement (L.R. 16.1.f.2.e.3)............................... 49

4.   Invalidity ......................................................................................... 58

i.   Invalid Claim 13 – Error in Claim ............................................... 58

ii.   Prior Art ............................................................................ 59

iii.   Lack of Objective Evidence of Nonobviousness ........................ 68

iii

# TABLE OF CONTENTS (cont'd.)

**Page**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 5. | Inequitable Conduct | 70 |
|  | a. | Ericsson Article |  | 72 |
|  | b. | Columbia University Paper |  | 74 |
|  |  | 6. | Unclean Hands | 77 |
|  | b. | Inequitable Conduct |  | 77 |
|  | b. | Delay In Correcting Claim 13 |  | 78 |
|  |  | 7. | Traditional Laches | 85 |
|  |  | 8. | Equitable Estoppel | 86 |
|  | B. | Damages Issues |  | 88 |
|  |  | 1. | Statement of Material Facts | 88 |
|  |  | 2. | Actual Notice | 88 |
|  |  | 3. | Incremental Value of the Invention | 89 |
|  |  | 4. | Actual Licensing Efforts | 89 |
|  |  | 5. | Entire Market Value Rule | 90 |
|  |  | 6. | Foreign Sales | 91 |
|  |  | 7. | Windows Media Player Downloads | 92 |
|  |  | 8. | Additional Limitations on Damages | 92 |
|  |  | 9. | Government Use Under 28 U.S.C. 1498 | 93 |
|  |  | 10. | No Injunction | 94 |
| III. | MICROSOFT'S CLAIMS OF INFRINGEMENT AGAINST LUCENT AND ALCATEL |  |  | 94 |
|  | A. | Statements of Material Fact |  | 94 |
|  |  | 1. | The Parties | 94 |
|  | B. | U.S. Patent No. 6,412,004 ("The '004 Patent") |  | 95 |
|  |  | 1. | The Teaching Of Asserted Claims Of The '004 Patent | 95 |

iv

## TABLE OF CONTENTS (cont'd.)

**Page**

  2.   Infringement Of The Asserted Claims Of The '004 Patent .................... 98

  3.   Validity Of The Asserted Claims Of The '004 Patent .......................... 100

  4.   Enforceability Of the Asserted Claims Of The '004 Patent ................ 102

C.   U.S. Patent No. 6,483,217 ("The '217 Patent") ................................. 102

  1.   The Teaching Of Asserted Claims Of The '217 Patent ...................... 102

  2.   Infringement Of The Asserted Claims Of The '217 Patent ................ 105

  3.   Validity Of The Asserted Claims Of The '217 Patent .......................... 109

  4.   Enforceability Of the Asserted Claims Of The '217 Patent ................ 112

D.   U.S. Patent No. 5,438,433 ("The '433 Patent") ................................. 112

  1.   The Teaching Of Asserted Claims Of The '433 Patent ...................... 112

  2.   Infringement Of The Asserted Claims Of The '433 Patent ................ 115

  3.   Validity Of The Asserted Claims Of The '433 Patent .......................... 118

  4.   Enforceability Of the Asserted Claims Of The '433 Patent ................ 120

E.   U.S. Patent No. 6,339,794 ("The '794 Patent") ................................. 120

  1.   The Teaching Of Asserted Claims Of The '794 Patent ...................... 120

  2.   Infringement Of The Asserted Claims Of The '794 Patent ................ 121

  3.   Validity Of The Asserted Claims Of The '794 Patent .......................... 122

  4.   Enforceability Of the Asserted Claims Of The '794 Patent ................ 123

F.   U.S. Patent No. 5,941,947 ("The '947 Patent") ................................. 123

  1.   The Teaching Of Asserted Claims Of The '947 Patent ...................... 123

  2.   Infringement Of The Asserted Claims Of The '947 Patent ................ 127

  3.   Validity Of The Asserted Claims Of The '947 Patent .......................... 127

  4.   Enforceability Of the Asserted Claims Of The '947 Patent ................ 130

G.   U.S. Patent No. 5,917,499 ("The '499 Patent") ................................. 130

  1.   The Teaching Of Asserted Claims Of The '499 Patent ...................... 130

v

# TABLE OF CONTENTS (cont'd.)

**Page**

2.  Infringement Of The Asserted Claims Of The '499 Patent .................. 133

3.  Validity Of The Asserted Claims Of The '499 Patent .......................... 133

4.  Enforceability Of the Asserted Claims Of The '499 Patent ................. 135

H.  U.S. Patent No. 5,764,913 ("The '913 Patent") ................................... 135

1.  The Teaching Of Asserted Claims Of The '913 Patent ....................... 135

2.  Infringement Of The Asserted Claims Of The '913 Patent .................. 136

3.  Validity Of The Asserted Claims Of The '913 Patent .......................... 138

4.  Enforceability Of the Asserted Claims Of The '913 Patent ................. 139

I.  U.S. PATENT NOS. 5,977,971 ("The '971 Patent") ............................. 139

1.  The Teaching Of Asserted Claims Of The '971 Patent ....................... 139

2.  Infringement Of The Asserted Claims Of The '971 Patent .................. 141

3.  Validity Of The Asserted Claims Of The '971 Patent .......................... 142

4.  Enforceability Of the Asserted Claims Of The '971 Patent ................. 143

J.  U.S. Patent No. 6,565,608 ("The '608 Patent") ................................... 143

1.  The Teaching Of Asserted Claims Of The '608 Patent ....................... 144

2.  Infringement Of The Asserted Claims Of The '608 Patent .................. 146

3.  Validity Of The Asserted Claims Of The '608 Patent .......................... 147

4.  Enforceability Of the Asserted Claims Of The '608 Patent ................. 149

K.  Damages ............................................................................................... 149

1.  Damages For Infringement Of The '004 Patent .................................... 150

2.  Damages For Infringement Of The '217 Patent .................................... 150

3.  Damages For Infringement Of The '433 Patent .................................... 150

4.  Damages For Infringement Of The '794 Patent .................................... 150

5.  Damages For Infringement Of The '947 Patent .................................... 151

6.  Damages For Infringement Of The '499 Patent .................................... 151

vi

## TABLE OF CONTENTS (cont'd.)

| | | | Page |
|---|---|---|---|
| | 7. | Damages For Infringement Of The '913 Patent | 151 |
| | 8. | Damages For Infringement Of The '971 Patent | 151 |
| | 9. | Damages For Infringement Of The '608 Patent | 151 |
| IV. | RESERVATION OF RIGHTS | | 152 |
| V. | ABANDONED ISSUES | | 152 |
| VI. | EXHIBITS | | 152 |
| VII. | WITNESSES | | 152 |
| A. | Witnesses That Microsoft Expects To Call In Person | | 152 |
| | 1. | Expert Witnesses | 152 |
| | | i. Dale Buscaino | 152 |
| | | ii. Jerry Gibson | 153 |
| | | iii. John Kelly | 153 |
| | | iv. James Modestino | 154 |
| | | v. Gerald Mossinghoff | 155 |
| | | vi. Brad Myers | 156 |
| | | vii. Adam Porter | 157 |
| | | viii. Ryan M. Sullivan | 157 |
| | 2. | Fact Witnesses | 158 |
| B. | Other Witnesses That Microsoft May Call In Person | | 161 |
| C. | Witnesses That Microsoft May Call By Deposition | | 167 |

MICROSOFT CORPORATION'S MEMORANDUM OF
CONTENTIONS OF
FACT AND LAW AND RULE 26(a)(3) DISCLOSURES
Judge: Hon. Marilyn L. Huff

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A. C. Aukerman Co. v. R.L. Chaides Const. Co.,*
960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc)................................ 17, 18, 19

*A.C. Aukerman Co. v. Miller Formless Co., Inc.,*
693 F.2d 697, 700 (7th Cir. 1982).............................................. 18

*Acco Brands, Inc. v. ABA Locks Manuf. Co., Ltd.,*
501 F.3d 1307, 1313 (Fed. Cir. 2007)........................................ 4

*Adelberg Labs., Inc. v. Miles, Inc.,*
921 F.2d 1267, 1272 (Fed. Cir. 1990)........................................ 18

*Al-Site Corp. v. VSI Intl, Inc.,*
174 F.3d 1308, 1320 (Fed. Cir. 1999)........................................ 3

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
725 F.2d 1350, 1359-60 (Fed. Cir. 1984) .................................... 14

*American Stock Exchange, LLC v. Mopex, Inc.,*
250 F. Supp. 2d 323 (S.D.N.Y. 2003)........................................ 8

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
314 F.3d 1313, 1357 (Fed. Cir. 2003)........................................ 14

*Apotex USA, Inc. v. Merck & Co., Inc.,*
254 F.3d 1031, 1035 (Fed. Cir. 2001)........................................ 9

*Aptix Corp. v. Quickturn Design Systems, Inc.,*
269 F.3d 1369, 1374 (Fed. Cir. 2001) ....................................... 17

*Azioni*
 158 F.3d 1243, 1247-48 (Fed. Cir. 1998) ................................... 2

*Berges v. Gottstein,*
618 F.2d 771, 776 (C.C.P.A. 1980) .......................................... 11

*BonitoBoats, Inc. v. Thunder Craft Boats, Inc.,*
489 U.S. 141, 156 (1989)................................................... 12

*Braun Inc. v. Dynamics Corp.,*
975 F .2d 815 , 819 (Fed. Cir. 1992)......................................... 2

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
326 F.3d 1226, 1239 (Fed. Cir. 2003)........................................ 16

*Brown & Williamson Tobacco Corp v. Philip Morris Inc.,*
229 F.3d 1120, 1130 (Fed. Cir. 2000)........................................ 13

*Brown v. Barbacid,*
436 F.3d 1376, 1380 (Fed. Cir. 2006) ................................................................. 10

*Bruckelmyer v. Ground Heaters, Inc.,*
445 F.3d 1374, 1378 (Fed. Cir. 2006) .............................................................. 7, 8

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
418 F.Supp.2d 1021, 1042 (S.D. Ind. 2006) ................................................... 92

*Carella v. Starlight Archery and Pro Line Co.,*
804 F .2d 135, 139 (Fed. Cir. 1986) .................................................................. 7

*Cargill, Inc. v. Canbra Foods, Ltd.,*
476 F.3d 1359, 1364 (Fed. Cir. 2007) ............................................................. 16

*Caron, Inc. v. Plasser American Corp.,*
474 F. Supp. 1010, 1013 (E.D. Va. 1978) ......................................................... 7

*Chen v. Bouchard,*
347 F.3d 1299, 1309 (Fed. Cir. 2003) .............................................................. 11

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,*
2001 WL 21304, at *2 (Fed. Cir. Jan. 8, 2001) ......................................... 2, 93

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,*
145 F.3d 1303, 1307-08 (Fed. Cir. 1998) ........................................................ 2

*City of Elizabeth v. American Nicholson Pavement Co.,*
97 U.S. 126 (1877) .............................................................................................. 8

*Constant v. Advanced Micro-Devices, Inc.,*
848 F.2d 1560 (Fed. Cir. 1988) ......................................................................... 7

*Cooper v. Godfarb,*
154 F.3d 1321, 1327 (Fed. Cir. 1998) ......................................................... 11, 12

*Corp. v. Condotte Am., Inc.,*
346 F.3d 1057, 1068 (Fed. Cir. 2003) .............................................................. 6

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,*
120 F.3d 1253, 1256 (Fed. Cir. 1997) .............................................................. 16

*Cummins-Allison Corp.,*
2005 WL 2012259 ............................................................................................... 8

*Dayco Products, Inc. v. Total Containment, Inc.,*
329 F.3d 1358, 1363 n.1 (Fed. Cir. 2003) ...................................................... 15

*Digital Control Inc. v. The Charles Mach. Works,*
437 F.3d 1309, 1313 (Fed. Cir. 2006) .............................................................. 16

1
2
*DSUMedical Corp. v. JMS Co., Ltd.,*
471 F.3d 1293, 1305 (Fed. Cir. 2006)................................................. 5, 6, 92

3
*Dynacore Holdings Corp. v. U. S. Philips Corp.,*
363 F.3d 1263, 1272 (Fed. Cir. 2004)................................................. 4, 92

4
5
*E-Pass Techs., Inc. v. 3Com Corp.,*
473 F.3d 1213, 1222 (Fed. Cir. 2007)................................................. 6

6
7
*Ferring B. V. v. Barr Labs., Inc.,*
437 F.3d 1181, 1194 (Fed. Cir. 2006)................................................. 16

8
*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
535 U.S. 722, 741 (2002)................................................................. 3, 4

9
10
*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intl, Inc.,*
389 F.3d 1370, 1378 (Fed. Cir. 2004)................................................. 3

11
12
*General Mills, Inc. v. Hunt-Wesson, Inc.,*
103 F . 3d 978, 981 (Fed. Cir. 1997)................................................. 2

13
*General Motors Corp. v. Devex Corp.,*
 461 U.S. 648, 657 (1983).............................................................. 20

14
15
*GFI, Inc. v. Franklin Corp.,*
265 F.3d 1268, 1274 (Fed. Cir. 2001)................................................. 16

16
17
*Glaxo Inc. v. Novopharm Ltd.,*
52 F.3d 1043, 1055 (Fed. Cir. 1995)................................................. 17

18
*Globespanvirata, Inc. v. Texas Instruments, Inc.,*
2005 WL 3077915, *27 (D.N.J. 2005) ............................................... 8

19
20
*Golden Blount, Inc. v. Robert H. Peterson Co.,*
365 F.3d 1054, 1061 (Fed. Cir. 2004)................................................. 5

21
22
*Gould v. Schawlow,*
363 F.2d 908, 918-19 (C.C.P.A. 1966) .............................................. 10

23
*Graham v. John Deere,*
383 U.S. 1, 17 (1966).................................................................... 12

24
25
*Hall v. Aqua Queen Mfg. Inc.,*
93 F.3d 1548, 1553-54 (Fed. Cir. 1996) ............................................ 18

26
*Hess v. Adv. Cardiovascular Sys., Inc.,*
106 F.3d 976, 980 (Fed. Cir. 1997)................................................... 14

27
28
*Hodosh v. Block Drug Co., Inc.,*
833 F.2d 1575, 1578 (Fed. Cir. 1987)................................................. 5

x

*Holm-wood v. Sugavanam,*
948 F.2d 1236, 1238-40 (Fed. Cir. 1991) .................................................. 10

*Imagexpo, L.L.C. v. Microsoft Corp.,*
284 F. Supp. 2d 365, 369 n.3 (E.D. Va. 2003) ........................................... 93

*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH,*
408 F.3d 1374, 1379 (Fed. Cir. 2005) .................................................. 20, 90

*IMS Tech., Inc. v. Haas Automation, Inc.,*
206 F.3d 1422, 1436 (Fed. Cir. 2000) ........................................................ 2

*In re Carlson,*
983 F .2d 1032, 1038 (Fed. Cir. 1992) ...................................................... 13

*In re Cronyn,*
890 F.2d 1158, 1160-61 (Fed. Cir. 1989) .................................................... 7

*In re Epstein,*
32 F.3d 1559, 1567-68 (Fed. Cir. 1994) .................................................... 14

*In re Etter,*
756 F.2d 852, 859 (Fed. Cir. 1985) ........................................................... 13

*In re Hall,*
781 F.2d 897, 899 (Fed. Cir. 1986) ............................................................. 7

*In re Klopfenstein,*
380 F.3d 1345, 1348 (Fed. Cir. 2004) ......................................................... 8

*In re Mulder,*
716 F.2d 1542, 1545 (Fed. Cir. 1983) ...................................................... 10

*In re Winslow,*
365 F .2d 1017, 1020 (C.C.P.A. 1966) ...................................................... 13

*In re Yamamoto,*
740 F.2d 1569, 1573 (Fed. Cir. 1984) .................................................. 13, 14

*Inc. v. MercExchange, L.L.C.,*
547 U.S. 388, 126 S.Ct. 1837, 1839 (2006) .............................................. 94

*Instituform Techs., Inc. v. Cat Contracting, Inc.,*
161 F.3d 688, 695 (Fed. Cir. 1998) ........................................................... 92

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
331 F.3d 860, 870 (Fed. Cir. 2003) ........................................................... 89

*Jockmus v. Leviton,*
28 F.2d 812 (2"d Cir. 1928) ....................................................................... 7

xi

*Johnston & Standard Min. Co.,*
148 U.S. 360, 370 (1893) ........................................................................ 18

*Kimberly- Clark Corp. v. Johnson & Johnson,*
745 F.2d 1437, 1452 (Fed. Cir. 1984) ...................................................... 13

*Knorr v. Pearson,*
671 F.2d 1368, 1374 (C.C.P.A. 1982) ...................................................... 11

*KSR Int'l Co. v. Teleflex Inc.,*
127 S. Ct. 1727, 1739 (2007) ........................................................ 12, 13, 14

*Lane & Bodley Co. v. Locke,*
150 U.S. 193, 201 (1893) ........................................................................ 17

*Lemelson v. United States,*
752 F.2d 1538, 1549 (Fed. Cir. 1985) ........................................................ 5

*Lewmar Marine, Inc. v. Barient, Inc.,*
827 F.2d 744, 747 (Fed. Cir. 1987) ............................................................ 6

*Li Second Family Ltd. P'ship v. Toshiba Corp.,*
231 F.3d 1373, 1381 (Fed. Cir. 2000) ...................................................... 15

*Lifescan, Inc. v. Home Diagnostic, Inc.,*
103 F. Supp. 2d 345, 369 (D. Del. 2000) .................................................. 11

*Loral Fairchild Corp. v. Victor Company of Japan, Ltd.,*
208 F. Supp. 2d 344, 356 (E.D.N.Y. 2002) .............................................. 12

*Lucent Techs., Inc. v. Gateway, Inc.,*
 509 F. Supp. 2d 912, 925 (S.D. Cal. 2007) ................................................ 4

*Mahn v. Harwood,*
112 U. S . 354, 362-63 (1884) .................................................................. 17

*Mahurkar v. C.R. Bard, Inc.,*
79 F.3d 1572, 1577 (Fed. Cir. 1996) .................................................. 10, 11

*Mann v. Werner,*
346 F.2d 636, 640 (C.C.P.A. 1965) .......................................................... 11

*Manville Sales Corp. v. Paramount Sys., Inc.,*
971 F.2d 544, 553-54 (Fed. Cir. 1990) .................................................... 92

*Massachusetts Institute of Technology v. AB Fortia,*
774 F.2d 1104, 1108 (Fed. Cir. 1985) ........................................................ 7

*Maxwell v. K Mart Corp.,*
880 F. Supp. 1323, 1333-34 (D. Minn. 1995) .......................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Mazzari v. Rogan,*
323 F.3d 1000, 1005 (Fed. Cir. 2003)................................................ 14

*Medichem, S.A. v. Rolabo, S.L.,*
437 F.3d 1157, 1169 (Fed. Cir. 2006)................................................ 11

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,*
370 F.3d 1354, 1365 (Fed. Cir. 2004)................................................ 6

*Mobile Oil Corp. v. Amoco Chem. Corp.,*
799 F. Supp. 1429, 1489 (D. Del. 1991)................................................ 8

*Moleculon Research Corp. v. CBS, Inc.,*
 793 F.2d 1261, 1263 (Fed. Cir. 1986)................................................ 6

*Molins PLC v. Textron,*
48 F.3d 1172, 1178 (Fed. Cir. 1995)................................................ 16

*Monsanto Co. v. Mycogen Plant Science, Inc.,*
261 F.3d 1356, 1262-63 (Fed. Cir. 2001) ................................................ 10

*Netscape Communications Corp. v Konrad,*
295 F.3d 1315, 1322-23 (Fed. Cir. 2002) ................................................ 8

*Oak Indus., Inc. v. Zenith Elecs. Corp.,*
726 F.Supp. 1525, 1543 (N.D. Ill. 1989) ................................................ 92

*OddzOn Prods. v. Just Toys,*
122 F.3d 1396, 1401 (Fed. Cir. 1997)................................................ 9

*Odetics, Inc. v. Storage Tech.,*
185 F.3d 1259, 1267 (Fed. Cir. 1999)................................................ 2, 3

*Oiness v. Walgreen Co.,*
88 F.3d 1025, 1029 (Fed. Cir. 1996)................................................ 88

*Ormco Corp. v. Align Tech., Inc.,*
463 F.3d 1299, 1305 (Fed. Cir. 2006)................................................ 7

*Orthopedic Equipment Co. v. United States.,*
702 F.2d 1005, 1013 (Fed. Cir. 1983) ................................................ 13

*Pannu v. Iolab Corp.,*
155 F.3d 1344, 1350 (Fed. Cir. 1998)................................................ 14

*Pennwalt Corp. v. Durand-Wayland, Inc.,*
833 F.2d 931, 934 (Fed. Cir. 1987)................................................ 2

*Petrolite Corp. v. Baker Hughes Inc.,*
96 F.3d 1423, 1425 (Fed. Cir. 1996)................................................ 8

*Pfizer, Inc. v. Apotex, Inc.,*
480 F.3d 1348, 1359-60 (Fed. Cir. 2007) ........................................................... 8

*Popeil Bros., Inc. v. Schick Elec., Inc.,*
494 F.2d 162, 166 (7th Cir. 1974) ..................................................................... 7

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,*
324 U.S. 806, 814 (1945) ................................................................................... 17

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.,*
803 F.2d 1170, 231 USPQ 297 (Fed. Cir. 1986) ............................................... 5

*Price v. Symsek,*
988 F.2d 1187, 1190 (Fed. Cir. 1993) ......................................................... 10, 11

*Refac Int'l, Ltd. v. IBM,*
798 F.2d 459, 460 (Fed. Cir. 1986) ................................................................... 5

*Rexnord Corp. v. Laitram Corp.,*
274 F. 3d 11336, 1341 (Fed. Cir. 2001) ............................................................ 2

*Riles v. Shell Exploration & Prod.,*
298 F.3d 1302, 1311 (Fed. Cir. 2002) ........................................................ 88, 89

*Rite-Hite Corp. v. Kelley Co.,*
56 F.3d 1538, 1554 (Fed. Cir. 1995) ................................................................. 19

*Sakraida v. AG Pro, Inc.,*
425 U.S. 273, 282 (1976) ................................................................................... 14

*Sandt Tech, Inc. v. Resco Metal and Plastic Corp.,*
264 F . 3d 1344, 1351 (Fed. Cir. 2001) .............................................................. 11

*SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.,*
225 F.3d 1349, 1355 (Fed. Cir. 2000) ............................................................... 12

*Southwall Tech., Inc. v. Cardinal IG Co.,*
54 F . 3d 1570, 1575 (Fed. Cir. 1995) ............................................................... 2

*Southwest Software, Inc. v. Harlequin Inc.,*
226 F.3d 1280, 1296 (Fed. Cir. 2000) ......................................................... 15, 79

*SRAM Corp. v. AD-II Eng'g, Inc.,*
465 F.3d 1351, 1357 (Fed. Cir. 2006) ............................................................... 10

*Stark v. Advanced Magnetics, Inc.,*
119 F.3d 1551, 1555 (Fed. Cir. 1997) ............................................................... 14

*Superior Fireplace Co. v. The Majestic Prods. Co.,*
270 F.3d 1358, 1373, 1374 (Fed. Cir. 2001) ..................................................... 79

*Trell v. Marlee Elect. Corp.,*
912 F.2d 1443, 1446 (Fed. Cir. 1990) ................................................................. 89

*Union Carbide Chem & Plastics Tech Corp v. Shell Oil Co.,*
425 F.3d 1366, 1379 (Fed. Cir. 2005) ................................................................. 11

*Unisplay S.A. v. American Electronic Sign Co.,*
69 F.3d 512, 517 n.7 (Fed. Cir. 1995) ......................................................... 20, 89

*Wanless v. General Electric Co.,*
148 F.3d 1334, 1336-37 (Fed. Cir. 1998) ........................................................... 18

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
520 U.S. 17, 24-28 (1997) ............................................................................... 3, 4

*Winbond Electronics Corp. v. International Trade Com 'n,*
262 F.3d 1363, 1372 (Fed. Cir. 2001) ................................................................. 17

*Wollensak v. Reiher,*
115 U.S. 96, 99-100 (1885) ............................................................................... 17

## **Statutes**

28 U.S.C. §1498(a) ............................................................................................ 93

35 U.S.C. § 102 ......................................................................................... passim

35 U.S.C. § 103 ................................................................................................. 71

35 U.S.C. § 112 ......................................................................................... passim

35 U.S.C. § 126 .......................................................................................... 49, 52

35 U.S.C. § 254 ................................................................................................. 15

35 U.S.C § 271 ................................................................................................... 4

35 U.S.C. § 282 ................................................................................................... 6

35 U.S.C. § 284 ................................................................................................. 19

F.R.C.P. 26(a)(3) ................................................................................................. 1

C.F.R. 1.56(a) .................................................................................................... 71

Defendant and Counter-claimant Microsoft Corporation ("Microsoft"), provides the following Memorandum pursuant to Local Rule 16.1(f)(2) and the April 5, 2007 Second Revised Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings [D.I. 69].  As required by the Rule, this memorandum provides a concise summary of the material facts and points of law on which Microsoft intends to rely.  It does not purport to be exhaustive or to address every item of evidence Microsoft may offer at trial.  The attached exhibit list further complies with Microsoft's obligations under Federal Rule of Civil Procedure 26(a)(3).  Microsoft also incorporates by reference as if fully set forth herein its opening, opposition and reply briefs on summary judgment.

