Such a detailed study of the specification, claims, and prosecution of the '878 Patent should have uncovered the errors in Claim 13 of the '878 Patent. By such detail study, Lucent knew or should have known of the error in Claim 13 at the time the '878 Patent at least by that time (i.e., before October 31, 1996). (Mossinghoff Dep. at 253:1-11).

Per Lucent's request, Rubenstein analyzed Claim 13 of the '878 Patent, and Rubenstein's opinion reflects he performed the analysis on Published Claim 13. (LUC1141399-402).

Before March 22, 2002, Lucent entered into discussions with Apple Computers regarding certain of Lucent's patents in Lucent's patent portfolio. On March 22, 2002, Lucent presented to Apple Computers a presentation to provide Apple Computers an orientation to exemplary portions of Lucent's patent portfolio, to provide a detailed analysis supporting Lucent's view as to how specific Apple Computer products were covered by exemplary claims from the Lucent patent portfolio. (LUC1043147-153).

Such exemplary patent claims of the presentation to Apple Computers expressly included Claim 13 of the '878 Patent. Lucent's detailed analysis as to how specific Apple Computer products were covered by that claim utilized and quoted Published Claim 13, rather than utilizing and quoting the narrower Allowed Claim 13. (LUC1043165-167).

Before May 20, 2002, Lucent entered into discussions with eMachines regarding certain of Lucent's patents in Lucent's patent portfolio. On May 20, 2002, Lucent presented to eMachines a presentation to provide eMachines a marketing package directed to exemplary portions of Lucent's patent portfolio, and to provide a detailed analysis supporting Lucent's view as to how specific products would be covered by these exemplary claims from the Lucent patent portfolio. (LUC1012539-543).

Such exemplary patent claims of the presentation to eMachines expressly included Claim 13 of the '878 Patent. Lucent's detailed analysis as to how specific products would be covered by that claim utilized and quoted Published Claim 13, rather than utilizing and quoting the narrower Allowed Claim 13. (LUC1012558-560).

Before November 21, 2002, Lucent entered into discussions with Terayon Networks regarding certain of Lucent's patents in Lucent's patent portfolio. On November 11, 2002, Lucent

Case No. 06-CV-0684 H (CAB)

1 presented to Terayon Networks a presentation to provide Terayon Networks a marketing package

2 directed to exemplary portions of Lucent's patent portfolio, and to provide a detailed analysis

3 supporting Lucent's view as to how specific Terayon Network products were covered by these

4 exemplary claims from the Lucent patent portfolio. (LUC1047892 & LUC1047894-896).

5      Such exemplary patent claims of the presentation to Terayon Networks expressly included

6 Claim 13 of the '878 Patent. Lucent's detailed analysis as to how specific Terayon Networks

7 products were covered by that claim utilized and quoted Published Claim 13, rather than utilizing

8 and quoting the narrower Allowed Claim 13. (LUC1047906-910).

9      Lucent presented presentations similar to those provided to Apple Computers, eMachines,

10 and Terayon Networks, to other entities, such as Elite Computer Corp. *See, e.g.,* LUC0020776-

11 784. And like those other presentations, Lucent's detailed analysis again utilized and quoted

12 Published Claim 13, rather than utilizing and quoting the narrower Allowed Claim 13. *See, e.g.,*

13 LUC1047906-910.

14      One of the other entities that Lucent entered into discussions with regarding certain of

15 Lucent's patents in Lucent patent portfolio was Dell Computer. Again, Lucent utilized Published

16 Claim 13, rather than narrower Allowed Claim 13 as an exemplar claim of Lucent's patents in its

17 portfolio. *See* LUC 043658-660.

18      On February 3, 2003, Dell specifically asked Lucent whether Published Claim 13 or the

19 more narrower Allowed Claim 13 should be considered during their discussions. *See* LUC

20 043658-660.

21      Before that time, Dell had previously informed Lucent of the error in Claim 13 of the '878

22 and the difference between Allowed Claim 13 and Published Claim 13. (Hearing Transcript of

23 7/11/05 in Case No. 02-CV-2060, 58:10-59:8; Hearing Transcript of 1/9/06 in Case No. 02-CV-

24 2060, 17:18-18:19).

25      Lucent continued to assert Published Claim 13 of the '878 Patent after Dell informed

26 Lucent of the error in that claim. For example, on April 17, 2003, Lucent presented to Orient

27 Power Multimedia Limited claim charts directed to exemplary portions of Lucent's patent

28 portfolio, and to provide a detailed analysis supporting Lucent's view as to how specific Orient

Case No. 06-CV-0684 H (CAB)

1  Power Multimedia Limited products were covered by these exemplary claims from the Lucent
2  patent portfolio. (LUC1043332-333).

3      Such exemplary patent claims of the presentation to Orient Power Multimedia Limited
4  expressly included Claim 13 of the '878 Patent. Lucent's detailed analysis as to how specific
5  Orient Power Multimedia Limited products were covered by that claim utilized and quoted
6  Published Claim 13, rather than utilizing and quoting the narrower Allowed Claim 13.
7  [LUC1043340-343] Lucent prepared these claim charts and the detailed analysis for Orient Power
8  Multimedia Limited on April 15, 2003, at least two-and-a-half months after Lucent had been
9  advised by Dell that claim 13 of the '878 Patent contained errors. (LUC1043340-343).

10      On February 20, 2003, Lucent filed suit against Dell in Federal Court in the District of
11  Delaware, asserting that Dell had infringed certain of Lucent's patents in Lucent's patent portfolio,
12  including specifically, the '878 Patent. (Lucent Complaint, Case No. 03-CV-205 (D. Del.), filed
13  February 20, 2003).

14      This case was later transferred to Federal Court in the Southern District of California (San
15  Diego) Case No. 03-CV-1108. Lucent amended the complaint to include Microsoft as a
16  defendant, and included allegations against Microsoft that it too infringed the '878 Patent. (Lucent
17  Amended Complaint, Case No. 03-CV-1108 (S.D. Cal.), filed July 21, 2003).

18      On August 15, 2003, Microsoft filed a motion for summary judgment that Claims 13 (and
19  the claims that dependent from Claim 13, i.e., Claims 14-17) were invalid under 35 U.S.C. §
20  112(2) in view of the error in Published Claim 13. (Microsoft Corporation's Motion For Partial
21  Summary Judgment That Claims 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid
22  Under 35 U.S.C. § 112(2) and Memorandum In Support, Case No. 03-CV-1108 (S.D. Cal.), filed
23  August 15, 2003).

24      On August 20, 2003, Lucent requests an indefinite adjournment of the time for its response
25  to Microsoft's partial summary judgment. The Court grants the request. (Transcript Tutorial of
26  8/20/03 in Case No. 02-CV-2060, 168:16-170:12).

27      On April 4, 2005, Microsoft filed again its motion for summary judgment that Claims 13
28  (and the claims that dependent from Claim 13, i.e., Claims 14-17) were invalid under 35 U.S.C. §

112(2) in view of the error in Published Claim 13. (Microsoft Corporation's Motion For Partial Summary Judgment That Claims 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2) and Memorandum In Support, Case No. 03-CV-1108 (S.D. Cal.), filed April 4, 2005).

On May 12, 2005, Lucent filed its opposition to Microsoft's partial summary judgment motion. (Lucent's Brief in Opposition To Microsoft's Motion For Partial Summary Judgment That Claims 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), Case No. 03-CV-1108 (S.D. Cal.), filed May 12, 2005).

On May 23, 2005, Microsoft filed its reply to Lucent's opposition to Microsoft's partial summary judgment motion. (Reply To Lucent Technologies Inc.'s Opposition To Microsoft Corporation's Notice of Motion And Motion For Partial Summary Judgment That Claims 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), Case No. 03-CV-1108 (S.D. Cal.), filed May 23, 2005).

Lucent's argued that even at that time it was still premature to rule on Microsoft's motion for partial summary judgment. Lucent advocated the Court should wait further and first hold a *Markman* hearing to construe the claims before ruling of Microsoft's motion. (*See e.g.,* Hearing Transcript of 7/11/05 in Case No. 02-CV-2060, 6:3-8:12 & 19:7-14).

Lucent further contended that Lucent had the right to enforce Published Claim 13, even if that claim was broader than Allowed Claim 13, which was the claim the PTO actually allowed. (*See, e.g.,* Hearing Transcript of 7/11/05 in Case No. 02-CV-2060, 14:9-17:6).

Lucent acts were intended to take advantage of the USPTO's publishing mistake of claim 13 of the '878 Patent. Lucent intentionally asserted the Published Claim 13, despite knowing it was not the claim allowed by the USPTO. (*See, e.g.,* Hearing Transcript of 7/11/05 in Case No. 02-CV-2060, 14:9-17:6; *see also* MSLT1060599, MSLT1060601, & MSLT1060645- 649).

On August 9, 2005, the Court granted summary adjudication that Claims 13-17 of the '878 Patent are invalid for indefiniteness under 35 U.S.C. § 112(2). (Order Granting-In-Part and Denying-In-Part Microsoft's Motion For Partial Summary Judgment That Claims 13, 14, 15, 16,

Case No. 06-CV-0684 H (CAB)

1  and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), Case No. 03-CV-1108

2  (S.D. Cal.), dated August 9, 2005).

3        On September 9, 2005, Lucent transmitted a request to USPTO to correct Claim 13 of the

4  '878 Patent so that it is corrected from Published Claim 13 to Allowed Claim 13. ('878 Patent

5  Prosecution History, Amendment, dated September 9, 2005, CCMS_311987-989). The express

6  reason why Lucent corrected Claim 13 of the '878 Patent was because the Court had held

7  Published Claim 13 to be indefinite. (*Id.*)

8        Before September 9, 2005, Lucent entered into discussions with 2Wire regarding certain of

9  Lucent's patents in Lucent's patent portfolio. On September 9, 2005 (*i.e.*, the same day that Lucent

10 filed for correction of Claim 13 of the '878 Patent), Lucent presented to 2Wire a presentation to

11 provide 2Wire a marketing package directed to exemplary portions of Lucent's patent portfolio,

12 and to provide a detailed analysis supporting Lucent's view as to how specific 2Wire products

13 were covered by these exemplary claims from the Lucent patent portfolio. (MSLT1060599 &

14 MSLT1060601).

15       Such exemplary patent claims of the presentation to 2Wire expressly included Claim 13 of

16 the '878 Patent. Lucent's detailed analysis as to how specific 2Wire products were covered by that

17 claim utilized and quoted Published Claim 13, rather than utilizing and quoting the narrower

18 Allowed Claim 13. (MSLT1060645- 649). Such assertion of Published Claim 13 occurred one

19 month after San Diego Federal Court had invalidated Published Claim 13 and after Lucent

20 unquestionably knew that the San Diego Federal Court had done so. (Order Granting-In-Part and

21 Denying-In-Part Microsoft's Motion For Partial Summary Judgment That Claims 13, 14, 15, 16,

22 and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), Case No. 03-CV-1108

23 (S.D. Cal.), dated August 9, 2005; '878 Patent Prosecution History, Request for Certificate of

24 Correction, dated September 9, 2005, CCMS_311987-989).

25       Lucent intentionally presented an invalid claim to 2Wire and did so knowing that the claim

26 had not been corrected by the USPTO. Moreover, by asserting Published Claim 13 of the '878

27 Patent, Lucent intention was asserting a claim that it knew was broader in scope than what it had

28 been granted by the USPTO. (Order Granting-In-Part and Denying-In-Part Microsoft's Motion

For Partial Summary Judgment That Claims 13, 14, 15, 16, and 17 of U.S. Patent No. 5,227,878 Are Invalid Under 35 U.S.C. § 112(2), Case No. 03-CV-1108 (S.D. Cal.), dated August 9, 2005; '878 Patent Prosecution History, Request for Certificate of Correction, dated September 9, 2005, CCMS_311987-989).

On October 25, 2005, the USPTO issued a certificate of correction to correct Claim 13 to be the Allowed Claim 13. ('878 Patent Prosecution History, Certificate of Correction, dated September 9, 2005, CCMS_311990).

Lucent intentionally delayed in correcting Claim 13 of the '878 Patent so that it could continue to assert Published Claim 13 of the '878 Patent. The only reason they did so was because Lucent was compelled to do so after the Court held Published Claim 13 was invalid. ('878 Patent Prosecution History, Request for Certificate of Correction, dated September 9, 2005, CCMS_311987-989).

In view of the balance of equities, Lucent has unclean hands.

### 7.    Traditional Laches

As noted above Section 7 for Unclean Hands:

Lucent and its predecessor-in-interest in the '878 Patent (AT&T) did not seek a certificate of correction from the USPTO until over 12 years after the '878 Patent issued.

Lucent knew or should have known of the errors in Claim 13 at the time of issuance of the '878 Patent and further knew or should have known of the errors in Claim 13 by October 31, 1996.

Lucent asserted Published Claim 13 for more than two years against Microsoft before the Court in a prior dispute (Case No. 03-CV-1108). In this prior dispute (Case No. 03-CV-1108), the Court held that Published Claim 13 was invalid.

Lucent actively asserted Claim 13 in licensing negotiations at least as early as 2002, and Lucent was informed of these errors in Claim 13 before the prior dispute (Case No. 03-CV-1108) was initiated.

Such licensing negotiations included presentations, claim charts, and the like presented to Apple Computes, eMachines, Terayon Networks, Dell, and Orient Power Multimedia Limited.

Case No. 06-CV-0684 H (CAB)

The presentation to Orient Power Multimedia Limited occurred after Lucent admits it was expressly informed of the error in Published Claim 13 by Dell.

Lucent obtained its certificate of correction on October 25, 2005.

Lucent brought the present action on March 25, 2006. (Complaint, Case No. 06-CV-0684).

Lucent's delay in filing suit against Microsoft for Allowed Claim 13 was for an unreasonable and inexcusable length of time from the time Lucent knew or reasonable should have known of Lucent's claim against Microsoft.

Such delay operated to prejudice and injure Microsoft, including because Microsoft made investments during the time the '878 Patent was invalid, and due to the costs associated in converting Microsoft's products to avoid the corrected patent. Microsoft invested substantial amounts in its development of products at issue in the present dispute, including Windows Vista operating system and the Xbox game console. Microsoft's investments took place during the period when the Puri '878 Patent was invalid due to indefiniteness, as determined by the Court. Microsoft implemented MPEG-2 and VC-1 features in these products based on Microsoft's analysis of the market and the '878 Patent as it existed at that time. (1/3/08 Thumpudi Declaration; 1/4/08 Schmidt Declaration; 1/4/08 Chu Declaration; 1/3/08 Sirivara Declaration).

In view of the balance of equities, certain of Lucent's claims of damages are barred by laches.

### 8. Equitable Estoppel

As noted above in Section 7 for Unclean Hands and Section 8 for Laches:

While Lucent was aware of the errors in Claim 13 before bringing suit, Lucent affirmatively elected to assert Published Claim 13 against Microsoft rather than the Allowed Claim 13. Lucent also affirmatively elected to assert Published Claim 13 against many other third parties, including Apple Computes, eMachines, Terayon Networks, Dell, and Orient Power Multimedia Limited.

Lucent intentionally elected not to correct Claim 13 of the '878 Patent even after Microsoft filed a motion to invalidate Claim 13 of the '878 Patent due to such errors. Rather, Lucent

86

1  maintained assertion of Published Claim 13 and repeatedly requested the Court hold off on ruling

2  upon Microsoft's motion to invalidate this claim. Such motion was not ruled upon for over two

3  years after Microsoft first brought its motion to invalidate.

4      And, while Lucent and its predecessor-in-interest could have corrected Claim 13 of the

5  '878 Patent at any time during the 12 years (between the publication of the '878 Patent and the

6  Court's order invalidating Claim 13) and Lucent could have corrected Claim 13 at any time during

7  the two-plus years after Microsoft brought its motion to invalidate (before the Court's order

8  invalidated Claim 13, Lucent consciously and intentionally made the strategic decision to assert

9  the Published Claim 13 against Microsoft and all other third parties.

10      Lucent could have asserted Allowed Claim 13 of the '878 Patent at the inception of Case

11  No. 03-CV-1108, but intentionally declined to do so. Lucent only tried to assert Allowed Claim 13

12  against Microsoft after the Court held Published Claim 13 to be invalid.

13      By Lucent's acts, Microsoft was led to believe and reasonably inferred that Lucent

14  intended to assert Published Claim 13 against Microsoft, not Allowed Claim 13.

15      Microsoft relied on Lucent's conduct that Lucent was asserting allowed Published Claim

16  13 against Microsoft, and not Allowed Claim 13. Microsoft made investments during the time the

17  '878 Patent was invalid, and due to the costs associated in converting Microsoft's products to avoid

18  the corrected patent. Microsoft invested substantial amounts in its development of products at

19  issue in the present dispute, including Windows Vista operating system and the Xbox game

20  console. Microsoft's investments took place during the period when the Puri '878 Patent was

21  invalid due to indefiniteness, as determined by the Court. Microsoft implemented MPEG-2 and

22  VC-1 features in these products based on Microsoft's analysis of the market and the '878 Patent as

23  it existed at that time.

24      Microsoft relied to its detriment by making these investments to implement features that

25  Lucent contends fall within the scope of Claim 13 of the '878 Patent. (1/3/08 Thumpudi

26  Declaration; 1/4/08 Schmidt Declaration; 1/4/08 Chu Declaration; 1/3/08 Sirivara Declaration).

27      Due to its reliance, Microsoft will be materially prejudiced if Lucent is now allowed to

28  proceed with its claim that Microsoft has infringed Allowed Claim 13. (*Id.*)

Case No. 06-CV-0684 H (CAB)

In view of the balance of equities, Lucent is equitably estopped from asserting claim 13 of the '878 Patent, as corrected (i.e. Allowed Claim 13) against Microsoft, and Allowed Claims 13 cannot be enforced against Microsoft.

### B. Damages Issues

MPT bears the burden of proving its alleged damages. *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996). As described below, MPT's damages claims are grossly inflated and lack the necessary factual and legal support. *See Riles v. Shell Exploration & Prod.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (vacating a patent damages award that was not supported by "sound economic and factual" predicates). Microsoft's damages analysis, as described below, is more particularly explained, in part, in the Rebuttal Expert Report of Ryan Sullivan, Ph.D., dated January 9, 2008 and incorporated by reference as if set forth fully herein.

### 1. Statement of Material Facts

MPT is asserting a single patent in this action, the Puri '878 Patent. With respect to certain of the accused products such as Windows XP and Windows Vista, MPT is seeking 0.5% of the value of the hardware products sold by Microsoft's customers. With respect to other products such as the XBox360, MPT is seeking 0.5% of the retail price of the console. Finally, with respect to the accused free Windows Media Player downloads, MPT is seeking 0.5% of what it contends is an average selling price of computers. In the alternative, MPT is seeking $1.50 per accused computer system, console, and download.

### 2. Actual Notice

This case is not the first time MPT has sued Microsoft for alleged infringement of the Puri '878 Patent. A previous suit was dismissed when the claims of the Puri '878 Patent were found invalid.

In response to the dismissal for invalidity, MPT sought a certificate of correction on the Puri '878 Patent. The certificate of correction issued on October 25, 2005.

Microsoft was not aware of the certificate of correction at the time it issued. Despite that fact, MPT now argues that the date of issuance of the certificate of correction is the date MPT put Microsoft on actual notice of infringement of the Puri '878 Patent.

88

1    In fact, MPT did not put Microsoft on actual notice of the alleged infringement of the Puri

2  '87 Patent until January 6, 2006.  On that date, Microsoft's counsel received a letter from MPT's

3  counsel accusing Microsoft of infringement and declaring MPT's intent to sue.