# I.    POINTS OF LAW

## A.    The Law of Patent Infringement

### 1.    Literal Infringement

MPT has accused Microsoft of infringement of U.S. Patent No. 5,227,878 (the "'878 Patent").  Microsoft has accused Lucent of infringement of nine Microsoft patents, namely:

(a) United States Patent No. 6,438,217;

(b) United States Patent No. 6,339,794;

(c) United States Patent No. 5,438,433;

(d) United States Patent No. 5,941,947;

(e) United States Patent No. 6,412,004;

(f) United States Patent No. 5,977,971;

(g) United States Patent No. 6,565,608;

(h) United States Patent No. 5,764,913; and

(i) United States Patent No. 5,917,499.

In addition, Microsoft has accused Alcatel of infringing five of those patents, namely, the '794, '004, '971, '608 and '913 patents.

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then the fact-finder compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations

1  are present, either literally or by a substantial equivalent, in the accused device." *Rexnord Corp. v.*

2  *Laitram Corp.*, 274 F. 3d 11336, 1341 (Fed. Cir. 2001)(citing *Johnson Worldwide Assocs., Inc. v.*

3  *Zebco Corp.*, 175 F.3d 985, 1988 (Fed. Cir. 1999)); *Renishaw PLC v. Marposs Societa' per Azioni*,

4  158 F.3d 1243, 1247-48 (Fed. Cir. 1998); *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F . 3d

5  978, 981 (Fed. Cir. 1997). "The patentee must establish infringement by a preponderance of the

6  evidence." *See, e.g., Braun Inc. v. Dynamics Corp.*, 975 F .2d 815 , 819 (Fed. Cir. 1992). "To

7  establish literal infringement, every limitation set forth in a claim must be found in an accused

8  product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F . 3d 1570, 1575 (Fed. Cir. 1995).

9  **2.    Means Plus Function Limitations**

10     Pursuant to statute, a claim limitation may be written in "means-plus-function" format, *i.e.*,

11  as a "means for performing a recited function." *See* 35 U.S.C. § 112, ¶ 6. A means-plus-function

12  limitation is literally met when the accused product performs the *identical* function recited in the

13  limitation and has a structure that is identical or equivalent to the structure disclosed in the

14  specification for performing the claimed function. *Chiuminatta Concrete Concepts, Inc. v.*

15  *Cardinal Indus., Inc.*, 145 F.3d 1303, 1307-08 (Fed. Cir. 1998). Section 112, paragraph 6 rules

16  out the possibility that any and every means which performs the function specified in the claim

17  literally satisfies that limitation. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934

18  (Fed. Cir. 1987). Moreover, where the characteristics of the disclosed structure are critical in

19  performing the claimed function in the context of the invention, there may be a narrow range of

20  equivalents that satisfy the claim. *See IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422,

21  1436 (Fed. Cir. 2000).

22     "Structural equivalence under [35 U.S.C.] § 112, 6 is met only if the differences are

23  insubstantial," *see Chiuminatta*, 145 F.3d at 1309; that is, if the assertedly equivalent structure

24  performs the claimed function in substantially the same way to achieve substantially the same

25  result as the corresponding structure described in the specification. *Odetics, Inc. v. Storage Tech.,*

26  185 F.3d 1259, 1267 (Fed. Cir. 1999). Whether the structure of the accused product is equivalent

27  to a structure described in the patent specification is decided from the perspective of a person of

28

2

ordinary skill in the art. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intl, Inc.,* 389 F.3d 1370, 1378 (Fed. Cir. 2004).

When assessing the validity of a claim drafted in means-plus-function form, § 112, ¶ 6 does not require that the exact structure identified by the Court as corresponding be shown in the prior art, or even that every individual component of the corresponding structure be satisfied in the prior art. No such "component-by-component" analysis is required by § 112, ¶ 6:

> The similar analysis of equivalents under § 112, ¶ 6 and the doctrine of equivalents does not, however, lead to the conclusion that *Pennwalt* and *Warner-Jenkinson* command a component-by-component analysis of structural equivalence under § 112, ¶ 6. . . . The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function. This is why structures with different numbers of parts may still be equivalent under § 112, ¶ 6, thereby meeting the claim limitation.

*Odetics*, 185 F.3d at 1267-68.

Furthermore, a means-plus-function limitation cannot be satisfied by "after-developed" technology. As the Federal Circuit has held, "a structural equivalent under § 112 must have been available at the time of the issuance of the claim. An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon issuance. An 'after arising equivalent' infringes, if at all, under the doctrine of equivalents." *Al-Site Corp. v. VSI Intl, Inc.,* 174 F.3d 1308, 1320 (Fed. Cir. 1999) (citations omitted).

### 3.  Doctrine of Equivalents

In some situations, an accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24-28 (1997). The doctrine of prosecution history estoppel may preclude a patentee from reclaiming, through equivalents, subject matter that was relinquished based on statements or amendments during prosecution. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 741 (2002). If a patentee narrowed a claim limitation by amendment during prosecution for reasons pertaining to patentability, that limitation is not entitled to any range of equivalents unless: (a) the equivalent was unforeseeable at the time of the application; (b) the rationale

3

1    underlying the amendment bears no more than a tangential relation to the equivalent; or (c) the

2    patentee could not reasonably have been expected to have described the equivalent in question.

3    *See id.*  The burden is on the patentee to establish that the reason for the amendment was unrelated

4    to patentability. *Warner-Jenkinson*, 520 U.S at 33, 117 S.Ct. 1040.  If the patentee fails to meet

5    this burden, the court must presume that the patentee "had a substantial reason related to

6    patentability for including the limiting element added by amendment." *Id.*  If there is a substantial

7    reason related to patentability "prosecution history estoppel would bar the application of the

8    doctrine of equivalents as to that element." *Id.*

9                        **4.    Infringement of Method Claims**

10           Method claims are distinct from apparatus claims in that they involve a series of process

11   steps rather than physical structure. To be liable for direct infringement of a method claim, "there

12   must be sufficient evidence that establishes the device is capable of performing the method and

13   that it indeed performs the method." *Lucent Techs., Inc. v. Gateway, Inc.*, 509 F. Supp. 2d 912,

14   925 (S.D. Cal. 2007) (citing J*oy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993) ("A

15   method claim is *directly* infringed only by one practicing the patented method.") (emphasis in

16   original)).

17                            **5.    Indirect Infringement**

18           Liability for indirect infringement requires a showing of direct infringement.  *Dynacore*

19   *Holdings Corp. v. U. S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect

20   infringement, whether inducement to infringe or contributory infringement, can only arise in the

21   presence of direct infringement . . . ").  "In order to prove direct infringement a patentee must

22   either point to specific instances of direct infringement or show that the accused device necessarily

23   infringes the patent in suit." *Acco Brands, Inc. v. ABA Locks Manuf. Co., Ltd.*, 501 F.3d 1307,

24   1313 (Fed. Cir. 2007).  If an accused device "can be used at any given time in a non-infringing

25   manner, the accused device does not necessarily infringe." *Id.*

26                            **i.    Contributory Infringement**

27           Under 35 U.S.C 271(c), contributory infringement requires a showing that the defendant

28   sold or offered to sell or imported into the United States a component of a patented invention that

constitutes a material part of the invention, knowing it to be especially made or especially adapted for an infringing use and that the component is not a staple article or commodity of commerce suitable for substantial non-infringing use.

In order for there to be contributory infringement, the person who received the component must infringe the patent. *Refac Int'l, Ltd. v. IBM*, 798 F.2d 459, 460 (Fed. Cir. 1986). The component must also have certain characteristics. First, the component must be a material part of the invention. Second, the component must be especially made or adapted for use in a manner that infringes the patent, and the supplier must know that the component was especially made for that use. *See Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 803 F.2d 1170, 231 USPQ 297 (Fed. Cir. 1986); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004). Third, the "thing sold" must not have a substantial use that does not infringe the patent. *Hodosh v. Block Drug Co., Inc.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987). The question of substantial non-infringing use focuses on "the thing sold by the one accused of contributing to infringement." *Id.*

Finally, for method claims a plaintiff must prove the modes in which the accused devices have been operated and the manner in which those modes infringe the patent claims ." *Lemelson v. United State*s, 752 F.2d 1538, 1549 (Fed. Cir. 1985) (emphasis added) (affirming finding of non-infringement where plaintiff had not proven that accused products operated in certain infringing modes of operation).

### ii.    Inducing Infringement

Proof of inducing infringement requires the establishment of specific intent. The patent owner must establish that the alleged infringer "actively and knowingly aided and abetted another to directly infringe the patent." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006). Mere "knowledge of the acts alleged to constitute infringement is not enough. The mere knowledge of possible infringement by others does not amount to inducement." *Id.* (quotation marks and citations omitted). This standard breaks down into four elements that must be proven: (1) an act of direct infringement; (2) the alleged infringer knowingly induced infringement with the intent to encourage the infringement; (3) the alleged infringer must have

5

1    intended to cause the acts that constitute the direct infringement; and (4) the alleged infringer must

2    have known or should have known that its action would cause the direct infringement. *Id.*

3         Where customers are the alleged direct infringers, "it is too speculative a leap" to conclude

4    that any customer actually performed the claimed method based on circumstantial evidence

5    relating to "general purpose computing devices that can be used for a variety of purposes and in a

6    variety of ways." *E-Pass Techs., Inc. v. 3Com Corp.,* 473 F.3d 1213, 1222 (Fed. Cir. 2007).

7    Method claims are not infringed by the mere sale of an apparatus capable of performing the

8    claimed process. *EPass Techs.*, 473 F. 3d at 1222 (explaining *Moleculon Research Corp. v. CBS,*

9    *Inc.*, 793 F.2d 1261, 1263 (Fed. Cir. 1986).

10        **B.     The Law of Validity**

11        Patents issued by the United States Patent and Trademark Office ("PTO") are entitled to a

12   statutory presumption of validity. 35 U.S.C. § 282; *Metabolite Labs., Inc. v. Lab. Corp. of Am.*

13   *Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004). To overcome this presumption, the patent

14   challenger must demonstrate the patents are invalid (either as anticipated or obvious) by clear and

15   convincing evidence. *Metabolite Labs*, 370 F.3d at 1365.

16        **1.     Anticipation**

17        Anticipation under 35 U.S.C. § 102 requires proof that a single prior art reference discloses

18   each and every limitation of the claimed invention. *Lewmar Marine, Inc. v. Barient, Inc.*, 827

19   F.2d 744, 747 (Fed. Cir. 1987). Under 35 U. S .C. § 102, a patent is invalid for anticipation if a

20   single prior art reference "explicitly or inherently discloses every limitation recited in the claims."

21   *State Contracting & Eng g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1068 (Fed. Cir. 2003).

22        Under § 102(a), a person shall be entitled to a patent "**unless** . . . the invention was known

23   or used by others in this country, or patented or described in a printed publication in this or a

24   foreign country, before the invention thereof by the applicant for patent." 35 U. S .C. § 102(a)

25   (emphasis added).

26        Under § 102(b), a person shall be entitled to a patent "**unless** . . . the invention was

27   patented or described in a printed publication in this or a foreign country or in public use or on

28

6

Case No. 06-CV-0684 H (CAB)

1 sale more than one year prior to the date of the application for patent in the United States . . . ."

2 35 U.S.C. § 102(b) (emphasis added).

3          **2.      Printed Publication**

4          "Whether a given reference is a 'printed publication' depends on whether it was 'publicly

5 accessible' . . . ." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006).

6 "Accessibility goes to the issue of whether an interested member of the relevant public could

7 obtain the information if they wanted to." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d

8 1560 (Fed. Cir. 1988). "A given reference is 'publicly accessible' upon a satisfactory showing that

9 such document has been disseminated or otherwise made available to the extent that persons

10 interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can

11 locate it." *Bruckelmyer*, 445 F.3d at 1378. This issue "must be approached on a case-by-case

12 basis." *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986). As long as accessibility to the reference is

13 proven, "there is no requirement to show that particular members of the public actually received

14 the information." *Constant*, 848 F.2d at 1560.

15          Accessibility may be shown by the actual distribution or dissemination of the document to

16 the public. *See, e.g., Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006);

17 *Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1108 (Fed. Cir. 1985); *see*

18 *also Popeil Bros., Inc. v. Schick Elec., Inc.*, 494 F.2d 162, 166 (7th Cir. 1974); *Jockmus v. Leviton*,

19 28 F.2d 812 (2"d Cir. 1928). In the case of printed material that has been distributed, its date of

20 public availability is the date that it was first received by a recipient (the so-called "magazine

21 rule"). *See Carella v. Starlight Archery and Pro Line Co.*, 804 F .2d 135, 139 (Fed. Cir. 1986);

22 *Caron, Inc. v. Plasser American Corp.*, 474 F. Supp. 1010, 1013 (E.D. Va. 1978); MPEP § 2128

23 .02

24          In the case of a lone thesis in a single library, accessibility may be demonstrated by the fact

25 that the thesis was indexed and shelved so that a user of that library could have located it . *See,*

26 *e.g., In re Hall*, 781 F.2d 897, 899-900 (Fed. Cir. 1986); *In re Cronyn*, 890 F.2d 1158, 1160-61

27 (Fed. Cir. 1989). However, even if the reference itself is not indexed by subject matter, it may

28 nevertheless be accessible if a diligent person could find it under the circumstances. *See American*

7

1   *Stock Exchange, LLC v. Mopex, Inc.*, 250 F. Supp. 2d 323 (S.D.N.Y. 2003). Indeed, the evidence

2   and circumstances sufficient to establish that a reference is a "printed publication" are not limited

3   to those situations where "there is distribution and/or indexing." *In re Klopfenstein*, 380 F.3d

4   1345, 1348 (Fed. Cir. 2004).

5          Public accessibility of a prior art reference may be established upon a showing of the

6   publishing of an abstract or other document directing the public to the reference. *See, e.g.,*

7   *Bruckelmyer*, 445 F.3d at 1378-79 ; *Mobile Oil Corp. v. Amoco Chem. Corp.*, 799 F. Supp. 1429,

8   1489 (D. Del. 1991). Furthermore, a thesis that is abstracted in Dissertation Abstract

9   International, a periodical catalog containing the abstracts of Ph.D. theses, is a printed publication

10  as of the date the abstract is available for ordering from University Microfilm International, the

11  publisher of Dissertation Abstract International. *Globespanvirata, Inc. v. Texas Instruments, Inc.*,

12  2005 WL 3077915, *27 (D.N.J. 2005).

13                 **3.     Public Use**

14         Under 35 U. S.C. § 102(b) a person shall be entitled to a patent "unless . . . the invention

15  was . . . in public use or on sale in this country, more than one year prior to the date of the

16  application for patent in the United States." 35 U.S.C. § 102(b). The patent challenger bears the

17  burden of proof on public use and sale and must prove by clear and convincing evidence that the

18  claimed feature was ***publicly used*** or ***on sale*** more than one year prior to the filing date of the

19  patent. *See Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1359-60 (Fed. Cir. 2007)(emphasis added).

20  A patentee can "keep his invention out of the public domain" – by imposing "some measure of

21  secrecy, usually in the form of a confidentiality agreement." *Cummins-Allison Corp.*, 2005 WL

22  2012259, at *3 (citing *Netscape Communications Corp. v Konrad*, 295 F.3d 1315, 1322-23 (Fed.

23  Cir. 2002)); *see also id.* at *3 (stating that public use includes any use of the claimed invention

24  other than the inventor who is under no limitation, restriction, or obligation of secrecy to the

25  inventor) (citing *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)).

26  Confidential beta tests whose primary purpose is not commercial are not a public use. *City of*

27  *Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877).

28

Case No. 06-CV-0684 H (CAB)

### 4. 35 U.S.C. § 102(e)

Under 35 U. S.C. § 102(e) a person shall be entitled to a patent "unless . . . the invention was described in - (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language." 35 U.S.C. § 102(e).

### 5. 35 U.S.C. § 102(f)

A person is entitled to a patent unless "he did not himself invent the subject matter sought to be patented." 35 U.S.C. §102(f). Under this provision, "one may not obtain a patent on that which is obtained from someone else whose possession of the subject matter is inherently 'prior.'" *OddzOn Prods. v. Just Toys*, 122 F.3d 1396, 1401 (Fed. Cir. 1997). That applies "to private communications between the inventor and another which may never become public." *Id.* at 1401-02. "Subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103." *Id.* at 1404.

### 6. 35 U.S.C. § 102(g)

Under 35 U.S.C. § 102(g)(2) a person shall be entitled to a patent unless:

> [B]efore such person' s invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice , from a time prior to conception by the other.

35 U.S.C. § 102(g)(2). Section 102(g) defines a category of prior art that can invalidate an issued patent during litigation. *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001). A party may establish a prior invention under § 102(g)(2) by showing that an invention originally developed in a foreign country was brought to the United States. *See Holm-wood v.*

9

1  *Sugavanam*, 948 F.2d 1236, 1238-40 (Fed. Cir. 1991) (holding that although invention was made

2  in Germany, prior invention in this country was shown through evidence that inventor's assignee

3  sent a sample to its research unit in the United States to verify test results); *Maxwell v. K Mart*

4  *Corp.*, 880 F. Supp. 1323, 1333-34 (D. Minn. 1995) ("It is well established that the introduction of

5  a completed invention into the United States may be relied upon for priority purposes even though

6  the invention was conceived and reduced to practice abroad.). The party asserting invalidity under

7  § 102(g) bears the burden of demonstrating an actual reduction to practice by clear and convincing

8  evidence. *See, e.g., SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

9          Pursuant to subsection 102(g), "the person who first reduces an invention to practice is

10  'prima facie the first and true inventor.'" *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed.

11  Cir. 1996). A party who is first to conceive but last to reduce to practice is only entitled to a

12  patent if they exercised reasonable diligence in reducing the invention to practice from just before

13  the other party's conception. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993); *Monsanto*

14  *Co. v. Mycogen Plant Science, Inc.*, 261 F.3d 1356, 1262-63 (Fed. Cir. 2001).

15          Thus, a patent claim is invalid if the invention it claims was first reduced to practice by

16  someone other than the patent's inventor. The only exception to this general rule is if the patent's

17  inventor can show first conception of the claimed invention, and also diligence to reduce the

18  invention to practice for the entire time period starting just before the other's conception up until

19  the patent's inventor's own reduction to practice. *See Price*, 988 F.2d at 1190; *Monsanto*, 261 F.

20  3d at 1262-63. To prove reasonable diligence a party must present evidence of specific acts at

21  specific times ***throughout*** the critical period. *Gould v. Schawlow*, 363 F.2d 908, 918-19 (C.C.P.A.

22  1966)(emphasis added). Even short periods of unexplained inactivity defeat an attempt to show

23  diligence. *In re Mulder*, 716 F.2d 1542, 1545 (Fed Cir. 1983); *Monsanto*, 261 F.3d at 1369;

24  *Gould*, 363 F.2d at 908. The reduction to practice can be actual by achieving the operation of the

25  invention, or constructive by filing a patent application describing the invention; and, evidence of

26  diligence must be corroborated. *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).