4              **3.    Incremental Value of the Invention**

5    MPT's attempt to recover damages cannot be recognized to the extent that it does not

6  associate the proposed royalty with the value of the invention, *Riles v. Shell Exploration and Prod.*

7  *Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002); *Trell v. Marlee Elect. Corp.*, 912 F.2d 1443, 1446

8  (Fed. Cir. 1990), or reflect an assessment of the "relevant market as it would have developed

9  before and absent the infringing activity," *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d

10  860, 870 (Fed. Cir. 2003); *see also Riles*, 298 F.3d at 1311; *see also TP Orthodontics Inc. v. Prof'l*

11  *Positioners Inc.*, 20 U.S.P.Q. 2d (BNA) 1017 (E.D. Wis. 1991), 1025 (rejecting a patentee's

12  assertion that the royalty base should be the revenue generated by the whole product package

13  because the focus of the hypothetical negotiation is the "additional revenue" the hypothetical

14  licensee would lose by not using the particular feature covered by the patent), *aff'd*, 980 F.2d 743

15  (Fed. Cir. 1992).

16              **4.    Actual Licensing Efforts**

17    The Federal Circuit requires that a patentee's actual licensing practices with respect to the

18  patent-in-suit must be considered in determining an appropriate royalty rate. *See, e.g., Riles*, 298

19  F.3d at 1313 (ordering the exclusion of a damages model that ignored established licensing

20  practices); *Unisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (stating that

21  prior licensing proposals "should carry considerable weight").  Here, MPT's damages theories

22  ignore wholesale the actual licensing history of the Puri '878 Patent.

23    MPT's asserted royalty rates ignore the fact that the Puri '878 Patent has no demonstrated

24  stand alone licensing value.  Actual licensing efforts establish that a potential licensee would take

25  a license to the Puri '878 Patent only in conjunction with all other Lucent patents necessary to the

26  MPEG-2 and WMV-9/VC-1 video formats.  The only licenses, and negotiations to license, that

27  involve the Puri '878 Patent also include multiple other patents.  As a result, a hypothetical

28

Case No. 06-CV-0684 H (CAB)

1    negotiation to license the Puri '878 Patent on a stand-alone basis would not result in a per-unit

2    royalty rate higher than $0.026.

3        Specifically, MPT's analysis completely disregards the MPEG-LA patent pool license.

4    The royalty under the MPEG-LA patent pool license must be considered when determining what

5    royalty a willing licensor and licensee would have agreed upon in the late 2005 to early 2006 time

6    period.  Lucent's representations to the United States government that the Puri '878 Patent would

7    stay with Lucent following the Lucent-Alcatel merger indicates that Lucent was aware that the

8    MPEG-LA royalty covered **all** patents essential to the standard, ***including*** the Puri '878 Patent.  It

9    does not follow that any party would be expected to pay a greater royalty for one patent relevant to

10   the standard than would be paid for all patents essential to the standard.  Lucent's transfer of the

11   '878 Puri Patent to MPT underscores the ineluctable relevance of the MPEG-LA patent pool

12   license to any damages analysis in this case.  If the MPEG-LA patent pool license were not critical

13   to that determination, there would be no reason for Lucent to engage in such a transparent,

14   litigation-motivated transfer to MPT.

15            **5.     Entire Market Value Rule**

16       In special cases, a patentee may seek to recover damages based on the value of an entire

17   product, despite only a component of that product being patented, under the "entire market value

18   rule." *See, e.g., Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374,

19   1379 (Fed. Cir. 2005). To do so, the patentee must demonstrate inter alia that "'the patent related

20   feature is the basis for customer demand'" for the entire product. *Id.* (emphasis added) Here,

21   MPT's damages experts, Roger Smith and Wayne Hoeberlein, have defined the royalty base, for

22   MPT's damages theories as including computer systems and consoles. But neither Mr. Smith nor

23   Mr. Hoeberlein cite any evidence that demand for computer systems and consoles is premised

24   upon the alleged invention of the Puri '878 Patent. Nor do Messrs. Smith and Hoberlein identify

25   evidence to support the allegation that the accused video decoding technology is the basis for the

26   demand for a computer system or console.

27       This Court already has ruled, in connection with the trial of Lucent's Audio patents, that

28   Lucent's damages theories based on the value of an entire computer are an impermissible

90

1   application of the entire market value rule. In his August 6, 2007 Order on Microsoft's Motions for

2   Judgment As A Matter Of Law And New Trial ("August 6 Order"), Judge Brewster held that

3   "there was insufficient evidence to establish the required nexus between the patented features and

4   the value of the entire computer and therefore, the jury's application of the entire market value rule

5   to the computer was unsupported as a matter of law." (Order on Microsoft's Motions for Judgment

6   as a Matter of Law and New Trial and Lucent's Motion to Alter or Amend the Judgment

7   Regarding U.S. Patent Nos. 5,341,457 and RE 39,080, at 34, *Lucent Techs., Inc. v. Gateway, inc.*,

8   No. 02CIV2060-B (S.D. Cal. August 6, 2007). Moreover, the Court found that there was a "lack of

9   evidence showing that the patented features set forth in the claims of the [patents at issue] were the

10  basis for customer demand and/or the substantial value of the [computers]." The same defects exist

11  with respect to the damages claims being asserted here by MPT.

### 6.    Foreign Sales

13          MPT is not entitled to recover damages on any of Microsoft's foreign sales.  In *Microsoft*

14  *Corporation v. AT&T Corp.*, -- U.S. --, 127 S.Ct. 1746, 1753 (April 30, 2007), the Supreme Court

15  held there could be no liability for Microsoft's foreign sales under Section 271(f).  The Court

16  concluded 271(f) does not extend to software sold abroad where, as here, master discs are

17  manufactured in the United States and shipped abroad for duplication and sale. *See id.* at 1750-51

18  ("The question before us: Does Microsoft's liability extend to computers made in another country

19  when loaded with Windows software copied abroad from a master disk or electronic transmission

20  dispatched by Microsoft from the United States? Our answer is 'No.'")  The Supreme Court held

21  the Windows software is not a "component" of the patent invention as that term is used in § 271(f)

22  and that the copies of Windows made and distributed abroad are not supplied from the United

23  States as required by that section. *See id.* at 1753.  This ruling is applicable not only to Windows

24  software but to other Microsoft software that is distributed in the same way.  Additionally the

25  Xbox 360 is not a component, and units of the Xbox 360 that are sold outside the United States are

26  also manufactured abroad.  As such, MPT is not entitled to recover damages on foreign sales of

27  these products.

28

Case No. 06-CV-0684 H (CAB)

### 7.    **Windows Media Player Downloads**

MPT is not entitled to recover on free downloads of Windows Media Player because MPT has failed to establish the required factual and legal predicate. MPT's technical expert has not opined on Window Media Players downloads as an accused infringing product. MPT's damages experts cannot allay the enormous double counting problem posed by seeking damages on downloads made to computers for which MPT is also separately seeking damages. Even if MPT were entitled to recover on the free Windows Media Player downloads, MPT's damages experts make no distinction between U.S. versus foreign downloads. MPT's cursory, shallow treatment of this issue from both a technical and damages standpoint renders its position unsupportable factually and legally.

### 8.    **Additional Limitations on Damages**

MPT's recovery for alleged infringement of the method claims of the Puri '878 Patent, if any, is limited to the number of units that MPT can show were actually used in an infringing manner. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277-78 (Fed. Cir. 2004); *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F.Supp.2d 1021, 1042 (S.D. Ind. 2006) ("As a matter of law, [plaintiff's] damages for infringement [of the asserted claims] are limited to only those devices that can be shown to have executed the claimed method during the relevant infringement period."); *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 726 F.Supp. 1525, 1543 (N.D. Ill. 1989).

Likewise, MPT is not entitled to damages based on indirect infringement before Microsoft had actual notice of the Puri '878 Patent, a prerequisite to liability for inducing infringement. *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent."); *See also Instituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998) (finding no inducement where defendant did not know of the existence of the patent until suit was filed); *Manville Sales Corp. v. Paramount Sys., Inc.*, 971 F.2d 544, 553-54 (Fed. Cir. 1990) (finding no specific intent to induce infringement where defendants were not aware of patent until suit was filed). As discussed

Case No. 06-CV-0684 H (CAB)

above, Microsoft was not aware that a certificate of correction had issued on the Puri '87 Patent until January 6, 2006. Until that date, as far as Microsoft knew, there was no patent to be aware of because the Puri '87 Patent was no more than an invalidated patent, per the preceding litigation discussed above. Given Microsoft's lack of knowledge of the existence of the Puri '878 Patent before January 6, 2006, MPT cannot establish the requisite intent to support an inducement theory.

Even if MPT can prove inducing infringement of the Puri '878 Patent, the damages sought fail to consider the different damages metrics applicable under that theory of infringement. Although a single direct act of infringement may establish liability for inducing infringement, the Federal Circuit has held that a "separate damages analysis must still be performed" in connection with inducement claims. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 2001 WL 21304, at *2 (Fed. Cir. Jan. 8, 2001) (vacating a damages judgment rendered under incorrect legal standards); *see also Imagexpo, L.L.C. v. Microsoft Corp.*, 284 F. Supp. 2d 365, 369 n.3 (E.D. Va. 2003) (following *Chiuminatta* based on its persuasive "logic and analysis"). The reason that a separate damages analysis is necessary in inducement cases is clear: when not every sale leads to an instance of infringement, it logically follows that not every sale should be compensated. *Chiuminatta*, 2001 WL 21304, at *4. Here, MPT has not established *any* corollary between the number of relevant units distributed by Microsoft and the number of units that an end user actually has employed to use the infringing features. Thus, there is no foundation for MPT's proposed damages testimony assessing a royalty on every product alleged to infringe the Puri '878 Patent.

### 9.      Government Use Under 28 U.S.C. 1498

MPT's remedies are limited under 28 U.S.C. §1498(a). Section 1498(a) provides that, "(a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture." Microsoft inserts this paragraph as a precautionary measure because MPT is apparently no longer seeking damages for government sales.

Case No. 06-CV-0684 H (CAB)

1

### 10. No Injunction

MPT cannot make the necessary showing required for an injunction. MPT cannot demonstrate: "(1) that they it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 1839 (2006). In addition, AT&T, MPT's predecessor-in-interest, publicly committed in 1990 to licensing the patent "to any applicant upon reasonable terms" and thus waived its right to seek an injunction or at least conceded that any infringement could be compensated with monetary damages.

## III. MICROSOFT'S CLAIMS OF INFRINGEMENT AGAINST LUCENT AND ALCATEL

### A. Statements of Material Fact

#### 1. The Parties

Microsoft Corporation is a corporation organized under the laws of the state of Washington with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

Lucent is a corporation organized under the laws of the state of Delaware with its principal place of business at 600 Mountain Avenue, Murray Hill, NJ 07974. On November 30, 2006, Lucent became a wholly-owned subsidiary of Alcatel SA.

Alcatel-Lucent, formerly Alcatel SA, ("Alcatel") is a corporation organized under the laws of the Republic of France with its principal place of business at 54 rue la Boétie, Paris, 75008, France.

The "Microsoft Patents-In-Suit" means all patents asserted by Microsoft against Lucent and/or Alcatel in this action, Case No. 06-CV-0684-B.[4] As noted above, the following patents have been asserted against Lucent.

---

[4] As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-

94

Case No. 06-CV-0684 H (CAB)

(a) United States Patent No. 6,438,217;

(b) United States Patent No. 6,339,794;

(c) United States Patent No. 5,438,433;

(d) United States Patent No. 5,941,947;

(e) United States Patent No. 6,412,004;

(g) United States Patent No. 5,977,971;

(h) United States Patent No. 6,565,608;

(i) United States Patent No. 5,764,913; and

(j) United States Patent No. 5,917,499.

In addition, Microsoft has asserted five of those patents against Alactel, namely, the '794, '004, '971, '608 and '913 patents.

**B.      U.S. Patent No. 6,412,004 ("The '004 Patent")**

**1.      The Teaching Of Asserted Claims Of The '004 Patent**

Microsoft is the owner of the '004 patent with the right to sue for past infringement.

The '004 patent relates to a metaserver for managing the delivery of multimedia data streams over a network from multimedia servers to multimedia clients that request them.

Microsoft is asserting claims 2, 25, 26, and 29 of the '004 patent against Lucent and Alcatel.

Asserted claim 2 of the '004 patent reads as follows:

> 2.   The method of claim 1, wherein selecting further includes:
>
> using a minimum cost algorithm as said selection algorithm; choosing a set of parameters including multimedia content, current load, geographic location, and a network distance from said at least one multimedia server to said client computer ; and applying said minimum cost algorithm to said set of parameters .

Claim 1 (from which claim 2 depends) recites:

---

defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

Case No. 06-CV-0684 H (CAB)

1    In at least one metaserver at one level of management,
each said metaserver having a processor and a memory, a
method for assigning a plurality of multimedia servers
configured to provide data streams for a plurality of client
computers, each said client computer being coupled to each
said metaserver at the same level of management and to each
said multimedia server via a network, each said client
computer including a video and audio display device, each
said metaserver memory configured to store a metaserver
database that includes information about the data streams
stored in at least one of said multimedia servers, said method
comprising :
        receiving a request for a multimedia stream from one of
said client computers;
        monitoring the status of each said multimedia server and
the status of said network;
        selecting from the metaserver database at least one eligible
multimedia server storing the requested multimedia
stream using a selection algorithm; and
        communicating a name of said at least one eligible
multimedia server to said client computer.

Claim 2 thus recites a metaserver which is connected to at least one client computer, and can provide data stored in multimedia servers to the client upon request. The multimedia data streams themselves are stored in multimedia servers which are located in different geographic locations throughout the network. The metaserver is configured to store information about the data streams stored in the multimedia servers, and monitor the status of each multimedia server, in order to select the one best suited to providing the client with the data it requested. Specifically, the metaserver may apply a minimum cost algorithm to parameters such as geographic location of the multimedia server with respect to the client in determining which multimedia server would in fact be best suited for that task.

Asserted claim 25 of the '004 patent reads as follows:

25.        A method comprising :
        receiving a request for a multimedia stream from one of
a number of client computers;
        monitoring the status of each of a number of multimedia
servers and the status of a network coupling the number
of client computers and the number of multimedia
servers;
        selecting from a database having information about data

96                                           Case No. 06-CV-0684 H (CAB)

streams stored in at least one of the multimedia servers
at least one eligible multimedia server storing the
requested multimedia stream using a selection algorithm; and
communicating a name of said at least one eligible
multimedia server to the one of the number of client
computers

Claim 25 thus includes a method for providing a client computer with the data it requested, by receiving a request for a stream, monitoring the status of each multimedia server and the network, and then selecting from the possibilities a multimedia server containing the requested stream, and communicating the name of that multimedia server back to the client.

Asserted claim 26 of the '004 patent reads as follows:

26. A metaserver comprising :
a receiver configured to receive a request for a multimedia
stream from one of a number of client computers;
a monitor configured to monitor the status of each of a
number of multimedia servers and the status of a
15 network coupling the number of client computers and
the multimedia servers ;
a selector configured to select from a database at least one
eligible multimedia server that stores the requested
multimedia stream using a selection algorithm; and
a transmitter configured to transmit the name of said at
least one eligible multimedia server to the one of the
number of client computers.

Claim 26 thus includes a system for providing a client computer with the data it requested, including a receiver for receiving a client request for a stream, a monitor to keep track of the status of each multimedia server and the network, a selector to select at least one possible multimedia server containing the requested stream, and a transmitter to pass the name of that multimedia server back to the client.

Asserted claim 29 of the '004 patent reads as follows:

29. A computer readable medium having computer executable
instructions comprising:
receiving a request for a multimedia stream from one of
a number of client computers;
monitoring the status of each of a number of multimedia
servers and the status of a network coupling the number
of client computers and the number of multimedia
so servers;
selecting from a database at least one eligible multimedia
server that stores the requested multimedia stream
using a selection algorithm, the database having information

97

1

about data streams stored on at least one multimedia server ; and
communicating a name of said at least one eligible
multimedia server to the one of the number of client
computers .

2

3

4    Claim 29 thus includes instructions to receive a client request for data, monitor the status

5    of each multimedia server and the network, select at least one possible multimedia server

6    containing the requested stream, and communicate the name of that multimedia server back to the

7    client.

8          **2.    Infringement Of The Asserted Claims Of The '004 Patent**

9    Microsoft contends that Lucent's Accelerate Solution infringes claims 2, 25, 26, and 29 of

10   the '004 patent directly and contributorily, literally and under the doctrine of equivalents.[5]

11   Lucent's Accelerate Solution consists of a number of components for providing voice over IP

12   (VoIP) telephony and related services.  In addition to hardware and software for client end-points,

13   Lucent Accelerate Solution also provides a network communications platform which hosts several

14   servers, among them an Application Server, a Media Server, and a Network Server, all three of

15   which are hosted on the Lucent Feature Server 3000.  The Network Server performs the role of a

16   SIP re-direct server in setting up a media session between the client and media server; it receives

17   the request and provides a selection policy to return a list of media servers best suited to handle the

18   requested streams.   The list is ordered based on numerous factors including the geographic

19   distance between the media server and the requesting client, as well as network topology and

20   congestion levels and the status of the different media servers.

21   Microsoft also contends that Alcatel Open Media Suite infringes claims 2, 25, 26, and 29

22   of the '004 patent directly and contributorily, literally, and under the doctrine of equivalents.

23   Alcatel's Open Media Suite is a collection of hardware and software components that manage and

24

25          [5]  As suggested by the Court during the March 28, 2007 telephonic status conference,
26   Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to
     avoid a lengthy *Markman* hearing.  *See* Letter to McDavit from Vyas dated September 25, 2007;
27   Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-
     defendants").  Microsoft reserves the right to assert the remaining claims of any of the patents-in-
28   suit in this litigation or otherwise in the future.  *See id.*

Case No. 06-CV-0684 H (CAB)

deliver broadband multimedia entertainment services over IP networks to end-user devices. Among the major components are the 5950 Open Media Platform, and the 5959 Open Media Distribution Manager. The 5959 Open Video Server includes a server for servicing requests from clients. The 5959 Open Media Distribution Manager typically accesses multimedia content and metadata from the Content Manager in the 5959 Open Media Content Manager, and prepares that information for subsequent transfer to clients over an IP network. Specifically, multimedia content and metadata on the 5959 Open Video Server and the 5950 Open Media Platform is managed, and delivered to or from the Open Media Client over the IP network. A client request can be redirected to an alternative Open Video Server that is better suited to servicing that request, determined by a number of factors including content availability, current individual server loads, network congestion, and geographical distance between the requesting client and server.

Regarding claim 2, each of the accused products includes a client, metaserver, and multimedia servers to provide a client with a requested data stream. The network and multimedia servers are monitored in order to select the multimedia server best suited to provide the data stream based on factors including geographic location.

Regarding claim 25, each of the accused products includes receiving a request from a client for a multimedia stream, monitoring the status of each multimedia server and the network, selecting from the possibilities a multimedia server containing the requested stream, and communicating the name of that multimedia server back to the client.

Regarding claim 26, each of the accused products includes a receiver for receiving a client request for a data stream, a monitor to keep track of the status of each multimedia server and the network, a selector to select at least one possible multimedia server containing the requested stream, and a transmitter to pass the name of that multimedia server back to the client.

Regarding Claim 29, each of the accused products includes instructions to receive a client request for data, monitor the status of each multimedia server and the network, select at least one possible multimedia server containing the requested stream, and communicate the name of that multimedia server back to the client.

Case No. 06-CV-0684 H (CAB)

1   Lucent's infringement is more particularly explained in the December 7, 2007 Expert

2   Report of James Modestino and the February 15, 2008 Supplemental Expert Report of James

3   Modestino, which are incorporated by reference as if set forth fully herein.  *See also* Modestino

4   Opening Expert Report, Exhibit D.

5   Alcatel's infringement is more particularly explained in the December 7, 2007 Expert

6   Report of James Modestino and the February 15, 2008 Supplemental Expert Report of James

7   Modestino, which are incorporated by reference as if set forth fully herein.  *See also* Modestino

8   Opening Expert Report, Exhibit E.

9   ### 3.   Validity Of The Asserted Claims Of The '004 Patent

10   Lucent and Alcatel contend that the asserted claims of the '004 patent are anticipated or

11   obvious by a number of references.  As an initial matter, Lucent and Alcatel must prove by clear-

12   and-convincing evidence that each of the references upon which they rely qualifies as prior art

13   under 35 U.S.C. § 102.  To the extent they can carry their burden on this issue, the asserted claims

14   of the '004 patent are not anticipated by or obvious in view of the references they rely upon.