27          "In order to establish an actual reduction to practice, the inventor must prove that: (1) he

28  constructed an embodiment or performed a process that met all the limitations . . . and (2) he

10

1   determined that the invention would work for its intended purpose." *Cooper v. Godfarb*, 154 F.3d

2   1321, 1327 (Fed. Cir. 1998).   In the context of a method patent, the execution of a program on a

3   computer performs the steps of a method.   *See Union Carbide Chem & Plastics Tech Corp v. Shell*

4   *Oil Co.*, 425 F.3d 1366, 1379 (Fed. Cir. 2005).   Additionally, the purported inventor must also

5   prove the "the existence of sufficient evidence to corroborate inventors [sic] testimony regarding

6   these events."   *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) *(citing*

7   *Cooper*, 154 F. 3d at 1330).

8       "Credibility concerns undergird the corroboration requirement, the purpose of which is to

9   prevent fraud."   *Medichem*, 437 F . 3d at 1170; *see also Chen v. Bouchard*, 347 F.3d 1299, 1309

10  (Fed. Cir. 2003).   The sufficiency of corroborating evidence is determined by using a "rule of

11  reason analysis, under which all pertinent evidence is examined when determining the credibility

12  of an inventor's testimony."   *Medichem*, 437 F.3d at 1170; *see also Price*, 988 F.2d at 1195;

13  *Berges v. Gottstein*, 618 F.2d 771, 776 (C.C.P.A. 1980).   There is no need to corroborate "every

14  factual issue contested by the parties." *Cooper*, 154 F.3d at 1330; *Mann v. Werner*, 346 F.2d 636,

15  640 (C.C.P.A. 1965); *Knorr v. Pearson*, 671 F.2d 1368, 1374 (C.C.P.A. 1982).   As a result,

16  corroboration does not require "an actual over-the-shoulder observer." *Cooper*, 154 F.3d at 1330;

17  *Berges*, 618 F.3d at 771.   Instead, corroboration can be shown circumstantially rather than by

18  direct observation. *Cooper*, 154 F.3d at 1330; *Sandt Tech, Inc. v. Resco Metal and Plastic Corp.*,

19  264 F . 3d 1344, 1351 (Fed. Cir. 2001).

20      Documents generated by an inventor are probative as to reduction to practice but cannot,

21  by themselves, corroborate a reduction to practice. *Medichem*, 437 F.3d at 1170.   There is no

22  corroboration requirement imposed on documents generated by an inventor or, or any other

23  document or physical evidence, as a condition for its serving as evidence of reduction to practice.

24  *See, e.g., Mahurkar*, 79 F.3d at 1577-78.   Testimony of someone other than the purported inventor

25  may corroborate the inventor's testimony. *Sandt Tech*, 264 F.3d at 1351.   However, there is no

26  requirement that the corroborating witness remember specific details regarding the inventor's

27  reduction to practice. *Lifescan, Inc. v. Home Diagnostic, Inc.*, 103 F. Supp. 2d 345, 369 (D. Del.

28  2000).   Additionally, "[c]orroborative testimony does not necessarily have to be an actual

11

1  witnessing of the reduction to practice by one who understands what is going on in order to be

2  adequate." *Cooper*, 154 F.3d at 1330; *Berges*, 618 F.3d at 774.

3          The publication of an inventor's work obviates any credible claim of abandonment,

4  suppression, or concealment of the work.  *Loral Fairchild Corp. v. Victor Company of Japan,*

5  *Ltd.*, 208 F. Supp. 2d 344, 356 (E.D.N.Y. 2002).

6          **7.    Obviousness**

7          Obviousness under §103 requires proof that "the differences between the subject matter

8  sought to be patented and the prior art are such that the subject matter as a whole would have been

9  obvious at the time the invention was made to a person having ordinary skill in the art." *SIBIA*

10  *Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000)

11  (affirming jury verdict that patent was obvious in light of art that was before the examiner)

12  (quoting 35 U.S.C. § 103(a) (1994)).  "[T]he combination of familiar elements according to known

13  methods is likely to be obvious when it does no more than yield predictable results," *KSR Int'l Co.*

14  *v. Teleflex Inc.*, 127 S. Ct. 1727, 1739 (2007), thus the question is "whether the improvement is

15  more than the predictable use of prior art elements according to their established functions."  *Id.*

16  Obviousness is based on underlying factual inquiries regarding the scope and content of the prior

17  art, the level of ordinary skill in the field of the invention, the differences between the claimed

18  invention and the prior art, and any objective evidence of non-obviousness such as long-felt need,

19  and commercial success.  *Id.* at 1734 (referring to the "*Graham* factors" as recited in *Graham v.*

20  *John Deere*, 383 U.S. 1, 17 (1966)).

21          However, a valid patent cannot be obtained for implementing obvious variations of the

22  prior art.  Indeed, "requirements of federal patent law are grounded in the notion that concepts

23  within the public grasp, or those so obvious that they readily could be, are the tools of creation

24  available to all."  *BonitoBoats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989).

25  "[W]e cannot 'deny factfinders recourse to common sense.'"  *KSR Int'l*, 127 S . Ct. at 1742.

26  "Conclusory statements by experts cannot make nonobvious what those facts make obvious," *id.* at

27  1741, especially where there are no "secondary factors to dislodge the determination that . . . [it] is

28  obvious."  *Id.* at 1745.  Further, "[a] nexus between . . . [secondary factors] and the claimed

1   features is required before secondary considerations *can* dislodge the determination." *See Brown*

2   *& Williamson Tobacco Corp v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). But

3   secondary considerations cannot overcome strong evidence of obviousness. *Id.*

4          The hypothetical person of ordinary skill – from whose perspective the obviousness

5   determination is made – is one who is "presumed to be aware of all the pertinent prior art, whether

6   or not the applicant was aware of its existence." *In re Carlson*, 983 F .2d 1032, 1038 (Fed. Cir.

7   1992). The law thus "imputes to the inventor an omniscience which will again and again deprive

8   him of the reward that his talents as an individual might otherwise deserve." *Kimberly- Clark*

9   *Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1452 (Fed. Cir. 1984). Put another way, "the proper

10  way to apply the 103 obviousness test . . . is to first picture the inventor as working in his shop

11  with the prior art references which he is presumed to know – hanging on the walls around him."

12  *In re Winslow*, 365 F .2d 1017, 1020 (C.C.P.A. 1966). More recently, the Supreme Court

13  explained that "a person of ordinary skill will be able to fit the teachings of multiple patents

14  together like pieces of a puzzle." *KSR Intl*, 127 S. Ct. at 1742. Moreover, whether one prior art

15  reference can be substituted or incorporated into another is irrelevant, "the criterion being not

16  whether the references could be physically combined but whether the claimed inventions are

17  rendered obvious by the teachings of the prior art as a whole." *In re Etter*, 756 F.2d 852, 859

18  (Fed. Cir. 1985); *see also Orthopedic Equipment Co. v. United States.*, 702 F.2d 1005, 1013 (Fed.

19  Cir. 1983); *In re Yamamoto*, 740 F.2d 1569, 1573 (Fed. Cir. 1984).

20         A determination of obviousness requires an "expansive and flexible approach." *KSR Int'l*,

21  at 1731. In *KSR*, the Supreme Court determined that the rigid application of the teaching-

22  suggestion-motivation to combine test commonly applied by the Federal Circuit was inconsistent

23  with the flexible approach to obviousness outlined in earlier Supreme Court cases such as *Graham*

24  *v. John Deere*. *See id.* at 1739. Where the possible combinations and permutations are limited,

25  obviousness may be established by "showing that the combination of elements was 'obvious to

26  try.'" *Id.* at 1739. "When a patent 'simply arranges old elements with each performing the same

27  function it had been known to perform' and yields no more than one would expect from such an

28  arrangement, the combination is obvious." *Id.* at 1740 (citing *Sakraida v. AG Pro, Inc.*, 425 U.S.

1  273, 282 (1976)).  "Granting patent protection to advances that would occur in the ordinary course

2  without real innovation retards progress . . . ."  *Id.* at 1743.

3      A patent challenger's burden of proof of invalidity is more easily carried, when the

4  invalidating prior art was not before the examiner.  *American Hoist & Derrick Co. v. Sowa &*

5  *Sons, Inc.*, 725 F.2d 1350, 1359-60 (Fed. Cir. 1984); *see also KSR*, 127 S. Ct. at 1745.  "Deference

6  is due the Patent and Trademark Office decision to issue the patent with respect to evidence

7  bearing on validity which it considered but no such deference is due with respect to evidence it did

8  not consider."  *American Hoist & Derrick*, 725 F.2d at 1360.

9      **8.**    **Enablement**

10      There is no enablement requirement for an invalidating public use under § 102(b) or for

11  prior invention under § 102(g).  *See In re Epstein*, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994)

12  ("Beyond this 'in public use or on sale' fording, there is no requirement for an enablement-type

13  inquiry.");  *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003) ("To establish an actual

14  reduction to practice, an inventor must prove that he constructed his claimed invention and that it

15  would work for its intended purpose.").  Similarly, there is no enablement requirement for

16  obviousness under § 103.  *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357

17  (Fed. Cir. 2003) ("enablement of the prior art is not a requirement to prove invalidity under §

18  103.").

19      **9.**    **Non-Joinder of Inventor**

20      A patent's named inventors must be the true and only inventors.  *Hess v. Adv.*

21  *Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).  Accordingly, a party may assert

22  invalidity of a patent due to the failure to name a co-inventor.  *Pannu v. Iolab Corp.*, 155 F.3d

23  1344, 1350 (Fed. Cir. 1998).  If a party asserting invalidity proves incorrect inventorship, the court

24  should hold the patent invalid for failure to comply with section 102(f) unless the patentee

25  successfully takes steps to correct inventorship.  *Id.* at 1350-51.  However, correction is not

26  permitted when the nonjoinder occurred with deceptive intent.  *Stark v. Advanced Magnetics, Inc.*,

27  119 F.3d 1551, 1555 (Fed. Cir. 1997).  And a high degree of materiality of withheld information

28  can itself be considered "potent evidence in determining intent."  *Id.* at 1367.

Case No. 06-CV-0684 H (CAB)

1

**C.      35 U.S.C. § 254 Certificate of correction**

2        35 U.S.C. § 254 provides that "[w]henever a mistake in a patent, incurred through the fault

3  of the Patent and Trademark Office, is clearly disclosed by the records of the Office, the Director

4  may issue a certificate of correction stating the fact and nature of such mistake, under seal, without

5  charge, to be recorded in the records of patents."  The Federal Circuit observed that it was not "too

6  much to expect a patentee to check a patent when it is issued in order to determine whether it

7  contains any errors that require the issuance of a certificate of correction." *Southwest Software,*

8  *Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1296 (Fed. Cir. 2000).  A printed copy of the correction to

9  the patent "shall be attached to each printed copy of the patent, and such certificate shall be

10  considered as part of the original patent. Every such patent, together with such certificate, shall

11  have the same effect and operation in law on the trial of actions for causes thereafter arising as if

12  the same had been originally issued in such corrected form." 35 U.S.C. § 254.  A certificate of

13  correction does not have retroactive effect to causes of action arising before its issuance.

14  *Southwest Software*, 226 F.3d at 1294-96.

15

**D.      The Law of Inequitable Conduct**

16        "A duty of candor and good faith toward the Patent and Trademark Office rests on the

17  inventor, on each attorney or agent who prepares or prosecutes the application and on every other

18  individual who is substantively involved in the preparation or prosecution of the application and

19  who is associated with the inventor, with the assignee or with anyone to whom there is an

20  obligation to assign the application.  All such individuals have a duty to disclose to the Office

21  information they are aware of which is material to the examination of the application." *Dayco*

22  *Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 n.1 (Fed. Cir. 2003) (citing 37

23  C.F.R. § 1.56(a) (1991)).  "[T]the test for materiality is not whether there is anticipation or

24  obviousness but, rather, what a reasonable examiner would consider important in deciding whether

25  to allow the application to issue as a patent." *Li Second Family Ltd. P'ship v. Toshiba Corp.,* 231

26  F.3d 1373, 1381 (Fed. Cir. 2000); *see also Dayco Products, Inc.* 329 F.3d at 11363 n.1 (citing 37

27  C.F .R. § 1.56(a) (1991) and holding that "reasonable examiner standard remains a sufficient

28  ground for inequitable conduct materiality even after 1992 amendment of 37 C.F.R. § 1.56").  The

Case No. 06-CV-0684 H (CAB)

duty of candor thus applies to "any information that is material." *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001).

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Digital Control Inc. v. The Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006). The party urging unenforceability must show by clear and convincing evidence that the applicant met the "thresholds of both materiality and intent." *Molins PLC v. Textron*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

Where material information was not provided to the PTO and the evidence shows that the patentee knew or should have known of such materiality, the patentee "can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239 (Fed. Cir. 2003) (emphasis added). "Intent rarely can be, and need not be, proven by direct evidence. Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

"If a district court finds that the requirements of materiality and intent have been established by clear and convincing evidence, it must then balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." *Id.* at 1364. "The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997) (reversing district court's fording that no inequitable conduct had occurred). Multiple omissions "even if they do not themselves constitute inequitable conduct, can heighten the effect of the omission at issue." *Ferring B. V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1194 (Fed. Cir. 2006). It is "axiomatic that "close cases should be resolved by disclosure, not unilaterally by [the] applicant." *Critikon*, 120 F.3d at 1257; *Cargill*, 476 F . 3d at 1364.

16

### E.    Unclean Hands

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). It requires that the party seeking relief "have acted fairly and without fraud or deceit as to the controversy in issue." *Id.*

Although courts are divided as to whether the defense of unclean hands applies to claims at law for money damages, the doctrine has been applied in patent suits. *See e.g., Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1055 (Fed. Cir. 1995) (noting the endorsement of the Supreme Court for application of unclean hands to patent suits as set forth in *Precision Instrument*, 324 U.S. at 816). Generally, to demonstrate unclean hands there must be some misconduct such as fraud underlying the relevant circumstances. *See e.g., Winbond Electronics Corp. v. International Trade Com 'n*, 262 F.3d 1363, 1372 (Fed. Cir. 2001) (misconduct before the U.S. Patent and Trademark Office); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1374 (Fed. Cir. 2001) (litigation misconduct) .

### F.    Traditional Laches

The Supreme Court has long recognized the defense of laches to a patent infringement action brought in equity. *See Lane & Bodley Co. v. Locke*, 150 U.S. 193, 201 (1893); *Wollensak v. Reiher*, 115 U.S. 96, 99-100 (1885); *Mahn v. Harwood*, 112 U. S . 354, 362-63 (1884). "Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them." *Lane & Bodley*, 150 U.S. at 201.

Traditional laches is found where "1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and 2. the delay operated to the prejudice or injury of the defendant. *A. C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). The period of delay which may be deemed unreasonable has no fixed boundaries and is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit. *Id.* Where a patentee delays more than six years in

17

1    filing suit, however, a presumption arises that the patentee's delay was "unreasonable, inexcusable,

2    and prejudicial." *See id.* at 1036-37; *Wanlass v. General Electric Co.*, 148 F.3d 1334, 1336-37

3    (Fed. Cir. 1998); *see also Hall v. Aqua Queen Mfg. Inc.*, 93 F.3d 1548, 1553-54 (Fed. Cir. 1996)

4    (noting that the *Aukerman* presumption "places a burden of production on the patentee to come

5    forward with evidence of lack of prejudice or a legally cognizable excuse for delay").    When

6    laches is proven, the patent owner may not recover damages for infringement occurring prior to

7    the filing of the suit. *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990).

8        The availability of delay based on constructive knowledge of the alleged infringer's

9    activities "imposes on patentees the duty to police their rights." *Wanlass*, 148 F.3d at 1338.

10    Pervasive, open, and notorious activities by an alleged infringer, such as sales, marketing, or

11    public use of a product similar to or embodying technology similar to a patented invention "give

12    rise to a duty to investigate whether there is infringement." *Id.*; *Hall*, 93 F.3d at 1553 (patent

13    holder cannot claim ignorance in the face of "pervasive, open and notorious activities by alleged

14    infringer"); *Adelberg Labs*, 921 F.2d at 1272 (affirming summary judgment on laches defense

15    where defendant "sold millions of allegedly infringing products during the period of delay").    A

16    reasonable patentee is required to stay abreast of developments in his field of endeavor. *See*

17    *Wanlass*, 148 F.3d at 1339 (holding that a reasonable patentee must keep "abreast of the activities

18    of those in his field of endeavor"); *see also Johnston & Standard Min. Co.*, 148 U.S. 360, 370

19    (1893) (it is "well settled that where the question of laches is in issue the plaintiff is chargeable

20    with such knowledge as he might have obtained upon inquiry").

21        Ongoing settlement discussions may justify a patentee's delay under appropriate

22    circumstances. *See Aukerman,* 960 F.2d at 1003.    However, "license negotiations do not

23    necessarily push back the running of time in a laches defense." *A.C. Aukerman Co. v. Miller*

24    *Formless Co., Inc.*, 693 F.2d 697, 700 (7th Cir. 1982).    "[T]he negotiations must ordinarily be

25    continuous and bilaterally progressing, with a fair chance of success, so as to justify significant

26    delays." *Id.*

27

28

### G.   Equitable Estoppel

Equitable estoppel requires:  "(1) unreasonable and inexcusable delay in filing suit, (2) prejudice to the infringer, (3) affirmative conduct by the patentee inducing the belief that it abandoned its claims against the alleged infringer, [later defined to include silence] and (4) detrimental reliance by the infringer. " *Aukerman*, 960 F.2d at 1042.

### H.   The Law of Patent Damages

MPT seeks damages for Microsoft's alleged infringement of the '878 patents in the form of a reasonable royalty.  MPT also seeks prejudgment interest on any award.

Microsoft similarly seeks damages for Lucent's and Alcatel's infringement of the ten Microsoft patents-in-suit in the form of a reasonable royalty and prejudgment interest on any award.

Under 35 U.S.C. § 284, a patent owner is entitled to damages adequate to compensate for any infringement, but in no event less than a reasonable royalty.  "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).  "The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began."  *Id.*

The following evidentiary facts are relevant to the determination of the amount of a reasonable royalty for a patent license:  (1) the royalties received by the patentee for the licensing of a patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non-exclusive or as territory restricted or non-restricted; (4) the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors or inventor/promoter; (6) the extent of derivative or convoyed sales for either the licensee or licensor; (7) the duration of the patent and the term of the license; (8) the

19

established profitability of the product made under the patent; (9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (10) the nature of the patented invention including the character of the commercial embodiment and the benefits to those who have used the invention; (11) the extent to which the infringer has made use of the invention; (12) the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; (14) the opinion testimony of qualified experts, and; (15) the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement. *Unisplay S.A. v. American Electronic Sign Co.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S .D.N.Y. 1970) for the relevant factors).

In special cases, a patentee may seek to recover damages based on the value of an entire product when only a component of that product is patented under the "entire market value rule." *See, e.g., Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005). To do so, the patentee must demonstrate inter alia that "'the patent related feature is *the* basis for customer demand' for the entire product." *Id.* (emphasis added) Once damages are quantified, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).

## II.      MPT'S CLAIM OF INFRINGEMENT AGAINST MICROSOFT

### A.      The U.S. Patent No. 5,227,878 ("the '878 Patent")

#### 1.      Statement of Material Facts

##### i.      The '878 Patent

United States Patent No. 5,227,878 ("the '878 patent") to Puri, *et al.*, entitled "Adaptive Coding and Decoding of Frames and Fields of Video," issued on July 13, 1993, from an application dated November 15, 1991. The purported invention of the '878 patent was to

20

1   selectively and adaptively switch between field-based motion compensated prediction and frame-

2   based motion compensated prediction based on a motion compensation type signals.

3       Microsoft incorporates by reference as if fully set forth herein the expert reports and expert

4   rebuttal reports prepared by Professor Jerry D. Gibson, which set forth in greater detail Microsoft's

5   factual contentions with respect to non-infringement and invalidity concerning the '878 patent.

6               **ii.      The Prior Art**

7                   **a.      U.S. Patent No. 5,091,782 (Krause '782 patent)**

8       Originally, claim 13 of the '878 patent recited the following:

9               An apparatus for decoding a compressed digital video signal,
                comprising:

10              a means for receiving a compressed digital video bit stream; and

11              a means responsive to a coding type signal for selectively decoding
12              frames of the compressed digital video bit stream and fields of the
                compressed video bit stream.

13      The examiner rejected claims 13 and 15 as being unpatentable over the Krause '782 patent.

14  The examiner found that the Krause '782 patent taught the limitations of original claim 13 because

15  Krause discloses switching between field and frame DCT coding – see Figure 3 of Krause, blocks

16  36, 42, 44, and 52.  (See also MSLT_0040739-49 Robert Kutka, "Block Adaptive Field/Frame

17  DCT Coding Decided by the Vertical Difference Test," Signal Processing of HDTV, II,

18  Proceedings of the Third International Workshop on HDTV, Turin, Italy, August 30 through

19  September 1, 1989 (teaching, like the '782 patent, adaptive field/frame DCT).)

20      In response to the rejection over Krause, the applicants apparently agreed with the

21  rejection, because rather than challenging the examiner they instead amended the claims to focus

22  on adaptive field/frame motion compensated decoding.  They amended the claim as follows:

23

24              13.  (Amended)  An apparatus for decoding a compressed digital
25              video signal, comprising:

26              a means for receiving a compressed digital video bit stream;

27              a means responsive to a <u>motion compensation</u> [coding] type signal
28              for selectively <u>and adaptively performing motion compensated</u>
                decoding <u>of</u> frames of the compressed digital video bit stream and
                fields of the compressed video bit stream.

21

1   The inventors argued that the "decoder referred to in the Krause patent does not involve any

2   adaptive motion compensated decoding of an input bit stream, and does not need such decoding

3   capability, because there is no adaptive motion compensated coding of video in the encoder shown

4   in the Krause patent.  The motion compensation scheme has no adaptation capability in the Krause

5   patent because it is stated at col. 9, line 67, to col. 10, line 1, that the motion compensation does

6   not change regardless of whether field coding or frame coding is used, as discussed above."