15   Microsoft's validity positions are set forth in detail in the Rebuttal Expert Report of James

16   Modestino dated December 21, 2007.  None of the prior art references relied upon by Alcatel and

17   Lucent, alone or in combination, disclose all of the elements of the asserted claims.

18   A person of ordinary skill in the art pertaining to the '004 patent at the time of the

19   invention would have had an undergraduate degree in electrical engineering, computer

20   engineering, computer science, or similar technical field together with two to three years of

21   experience designing, testing, implementing or otherwise working with multimedia networks.  In

22   the alternative, a person could achieve ordinary skill in the art with a more advanced degree and

23   less experience in those disciplines.

24   Lucent and Alcatel rely on Lippman and Kermode, *Media Banks: Entertainment and the*

25   *Internet* ("Lippman") reference to anticipate claims 2, 25, 26, and 29.  However, this reference

26   fails to disclose a "selection algorithm" as is required by each of the asserted claims.  The

27   Lippman reference merely involves a "lookup" function between directory servers which respond

28   to an inquiry for information regarding objects that match a particular name, and object servers,

Case No. 06-CV-0684 H (CAB)

1  which store and deliver the data. No intelligent selection process based on any of the parameters

2  in the asserted claims is involved in the lookup process.

3     Further, the network in Media Bank is not "monitored" the way the status of the

4  multimedia servers and networks are monitored according to the asserted claims of the '004 patent.

5  The '004 patent's process is an active process initiated by the metaserver whereby the metaserver

6  communicates with each multimedia server and determines the status of the network. This is in

7  stark contrast to any passive updates that the directory server receives from object servers in the

8  Lippman reference.

9     Lucent and Alcatel rely on a combination of Lippman and prior art references to render

10  claims 2, 25, 26 and 29 obvious. However, this combination of references fails to disclose the

11  required claim elements of those asserted claims. First, Lucent and Alcatel rely on the Carter and

12  Crovella, *Dynamic Server Selection Using Bandwidth Probing in Wide-Area Networks* ("Carter

13  and Crovella") reference to provide the minimum cost algorithm for multimedia server selection,

14  when in actuality that reference is directed to a minimum cost algorithm for calculating where to

15  place replicas for efficient file caching. This article likewise references an earlier article by

16  Gwertzman and Seltzer, *The Case for Geographical Push-Catching* ("Gwertzman and Seltzer")

17  which purportedly discloses using geographic distance; however, this is with respect to an

18  unrelated art, and not obvious to combine with Lippman. Second, Lucent and Alcatel rely on the

19  Guyton and Schwartz, *Locating Nearby Copies of Replicated Internet Services* ("Guyton and

20  Schwartz") to provide the network distance between server and client, when in actuality, this

21  article, like Carter and Crovella, purportedly discloses a minimum cost algorithm for locating

22  nearby file server replicas in a network. Each of these references, when taken in combination with

23  Lippman, still do not disclose all of the required elements in asserted claims 2, 25, 26, and 29.

24     Secondary considerations of non-obviousness also support a finding that the asserted

25  claims of the '004 patent are not invalid for obviousness, including evidence that others in the

26  industry were attempting to solve the bottleneck problem for delivering multimedia content that

27  the '004 patent solves. In addition, the technology of the '004 patent was commercially successful

28  in that the company that developed it, Vxtreme, was acquired by Microsoft who implemented the

Case No. 06-CV-0684 H (CAB)

1  '004 patent technology into its product. Moreover, others have copied the '004 patent, including at

2  least Lucent and Alcatel.

3  **4.    Enforceability Of the Asserted Claims Of The '004 Patent**

4  Neither Lucent nor Alcatel allege that the '004 patent is unenforceable.

5  **C.    U.S. Patent No. 6,483,217 ("The '217 Patent")**

6  **1.    The Teaching Of Asserted Claims Of The '217 Patent**

7  United States Patent No. 6,438,217 ("the '217 Patent) to Huna, entitled "Apparatus and

8  Method for Future Transmission of Device-Independent Messages," issued on August 20, 2002,

9  from an application filed March 11, 1999.

10  Microsoft is the owner of the '217 Patent with the right to sue for past infringement.

11  As the title suggests, the '217 Patent relates to an apparatus and method for future

12  transmission of device-independent messages.

13  At the time of the invention, many advances had been made in the field of messaging

14  including the introduction of the telephone, automated voicemail systems, facsimile machines, the

15  Internet, and cellular phones and paging technology. In spite of these advances, several problems

16  still existed including restricted message distribution between dissimilar messaging networks and

17  message format translation. As a result, the inventor of the '217 Patent set forth an apparatus that

18  would resolve these and other issues.

19  As defined by the Court's Claim Construction Order of November 13, 2008, regarding

20  certain claim terms recited in the '217 Patent, incorporated herein, the '217 Patent describes an

21  apparatus consisting of a message server, a data-centric network server, and a telephony-centric

22  network server. Messages are created on an originator device and transmitted to the message

23  server. The message server translates the messages into a format compatible with the receiving

24  device and initiates delivery of the message. The message server is coupled to the data-centric

25  network server, which transmits the message over a data-centric network such as the Internet. If

26  the message can be delivered to a receiving device that is addressable over the data-centric

27  network, the message is transmitted by the data-centric network sever to the receiving device.

28  Otherwise, if the message is to be delivered to a receiving device addressable over a telephony-

Case No. 06-CV-0684 H (CAB)

1   centric network, the data-centric network server sends the message to the telephony-centric

2   network server over the data-centric network. The telephony-centric network server receives the

3   message from the data-centric network server and transmits the message to the receiving device

4   over the telephony-centric network. The '217 Patent discloses a number of receiving devices such

5   as a desktop computer, pager, facsimile machine, and telephone.

6          Another aspect of the '217 Patent is the ability to send message that have future delivery

7   times. The '217 Patent discloses that a message scheduler determines when to send messages that

8   have future delivery times specified thereby eliminating the need for any special intervention

9   apparatus in the sending or receiving devices that may otherwise be required to send a future

10  message.

11         Asserted Claim 1 of the '217 Patent reads as follows:

12             An apparatus for sending a message to a receiving device, the
               receiving device coupled to either a data-centric network or a
13             telephony-centric network, the apparatus comprising:

14             a message server, configured to translate the message into a format
               compatible with the receiving device, and to initiate delivery of the
15             message at a delivery time;

16             a data-centric network server, coupled to said message server,
               configured to transmit the message over the data-centric network,
17             wherein, if the receiving device is addressable over the data-centric
               network, then said data-centric network server delivers the message
18             to the receiving device; and

19             a telephony-centric network server, coupled to said data-centric
               network server, configured to interface said data-centric network
20             server to the telephony-centric network, wherein, if the receiving
               device is addressable by the telephony-centric network, then said
21             telephony-centric network server receives the message from said
               data-centric network server and delivers the message to the
22             receiving device over the telephony-centric network.

23         Therefore, Claim 1 discloses an apparatus comprising a message server, a data-centric

24  network server, and a telephony-centric network server in the manner as set forth in the claim.

25         Asserted Claim 8 of the '217 Patent reads as follows:

26             The apparatus as recited in claim 6, wherein said originator supplies
               the message in text or voice form from an origination device that is
27             addressable over the data-centric network.

28

103

Case No. 06-CV-0684 H (CAB)

Claim 8 of the '217 Patent depends from Claim 6. In turn, Claim 6 depends from Claim 5, Claim 5 from Claim 4, Claim 4 from Claim 2, and Claim 2 from independent Claim 1, above. Putting the claim limitations together, claim 8 adds to claim 1 in the following way:

> The apparatus as recited in claim 1, wherein the receiving device comprises a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer; wherein the receiving device is addressed by accessing an internet protocol (IP) address over the data-centric network; wherein said IP address is accessed using TCP/IP protocol; wherein the message is supplied to the message server by an originator; and wherein said originator supplies the message in text or voice form from an origination device that is addressable over the data-centric network.

Asserted Claim 14 of the '217 Patent reads as follows:

> The apparatus as recited in Claim 2, wherein the message is delivered to the receiving device in voice format as an electronic voice file.

Thus, Claim 14 adds to Claim 1 the following limitations:

> The apparatus as recited in claim 1, wherein the receiving device comprises a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer; and wherein the message is delivered to the receiving device in voice format as an electronic voice file.

Asserted Claim 37 of the '217 Patent reads as follows:

> A system for sending a message at a specified delivery time to a receiving device, the system comprising: a message scheduler, configured to initiate delivery of the message at the specified delivery time;
>
> a message server, coupled to said message scheduler, configured to translate the message into a format that is compatible with the receiving device;
>
> a data-centric network server, coupled to said message server, configured to transmit the message;
>
> a data-centric network, coupled to said data-centric network server, configured to route the message from said data-centric network server to either the receiving device or a telephony-centric network server, wherein, if the receiving device is addressable over a telephony-centric network, then said data-centric network routes the message to said telephony-centric network server.

Claim 37 thus relates to a system for sending a message at a future delivery time where the system is comprised of a message scheduler, a message server, a data-centric network, and a data-

104

1  centric network server configured to route the message to either a receiving device or telephony-

2  centric network server (if the receiving device is addressable over the telephony-centric network

3  server).

4            **2.        Infringement Of The Asserted Claims Of The '217 Patent**

5          Microsoft contends that Lucent directly infringes and induces others to infringe at least

6  Claims 1, 8, 14, and 37 of the '217 Patent with Lucent's AnyPath Messaging System.[6]   Lucent

7  commits direct infringement when it uses the AnyPath system (for example, when testing or

8  demonstrating the system) and Lucent induces customers to infringe by selling a system that is

9  designed to infringe and teaches customers about the infringing features in its literature or

10 otherwise.

11         Lucent's AnyPath meets all the limitations of Claim 1.  Lucent's AnyPath includes the

12 ability to send messages to a number of receiving devices including fax machines, wireline

13 phones, cell phones connected to a public-switched-telephone network ("PSTN"), desktop

14 computers connected to public/private data networks, and cell phones and other devices connected

15 to a mobile data network.

16         Lucent AnyPath supports the delivery of a message at a specified delivery time that can be

17 up to 365 days in the future.  Message delivery at a specified delivery time is initiated in the

18 Message Core module in the MS.  Additionally, translation of a message into a format compatible

19 with a receiving device is performed by various translation logic modules.  The computing

20 components on which the translation logic modules and the delivery initiation modules execute are

21 therefore collectively a "message server" because the collective distributed computer both

22 provides services for processing messages and contains translation logic and software.

23

24  _____

25         [6]  As suggested by the Court during the March 28, 2007 telephonic status conference,
    Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to
26  avoid a lengthy *Markman* hearing.  *See* Letter to McDavit from Vyas dated September 25, 2007;
    Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-
27  defendants").  Microsoft reserves the right to assert the remaining claims of any of the patents-in-
    suit in this litigation or otherwise in the future.  *See id.*

28

In certain situations, the MS hosting the recipient's mailbox is the data-centric network server because it is coupled to the message server identified above, and further delivers the message to the recipient's computer. Additionally, the MS hosting the recipient's mailbox also interfaces with the TS when the message is to be delivered over the telephony network to a telephony device. A Lucent AnyPath MS is a data-centric network server according to the construction of that term because it is a computer that is connected to the AnyPath service provider network, and provides services (related to subscriber requests over the TUI and WUI) over the AnyPath service provider network (and in the case of WUI based services, over the Internet). The AnyPath service provider network is a "data-centric network" because it is a network that carries digital data primarily to facilitate information exchange among computers.

A Lucent AnyPath TS is a "telephony-centric network server" because a TS is connected to a telephony-centric network such as a PSTN and provides services such as TUI over the telephony-centric network. A TS is coupled to an MS (the data-centric network server) and is configured to interface the MS to a telephony network, wherein when the subscriber receives the message through the TUI, *i.e.*, the receiving device is addressable over a telephony network, the TS receives the message from the MS and delivers the message to the subscriber's telephony device.

Asserted Claim 8 of the '217 Patent depends from Claims 2, 4, 5, and 6. Lucent's AnyPath also infringes these dependent claims as described below.

Claim 2 depends from Claim 1. Lucent's AnyPath meets all the limitations of Claim 1 and the additional limitations in Claim 2. The recipient subscriber can receive a message whose delivery was initiated at a specified time from a wireless or wireline telephone when using the TUI, or alternatively from a desktop computer or other computer connected to the Internet when using the WUI.

Claim 4 depends from Claim 2. Lucent's AnyPath meets all the limitations of Claim 2 and the additional limitations from Claim 4. A subscriber can receive a message whose delivery was initiated at a specified time from any computer that can utilize the Lucent's AnyPath WUI.

Case No. 06-CV-0684 H (CAB)

Claim 5 depends from Claim 4. Lucent's AnyPath meets all the limitations of Claim 4 and the additional limitations from Claim 5. A subscriber can receive a message whose delivery was initiated at a specified time from any computer that can utilize Lucent's AnyPath WUI.

Claim 6 depends from Claim 5. Lucent's AnyPath meets all limitations of Claim 5 and the additional limitations from Claim 6. A subscriber can send a message (including voicemail and email) from an originator PC (or other subscriber computer) to be delivered at a specified time through a web messaging server.

Regarding asserted Claim 8, which depends from Claim 6, Lucent's AnyPath meets all limitations of Claim 6 and the additional limitations of Claim 8. A subscriber can send a message (including voicemail and email) from an originator PC (or other subscriber device that uses IP addressing) to be delivered at a specified time through a web messaging server. When a web messaging server is used, the message will be supplied from an originator PC (or other subscriber web-based device) and sent via the web messaging server. When a subscriber accesses messages through Lucent's web messaging server, a subscriber will use a "thin client" such as a browser on the subscriber's PC to send the message. It is well understood that, in this situation, both the subscriber's PC and the web messaging server would be addressable using respective IP addresses, *i.e.*, when an originator sends messages through the web messaging server, the originating device (web messaging server and/or the PC) is addressable over a data-centric network.

Regarding asserted Claim 14, which depends from Claim 2, Lucent's AnyPath meets all limitations of Claim 2 and the additional limitations of Claim 14. When a subscriber receives the message through WUI or through a "thick" email client, the message is downloaded to the user's computer as an electronic voice file that is played out in voice format.

Lucent's AnyPath meets all the limitations of Claim 37. Lucent's AnyPath is a system for sending a message to a receiving device at a specified delivery time. Lucent's AnyPath includes a "message scheduler" that executes as a separate process as part of the Messaging Core module on a Lucent AnyPath MS. The process checks whether there are messages whose delivery time has occurred, and if so, initiates delivery of the message.

Case No. 06-CV-0684 H (CAB)

The computing components in Lucent AnyPath that execute translation logic or include message scheduling logic are collectively a "message server." These components may include the message link, message servers, RS devices, etc. Furthermore, a Lucent AnyPath MS that hosts a recipient's mailbox is a data-centric network server, and a Lucent AnyPath TS is a telephony-centric network server.

Lucent's AnyPath also includes an AnyPath service provider network that carries digital data and facilitates information exchange between components such as MS, TS, CS, and so forth. The AnyPath service provider network is therefore a data-centric network. When messages are delivered to a subscriber's computer through WUI, the Internet also carries the digital data and facilitates information exchange between an MS and the subscriber's computer. For this reason, the combination of the Lucent AnyPath service provider network and the Internet, is also a data-centric network. The data-centric network comprising the Internet and Lucent's AnyPath service provider network is coupled to the Lucent AnyPath "message server" identified above. Additionally, because messages are delivered from an MS to a subscriber's computer over the data-centric network comprising the Lucent AnyPath service provider network and the Internet, this data-centric network is configured to route messages towards receiving devices such as a desktop computer or other computers used by the subscriber to receive messages through WUI (or through use of other email client software). Furthermore, because messages are delivered from an MS to a TS over the data-centric network when the messages are to be delivered to a telephony device such as a wireless or wireline telephone, the data-centric network is configured to route messages to a "telephony-centric network server" if the receiving device is addressable over a telephony-centric network.

Thus, Lucent has infringed at least Claims 1, 8, 14, and 37 of the '217 Patent by using Lucent's AnyPath in testing or demonstrations. Lucent has also induced its customers to infringe Claims 1, 8, 14, and 37 by providing the infringing features to its customers and by teaching its customers how to use the infringing features through manuals or otherwise.

Case No. 06-CV-0684 H (CAB)

1   To the extent the fact finder believes that any limitation is missing from AnyPath (contrary

2   to Microsoft's contentions), then Microsoft contends that such a missing limitation is still present

3   under the doctrine of equivalents.

4   Lucent's infringement is more particularly explained in the Opening Expert Report of Dr.

5   John P. J. Kelly dated December 7, 2007, and all supplements thereto, all of which are

6   incorporated herein by reference as if set forth fully herein.

### 3.   Validity Of The Asserted Claims Of The '217 Patent

8   Lucent contends that the asserted claims of the '217 Patent are anticipated or obvious by a

9   number of references.  As a preliminary matter, the '217 Patent is an issued patent is therefore

10  presumed valid.  Lucent must prove by clear and convincing evidence that each of the references

11  upon which they rely qualifies as prior art under 35 U.S.C. § 102.  Lucent has not met its burden

12  as none of the prior art references – alone or in combination – discloses the inventions of Claims

13  1, 8, 14, and 37 of the '217 Patent.  Nor would such elements have been obvious to one of ordinary

14  skill in the art.  Microsoft's validity positions are set forth in detail in the Rebuttal Report of Dr.

15  John P. J. Kelly dated December 21, 2007.

16  A person of ordinary skill in the art would have a Bachelors of Science degree in either

17  computer science, computer engineering, or a related technical discipline or equivalent and at least

18  two years of experience in the design and implementation of software systems that involve

19  messaging and networking.

20  Lucent relies on U.S. Patent No. 6,055,240 ("Tunnicliffe") (LUCENT0005231-41).

21  However, this reference does not anticipate Claims 1, 8, 14, or 37 of the '217 Patent.  Tunnicliffe

22  also does not render the asserted claims of the '217 Patent invalid under the obviousness standard.

23  Tunnicliffe does not teach, disclose, or otherwise suggest a "telephony-centric network

24  server" coupled to a "data-centric network server" that is configured to interface the data-centric

25  network server to a telephony network which is also coupled to a "message server" as claimed.

26  Tunnicliffe also does not teach, disclose or otherwise suggest a "telephony-centric network server"

27  coupled to a "data-centric network server" that "receives" a message from the "data-centric

28  network server."

Case No. 06-CV-0684 H (CAB)

Further, Tunnicliffe does not teach, disclose or otherwise suggest a message scheduler configured to initiate delivery of a message at a specified delivery time. Tunnicliffe does not teach, disclose or otherwise suggest a "data-centric network," coupled to a "data-centric network server" and "configured to route" messages from the "data-centric network server" to a "telephony-centric network server . . . if the receiving device is addressable over a telephony-centric network" as required by certain asserted claims of the '217 Patent.

Lucent has not presented any analysis to support any conclusions that Claims 1, 8, and 14 are rendered obvious by Tunnicliffe in combination with prior art teachings.

Tunnicliffe teaches away from the use of a specified delivery time, because it teaches that the user agent will determine an appropriate time to send a message based on a number of factors, as opposed to the use of a specified delivery time. For this reason, one of ordinary skill would not consider Tunnicliffe to teach, suggest or otherwise disclose the "specified delivery time" limitations of Claim 37, and additionally, for the same reason would not consider making the obviousness combinations proffered by Lucent.

Even the U.S. Patent and Trademark Office ("USPTO") concluded that the claims were not rendered obvious under Tunnicliffe or a combination of Tunnicliffe prior art teachings (for Claims 1, 8, and 14), or between Tunnicliffe and other references cited by Lucent (for Claim 37).

Lucent relies on U.S. Patent No. 6,233,318 ("Picard") (LUCENT0005311-34). However, this reference does not anticipate Claims 1, 8, 14, or 37 of the '217 Patent. Picard also does not render the asserted claims of the '217 Patent invalid under the obviousness standard.