7

8              **b.     Staffan Ericsson, "Fixed and Adaptive Predictors for**
               **Hybrid Predictive/Transform Coding," IEEE**
9              **Transactions on Communications, Vol. COM-33, No. 12,**
               **Dec. 1985 (LUC 1047117-128)**

10

11       Ericsson discloses a system that uses pixel-based motion compensation around transform

12   coding of the motion compensated error.  Krause '782 cites and incorporates Ericsson for his

13   teachings relating to "motion compensation techniques."  Krause and Ericsson are examples of

14   many prior art systems and studies that include the principle coding approach, hybrid coding, used

15   in the '878 patent.

16       Ericsson in Section II.C discusses hybrid coding for interlaced TV with field or frame

17   prediction.  He suggests an adaptive prediction mechanism with frame prediction in unchanged

18   areas and field prediction in changed areas (LUC 1047120).  He further discusses this concept in

19   Section III.B, where he describes switched prediction between field and frame, using frame for

20   background areas and field for moving areas.  The concept of switching between field and frame

21   prediction in this manner was considered by others in the 1980s and early 1990s – see, for

22   example, U.S. Patent 4,546,386; U.S. Patent No. 5,191,414.  Ericsson evaluates performance of

23   field/frame prediction based on mean square error.

24       The Ericsson article goes on to describe the use of motion compensation in an adaptive

25   prediction scheme in Section III.C.  In that section, he writes:

26              Motion compensation is a more complicated adaptive
           prediction scheme.  The displacement between two pictures is
27         estimated.  The predictor is taken to be the previous frame displaced
           according to a displacement estimate. . . .

28

Case No. 06-CV-0684 H (CAB)

… The estimate is a displacement in integer pels horizontally and vertically, which is found with a logarithmic search algorithm.

We applied the algorithm to the previous field and the second previous field, which is situated one frame back. A search was performed in each field, and two displacement estimates were found. Then the field giving the smallest squared error was picked.

Ericsson then goes on to identify various modes of prediction that he studied in Section III.D, entitled "Simulations":  (1) previous frame prediction; (2) switched prediction (previous frame or previous field); (3) integer motion compensation where two previous fields are searched for a displacement estimate; and (4) fractional pel motion compensation where two previous fields are searched for a fractional estimate.  For each of these four modes of prediction, Ericsson studies the performance gain as a function of block size, including the block sizes 4x4, 8x8, and 16x16. He states that "the varying statistics in background and moving area indicate that an adaptive coder should be advantageous."

Ericsson also discusses the results of simulations that he performed.  For example, Figure 13 plots bit rate versus distortion for hybrid coding from two video sequences, in which he compares prediction modes 1, 3, and 4 with field-wise and frame-wise coding.

         **c.**      **U.S. Patent No. 5,093,720 (Krause '720 patent) (CCMS 279960-973)**

This patent, which shares an inventor (Krause) with the '782 patent (discussed above), describes a video coding and decoding system that includes a adaptive motion compensated predictor that adaptively selects between two or more candidate fields according to a variety of performance criteria.  For example, Figure 4 shows an overview of the encoder with adaptive selection between two preceding fields.  Figure 8 expands on the potential fields, showing a plurality of preceding fields that can be selected as the best predictor.  Figure 8 also shows a "control signal" output by error comparator 152 that is coupled to motion vector data bus 124.

One of ordinary skill in the art would have been motivated, at the time of the Krause '720 patent, to combine its teachings with that of the Krause '782 patent to arrive at a encoder/decoder that adaptively selects between field and frame motion compensated predictors.  Both patents share two of the same inventors; both patents are assigned on their face to General Instrument and

23

are directed to the same technology. In addition, like the Krause '782 patent, the Krause '720 patent incorporates by reference the Ericsson 1985 article.

> **d. DigiCipher HDTV System Description, Submitted by General Instrument Corporation Videocipher Division, 6262 Lusk Boulevard, San Diego, California 92121, to the FCC, on behalf of The American Television Alliance, August 22, 1991 (Document No. TM 62004) (CCMS 274895-985**

General Instrument created the Digicipher System, which is described in "Digicipher HDTV System Description" ("Digicipher Description"), submitted to the FCC on August 22, 1991 by General Instrument Corporation Videocipher Division on behalf of The American Television Alliance. In Section 3.8, the Digicipher Description describes "adaptive field/frame encoding":

> There are two options when processing interlaced signals. The first option is to separate each frame into its two fields and then process the two fields independently (Figure 3-5). The second option is to process the two fields as a single fame by interleaving the lines of corresponding even and odd fields (Figure 3-6). Frame processing works better than field processing when there is little or no motion. ...
>
> …
>
> Field processing generally works better than frame processing in detailed moving areas. …
>
> The DigiCipher HDTV System uses a novel that has been developed to combine the advantages of both frame processing and field processing. It permits video signals to be compressed and then reconstructed with minimal degradation in motion rendition.
>
> A selection between frame processing and field processing based on achieving minimum error has been found to be very effective. Still or slowly moving regions are rendered much more accurately than would be possible in a field-only processing system, while motion rendition is much better than would be possible in a frame-only processing system. Since the selection is made on a local basis, the system can adjust to scenes containing both moving and non-moving features.
>
> Other simulated and less effective selection methods for the field/frame decision include simple motion detection schemes and criteria based on minimizing the number of bits used to represent the image.

Case No. 06-CV-0684 H (CAB)

1
2
3

        Since one bit per superblock of side information is included in the encoded signal that is transmitted, decoder complexity can be significantly reduced. Field and frame processing decisions are not made at the decoder, and are instead extracted from the encoded video signal.

4
5
6
7
8
9

      The advantages of adaptive field/frame motion compensation were well to General Instrument and that adaptive field/frame motion compensation had been incorporated into the design of the DigiCipher HDTV system. In addition, the analysis for the field/frame decision is made the encoder, and signals are sent to the decoder to selectively and adaptively perform motion compensated decoding on fields and frames.

10
11
12
13
14
15
16
17
18
19

      The DigiCipher Description also indicates that the DigiCipher system performs motion estimation on non-square, rectangular blocks: "Therefore, the motion estimation is performed on partial frame basis with the area of the portion chosen to equal a superblock. The superblock has a horizontal dimension equal to 4 DCT blocks and a vertical dimension equal to 2 DCT blocks." Since a block is defined to be an image area 8 pixels horizontally by 8 pixels vertically, the motion estimation is performed on 32 pixel horizontal by 16 pixel vertical regions, and the consequent motion vectors will correspond to that rectangular region. (See also Woo Paik, "DigiCipher – All Digital, Channel Compatible, HDTV Broadcast System," IEEE Transactions on Broadcasting, Vol. 36, No. 4, December 1990, pp. 245-254, particularly at page 249, where the article explains the same principles of superblocks and motion estimation.)

20
21
22
23
24
25
26
27

      An article published in October 1992 by Eric Petajan of AT&T Bell Labs, the same company that is named as the assignee on the face of the '878 patent, discusses DigiCipher and more particularly the DigiCipher Description. (Petajan, "Digital Video Coding Techniques for US High-Definition TV," IEEE October 1992.) Mr. Petajan states (at page 13, left column): "A consortium between the Massachusetts Institute of Technology and General Instrument corporation developed the Digicipher1 and Channel Compatible Digicipher2 (CCDC) systems." The document cited in footnote 1 is the DigiCipher Description. Mr. Petajan also notes that the DigiCipher system used interlaced scanning. (Petajan at 14, right column.)

28

For further support that the DigiCipher Description was publicly available, see, for example, the following U.S. patents, all of which cite the DigiCipher Description:

- 5,512,957 (assigned to Philips Electronics North America)

- 5,377,051 (assigned to Hitachi America Ltd.; DigiCipher Description incorporated by reference)

- 5,452,015 (assigned to Philips Electronics North America; DigiCipher Description incorporated by reference)

- 5,563,660 (assigned to Sony Corporation)

- 5,734,784 (assigned to Kabushiki Kaisha Toshiba)

- 6,144,410 (assigned to Nippon Television Network Corporation).

In addition, the following article and book indicate that the DigiCipher Description was publicly available:

- Ti-Hao Chiang, et al., "Compatible Coding of Digital Interlaced HDTV Using Prediction of the Even Fields from the Odd Fields," Signal Processing of HDTV, III, Proceedings of the Fourth International Workship on HDTV and Beyond (Turin, Italy, September 4-6, 1991) (H. Yasuda and L. Chiariglione (Eds.))

- Phillip A. LaPlante, "Comprehensive Dictionary of Electrical Engineering," IEEE Press, at page 182 ("DigiCipher HDTV System – a high-definition television (HDTV) digital transmission television system proposed to the FCC by the American Television Alliance composed of General Instruments and the Massachusetts Institute of Technology. The DigiCipher HDTV system proposal submitted to the FCC in August 1991 was the first system to provide an all digital television system that promised spectrum compatibility with the existing television channel allocation.").

Case No. 06-CV-0684 H (CAB)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

e.     **MPEG Submissions Prior to November 1991**

*(1)     Columbia University May, 23-24 1991 (MPEG 91/014)
and August 15-16, 1991 (MPEG 91/131)*

The Columbia 91/014 submission (GW-LT 277912-613) describes even-field encoding assuming that the neighboring odd fields have already been encoded.  And it cites three modes that were particularly useful, including averaged mode between the latest available co-sited even field and the future odd field, single mode using the latest available co-sited even field, and single mode using the future odd field.  "The latest available odd field, and 'intra' modes may also be useful," citing two references ([1] and [2]) from December 1990 and January 1991.  "If it is desired (as in [3]) to treat two fields jointly as a pair in an MPEG-like fashion, then at least the future field should be coded first ...."  Accordingly, this submission indicates that the coding scheme can use both field-based and frame-based prediction.

The Columbia 91/131 submission (GW-LT 278484-485) allows joint coding of even and odd fields to optimize coding performance.  In particular, they cite examples where coding the fields jointly will provide an advantage.   Specifically, they say:  "Similarly, in motion compensated predictive video coding if an object has uniform motion, the error image contains properly aligned fields, and it may be preferable to compress them jointly.  This is not the case, however, when the object is accelerating ....  Accordingly, the decision on whether to code the fields separately or jointly must be taken on a macroblock by macroblock basis."   In their conclusions (Section 3), they state:  "We have found, however, slightly better coding performance of the final signal, by occasionally (but not always) allowing the fields to be coded jointly."  This submission teaches that adaptive field/frame motion compensated prediction is advantageous to compression performance.

*(2)     VADIS – Cost Algorithm Group 2 August 16,
1991(MPEG 91/159) (GW-LT 278625-626)*

The 91/159 submission teaches, among other things, the following:

- Motion vectors applied to 16x8 blocks of luminance samples (and associated chrominance)

27

- Adaptive field/frame DCT
- Motion compensation from fields of the parity for predicted picture fields
- Adaptive motion compensation from fields of either the same or opposite parity for interpolated picture fields

### f.        Publications Authored on the European HDTV System

Marzio Barbero and a number of his colleagues worked on a project called Eureka EU256 back in the 1980s and early 1990s.  This work was intended to develop an HDTV system.  Dr. Barbero and his team built an actual working system that included some of the salient features that I describe below.  That system was publicly used to broadcast the 1990 World Cup.  See, for example:

- M. Cominetti, S. Cucchi, J.A. Garcia Perez, "Problems Concerning Coding and Transmission of the HDTV Signal:  the Experimental Link for the FIFA – World Cup '90," Telettra Review, Contributions to Telecommunications Development, Special Issue for High Definition TV, August 1, 1990 (CCMS 275419-430)

- M. Barbero, M. Cucchi, M. Stroppiana, "Implementation and Performance of an HDTV Codec Based on the DCT," 1991 IEEE International Symposium on Circuits and Systems, June 11-14, 1991, pages 69-72, vol.1 (CCMS 273581-584)

### (1)      M. Barbero, "Digital Coding of HDTV Based on Discrete Cosine Transform," ITU Technical Symposium, Geneva, October 4-7, 1989 (CCMS 273558-563)

In this paper, published in connection with a technical symposium dated October 4-7, 1989, Dr. Barbero presents the results of studies carried out at the RAI Centre done in the framework of the European Eureka EU256 project.  He explains in the Introduction that the results were obtained by computer simulation on 4:2:2 (Rec. CCIR 601) sequences.  He also states in the introduction that the hardware implementing the described system was under development.

28

The Barbero October 1989 article describes a hybrid-DCT codec in which the DCT transform is used for bit-rate reduction using 8x8 blocks.  The article says the video field can be divided into a number of "stripes" each of which includes 8 lines of video.  (Section 3.1)  Due to the horizontal resolution, each stripe contains 90 blocks of luminance Y samples, 45 blocks each of the two chrominance components.  It further states that, "for each picture zone of 16x8 pels there are two Y blocks, a Cb and Cr."  (Section 3.1)  The article also states that variable length codes are exploited to reduce the average number of bits assigned to each of the DCT coefficients.  (Section 3.2)  In the next section, the article states that the system uses adaptive quantization

In section 3.5, Dr. Barbero describes the method by which the hybrid codec (pictured in a block diagram in Section 3.6) exploited temporal redundancy.  For temporal analysis, the article states that the size of the transformed block is the same for DCT – i.e., 8x8.  The paper than discusses results for predictions in "static" versus "quasi-static" portions of the pictures.  The article states:

> In the case of static areas, the optimum prediction value is that of the co-sited pel belonging to the previous frame (inter-frame prediction).  If slight movements are present, then the optimum prediction value can be that obtainable from the pels belonging to the previous field and having a temporal distance of 1/50 or 1/60 s (inter-field prediction).  In case of a highly detailed picture, the interpolation can be inadequate to provide a good prediction value.  For this reason, the choice to use the temporal redundancy, and in the affirmative, to use the inter-frame or inter-field prediction is done, for each 8x8 block, on the basis of the minimum bit-rate.

The article then provides a table that provides the percentage of luminance and chrominance blocks that are coded in the intra-field, inter-field, and inter-frame modes.  The article further states that the optimum coding mode should be determined on the basis of the minimum number of bits necessary to code the block itself.  (See also U.S. Patent No. 4,546, 386, entitled "Adaptive Predictive Coding System for Television Signals," disclosing an adaptive intra-field, inter-field,

29

and inter-frame encoder that includes adaptive intra-field, inter-field, and inter-frame prediction in which the prediction mode is selected by a prediction mode switching section 10.)

In the next section (Section 3.6), the article notes that the DCT can be switched between the three modes stated above.  At the end of that section, Dr. Barbero explains that "[i]t is possible, but not necessary, also to provide a block to evaluate and, in the decoding part, to compensate the movement.  By using such a technique, the motions for the whole picture, due to, for instance, the camera panning, or for picture portions can be compensated.  In this way the system works in the inter-frame mode, instead of intra-field and inter-field and exploits the temporal redundancy at the utmost."

Therefore, the Barbero October 1989 article teaches, among other things, the following principles:

- Hybrid DCT codec

- DCT that switches between field and frame

- Pictures that are broken into "stripes" that are further broken into 8x8 blocks

- Variable length coding and adaptive quantization

- Adaptive prediction on a block-level with three modes

    o  Intra-field

    o  Inter-field – motion compensation using the previous field when motion is present ("quasi-static areas")

    o  Inter-frame – motion compensation using a field in a different frame when motion is not present ("static areas")

    o  For switching between modes, analyzing the bit-rate or calculating the minimum energy in the blocks to be coded by the DCT

30

> **(2)    G. Barbieri, F. Molo, J.L. Tejerina, "A Modular and Flexible Video Codec Architecture for Application to TV and HDTV," 16th International TV Symposium Montreux Switzerland, June 17-22 1989 (CCMS 273597-608)**

This paper, authored by an individual working, like Barbero, at RAI and Telettra, describes a hybrid DCT codec with the same prediction modes as the Barbero article (i.e., intra-field, inter-field, inter-frame).  In addition to what is described in Barbero, the Barbieri article specifically notes that "side information" is sent which includes field parity, a menu of motion vectors, normalization factor in a block, what type of predictor (if any) has been used in the block, etc.  (Section entitled "Side Information").  The side information is never mixed with the information related only to the video and the information is sent directly into the multiplexer.

> **(3)    U.S. Patent 5,006,929 to Barbero, et al., assigned to RAI Radiotelevisione Italiano, Turin, Italy – motion vector prediction (CCMS 277035-040)**

The '929 patent, co-invented by Dr. Barbero and filed in the European Patent Office on September 25, 1989 and the U.S. PTO on March 6, 1990, is entitled "method for encoding and transmitting video signals as overall motion vectors and local motion vectors."  In the Summary of the Invention section, the '929 patent states the invention defines a system in which motion vectors are generated for each image block and in which a "global or overall motion vector is furthermore generated for the entire image or an array of image blocks, the motion vectors are subtracted from the global vector to obtain local motion vectors representing the differences with respect to the global vector."  (Column 2, lines 39-48.)  The "global vector is encoded at fixed length, the local vectors are encoded at variable length, and both the coded global vector and the coded local vectors are multiplexed in the transmitted signal."  (Column 2, lines 48-52.)

31

### g. U.S. Patent No. 4,710,810 – motion vector prediction (CCMS 279950-959)

The '810 patent describes, among other concepts, the differential encoding and decoding of motion vectors. (See claims 12 and 14 and column 6, lines 33-46) Column 6, lines 33-46 provides:

> The motion vector supplied via the line 1200 follows the time series A. Since each block has only one data (one motion vector), utilizing this property, a differential circuit 184 produces a difference between the motion vectors of neighboring blocks and supplies it to a variable length coder 185. Outputs of the variable length coders 182 and 185 are supplied to a multiplexer 183 where they are multiplexed according to a predetermined order, and additional data such as synchronizing data, etc. that are necessary for the decoding are appended to them. The multiplexed data delivered from the multiplexer 183 is supplied as the output of the compression coding circuit 18 to the buffer memory 19 via a line 1800.

Claims 12 and 14 provide:

> 12. A coding apparatus for encoding an input video signal comprising:
>
> means for detecting motion contained in said input video signal to produce motion vector signal representative thereof, said motion being detected for each of several blocks into which a video picture frame of said input video signal is divided, said motion vector signal being produced in accordance with a time sequence associated with said blocks;
>
> means for converting the time sequence of said motion vector signal into a time sequence associated with said input video signal to produce a converted motion vector signal;
>
> means responsive to said input video signal and said converted motion vector signal for generating a prediction error signal;
>
> means for converting the time sequence of said prediction error signal into the time sequence of said motion vector signal produced by said detecting means to produce a converted prediction error signal;
>
> means for coding said converted prediction error signal by a variable length coding scheme to produce a coded prediction error signal;
>
> means for coding said motion vector signal by a variable length coding scheme to produce a coded motion vector signal; and

32

1

means for multiplexing said coded prediction error signal and said coded motion vector signal.

2

3

4

14.     A coding apparatus as claimed in claim 12, in which said motion vector signal coding means includes a *differential circuit for producing a difference signal between said motion vector signals which belong to neighboring blocks before being processed in accordance with said variable length coding and including means for processing said difference signal in accordance with said variable length coding*.  (emphasis added.)

5

6

7

### h.     MPEG-1: macroblock modes and differential motion vector prediction (MSLT_0602886-934)

8

9

A draft of the MPEG-1 standard was in place prior to the filing of the '878 patent.  In fact,

10

a draft of the MPEG-1 standard was considered in the prosecution history of the '878 patent and is

11

listed on the cover page of the patent:  "Coding of Moving Pictures And Associated Audio—For

12

Digital Storage Media At Up to About 1.5 Mbit/s—Part 2 Video," 1991, pp.2-51 ("MPEG-1

13

Draft").  (See face of '878 patent; see also MSLT_0602886-934).  The MPEG-1 Draft is dated

14

August 22, 1991.  The applicants disclosed the MPEG-1 Draft to the United States Patent and

15

Trademark Office ("PTO") in an Information Disclosure Statement dated March 9, 1992

16

17

(MSLT_0602750-52).

18

The MPEG-1 Draft in Sections 2.4.4.2 (P-pictures) and 2.4.4.3 (B-pictures) provides an

19

algorithm describing the differential encoding of motion vectors for P and B pictures.

20

Also in Sections 2.4.4.2 and 2.4.4.3, the MPEG-1 Draft provides the various macroblock

21

types that were available.  For P pictures, the macroblock types are described in Section 9.3.2

22

(MSLT_0602867); Table 9.1 indicates that the macroblock type includes a "motion forward" bit

23

indicating that the macroblock is motion compensated; if this bit is set to 0, there is no motion

24

vector (an intra or skipped macroblock).  For B pictures, the macroblock types are described in

25

Section 10.3.2 (MSLT_0602877); Table 10.1 indicates that the macroblock type includes "motion

26

forward" and/or "motion backward" bits, meaning that motion vectors may be forward, backward,

27

or both; also, when those bits are set to 0, the macroblock is not motion compensated (intra or

28

33

skipped).   The MPEG-1 Draft in Section 5.5.3 describes a "picture coding type signal" that indicates what kind of picture is present.

> i.   **A. Puri, et al., "Interframe Coding with Variable Block-size Motion Compensation," IEEE 1987 (CCMS 276015-024); and A. Puri, et al., "Adaptive Schemes for Motion Compensated Coding," SPIE Vol. 1001 Visual Communications and Image Processing 1988 (pp. 925-935) (CCMS 276035-046)**

Both of these papers, co-authored by one of the inventors of the '878 patent (Atul Puri), describe using variable block sizes for motion compensation.  The Puri papers indicate that they start with an 8x8 block and then initially classify the image blocks into the following three types (see, e.g., 1987 Puri paper in the Introduction):

1. "Type 1:  nonmoving blocks – The frame-difference values are mostly small and hence this type of block is identified by the motion detector as non-moving."

2. "Type 2:  compensable moving blocks – These blocks are originally identified as moving by the motion detector, but after motion compensation the values in these blocks are found to be below the motion activity threshold.  For such blocks only the motion vectors need to be transmitted to the receiver."