Regarding Claims 1, 8, and 14 of the '217 Patent, Picard does not teach, disclose or otherwise suggest the combination of a data-centric network server and a telephony-centric network server wherein the telephony-centric network server is coupled to and configured to interface the data-centric network server to a telephony-centric network, and where in if the receiving device is addressable over the telephony-centric network, the data-centric network routes the message to the telephony-centric network server.

Regarding Claim 37 of the '217 Patent, Lucent has not shown that Picard discloses the use of a message scheduler that resides on one or more of the servers and determines when to send

110

1  messages with future delivery times. Also, Lucent failed to show that Picard discloses a "message

2  scheduler" as construed by the Court. In addition, Lucent applied the same invalidity asserted to

3  Claim 37 as applied to Claim 1 which, for the same reasons discussed above, are incorrect.

4      The USPTO findings do not concur with Lucent's interpretation of Picard. The USPTO

5  recognized that the limitations of the '217 Patent are not satisfied and correctly concluded that the

6  prior art of record (including Picard and the Jones '110 Patent reference – a patent incorporated by

7  reference in Picard which was cited by the USPTO examiner) did not disclose the limitations of

8  Claims 1, 8, 14, and 37 of the '217 Patent.

9      Further, Lucent concedes that Claims 1, 8, and 14 of the '217 Patent are not rendered

10  obvious by Picard in combination with prior art teachings because Lucent failed to identify which

11  elements of the asserted claims are within the prior art and explain how the missing elements

12  would be satisfied or understood by those of skill in the art in view of prior art teachings.

13      Lucent relies on U.S. Patent No. 5,987,100 ("Fortman") (LUCENT0005214-30).

14  However, this reference does not anticipate Claims 1, 8, or 14 of the '217 Patent. Fortman also

15  does not render the asserted claims of the '217 Patent invalid under the obviousness standard.

16      Regarding Claims 1, 8, and 14 of the '217 Patent, Fortman does not teach, disclose or

17  otherwise suggest a "telephony-centric network server" that is coupled to a "data-centric network

18  server" and configured to "interface" the data-centric network server to a telephony-centric

19  network, wherein the telephony-centric network server "receives the message" from the data-

20  centric network server over a data-centric network.

21      Further, Lucent failed to identify which elements of the asserted claims are in the prior art

22  reference and explain how the missing elements would be satisfied or understood by those of skill

23  in the art in view of prior art teachings. Further, Lucent has not shown that all the limitations of

24  Claim 8 are taught by the combination of Fortman and Picard.

25      The USPTO findings do not concur with Lucent's interpretation of Fortman. The USPTO

26  recognized that the limitations of the asserted claims are not taught by the prior art of record

27  (including Fortman) and correctly concluded that the prior art of record (including Fortman) did

28  not disclose Claims 1, 8, and 14 of the '217 Patent.

Case No. 06-CV-0684 H (CAB)

1    Lucent does not assert that Fortman anticipates, or alternatively renders obvious, Claim 37

2    of the '217 Patent.

3    Regarding secondary considerations of nonobviousness, the elegant solution of the '217

4    Patent provides an improved architecture for future messaging between a variety of devices. All

5    the prior art systems cited by the USPTO during examination, and by Lucent in this action, differ

6    from the invention and only highlight the failure of others to solve the unmet need of transparent

7    future messaging. The '217 Patent specifically distinguished prior art that required specialized

8    circuitry or software in the sending and receiving devices. The fact that Lucent chose to adopt a

9    system covered by the '217 Patent and rejected the "universal messaging" proposals in the prior art

10   is further evidence of the success of the inventions of the '217 Patent. All these secondary

11   considerations buttress the fact the inventions disclosed in the '217 Patent were not obvious at the

12   time they were made.

13   **4.    Enforceability Of the Asserted Claims Of The '217 Patent**

14   Neither Lucent nor Alcatel allege that the '217 is unenforceable.

15   **D.    U.S. Patent No. 5,438,433 ("The '433 Patent")**

16   **1.    The Teaching Of Asserted Claims Of The '433 Patent**

17   United States Patent No. 6,412,433 ("the '433 Patent") to Reifman, *et al*., entitled "System

18   and Method for Facsimile Cover Page Storage and Use," issued on August 1, 1995, from an

19   application dated March 31, 1994, which is a division of U.S. Patent Application Serial No.

20   08/073,511, filed on June 7, 1993.

21   Microsoft is the owner of the '433 Patent with the right to sue for past infringement.

22   The '433 Patent states that it "relates generally to a user interface for an intelligent

23   facsimile machine (IFAX) and, more specifically, to a system and method for controlling user

24   interface with the IFAX." *See* '433 Patent at 1:10-13.

25   Around the time of the filing of the '433 Patent (1993), there were millions of facsimile

26   machines in use around the world including the United States. In addition, personal computers, or

27   "PCs," had become ubiquitous and the introduction of laptop computers provided a portable means

28   of computing. PC users connected to computer networks through the use of modems. By 1992,

112

1    these modems supported fax functions which then enabled attached computers to become

2    facsimile machines in order to send faxes to/from other computers and old-style facsimile

3    machines.   As a result, vendors began to develop software to permit PCs to access facsimile

4    functions.

5            Even so, the average user found these rapid advances in technology difficult to understand

6    without extensive training.  Appreciating this significant need, the inventors of the '433 Patent sets

7    forth a variety of features to make the use of advanced facsimile functions in intelligent facsimile

8    machines easier.

9            Specifically, Claims 1 and 4 of the '433 Patent relate to the use and/or sharing of intelligent

10   facsimile machines where certain users may have default cover pages and/or individually designed

11   cover pages.

12           Asserted Claim 1 of the '433 Patent reads as follows:

13                   A method in a facsimile machine having a display and a user input
                     device, for storage and use of a facsimile cover page, the method
14                   comprising the steps of:

15                   maintaining at least one facsimile cover page in a first storage
                     location continuously accessible by any of a plurality of users of the
16                   facsimile machine;

17                   maintaining at least another facsimile cover page in a second storage
                     location accessible by a selected one of said plurality of users, said
18                   selected user having a corresponding user identification;

19                   sensing if a user inputs a user identification; and

20                   enabling access to said, second storage location only if said sensed
                     user identification corresponds to said user identification of said
21                   selected user, said first storage area being continuously enabled for
                     any of said plurality of users and said second storage area being
22                   enabled only when said sensed user identification corresponds to
                     said user identification of said selected user.

23

24           Claim 1 includes several elements and is a method claim that may be infringed by the use

25   of an apparatus that practices the claimed steps.  The claim begins with a preamble which provides

26   the intended environment for the invention, the claimed method involves facsimile cover pages

27   stored on a facsimile machine. The Court defined a *facsimile machine* as an apparatus capable of

28   sending and receiving copies using facsimile protocols established by the International Telegraph

Case No. 06-CV-0684 H (CAB)

and Telephone Consultative Committee (or "CCITT").[7] A *facsimile machine* can thus be implemented in a variety of ways: from a traditional stand-alone fax machine, to a complex distributed fax server, to a distributed computer system with fax functionality. As such, in accordance with the language of the '433 Patent, the Court concluded that "neither the claim language nor the specification disavows implementation on a PC."[8] Finally, a *facsimile cover page* is construed as a page containing information identifying a facsimile.[9]

In addition, Claim 1 sets forth four limitations. The first limitation relates to maintaining at least one facsimile cover page in a first storage location continuously accessible by any plurality of users of the facsimile machine. This limitation concerns the one or more standard cover pages that may be selected by at least a plurality of users of the system.

The second limitation relates to maintaining one or more facsimile cover page in a second storage location accessible by a selected one of said plurality of users. This limitation concerns one or more personal cover pages that are not generally available to the plurality of users of the fax machine.

The third limitation relates to the sensing if a user inputs a user identification.

The fourth limitation relates to controlling access to the personal cover pages. It states that access to the personal cover page is only enabled if the sensed user identification corresponds to the selected user (a user having a personal cover page). The limitation also states that unlike the personal cover page, access to the standard cover page is continuously enabled for the plurality of users.

Asserted Claim 4 of the '433 Patent reads as follows:

> A method in a facsimile machine having a user input device for the storage and use of a facsimile cover page, the method comprising the steps of:
>
> maintaining at least one facsimile cover page in a first storage location continuously accessible by any of a plurality of users of the facsimile machine;
>
> maintaining at least another facsimile cover page in a second storage

---

[7] *See* Court's Claim Construction Order at 25-29.
[8] *See id* at 27 ("Note 1").
[9] *See id.*

114

location accessible by a selected one of said plurality of users, said selected user having a corresponding user identification;

sensing if a user inputs a user identification; and

enabling access to said second storage location only if said sensed user identification corresponds to said user identification of said selected user, said first storage area being continuously enabled for any of said plurality of users and said second storage area being enabled only when said second user identification corresponds to said user identification of said selected user;

sensing a user input on the user input device to select a particular one of said stored cover pages from said first storage location or said second storage location if said user identification data corresponds to said selected one of said plurality of users;

selecting said particular cover page in response to said user input; and

transmitting said particular cover page as a cover page for a facsimile message.

Claim 4, like Claim 1, begins with a preamble referring to facsimile cover pages stored on a facsimile machine.

The preamble of Claim 4 is also followed by the four limitations recited above in the discussion of Claim 1, and includes three additional limitations. The fifth limitation of Claim 4 concerns sensing a user input to select a particular cover page from the standard and personal cover pages if the user identification corresponds to a selected user having a personal cover page.

The sixth limitation of Claim 4 requires selecting the particular cover page in response to the user input.

The seventh limitation of Claim 4 requires transmitting said particular cover page as a cover page for a facsimile message. Thus, the selected cover page (either the custom or standard cover page) is used in transmission as a cover page for a facsimile message.

## 2. Infringement Of The Asserted Claims Of The '433 Patent

Microsoft contends that Lucent directly infringes and induces others to infringe at least Claims 1 and 4 of the '433 Patent with its AnyPath Messaging System.[10]

---

[10] As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-

115

1      AnyPath is a "facsimile machine" – as that term is construed by the Court – in that it is a

2 messaging system capable of sending and receiving copies using facsimile protocols established

3 by CCITT. AnyPath users can receive, store, reply, forward, and send a fax using standard

4 facsimile protocols including CCITT. AnyPath telephony servers can receive a fax from a fax

5 machine and can forward a received fax message to other facsimile machines based on dialed

6 telephone numbers.

7      Although not required by an limitation in Claims 1 or 4, AnyPath also has numerous

8 displays. System administrators use computers having displays, keyboards, and mice to input

9 information into the AnyPath system. The TUI (or telephone user interface) with its telephone

10 display and keypad, WUI (or web user interface) with its computer display screen and a pointing

11 device, or WAP (or wireless application protocol) with its telephone or device display and keypad,

12 give users the ability to view, print, address messages, and/or send fax messages.

13      AnyPath users store and use facsimile cover pages. The individual cover pages are stored

14 on the message server that hosts their mailbox. AnyPath subscribers can specify that their

15 personalized cover pages are sent with their fax transmissions. The standard cover pages are

16 stored on the Administration and Control Server (or "ACS"). This would correspond to the "first

17 location" of the claims. If no customized cover sheet is created, then the standard fax cover sheet

18 is printed instead.

19      AnyPath practices the first limitation of Claim 1. AnyPath users have access without

20 interruption to a standard facsimile cover sheet. At any time, AnyPath users can choose to use the

21 standard facsimile cover page of the system. If the user has loaded a personal cover page, this

22 choice is made by deleting the personal cover page so that the system reverts back to the standard

23 cover page.

24      AnyPath practices the second limitation of Claim 1. AnyPath users have access to their

25 own personal cover page. AnyPath users can set up their profiles so that when you forward a fax,

26 it will include a persona cover page. To access their mailbox, the subscriber logs in using their

27

28     defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

Case No. 06-CV-0684 H (CAB)

1  user identification. The individual cover pages are stored on the message server that hosts their
2  mailbox. This mailbox corresponds to the second location of the claim.

3  Further, access to the second location is restricted to selected users and access is controlled
4  by sensed user identifications. For example, a subscriber must log-in to their mailbox in order to
5  have access to any messages in their mailbox (e.g., fax messages) or functions of their mailbox
6  (e.g., fax forwarding). Within the source code, there is something called an "SID" which stands
7  for "Subscriber ID". The Subscriber IDs are correlated to mailboxes within the AnyPath system.

8  AnyPath practices the third limitation of Claim 1. Users can interact with AnyPath by TUI
9  (*e.g.,* a Lucent desk phone) or WUI (*e.g.,* a web browser running on a laptop) and the AnyPath
10  system will sense the user identification based on the user's use of the TUI or WUI devices.

11  AnyPath practices the fourth limitation of Claim 1. Access to AnyPath ppersonal cover
12  pages is controlled based on the sensed user identification of selected users who have personal
13  cover pages. On the other hand, the standard cover pages are continuously available to the
14  plurality of users, including users who have personal cover pages. A user with a personal cover
15  page selects the standard cover page by deleting the personal cover page.

16  AnyPath practices the limitations of Claim 4 that are also found in Claim 1, as discussed
17  above. In addition, AnyPath practices the fifth limitation of Claim 4 as discussed above regarding
18  limitations of Claim 1. If a user has a personal cover page selected, then the system will use the
19  sensed user identification to select the personal cover page. Thus, the sensing of the user
20  identification corresponds to both the third and the fifth limitations of claim 4 Also, if the user has
21  fax pages in the user's mailbox, the user is prompted to choose whether to make each of those fax
22  pages a personal cover page. The sensed user input in response to the prompt also corresponds to
23  the fifth limitation of Claim 4.

24  AnyPath practices the sixth limitation of Claim 4. Based on the sensed user input, a cover
25  page is selected.

26  AnyPath practices the seventh limitation of Claim 4. The selected cover page (either the
27  personal or standard cover page) is used as the cover page of fax messages by AnyPath.

28

Case No. 06-CV-0684 H (CAB)

1    Lucent has infringed Claims 1 and 4 of the '433 Patent by using the AnyPath system in

2 testing or demonstrations. Lucent has also induced its customers to infringe claims 1 and 4 by

3 providing the infringing features to its customers and by teaching its customers how to use the

4 infringing features through manuals or otherwise.

5    To the extent that the fact finder believes that any limitation is missing from AnyPath

6 (contrary to Microsoft's contentions), then Microsoft contends that such a missing limitation is still

7 present under the doctrine of equivalents.

8    Lucent's infringement is more particularly explained in the Opening Expert Report of Brad

9 Myers dated December 7, 2007, and the Supplemental Expert Report of Brad Myers dated

10 February 11, 2008, which are incorporated by reference as if set forth fully herein.

11    **3.    Validity Of The Asserted Claims Of The '433 Patent**

12    Lucent contends that the asserted claims of the '433 Patent are anticipated or obvious by a

13 number of references. As a preliminary matter, the '433 Patent is an issued patent is therefore

14 presumed valid. Lucent must prove by clear and convincing evidence that each of the references

15 upon which they rely qualifies as prior art under 35 U.S.C. § 102. Lucent has not met its burden

16 as none of the prior art references – alone or in combination – discloses the inventions of Claims 1

17 and 4 of the '433 Patent. Nor would such elements have been obvious to one of ordinary skill in

18 the art. Microsoft's validity positions are set forth in detail in the Rebuttal Report of Brad Myers

19 dated December 21, 2007, and the Supplemental Expert Report of Brad Myers dated February 11,

20 2008.

21    A person of ordinary skill in the art relating to the '433 Patent should have a bachelor's

22 degree in electrical engineering or computer science and at least two to three years of experience

23 in user interface design of fax systems or similar computer systems.

24    Lucent relies on U.S. Patent No. 5,267,047 ("Argenta") (LUCENT0144481-530).

25 However, this reference fails to teach the steps of having personal cover pages accessible by

26 individual users and having a standard cover pages generally available for a plurality of users.

27 The second, third, and fourth limitations are of claim 1 are missing from Argenta and the second,

28 third, fourth, fifth, and sixth limitations from claim 4 are missing from Argenta.

Case No. 06-CV-0684 H (CAB)

Lucent also asserts that Claims 1 and 4 of the '433 Patent are rendered obvious by Argenta in combination with the AT&T Fax Attendant System or the IBM ImagePlus System, but elements of Claims 1 and 4 of the '433 Patent are absent from this combination of references. Argenta combined with the AT&T Fax Attendant System provides no support for the second or fourth limitations of claim 1. Argenta combined with the IBM ImagePlus System does not mention having personal cover pages nor does it disclose, teach, or suggest using user access rights to control access to cover sheets. In fact, Argenta states that the cover pages are available to everyone.

Claim 4 cannot be anticipated by Argenta because there is nothing in the any other references identified by Lucent where a cover page would be selected based upon the user's identification.

Argenta was considered by the examiner during prosecution of the '433 Patent, and the issued claims were already found patentable over Argenta.

Lucent further cites to WinFax Pro as anticipating the asserted claims of the '433 Patent. However, WinFax Pro is missing the same limitations are Argenta. WinFax Pro does not teach the steps of having cover page accessible only by specific users, and having a standard cover page available for everyone. Further, WinFax Pro only shows how multiple cover pages can be used by the single user of the personal computer, not a plurality of users with separate cover pages. WinFax Pro, itself, has no notion of multiple users—all users of the PC look like a single user to WinFax Pro. Accordingly, WinFax Pro does not suggest distinguishing users based on user identifications.

Lucent asserts that WinFax Pro in combination with Netware 3.11 or NetWare 4.0 render obvious the asserted claims of the '433 Patent. WinFax Pro is not a server application and would not interact with Netware and Lucent has failed to explain how the teachings of the references could be combined in the first place. The operation of WinFax Pro on a computer that also is running Netware would still lack all but the first limitation of claims 1 and 4. Also, to the extent that the computer sensed a user identification for unrelated purposes, this would not affect the operation of WinFax Pro. Lucent does not describe, however, how the user identification feature

Case No. 06-CV-0684 H (CAB)

1    of NetWare says anything about "enable access to said second storage location only said sensed

2    user identification corresponds to said user identification of said selected user." Nor does Lucent

3    explain how one would combine WinFax Pro (a PC-based client application) with Netware to

4    arrive at the claim invention.

5          WinFax Pro was considered by the examiner during prosecution of the '433 Patent and an

6    advertisement and article describing WinFax Pro are included in the prosecution history for the

7    '433 Patent. Even so, the examiner found the issued claims patentable.

8          Secondary considerations of nonobviousness include that others failed to invent the

9    claimed inventions of the '433 Patent. It was not an obvious requirement that a system have cover

10   sheets reserved for individual users, and have a default cover sheet available for a larger universe

11   of users. In addition, the invention discloses the storage and use of digital cover pages which a co-

12   inventor of the patent – Mr. Kurt DelBene – testified was a "unique invention" that culminated in

13   the '433 Patent.

14             **4.      Enforceability Of the Asserted Claims Of The '433 Patent**

15         Lucent does not suggest that the '433 is unenforceable.

16        **E.     U.S. Patent No. 6,339,794 ("The '794 Patent")**

17             **1.      The Teaching Of Asserted Claims Of The '794 Patent**

18         Microsoft is the owner of the '794 patent with the right to sue for past infringement.

19         The '794 patent relates to a wire protocol for a media server system. The wire protocol

20   facilitates the creation of a network connection between a media server and client, including

21   creation of a control connection for passing control information, and a data connection for passing

22   data of multiple media.

23         Microsoft is asserting claim 33 of the '794 patent against Lucent and Alcatel. [11]

24         [11] As suggested by the Court during the March 28, 2007 telephonic status conference,
     Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to

25   avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007;
     Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-

26   defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-
     suit in this litigation or otherwise in the future. *See id.*

27

28

Case No. 06-CV-0684 H (CAB)

Asserted claim 33 of the '794 patent reads as follows:

> 33.     In a distributed system having a media server storing files holding data of multiple media, a computer system comprising :
>     a control connection generator for creating a bidirectional control connection between the media server and the computer system to enable control information to be passed between the media server and the computer system, the control connection utilizing a first transport protocol ; and
>     a data connection generator for creating a bidirectional data connection between the media server and the computer system to enable data to be passed between the media server and the computer system, the data connection using a second transport protocol distinct from the first transport protocol .