3. "Type 3:  uncompensable moving blocks – These blocks are identified as moving blocks and cannot be well-compensated by the block-matching motion compensation.  Both the motion vectors and the coded MCFD values are transmitted for reconstruction of these blocks.  *The Type 3 blocks are examined further by the variable block-size motion compensator* as described in the next section."  (emphasis added.)

The Type 3 blocks are thus examined by a variable block-size motion compensated scheme, in which the 8x8 block are subdivided into four 4x4 sub-blocks.  The 4x4 sub-blocks are then subjected a further process (1987 Puri paper at page 2.7.2):  "Type 3A, sub-block compensable moving blocks – with sub-block motion compensation these blocks are now classified as compensable blocks."  "Type 3B, sub-block uncompensable moving blocks – even

Case No. 06-CV-0684 H (CAB)

1   with sub-block motion compensation these blocks are still above the (block) motion activity

2   threshold, i.e., not well compensated."  The 1987 Puri paper states that Figure 1 illustrates the

3   process.

4          Puri teaches different block sizes for motion compensation to adapt the performance of

5   video coding schemes.  In fact, the 1987 Puri paper states:  "In general, the motion even in video

6   conferencing scenes is not purely translational and may result in large MCFD's [motion-

7   compensated frame differences] when large block sizes are used.  Therefore, the use of smaller

8   blocks improves the performance of motion compensation."  (1987 Puri paper at page 2.7.1.)  Also

9   see:  (1) U.S. Patent No. 4,546,386 ("That is to say, if the field of a television picture frame is

10  divided into blocks, *each including m×n picture elements*, then the movement of the image if

11  seen locally in these blocks can be regarded as substantially parallel." (emphasis added)); and (2)

12  Ti-Hao Chiang, et al., "Compatible Coding of Digital Interlaced HDTV Using Prediction of the

13  Even Fields from the Odd Fields," Signal Processing of HDTV, III, Proceedings of the Fourth

14  International Workship on HDTV and Beyond (Turin, Italy, September 4-6, 1991) (H. Yasuda and

15  L. Chiariglione (Eds.)) (Figures 2 and 3 and pages 526-28).

16                          **j.    Prior and Simultaneous Work on Field/Frame Motion
                                    Compensation**

17
        • **U.S. Patent No. 5,428,693 to Murakami et al., filed in U.S. on April 1, 1992 and filed**
18        **in Japan on April 12, 1991, and assigned to Mitsubishi Denki Kabushiki Kaisha**
          **(CCMS 277294-317)**
19
20         The '693 patent was filed in the U.S. on April 1, 1992 based on a Japanese patent

21  application filed on April 12, 1991 – this Japanese date is several months before the September 1,

22  1991 conception date claimed by MPT and Lucent.

23         The '693 patent discloses a motion compensation predictive coding apparatus that utilizes

24  adaptive field/frame motion compensation.  Figure 9 shows the an embodiment disclosed in the

25  patent.  It works as follows:

26

27                 An input image signal 300, which is organized into blocks of even
                   field pixels and blocks of odd field pixels, is fed to the first motion
28                 detector 43 and the memory 41.  The input image signal 300 is

                                           35

                                           Case No. 06-CV-0684 H (CAB)

stored in the memory 41. The input image signal 300 is also sent to the first motion detector 43. The previously received image signal 301 is read out of the memory 41 and sent to the first and second motion detectors 32 and 43. The image signal 301 is also sent to the subtracter 34. The first motion detector 43 calculates a motion vector 306 between the odd and even fields of the input image signal 300 and the image signal 301 in the same manner as described above for the previous embodiments. The motion vector 306 is then sent to the MUX 38, the adaptive composer 39, and the adaptive decomposer 40. The second motion detector 32 calculates a motion vector 302 indicating the motion between the odd field of image signal 301 and an odd field of a neighboring block read out of frame memory 33 and indicating the motion between the even field of image signal 301 and an even field of a neighboring block read out of frame memory 33. Although the first and second motion detectors are independently provided in this embodiment, one motion detector can be used at a time, being shared for the two purposes.

In this embodiment, motion vector 306 determines whether the coding is carried out in a field composition mode (i.e., the fields are composed) or in a field independent mode (i.e., the fields remain separate). For example, when the motion vector 306 between the even and odd fields is zero, field composition mode is chosen, and the fields are composed. On the other hand, if there is a substantial disparity between motion of the even fields and motion of the odd fields, field independent mode is chosen. The selection of the modes is realized by passing the motion vector 306 to the adaptive composer 306.

The subtracter 34 subtracts the motion compensation prediction signal 303, which is read out of the frame memory 33, from the image signal 301 which is read out of the memory 41 to obtain a prediction error signal 304. The prediction error signal 304 is fed to the adaptive composer 39. The adaptive composer 39 controls the blocking of the prediction error signal 304 on the basis of the motion vector 306 in the same manner as described for the second embodiment. The other illustrated components are operated in the same manner as the second embodiment described above.

Although the motion vectors that are independently obtained for the odd and even fields are used for the blocking switching in the second embodiment, in the third embodiment the motion vector obtained between the odd and even fields is used to control the adaptive blocking. In this embodiment, the motion vectors between the odd fields and between the even fields in the first motion detector 43 are compared with each other. Hence, the motion between the two fields is exactly known, and suitable blocking control is performed.

(Column 10, line 14 through column 11, line 3.)

- **U.S. Patent No. 5,539,466 to Igarashi et al., filed in U.S. on September 26, 1994 and filed in Japan on July 30, 1991, assigned to Sony Corporation (CCMS 277318-356)**

The '466 patent was filed in the U.S. on September 26, 1994 and it was based on a U.S. application that was filed as a PCT application on July 28, 1992. The PCT application was based on a Japanese patent application filed on July 30, 1991, before MPT's and Lucent's September 1, 1991 conception date. The '466 patent describes adaptive motion compensation. Figure 1 shows a coding apparatus in accordance with an embodiment described in the patent. (Column 11, lines 3-9.) The patent describes this embodiment:

> [T]he efficient coding apparatus comprises a group of frame memories 10 in which a plurality of frames (pictures) comprised of a plurality of unit blocks of 16x16 pixels are stored as an original picture, and [*sic*]
>
> a frame motion detection circuit 22 and a field motion detection circuit 21, which serve as motion detection means for detecting, every macro block, motion vectors between frames and a sum of differences of absolute values of respective pixels, and for detecting, every macro block, motion vectors between fields obtained by dividing a frame in dependency upon odd and even scans of pixels and a sum of differences between absolute values of pixels, respectively.
>
> The efficient coding apparatus further comprises motion prediction mode judgment circuit 23 and a selector 24, which serve as first mode selection means for judging, by using information outputted from the motion detection means, which any one of a frame prediction mode for carrying out motion compensation with a frame comprised of the macro blocks being as a unit and a field prediction mode for carrying out motion compensation with a field comprised of the macro blocks being as a unit has a higher efficiency, thus to select a prediction mode of a higher efficiency.
>
> The efficient coding apparatus further comprises a block data generation mode judgment circuit 25, serving as second mode selection means, which is adapted to judge, by using information outputted from the motion detection means and the first mode selection means, which any of one a frame orthogonal transform mode for transforming input picture data to block data so as to carry out orthogonal transform processing with a frame comprised of macro blocks being as a unit and a field orthogonal transform mode for transforming input picture data to block data so as to carry out orthogonal transform processing with a field comprised of macro blocks being as a unit has a higher efficiency in carrying out orthogonal transform processing, thus to select a block data generation mode of a higher efficiency.

(Column 11, lines 12-50.)

The '466 patent also discloses a prediction mode signal (MPFM and MPFD) that identifies whether the prediction is frame or field mode. That signal is transmitted by the encoder. (See, for example, Fig. 1 – the output of block 23 which is inputted to VLC 15.)

- **KDD's Implementation of Proposal of Video for MPEG2 dated October 31, 1991 (MPEG 91/214) (GW-LT 285358-415)**

KDD proposed using adaptive field/frame motion compensation, adaptive variable block size motion compensation, motion vector prediction, and information that provides motion compensation type.

"In Predictive- and Bidirectionally predictive-coded pictures, frame to frame motion compensation as well as field to field motion compensation are employed." (Page 4.) "There are two types of motion estimation and compensation. One is done by frame basis and the other is made by field basis." (Page 7.) Section 2.2.4 describes adaptive field/frame motion compensation. (Page 9.) Adaptive selection of variable block size motion compensation is described on p. 11: "In each MB, motion compensated image data of neighboring MB extended by 4 pixels and/or 4 lines depending on its position is overlapped to originally motion compensated image. ... The mode selection of overlap or non-overlap motion compensation is based on the minimization of a cost function which is the MSE of the luminance difference between the prediction MB and the MB being coded."

Section 2.5.4 describes motion vector prediction: "Like SM3, motion vectors are coded differentially relative to the last vectors of the same type." (Page 15.)

Adaptive motion compensation for even and odd field is disclosed on page 22: "In the case of field motion compensation, the above coding is performed for both odd and even fields."

Case No. 06-CV-0684 H (CAB)

Section 3.4 provides information that identifies the mode of motion compensation. (See page 26.)

- **COLUMBIA UNIVERSITY'S MPEG-2 PROPOSAL DATED NOVEMBER 1991 ((MPEG 91/39) (GW-LT 286011-026))**

Columbia University's MPEG-2 proposal describes adaptive separate/joint coding of fields in Section 3:   "Compared to entirely separate field coding, performance can be slightly improved by allowing joint coding of even and odd fields."

"Similarly, in motion compensated predictive video coding, if an object has uniform motion, the error image contains properly aligned fields, and it may be preferable to compress them jointly.  This is not the case, however, when the object is accelerating, or at the critical areas around the edges of moving objects.  Accordingly, the decision on whether to code the fields separately or jointly must be taken on a macroblock-by-macroblock basis." (Pages 4-5.)

- **SONY'S PROPOSAL OF ENCODING ALGORITHM OF MPEG II DATED NOVEMBER 1991 (MPEG 91/33) (GW-LT 286077-134)**

Sony's proposal discloses frame/field motion compensation, motion vector prediction, 16x8 field motion compensation and 16×16 frame motion compensation.  Adaptive     frame/field prediction is described on pages 3-5 and includes information that defines the prediction mode. Also see Figures 8-a and 8-b on page 8.  The Table in 5.1 (page 4) shows the function for frame prediction for 16×16 blocks and the function for field prediction for 16×8 blocks.  Section 15.4 describes frame/field motion compensation and motion vector prediction.

- **NEC'S HYBRID MULTI-RESOLUTION REPRESENTATION CODING DATED NOVEMBER 1991 (MPEG 91/25) (GW-LT 285757-790)**

NEC was the main proposer to the MPEG-2 proposal entitled "Hybrid Multi-Resolution Representation Coding.  The other proposers were GCT, NHK, Sharp, Toppan and Waseda

39

University.  The proposal described adaptive prediction with field/frame motion compensation, motion vector prediction and a prediction mode signal.  (See section 2.2 on pages 2-3; Figures 1(a) and 1(b) on page 10; Tables 3 and 4 on page 23.)

- **MATSUSHITA PROPOSAL DESCRIPTION FOR MPEG-II DATED NOVEMBER 13, 1991 (MPEG 91/217) (CCMS 273404-479)**

Matsushita's proposal describes adaptive field/frame motion compensation, field motion compensation for 16x8 blocks, frame motion compensation for 16x16 blocks and bit stream syntax to indicate motion compensation type.  (See pp. 7-9, 15-17, 40.)

Section 2.6 describes motion compensation.  In particular, adaptive field/frame motion compensation is disclosed:  "In the case of Non-intra coded (P&B) frames, the first operation is to select between using one motion vector (MV) or two motion vectors (even and odd lines, IMV) for displacement estimation; this selection process is to be repeated for both prediction directions in the case of B-Frame."  (Page 8.)  "For B-frame, the second operation is to select one of the coding modes : forward predictive, backward predictive, bi-directional interpolative, or intra-coded."  *Id.*

Section 2.7 describes interlace detection:  "The objective of this module is to detect fast motion occurred in the Macroblock causing the data in the two fields in the Macroblock to be highly decorrelated."  (Page 8.)

Section 3 describes the bit stream syntax.  Page 16 describes providing in the bit stream syntax information that identifies the mode of motion compensation.

Section 5 contains a description of the implementation of the Matsushita proposal. Sections 5.3.3 and 5.3.4 describe the motion compensation module which includes adaptive motion compensation field/frame decisions.  (Page 40.)

- **KDD'S PROPOSAL OF VIDEO CODING FOR MPEG2 DATED NOVEMBER 18, 1991 (MPEG 91/246) (GW-LT 286586-595)**

KDD proposed using adaptive field/frame motion compensation for P- and B-pictures.  (See Page 3.)  More specifically, "both frame and field-basis motion estimation are examined and

the selection is made on the value of absolute difference." *Id.* KDD's proposal also included 16x8 and 16x16 block size motion compensation. (See pages 3-4, 9-10.)

- **KATAYAMA ET AL. FRAME-BASED FIELD/FRAME ADAPTIVE CODING DATED NOVEMBER 18, 1991 (MPEG 91/11) (GW-LT 285173-192)**

The Katayama et al. proposal discloses adaptive field/frame motion compensation and field/frame information. "Frame-based block arrangement is used for frame-based prediction having the same prediction structure as MPEG1. Field-based block arrangement is for field-based prediction. For still area, frame-based arrangement is efficient in encoding. On the other hand, field-based arrangement is efficient for motion area." (p. 2 (GW-LT 285714).) "Although all predictive types in B-pictures are frame-based prediction, they have 'field/frame' bit which selects the block arrangement." (p. 3 (GW-LT 285175).) Section 10 of the proposal shows field/frame and other motion compensation modes. (pp. 8-10 (GW-LT 285180-182).) Section 10 also discloses information that identifies motion compensation mode.

k.      **Japanese Patent Application Publication S58-137379**

Japanese Patent Application Publication S58-137379 (the "'379 application") published, as stated above, on August 15, 1983 and lists Akira Hirano as the inventor and NEC Corporation as the applicant. The '379 application describes a "device for encoding television signals" that includes both field-based and frame-based motion compensation. ('379 application at p. 1, right column.) The device "adaptively switch[es] between motion detection inter-frame prediction and motion detection inter-field prediction" (*Id.* at p. 2, right column), where the motion is detected on a block level. The '379 application describes motion in fields versus motion in frames:

> … 30 frames' worth of image signals are transmitted per second, but one image signal is made up of two images, called fields, in line interlace format.

> Therefore, if one field is seen as one image, it is possible to view this as sixty images per [second] being transmitted; for instance, a motion of two pixels in the space of one frame (two pixels per frame) can be observed as a motion of one pixel in the space of one field (one pixel per field). Thus, when inter-field motion (inter-field motion vector) is detected, and inter-field motion compensation performed by generating prediction signals

41

1    compensated for inter-field motion, if the motion compensation
     range for inter-field motion is four lines per field vertically and four
2    pixels per field horizontally, compensation equivalent to eight lines
     per frame vertically and eight pixels per frame horizontally can be
3    performed.

4           That is to say, if inter-field motion compensation is used,
     even quite large motions can be detected using smaller-scale
5    hardware than for inter-frame motion compensation.

6    (*Id.* at 2, left column continuing to right column.)

7           The '379 application cites to a prior article by Matsumoto *et al.*, entitled "Study of a

8    Method for Inter-frame and Inter-field Adaptive Motion Compensated Encoding."  According to

9    the '379 application, the Matsumoto article compares "the degrees of similarity of the previous

10   frame signal with the highest degree of similarity to a block in the present frame (most similar

11   previous frame signal) and the previous field signal with the highest degree of similarity to a block

12   in the present field (most similar previous field signal)", "and the one with the highest degree of

13   similarity is made the prediction signal." ('379 application at p. 2, right column.)

14          The '379 application indicates that it uses a different technique to determine whether to use

15   field- or frame-based motion compensated prediction:  "the number of bits needed to transmit the

16   motion vector." ('379 application at p. 3, right column.)  Specifically, if the code length for the

17   inter-frame motion vector is shorter than the code length for the inter-field motion vector, then the

18   prediction is frame-based; otherwise, it is field based.  (*Id.*)  The application states that "switching

19   between motion compensation inter-frame prediction and motion compensation inter-field

20   prediction in this manner is rational."  (*Id.*)

21          Figure 2 shows a block diagram of an encoding device and is reproduced on the top of

22   the next page:

23

24

25

26

27

28

42

Case No. 06-CV-0684 H (CAB)



第 2 図

3 – Delay circuit

5 – Subtractor (subtracts prediction from input to provide error signal)

7 – Quantizer

9 – First variable word length encoder (encodes error signal)

11 – Multiplexer

13 – Buffer

15 – Line that conveys prediction signal

16 – Adder (adds quantized error signal to prediction signal)

18 – Frame memory

19 – Line that conveys pixel data from one field previous

20 – Line that conveys pixel data from one frame previous

25 – Delay and shift circuit (receives previous field data and field motion vector and performs motion compensation on field data to obtain field prediction signal)

26 – Delay and shift circuit (receives previous frame data and frame motion vector and performs motion compensation on frame data to obtain frame prediction signal)

29 – Selector (picks either the field or frame prediction signal based on the value of the signal output by the decision circuit 37 on line 35)

30 – Second variable word length encoder (encodes motion vector and signal output by the decision circuit 37)

31 – Field vector detector #1 (performs motion estimation on fields)

32 – Line output by 31 that carries the field motion vectors

33 – Selector (picks either the field or frame motion vector based on the value of the signal output by the decision circuit 37 on line 35)

34 – Line that carries the selected field or frame motion vector

38 – Frame vector detector #2 (performs motion estimation on frames)

36 – Line output by 38 that carries the frame motion vectors

37 – Decision circuit (compares code lengths of field and frame motion vectors and selects motion vector with shorter code length)

35 – Line that carries the signal output by 37 that indicates whether field or frame prediction is used

43

Case No. 06-CV-0684 H (CAB)

A digital TV signal is fed via signal line 2 to delay circuit 3, first vector detector 31, and to second vector detector 38. The delay circuit matches the timing of the TV signal to the signal line and the prediction signal output to signal line 15, "i.e., to correct for the time needed for motion vector detection and prediction signal generation." ('379 application at p. 4, left column.) The prediction error signal is obtained at subtractor 5, which computes the difference between the input TV signal and the predicted signal. The error signal is then quantized by 7, variable word length encoded by 9, and then multiplexed by 11 with the encoded motion vectors and signal that indicates whether field or frame coding has been selected.

The decision whether to select field or frame motion compensation is made by the circuitry at the bottom of Figure 2. The input TV signal is provided to two motion vector detectors 31 and 38; the former does field-based motion estimation while the latter does frame-based. The result is two motion vectors, a field motion vector output on line 32, and a frame motion vector output on line 36. Both motion vectors are provided to decision circuit 37, which determines which motion vector contains fewer bits and thus selects that motion vector, whether it is field or frame. The decision circuit 37 outputs a 1-bit signal, with "0" indicating frame motion vector and "1" indicating field motion vector. The application describes decision circuit 37 as follows:

> Decision circuit 37 compares the code lengths of the codes assigned to the inter-field motion vector input through signal line 32 and the inter-frame motion vector input through signal line 36, and according to the relative magnitudes of the two outputs a signal value of either "0" or "1" to signal line 35. …
>
> …
>
> If the signal input through signal line 35 is a "1," selector 33 outputs inter-field motion vector signal fed in through signal line 32 to second encoder [30] via signal line 43, and if the signal input through signal line 35 is a "0," it outputs the inter-frame motion vector signal fed in through signal line 36. Second encoder 30 performs … variable length encoding on the motion vector signal input by selector 33 and a signal that identifies this as inter-field motion vector or inter-frame motion vector, and outputs [the resultant signal] to signal line 31.

('379 application at p. 4, right column, through line 5, left column.)

Prediction is performed in the circuitry at the center of Figure 2. A frame memory 18 holds frame data. It outputs data from one previous field on line 19 and from one frame previous

44

1  on line 20. That data is fed, respectively, into field and frame delay and shift circuits 25 and 26,

2  which apply the field and frame motion vectors, respectively, to the previous field and frame data.

3  The signals output from both delay/shift circuits 25 and 26 are provided to selector 29 together

4  with the field/frame motion vector indicator signal, which allows the selector to determine which

5  prediction, field or frame, is provided to the subtractor 5.

6  **l.      Japanese Patent Application Publication S59-128881**

7          Japanese Patent Application Publication S59-128881 (the "'881 application") published, as

8  stated above, on July 25, 1984 and lists Akira Hirano as the inventor and NEC Corporation as the

9  applicant. Thus, the '881 and '379 applications share the same inventor, applicant, and have nearly

10  identical titles.

11          The '881 application describes a codec that performs adaptive motion compensated inter-

12  frame and inter-field encoding and decoding of blocks. Frames of images are "structured such that

13  two images, known as 'fields,' are interlaced." ('881 application at p. 2.) The application states

14  that "[i]f a device was made to perform motion-compensated for inter-frame prediction in those

15  portions of the images where there is little motion and motion-compensated inter-field prediction

16  for those portion where there is much motion, that would enable efficient encoding for both still

17  and moving images using relatively small scale hardware." ('881 application at pp. 2-3.) To

18  accomplish this, "adaptively switching between motion-compensated inter-frame prediction and

19  motion-compensated inter-field prediction" is used. (*Id.* at p. 3.)

20                  The present invention is structured from motion vector
          detecting means for detecting motion in adjacent frames (the inter-
21          frame motion vector) and motion in adjacent fields (the inter-field
          [motion] vector) in a television image, a means that, when
22          generating the prediction signal for said television image, uses the
          magnitude of at least one of said two motion vector or an inter-field
23          motion vector, generates a motion compensated prediction signal
          based on the selected motion vector, and predictively encodes said
24          input television image.

25  (*Id.*)

26          "The object of the present invention is to provide a motion-compensated inter-frame

27  encoding device that performs encoding for both still and moving images by adaptively switching

28

45

between motion-compensated inter-frame prediction and motion-compensated inter-field prediction." (*Id.* at p. 3.)