Claim 33 thus recites a computer system and a media server which stores multiple media data. Two connections are created between the computer system and media server to: a control connection for the exchange of control information, and a data connection for the exchange of data. Both the control and data connections are bidirectional, allowing control information and data to be transferred from the media server to the computer system and vice versa. The control and data connections employ two distinct transport protocols such as UDP and TCP.

## 2.     Infringement Of The Asserted Claims Of The '794 Patent

Microsoft contends that Lucent's AnyPath Messaging System infringes claim 33 of the '794 patent directly and contributorily, literally, and under the doctrine of equivalents. Lucent's AnyPath Messaging System is a comprehensive voice telephony messaging system which provides client end-systems with a network based mailbox having messaging services including voicemail and email, allowing remote clients to access and retrieve messages, among other features. An AnyPath deployment ordinarily comprises a number of servers throughout a network for storing and retrieving messages, and administering and controlling the AnyPath Messaging System.

Microsoft also contends that Alcatel's 8788 Media Resource Platform infringes claim 33 of the '794 patent directly and contributorily, literally, and under the doctrine of equivalents. Alcatel's 8788 Media Resource Platform is a comprehensive hardware and software system for

121

supporting voice and video applications, including multimedia streaming among other features. It includes the 8688 Media Resource Function (MRF) which provides the media server function.

Regarding claim 33, each of the accused products includes a client and media servers, and has a bidirectional control connection for the exchange of control information and a bidirectional data connection for the exchange of data. The control connections employ the TCP transport protocol and the data connections employ the UDP transport protocol.

Lucent's infringement is more particularly explained in the December 7, 2007 Expert Report of James Modestino and the February 15, 2008 Supplemental Expert Report of James Modestino, both of which are incorporated herein by reference as if set forth fully herein.

Alcatel's infringement is more particularly explained in the December 7, 2007 Expert Report of James Modestino and the February 15, 2008 Supplemental Expert Report of James Modestino, both of which are incorporated herein by reference as if set forth fully herein.

### 3. Validity Of The Asserted Claims Of The '794 Patent

Lucent and Alcatel contend that the asserted claim 33 of the '794 patent is anticipated or obvious by a number of references. As an initial matter, Lucent and Alcatel must prove by clear-and-convincing evidence that each of the references upon which they rely qualifies as prior art under 35 U.S.C. § 102. To the extent they can carry their burden on this issue, claim 33 of the '794 patent is not anticipated by or obvious in view of the references they rely upon. Microsoft's validity positions are set forth in detail in the December 21, 2007 Rebuttal Expert Report of James Modestino and the February 28, 2008 Second Supplemental Expert Report of James Modestino. None of the references relied upon by Alcatel and Lucent, alone or in combination, disclose all of the limitations of claim 33.

A person of ordinary skill in the art pertaining to the '794 patent at the time of the invention would have had an undergraduate degree in electrical engineering, computer engineering, computer science, or similar technical field together with two to three years of experience designing, testing, implementing or otherwise working with multimedia networks. In the alternative, a person could achieve ordinary skill in the art with a more advanced degree and less experience in that discipline.

Case No. 06-CV-0684 H (CAB)

Lucent and Alcatel rely on Crutcher & Grinham, *The Networked Video Jukebox* ("Crutcher") reference to anticipate claim 33. However, this reference fails to disclose a "media server" or a "client" as the Court has defined the terms. Crutcher does not identify a client computer that requests service from a media server. Further, Crutcher does not disclose protocols at the application layer that are bidirectional. There is no identified "control connection generator" or "data connection generator" for creating the bidirectional control and data connections.

Lucent and Alcatel rely on a combination of Crutcher and prior art references to render claim 33 obvious. However, this combination of references fails to disclose the required elements of claim 33. First, the TFTP Protocol (Rev. 2) ("TFTP Protocol") reference teaches away from the invention because it uses UDP as its transport protocol for the control connection, not TCP. This would create a system that uses the same transport protocol for both the data and control connections, in direct contradiction to what claim 33 requires. Second, the Berkeley Computer Systems Research Group report by Leffler, Fabry and Joy ("Leffler") reference teaches away from the invention as well, using TCP as the transport layer protocol for data transport. When used in combination with Crutcher, which relies on TCP for the control connection as well, this too would result in a system that used the same transport protocol for both the data and control connections, in direct contradiction to what claim 33 requires.

Secondary considerations of non-obviousness also support a finding that claim 33 of the '794 patent is not invalid for obviousness, including evidence that others in the industry were attempting to design systems for delivery multimedia content as the '794 Patent does (see Crutcher at 105.) In addition, the technology of the '794 Patent was commercially successful in that Microsoft successfully implemented it in its products and others have copied the '794 Patent, including at least Lucent and Alcatel.

### 4. Enforceability Of the Asserted Claims Of The '794 Patent

Neither Lucent nor Alcatel allege that the '794 patent is unenforceable.

### F. U.S. Patent No. 5,941,947 ("The '947 Patent")

### 1. The Teaching Of Asserted Claims Of The '947 Patent

Microsoft is the owner of the '947 Patent with the right to sue for past infringement.

123

The '947 Patent relates to a "system and method for controlling access to data entities in a computer network." The '947 Patent describes a way of "controlling user access to data entities on a computer network" ([*see, e.g.,* '947 Patent, 2:20-21), and a manner of storing "access rights data within an access rights database" (*see, e.g.,* '947 Patent, 2:62-63). The '947 Patent seeks to address the problem wherein as the numbers of data entities and users grow large, controlling each user's specific access rights to each data entity becomes increasingly complicated both in terms of the data storage required to maintain the access rights and in terms of the time required to search for a particular user's access rights with regard to a particular data entity.

Before the invention of the '947 Patent, existing access control methods "consume[d] large amounts of memory, and often [took] unacceptably long periods of time to search." (*See* '947 Patent at 2:8-10).

Recognizing the limitations of these systems, the inventors of the '947 patent invented the technology of the '947 patent at Microsoft Corporation, for use in the Microsoft Network ("MSN 1.0").  The inventions disclosed in the '947 patent reduce memory and search time by defining access rights by "content categories, rather than the content objects" (*see* '947 patent at 3:5-7), "primarily on a per-user-group basis, rather than separately storing the access rights of each individual user" (*see* '947 patent at 3:17-19).  The patent discloses that access rights data is stored within a relational database in association with multiple content categories that serve [as] the basic content units to which user access rights may be specified. The use of content categories eliminates the need to store access rights data on a per-object basis, and thereby significantly reduces the quantity of access rights data that needs to be stored." (*See* '947 patent at 2:66-3:11). Similarly, "each user of the network is a member of at least one user group, and may be a member of multiple groups." (*See* '947 patent at 4:19-21) "[T]he use of user groups further reduces the quantity of access rights data that needs to be stored." (*See* '947 patent 3:19-20).

Claim 21 of the '947 Patent reads as follows:

> 21. A method of determining the access rights of a user of a
> computer system with respect to a plurality of data entities of the
> computer system, comprising the steps of:

124

identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups;

and identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories.

Claim 21 thus includes a number of different elements. First, claim 21 is a method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system. Second, claim 21 includes the step of identifying at least one user group of which said user is a member, where at least one user group is a part of a predefined set of user groups. Third, claim 21 includes the step of identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, where at least one data entity category is a part of a predefined set of data entity categories. The Court construed the term "computer system" as "a plurality of interconnected computers", the term "plurality" as "more than one", and the term "data entity[ies]" as "a resource to which access may be controlled, where 'resource' may refer to a system resource on a host computer, but not the host computer itself, viewed as a whole".

Asserted Claim 22 of the '947 Patent reads as follows:

22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network.

Asserted Claim 22 depends from Claim 21 and includes the following additional elements. Claim 22 includes the limitation where the steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. The Court construed the term "server" as "a computer that provides services", and the term "relational database" as "a database in which the contents are organized as a set of two or more interrelated tables".

Asserted Claim 24 of the '947 Patent reads as follows:

The method according to claim 21, further comprising the steps of:

Case No. 06-CV-0684 H (CAB)

1               determining a specific data entity category in which a specific data
              entity falls;

2

3               and determining whether said at least one data entity category to
              which said user has access includes said specific data entity
              category, to thereby determine whether said user has access to said

4               specific data entity.

5        Asserted Claim 24 depends from Claim 21 and includes the following additional elements.

6 First, Claim 24 includes the step of determining a specific data entity category in which a specific

7 data entity falls. Second, Claim 24 includes the step of determining whether the at least one data

8 entity category to which the user has access includes said specific data entity category, to thereby

9 determine whether the user has access to said specific data entity.

10        Asserted Claim 59 of the '947 Patent reads as follows:

11               A relational database for storing access rights data which specifies
              access rights of users with respect to a plurality of data entities of a

12               computer network, said plurality of data entities subdivided into a
              plurality of categories, said database comprising:

13
              a first table that maps users to user groups, at least one of said users

14               being a member of multiple of said user groups;

15               a second table which contains, for each of said user groups, a group-
              based access rights list that specifies group-based access rights of

16               members of a respective user group, said group-based access rights
              list stored in association with a plurality of category identifiers that

17               identify said categories of data entities;

18               and a third table which contains, for at least one of said users, a user-
              specific access rights list that specifies special rights for a respective

19               user, said user-specific access rights list stored in association with
              said plurality of category identifiers.

20

21        Asserted Claim 59 thus includes a number of different elements. First, Claim 59 is a

22 relational database for storing access rights data which specifies access rights of users with respect

23 to a plurality of data entities of a computer network, said plurality of data entities subdivided into

24 a plurality of categories. Second, claim 59 includes a first table that maps users to user groups,

25 where at least one of said users being a member of multiple of said user groups. Third, claim 59

26 includes a second table which contains, for each of said user groups, a group-based access rights

27 list that specifies group-based access rights of members of a respective user group, where said

28 group-based access rights list stored in association with a plurality of category identifiers that

identify said categories of data entities.  Fourth, claim 59 includes a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, where said user-specific access rights list stored in association with said plurality of category identifiers.  The Court has construed the term "table" as "a collection of data usually organized in rows and columns" and the term "category identifiers" as "identifiers of a category".

### 2.    Infringement Of The Asserted Claims Of The '947 Patent

Microsoft contends that all versions of NavisAccess Dial and NavisAccess DSL subsequent to and including version 5.0 that were used, sold or offered for sale in the United States, or imported into the United States by Lucent after Aug. 24, 1999 contain each and every element of Claims 22, 24 and 59 of the '947 Patent[12] and therefore literally infringed those claims, and also infringed those claims under the doctrine of equivalence.  Additionally, Lucent induced and contributed to the infringement of Claims 22, 24 and 59 to the extent to which said versions of NavisAccess were sold, offered for sale or imported for use by a third party within the United States.

NavisAccess includes or performs all of the elements of claims 22, 24 and 59 of the '947 patent, as described in Appendix A attached here to the Declaration of Desa Burton in Support of Microsoft's Memorandum of Contentions of Fact and Law and Rule 26(a)(3) Disclosures.

Lucent's infringement is more particularly explained in the December 7, 2007 Expert Report of Dr. John P. Kelly and the January 22, 2008 Supplemental Expert Report of Dr. John P. Kelly, both of which are incorporated by reference as if set forth fully herein.

### 3.    Validity Of The Asserted Claims Of The '947 Patent

Lucent contends that claims 22, 24 and 59 of the '947 Patent are anticipated or rendered obvious by a number of references. As an initial matter, Defendants must prove by clear-and-

---

[12]  As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

Case No. 06-CV-0684 H (CAB)

1   convincing evidence that each of the references upon which they rely qualifies as prior art under

2   35 U.S.C. § 102. To the extent Lucent can carry its burden on this issue, claims 22, 24 and 59 of

3   the '947 patent are not anticipated by or obvious in view of the references relied upon by

4   Defendants. Microsoft's validity positions are set forth in detail in the Rebuttal Expert Report of

5   Dr. John. P. Kelly dated December 21, 2007. None of the prior art references relied upon by

6   Lucent - alone or in combination discloses all of the elements of any of the asserted claims. Nor

7   would such elements have been obvious to one of ordinary skill in the art .

8        Lucent contends that the asserted claims of the '947 Patent are anticipated or obvious by a

9   number of references including U.S. Patent Nos. 5,263,157, 5,263,158 and 5,263,165 (Janis

10  Patents), Windows NT 3.1, IBM LAN Server 4.0 ("LAN Server"), Access Control: Principles and

11  Practice ("Sandhu"), and Unix.

12       A person of ordinary skill in the art a "person of ordinary skill in the art" with regard to the

13  "art" of the '947 patent would have a Bachelors of Science degree in either computer science,

14  computer engineering, or a related technical discipline or equivalent and at least 2 years of

15  experience in the design and implementation of software systems that involve database systems

16  and access control.

17       Lucent relies on U.S. Patent Nos. 5,263,157, 5,263,158 and 5,263,165 (the "Janis

18  Patents"). However, these references fails to disclose "identifying at least one user group of which

19  said user is a member, said at least one user group being part of a predefined set of user groups",

20  "identifying at least one data entity category to which said user has access by virtue of being a

21  member of said at least one user group", or "wherein said steps of identifying at least one user

22  group and identifying at least one data entity category each comprise accessing a relational

23  database stored on a server of a computer network." Nor does it disclose "determining a specific

24  data entity category in which a specific data entity falls" or "determining whether said at least one

25  data entity category to which said user has access includes said specific data entity category."

26  Neither does it disclose "a relational database for storing access rights data", "a first table that

27  maps users to user groups", "a second table which contains, for each of said user groups, a group-

28

Case No. 06-CV-0684 H (CAB)

1   based access rights list", or "a third table which contains, for a least one of said users, a user-

2   specific access rights list."

3       Lucent relies on Windows NT 3.1. However, this reference fails to disclose "identifying at

4   least one user group of which said user is a member, said at least one user group being part of a

5   predefined set of user groups", "identifying at least one data entity category to which said user has

6   access by virtue of being a member of said at least one user group", or "wherein said steps of

7   identifying at least one user group and identifying at least one data entity category each comprise

8   accessing a relational database stored on a server of a computer network." Nor does it disclose

9   "determining a specific data entity category in which a specific data entity falls" or "determining

10  whether said at least one data entity category to which said user has access includes said specific

11  data entity category." Neither does it disclose "a relational database for storing access rights data",

12  "a first table that maps users to user groups", "a second table which contains, for each of said user

13  groups, a group-based access rights list", or "a third table which contains, for a least one of said

14  users, a user-specific access rights list."

15      Lucent relies on LAN Server. However, this reference fails to disclose "identifying at least

16  one data entity category to which said user has access by virtue of being a member of said at least

17  one user group", or "wherein said steps of identifying at least one user group and identifying at

18  least one data entity category each comprise accessing a relational database stored on a server of a

19  computer network." Nor does it disclose "determining a specific data entity category in which a

20  specific data entity falls" or "determining whether said at least one data entity category to which

21  said user has access includes said specific data entity category." Neither does it disclose "a

22  relational database for storing access rights data", "a first table that maps users to user groups", "a

23  second table which contains, for each of said user groups, a group-based access rights list", or "a

24  third table which contains, for a least one of said users, a user-specific access rights list."

25      Lucent relies on Sandhu. However, Sandhu does not constitute prior art to the '947 patent

26  because it was not published until after the invention of the '947 Patent, nor was it published

27  before the statutory bar period of 35 USC §102. Furthermore, this reference fails to disclose

28  "wherein said steps of identifying at least one user group and identifying at least one data entity

129

1   category each comprise accessing a relational database stored on a server of a computer network."

2   Nor does it disclose "determining a specific data entity category in which a specific data entity

3   falls" or "determining whether said at least one data entity category to which said user has access

4   includes said specific data entity category." Neither does it disclose "a relational database for

5   storing access rights data", "a first table that maps users to user groups", "a second table which

6   contains, for each of said user groups, a group-based access rights list", or "a third table which

7   contains, for a least one of said users, a user-specific access rights list."

8          Lucent relies on Unix. However, this reference fails to disclose "identifying at least one

9   data entity category to which said user has access by virtue of being a member of said at least one

10   user group", or "wherein said steps of identifying at least one user group and identifying at least

11   one data entity category each comprise accessing a relational database stored on a server of a

12   computer network." Nor does it disclose "determining a specific data entity category in which a

13   specific data entity falls" or "determining whether said at least one data entity category to which

14   said user has access includes said specific data entity category." Neither does it disclose "a

15   relational database for storing access rights data", "a second table which contains, for each of said

16   user groups, a group-based access rights list", or "a third table which contains, for a least one of

17   said users, a user-specific access rights list."

18          Secondary considerations of nonobviousness include a long felt need for useful access

19   control mechanisms and knowledge of relational databases which were, nevertheless, not used to

20   accomplish the claimed access control scheme prior the invention of the '947 patent. The success

21   of the invention is confirmed by the adoption of the patented invention by Lucent.

22                **4.      Enforceability Of the Asserted Claims Of The '947 Patent**

23          Neither Lucent nor Alcatel suggest that the '947 is unenforceable.

24        **G.      U.S. Patent No. 5,917,499 ("The '499 Patent")**

25                **1.      The Teaching Of Asserted Claims Of The '499 Patent**

26          Microsoft is the owner of the '499 patent with the right to sue for past infringement.

27          The '499 patent relates to a system for generating an interactive graph that is dynamically

28   updatable.

                                                        130

                                                        Case No. 06-CV-0684 H (CAB)

Microsoft is asserting claims 13 and 23 and 29 of the '499 patent against Lucent.

Asserted claim 13 of the '499 patent reads as follows:

> 13. A method for displaying an interactive graph, said method comprising:
>
> storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements;
>
> generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements;
>
> dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user;
>
> generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and
>
> overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic.

Claim 13 thus describes a method for displaying an interactive graph which includes storing a sequence of values in a memory as they occur in real time for display elements of a graph primitive. The display elements are updated in real time independent of any user intervention. The method further includes generating a superimposed display of at least one level of detail for any one of the display elements in response to a user input command, and overlaying at least two display elements within the graph primitive, which are distinguishable by a unique display characteristic.

Asserted claim 23 of the '499 patent reads as follows:

> 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising:
>
> storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements;
>
> generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements;

Case No. 06-CV-0684 H (CAB)

1          dynamically updating said plurality of display elements in said
display in real time independent of any intervention by a human

2          user;

3          and generating a superimposed display of at least one additional
level of display element detail for any one of said plurality of

4          display elements in response to a user input command.

5        Claim 23 thus describes a program storage device that includes instructions for displaying

6  an interactive graph which includes storing a sequence of values in a memory as they occur in real

7  time for display elements of a graph primitive.  The display elements are updated in real time

8  independent of any user intervention. The method further includes generating a superimposed

9  display  at least one level of detail for any one of the display elements in response to a user input

10  command.

11        Asserted claim 29 of the '499 patent reads as follows.

12          29. A program storage device readable by a computer, said program
storage device tangibly embodying instructions executable by said

13          computer to perform method steps for displaying an interactive
graph, said method comprising:

14

15          storing a sequence of present values in a memory as they occur in
real time for each of a plurality of display elements;

16          scaling each of said plurality of display elements according to a
predetermined scale for each of said plurality of display elements;

17

18          overlaying at least two display elements within said graph primitive
wherein each of said at least two display elements are
distinguishable by a unique display characteristic;

19

20          generating at least one graph primitive on a display wherein said at
least one graph primitive is a graph comprised of said plurality of
display elements;

21

22          dynamically updating said plurality of display elements in said
display; and

23          generating a superimposed display of at least one level of display
element detail for any one of said plurality of display elements in

24          response to a user input command.

25        Claim 29 thus describes  a program storage device that includes instructions for displaying

26  an interactive graph which includes storing a sequence of values in a memory as they occur in real

27  time for display elements of a graph primitive.  The display elements are scaled according to a

28  predetermined scale. Further, the display elements are updated in real time independent of any

Case No. 06-CV-0684 H (CAB)

1  user intervention. The method further includes generating a superimposed display at least one

2  level of detail for any one of the display elements in response to a user input command, and

3  overlaying at least two display elements within the graph primitive, which are distinguishable by a

4  unique display characteristic.