> "If motion-compensated inter-frame prediction has been performed on, for example, the block that is adjacent on the left (the reference block), from among those blocks surrounding the current block, for which encoding has been completed, then if the magnitude of the norm of the motion vector used in generating the prediction signal in the reference block (that is, the inter-frame motion vector) is large, then motion-compensated inter-field prediction is performed for the current block, but if it is small, then motion-compensated inter-frame prediction is performed. Similarly, when motion-compensated inter-field prediction has been performed for the reference block, then if the norm of the inter-field motion vector for the reference block is large, then motion-compensated inter-field prediction is performed for the current block, but if not, then motion-compensated inter-frame prediction is performed for the current block."

(*Id.* at p. 3.)

The amount of motion is represented by motion vectors.  The '881 application describes frame motion vectors and field motion vectors:

> In this way, by switching between motion-compensated inter-frame prediction and motion-compensated inter-field prediction, it is possible to perform motion-compensated inter-frame prediction, which has a narrow scope of motion compensation but has a high motion detection accuracy and high encoding efficiency, for those portions of the image wherein there is little motion, and perform motion-compensated inter-field prediction, which has a somewhat rough motion detection accuracy but which can increase the range of motion compensation using hardware of a small scope, for those portions of the image were there is much motion, thereby making it possible to perform efficient encoding for both still images and moving images.

(*Id.* at p. 3.)

Figure 2 shows a motion compensated inter-frame/inter-field encoder.  (*Id.*)  The motion compensated encoder (and corresponding decoder) is also capable of using variable length coding. (*Id.* at p. 5.)  A copy of Figure 2 is reproduced at the top of the next page:

Case No. 06-CV-0684 H (CAB)

1
2

3
4
5
6
7

8    Figure 3 shows a motion compensated inter-frame/inter-field decoder, and the figure is

9  reproduced below:

10
11

12
13
14
15
16
17

18    The bitstream is sent from the encoder to the decoder.  More specifically, "[t]he signal

19  outputted from the encoding unit to the transmission path 14 is written in the buffer memory 101

20  at the receiver side at the transmission speed of the transmission path 14."  (*Id.* at 5.)  "The

21  contents of the reception side buffer memory 101 are read out to the signal line 102, and the code

22  that shows the predicted error signal and the code that shows the motion vector are separated in

23  the demultiplexer 103, and are respectively outputted to signal lines 104 and 118."  (*Id.*)

24    "The code that shows the motion vector outputted from the demultiplexer 103 to the signal

25  line 118 is returned to the motion vector signal by the second decoder 119 and is then inputted,

26  through the signal line 120, to the variable delay circuits 112, 113 and reception side

27  determination circuit 121."  (*Id.*)

28    The variable delay circuits 112 and 113 shift the signals
    provided respectively by the signal lines 110 and 111 according to

47

the motion vector signal provided by the signal line 120, and respectively output them as the MC inter-field prediction signal and MC inter-frame prediction signal to the signal lines 114 and 115, and each is inputted to the selector 116.  The reception side determination circuit 121 monitors whether the prediction decoding of the current block signal is MC inter-field prediction or MC inter-frame prediction, and makes a determination from the motion vector signal inputted from the signal line 120 based on the aforementioned switching rules, similar to the encoding unit side determination circuit 37, and provides the results of the determination to the determination delay circuit 123 thorough the signal line 122.

(*Id.*)  "[T]he results of the determination are executed by the selector 116 after one block time."  (*Id.*)

        "The selector 116 selects one of the signals of the signal lines 114 or 115 – namely the MC inter-field prediction signal or MC inter-frame prediction signal – according to the control signal inputted by the signal line 124, and outputs it to the signal line 117 as a prediction signal."  (*Id.*)  The prediction signal is provided to the adder 107 along with the predicted error signal so that the video signal is reconstructed and is output on the signal line 108.  The decoded signal is stored in the frame memory 109 to be used as a reference for the next frame signal.

## 2.      Teaching of the Claims (L.R. 16.1.f.2.e.1)

        The '878 patent "relates to adaptive encoders and decoders involved in the transmission and reception of digital video signals."  Claims 13 and 15 are the sole claims at issue.  Claim 13 is independent.  Claim 15 depends from claim 13.

        Claim 13 is directed to an apparatus that decodes a compressed digital video signal.  It contains two means elements:  (1) "means for receiving a compressed digital video bit stream; and (2) "means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the video bit stream."  (After the words "decoding of frames of the compressed," the word "digital" was missing from issued claim 13.  In addition, the words "and fields of the video bit stream" were also missing.  They were added by Certificate of Correction in October 2005, after this Court had invalidated claim 13.)  In its claim construction order, the Court assigned a host of structural limitations to each of the means limitations of claim 13.

48

Claim 15 depends from claim 13 and adds three means limitations to the "decoding means" limitation (the second means element) of claim 13: (1) "means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal"; (2) "means responsive to the compressed digital video bit stream for producing a decoded estimate error signal"; and (3) "means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal." In its claim construction order, the Court assigned a host of structural limitations to each of the means limitations of claim 15.

### 3. Statement of Non-infringement (L.R. 16.1.f.2.e.3)

Microsoft incorporates by reference as if fully set forth herein the rebuttal expert report prepared by Professor Jerry D. Gibson, which sets forth in greater detail Microsoft's factual contentions with respect to non-infringement of the '878 patent.

Claim 13 requires the second means limitation be responsive to a motion compensation type signal. This one signal conveys the information for switching between the numerous motion compensation modes in Figure 3 (unidirectional motion compensated prediction) and Figure 4 (bidirectional motion compensated prediction) – the Court held that both of these Figures are part of the corresponding structure under 35 U.S.C. Section 112/6 for the second means limitation of claim 13. None of the accused Microsoft decoders (neither MPEG-2 nor VC-1 decoders) includes a single signal that provides information for switching between motion compensation modes for P and B frames. Instead, MPT has only identified multiple, compound signals in an effort to find correspondence to the motion compensation type signal of the '878 patent. In addition, none of the signals identified by MPT are derived by a block type declassifier circuit 80, as no such structure or equivalent exists in the accused decoders (see below). The signals identified by MPT, moreover, cannot be identical or equivalent to the claimed motion compensation type signal because the are nothing more than preprocessor definitions and are multiple, separate signals.

Originally, claim 13 recited the following:

An apparatus for decoding a compressed digital video signal, comprising:

49

Case No. 06-CV-0684 H (CAB)

1

2                              a means for receiving a compressed digital video bit
                stream; and

3                              a means responsive to a coding type signal for
                selectively decoding frames of the compressed digital video bit
                stream and fields of the compressed video bit stream.

4

5   (Application at p. 74 (MSLT_602722).)

6       The examiner rejected claims 13 and 15 as being unpatentable over the Krause '782 patent.

7   In particular, the examiner stated:

8

9   4.   Claims 1, 2 and 12-21 are rejected under 35 U.S.C.  102(e)

10  as being clearly anticipated by KRAUSE.   Note col. 5, line 30-

11  col. 8, line 53, and col. 9 lines 43-52.

12  (Office Action dated August 22, 1992 at p. 4 (MSLT_602757).)

13      The examiner found that the Krause '782 patent taught the limitations of original claim 13

14  because Krause discloses switching between field and frame DCT coding – see Figure 3 of

15  Krause, blocks 36, 42, 44, and 52.  (See also MSLT_0040739-49 Robert Kutka, "Block Adaptive

16  Field/Frame DCT Coding Decided by the Vertical Difference Test," Signal Processing of HDTV,

17  II, Proceedings of the Third International Workshop on HDTV, Turin, Italy, August 30 through

18  September 1, 1989 (teaching, like the '782 patent, adaptive field/frame DCT).)  Figure 3 of the

19  Krause '782 patent is reproduced on the top of the next page:

20

21

22

23

24

25

26

27

28



FIG. 3

The Krause '782 patent describes certain features of Figure 3 as follows:

[T]he field formatted data is output from scan converter 32 to a first compression path comprising a DCT transform coder 36 and a quantizer 38. These are conventional elements used in DCT compression, as described in the Chen and Pratt article referred to above. The field formatted data is also input to a second compression path comprising a second scan converter 42, a transform coder 44, and a quantizer 46. Transform coder 44 and quantizer 46 are identical to those in the first compression path. Prior to inputting the field formatted data to the first and second compression paths, an optional predictor signal used for motion compensation can be subtracted by a subtraction circuit 34. The motion compensation aspect of the present invention is described in more detail below.

Scan converter 42 is used to convert the field formatted data from scan converter 32 into a frame format. In this format, corresponding pairs of blocks from the even and odd fields are interleaved on a line-by-line basis. . . .

. . .

As indicated in FIG. 3, the compressed field formatted data from the first compression path is output from quantizer 38 to a switch 39. The frame formatted data compressed in the second compression path is output from quantizer 46 to switch 39. In accordance with the present invention, errors in the compressed data from the two different compression paths are evaluated and the data having the least error for each odd/even block pair is selected for transmission. Thus, where a portion of a video frame having little or no motion is compressed, it is likely that the pixel data processed in

51

the frame format will be selected. Where the portion of the video frame being evaluated is from a detailed moving area, it is probable that the data compressed in a field format will be selected.

Error evaluation and selection of frame processed or field processed data is achieved using hard wired logic generally designated by reference numeral 51. . . .

(Column 7, line 10 through column 8, line 7.)

In response to the rejection over Krause, the applicants apparently agreed with the rejection, because rather than challenging the examiner they instead amended the claims to focus on adaptive field/frame motion compensated decoding. They amended the claim as follows:

13. (Amended) An apparatus for decoding a compressed digital video signal, comprising:

a means for receiving a compressed digital video bit stream;

a means responsive to a <u>motion compensation</u> [coding] type signal for selectively <u>and adaptively performing motion compensated</u> decoding <u>of</u> frames of the compressed digital video bit stream and fields of the compressed video bit stream.

(Amendment dated December 22, 1992 at p. 4 (MSLT_602766).)

Concerning the amendment, they argued:

Claims 13-17 specify an apparatus for decoding a compressed digital video signal comprising, among other things, a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames and fields of a compressed digital video bit stream. The decoder referred to in the Krause patent does not involve any adaptive motion compensated decoding of an input bit stream, and does not need such decoding capability, because there is no adaptive motion compensated coding of video in the encoder shown in the Krause patent. The motion compensation scheme has no adaptation capability in the Krause patent because it is stated at col. 9, line 67, to col. 10, line 1, that the motion compensation does not change regardless of whether field coding or frame coding is used, as discussed above. Accordingly, the **§** 102 rejection of claims 13-17 ought to be withdrawn.

(*Id.* at p. 11 (MSLT_602773).)

The limitation at issue here – "responsive to a motion compensation type signal" – was added by amendment during prosecution. Furthermore, the original recitation of "selectively decoding" frames and fields was narrowed to "selectively and adaptively performing motion

52

compensated decoding" of frames and fields. The amendments were made for reasons pertaining to patentability because the inventors amended the claims to overcome the rejection based on Krause. Thus, the second means element – in particular, the limitations of "responsive to a motion compensation type signal" and "selectively and adaptively performing motion compensated decoding" – are not entitled to any range of equivalents, unless (a) the equivalent was unforeseeable at the time of the application; (b) the rationale underlying the amendment bears no more than a tangential relation to the equivalent; or (c) the patentee could not reasonably have been expected to have described the equivalent in question.

As to exception (a) – the equivalent was unforeseeable at the time of the application – the use of the two pieces of "motion compensation type information" identified by MPT to obtain the motion compensation type was not unforeseeable when the '878 patent was filed. In the early 1990s, when the '878 patent was filed, people who had experience in writing source code knew that it could be more efficient to develop and write code in more granular ways, breaking down larger functions and operations into smaller, more manageable concepts. It was thus not foreseeable to use two pieces of "motion compensation type information" as described by MPT.

Exception (b) – the rationale underlying the amendment bears no more than a tangential relation to the equivalent – also does not apply. The equivalent at issue is the use of two pieces of "motion compensation type information" identified by MPT to obtain the motion compensation type instead of being responsive to the motion compensation type signal, as recited in the claim. The rationale underlying the amendment was to avoid the Krause prior art patent and to specify that selective and adaptive performing of motion compensated decoding would be responsive to a particular signal, the motion compensation type signal. The use of "motion compensation type signal" was to remain consistent with the structures shown in the specification, considering that this is a means-plus-function claim. Therefore, the rationale underlying the amendment bears a direct relationship to the purported equivalent, the two pieces of "information" identified by MPT.

Finally, exception (c) – the patentee could not reasonably have been expected to have described the equivalent in question – also does not apply. In the early 1990's, when the '878 patent was filed, people who had experience in writing source code knew that it could be more

Case No. 06-CV-0684 H (CAB)

1    efficient to develop and write code in more granular ways, breaking down larger functions and

2    operations into smaller, more manageable concepts. Thus, the inventors of the '878 patent, who

3    included source code in the '878 patent and thus must have been familiar with writing code, could

4    reasonably have been expected to have described using two pieces of "motion compensation type

5    information" like MPT identified instead of or in addition to the motion compensation type signal.

6        The accused Microsoft MPEG-2 and VC-1 software decoders cannot be equivalent

7    structurally to claim 13 (or claim 15) because, according to MPT's contentions, the decoders run

8    on processors using MMX instructions. MMX is the name of a set of multimedia instructions that

9    are used in Intel processors and other processors; MMX was first shipped and used in PCs after

10   filing and issuance of the '878 patent. (AMD has similar instructions called 3DNow! that also

11   arose after the '878 patent.) Accused structures that arise after the date of a patent cannot be

12   structural equivalents under Section 112/6. And since MPT's contends that it is the Microsoft

13   decoders running on a PC that infringe claims 13 and 15, and since those PCs use MMX or

14   3DNow! instructions that arose after the '878 patent, the accused products cannot infringe claims

15   13 and 15.

16       MPT contends that any Main Profile MPEG-2 decoder or any Advanced Profile VC-1

17   decoder necessarily infringes claims 13 and 15. MPT's contention would, in effect, vitiate the

18   structural limitation of claims 13 and 15 and cannot stand. MPT's position is legally flawed and

19   must be rejected. In fact, MPT should be precluded from offering evidence or testimony to this

20   effect at trial, since it is at least irrelevant, improper, and prejudicial. The standards only specify

21   the bit stream syntax and a functional decoder. The standards can be implemented in myriad

22   different ways. Thus, not only is it legally incorrect for MPT to contend that any Main Profile

23   MPEG-2 decoder or any compliant Advanced Profile VC-1 decoder infringes claims 13 and 15; it

24   disregards the way the technical specifications of the standard.

25       The Court construed the corresponding structure for the first means limitation of claim 13

26   to be input line 50. MPT failed to identify any structure in the accused MPEG-2 and VC-1

27   decoders that is either the same or equivalent to that corresponding structure.

28

Case No. 06-CV-0684 H (CAB)

1    The Court construed the corresponding structure for the second means limitation of claim

2    13 to be the following elements:

3              Structure: circuit 100 (as shown in Fig. 2 and its internal circuitry as
               shown in Figs. 3, 4A, and 4B and as described at col.15 line 22 to
4              col. 18 line 10); circuit 94 (as shown in Fig. 2 and the circuitry
               within circuit 94 as shown and described in Figs.15, 16A, and 16B,
5              and the description of circuit 94 and its internal circuitry set forth in
               col. 15 lines 11-28 and in col. 25 line 26 to col. 27 line 34);
6              summing element 92; picture stores 100C and 100A; circuit 54 (as
               shown in Fig. 2, and as described in Fig. 12 and at col. 14 lines 5-68
7              and col. 24 lines 47-60); circuit 80 (as shown in Fig. 2 and as
               described at col. 15 lines 4-10); and including all interconnections of
8              these elements

9    Neither the accused MPEG-2 nor accused VC-1 decoders has structure that is equivalent to the

10   corresponding structure.

11   For example, the accused decoders are software; the corresponding structure is circuitry.

12   Thus, the accused decoders have a substantially different structure than the corresponding

13   structure of the second means limitation.  Also, because they are implemented in software rather

14   than the corresponding circuitry of the second means limitation, the accused decoders operate in a

15   substantially different way.

16   Furthermore, the accused MPEG-2 and VC-1 decoders are entirely missing circuit 80 and

17   do not perform that circuit's operations, as indicated by the parts of the '878 specification

18   identified by the Court as corresponding structures.   The accused decoders do not have a

19   connection between circuit 80 and circuit 54 that passes a block classification signal.    The

20   accused decoders do not separate a block classification signal into four separate signals, as

21   performed by circuit 80.  They also do not pass, for example, a motion compensation type signal

22   from circuit 80 by a direct interconnect to any software routine or other element that performs uni-

23   or bi-directional motion compensated prediction (like circuit 100) or motion vector prediction (like

24   circuit 94).   Moreover, the accused decoders do not extract a "picture type" signal from the

25   incoming bit stream and pass it directly to a motion vector predictor at all, let alone while at the

26   same time passing it directly to another circuit (like circuit 80, which does not even exist in the

27   accused decoders).

28

Case No. 06-CV-0684 H (CAB)

In addition, the accused MPEG-2 and VC-1 decoders do not include a motion vector predictor like circuit 94 (and internal circuitry shown in Figures 15, 16A, and 16B) of the '878 patent.  First, the accused decoders do not include a motion vector predictor that is in any way responsive to a motion compensation type signal.  Further, the accused decoders do not contain any structure that selects between multiple modes of motion compensation based on a motion compensation type signal, let alone like the set of linear decisions made for the 10 motion compensation modes shown in Figures 15, 16A, and 16B.

The accused MPEG-2 and VC-1 decoders also do not include circuit 54.  MPT has failed to offer any evidence or argument that the accused decoders contain any software routines or anything else like Figure 12, which the Court identified as showing and describing circuit 54.  Also, the accused MPEG-2 decoders do not contain any software routines or anything else that extract data from the incoming bit stream and route it to its intended location, let alone routing a block classification signal to a block declassifier circuit 80, as the accused decoders do not include such a signal or circuit, as explained above.  The accused MPEG-2 decoders operate in a substantially different way to provide the data to the appropriate routine or function.  The VC-1 decoders also do not include any software routines or anything else that works like circuit 54, for example, because, as with the MPEG-2 decoders, they do not include a block classification signal or a block declassifier circuit.  Furthermore, there is no structure in the accused decoders that outputs quantization parameters, differential dc coefficients, and block class signals as required by claims 13 and 15.

The accused MPEG-2 and VC-1 decoders also structurally differ from circuit 100.  That circuit, shown in more detail in Figures 3, 4A, and 4B, which are also corresponding structure under Section 112/6, is controlled by a single switch for P pictures and a single switch for B pictures, each of which is responsive to the singular motion compensation type signal.  The switches control the flow of data to the numerous predictors that correspond to the various motion compensation modes required by claims 13 and 15, as construed by the Court.  The accused decoders do not use a single motion compensation signal to select among predictors and operate in a substantially different way.  In addition, the accused MPEG-2 decoders include a motion

56

Case No. 06-CV-0684 H (CAB)

1    compensation mode known as dual prime that does not exist in the interconnected circuitry of

2    circuit 100 and its internal circuitry as shown in Figures 3, 4A, and 4B.

3        The differences between the structure of the accused decoders and the corresponding

4    structure of claim 13 are not insubstantial. The overall structure of the accused software decoders,

5    taken as a whole, is substantially different from the structure of the second means element of claim

6    13. Moreover, the accused software decoders operate in a substantially different way, as described

7    above. Furthermore, they cannot be structurally equivalent because of the after arising technology

8    of the MMX and 3DNow!

9        Claim 15 is not infringed for all the reasons stated above for claim 13, but there are further

10   reasons why claim 15 cannot infringe. The accused MPEG-2 and VC-1 decoders cannot select

11   between frame motion vectors and field motion vectors. In addition, those accused decoders lack

12   structures that are the same as or equivalent to circuits 66 and 64. And the VC-1 decoders do not

13   contain equivalent structure because they use a new unique adaptive integer transform, while

14   claim 13 requires an inverse DCT. In the VC-1 integer transform, unique block structures used to

15   trade off between computational complexity, ringing artifacts, and texture preservation. This

16   allows 8x8 blocks to be encoded using one 8x8, two horizontally stacked 8x4s, two vertically

17   stacked 4x8s, or four 4x4 block transforms. The ability to encode error using variable block sizes

18   increases the quality of the image because it localizes the error within the frame. Microsoft's

19   integer transform used in VC-1 is now the subject of an issued U.S. patent. Prior art cited to the

20   Patent Office included inverse DCT. The use of the patented integer transform, instead of DCT,

21   renders the accused VC-1 decoders structurally non-equivalent to the overall structure of claim 15

22   of the '878 patent. Thus, claim 15 is not infringement for additional reasons.

23       Any contention by MPT that Microsoft contributorily infringes claims 13 and 15 is flawed

24   and baseless. MPT is contending that a PC or Xbox 360 containing an accused MPEG-2 or VC-1

25   decoder infringes the claims. The PC and Xbox 360 have substantial noninfringing uses.

26   Moreover, Windows Vista and Windows Media Player also have substantial noninfringing uses.

27   The accused decoders, furthermore, can be used with progressive-only video sequences and thus

28   never practice the alleged invention in the asserted claims.

Case No. 06-CV-0684 H (CAB)

1   Any contention by MPT that Microsoft induces infringement of claims 13 and 15 is flawed

2   and baseless.   Microsoft has not actively induced anyone to practice the alleged invention of

3   claims 13 and 15.   Moreover, the claims were invalid before the Certificate of Correction issued in

4   October 2005.   Thus, Microsoft designed the alleged infringing products under the impression that

5   there could be no infringement because the claims were invalid.

6       **4.     Invalidity**

7           **i.     Invalid Claim 13 – Error in Claim**

8   When the PTO issued claim 13, it contained a fatal error.   It was missing several critical

9   words that defined the inventors regarded as their invention.   Eventually, claim 13 (and dependent

10  claim 15) were held to be invalid by this Court due to this error.

11  Despite the error, then-owner Lucent asserted claim 13 and claimed that it was "essential"

12  to the MPEG-2 standard.   Lucent submitted claim 13 to a potential MPEG-2 patent pool, which

13  became known as MPEG LA.   Lucent contended that claim 13, as issued, was essential to the

14  practice of the MPEG-2 standard.   Lucent requested a letter from a lawyer named Kenneth

15  Rubenstein, who concluded that claim 13 was essential to MPEG-2, but Mr. Rubenstein analyzed

16  the erroneous and invalid version of claim 13, which was missing the critical words.   In addition,

17  Mr. Rubenstein did not have the Court's claim construction when he issued his opinion.   Thus, the

18  conclusion that the '878 patent is essential to MPEG-2 is flawed and irrelevant to this case.