5  ## 2. Infringement Of The Asserted Claims Of The '499 Patent

6  Microsoft contends that Lucent's VitalSuite infringes claims 13, 23, and 29 of the '499

7  patent directly and contributorily, literally, and under the doctrine of equivalents.[13] The VitalSuite

8  Performance Management Software ("VitalSuite") is a suite of application programs designed to

9  monitor and evaluate the performance of network devices and their corresponding applications.

10  The suite of VitalSuite applications are VitalSuite NET, VitalSuite ART, VitalSuite Real-time

11  Event Analysis, VitalSuite APPS, VitalAgent, VitalAgent Automon, and the Transact Toolkit.

12  Lucent's infringement is more particularly explained in the December 7, 2007 Expert

13  Report of Dale Buscaino, December 31, 2007, Supplemental Expert Report of Dale Buscaino, and

14  January 22, 2008, Second Supplemental Expert of Dale Buscaino, all of which are incorporated

15  by reference as if set forth fully herein.

16  ## 3. Validity Of The Asserted Claims Of The '499 Patent

17  Lucent contends that the asserted claims of the '499 patent are anticipated or obvious by a

18  number of references.   As an initial matter, Lucent and Alcatel must prove by clear-and-

19  convincing evidence that each of the references upon which they rely qualifies as prior art under

20  35 U.S.C. § 102.  To the extent they can carry their burden on this issue, the asserted claims of the

21  '499 patent are not anticipated by or obvious in view of the references they rely upon.  Microsoft's

22  validity positions are set forth in detail in the Rebuttal Expert Report of Dale Buscaino dated

23

24

---

25  [13] As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-defendants").  Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

26

27

28

Case No. 06-CV-0684 H (CAB)

December 21, 2007. None of the prior art references relied upon by Alcatel and Lucent, alone or in combination, disclose all of the elements of the asserted claims.

A person of ordinary skill in the art pertaining to the '499 patent at the time of the invention would have had a degree in computer science with 2-3 years of experience working in the area of graphical interfaces.

Lucent relies on U.S. Patent No. 5,581,677 ("the '677 patent") and the Foley et al., *Creating Charts and Visualizations by Demonstration* ("Foley") reference to anticipate claims 13, 23, and 29. However, the '677 patent, among other things, fails to disclose a superimposed display, as is required by each of the asserted claims. Rather, the '677 patent provides "list boxes" that are generated when the graph is generated and not superimposed, as required by the claims. Further, the '677 patent does not disclose scaling each display element according to a predetermined scale.

Further, the Foley reference does not disclose, among other things, the claimed "display elements." Rather, Foley discloses one-line diagrams that represent a visualization of power system in the form of a map. Because the display elements are not found in Foley, the remaining steps of updating, overlaying, scaling, and superimposing cannot be met.

Lucent relies on a combination of prior art references to render claims 13, 23, and 29 obvious. However, the combination of references fails to disclose the required claim elements of the asserted claims. First, Lucent relies on *SQL Server 6.0 with Microsoft Performance Monitor* ("SQL Server"). This reference, alone or combination, does not teach or suggest the superimposed display which provides at least one level detail about a display element. The reference instead teaches a pop-up window that has nothing to do with a display element. Second, Lucent relies on *Paragraph* which also fails to teach or disclose a superimposed display and the overlaying of display elements as claimed. Lucent further relies on *Upshot* to show the missing overlaying and superimposing steps in Paragraph. However, the claimed superimposing and overlaying shown are missing in Upshot.

Further, Lucent relies on U.S. Patent Nos. 5,432,932 and 5,438,468 ("Chen Patents"). The Chen Patents fail to teach the claimed superimposing and overlaying. In fact, the Chen Patents

specifically require that instruments on the disclosed dashboard, which Lucent relies on to purportedly meet the claimed display elements, not be overlapping, thereby teaching away from the asserted claims. Lucent also relies on *Motif* in with no support as to why the combination the Chen Patents renders the claims obvious.

Lucent also relies on U.S. Patent No. 5,375,199 ("the '199 patent") to render claims 13, 23, and 29 obvious. The '199 patent admittedly does not teach generating a superimposed display, as required by the asserted claims. Accordingly, Lucent relies on Scheifler et al., *The XWindows System* reference. Neither the reference nor Lucent show how windows in XWindows could be used to provide the claimed superimposed display or overlaid display elements other than using impermissible hindsight reconstruction.

Secondary considerations of non-obviousness also support a finding that the asserted claims of the '499 patent are not invalid for obviousness. There is evidence of a long-felt, but unsolved, need for the claimed invention. For example, the prior art relied upon by Lucent makes clear that there existed several attempts to generate interactive graphs. Further, the prior art shows that others attempted but failed to invent the claimed invention. None of the several references cited by Lucent or Alcatel anticipate or render obvious the claims of the '499 patent. There is evidence of copying by others. For example, Lucent products use the inventions claimed in the '499 patent.

### 4. Enforceability Of the Asserted Claims Of The '499 Patent

Lucent does not allege that the '499 patent is unenforceable.

### H. U.S. Patent No. 5,764,913 ("The '913 Patent")

#### 1. The Teaching Of Asserted Claims Of The '913 Patent

Microsoft is the owner of the '913 patent with the right to sue for past infringement.

The '913 patent relates to a status monitoring system for a computer network including obtaining, concurrently displaying, and dynamically updating the operational state of nodes in the network.

Microsoft is asserting claim 6 of the '913 patent against Lucent and Alcatel.

Asserted claim 6 of the '913 patent reads as follows:

> 6. A method for monitoring and displaying status of a plurality of nodes in a computer network, said method comprising:

135

Case No. 06-CV-0684 H (CAB)

monitoring an operational state of each of said plurality of nodes in said computer network;

concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network;

superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status icons;

dynamically updating said display of said operational state for each of said plurality of nodes; and

generating a hierarchical list of objects available from a user selected one of said plurality of nodes.

Claim 6 thus describes a method for monitoring and displaying status of nodes in a computer network. The method further includes concurrently generating a display of operational status icons from any node in the network. Each icon is indicative of a lowest detail view of the operational state the nodes. The method also includes superimposing at least one additional status indicator on the display of any one of  the operational such that compound operational status information for a node is available in a single viewable operational status icon.  The operational state of the nodes is dynamically updated said and a hierarchical list of objects is available from a selected node.

### 2.    Infringement Of The Asserted Claims Of The '913 Patent

Microsoft contends that Lucent's VitalSuite infringes claim 6 of the '499 patent directly and contributorily, literally, and under the doctrine of equivalents.[14]  The VitalSuite Performance Management Software ("VitalSuite") is a suite of application programs designed to monitor and evaluate the performance of network devices and their corresponding applications. The suite of

---

[14]  As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-defendants").  Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

136

1  VitalSuite applications are VitalSuite NET, VitalSuite ART, VitalSuite Real-time Event Analysis,

2  VitalSuite APPS, VitalAgent, VitalAgent Automon, and the Transact Toolkit.

3      Microsoft also contends that Alcatel's OmniAccess Air Control System ("ACS")infringes

4  claims 7, 15, 21, and 25 of the '913 patent directly and contributorily, literally and under the

5  doctrine of equivalents.[15]  ACS is one of the interfaces to the Alcatel Wireless Operating System.

6  The Alcatel OmniAccess Wireless System includes Alcatel OmniAccess Wireless Switches and

7  Appliances (Alcatel OmniAccess Switches and Appliances)and their associated OmniAccess APs

8  (Alcatel OmniAccess Wireless Access Points) controlled by the Alcatel Wireless Operating

9  System, all managed by any or all of the Alcatel Wireless Operating System user interfaces. 78.

10  The OmniVista AirView Software allows Alcatel OmniAccess Switches and Appliances to

11  continually monitor their associated OmniAccess APs and Alcatel OmniAccess Remote Edge

12  Access Points (OmniAccess 1200R APs) for information, such as traffic load, interference, noise,

13  coverage, and nearby APs.

14      Microsoft also contends that Alcatel's OmniVista 2500 and 2700 infringe claim 6 of the

15  '913 patent directly and contributorily, literally and under the doctrine of equivalents.  Alcatel's

16  OmniVista 2500 and 2700 ("OmniVista") products consist of a suite of network management

17  applications and tools that are designed to simplify the management of network devices.

18  OmniVista will allow network administrators to monitor network activity, as well as configure and

19  troubleshoot devices on the network. OmniVista is designed to allow an administrator to manage

20  an entire network from a single computer system.

21      Lucent's infringement is more particularly explained in the December 7, 2007 Expert

22  Report of Adam Porter, December 31, 2007, Supplemental Expert Report of Adam Porter,

23  January 2, 2008, Second Supplemental Expert  Report of Adam Porter, January 18, 2008, Third

24  Supplemental Report of Adam Porter, January 22, 2008, Fourth Supplemental Report of Adam

---

25

26  [15]  As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to

27  avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-

28  defendants").  Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

Case No. 06-CV-0684 H (CAB)

1   Porter, and February 29, 2008, Fifth Supplemental Report of Adam Porter, all of which are

2   incorporated by reference as if set forth fully herein.

3        Alcatel's infringement is more particularly explained in the December 7, 2007 Expert

4   Report of Adam Porter, December 31, 2007, Supplemental Expert Report of Adam Porter,

5   January 2, 2008, Second Supplemental Expert  Report of Adam Porter, January 18, 2008, Third

6   Supplemental Report of Adam Porter, January 22, 2008, Fourth Supplemental Report of Adam

7   Porter, and February 29, 2008, Fifth Supplemental Report of Adam Porter, all of which are

8   incorporated by reference as if set forth fully herein.

9            **3.    Validity Of The Asserted Claims Of The '913 Patent**

10       Lucent and Alcatel contends that the asserted claim of the '913 patent are anticipated by an

11  on-sale bar and the public use of *Microsoft SQL Server 6.0 Enterprise Manager* (SQL-EM")

12  because, among other things, Microsoft beta tested SQL-EM prior to the April 5, 1995 critical

13  date. However, each of the beta tests were performed under strict confidentiality, including non-

14  disclosure agreements, and never disclosed to the public without such an agreement  Therefore, no

15  public-use or on-sale bar applies.  Moreover, Lucent and Alcatel must and have failed to prove by

16  clear and convincing evidence that there was an on-sale or public use of SQL-EM by clear and

17  convincing evidence.

18       Further, Lucent and Alcatel must prove by clear-and-convincing evidence that each of the

19  references upon which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extent they

20  can carry their burden on this issue, the asserted claims of the '913 patent are not obvious in view

21  of the references they rely upon.  Microsoft's validity positions are set forth in detail in the

22  Rebuttal Expert Report of Adam Porter dated December 21, 2007.  None of the prior art references

23  relied upon by Alcatel and Lucent, alone or in combination, disclose all of the elements of the

24  asserted claims.

25       A person of ordinary skill in the art pertaining to the '913 patent at the time of the

26  invention would have had  a bachelor' s degree in computer science or engineering, and three to

27  five years of experience working in the software development industry.

28

Case No. 06-CV-0684 H (CAB)

1   Lucent and Alcatel primarily rely on Netview, U.S. Patent No. 5, 226,120 ("Brown"), and

2   StarKeeper II to render obvious claim 6.  However, none of these references admittedly discloses

3   viewing an operational state from any node in the network or superimposing icons, as claimed.   In

4   each case, Lucent and Alcatel use impermissible hindsight construction to support an obvious

5   claim.  For example, for Netview, Lucent and Alcatel rely on XWindows to show superimposition

6   was possible with Netview.  However, XWindows is a windowing system that does not itself have

7   the ability to generate the claimed superimposed compound icon.

8   Further, Brown teaches away by putting the concentrator icons in Figure 3, which Alcatel

9   and Lucent rely on to purportedly meet the claimed operational status icon, next to each other, as

10  opposed to superimposing to provide the compound status icon as claimed.   Additionally, for

11  StarKeeper II, shows opening   a new window to display additional information and not the

12  claimed superimposed compound status icon.

13  Secondary considerations of non-obviousness also support a finding that the asserted

14  claims of the '913 patent are not invalid for obviousness. There is evidence of a long-felt, but

15  unsolved, need for the claimed invention. For example, the prior art relied  upon by Alcatel and

16  Lucent makes clear that there existed several attempts to generate interactive graphs. Further, the

17  prior art shows that others attempted but failed to invent the claimed invention. None of the

18  several references cited by Lucent or Alcatel anticipate or render obvious the claims of the '913

19  patent. There is evidence of copying by others. For example,  Alcatel and Lucent products use the

20  inventions claimed in the '913 patent.

21      **4.      Enforceability Of the Asserted Claims Of The '913 Patent**

22  Lucent does not allege that the '913 patent is unenforceable.

23  **I.      U.S. PATENT NOS. 5,977,971 ("The '971 Patent")**

24      **1.      The Teaching Of Asserted Claims Of The '971 Patent**

25  Microsoft is the owner of the '971 patent with the right to sue for past infringement.

26  The '971 patent relates to a tree view control that can be used to display a hierarchical list

27  of items, which can be collapsed and expanded.  In addition, an item in the may be selected

28  independent of expanding or collapsing items in the tree.

139

Microsoft is asserting claims 2 and 3 of the '971 patent against Lucent and Alcatel.[16]

Asserted claim 2 of the '971 patent reads as follows:

> 2. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising:
>
> displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control;
>
> in a response to a user using the input device, selecting one of the items display in the hierarchical tree of items; and
>
> expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items.

Claim 2 describes a computer readable medium, such as a computer disk, that includes instructions for displaying a hierarchical tree of items having at least two levels on an output device as part of a window control in response to a user using the input device, selecting one of the items displayed in the hierarchical tree; and expanding the hierarchical tree of items independently of selecting the item.

Asserted claim 3 of the '971 patent reads as follows:

> 3. A computer-readable medium having computer-executable instructions, which when executed in a computer system having an output device and an input device, performs a method comprising:
>
> displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control;
>
> in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and
>
> collapsing the hierarchical tree of items independently of the selecting so that one of the levels of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items.

---

[16] As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

140

Claim 3 thus includes a computer readable medium, such as a computer disk, that includes instructions for displaying a hierarchical tree of items having at least two levels on an output device as part of a window control in response to a user using the input device, selecting one of the items displayed in the hierarchical tree; and collapsing the hierarchical tree of items independently of selecting the item.

### 2. Infringement Of The Asserted Claims Of The '971 Patent

Microsoft contends that Alcatel's OmniVista 2500 and 2700 infringe claims 2 and 3 of the '971 patent directly and contributorily, literally and under the doctrine of equivalents. Alcatel's OmniVista 2500 and 2700 ("OmniVista") products consist of a suite of network management applications and tools that are designed to simplify the management of network devices. OmniVista will allow network administrators to monitor network activity, as well as configure and troubleshoot devices on the network. OmniVista is designed to allow an administrator to manage an entire network from a single computer system. OmniVista 2500 is the core application for network management, configuration, and monitoring. The OmniVista 2700 consists of a series of applications that extend the capabilities of OmniVista 2500.

Microsoft also contends that Alcatel's1300 Convergent Network Management Center ("CMC") infringes claims 2 and 3 of the '971 patent directly and contributorily, literally, and under the doctrine of equivalents. The 1300 CMC is a network management system that provides network management for next generation networks (NGNs), IP multimedia subsystem networks (IMS), and public switched telephone networks (PSTNs).

Microsoft also contends that Alcatel's OmniStack 6300 infringes claims 2 and 3 of the '971 patent directly and contributorily, literally, and under the doctrine of equivalents. The Alcatel OmniStack 6300 is a 24 port network switch that is used to connect devices within a network. Network switches are capable of inspecting data packets as they are received, and forwarding them appropriately.

Microsoft also contends that Lucent's VitalSuite infringes claims 2 and 3 of the '971 patent directly and contributorily, literally, and under the doctrine of equivalents. The VitalSuite Performance Management Software ("VitalSuite") is a suite of application programs designed to

141

1  monitor and evaluate the performance of network devices and their corresponding applications.

2  The suite of VitalSuite applications are VitalSuite NET, VitalSuite ART, VitalSuite Real-time

3  Event Analysis, VitalSuite APPS, VitalAgent, VitalAgent Automon, and the Transact Toolkit.

4       Lucent's infringement is more particularly explained in the December 7, 2007 Expert

5  Report of Dale Buscaino, December 31, 2007, Supplemental Expert Report of Dale Buscaino, and

6  January 22, 2008, Second Supplemental Expert Report of Dale Buscaino, which are incorporated

7  by reference as if set forth fully herein.

8       Alcatel's infringement is more particularly explained in the December 7, 2007 Expert

9  Report of Dale Buscaino, December 31, 2007, Supplemental Expert Report of Dale Buscaino, and

10  January 22, 2008, Second Supplemental Expert Report of Dale Buscaino, which are incorporated

11  by reference as if set forth fully herein.

12  ### 3. Validity Of The Asserted Claims Of The '971 Patent

13       Lucent and Alcatel contend that the asserted claims of the '971 patent are anticipated or

14  obvious by a number of references. As an initial matter, Lucent and Alcatel must prove by clear-

15  and-convincing evidence that each of the references upon which they rely qualifies as prior art

16  under 35 U.S.C. § 102. To the extent they can carry their burden on this issue, the asserted claims

17  of the '971 patent are not anticipated by or obvious in view of the references they rely upon.

18  Microsoft's validity positions are set forth in detail in the Rebuttal Expert Report of Dale Buscaino

19  dated December 21, 2007. None of the prior art references relied upon by Alcatel and Lucent,

20  alone or in combination, disclose all of the elements of the asserted claims.

21       A person of ordinary skill in the art pertaining to the '971 patent at the time of the

22  invention would have had had a degree in computer science with 2-3 years of experience working

23  in the area of graphical interfaces.

24       Lucent and Alcatel rely on U.S Patent No. 5,230,072 ("the '072 patent"), Apple Computer's

25  System 7 ("System 7"), and XTree for Windows ("XTree") to anticipate claims 2 and 3. However,

26  these reference fails to disclose, among other things, a "child window control" as is required by

27  each of the asserted claims. These references merely show windows but do not show the Court's

28  requirement of computer code, along with an accompanying graphical representation, that sends

notification messages to a parent window when events, like user input, occur within the window control.

Lucent and Alcatel rely on a combination of prior art references to render claims 2 and 3 obvious. However, the combination of references fails to disclose the required claim elements of the asserted claims. First, Lucent and Alcatel rely on a combination of the above references to render the asserted claims obvious but none of them in combination comes close to teaching the claimed window control. For example, all of the references mentioned above are silent concerning sending notifications from a child window control to a parent window when events occur in the child window. Further, Lucent and Alcatel rely on the *IBM C/C++ Class Libraries* reference. However, this reference does not disclose the child window controls as claimed, let alone expanding, collapsing, and selecting items in the tree independent of those operations. Further, Lucent and Alcatel rely on the *Programming for Windows 3.1* reference which admittedly does not teach the child window control. Further, this reference was considered by the Examiner and the claims were allowed over this reference during prosecution. This reference neither discloses the claimed child control window, which displays items in a hierarchical tree, nor the ability to collapse, expand, or select an item independent of these operations.

Secondary considerations of non-obviousness also support a finding that the asserted claims of the '971 patent are not invalid for obviousness. There is evidence of a long-felt, but unsolved, need for the claimed invention. For example, the prior art cited upon by Lucent and Alcatel makes clear that there existed several attempts to organize information in a uniform and consistent way while reducing the amount of coding required by the writer of an application program. Further, the prior art shows that others attempted but failed to invent the claimed invention. None of the several references cited by Lucent or Alcatel render obvious the claims of the '971 patent. There is evidence of copying by others. For example, both Lucent and Alcatel products use the inventions claimed in the '971 patent.

### 4. Enforceability Of the Asserted Claims Of The '971 Patent

Neither Lucent nor Alcatel allege that the '971 patent is unenforceable.

### J. U.S. Patent No. 6,565,608 ("The '608 Patent")

143

### 1.   The Teaching Of Asserted Claims Of The '608 Patent

Microsoft is the owner of the '608 patent with the right to sue for past infringement.

The '608 patent relates to a method for providing customized content in an alert message when a predetermined condition, such as an error condition, is detected.