19  Despite the flawed letter and the invalidity of claim 13, Lucent continued to assert claim 13

20  even in the face of the error, which Lucent should have known about since the date the patent

21  issued – if Lucent had acted prudently, it would have reviewed the claims upon issuance and seen

22  that claim 13 had issued incorrectly.   Lucent asserted claim 13 against, among others, Dell and

23  Gateway.   Dell's lawyer, Joel Freed, informed Lucent that the claim was in error and thus invalid

24  before Lucent brought suit against Dell.   Despite this knowledge, Lucent never bothered to correct

25  the claim.   Instead, Lucent sued Gateway, Dell, and Microsoft on an invalid claim and only

26  corrected it after the Court struck down claims 13 and 15 as invalid.

27

28

Case No. 06-CV-0684 H (CAB)

1          ii.     **Prior Art**

2          Claims 13 and 15 of the '878 patent are invalid as obvious in light of the prior art described

3  above, alone or in combination.

4          The code found in Appendix A of the '878 patent has a copyright of September 1991.

5  Assuming the September 1991 date is correct, there is no evidence the code relating to motion

6  compensation was written before that date. The only "evidence" relied on by MPT is Dr. Puri's

7  deposition testimony and Professor Girod's opinion. In addition, MPT has not identified how the

8  source code of Appendix A corresponds to the structure identified by the Court for the decoder of

9  claims 13 and 15. Consequently the source code of Appendix A does not establish a conception

10 date earlier than the filing date of the application.

11         MPT cites to PURI000225, PURI000245-46, LUC1258540, and LUC1258547 in support

12 of a conception date other than September 1991. However, these documents do not establish that

13 the subject matter of claims 13 and 15 was conceived as of the dates of the documents. For

14 example, PURI000225 and PURI000245-46 do not describe field/frame adaptive motion

15 compensation. PURI000245-46 is a testing proposal submitted to MPEG that does not show the

16 claimed functions or structures. LUC1258540 refers to DCT coefficients and not adaptive

17 field/frame motion compensation. LUC1258547 also does not disclose adaptive field/frame

18 motion compensation. In addition, none of these documents describes any of the structures

19 identified in the Court's claim construction order for claims 13 and 15. As such, these four

20 documents do not establish conception of the subject matter of claims 13 and 15.

21         Claim 13 includes two functional limitations associated with the two means elements. The

22 first function, "receiving a compressed digital video bit stream," was well-known in the prior art,

23 including publications, patents, and standards. The second function, "selectively and adaptively

24 performing motion compensated decoding of frames ... and fields," is shown in the following

25 publications described above: (1) DigiCipher Description; (2) Columbia 91/131 Submission (3)

26 Ericsson 1985 Article (adaptive motion compensated and intra prediction using a variety of

27 prediction modes; block-level switching between field and frame prediction; and field and frame

28 motion compensated prediction at both the integer and fractional pixel level); (4) U.S. Patent Nos.

59

5,428,693 and 5,539,466; (5) Numerous MPEG submissions described above that were provided to the MPEG standards body nearly simultaneously with the purported conception date of claims 13 and 15 – these submissions also disclose adaptive field/frame motion compensated prediction, and many of them disclose information that identifies the motion compensation mode.

Similarly, the following exemplary references teach selective and adaptive motion compensated decoding in which different motion compensation modes are used: the Barbero 1989 article, the Barbieri June 1989 article, MPEG-1, and many of the references referred to as "Prior and Simultaneous Work on Field/Frame Motion Compensation."

The following references teach or suggest the three functions of claim 15: (1) DigiCipher Description; (2) Ericsson 1985 Article (Ericsson teaches a hybrid coder in Figures 1 and 2 in which prediction error is decoded and added to an adaptive motion compensated estimate); (3) U.S. Patent Nos. 5,428,693 and 5,539,466; (4) Numerous MPEG submissions described above that were provided to the MPEG standards body nearly simultaneously with the purported conception date of claims 13 and 15 – many of these submissions also disclose adaptive field/frame motion compensated prediction, producing a decoded estimate error signal, and adding a decoded motion compensated estimate to the decoded estimate error signal, and many of them disclose information that identifies the motion compensation mode.

Similarly, the following exemplary references teach selective and adaptive motion compensated decoding in which decoded error estimates are added to a decoded motion compensated estimate: the Barbero 1989 article, the Barbieri June 1989 article, MPEG-1, and many of the references referred to as "Prior and Simultaneous Work on Field/Frame Motion Compensation."

The structure of the first means element of claim 13 is the input line 50. It was well-known in prior art decoders, including those described above, to use an input line for a decoder.

As to the second means element of claim 13, certain prior art references described above demonstrate that it was well-known to provide a variety of motion compensated and non-motion compensated prediction modes, including adaptively selecting field and frame modes, within a single coding system. Further, prior art coding systems described above include the ability to

60

1  adaptively select between such various prediction modes.   In addition, prior art references

2  described above allow for motion compensated  prediction in which variable block sizes are

3  adaptively selected; certain references also disclose motion compensation based on 16x16 and

4  16x8 blocks.   (See, for example, MPEG 91/159; Puri 1987 and 1988 articles; Ericsson 1985

5  article; MPEG 91/246; MPEG 91/33; MPEG 91/217.)   Certain prior art references described

6  above also disclose the use of motion vector prediction in motion compensated predictive coding

7  systems. (See, for example, U.S. Patent Nos. 5,006,929 and 4,710,810; MPEG-1; MPEG 91/214;

8  MPEG 91/33; MPEG 91/25.)  Finally, prior art hybrid, bi-directional, predictive coding systems

9  necessarily employed two storage elements, one for past and one for future frame data.   Many

10  such systems are described above.  (See, for example, U.S. Patent Nos. 5,428,693 and 5,539,466.)

11       For the first means element of claim 15, the Court identified block 100 as well as the same

12  additional structures associated with block 100 identified in claim 13.  See the analysis for claim

13  13 above.

14       For the second means element of claim 15, the Court identified structures that perform

15  inverse scanning, dequantization, and inverse DCT.  Prior art coding systems, as described above,

16  performed these functions and included structures for doing so.  (See, for example, DigiCipher

17  Description; Krause '782 Patent; Krause '720 Patent; U.S. Patent No. 5,539,466; Barbero 1985

18  article; and many of the MPEG submissions cited in Section VI.J. above.)

19       For the third means element of claim 15, the Court identified the summing element 74.

20  For a prior art decoder to produce a decoded video signal using the first two means elements of

21  claim 15, the decoder required structure to add the motion compensated estimate to the error

22  signal.

23       A second version of MPEG, with a coding rate of video up to 10 Mbps, was being

24  considered at least as early as 1990.  (See, for example, MPEG 90-262, September 1990, Source

25  Yasuhiro Yamada of JVC (GW-LT 276495-496); MPEG 90-268, September 14, 1990, Source

26  Sakae Okubo of NTT (GW-LT 276578-583); MPEG 90-271, October 1990, Source Leonardo

27  Chiariglione (GW-LT 276593-625).)  The 90-262 document discusses the coding rate of video up

28  to 10 Mbps for digital broadcasting and other applications, and states that "technical features to be

implemented" include "wider range of motion compensation because of smaller pixel size" and "inter-frame and inter-field prediction." The 90-268 document discusses the "second phase work of MPEG" and mentions "technical implementations" in section 3.6, stating that the picture formats include "interlaced pictures [that] are to be coded (inter-frame and inter-field prediction?)." The 90-271 document – which includes Annex V (dated September 10-14, 1990), entitled "Report of Discussion on Requirements for the Second Phase of Work on MPEG" – makes the same statement in section 3.6 of Annex V as the 90-268 document quoted above.

Accordingly, it was evident that at least as early as 1990 the MPEG standards body had defined an effort to create a video coding standard to handle data rates up to 10 Mbps that would use motion compensation and inter-field and inter-frame prediction. The MPEG standards body had therefore stated the problem – the need to code video at data rates up to 10 Mbps for use in, for example, digital broadcasting – and had suggested that part of the solution would be motion compensation together with inter-frame and inter-field prediction. This provided one of ordinary skill in the art with good reason to pursue the known options within his or her technical grasp to solve the identified problem. Moreover, one of ordinary skill in the art can employ inferences and creative steps in his or her possession to develop a solution to the problem. The fact that people of skill in the art knew in the 1980's that field coding is useful for fast motion and frame motion is useful for slow or no motion would have led them to employ motion compensated inter-frame and inter-field prediction in an interlaced video system, like that proposed for the second phase of MPEG.

In fact, after the MPEG standards body identified the design need and a solution, several different groups, including Columbia University, KDD, NEC, Sony, and Toshiba, made algorithmic proposals to MPEG that incorporated adaptive, motion compensated field/frame prediction. In addition, a number of these proposals also disclosed other features consistent with the Court's construction of claim 13, including motion vector prediction, variable block size for motion compensated prediction, multiple adaptive motion compensated prediction modes, and prediction mode signal. (See, for example, 91/214 (all three features); 91/33 (16x8 and 16x16 block sizes for motion compensation and motion vector prediction); 91/25 (motion vector

62

1   prediction and prediction mode signal.) Moreover, at least two patent applications were filed by

2   companies participating in the MPEG standards process that include many of these features and

3   that predate the purported conception date of the '878 patent, i.e., September 1, 1991. (See U.S.

4   Patent Nos. 5,428,693 and 5,539,466.)

5   These submissions were presented to MPEG within a few weeks of the purported date of

6   conception of the '878 patent. They were presented to the same standards body that the '878 patent

7   inventors submitted their purported invention (MPEG 91/201 (GW-LT 286415-455)) and were

8   aimed at providing the same solution identified by MPEG. The fact that each of these companies

9   came to similar solutions comes as no surprise. When there are a finite number of identified,

10  predictable solutions, a person of ordinary skill in the art has good reason to pursue the known the

11  options within his grasp. Here, the fact that the MPEG standards body had identified the use of

12  motion compensation and inter-frame and inter-field prediction for an interlaced and progressive

13  coding system, which constitute a finite number of identified, predictable solutions, it would have

14  been obvious for one of ordinary skill in the art before the purported '878 patent conception date to

15  arrive at the functional aspects of claims 13 and 15. In addition, as stated above, this identified,

16  predictable solution would have lead one of ordinary skill in the art to design decoders like that

17  recited functionally in claims 13 and 15.

18  More than that, before MPEG formally identified the problem and solution, a goal for

19  video transmission was to decrease the amount of bits needed to produce video. Prior art

20  references discussed above establish that this goal was being addressed by, for example, Eureka

21  EU256, the DigiCipher Description, the Ericsson article, and the Krause patents. These prior art

22  references predate the alleged date of conception of the '878 patent, and demonstrate that at least

23  the functionality encompassed in claims 13 and 15 as construed by the Court was known and

24  obvious. Further, each of these prior art references contained structure for performing the

25  functionality. Consistent with the principle that one of ordinary skill in the art will be able to fit

26  the teachings of multiple prior art references together like pieces of a puzzle, these references

27  together with others addressed above can be readily pieced together to arrive at the functions of

28

63

1   claims 13 and 15 as well as motion vector prediction, variable and adaptive block size, IDCT,

2   dequantization, and inverse scanning structures.

3        For example, Ericsson teaches adaptive prediction modes including motion compensation,

4   switching between field and frame prediction, and field and frame motion compensated prediction

5   at both the integer and fractional pixel level. It would have been obvious to take the teachings of

6   Ericsson and arrive at the functions recited in claims 13 and 15. One of ordinary skill in the art

7   would have known, given these teachings, to create a decoder in which field and frame motion

8   compensation could be selectively and adaptively operated in response to a signal identifying the

9   type of motion compensation. Evidence for this conclusion exists in the multitude of patents and

10  MPEG submissions at or before the alleged date of conception for the '878 patent, as well as in the

11  DigiCipher Description and the 91/131 and 91/159 MPEG submissions. Furthermore, this

12  conclusion is bolstered by the numerous prior art references described above that teach adaptive

13  selection of motion compensated prediction modes, including the references describing Eureka

14  EU256. In addition, the teachings of Ericsson – including field and frame motion compensation

15  and his statement that field motion compensation can be used in "changed areas" and frame

16  motion compensation in "unchanged areas" – would have lead one of ordinary skill in the art to

17  use his creativity to arrive at the functional decoder described in claims 13 and 15.

18        Similarly, the DigiCipher Description as well as 91/131 and 91/159 MPEG submissions

19  teach adaptively selecting motion compensated prediction, where the prediction modes include

20  field and frame. Again, the teachings of the DigiCipher Description or the teachings of the 91/131

21  or 91/159 MPEG submissions are consistent with the functions of claims 13 and 15. One of

22  ordinary skill in the art would have known, given these teachings, to create a decoder in which

23  field and frame motion compensation could be selectively and adaptively operated in response to a

24  signal identifying the type of motion compensation. This conclusion is bolstered by the numerous

25  prior art references described above that teach adaptive selection of motion compensated

26  prediction modes, including the references describing Eureka EU256. It is also bolstered by the

27  fact these teachings would have lead one of ordinary skill in the art to use his or her creativity to

28  arrive at a decoder having the recited functionality.

Case No. 06-CV-0684 H (CAB)

Not only did the prior art teach the functional aspects of claims 13 and 15, but also, the prior art taught certain structural details that the Court identified as corresponding structure for those claims. In particular, as indicated above, the prior art teaches motion vector prediction, adaptive selection of field/frame motion compensation prediction, adaptive selection of block size motion compensation, and motion compensation based on 16x16 and 16x8 blocks. In addition, as described above, the prior art also teaches providing information in the compressed bit stream identifying the mode of motion compensation.

As stated above, claims 13 and 15 are broad enough to cover Microsoft's accused products, then the claims are invalid because the subject matter of the claims as asserted would be found in and/or obvious from prior art available to a person of ordinary skill in the art at the time of the purported invention. Any attempt by MPT to read claims 13 and 15 on the accused decoders would thus render the claims invalid.

Additional prior art, invented by Akira Hirano of NEC, also invalidates claims 13 and 15. Mr. Hirano filed two patent applications in Japan in the early 1980s, the '379 and '881 applications, described above. The applications were published by the Japanese Patent Office in 1983 and 1984.

Mr. Hirano's '881 application teaches, among other things, the following principles recited in claims 13 and 15:

- Claim 13: "means for receiving a compressed signal"

"The signal outputted from the encoding unit to the transmission path 14 is written in the buffer memory 101 at the receiver side at the transmission speed of the transmission path 14." (*Id.* at p. 5.)

- Claim 13: "selectively and adaptively performing motion compensated decoding" of frames and fields of a compressed video bit stream"

The '881 patent application discloses an encoder and matching decoder that performs motion compensated prediction and adaptively switches between fields and frames. The encoder of Figure 2 compares the results from inter-field prediction to inter-frame prediction by analyzing the norm of the motion vectors produced by each prediction and selecting inter-field or inter-frame

prediction (as quoted above) and encodes the selected motion vector and prediction error and transmits them to the decoder.

The decoder of Figure 3 of the '881 application receives the encoded motion vector and the prediction error as described above.  The demultiplexer 103 separates the coded predicted error signal and the coded motion vector signal. ('881 application at p. 5.)

In the '881 application, depending on whether the determination circuit 121 determines that the motion vector is inter-field or inter-frame, the motion vector is provided to the determination delay circuit 123 through signal line 122.  Thus, the '881 application implicitly discloses a motion type indicator because the determination circuit 121 is able to determine whether the motion vector is inter-field or inter-frame.  The determination circuit 121 of the decoder is shown in more detail in Figure 4(b).  Furthermore, the '379 application expressly discloses a bit that is transmitted from the encoder to the decoder that indicates whether field- or frame-based motion compensation has been used.  One skilled in the art would have been motivated to combine the '881 and '379 applications because the inventions were created by the same inventor, the applications list the same corporate applicant, they have nearly identical titles, and they are both directed to switching between inter-frame and inter-field motion compensation.  Thus, it would have been obvious for one skilled in the art to combine the teachings of the '881 and '379 applications.

- Claim 15: "responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal"

In the '881 application, the variable delay circuits 112 and 113 shift the signals provided by the signal lines 110 and 111 based on the motion vector signal provided by signal line 120. ('881 application at p. 5.)  These signals are then output as the MC inter-field prediction signal and MC inter-frame prediction signal to the signal lines 114 and 115, and then are provided to the selector 116. (*Id.*)  The determination circuit 121 "monitors whether the prediction decoding of the current block signal Is MC inter-field prediction or MC inter-frame prediction, and makes a determination from the motion vector signal inputted from the signal line 120 based on the

66

1   aforementioned switching rules, similar to the encoding unit side determination circuit 37, and

2   provides the results of the determination to the determination delay circuit 123 through signal line

3   122." (*Id.*) "The determination delay circuit 123 delays the results of the determination by one

4   block time and inputs it to the selector 116." (*Id.*) Selector 116 selects one of the prediction

5   signals 114 or 115 based on the control signal input by the signal line 124 and outputs the selected

6   signal to signal line 117 as a prediction signal. (*Id.*)

7   • Claim 15: a means responsive to the compressed digital video bit stream for producing a

8       decoded estimate error signal

9   "The code that shows the predicted error signal is returned to the predicted error signal by

10  the first decoder 105 and the predicted error signal is inputted to the adder 107 via the signal line

11  106." ('881 application at p. 5.)

12  • Claim 15: means responsive to the adaptive motion compensated estimate and the estimate

13      error signal for producing a decoded video signal

14  "The prediction signal is inputted from the selector 116 via the signal line 117 to the adder

15  107, and is added to the predicted error signal so that the TV signal undergoes prediction decoding

16  and is outputted to the signal line 108." (*Id.*)

17  It would have been obvious for one skilled in the art to combine the '881 application with

18  prior art references identified above to create a decoder in accordance with claims 13 and 15 of the

19  '878 patent. As shown above, the '881 application discloses all of the functional limitations of

20  claims 13 and 15 of the '878 patent, except for an explicit motion compensation type signal.

21  However, as described above, the decoder of the '881 application has a determination circuit 121

22  from which the type of motion vector, field or frame, can be determined by using the circuitry

23  shown in Figure 4(b) and as described in the '881 application on pages 6-7. Further, as stated

24  above, the '379 application explicitly discloses a field/frame motion vector indicator signal that

25  distinguishes between field and frame motion compensation and that is transmitted by the encoder

26  to a decoder. Consequently, the '881 application alone or in combination with the '379 application

27  renders obvious the asserted claims of the '878 patent if claims 13 and 15 are stretched to read on

28

67

1   the accused MPEG-2 and VC-1 decoders. Alternatively, or in addition, the '881 and '379

2   applications teach the functions claimed in claims 13 and 15.

3       In addition, one skilled in the art would have been motivated to combine the teachings of

4   the '881 and '379 applications with references disclosed above that teach motion compensated

5   interpolation and DCT. For example, the Ericsson 1985 Article and the Krause '782 and '720

6   patents teach DCT and motion compensated prediction as well as frame- and field-based decoding.

7   Furthermore, the MPEG-1 draft submission that was cited during prosecution of the '878 patent

8   discloses both DCT and B-frames; one skilled in the art would have combined the teachings of the

9   '881 and/or '379 applications with the MPEG-1 draft submission because those applications would

10  allow one to extend MPEG-1 to field and frame motion compensation. As stated above, well

11  before the '878 patent was filed, the MPEG-2 standards initiative had indicated a desire to process

12  both progressive and interlaced video; the MPEG-1 standard was directed to progressive, and thus

13  one would have been motivated to combine the '881 and/or '379 applications with the draft

14  MPEG-1 standard.

15      Finally, that numerous other investigators also implemented claim 13 and 15 before, at,

16  and near the same time as the named inventors of the '878 patent suggests that the level of

17  knowledge in the art had made claims 13 and 15 obvious prior to the filing of the application for

18  the '878 patent. *See, e.g.*, MPEG Submissions described above (91/131, 91/214, 91/39, 91/33,

19  91/25, 91/217, 91/246, 91/11) and U.S. Patent Nos. 5,428,693 and 5,539,466. The MPEG

20  submissions were provided to the MPEG-2 standards body at or near the time that AT&T, through

21  inventor Puri, submitted its proposal disclosing adaptive field/frame. These submissions were all

22  made in light of the fact that MPEG-2 was seeking proposals regarding a progressive/interlace

23  coding standard; the fact that may companies with researchers skilled in the art arrived at the same

24  solution indicates that claims 13 and 15 were obvious.

25          **iii.    Lack of Objective Evidence of Nonobviousness**

26      MPT has not established that there is a nexus between the claimed features of the

27  purported invention and the alleged success of the MPEG-2 and VC-1 video coding standards and

28  products based on those standards. Claims 13 and 15 of the '878 patent recite selectively and

68

1 adaptively performing motion compensated decoding of frames and fields. MPT fails to opine or

2 put forth any evidence that the success of the MPEG-2 and VC-1 codecs is due to the use of such

3 motion compensated decoding. Nor has MPT explained how the alleged reduction in bandwidth

4 and storage requirements is responsible for the success of the cited codecs.

5       The success of the MPEG-2 and VC-1 standards is due to the fact that decoders which

6 implement standards are attractive to industry because they increase compatibility among products

7 manufactured/implemented by different vendors. Also, there are many different techniques used

8 for compression in the MPEG-2 or VC-1 standard, including, for example, the DCT in MPEG-2

9 and the integer transform in VC-1, variable word length coding, motion compensation, and

10 perceptually based quantization, among other techniques. MPT fails to point to evidence that the

11 field/frame motion compensation technique claimed in claims 13 and 15 of the '878 patent

12 provided the impetus for the success of the MPEG-2 and VC-1 standards over any other

13 compression techniques that these standards employ.