Microsoft is asserting claims 7, 15, 21, and 25 of the '608 patent against Lucent and Alcatel.[17]

Asserted claim 7 of the '608 patent reads as follows:

> 7. The computer-implemented method of claim 3 wherein the step of accessing the information source comprises the steps of: launching a browser in response to selecting one of the control objects of the alert message; and using the browser to access the custom content maintained at the information source by opening a hyperlink to the information source.

Claim 3 (from which claim 7 depends) recites:

> 3. The computer-implemented method of claim 2, wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content.

Claim 2 (from which claims 3 depends) recites:

> 2. The computer-implemented method of claim 1 further comprising the step of displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module.

Claim 1 (from which claims 2 depends) recites:

> 1. A computer-implemented method for providing information regarding one of a plurality of predetermined conditions associated with operation of a program module on a computer, comprising the steps of: detecting one of the predetermined conditions; accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the program module; and presenting the custom content.

---

[17] As suggested by the Court during the March 28, 2007 telephonic status conference, Microsoft proposed a reduced claim set to simplify the proceedings, streamline the issues, and to avoid a lengthy *Markman* hearing. *See* Letter to McDavit from Vyas dated September 25, 2007; Letter to Partridge from Vyas dated September 26, 2007 (collectively, "Notice to Counter-defendants"). Microsoft reserves the right to assert the remaining claims of any of the patents-in-suit in this litigation or otherwise in the future. *See id.*

1   Claim 7 thus describes a method that includes detecting one of the predetermined

2   conditions associated with the operation of a program module and, in response, presenting custom

3   content by accessing an information source that maintains the custom content. The custom

4   content is information defined by a party other than the manufacturer of the program module and

5   is displayed in an alert message that also includes static content. The information source is

6   accessed by selecting a control object in the alert message and further using a hyperlink to launch

7   a browser to access the custom content.

8   Asserted claim 15 of the '608 patent reads as follows:

9   15. computer-implemented method for providing custom content
    that supplements static content displayed in an alert message for a
10  software program module running on a local machine, comprising
    the steps of: detecting one of a plurality of predetermined
11  conditions; displaying the alert message in response to the detected
    predetermined condition, the alert message comprising the static
12  content and at least one control object; responsive to selection of one
    of the control objects, accessing an information source that
13  maintains the custom content, wherein the information source is
    located separately from the local machine; and displaying the
14  custom content to present supplemental information that is related to
    the detected predetermined condition.

15

16  Claim 15 thus describes a method that includes detecting a predetermined condition and, in

17  response, displaying the alert message. The alert message includes static content and at least one

18  control object, which can be selected to access an information source that maintains the custom

19  content. The information source is located separately from the local machine.

20  Asserted claim 21 (which depends from claim 15) of the '608 patent reads as follows.

21  21. The computer-implemented method of claim 15, wherein the
    step of accessing an information source that maintains the custom
22  content comprises: obtaining an identifier that identifies the
    information source; and launching a browser; and using the browser
23  to view the custom content maintained at the information source by
    opening a hyperlink including the identifier.

24

25  Claim 21 thus discloses a method which further includes obtaining an identifier that

26  identifies the information source; launching and using a browser to view the custom content

27  maintained at the information source by opening a hyperlink including the identifier.

28  Asserted claim 25 of the '608 patent reads as follows.

Case No. 06-CV-0684 H (CAB)

25. A computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: detecting one of a plurality of predetermined conditions; displaying the alert message in response to the detected predetermined condition; opening a hyperlink from the alert message to access an external information source that maintains the custom content, the external information source operating in a location separate from the local machine; displaying the custom content to present supplemental information that is related to the detected predetermined condition.

Claim 25 thus describes a method that includes detecting a predetermined condition, and in response displaying an alert message. The method further includes opening a hyperlink from the alert message to access an external information source that maintains the custom content. The external information source operates in a location separate from the local machine. The custom content is displayed to present supplemental information that is related to the detected predetermined condition.

## 2.      Infringement Of The Asserted Claims Of The '608 Patent

Microsoft contends that Lucent's VitalSuite infringes claims 13, 23, and 29 of the '608 patent directly and contributorily, literally, and under the doctrine of equivalents. The VitalSuite Performance Management Software ("VitalSuite") is a suite of application programs designed to monitor and evaluate the performance of network devices and their corresponding applications. The suite of VitalSuite applications are VitalSuite NET, VitalSuite ART, VitalSuite Real-time Event Analysis, VitalSuite APPS, VitalAgent, VitalAgent Automon, and the Transact Toolkit.

Microsoft also contends that Alcatel's OmniAccess Air Control System ("ACS") infringes claims 7, 15, 21, and 25 of the '608 patent directly and contributorily, literally and under the doctrine of equivalents.  ACS is one of the interfaces to the Alcatel Wireless Operating System. The Alcatel OmniAccess Wireless System includes Alcatel OmniAccess Wireless Switches and Appliances (Alcatel OmniAccess Switches and Appliances)and their associated OmniAccess APs (Alcatel OmniAccess Wireless Access Points) controlled by the Alcatel Wireless Operating System, all managed by any or all of the Alcatel Wireless Operating System user interfaces. 78. The OmniVista AirView Software allows Alcatel OmniAccess Switches and Appliances to continually monitor their associated OmniAccess APs and Alcatel OmniAccess Remote Edge

146

1  Access Points (OmniAccess 1200R APs) for information, such as traffic load, interference, noise,

2  coverage, and nearby APs.

3      Lucent's infringement is more particularly explained in the December 7, 2007 Expert

4  Report of Adam Porter, December 31, 2007, Supplemental Expert Report of Adam Porter, January

5  2, 2008, Second Supplemental Expert Report of Adam Porter, January 18, 2008, Third

6  Supplemental Report of Adam Porter, January 22, 2008, Fourth Supplemental Report of Adam

7  Porter, and February 29, 2008, Fifth Supplemental Report of Adam Porter, which are incorporated

8  by reference as if set forth fully herein.

9      Alcatel's infringement is more particularly explained in the December 7, 2007 Expert

10  Report of Adam Porter, December 31, 2007, Supplemental Expert Report of Adam Porter, January

11  2, 2008, Second Supplemental Expert Report of Adam Porter, January 18, 2008, Third

12  Supplemental Report of Adam Porter, January 22, 2008, Fourth Supplemental Report of Adam

13  Porter, and February 29, 2008, Fifth Supplemental Report of Adam Porter, which are incorporated

14  by reference as if set forth fully herein.

15      **3.      Validity Of The Asserted Claims Of The '608 Patent**

16      Lucent and Alcatel contend that the asserted claims of the '608 patent are rendered obvious

17  by a number of references.  As an initial matter, Lucent and Alcatel must prove by clear-and-

18  convincing evidence that each of the references upon which they rely qualifies as prior art under

19  35 U.S.C. § 102.  To the extent they can carry their burden on this issue, the asserted claims of the

20  '608 patent are not obvious in view of the references they rely upon.  Microsoft's validity positions

21  are set forth in detail in the Rebuttal Expert Report of Adam Porter dated December 21, 2007.

22  None of the prior art references relied upon by Alcatel and Lucent, alone or in combination,

23  disclose all of the elements of the asserted claims.

24      A person of ordinary skill in the art pertaining to the '608 patent at the time of the

25  invention would have had  a bachelor' s degree in computer science or engineering, and three to

26  five years of experience working in the software development industry.

27      Lucent and Alcatel rely on the HP OpenView reference to render obvious claims 7, 15, 21,

28  and 25.  This reference admittedly does not teach custom content, control objects, or hyperlinks to

Case No. 06-CV-0684 H (CAB)

access custom content. Additionally, HP OpenView does not teach adding custom content to alert messages. Lucent and Alcatel rely on U.S. Patent No. 5,845,120 ("Reddy"), Robert Lord, *Help File Web Links: Embedding URL Links in Windows Help Files*, *Microsoft HTML Help 1.0*, *HP Help System Version 3.0*, U.S. Patent No. 6,005,569 ("Breggin"), U.S. Patent No. 4,800,485 ("Ackroff"), U.S. Patent No. 5,58 1,684 ("Dudzik"), and IBM Technical Disclosure Bulletin, *Method for Dynamically Generating Error Messages* ("IBM") None of these references describe adding custom information to alert messages or alert messages with control objects and/or hyperlinks to allow access to the custom content at an information source.

Further, Lucent and Alcatel rely on the IBM reference to render obvious claims 7, 15, 21, and 25. This reference admittedly does not teach custom content, control objects or hyperlinks to access custom content. The IBM Technical Disclosure Bulletin teaches away from modifying the described help messages, which Lucent and Alcatel rely on to purportedly meet the claimed alert messages. Thus, it would not have been obvious to combine with U.S. Patent No. 5,845,120 ("Reddy"), Robert Lord, *Help File Web Links: Embedding URL Links in Windows Help Files*, *Microsoft HTML Help 1.0*, *HP Help System Version 3.0*, U.S. Patent No. 6,005,569 ("Breggin"), U.S. Patent No. 4,800,485 ("Ackroff"), U.S. Patent No. 5,58 1,684 ("Dudzik"), and HP OpenView with the IBM reference to provide messages with custom content, control objects, or hyperlinks.

Further, Lucent and Alcatel rely on U.S. Patent Nos. 5,845,120 ("Reddy"), which was considered by the Examiner and the asserted claims were allowed over during prosecution. Reddy fails to teach the claimed custom content, control objects and hyperlinks in alert messages. Lucent and Alcatel further rely on the combination of Robert Lord, *Help File Web Links: Embedding URL Links in Windows Help Files*, *Microsoft HTML Help 1.0*, *HP Help System Version 3.0*, U.S. Patent No. 6,005,569 ("Breggin"), U.S. Patent No. 4,800,485 ("Ackroff"), U.S. Patent No. 5,58 1,684 ("Dudzik"), HP OpenView, and the IBM Technical Disclosure Bulletin, *Method for Dynamically Generating Error*. None of these references teach adding custom content to alert messages or control objects and/or hyperlinks to access the custom content as required by the claims. Thus, these references in combination with Reddy do not render the asserted claims obvious.

Case No. 06-CV-0684 H (CAB)

Secondary considerations of non-obviousness also support a finding that the asserted claims of the '608 patent are not invalid for obviousness. There is evidence of a long-felt, but unsolved, need for the claimed invention. For example, the prior art relied upon by Alcatel and Lucent makes clear that there existed several attempts to generate interactive graphs. Further, the prior art shows that others attempted but failed to invent the claimed invention. None of the several references cited by Lucent or Alcatel anticipate or render obvious the claims of the '608 patent. There is evidence of copying by others. For example, Alcatel and Lucent products use the inventions claimed in the '608 patent.

### 4. Enforceability Of the Asserted Claims Of The '608 Patent

Lucent does not allege that the '608 patent is unenforceable.

### K. Damages

To calculate the damages resulting from Lucent's and Alcatel's infringement, Microsoft filtered roughly 300 license agreements entered by Microsoft, Lucent, and/or Alcatel-Lucent using four criteria: (1) *patent* license agreements; (2) minimum royalty provision; (3) no running royalties; and, (4) patent identification. Of the seventeen agreements that satisfied all four criteria, the median minimum royalty payment is $1 million, which is therefore used as the benchmark royalty for evaluating the hypothetical negotiations for the Microsoft patents. Microsoft's damages analysis, as described above and below, is more particularly explained in the Initial Expert Report of Ryan Sullivan, Ph.D., dated December 19, 2007 and incorporated by reference as if set forth fully herein.

Additionally, given the substantial competition between Microsoft and Lucent, it is necessary to adjust the benchmark royalty rate upwards for four of the nine Microsoft patents-in-suit—the '217 Patent, '794 Patent, '433 Patent, and '004 Patent—because the median minimum royalty reflects only typical situations with average competition. Lucent's use of these patents in competing products warrants a royalty at the seventy-fifth percentile (as opposed to the median as discussed above) of the minimum royalties reflected in the seventeen agreements discussed above. The seventy-fifth percentile minimum royalty is $3,250,000.00, which is the reasonable royalty for the '217 Patent, '794 Patent, '433 Patent, and '004 Patent.

Case No. 06-CV-0684 H (CAB)

The total reasonable royalty damages Lucent owes are $18 million. The total reasonable royalty damages Alcatel owes are $3 million. The application of the royalties discussed above to each Microsoft patent-in-suit is discussed more particularly below.

### 1. Damages For Infringement Of The '004 Patent

Lucent's Accelerate Solution / Feature Server 3000 product infringes the '004 Patent. The first sales occurred in the third quarter of 2004. Because the first commercial release infringed the '004 Patent, the hypothetical negotiation is set at mid-2004. Because the Accelerate Solution / Feature Server 3000 product is a competing product, the reasonable royalty for the '004 Patent is the seventy-fifth percentile minimum royalty, $3,250,000.00.

### 2. Damages For Infringement Of The '217 Patent

Lucent's Anypath Messaging System product infringes the '217 Patent. The first sale of Anypath occurred in mid-to-late 2000. Because all versions of Anypath infringe the '217 Patent, the hypothetical negotiation is set at mid-2000. Because Anypath is a competing product, the reasonable royalty for the '217 Patent is the seventy-fifth percentile minimum royalty, $3,250,000.00.

### 3. Damages For Infringement Of The '433 Patent

Lucent's Anypath Messaging System product infringes the '433 Patent. Release 3 of Anypath, which became available on or around mid-2000, first infringed the '433 Patent. Thus, the hypothetical negotiation is set during mid-2000. Because Anypath is a competing product, the reasonable royalty for the '433 Patent is the seventy-fifth percentile minimum royalty, $3,250,000.00.

### 4. Damages For Infringement Of The '794 Patent

Lucent's Anypath Messaging System product infringes the '794 Patent. Release 7 of Anypath, which became available on or around March 31, 2005, first infringed the '794 Patent. Thus, the hypothetical negotiation is set during the first quarter of 2001. Because Anypath is a competing product, the reasonable royalty for the '794 Patent is the seventy-fifth percentile minimum royalty, $3,250,000.00.

Case No. 06-CV-0684 H (CAB)

### 5.     Damages For Infringement Of The '947 Patent

Lucent's NavisAccess offering infringes the '947 Patent.  The first sales of NavisAccess occurred in 2000.  The hypothetical negotiation is set at early 2000.  The reasonable royalty for the '947 Patent is the benchmark royalty, $1,000,000.00.

### 6.     Damages For Infringement Of The '499 Patent

Lucent's VitalSuite offering infringes the '499 Patent.  VitalSuite's initial infringement began in the fourth quarter of 2002 or earlier.  The reasonable royalty for the '499 Patent is the benchmark royalty, $1,000,000.00.

### 7.     Damages For Infringement Of The '913 Patent

Lucent's VitalSuite offering infringes the '913 Patent.  VitalSuite's initial infringement began in the fourth quarter of 2002 or earlier.  The reasonable royalty for the '913 Patent is the benchmark royalty, $1,000,000.00.

Alcatel's OmniAccess Air Control System and OmniVista 2500 & 2700 offerings infringe the '913 Patent.  Based on the sales of these offerings, the hypothetical negotiation for the '913 Patent is set at late 2001.  The reasonable royalty for the '913 Patent is the benchmark royalty, $1,000,000.00.

### 8.     Damages For Infringement Of The '971 Patent

Lucent's VitalSuite offering infringes '971 Patent.  VitalSuite's initial infringement began in the fourth quarter of 2002 or earlier.  The reasonable royalty for the '971 Patent is the benchmark royalty, $1,000,000.00.

Three Alcatel products infringe the '971 Patent: (1) 1300 CMC; (2) OmniStack 6300; and (3) OmniVista 2500 & 2700.  Based on the sales of these various products, the hypothetical negotiation for the '971 Patent is set at late 2001.  The reasonable royalty for the '971 Patent is the benchmark royalty, $1,000,000.00.

### 9.     Damages For Infringement Of The '608 Patent

Lucent's VitalSuite offering infringes the '608 Patent.  VitalSuite's initial infringement began in the fourth quarter of 2002 or earlier.  The reasonable royalty for the '608 Patent is the benchmark royalty, $1,000,000.00.

Case No. 06-CV-0684 H (CAB)

Alcatel's OmniAccess Air Control System product infringes the '608 Patent. The hypothetical negotiation is set at early 2004 because the first OmniAccess Air Control System products were sold in April 2004. The reasonable royalty for the '608 Patent is the benchmark royalty, $1,000,000.00.

## IV.    RESERVATION OF RIGHTS

Although Microsoft has not listed here those claims and defenses for which the Court has already granted summary judgment adverse to Microsoft, Microsoft specifically preserves its rights to appeal such rulings and to present such claims and defenses at a subsequent trial in the event of a remand. Where the Court ruled adverse to Microsoft on claim construction, Microsoft specifically preserves its rights to appeal such rulings.

## V.    ABANDONED ISSUES

Lucent has withdrawn its laches defense upon stipulation with Microsoft.

Microsoft has abandoned its claim that Lucent and Alcatel infringe the '319 patent.

Microsoft has abandoned its claim that Alcatel infringes the '947 patent.

## VI.    EXHIBITS

Microsoft's list of exhibits that it expects to offer or may offer at trial (other than demonstrative exhibits) is submitted herewith as Exhibit 2. Microsoft reserves the right to supplement this list after reviewing MPT's, Lucent's and Alcatel's pretrial disclosures.

## VII.    WITNESSES

Microsoft expects to call the following expert and/or fact witnesses in person (or by deposition, if unavailable). Microsoft reserves the right to call a witness live in lieu of deposition, or vice-versa, should circumstances change.

### A.    Witnesses That Microsoft Expects To Call In Person

#### 1.    Expert Witnesses

##### i.    Dale Buscaino

Mr. Buscaino is a self-employed consultant with over twenty years of experience in the personal computer industry. He obtained a Bachelor of Science degree in Computer Science from

152

the University of California at Irvine in 1982, and has been involved with the computer industry ever since. His expertise includes data entry systems and graphical user interfaces.

Mr. Buscaino is expected to testify that Lucent and Alcatel infringe the asserted claims of the '971 and '499 patents. Mr. Buscaino is also expected to provide background testimony regarding the '971 and '499 patents, the technology background of such patents, the accused products and the level of skill in the art. Mr. Buscaino is also expected to testify that the '971 and '499 patents are valid. Mr. Buscaino may also testify about any of the topics discussed in his expert reports and depositions.

Mr. Buscaino's address and telephone number are: 4775 Green Crest Drive, Yorba Linda, California 92887, (714) 692-8755.

### ii.    Jerry Gibson

Dr. Gibson is a Professor in the Department of Electrical and Computer Engineering at the University of California, Santa Barbara. Dr. Gibson holds a Ph.D. in Electrical Engineering and has been involved in the field of electrical engineering for over thirty-eight years, of image coding since the late 1970s and of video coding since the mid-1980s. Dr. Gibson has authored or co-authored more than 200 articles, technical papers, books and book chapters.

Dr. Gibson is expected to testify that Microsoft does not directly or indirectly infringe any claims of the '878 patent. Dr. Gibson is also expected to provide background testimony regarding the '878 patent, the prosecution history of the '878 patent, the alleged conception date of the '878 patent, the pertinent art, the accused products and the level of skill in the art. Dr. Gibson is also expected to testify that the '878 patent is invalid. Dr. Gibson may also testify about any of the topics discussed in his expert reports and depositions.

Dr. Gibson's address and telephone number are: 3768 Brenner Drive, Santa Barbara, California 93105, (805) 893-6187.

### iii.    John Kelly

Dr. Kelly holds Bachelor of Arts and Master of Arts degrees with Honors in Mathematics from the University of Cambridge, England and a Ph.D. in Computer Science from U.C.L.A. From 1982 through 1986, Dr. Kelly was a professor in the Computer Science Department at

Case No. 06-CV-0684 H (CAB)

U.C.L.A.   From 1986 through 1997, he was a professor in the Electrical and Computer Engineering Department of the University of California, Santa Barbara.

Dr. Kelly teaches and consults in several aspects of computer science and engineering, including computer hardware and software architecture and design, software engineering and fault tolerance.  His areas of expertise include computer architecture, software engineering and "clean-room" development and evaluation, reverse engineering, operating systems (including real-time and embedded), network computing (including Internet computing), storage systems, fault tolerance, parallel and distributed computing systems, transaction processing systems, database systems, and program management.