14       According to a book written by Barry G. Haskell, Atul Puri, and Arun N. Netravali, *Digital*

15 *Video: An Introduction to MPEG-2* (1997) DELL 319498-952 ("Digital Video") at 258-60, the

16 "important requirements for MPEG-2 video" are:

17
18     • Coding of CCIR-601 4:2:0 interlaced video at 4 to 9 Mbits/s with good
      quality

19     • Random access/channel-hopping in limited time (0.5 s or less)
    • Trick modes such as fast forward/fast reverse

20     • Special modes with low coding/decoding delay
    • Variety of picture resolutions and formats including 4:2:2 and 4:4:4

21       chroma formats

22     • Bitstream scalability
    • Resilience to errors typical in storage transport

23     • Bitstream editability

24 (*Id.* at p. 259)

25       In the case of MPEG-2, MPEG LA contributed to its success by providing a "one stop

26 shop" for patent licensing, which reduced the transaction costs and encouraged the adoption of the

27 technology. (*See, e.g.*, Baryn Futa Tr. at p. 16, lines 2-11; p. 26, lines 17 through p. 27, line 6; p.

28 39, line 4 through p. 40, line 3; and p. 48, line 8 through 11.) The MPEG-LA patent pool includes

Case No. 06-CV-0684 H (CAB)

93 "essential" patents for MPEG-2 and MPT never explains why the success of MPEG-2 is due to the '878 patent instead of any or all of the inventions claimed in these other 93 patents. (*See* MPEG LA 000003-30 and Futa Tr. at p. 40, lines 4-21.)[1]

Further, in the case of WMV-9 (which is Microsoft's implementation of VC-1), its success can be attributed in large part to the fact that it is included with Microsoft Windows operating systems and Microsoft possesses the dominant market share for operating systems.[2] VC-1 is an SMPTE standard (SMPTE 421-M 2006), and MPEG LA has a VC-1 patent pool. (See, e.g., http://www.mpegla.com/vc1/.) Thus, for similar reasons discussed above for MPEG-2, MPT does not establish a nexus between the success of VC-1 and the '878 patent claims 13 and 15.

Further, because the uncorrected claim 13 was asserted during licensing of the '878 patent, there is a failure to establish a nexus between such activities and the true (and correct) claims of the patent.

Accordingly, there is no objective evidence in the form of secondary considerations that establishes or suggests that the asserted claims of the '878 patent would have been nonobvious to those of ordinary skill in the art.

### 5. Inequitable Conduct

Microsoft incorporates by reference as if fully set forth herein the expert report prepared by Professor Jerry D. Gibson, which sets forth in greater detail Microsoft's factual contentions with respect inequitable conduct.

The '878 Patent was granted on July 13, 1993, to Atul Puri and Rangarajan Aravind for an invention entitled Adaptive Coding and Decoding of Frames and Fields of Video. The '878 patent

---

[1] Several of these "essential" MPEG LA patents expressly claim inventions whose purpose is to reduce the necessary channel bandwidth (or bit rate). See U.S. Pat. No. 4,901,075 at col. 1, lines 7-10, col. 3, lines 13-25, and claims 8 and 13; U.S. Pat. No. 4,394,774 at col. 1, lines 10-14, col. 1, lines 53-56, and claims 1 and 4; see also U.S. Pat. No. RE35,093 at col. 1, lines 20-38; U.S. Pat. No. 4,796,087 at col. 6, lines 24-28; U.S. Pat. No. 5,128,758 at col. 2, lines 7-13; U.S. Pat. No. 5,027,206 at Abstract, col. 7, lines 32-37; U.S. Pat. No. 4,849,812 at col. 2, lines 48-51, col. 3, lines 26-43; U.S. Pat. No. RE36,015 at col. 9, lines 28-30. To the extent that bandwidth or bit rate reduction allegedly contributed to the success of MPEG-2, MPT fails to explain how the '878 patent is more responsible for this success than other patents.

[2] http://www.windowsitpro.com/Articles/Index.cfm?ArticleID=26567&DisplayTab=Article .

Case No. 06-CV-0684 H (CAB)

1    resulted from Application Serial No. 07/793,063 ("the '063 application"), filed November 15,

2    1991, and assigned for examination to Primary Examiner Howard W. Britton in Art Unit 2615.

3        In the Declaration and Power of Attorney signed by each of the named inventors is a

4    statement:

> I acknowledge the duty to disclose information which is material to
> the examination of this application in accordance with Title 37,
> Code of Federal Regulations. 1.56(a).

7    ('878 Patent Prosecution History, Declaration And Power of Attorney, received March 2, 1992,

8    CCMS_311929-930).

9        In an Office Action mailed September 22, 1992, Examiner Britton rejected claims 1–22

10   under 35 U.S.C. § 102 or § 103.  Claims 1, 2 and 12–21 were "rejected under 35 U.S.C. 102(e) as

11   being clearly anticipated by" U.S. Patent No. 5,091,782 ("the Krause '782 patent").  Claims 3–11

12   were "rejected under 35 U.S.C. 103 as being unpatentable" over the U.S. patent to Gharavi in view

13   of the Krause '782 patent.  Claim 22 was "rejected under 35 U.S.C. 103 as being unpatentable"

14   over the Krause '782 patent in view of Gharavi.  ('878 Patent Prosecution History, Office Action,

15   dated September 22, 1992, CCMS_311937-945).  In response to the September 22, 1992, Action,

16   the applicants' attorney filed an Amendment on December 22, 1992, that amended several of the

17   claims and added new claims 23–33.  The Remarks portion of the Amendment stated in part:

> Claims 13-17 specify an apparatus for decoding a
> compressed digital video signal comprising, among other things, a
> means responsive to a motion compensation type signal for
> selectively and adaptively performing motion compensated
> decoding of frames and fields of a compressed digital video bit
> stream.  The decoder referred to in the Krause patent does not
> involve any adaptive motion compensated decoding of an input bit
> stream, and does not need such decoding capability, because there is
> no adaptive motion compensated coding of video in the encoder
> shown in the Krause patent.  The motion compensation scheme has
> no adaptation capability in the Krause patent because it is stated at
> col. 9, line 67, to col. 10, line 1, that the motion compensation does
> not change regardless of whether field coding or frame coding is
> used, as discussed above.  Accordingly, the § 102 rejection of claims
> 13-17 ought to be withdrawn.

26   ('878 Patent Prosecution History, Amendment, dated December 22, 1992, CCMS_311946-959).

27

28

71

1    This response was filed by Eugene Indyk, one of the attorneys that Puri had appointed to
2    prosecute the '878 Patent Application.  ('878 Patent Prosecution History, Amendment, dated
3    December 22, 1992, CCMS_311929-930 & CCMS_311946-959).

4    Puri had actual or imputed knowledge of Krause. ('878 Patent Prosecution History,
5    Amendment, dated December 22, 1992, CCMS_311929-930 & CCMS_311946-959).

6    On January 26, 1993, Examiner Britton issued a Notice of Allowability that allowed claims
7    1–33.  ('878 Patent Prosecution History, Notice of Allowability, dated January 26, 1993,
8    CCMS_311962).

9                                    a.    **Ericsson Article**

10    In December 1985, the IEEE published an article by Dr. Staffan Ericsson on *Fixed and*
11    *Adaptive Predictors for Hybrid Predictive/Transfer Coding* ("Ericsson Article" or alternatively
12    "Ericsson") in Vol. Com. 33, No. 12, IEEE TRANSACTIONS ON COMMUNICATIONS. (LUC 1047117-
13    1047128).

14    The Ericsson Article was cited by Puri in his "dissertation submitted to the Graduate
15    Faculty in Engineering in partial fulfillment of the requirements for the degree of Doctor of
16    Philosophy, The City University of New York," entitled *Efficient Motion-Compensated Coding for*
17    *Low Bit-Rate Video Applications.*  It was cited as endnote No. 89 and referred to and described on
18    page 107 of the Puri dissertation.  (Dissertation of Atul Puri, submitted to the Graduate Faculty in
19    Engineering in partial fulfillment of the requirements for the degree of Doctor of Philosophy, The
20    City University of New York, entitled *Efficient Motion-Compensated Coding for Low Bit-Rate*
21    *Video Applications*, MSTL_0040302-0040593).

22    During prosecution of the '878 Patent Application, Puri reviewed his dissertation for
23    potential prior art for the '878 Patent. (Puri Dep. at 52:18-24).

24    Puri did not disclose the Erisson Article to Indyk or any of the other patent attorneys who
25    prosecuted the '878 Patent, who in turn did not disclose it to the United States Patent and
26    Trademark Office ("USPTO") during prosecution of the '878 Patent.  (Puri Dep. 283:7-285:6;
27    Indyk Dep. 102:17-22).

28

Case No. 06-CV-0684 H (CAB)

The Ericsson Article was not disclosed to the USPTO during prosecution of the '878 Patent. ('878 Patent, cover).

Krause incorporated the Ericsson Article by reference for the latter's teachings of "motion compensation techniques," stating that such techniques are "well known in the art" and cited to Ericsson for a description of such techniques. Krause states that "motion compensation is performed in the same manner regardless of whether field processing or frame processing is chosen for encoding." (Krause, col. 9, *l.* 66 – col. 10, *l.* 1). Applicants for the '878 Patent Application noted this statement and relied on it to distinguish amended claim 13 from Krause, contending that this statement meant that there is no adaptive field/frame motion compensation disclosed in Krause and that therefore amended claim 13 should be allowed. ('878 Patent Prosecution History, Amendment, dated December 22, 1992, CCMS_311956).

The Ericsson Article does disclose adaptive field/frame motion compensation, and Krause incorporates Ericsson for its motion compensation teachings. (Ericsson Article, LUC 104117-128; 12/14/07 Gibson Opening Rpt, page 19).

The Examiner would have wanted to see the Ericsson Article and would have found it important in determining the patentability of claim 13, as amended by the Applicants.

Based upon the combination of Krause and the Ericsson Article and the motivation that exists to combine their teachings, the Examiner would have found claim 13 unpatentable.

This teaching in the Ericsson Article is contrary to the argument made by the Applicants for patentability of claim 13, which argument applicants could not have made had the Ericsson Article been before the examiner.

The teachings of the Ericsson Article are more relevant to amended claim 13 than the prior art that was before the Examiner.

The Ericsson Article in combination with Krause established a *prima facie* case of unpatentability of a claim of the '878 patent. (Mossinghoff Dep. at 109:20-110:15).

The Ericsson Article is inconsistent with arguments made by Applicants in urging the allowance of claim 13 of the '878 patent. (Mossinghoff Dep. at 118:12-16).

The Ericsson Article was material information for the '878 Patent that should have been disclosed to the USPTO during prosecution of the '878 Patent Application. (Mossinghoff Dep. at 105:5-16).

The Ericsson Article was material information that would have been important to a reasonable examiner in deciding whether to allow the '878 Patent to be granted. (Mossinghoff Dep. at 119:1-20; 124:6-125:1).

Puri knew or should have known of the materiality of the Ericsson Article for the '878 Patent. (Puri Dep. at 42:20; Indyk Dep. 102:17-22; Puri Dissertation at CCMS_200810).

During prosecution of the '878 Patent, Puri intentionally withheld the Ericsson Article from his attorneys prosecuting the '878 Patent, concealing the Ericsson Article from the USPTO. (Puri Dep. at 42:20-43:5, 43:20-44:10; Indyk Dep. 102:17-22; Puri Dissertation at CCMS_200810).

The balance the equities regarding Puri's intentional withholding of the material Ericsson Article from the USPTO reflects Applicants committed inequitable conduct that warrants holding the '878 Patent unenforceable.

### b. Columbia University Paper

At an August 1991 meeting of the International Organization for Standardization, ISO-IEC JTC1/SC2/WG11, Coding of Moving Pictures and Associated Audio (the "August 1991 IOS Meeting"), D. Anastassiou, T.H. Chiang, A. Eleftheriadis, R. Mokry, F.M. Wang and Y.B. Yu, of Columbia University presented a paper on Technical Input to MPEG-2 Video Coding ("the Columbia University Paper" and, alternatively, "the Columbia 91/131 submission"). (GW-LT 278484-278485).

Puri attended the August 1991 IOS Meeting. (Puri Dep. at 204:19-22). The attendance list for that meeting prepared by Leonardo Chiariglione, Convenor, indicates that a Mr. A. Puri of AT&T attended the August 1991 meeting. (GW-LT 278693–278696). The MPEG Mailing list for that meeting also prepared by Leonardo Chiariglione, Convenor, reveals that Mr. A. Puri of AT&T is Dr. Atul Puri of AT&T Bell Laboratories, one of the named inventors on the '878 patent. (GW-LT 278229–278254).

Case No. 06-CV-0684 H (CAB)

Puri does not deny he may have been at the August 1991 IOS Meeting, may have attended the presentation of the Columbia University Paper at the August 1991 IOS Meeting, and may have received the Columbia University Paper during the August 1991 IOS Meeting. (Puri Dep. at 212:22-213:19).

Because the '878 Patent has a filing date of November 15, 1991, the Columbia University Paper is *prima facie* prior art to the '878 Patent claims under 35 U.S.C. § 102. Moreover, the presentation of the Columbia University Paper at the August 1991 IOS Meeting, to the attendees, including Puri, is also prior art to the '878 Patent under U.S.C. § 102. (Mossinghoff Dep. at 224:20-225:1).

Puri did not disclose the Columbia University Paper or its presentation at the August 1991 IOS Meeting to Indyk or any of the other patent attorneys who prosecuted the '878 Patent, who in turn did not disclose it to the USPTO during prosecution of the '878 Patent. (Puri Dep. at 42:20-43:5, 43:20-44:10; Indyk Dep. 102:11-16).

The Columbia University Paper and its presentation at the August 1991 IOS Meeting was not disclosed to the USPTO during prosecution of the '878 Patent. ('878 Patent, cover).

As noted above, Krause states that 'motion compensation is performed in the same manner regardless of whether field processing or frame processing is chosen for encoding.' (Krause, col. 9, l. 66 – col. 10, l. 1). Applicants for the '878 Patent Application noted this statement and relied on it to distinguish amended claim 13 from Krause, contending that this statement meant that there is no adaptive field/frame motion compensation disclosed in Krause and that therefore amended claim 13 should be allowed. ('878 Patent Prosecution History, Amendment, dated December 22, 1992, CCMS_311956).

The Columbia University Paper does disclose adaptive field/frame motion compensation on a macroblock-by-macroblock basis. (GW-LT 278484-278485; 12/14/07 Gibson Opening Rpt, page 26).

The Examiner would have wanted to see the Columbia University Paper and would have wanted to know of and its presentation at the August 1991 IOS Meeting. The Examiner would

Case No. 06-CV-0684 H (CAB)

1  have found these important in determining the patentability of Claim 13 of the '878 Patent, as
2  amended by the Applicants. (12/14/07 Gibson Opening Rpt, page 27).

3       Based upon the Columbia University Paper, the Examiner would have found claim 13
4  unpatentable. (12/14/07 Gibson Opening Rpt, page 27).

5       Based upon the presentation of the Columbia University Paper at the August 1991 IOS
6  Meeting, the Examiner would have found claim 13 unpatentable.  (12/14/07 Gibson Opening Rpt,
7  page 27).

8       This teaching in the Columbia University Paper and its presentation at the August 1991
9  IOS Meeting is contrary to the argument made by the Applicants for patentability of claim 13,
10  which argument Applicants could not have made had the Columbia University Paper and/or its
11  presentation at the August 1991 IOS Meeting been before the Examiner.   (12/14/07 Gibson
12  Opening Rpt, page 28).

13       The teachings of the Columbia University Paper are more relevant to amended claim 13
14  than the prior art that was before the Examiner.  The  teachings of the Columbia University Paper
15  presented at the August 1991 IOS Meeting are more relevant to amended claim 13 than the prior
16  art that was before the Examiner. (12/14/07 Gibson Opening Rpt, page 28).

17       The Columbia University Paper in combination with Krause established a *prima facie* case
18  of unpatentability of a claim of the '878 patent.  The presentation of the Columbia University
19  Paper presented at the August 1991 IOS Meeting in combination with Krause established a prima
20  facie case of unpatentability of a claim of the '878 patent. (Mossinghoff Dep. at 216:6-217:8).

21       The Columbia University Paper is inconsistent with arguments made by Applicants in
22  urging the allowance of claim 13 of the '878 patent. 116.    The presentation of the Columbia
23  University Paper presented at the August 1991 IOS Meeting is inconsistent with arguments made
24  by Applicants in urging the allowance of claim 13 of the '878 patent.   (Mossinghoff Dep. at
25  196:16-197:2).

26       The Columbia University Paper was material information for the '878 Patent that should
27  have been disclosed to the USPTO during prosecution of the '878 Patent Application.    The
28  presentation of the Columbia University Paper presented at the August 1991 IOS Meeting was

Case No. 06-CV-0684 H (CAB)

1  material information for the '878 Patent that should have been disclosed to the USPTO during

2  prosecution of the '878 Patent Application. (Mossinghoff Dep. at 187:19-22).

3      The Columbia University Paper was material information that would have been important

4  to a reasonable examiner in deciding whether to allow the '878 Patent to be granted. The

5  presentation of the Columbia University Paper presented at the August 1991 IOS Meeting was

6  material information that would have been important to a reasonable examiner in deciding whether

7  to allow the '878 Patent to be granted. (Mossinghoff Dep. at 209:2-9).

8      Puri knew or should have known of the materiality of the Columbia University Paper for

9  the '878 Patent. Puri knew or should have known of the materiality of the presentation of the

10  Columbia University Paper presented at the August 1991 IOS Meeting for the '878 Patent. (Puri

11  Dep. at 42:20-43:5, 179:4-15; Indyk Dep. 102:11-22; Puri Dissertation at CCMS_200810).

12      During prosecution of the '878 Patent, Puri intentionally withheld the Columbia University

13  Paper from his attorneys prosecuting the '878 Patent, concealing the Ericsson Article from the

14  USPTO. During prosecution of the '878 Patent, Puri intentionally withheld the presentation of the

15  Columbia University Paper presented at the August 1991 IOS Meeting from his attorneys

16  prosecuting the '878 Patent, concealing the Ericsson Article from the USPTO. (Puri Dep. at

17  42:20-43:5, 43:20-44:10; Indyk Dep. 102:11-22; Puri Dissertation at CCMS_200810).

18      The balance the equities regarding Puri's intentional withholding of the material Columbia

19  University Paper from the USPTO reflects Applicants committed inequitable conduct that

20  warrants holding the '878 Patent unenforceable. The balance the equities regarding Puri's

21  intentional withholding of the material presentation of the Columbia University Paper presented at

22  the August 1991 IOS Meeting reflects Applicants committed inequitable conduct that warrants

23  holding the '878 Patent unenforceable.

24        **6.**     **Unclean Hands**

25        **b.**     **Inequitable Conduct**

26      The Applicant's of the '878 Patent fraudulently and intentionally withheld the material

27  Ericsson Article, the material Columbia University Paper, and the material presentation of the

28

Case No. 06-CV-0684 H (CAB)

Columbia University Paper presented at the August 1991 IOS Meeting during prosecution of the '878 Patent Application.

### b.   Delay In Correcting Claim 13

During prosecution of the '878 Patent Application (December 22, 1992), Applicant's amended Claim 13 to be:

> 13. An apparatus for decoding a compressed digital video signal, comprising:
>
> a means for receiving a compressed digital video bit stream; and a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream.

("Allowed Claim 13").  ('878 Patent Prosecution History, Amendment, dated December 22, 1992, CCMS_311949).

On January 26, 1993, the USPTO allowed the then pending claims of the '878 Patent Application, including Claim 13 as recited above.  ('878 Patent Prosecution History, Notice of Allowability and Notice of Allowance, both dated January 26, 1993, CCMS_311962-963).

The '878 Patent issued on July 13, 1993.

As published, Claim 13 read as follows:

> 13. An apparatus for decoding a compressed digital video signal, comprising:
>
> a means for receiving a compressed digital video bit stream; and
>
> a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed video bit stream.

("Published Claim 13").

A comparison of Allowed Claim 13 and Published Claim 13 reveals that nine words of that claim were missing from Published Claim 13.  Specifically, the language absent from Published Claim 13 is reflected below in brackets:

> 13. An apparatus for decoding a compressed digital video signal, comprising:
>
> a means for receiving a compressed digital video bit stream; and

78

Case No. 06-CV-0684 H (CAB)

a means responsive to a motion compensation type signal for
selectively and adaptively performing motion compensated
decoding of frames of the compressed [digital video bit stream and
fields of the compressed] video bit stream.

Published Claim 13 is broader in scope that what the USPTO had allowed Applicant, when allowing Allowed Claim 13. (Order Granting-In-Part And Denying In-Part Microsoft's Motion For Partial Summary Judgment That Claim 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), at 7; *see also* 12/14/07 Gibson Opening Rpt, page 48).

AT&T, the then owner of the '878 Patent, knew or should have known of the error in Claim 13 at the time the '878 Patent was published. ['878 Patent Prosecution History, Amendment, dated December 22, 1992, CCMS_311949, with '878 Patent, CCMS_311824][3] Sophisticated patent-acquiring entities proofread granted U.S. Patent against the patent's prosecution history. (Mossinghoff Dep. at 253:11).

Post issuance, the '878 Patent was assigned to Lucent. Lucent provided certain claims of its patents (including Claim 13 of the '878 Patent) to Kenneth Rubenstein (counsel for MPEG LA) and asked Rubenstein to provide it an opinion, on behalf of MPEG LA as to whether such claims (including Claim 13 of the '878 Patent) were essential to the MPEG-2 standard. (LUC1141382-403).

Rubenstein's analysis was based upon a detailed study of the specification, claims, and prosecution of the various patents, including the '878 Patent. (LUC1141382).

Lucent's counsel would have performed a similar detailed study of the specification, claims, and prosecution of the various patents, including the '878 Patent. (Mossinghoff Dep. at 264:9-12).

---

[3] The Federal Circuit has held that "it does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction." *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1296 (Fed. Cir. 2000); *see also Superior Fireplace Co. v. The Majestic Prods. Co.*, 270 F.3d 1358, 1373, 1374 (Fed. Cir. 2001) (quoting same from *Southwest Software* twice and noting that for corrections to patents "the burden is on the patentee that has availed himself of the patent system, not on the public that is entitled to rely upon the public record of the patent.")

Case No. 06-CV-0684 H (CAB)