Dr. Kelly is expected to testify that Lucent and Alcatel infringe the asserted claims of the '217 and '947 patents.  Dr. Kelly is also expected to provide background testimony regarding the '217 and '947 patents, the technology background of such patents, the accused products and the level of skill in the art.  Dr. Kelly is also expected to testify that the '217 and '947 patents are valid.  Dr. Kelly may also testify about any of the topics discussed in his expert reports and depositions.

Dr. Kelly's address and telephone number are: Kelly Technology Group, 830 Park Lane, Santa Barbara, CA 93108, (805) 566-4807.

### iv.    James Modestino

Dr. Modestino is a Professor in the Department of Electrical and Computer Engineering at the University of Miami in Coral Gables, Florida, where he serves as the Victor E. Clarke Endowed Scholar and Chair of the Department.  Dr. Modestino teaches courses and conducts research in signal and image processing, the theory and application of random processes, information theory and coding, digital communications, video compression and coding and network transport of multimedia information.  Prior to joining the University of Miami, Dr. Modestino served on the faculty of the Department of Electrical, Computer and Systems Engineering at Rensselaer Polytechnic Institute in Troy, New York, for twenty nine years, where he taught courses and conducted research in communications and signal processing, image and video processing and coding, information theory and coding and network transport of digital

Case No. 06-CV-0684 H (CAB)

1  video. Dr. Modestino also held the title of Institute Professor, the highest academic rank at

2  Rensselaer Polytechnic Institute. Dr. Modestino was also Director of the Center for Image

3  Processing Research, one of the largest university research groups in the United States in the area

4  of image and video processing.

5  Dr. Modestino has an undergraduate Bachelor of Science degree in Electrical Engineering

6  from Northeastern University, a graduate Master of Science degree in Electrical Engineering from

7  the University of Pennsylvania, a Master of Arts degree in Mathematics and a Ph.D. in Electrical

8  Engineering form Princeton University.

9  Dr. Modestino is expected to testify that Lucent and Alcatel infringe the asserted claims of

10  the '004 and '794 patents. Dr. Modestino is also expected to provide background testimony

11  regarding the '004 and '794 patents, the technology background of such patents, the accused

12  products and the level of skill in the art. Dr. Modestino is also expected to testify that the '004

13  and '794 patents are valid. Dr. Modestino may also testify about any of the topics discussed in his

14  expert reports and depositions.

15  Dr. Modestino's address and telephone number are: Professor and Chair, Department of

16  Electrical and Computer Engineering, 1251 Memorial Drive, P.O. Box 248294, Coral Gables,

17  Florida 33124-0640, (305) 284-3539.

18  **v.    Gerald Mossinghoff**

19  Mr. Mossinghoff will appear as an expert witness on behalf of Microsoft to discuss the

20  patent prosecution process and the duty of candor and good faith before the Patent Office.

21  Mr. Mossinghoff served as the Commissioner of Patents and Trademarks from June 30,

22  1981 through January 19, 1985. Mr. Mossinghoff served for eight years on the Patent Public

23  Advisory Committee established pursuant to P.L. 106-113, which among other things, advises the

24  Under Secretary of Commerce on the policies, goals and performance of the USPTO. Mr.

25  Mossinghoff is a licensed attorney, and is Senior Counsel with the firm of Oblon, Spivak,

26  McClelland, Maier & Neustadt, P.C. Additionally, Mr. Mossinghoff teaches intellectual property

27  law at the George Washington University Law School and the George Mason University School

28  of Law.

Case No. 06-CV-0684 H (CAB)

Mr. Mossinghoff will provide expert testimony regarding the rules and procedural requirements governing the filing and prosecution of patent applications in the USPTO and the grant of U.S. patents by the USPTO. Mr. Mossinghoff will also provide expert testimony regarding the duty of candor and good faith to the USPTO. Mr. Mossinghoff will provide expert testimony regarding how those substantively involved in the prosecution of the '878 patent breached their duty of candor and good faith to the USPTO by failing to disclose material information during the prosecution of the patent. Mr. Mossinghoff is also expected to testify in rebuttal to the expert testimony or evidence introduced MPT regarding the prosecution of the '878 patent. Mr. Mossinghoff may also testify about any of the other topics discussed in his expert reports and depositions.

Mr. Mossinghoff's address and telephone number are: Oblon, Spivak, McClelland, Maier & Neustadt, PC, 1940 Duke Street, Alexandria, VA 22314, (703) 413-3000.

### vi.    Brad Myers

Dr. Myers is a Professor in the Human-Computer Interaction Institute, which is party of the School of Computer Science at Carnegie Mellon University. Dr. Myers' areas of expertise include user interface design, user interface software, computer science, visual programming, handheld devices and demonstrational interfaces. Dr. Myers has been working in the field of user interfaces for over twenty five years, is the author or editor of over 325 publications and has consulted on user interface design and implementation to over fifty companies.

Dr. Myers has a Bachelor of Science degree in Computer Science and Engineering and Master of Science in Computer Science from the Massachusetts Institute of Technology. Dr. Meyers received his Doctorate in Computer Science form the University of Toronto.

Dr. Myers is expected to testify that Lucent and Alcatel infringe the asserted claims of the '433 patent. Dr. Myers is also expected to provide background testimony regarding the '433 patent, the technology background of such patent, the accused products and the level of skill in the art. Dr. Myers is also expected to testify that the '433 patent is valid. Dr. Myers may also testify about any of the topics discussed in his expert reports and depositions.

Case No. 06-CV-0684 H (CAB)

Dr. Myers' address and telephone number are: Carnegie Mellon University, Human-Computer Interaction Institute, School of Computer Science, Pittsburg, Pennsylvania 15213-3891, (412) 268-5150.

### vii. Adam Porter

Dr. Porter is a Professor of Computer Science at the University of Maryland in College Park, Maryland, a position he has held since 2007. From 1998 until 2007, Dr. Porter was an Associate Professor of Computer Science, an Assistant Professor of Computer Science from 1992-1998 and a Lecturer from August 1991 through December 1991.

Dr. Porter received a Bachelor of Science degree from the California State University at Dominguez Hills, Carson, California, and a Masters of Science degree in Computer Science from the University of California, Irvine, and Ph.D. in Computer Science from the University of California at Irvine.

Dr. Porter is expected to testify that Lucent and Alcatel infringe the asserted claims of the '913 and '608 patents. Dr. Porter is also expected to provide background testimony regarding the '913 and '608 patents, the technology background of such patents, the accused products and the level of skill in the art. Dr. Porter is also expected to testify that the '913 and '608 patents are valid. Dr. Porter may also testify about any of the topics discussed in his expert reports and depositions.

Dr. Porter's address and telephone number are: University of Maryland, 4125 A.V. Williams, College Park, Maryland 20742, (301) 405-2702.

### viii. Ryan M. Sullivan

Dr. Sullivan holds a Bachelor of Science degree, Master of Arts degree and Ph.D. in economics from the University of California, San Diego. Dr. Sullivan is the Chief Economist of Quant Economics, Inc., a consulting firm specializing in the application of data-driven methods to solve economic problems. He has extensive experience determining economic damages, asset value, lost profits and licensing rates, and has offered economic expertise on a range of issues, including intellectual property and technology, antitrust and unfair competition, financial markets and services and other commercial disputes.

Case No. 06-CV-0684 H (CAB)

1    Dr. Sullivan is expected to testify about damages, if any, MPT is entitled to for the alleged

2    infringement of the '878 patent. Dr. Sullivan is also expected to testify about damages Microsoft is

3    entitled to for Lucent's and Alcatel's infringement of the ten Microsoft patents. Dr. Sullivan is

4    expected to discuss, among other things, the Georgia-Pacific factors. Dr. Sullivan may also testify

5    about any of the other topics discussed in his expert reports and depositions and may address any

6    of the damages-related testimony and evidence presented during MPT's case-in-chief and Lucent's

7    and Alcatel's case.

8    Mr. Sullivan's address and telephone number are: Quant Economics, 12531 High Bluff

9    Drive, Suite 110, San Diego, California 92130, (858) 876-9105.

10    **2.    Fact Witnesses**

11
12
13
14

Jeffrey Bogdan
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

15
16
17
18

William Bolosky
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

19
20
21
22

Todd Bowra
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

23
24
25
26

Chung Tao Chu
Intervideo
427 Camille CI
San Jose, CA 95134-2473
(408) 243-5675

27
28

Kurt Delbene
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real

Case No. 06-CV-0684 H (CAB)

San Diego, CA  92130
(858) 678-5070

Donald W. Hanley
Nelles Translations
20 North Wacker Drive
Chicago, IL  60606
(312) 977-9772

Darrin Hatekeda
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Gavin Jancke
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Alice Kim
TransPerfect Translations, Inc.
Three Park Avenue, 39th Floor
New York, NY  10016
(212) 689-5555

Kathleen Krapfl
TransPerfect Translations, Inc.
625 Broadway, Suite 620
San Diego, CA  92101
(619) 696-9000

Timothy Onders
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Albert Penello
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

159

1
2
3
4

Atul Puri
c/o John Desmarais
Kirkland & Ellis LLP
153 East 53rd Street
New York, NY 10022-4675
(212) 446-4800

5
6
7
8

Jordi Ribas
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

9
10
11

Brian Schmidt
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

12
13
14
15

Sudheer Sirivara
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

16
17
18
19

Barry Steinglass
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

20
21
22
23
24

Gary Sullivan
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

25
26
27
28

Naveen Thumpudi
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Case No. 06-CV-0684 H (CAB)

1    Microsoft also reserves the right to fully examine any witnesses that MPT, Lucent or

2  Alcatel brings live, on all issues Microsoft deems relevant, prior to dismissing the witness.

3    **B.     Other Witnesses That Microsoft May Call In Person**

4    In addition to the witnesses identified above, Microsoft may call, and therefore reserves the

5  right to call, any of the following additional witnesses in person (or by deposition, if unavailable).

6  Microsoft reserves the right to call a witness live in lieu of deposition, or vice versa, should

7  circumstances changes:

8

9  | |
10 | Robert Baker<br>c/o John Gartman<br>Fish & Richardson P.C.<br>12390 El Camino Real<br>San Diego, CA  92130<br>(858) 678-5070 |
11 | Olivier Baujard<br>c/o Scott Partridge<br>Baker Botts<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>(713) 229-1590 |
13 | David Bishop<br>Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br>(908) 582-8500 |
17 | Boaz Brickman<br>Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br>(908) 582-8500 |
20 | Francois Brun<br>c/o Scott Partridge<br>Baker Botts<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>(713) 229-1590 |
24 | Tony Chen<br>c/o John Gartman |

161

Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Jan de Rie
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Donald Dinella
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

David Fester
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Joel Freed
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC
20005-3096
(202) 756-8000

Sridhar Gopalkrishnan
Lucent Technologies Inc.
Salarpuria Towers-1
Hosur Road
Bangalore, INDIA

Thierry Gouverneur
Alcatel CIT
7-9, Avenue Morane Saulnier
Velizy 78140
FRANCE
33-1-3077-3452

Richard Greenberg
c/o John Gartman
Fish & Richardson P.C.

162

12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Christopher Guzak
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Donald W. Hanley
Nelles Translations
20 North Wacker Drive
Chicago, IL  60606
(312) 977-9772

William Harmon
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Larry Horn
MPEG LA
250 Steele Street, Suite 300,
Denver, CO 80206
(303) 331-1879

Eugene Indyk
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ  07974
(908) 582-8500

Rodney D. Jenkins
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

Laura Kaster
84 Heather Lane
Princeton, NJ 08544

Casey Kiernan
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

163

Case No. 06-CV-0684 H (CAB)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Alice Kim
TransPerfect Translations, Inc.
Three Park Avenue, 39th Floor
New York, NY 10016
(212) 689-5555

Ulrecht Knecht
c/o Scott Partridge
Baker Botts
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1590

Kathleen Krapfl
TransPerfect Translations, Inc.
625 Broadway, Suite 620
San Diego, CA 92101
(619) 696-9000

Barbara Landmann
c/o John Desmarais
Kirkland & Ellis LLP
153 East 53rd Street
New York, NY 10022-4675
 (212) 446-4800

Steven Levi
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Christopher Malvone
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

Renee Marceau
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

164

Daniel McCurdy
ThinkFire Services USA, Ltd.
Perryville Corporate Park III
53 Frontage Road
P.O. Box 4013
Clinton, NJ 08809

Roger Moline
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Steven Molloy
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

Russell Morgan
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

D. Laurence Padilla
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

Stan Pennington
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Marshall Phelps
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Case No. 06-CV-0684 H (CAB)

George Pitt
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Richard Rashid
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Bruce Schneider
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

Tiaan Schutte
c/o Scott Partridge
Baker Botts
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1590

Gary Sullivan
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Ozer Teitelbaum
37 Stiles Avenue
Morris Plains, NJ

Chris Tobey
c/o John Gartman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Gary Voth
c/o John Gartman

166

1
2
3
4
5

Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

6
7
8
9

Vincent Weyl
c/o Scott Partridge
Baker Botts
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1590

10
11
12

Bernard Zucker
Lucent Technologies
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-8500

13

14      **C.     Witnesses That Microsoft May Call By Deposition**

15      Microsoft may call any of the following witnesses by deposition (by reading the transcript

16  of showing the videotape of designated portions of the transcript), including, as applicable, in their

17  capacity as Rule 30(b)(6) witnesses:

18
19

Rod Alferness

20

Pramod Badjate

21

Robert Baker

22

Olivier Baujard

23

Adam Berns

24

John Berres

25
26

David Bishop

27

Boaz Brickman

28

Ross Brown

167

| # | |
|---|---|
| 1 | Francois Brun |
| 2 | Cathy Burdick |
| 3 | William Carapezzi |
| 4 | James Carmichael |
| 5 | Tony Chen |
| 6 | May Cheng |
| 7 | Jeff Conrad |
| 8 | Bob Dailey |
| 9 | Frank D'Amelio |
| 10 | Gerard deBlasi |
| 11 | Jan deRie |
| 12 | Vipul Dhanak |
| 13 | Donald Dinella |
| 14 | Joseph Feil |
| 15 | David Fester |
| 16 | Joel Freed |
| 17 | Baryn Futa |
| 18 | Martha Goodliffe |
| 19 | Sridhar Gopalkrishnan |
| 20 | Thierry Gouveneur |
| 21 | Richard Greenberg |
| 22 | Michael Greene |
| 23 | Douglas Griffin |
| 24 | Christopher Guzak |

168

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| |
| --- |
| Donald Hanley |
| William Harmon |
| Henry Hernandez |
| Larry Horn |
| Robert Hu |
| Andy Hung |
| Eugene Indyk |
| Rodney D. Jenkins |
| Allie Kadiatu |
| Laura Kaster |
| Casey Kiernan |
| Alice Kim |
| Ulrecht Knecht |
| George Kokkosoulis |
| Kathleen Krapfl |
| Ashok Kumar |
| Kapu Kumar |
| Louise Kuphal |
| Barbara Landmann |
| Steven Levi |
| Ping Ting Lin |
| Christopher Malvone |
| Renee Marceau |

Case No. 06-CV-0684 H (CAB)

| |
|---|
| Daniel McCurdy |
| Christopher McCarthy |
| Roger Moline |
| Steven Molloy |
| Russell Morgan |
| Thomas F. Morgenthien |
| Gregory Murgia |
| D. Laurence Padilla |
| James Patella |
| George Pauthner |
| Stan Pennington |
| Marshall Phelps |
| George Pitt |
| Marcial Quinones |
| Richard Rashid |
| Stephanie Robineau |
| Lydia Romp |
| Jean-Luc Ronarch |
| Eugene Rosenthal |
| Kenneth Rubenstein |
| Steven Samuels |
| Bruce Schneider |
| Tiaan Schutte |
| John Sideris |

Case No. 06-CV-0684 H (CAB)

| |
|---|
| Thomas Sisto |
| Sridhar Srinivasan |
| Louis Smith |
| Rodney Smith |
| Roger Stricker |
| Gary Sullivan |
| Robert Swanson |
| Richard Taylor |
| Jean-Francois Thietard |
| Ozer Teitelbaum |
| James Tierney |
| Chris Tobey |
| Rollin Traver |
| Michael Tyler |
| Greg Valicka |
| Gary Voth |
| Vincent Weyl |
| Keith Wilson |
| Bernard Zucker |

Dated: March 3, 2008

171

By: /s/ Desa L. Burton

    John E. Gartman (SBN 152300)
    Christopher S. Marchese (SBN 170239)
    Shekhar Vyas (SBN 229853)
    Desa Burton (SBN 232292)
    FISH & RICHARDSON P.C.
    12390 El Camino Real
    San Diego, California 92130
    Telephone:  (858) 678-5070
    Facsimile:   (858) 678-5099

Attorneys for Defendant and Counter-claimant
MICROSOFT CORPORATION

**PROOF OF SERVICE**

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 3, 2008 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

On March 3, 2008, I caused a copy of the following document(s):

**MICROSOFT CORPORATION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW AND RULE 26(a)(3) DISCLOSURES**

to be served on the interested parties in this action as follows:

| | |
|---|---|
| John A. Desmarais<br>Robert A. Appleby<br>James E. Marina<br>Michael P. Stadnick<br>Jonas McDavit<br>Paul Bonder<br>Kirkland & Ellis LLP<br>153 East 53rd Street<br>New York, NY 10022-4675<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900 | Attorneys for Plaintiff MULTIMEDIA PATENT TRUST and Counter-Defendant LUCENT TECHNOLOGIES, INC.<br><br>email: rappleby@kirkland.com;<br>jmarina@kirkland.com;<br>jdesmarais@kirkland.com;<br>mstadnick@kirkland.com;<br>jmcdavit@kirkland.com;<br>pbonder@kirkland.com |
| David Hahn<br>Hahn & Adema<br>501 West Broadway, Suite 1600<br>San Diego, CA 92101-3595<br>Tel.: (619) 235-2100<br>Fax: (619) 235-2101 | Attorney for Plaintiff MULTIMEDIA PATENT TRUST and Counter-defendants LUCENT TECHNOLOGIES INC., and ALCATEL-LUCENT<br><br>Email: dhahn@hahnadema.com;<br>sfrost@hahnadema.com |
| Scott F. Partridge<br>Brad Bowling<br>Lisa Kelly<br>Deborah Saucier<br>Baker Botts LLP<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel: (713) 229-1590<br>Fax: (713) 229-2790 | Attorney for Counter-defendant ALCATEL-LUCENT<br><br>Email: brad.bowling@bakerbotts.com;<br>scott.partridge@bakerbotts.com;<br>lisa.kelly@bakerbotts.com;<br>deborah.saucier@bakerbotts.com;<br>susan.bigler@bakerbotts.com |
| Tim Durst<br>Jonathan Rubenstein<br>Baker Botts LLP<br>2001 Ross Avenue<br>Dallas, Texas 75201-2980<br>Tel: (214) 953-6500<br>Fax: (214) 953-6503 | Attorney for Counter-defendant ALCATEL-LUCENT<br><br>Email: tim.durst@bakerbotts.com;<br>jonathan.rubenstein@bakerbotts.com |

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with U.S. Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

| | | |
|---|---|---|
| | **MAIL:** | Such correspondence was deposited, postage fully paid, with the United States Postal Service on the same day in the ordinary course of business. |
| | **PERSONAL:** | Such envelope was delivered by hand to the offices of the addressee. |
| | **FACSIMILE:** | Such document was faxed to the facsimile transmission machine with the facsimile machine number stated above.  Upon completion of the transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error. |
| X | **ELECTRONIC MAIL:** | Such document was transmitted by electronic mail to the addressees' email addresses as stated above. |
| | **FEDERAL EXPRESS:** | Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express. |
| | **OVERNIGHT DELIVERY:** | Such correspondence was given on the same day in the ordinary course of business to an authorized courier or a driver authorized by that courier to receive documents. |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on March 3, 2008, at San Diego, California.

/s/ Desa L. Burton
Desa L. Burton

2                               Case No. 06-CV-0684 H (CAB)