1  David A. Hahn, SBN 125784
   HAHN & ADEMA
2  501 West Broadway, Suite 1600
   San Diego, California 92101-3595
3  Telephone (619) 235-2100
   Facsimile (619) 235-2101
4
   Attorneys for *Multimedia Patent Trust,*
5   *Lucent Technologies Inc., and Alcatel-Lucent*

6

7

8              **UNITED STATES DISTRICT COURT**

9           **SOUTHERN DISTRICT OF CALIFORNIA**

10  MULTIMEDIA PATENT TRUST,          Case No. 06-CV-0684 H (CAB)

11              Plaintiff,            **MULTIMEDIA PATENT TRUST'S,
                                      LUCENT'S, AND ALCATEL-**
          v.                          **LUCENT'S CORRECTED**
12                                    **MEMORANDUM OF**
    MICROSOFT CORPORATION,            **CONTENTIONS OF FACT AND**
13                                    **LAW**
              Defendant.
14                                    Date:       April 22, 2008
15  MICROSOFT CORPORATION,            Time:       9:00 A.M.
                                      Courtroom:  13, 5th Floor
16              Counter-claimant,
                                      Honorable Marilyn L. Huff
17        v.

18  LUCENT TECHNOLOGIES INC.,
    ALCATEL-LUCENT, and MULTIMEDIA
    PATENT TRUST,
19              Counter-defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. iii

    Case No. 06-CV-0684 H (CAB) ...........................................................................................1

INTRODUCTION ...........................................................................................................................1

CONTENTIONS OF MATERIAL FACT .......................................................................................1

I.       The Parties .............................................................................................................................1

MULTIMEDIA PATENT TRUST'S PATENT IN SUIT ................................................................2

II.     U.S. Patent No. 5,227,878 to Puri et al. (the "Puri '878 Patent") .......................................2

    A.    The Teachings Of The Asserted Claims Of The Puri '878 Patent .........................3

    B.    Infringement Of The Asserted Claims Of The Puri '878 Patent ...........................6

    C.    Validity Of The Asserted Claims Of The Puri '878 Patent .................................61

III.    Damages for Infringement of the Puri '878 Patent ............................................................77

MICROSOFT'S PATENTS IN SUIT ...........................................................................................85

IV.    The Reifman '433 Patent ...................................................................................................86

    A.    The Reifman '433 Patent And Asserted Claims ..................................................86

    B.    Invalidity ..............................................................................................................88

    C.    Non-Infringement ................................................................................................97

V.     The Jancke '913 Patent ....................................................................................................100

    A.    The Jancke '913 Patent And Asserted Claims ..................................................100

    B.    Invalidity ............................................................................................................102

    C.    Non-Infringement ..............................................................................................108

VI.    The Jancke '499 Patent ....................................................................................................115

    A.    The Jancke '499 Patent And Asserted Claims ..................................................115

    B.    Invalidity ............................................................................................................119

    C.    Non-Infringement ..............................................................................................146

VII.   The Fein '608 Patent ........................................................................................................148

    A.    The Fein '608 Patent And Asserted Claims ......................................................148

    B.    Invalidity ............................................................................................................151

    C.    Non-Infringement ..............................................................................................167

VIII.  The Brown '947 Patent ....................................................................................................173

A.    The Brown '947 Patent And Asserted Claims ....................................173

B.    Invalidity ...........................................................................................175

C.    Non-infringement ...............................................................................195

IX.    The Guzak '319 Patent.......................................................................................197

A.    The Guzak '319 Patent And Asserted Claims ....................................198

B.    Invalidity ...........................................................................................201

C.    Non-Infringement ...............................................................................218

X.    The Guzak '971 Patent.......................................................................................220

A.    The Guzak '971 Patent And Asserted Claims ....................................220

B.    Invalidity ...........................................................................................222

C.    Non-Infringement ...............................................................................234

XI.    The Bolosky '794 Patent....................................................................................237

A.    The Bolosky '794 Patent And Asserted Claims .................................237

B.    Invalidity ...........................................................................................239

C.    Non-Infringement ...............................................................................251

XII.    The Huna '217 Patent ........................................................................................256

A.    The Huna '217 Patent And Asserted Claims ......................................256

B.    Invalidity ...........................................................................................259

C.    Non-Infringement ...............................................................................288

XIII.    The Chen '004 Patent.........................................................................................293

A.    The Chen '004 Patent And Asserted Claims ......................................293

B.    Invalidity ...........................................................................................296

C.    Non-Infringement ...............................................................................305

XIV.    Damages for infringement of the Microsoft Patents-in-Suit.............................312

POINTS OF LAW ...........................................................................................................313

XV.    Issues On Which Plaintiff Multimedia Patent Trust and Counterclaim Plaintiff
Microsoft Bear The Burden Of Proof ................................................................313

A.    Infringement .......................................................................................313

XVI.    Issues On Which Defendant Microsoft and Counterclaim Defendants Lucent and
Alcatel-Lucent Bear The Burden Of Proof.........................................................321

A.    Validity ..............................................................................................321

XVII.    Issues on Which Defendant Microsoft Bears The Burden Of Proof .................331

A.     Enforceability.......................................................................................331

XVIII. Damages.................................................................................................................337

A.     Damages...............................................................................................337

B.     Notice...................................................................................................341

C.     Microsoft is Not Entitled to a Jury Trial on Certain Issues ................................342

D.     Microsoft is Not Entitled to an Injunction on Certain Issues.............................343

E.     Attorneys' Fees ....................................................................................343

ABANDONED ISSUES .................................................................................................343

WITNESSES TO BE OFFERED BY MULTIMEDIA PATENT TRUST, LUCENT, AND
        ALCATEL-LUCENT ........................................................................................344

EXHIBITS TO BE OFFERED BY MULTIMEDIA PATENT TRUST, LUCENT, AND
        ALCATEL-LUCENT ........................................................................................344

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

4

*A.B. Dick Co. v. Burroughs Corp.*,
   713 F.2d 700 (Fed. Cir. 1983)................................................................................. 320

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)..................................................... 336, 338, 339, 341

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
   828 F. Supp. 1386 (E.D. Wis. 1993).................................................................... 340

*ACS Hospital Sys., Inc. v. Montefiore Hospital*,
   732 F.2d 1572 (Fed. Cir. 1984)............................................................................ 325

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
   1996 WL 621830 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000)....... 325, 331

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
   148 F.3d 1380 (Fed. Cir. 1998)............................................................................ 337

*Alpex Computer Corp. v. Nintendo Co. Ltd.*,
   102 F.3d 1214 (Fed. Cir. 1996)............................................................................ 320

*Am. Standard Inc. v. Pfizer Inc.*,
   722 F.Supp. 86 (D. Del. 1989)............................................................................. 329

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
   725 F.2d 1350 (Fed. Cir. 1984)..................................................................... 325, 326

*Amgen Inc. v. Hoescht Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)............................................................................ 327

*Amstar Corp. v. Envirotech Corp.*,
   730 F.2d 1476 (Fed. Cir. 1984)............................................................................ 321

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
   776 F.2d 281 (Fed. Cir. 1985)............................................................................. 334

*Atlas Powder Co. v. E.I. DuPont De Nemours*,
   750 F.2d 1569 (Fed. Cir. 1984)............................................................................ 327

*Autogiro Co. of Am. v. United States*,
   384 F.2d 391 (Ct. Cl. 1967)................................................................................. 318

*Bandag, Inc. v. Gerrard Tire Co.*,
   704 F.2d 1578 (Fed. Cir. 1983)............................................................................ 346

*Beckman Instruments, Inc. v. LKB Produkter AB,*
  892 F.2d 1547 (Fed. Cir. 1989)..................................................................... 347

*Bell Communications Research Inc. v. Vitalink Communications Corp.,*
  55 F.3d 615 (Fed. Cir. 1995), *aff'd,* 234 F.3d 1252 (Fed. Cir. 2000) ................... 322

*Bio-Technology Gen. CgM. v. Genentech, Inc.,*
  80 F.3d 1553 (Fed. Cir. 1996)..................................................................... 341

*Brucklemeyer v. Ground Heaters, Inc.,*
  445 F.3d 1374 (Fed. Cir. 2006)................................................................... 329

*Budde v. Harley-Davidson, Inc.,*
  250 F.3d 1369 (Fed. Cir. 2001)................................................................... 325

*C.R. Bard, Inc. v. M3 Systems, Inc.,*
  157 F.3d 1340 (Fed. Cir. 1998)................................................................... 338

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.,*
  134 F.3d 1085 (Fed. Cir. 1998)................................................................... 321

*Catalina Lighting, Inc v. Lamps Plus, Inc.,*
  295 F.3d 1277 (Fed. Cir. 2002)................................................................... 338

*Coleman v. Dines,*
  754 F.2d 353 (Fed. Cir. 1985)............................................................. 329, 341

*Colorado v. New Mexico,*
  467 U.S. 310 (1984)................................................................................ 325

*Constant v. Advanced Micro-Devices, Inc.,*
  848 F.2d 1560 (Fed. Cir. 1988)................................................................... 331

*Continental Can Co. v. Monsanto Co.,*
  948 F.2d 1264 (Fed. Cir. 1991)............................................................. 332, 335

*Cooper v. Goldfarb,*
  154 F.3d 1321 (Fed. Cir. 1998)................................................................... 329

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,*
  868 F.2d 1251 (Fed. Cir. 1989)............................................................. 317, 318

*Crown Operations Int'l Ltd. v. Solutia, Inc.,*
  289 F.3d 1367 (Fed. Cir. 2002)............................................................. 327, 332

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001)................................................................... 343

*Cytologix Corp, v. Ventana Med. Sys.,*
  424 F.3d 1168 (Fed. Cir. 2005)................................................................... 319

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)..................................................................................... 334

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
    257 F.3d 1364 (Fed. Cir. 2001)..................................................................................... 321

*Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*,
    720 F. Supp. 397 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990) ........................ 319, 323

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006)................................................................................. passim

*Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc.*,
    305 F.3d 1303 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003)................................. 322

*eBay Inc. v. MercExchange, L.L.C.*,
    126 S.Ct 1837 (U.S. 2006)............................................................................................ 345

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001)............................................................................... 318, 336

*Enzo Life Sciences, Inc. v. Digene Corp.*,
    270 F.Supp.2d 484 (D. Del. 2003) (JJF)........................................................................ 336

*E-Pass Techs., Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007)................................................................................ 108, 169

*Ferag AG v. Quipp, Inc.*,
    45 F.3d 1562 (Fed. Cir. 1995)........................................................................................ 330

*Finnigan Corp. v. Int'l Trade Comm'n*,
    180 F.3d 1354 (Fed. Cir. 1999)..................................................................................... 324

*Foster v. Am. Mach. & Foundry Co.*,
    492 F.2d 1317 (2d Cir. 1974)........................................................................................ 345

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
    60 F.3d 770 (Fed. Cir. 1995)......................................................................................... 340

*General Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983)...................................................................................................... 344

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................................ 343

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
    45 F.3d 1550 (Fed. Cir. 1995)........................................................................................ 332

*Glaxo Inc. v. Novopharm Ltd.*,
    52 F.3d 1043 (Fed. Cir. 1995)........................................................................................ 326

*Glenayre Elec., Inc. v. Jackson,*
    443 F.3d 851 (Fed. Cir. 2006)............................................................................................... 343

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) ................................................................................................... 332, 333

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.,*
    1996 WL 680243, at *6 (N.D.Ill. 1996) ............................................................................ 337

*Hemstreet v. Computer Entry Sys. Corp.,*
    972 F.2d 1290 (Fed. Cir. 1992).......................................................................................... 340

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
    909 F.2d 1464 (Fed. Cir. 1990).......................................................................................... 324

*Hilgraeve Corp. v. Symantec Corp.,*
    265 F.3d 1336 (Fed. Cir. 2001).......................................................................................... 317

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,*
    62 F.3d 1512 (Fed. Cir. 1996), *rev'd on other grounds,* 520 U.S. 17 (1997)....................... 322

*Hybritech Inc. v. Monclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986)........................................................................... 325, 328, 329

*Imagexpo L.L.C. v. Microsoft Corp.,*
    284 F. Supp. 2d 365 (E.D. Va. 2003) ............................................................................... 324

*IMX, Inc. v. Lendingtree, LLC,*
    No. Civ.03 1067 SLR, 2007 WL 1232184 (D. Del. April 25, 2007).................................. 344

*In re Cronyn,*
    890 F.2d 1158 (Fed. Cir. 1989).......................................................................................... 331

*In re Elsner,*
    381 F.3d 1125 (Fed. Cir. 2004).......................................................................................... 331

*In re Fritch ,*
    972 F.2d 1260 (Fed. Cir. 1992).......................................................................................... 333

*In re Hayes Microcomputer Prods. Patent Litig.,*
    982 F.2d 1527 (Fed. Cir. 1992).......................................................................................... 317

*In re Kahn,*
    441 F.3d 977 (Fed. Cir. 2006)............................................................................................ 333

*In re Klopfenstein,*
    380 F.3d 1345 (Fed. Cir. 2004).......................................................................................... 331

*In re Kotzab,*
    217 F.3d 1365 (Fed. Cir. 2000).......................................................................................... 333

*In re Smith*,
714 F.2d 1127 (Fed. Cir. 1983)..................................................................................... 330

*Innovative Scuba Concepts, Inc.* v. *Feder Industries, Inc.*,
26 F.3d 1112 (Fed. Cir. 1994)....................................................................................... 328

*Intel Corp., v. U.S. Int'l Trade Comm'n*,
946 F.2d 821 (Fed. Cir. 1991)....................................................................................... 325

*Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*,
708 F. Supp. 1423 (D. Del. 1989)................................................................................. 341

*Intervet Am., Inc. v. Kee-Vet Lab., Inc.*,
887 F.2d 1050 (Fed. Cir. 1989)............................................................................. 318, 319

*Itron, Inc. v. Benghiat*,
No. Civ.99-501 (JRT/FLN), 2003 WL 22037710 (D. Minn. Aug. 29, 2003) ...................... 344

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003)................................................................................. passim

*Johns Hopkins Univ. v. Cellpro*,
894 F. Supp. 819 (D. Del. 1995)................................................................................... 323

*Jones v. Hardy*,
727 F.2d 1524 (Fed. Cir. 1984)............................................................................. 318, 325

*Joy Techs., Inc. v. Flakt, Inc.*,
6 F.3d 770 (1993)............................................................................... 108, 111, 169

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999)....................................................................................... 319

*Kemco Sales, Inc. v. Control Papers Co.*,
208 F.3d 1352 (Fed. Cir. 2000)..................................................................................... 318

*King Instruments Corp. v. Perego*,
65 F.3d 941 (Fed. Cir. 1995)......................................................................................... 342

*Kingsdown Medical Consultants v. Hollister Inc.*,
863 F.2d 867 (Fed. Cir. 1988)....................................................................................... 336

*Kinzenbaw v. Deere & Co.*,
741 F.2d 383 (Fed. Cir. 1984)....................................................................................... 330

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004)..................................................................................... 326

*KSR Int'l. Co. v. Teleflex Inc.*, --- U.S. ---,
127 S. Ct. 1727 (2007).................................................................................................. 332

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991)...................................................................... 320

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004)...................................................................... 321

*Lisle Corp., v. A.J. Mfg. Co.*,
    No. 02 C 7024, 2004 WL 765872 (N.D. Ill. April 7, 2004) ............................ 344

*Lucent Techs. Inc. v. Newbridge Networks Corp.*,
    168 F. Supp. 2d 181 (D. Del. 2001)............................................................... 323

*Mahurkar* v. *C.R. Bard Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996)................................................................. 328, 329

*Manville Sales Corp. v. Paramount Sys., Inc.*,
    917 F.2d 544 (Fed. Cir. 1990)........................................................................ 323

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .......................... 318, 319

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001)............................................................... 325, 332

*Metro. Wire Corp. v. Falcon Prods. Inc.*,
    528 F. Supp. 897 (E.D. Pa. 1981) .................................................................. 339

*Meyers v. Brooks Shoe, Inc.*,
    912 F.2d 1459 (Fed. Cir. 1990)...................................................................... 341

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
    No. CV-S-97-1383-EJW, 2001 WL 34778689 (D. Nev. Aug. 2, 2001) ............ 344

*Minco. Inc. v. Combustion Eng'g. Inc.*,
    903 F. Supp. 1204 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) .............. 340

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics, Inc.*,
    976 F.2d at 1559 (Fed. Cir. 1992)........................................................... 318, 326

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)................ 321, 323, 324

*Motorola, Inc. v. Interdigital Tech. Corp.*,
    121 F.3d 1461 (Fed. Cir. 1997)...................................................................... 327

*nCube v. Sea Change Int'l, Inc.*,
    313 F. Supp. 2d 361 (D. Del. 2004)............................................................... 323

*Netscape Communications Corp. v. Konrad*,
    295 F.3d 1315 (Fed. Cir. 2002)...................................................................... 330

*Northern Telecom Inc. v. Datapoint Corp.*,
  23 U.S.P.Q.2d 1881 (N.D. Tex. 1992) ................................................................ 340

*Odetics Inc. v. Storage Tech. Corp.*,
  185 F.3d 1259 (Fed. Cir. 1999) ............................................................... 320, 321

*Okajima v. Bourdeau*,
  261 F.3d 1350 (Fed. Cir. 2001) ........................................................................ 332

*Oney v. Ratliff*,
  182 F.3d 893 (Fed. Cir. 1999) .......................................................................... 324

*Paice LLC v. Toyota Motor Corp.*,
  No. 2:04-CV-211-DF, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006) ................ 346

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
  745 F.2d 11 (Fed. Cir. 1984) ............................................................................ 322

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
  83 F.2d 931 (Fed. Cir. 1987) ............................................................................ 320

*Pentec, Inc. v. Graphic Controls Corp.*,
  776 F.2d 309 (Fed. Cir. 1985) .......................................................................... 334

*Playtex Products, Inc. v. Procter & Bamgle Co.*,
  400 F.3d 901 (Fed. Cir. 2005) .......................................................................... 318

*Potash Co. of Am. v. International Minerals & Chem. Corp.*,
  213 F.2d 153 (10th Cir. 1954) .......................................................................... 341

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
  75 F.3d 1558 (Fed. Cir. 1996) .......................................................................... 327

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*,
  803 F.2d 1170 (Fed. Cir. 1986) ........................................................................ 324

*Price v. Symsek*,
  988 F.2d 1187 (Fed. Cir. 1993) ........................................................................ 328

*Ralston Purina Co. v. Far-Mar-Co*,
  772 F.2d 1570 (Fed. Cir. 1985) ........................................................................ 346

*RCA Corp. v. Data Gener. Corp.*,
  701 F. Supp. 456 (D. Del. 1988) ...................................................................... 339

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) .......................................................................... 319

*Refac Int'l, Ltd. v. IBM*,
  798 F.2d 459 (Fed. Cir. 1986) .......................................................................... 324

*Regents of University of California v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997)..................................................................... 337

*Richardson v. Suzuki Motor Co., Ltd.,*
    868 F.2d 1226 (Fed. Cir. 1989).............................................................. 326, 327

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995)................................................................ 342, 344

*Ruiz v. A.B. Chance Co.,*
    234 F.3d 654 (Fed. Cir. 2000)......................................................................... 334

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991).............................................................. 326, 337

*Seal-Flex, Inc. v. Athletic Track & Court Construction,*
    172 F.3d 836 (Fed. Cir. 1999)................................................................ 317, 319

*Sewall v. Walters,*
    21 F.3d 411 (Fed Cir. 1994).......................................................................... 328

*Speedplay Inc. v. Bebop Inc.,*
    211 F.3d 1245 (Fed. Cir. 2000)...................................................................... 337

*SRI Intern. v. Matsushita Elec. Corp.,*
    775 F.2d 1107 (Fed. Cir. 1985)..................................................... 319, 346, 347

*Stiftung v. Renishaw PLC,*
    945 F.2d 1173 (Fed. Cir. 1991)...................................................................... 320

*Stratoflex, Inc. v. Aeroquip Corp.,*
    713 F.2d 1530 (Fed. Cir. 1983)...................................................................... 334

*Stryker Corp. v. Davol, Inc.,*
    75 F. Supp. 2d 741 (W.D. Mich. 1999) .................................................. 322, 344

*Symbol Techs., Inc. v. Opticon, Inc.,*
    935 F.2d 1569 (Fed. Cir. 1991)...................................................................... 335

*Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.,*
    492 F.3d 1350 (Fed. Cir. 2007)...................................................................... 332

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.,*
    192 F.3d 1353 (Fed. Cir. 1999).............................................................. 343, 344

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002)...................................................................... 326

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n.,*
    988 F.2d 1165 (Fed. Cir. 1993)...................................................................... 335

LUCENT'S CORRECTED MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
    viii
    Case No. 06-CV-0684 H (CAB)

*Union Oil Co. v. Atlantic Richfield Co.*,
     208 F.3d 989 (Fed. Cir. 2000)..............................................................................318

*Unisplay S.A. v. American Elec. Sign Co.*,
     69 F.3d 512 n.7 (Fed. Cir. 1995).........................................................................343

*United States v. Adam*,
     383 U.S. 39 (1966)..............................................................................................333

*Valutron N.V. v. NCR Corp.*,
     33 U.S.P.Q. 2d 1986 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993)....339

*Voda v. Cordis Corp.*,
     No. CIV-03-1512-L, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006)..................345

*Wafer Shave, Inc. v. Gillette Co.*,
     857 F. Supp. 112 (D. Mass. 1993),  *aff'd without op.*, 26 F.3d 140 (Fed. Cir. 1994)..........339

*Wang Lab., Inc. v. Mitsubishi Elec. Am. Inc.*,
     30 U.S.P.Q.2d 1241 (C.D. Cal. 1993)..................................................................328

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
     520 U.S. 17 (1997)..............................................................................................322

*Water Tech. Corp. v. Calco, Ltd.*,
     850 F.2d 660 (Fed. Cir. 1988).............................................................................323

*Woodland Trust v. Flowertree Nursery, Inc.*,
     148 F.3d 1368 (Fed. Cir. 1998)...........................................................................330

*Z4 Technologies, Inc. v. Microsoft Corp.*,
     507 F.3d 1340 (Fed. Cir. 2007)...........................................................................329

*z4 Techs., Inc. v. Microsoft Corp.*,
     434 F. Supp. 2d 437 (E.D. Tex. 2006)..................................................................345

*Zenith Lab., Inc. v. Bristol-Myers Squibb Co.*,
     19 F.3d 1418 (Fed. Cir. 1994).............................................................................319

**Statutes**

§ 102(a) .................................................................................................................330

12 Del. C. § 3801 .....................................................................................................1

2-6 Chisum on Patents § 6.02[4] (2006) .................................................................331

28 U.S.C. § 1961 ....................................................................................................344

28 U.S.C. § 2201 ....................................................................................................346

35 U.S.C. §  271(a) ................................................................................ 317, 318

35 U.S.C. §  271(b) ................................................................................ 322

35 U.S.C. § 102 ........................................................................ 61, 326, 329, 331

35 U.S.C. § 103 ................................................................................ 331

35 U.S.C. § 112 ................................................................................ 319

35 U.S.C. § 271(c) .......................................................................... 323, 324

35 U.S.C. § 282 ...................................................................... 324, 325, 332

35 U.S.C. § 283 ................................................................................ 344

35 U.S.C. § 285 ................................................................................ 347

35 U.S.C. § 286 ................................................................................ 338

35 U.S.C. § 287 ................................................................................ 346

**INTRODUCTION**

Under Local Rule 16.1(f)(2) and this Court's scheduling orders, Multimedia Patent Trust ("MPT"), Lucent Technologies Inc. ("Lucent"), and Alcatel-Lucent hereby submit their Memorandum of Contentions of Fact and Law, which include the pretrial disclosures required under Federal Rule of Civil Procedure 26(a)(3), Local Rule 16.1(f)(2), and 16.1(f)(3)(e).  MPT, Lucent, and Alcatel-Lucent incorporate by reference their briefs on summary judgment concerning the Puri '878 Patent, the Microsoft Patents-in-Suit,[1] and trust-related claims and defenses.

Lucent notes that it has prepared this Memorandum without the benefit of any pretrial disclosures from Microsoft Corporation ("Microsoft").  Accordingly, Lucent reserves the right to amend or supplement this Memorandum in response to Microsoft's disclosures.

**CONTENTIONS OF MATERIAL FACT**

**I.      The Parties**

1.      Multimedia Patent Trust ("MPT") is a Delaware Statutory Trust organized under the Delaware Statutory Trust Act, 12 Del. C. §§ 3801 *et seq.*, having as a licensing and litigation trustee Mr. Gerard A. deBlasi, an individual having a business address of 991 Route 22 West, Bridgewater, NJ 08807, and having as an administrative trustee the Wilmington Trust Company, having a business address of 1110 N. Market Street, Wilmington, Delaware 19801.

2.      MPT was formed on November 28, 2006 pursuant to a Trust Agreement executed on November 21, 2006.  On November 28, 2006, Lucent and MPT executed a Patent Assignment by which Lucent assigned its entire right, title, and interest in and to the Trust Patents, along with the right to sue for past infringement (including all current and future claims and causes of action).  The

---

[1] U.S. Patent Nos. 5,438,433; 5,764,913; 5,917,499; 5,941,947; 5,838,319; 5,977,971, 6,339,794, 6,438,217; 6,412,004; 6,565,608.

Trust Patents include U.S. Patent No. 5,227,878 ("the Puri '878 Patent"). On October 1, 2007, in case no. 02-CV-2060 B (CAB) this Court held as a matter of law that the assignment was valid and effective.

3.      Microsoft is a corporation organized under the laws of the state of Washington with its principal place of business at One Microsoft Way, Redmond, Washington 98052. Microsoft makes, uses, sells, and offers for sale in the United States, and imports into the United States, software for computer systems, components, and accessories.

4.      Alcatel-Lucent is a corporation organized under the laws of the Republic of France with its principal place of business at 54 rue la Boetie, Paris, France, 75008.

5.      Lucent is a corporation organized under the laws of the state of Delaware with its principal place of business at 600 Mountain Avenue, Murray Hill, NJ 07974. On November 30, 2006, Lucent became a wholly owned subsidiary (now indirect) of Alcatel SA, a corporation organized under the laws of the Republic of France. On the same day, Alcatel SA changed its name to Alcatel-Lucent.

6.      Alcatel-Lucent and its wholly-owned subsidiary, Lucent, are leading global suppliers of communications equipment, including data, software, voice, and wireless-networking technologies. Researchers at Lucent's Bell Laboratories have developed a wide variety of key innovations that have greatly enhanced the capabilities and utility of personal computers.

## MULTIMEDIA PATENT TRUST'S PATENT IN SUIT

## II.      U.S. Patent No. 5,227,878 to Puri et al. (the "Puri '878 Patent")

7.      The following sections discuss Multimedia Patent Trust's assertions of facts regarding the teaching of asserted claims 13 and 15 of the Puri '878 Patent, Microsoft's infringement of those claims, and the insufficiency of Microsoft's asserted prior art to invalidate the Puri '878 Patent. For a fuller discussion of these topics, MPT references the expert reports of Dr. Bernd Girod and MPT's Final Infringement Contentions.

**A.    The Teachings Of The Asserted Claims Of The Puri '878 Patent**

8.      On November 15, 1991, an application leading to the issuance of the '878 patent was filed in the United States Patent and Trademark Office ("PTO"). The application was assigned Application No. 07/793,063 ("the '063 application"). The joint inventors of record were listed as Atul Puri and Rangarajan Aravind ("the applicants"). Twenty-two claims were included in the original application, five of which were independent claims. On February 28, 1992, the applicants filed a Response to Notice to File Missing Parts of Application, enclosing an Assignment to the American Telephone and Telegraph Company and an executed Declaration and Power of Attorney relating to the '063 application. The '878 Patent issued on July 13, 1993. The '878 Patent was assigned to Lucent Technologies upon AT&T's divestiture of Lucent in 1996.

9.      On August 9, 2005 this Court in *Lucent Technologies, Inc. v. Gateway, Inc. et al.*, case no. 02-CV-2060 B (CAB) ruled that independent 13 and dependent claim 15 of the Puri '878 Patent were invalid for indefiniteness due to a typographical error in the final version of the claims. The Court declined to correct the PTO's typographical error in claim 13 based on the Federal Circuit's decision concerning Court correction of a PTO error in *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297 (Fed. Cir. 2005), issued on May 16, 2005 (after Lucent submitted its opposition to Microsoft's summary judgment motion). Thereafter, without delay, Lucent promptly filed a request for a Certificate of Correction on September 9, 2005. The PTO issued a Certificate of Correction on October 25, 2005. Lucent notified Microsoft of the Certificate of Correction on January 6, 2006. Lucent filed this action on March 28, 2006.

10.     Lucent requested the Certificate of Correction for the '878 patent in accordance with the provisions of 37 CFR 1.322 and 1.323 to correct a printing error made by the PTO in omitting nine words from independent Claim 13 (italicized below):

> A means responsive to a motion compensation type signal for
> *selectively and adaptively performing motion compensated decoding*

of frames of the compressed *digital video bit stream and fields of the compressed* video bit stream.

11.     On October 25, 2005, the PTO issued a Certificate of Correction for the '878 patent that added the above missing words to Claim 13.

12.     On November 28, 2006, Lucent assigned the Puri '878 Patent to Multimedia Patent Trust.

13.     The Puri '878 Patent is entitled "Adaptive Coding And Decoding Frames And Fields Of Video."  The inventions of the Puri '878 Patent generally relate to "adaptive encoders and decoders involved in the transmission and reception of digital video signals."  With respect to interlaced video signals in particular, the inventors recognized that "[t]here are significant areas whereby the encoding of video data may be improved, so that the number of bits which must be transmitted is reduced and an accurate reconstruction may be made by a video decoder."

14.     One specific embodiment described in the Puri '878 Patent specification combines motion-compensated prediction with block-wise transform coding of the prediction error.  For each block in the video frame, a different coding process is chosen that best combines a particular technique for motion compensated prediction ("motion compensation mode") with a particular technique to encode the motion-compensated prediction error ("coding mode").  The motion compensation modes and the coding modes are specifically designed to take advantage of the special properties of interlaced video.

15.     Claim 13 of the Puri '878 Patent is directed to an apparatus for decoding a compressed video signal:

> 13.  An apparatus for decoding a compressed digital video signal, comprising:
>
> a means for receiving a compressed digital video bit stream; and
>
> a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding

of frames of the compressed digital video bit stream and fields of the compressed video bit stream.

16. The Court construed "means for receiving a digital bit stream" as performing the function of "receiving a compressed digital bit stream" using the structure "input line 50 (as shown in Fig. 2 and described at col. 14, lines 8-10.)." The Court construed "means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream" as performing the function "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" and the structure as "circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); circuit 94 (as shown in Fig. 2 and the circuitry within circuit 94 as shown and described in Figs. 15, 16A, and 16B, and the description of circuit 94 and its internal circuitry set forth in col. 15 lines 11-28 and in col. 25 line 26 to col. 27 line 34); summing element 92; picture stores 100C and 100A; circuit 54 (as shown in Fig. 2, and as described in Fig. 12 and at col. 14 lines 5-68 and col. 24 lines 47-60); circuit 80 (as shown in Fig. 2 and as described at col. 15 lines 4-10); and including all interconnections of these elements."

17. Claim 15 is dependent on claim 13 and is directed toward an apparatus for decoding a compressed video signal:

> 15. The apparatus of claim 13, in which the decoding means comprises:
>
> a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal;
>
> a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and
>
> a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal.

18. The Court construed "means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal" as performing the function "producing an adaptive motion compensated estimate of a decoded video signal" using the structure "circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); [] and picture stores 100C and 100A; including interconnections of these elements." The Court construed "means responsive to the compressed digital video bit stream for producing a decoded estimate error signal" as performing the function "producing a decoded estimate error signal" using the structure "(as shown in Figs. 2, 7, 12, 13, and 14 and as described at col.14 lines 5-68, at col. 19 lines 19-38, and at col. 24 line 47 to col. 25 line 25): circuit 54; circuit 64 (see Fig. 14 for internal circuitry); circuit 66 (see Fig. 13 for internal circuitry); circuit 72; and circuit 72A (see Fig. 7 for internal circuitry); and all interconnections between these elements." The Court construed "means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal" as performing the function "producing a coded video signal" using the structure "(as shown in Fig. 2 and as described at col. 14 lines 50-68): summing element 74 and including all inputs and outputs of this element."

**B.    Infringement Of The Asserted Claims Of The Puri '878 Patent**

19. Lucent contends that the following Microsoft products directly and indirectly infringe claims 13 and 15 of the Puri '878 Patent (collectively the "Microsoft Accused Products):

- Every Microsoft product (or portion of a product) for decoding data representing video in accordance with International Standard ISO/IEC 13818-2 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft on or after October 25, 2005. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the Xbox 360 video game system, the Xbox 360 HD DVD player peripheral, Media Center Extender for Xbox 360, and the Windows Vista Operating system (Ultimate Home Edition, Home Premium Edition, Home Basic Edition with DVD Playback Pack, Business Edition with DVD Playback Pack, and Starter Edition with DVD Playback Pack).

- Every Microsoft product (or portion of a product) for decoding data representing video in accordance with Society of Motion Picture and Television Engineers (SMPTE) Standard SMPTE 421M-2006 ("WMV-9/VC-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft on or after October 25, 2005. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the Xbox 360 video game system, the Xbox 360 HD DVD player peripheral, Media Center Extender for Xbox 360, Xbox Dashboard/Flash Av/, Windows Media Player 10, Windows Media Player 11, Windows Media Format SDK 11, Windows Server 2003 R2, Windows Media Encoder 9 (x64 edition), VC-1 Decoder Porting Kit, VC-1 Encoder Porting Kit, VC-1 DXVA Emulator Porting Kit, Office Communicator, Windows Mobile 5.0 AKU, Windows Mobile 6.0, Windows CE 6.0, and the Windows Vista Operating system (Ultimate Home Edition, Home Premium Edition, Home Basic Edition with DVD Playback Pack, Business Edition with DVD Playback Pack, and Starter Edition with DVD Playback Pack).

20.    For example, Microsoft directly infringes claims 13 and 15 by making, using, selling, and offering to sell the accused products, including the Xbox 360 video game system, within the United States. Microsoft has also induced infringement of claims 13 and 15 of the Puri '878 Patent by distributing the Xbox 360 video game console and the Xbox 360 HD DVD player peripheral to end users with instruction concerning their use to play DVDs. The end users directly infringe by, for example, playing DVDs on the Xbox 360 video game console.

21.    Microsoft also induces and contributes to infringement by supplying the Windows Vista operating system and other accused software to end users and OEMs for installation and use on computers, and by providing user manuals and other documentation instructing end users how to play MPEG-2 and WMV-9/VC-1 video content. Microsoft further induces infringement by selling Xbox 360 games that incorporate WMV-9/VC-1 video content, distributing WMV-9/VC-1 content over Xbox Live and elsewhere, and by providing developer kits to third parties enabling them to create and distribute Xbox 360 games that incorporate WMV-9/VC-1 video content.

22.    Microsoft has induced infringement of claims 13 and 15 of the Puri '878 Patent by distributing the Vista operating system and/or Windows Media Player 10 and 11 to OEMs and end users for installation on computers. The end users and OEMs directly infringe by installing the

operating system and/or Windows Media Player 10 and 11 on a computer, thereby making an infringing apparatus, and also by using, selling, and/or offering for sale the infringing apparatus.

23.     In addition, Microsoft has contributed to the infringement of claims 13 and 15 of the Puri '878 Patent by distributing the Vista operating system and/or Windows Media Player 10 and 11 to OEMs and end users for installation on computers.  The Vista operating system and Windows Media Player 10 and 11 are components of the infringing product that constitute a material part of the invention and are not staple articles or commodities suitable for substantial noninfringing use. They are also adapted for use in an infringing manner.

### 1.     Vista MPEG-2 Decoder

#### a.     Claim 13

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
| --- | --- |
| 13.  An apparatus for decoding a compressed digital video signal, comprising: | The Windows Vista operating system includes an MPEG-2 decoder ("the Vista MPEG-2 Decoder").  (November 7, 2007 Onders Deposition at 36).  The source code that Microsoft compiles to create the Vista MPEG-2 decoder can be found at CCMS 0065988-0068982.  (November 7, 2007 Onders Deposition at 38; CCMS 0069405 - CCMS 0069414).  The Vista MPEG-2 Decoder is a software program that decodes MPEG-2 bit streams.  The Vista MPEG-2 decoder is compliant with the Main Profile of the MPEG-2 standard. (November 7, 2007 Onders Deposition at 41-42).<br><br>A computer that has the Vista MPEG-2 Decoder installed as part of the Microsoft Vista operating system is an apparatus for decoding a compressed digital video signal, specifically for decoding a compressed MPEG-2 digital video signal. When decoding a compressed MPEG-2 digital video signal, the Vista MPEG-2 Decoder takes a compressed version of a video signal and reproduces the original video signal (or at least a close approximation of the original signal).  Along the way, the Vista MPEG-2 Decoder produces estimates of the original video signal in the form of the motion compensated prediction signal used in P-Pictures and B-Pictures. A computer that has the Vista MPEG-2 Decoder installed as part of the Microsoft Vista operating system therefore meets all limitations of the claim preamble. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| a means for receiving a compressed digital video bit stream; and | The Vista MPEG-2 Decoder is capable of "receiving a compressed digital video bit stream" and therefore performs the function of this claim element of the Puri '878 Patent as construed by the Court. Any compliant MPEG-2 Main Profile decoder must perform this function, as mandated by the standard itself: "The decoding process input is one or more coded video bitstreams ..." (MPEG-2 Standard, p. 104, LUC 1093835). The MPEG-2 Standard defines "coded video bitstream" as "A coded representation of a series of one or more pictures as defined in ITU-T Rec. H.262 ISO/IEC 13818-2." (MPEG-2 Standard, p. 2, LUC 1093735). Therefore, an MPEG-2 Main Profile decoder must contain electrical circuitry that receives the compressed digital video bit stream.

The Vista MPEG-2 Decoder source code contains data structures that allow the program to receive a compressed digital video bit stream. For example, pointer pStream in function Get_Hdr provides access to the input bitstream. A list of data structures to receive a compressed digital video bit stream is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.

Based on these software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that performs the claimed function of "receiving a compressed digital bit stream" in the same way as the corresponding structure identified by the Court: input line 50 of the Puri '878 Patent (as shown in Fig. 2 and described at col. 14, lines 8-10). That is, a computer with the Vista MPEG-2 Decoder installed contains structure that provides a pathway for electrical signals representing the compressed digital bit stream to access circuitry for decoding the compressed digital bit stream.

Based on the aforementioned software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "receiving a compressed digital bit stream." Both structures achieve the result of permitting downstream circuitry to access the compressed digital bit stream.

Therefore, a computer with the Vista MPEG-2 Decoder installed meets the limitations of this means-plus-function claim element literally, since it performs the same function using structure that is equivalent to the corresponding structure |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | of the Puri '878 Patent identified by the Court. Even if the Vista MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Vista MPEG-2 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream. | A computer with the Vista MPEG-2 Decoder installed is capable of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant MPEG-2 Main Profile decoder must be capable of performing this function, as mandated by the MPEG-2 Standard.

Any compliant MPEG-2 Main Profile decoder must be capable of performing "motion compensated decoding," as construed by the Court, i.e., decoding a compressed video signal using data representing motion vectors that was produced and transmitted during the compression process. "The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture." (MPEG-2 Standard, p. vii, LUC 1093731).

Any compliant MPEG-2 Main Profile decoder must also be capable of performing motion compensated decoding "selectively," i.e., in a manner that selects from among two or more options, as well as "adaptively," i.e., in a manner that changes in response to the motion compensation type signal. The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal.

According to the MPEG-2 Standard, "There are two major classifications of the prediction mode: field prediction; and frame prediction. In field prediction, predictions are made independently for each field by using data from one or more previously decoded fields. Frame prediction forms a prediction for the frame from one or more previously decoded |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | frames." (MPEG-2 Standard, p. 70, LUC 1093802). "In addition to the major classification of field or frame prediction two special prediction modes are used: 16x8 motion compensation [. . .] Dual-prime." (MPEG-2 Standard, p. 71, LUC 1093803). Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes that must be supported when decoding frame pictures. (MPEG-2 Standard, p. 81, LUC 1071914). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code indicating the macroblock prediction type." Code 01 corresponds to field-based prediction, code 10 to frame-based prediction. This confirms that the Main Profile of the MPEG-2 Standard supports motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream, both selectively and adaptively and in response to a motion compensation type signal, and that any compliant MPEG-2 Main Profile decoder must therefore be capable of performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, pp. viii, LUC 1071831, 4-6, LUC 1071837 - LUC 1071839, 34, LUC 1071867, 57-58, LUC 1071890 - LUC 1071891, 61-64, LUC 1071894 - LUC 1071897, 69-83, LUC 1071902 - LUC 1071916, 122-26, LUC 1071955 - LUC 1071959). <br><br> A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 94, 92, 100C, 100A, 54, and 80. Section 7.6 "Motion Compensation" (LUC1093801 - LUC 1093814) provides details of the required circuitry, including Figure 7-5 which shows an overview block diagram of the motion compensation process, including the two reference frame stores, prediction field/frame selection, and motion vector decoding from the bit stream using motion vector prediction, just like Fig. 2 of the Puri '878 Patent. Figures 7-6, 7-7 and 7-8 of the MPEG-2 Standard illustrate uni-directional field prediction, Figure 7-9 bi-directional field prediction, Figure 7-10 uni-directional frame prediction, and Figure 7-11 bi-directional frame prediction, just like Figs. 3 and 4 of the Puri '878 Patent. <br><br> A computer installed with any compliant MPEG-2 Main Profile decoder switches between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal, where each macroblock comprises 16x16 luminance samples and the corresponding |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
|  | chrominance samples.  A computer installed with any compliant MPEG-2 Main Profile decoder obtains the motion compensation type including the frame_motion_type from the compressed video bitstream by decoding and demultiplexing macroblock modes, as illustrated, e.g., in Section 6.2.5.1 "Macroblock modes" (MPEG-2 Standard, p 34, LUC 1093766). Any compliant MPEG-2 Main Profile decoder derives the motion compensation type information macroblock_motion_forward and macroblock_motion_backward from the block class macroblock_type. (MPEG-2 Standard, p. 57, LUC 1093789, Tables B.3 and B.4, p. 122-123, LUC 1093853 - LUC 1093854).

A computer installed with any compliant MPEG-2 Main Profile decoder decodes a differential motion vector and adds it to a motion vector prediction. "Motion vectors are coded differentially with respect to previously decoded motion vectors in order to reduce the number of bits required to represent them." (MPEG-2 Standard, p. 73, LUC 1093805). Section 7.6.3.1 entitled "Decoding the motion vectors" provides details. "Each motion vector component, vector'[r][s][t], shall be calculated by any process that is equivalent to the following one. Note that the motion vector predictors shall also be updated by this process. [...] vector'[r][s][t] = prediction + delta;" (MPEG-2 Standard, p. 74, LUC 1093806). A computer installed with any compliant MPEG-2 Main Profile decoder generates a motion vector prediction that depends on the motion compensation type, as shown, for example, in Table 7-9 where the update of the motion vector predictors in frame pictures is shown to depend on the frame_motion_type signal. A computer installed with any compliant MPEG-2 Main Profile decoder obtains the differential motion vector delta by decoding the compressed video bit stream. Decoding proceeds via the signals motion_code[r][s][t] and motion_residual[r][s][t] (MPEG-2 Standard, p. 35, LUC 1093767). "[M]otion_code[r][s][t] and motion_residual[r][s][t] are fields recovered from the bitstream." (MPEG-2 Standard, p. 74, LUC 1093806).

The Vista MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" as defined by the Court. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | For example, the Vista MPEG-2 Decoder source code contains functions and routines that perform demultiplexing and decoding of macroblock modes to obtain the motion compensation type and differential motion vectors from the compressed video bit stream. The variable motion_type (corresponding to frame_motion_type of the MPEG-2 Standard) is extracted from the bit stream in function slice [CCMS_0068292-CCMS_0068301]; it can assume four values, MC_FIELD for field motion compensation, MC_FRAME for frame motion compensation, MC_16x8 for 16x8 motion compensation, MC_DMV for dual prime motion compensation. Differential motion vectors are demultiplexed and decoded, for example, in function Get_motion_code [CCMS_0068304 - CCMS_0068305]. A list of additional routines and functions that carry out demultiplexing and decoding of macroblock modes to obtain the motion compensation type and differential motion vectors from the compressed video bit stream is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Vista MPEG-2 Decoder source code also derives motion compensation type information, in particular the variables macroblock_motion_forward and macroblock_motion_backward of the MPEG-2 Standard, from the block class macroblock_type (corresponding to macroblock_type of the MPEG-2 Standard) in function form_predictions_frame [CCMS_0068511-CCMS_0068513]. A list of additional routines and functions that derive the motion compensation type information from the block class is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Vista MPEG-2 Decoder source code also contains functions and routines that generate a motion vector prediction that depends on the motion compensation type, and adds this motion vector prediction to the decoded differential motion vector. These functions and routines include functions motion_vectors [CCMS_0068434] and decode_motion_vector [CCMS_0068434] that update motion vector predictors in three-dimensional array PMV and function decode_motion_vector [CCMS_0068434] to add the decoded differential motion vector to the motion vector prediction. A list of routines and functions that generate a motion vector prediction that depends on the motion compensation type and adds this motion vector prediction to the decoded differential |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | motion vector is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Vista MPEG-2 Decoder source code also contains functions and routines that permit it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction. These functions and routines include function UpdatePictureBuffers [CCMS_0068490-CCMS_0068491] to access the arrays forward_reference_frame and backward_reference_frame. A list of functions and data structures to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Vista MPEG-2 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including macroblock_motion_forward, macroblock_motion_backward, and frame_motion_type of the MPEG-2 Standard).   These functions and routines include form_predictions [CCMS_0068509-CCMS_0068511] which is called by form_predictions_frame [CCMS_0068511-CCMS_0068513].  These functions respond to motion compensation type signals including variable motion_type which assume the value MC_FRAME for frame-based prediction and MC_FIELD for field-based prediction. A list of additional routines and functions that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switched on a macroblock basis, is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>Based on these software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that performs the claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" in substantially the same way as the corresponding structure identified by the Court:  circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); circuit 94 (as |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | shown in Fig. 2 and the circuitry within circuit 94 as shown and described in Figs. 15, 16A, and 16B, and the description of circuit 94 and its internal circuitry set forth in col. 15 lines 11-28 and in col. 25 line 26 to col. 27 line 34); summing element 92; picture stores 100C and 100A; circuit 54 (as shown in Fig. 2, and as described in Fig. 12 and at col. 14 lines 5-68 and col. 24 lines 47-60); circuit 80 (as shown in Fig. 2 and as described at col. 15 lines 4-10); and including all interconnections of these elements. That is, a computer with the Vista MPEG-2 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation in response to a motion compensation type signal. This structure decodes motion vectors and — depending on the motion compensation type — produces estimates of either frames or fields of the original video signal.<br><br>Any minor differences between the ways in which the Vista MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.<br><br>Based on the aforementioned software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field of video.<br><br>Therefore, a computer with the Vista MPEG-2 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Vista MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Vista MPEG-2 Decoder installed infringes claim 13 of the Puri '878 Patent either literally or under the doctrine of equivalents. |

b.     Claim 15

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| 15.  The apparatus of claim 13, in which the decoding means comprises: | |
| a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal; | A computer with the Vista MPEG-2 Decoder installed is capable of "producing an adaptive motion compensated estimate of a decoded video signal," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court.  In fact, any compliant Main Profile MPEG-2 decoder must be capable of performing this function, as mandated by the MPEG-2 Standard. More specifically, any compliant Main Profile MPEG-2 decoder must be capable of producing an adaptive motion-compensated estimate of a decoded video signal (i.e., a video signal that has been decoded) by generating a motion-compensated prediction signal for uni-directionally and bi-directionally predicted pictures.<br><br>"The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture." (MPEG-2 Standard, p. vii, LUC 1093731).<br><br>The motion-compensated estimate is "adaptive" as required by the claim language, i.e., it is produced in a manner that changes in response to the motion compensation type signal.<br><br>The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal. According to the MPEG-2 Standard, "There are two major classifications of the prediction mode: field prediction; and frame prediction. In field prediction, predictions are made independently for each field by using data from one or more previously decoded fields. Frame prediction forms a prediction for the frame from one or more previously decoded frames." (MPEG-2 Standard, p. 70, LUC 1093802). "In addition to the major classification of field or frame prediction two special prediction modes are used: 16x8 motion compensation [. . .] Dual-prime."  (MPEG-2 Standard, p. 71, LUC 1093803). Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | that must be supported when decoding frame pictures. (MPEG-2 Standard, p. 81, LUC 1071914). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code indicating the macroblock prediction type." Code 01 corresponds to field-based prediction, code 10 to frame-based prediction. Therefore, any compliant MPEG-2 decoder must be capable of producing an adaptive motion compensated estimate of a decoded video signal, thereby performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, pp.viii, LUC 1071831, 4-6, LUC 1071837 - LUC 1071839, 57-58, LUC 1071890 - LUC 1071891, 69-73, LUC 1071902 - LUC 1071906, 79-83, LUC 1071912 - LUC 1071916). |
| | A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 100C and 100A of the Puri '878 Patent. Section 7.6 "Motion Compensation" (LUC1093801 - LUC 1093814) provides details of the required circuitry, including Figure 7-5 which shows an overview block diagram of the motion compensation process, including the two reference frame stores, prediction field/frame selection, and motion vector decoding from the bitstream using motion vector prediction, just like Fig. 2 of the Puri '878 Patent. Figures 7-6, 7-7 and 7-8 of the MPEG-2 Standard illustrate uni-directional field prediction, Figure 7-9 bi-directional field prediction, Figure 7-10 uni-directional frame prediction, and Figure 7-11 bi-directional frame prediction, just like Figs. 3 and 4 of the Puri '878 Patent. A computer installed with any compliant MPEG-2 Main Profile decoder switches between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal, where each macroblock comprises 16x16 luminance samples and the corresponding chrominance samples. |
| | As required by the claim language, the structure performing this function in a computer installed with any compliant MPEG-2 Main Profile decoder is responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors. As discussed above, Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes that must be supported when decoding frame pictures (MPEG-2 Standard, p. 81, LUC 1071914). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | indicating the macroblock prediction type". Motion-compensated prediction in any compliant MPEG-2 Main Profile decoder is selectively responsive to frame motion vectors and field motion vectors. It selects from among two or more options, using either frame motion vectors or field motion vectors for a macroblock, but not both. For example, "mv_format is derived from field_motion_type or frame_motion_type as indicated in the Tables 6-17 and 6-18. mv_format indicates if the motion vector is a field-motion vector or a frame-motion vector." (MPEG-2 Standard, p. 58, LUC 1093790).<br><br>The Vista MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing an adaptive motion compensated estimate of a decoded video signal" as defined by the Court.<br><br>The Vista MPEG-2 Decoder source code also contains functions and data structures that permit it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction. These functions and data structures include function UpdatePictureBuffers [CCMS_0068490-CCMS_0068491] to access the arrays forward_reference_frame and backward_reference_frame (see also Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod).<br><br>The Vista MPEG-2 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including macroblock_motion_forward, macroblock_motion_backward, and frame_motion_type of the MPEG-2 Standard). These functions and routines include form_predictions [CCMS_0068509-CCMS_0068511] which is called by form_predictions_frame [CCMS_0068511-CCMS_0068513]. These functions respond to motion compensation type signals including variable motion_type which assume the value MC_FRAME for frame-based prediction and MC_FIELD for field-based prediction. Dependent on variable motion_type, the vectors in three-dimensional array PMV are either used as field motion vectors or frame motion vectors. A list of additional routines and functions that perform uni-directional field prediction, bi- |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switched on a macroblock basis, is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod. |

Based on these software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that performs the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal" in the same way as the corresponding structure identified by the Court: circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); and picture stores 100C and 100A; including interconnections of these elements. That is, a computer with the Vista MPEG-2 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation, in response to a motion compensation type signal and either frame motion vectors or field motion vectors. In so doing, these apply either frame motion vectors or field motion vectors to reference frames or fields, thereby producing estimates of either frames or fields of the original video signal.

Any minor differences between the ways in which the Vista MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal." Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field of video.

Therefore, a computer with the Vista MPEG-2 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Vista MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Vista MPEG-2 Decoder

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and | A computer with the Vista MPEG-2 Decoder installed is capable of "producing a decoded estimate error signal," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court.  In fact, any compliant MPEG-2 Main Profile decoder must be capable of performing this function, as mandated by the MPEG-2 Standard.  "The prediction error is further compressed using the Discrete Cosine Transform (DCT) to remove spatial correlation before it is quantised …." (MPEG-2 Standard, p. vii, LUC 1093731). "Depending on the type of the macroblock, motion vector information and other side information is encoded with the compressed prediction error in each macroblock. […] After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised." (MPEG-2 Standard, p. viii, LUC 1093732).  The MPEG-2 decoder reverses those encoding processes as illustrated in Figure 7-1 of the MPEG-2 Standard.

A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 54, 64, 66, 72, and 72A of the Puri '878 Patent. Figure 7-1 of the MPEG-2 Standard shows mandatory building blocks of an MPEG-2 Decoder. Clearly, the structure of any compliant MPEG-2 Main Profile Decoder is responsive to the compressed video bit stream, as required by the claim language.

Any compliant MPEG-2 Main Profile decoder must be capable of demultiplexing and VLC-decoding a compressed MPEG-2 video bitstream to produce quantized DCT coefficients.  "A variable length coded representation of quantised DCT coefficients is transmitted as part of the coded video bitstream." (MPEG-2 Standard, p. 6, LUC 1093739). Variable-length decoding is described in details in Section 7.2.2 of the MPEG-2 Standard. "To summarise 7.2.2. The variable length decoding process shall be equivalent to the following." (MPEG-2 Standard, p. 64, LUC 1093796). Any compliant MPEG-2 Main Profile decoder must be capable of sorting the DCT coefficients into an 8x8 array using one of two zig zag scanning orders. "Two scan patterns are defined. […] The scan patterns defined here are often referred to as 'zigzag scanning order'." (MPEG-2 Standard, p. 64, LUC 1093796). |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Any compliant MPEG-2 Main Profile decoder must be capable of dequantizing the DCT coefficients, using a visibility matrix of predetermined scaling factors:<br><br>The two-dimensional array of coefficients, QF[v][u], is inverse quantised to produce the reconstructed DCT coefficients. This process is essentially a multiplication by the quantiser step size. The quantiser step size is modified by two mechanisms; a weighting matrix is used to modify the step size within a block and a scale factor is used in order that the step size can be modified at the cost of only a few bits (as compared to encoding an entire new weighting matrix). […] When 4:2:0 data is used two weighting matrices are used. One shall be used for intra macroblocks and the other for nonintra macroblocks.<br><br>(MPEG-2 Standard, p. 66, LUC 1093798). Any compliant MPEG-2 Main Profile decoder must be capable of performing an inverse DCT of block size 8x8 to reconstruct the prediction error. "Once the DCT coefficients, F[v][u] are reconstructed, an IDCT transform that conforms to the specifications of Annex A shall be applied to obtain the inverse transformed values f[y][x]." (MPEG-2 Standard, p. 69, LUC 1093801).<br><br>Like the Puri '878 Patent, the inverse DCT is performed on data organized as a field or a frame, and then converted from field blocks to macroblocks, or from frame blocks to macroblocks. "In frame pictures, where both frame and field DCT coding may be used, the internal organisation within the macroblock is different in each case. In the case of frame DCT coding, each block shall be composed of lines from the two fields alternately. […] In the case of field DCT coding, each block shall be composed of lines from only one of the two fields." (MPEG-2, p. 20, LUC 1093752) The Standard further describes "dct_type - This is a flag indicating whether the macroblock is frame DCT coded or field DCT coded. If this is set to '1', the macroblock is field DCT coded." (MPEG-2, p. 58, LUC 1093790). Figures 6-13 and 6-14 of the MPEG-2 Standard illustrate the block unformatting that the Vista MPEG-2 Decoder performs for field DCT coding and frame DCT coding. In sum, any compliant MPEG-2 Main Profile decoder must be capable of performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, pp. 20-21, LUC 1071853 - LUC 1071854, 58, LUC 1071891, |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | 61-69, LUC 1071894 - LUC 1071902, 82-83, LUC 1071916 - LUC 1071917, 119-120, LUC 1071952 - LUC 1071953). |

The Vista MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing a decoded estimate error signal" as defined by the Court.

The Vista MPEG-2 Decoder source code also contains functions and routines that perform demultiplexing and VLC-decoding of a compressed video bit stream to produce quantized DCT coefficients. These functions and routines include Decode_MPEG2_Non_Intra_Block [CCMS_0068258-CCMS_0068260]. A list of further functions and routines that perform demultiplexing and VLC-decoding of a compressed video bit stream is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista MPEG-2 Decoder source code also contains functions and routines that sort the DCT coefficients into an 8x8 array using one of two zig zag scanning orders. These functions and routines again include function Decode_MPEG2_Non_Intra_Block [CCMS_0068258-CCMS_0068260]. A list of further functions and routines that sort the DCT coefficients into an 8x8 array using one of two zig zag scanning orders is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista MPEG-2 Decoder source code also contains functions and routines that dequantize the DCT coefficients, using a visibility matrix of predetermined scaling factors. These functions and routines again include function Decode_MPEG2_Non_Intra_Block [CCMS_0068258-CCMS_0068260]. The matrix of scaling factors is contained in array qmat. A list of further functions and routines that dequantize the DCT coefficients, using a visibility matrix of predetermined scaling factors, is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista MPEG-2 Decoder source code also contains functions and routines that perform an inverse DCT of block size 8x8 to reconstruct the prediction error. These functions and routines typically have idct or IDCT in their names. For speed optimization, different cases are distinguished. Typically, a row IDCT is carried out first, followed by a

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | column IDCT. A list of further functions and routines that perform an inverse DCT of block size 8x8 to reconstruct the prediction error is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Vista MPEG-2 Decoder source code also contains functions and routines that perform block unformatting, dependent on the field/frame transform information included in the compressed bit stream for each macroblock. These functions and routines include slice [CCMS_0068292 - CCMS_0068301]. The flag dct_type determines whether the decoded prediction error is unformatted according to a field transform or a frame transform for luminance [CCMS_0068299] and chrominance [CCMS_0068299 - CCMS_0068300]. A list of further functions and routines that perform block unformatting dependent on the field/frame transform information included in the compressed bit stream for each macroblock is contained in Appendix C to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>Based on these software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that performs the claimed function of "producing a decoded estimate error signal" in the same way as the corresponding structure identified by the Court:  (as shown in Figs. 2, 7,12, 13, and 14 and as described at col.14 lines 5-68, at col. 19 lines 19-38, and at col. 24 line 47 to col. 25 line 25): circuit 54; circuit 64 (see Fig. 14 for internal circuitry); circuit 66 (see Fig. 13 for internal circuitry); circuit 72; and circuit 72A (see Fig. 7 for internal circuitry); and all interconnections between these elements.  That is, a computer with the Vista MPEG-2 Decoder installed has structure capable of producing properly formatted prediction error blocks by variable length decoding quantized transform coefficients, performing an inverse zig-zag scan, dequantizing the coefficients, inverse transforming the coefficients, and performing reformatting so that the field/frame structure of the error block matches that of the predicted block.<br><br>Any minor differences between the ways in which the Vista MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.<br><br>Based on the aforementioned software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | identified by the Court for performing the claimed function of "producing a decoded estimate error signal." Both structures achieve the result of producing a block of decoded prediction error information. |
| a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal. | Any minor differences between the ways in which the Vista MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.<br><br>Based on the aforementioned software routines, a computer with the Vista MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing a decoded video signal." Both structures achieve the result of producing a block of decoded video signal.<br><br>Therefore, a computer with the Vista MPEG-2 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function ("producing a decoded video signal") using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Vista MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Vista MPEG-2 Decoder installed infringes claim 15 of the Puri '878 Patent either literally or under the doctrine of equivalents. |

### 2. Xbox 360 Products (MPEG-2)

#### a. Claim 13

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| 13. An apparatus for decoding a compressed digital video signal, comprising: | The Xbox 360 video game console includes an MPEG-2 decoder ("the Xbox 360 Console MPEG-2 Decoder"). (December 4, 2007 Bowra Deposition at 34-35; June 2, 2006 Steinglass Deposition at 53-54; Microsoft's Verified Responses to MPT's Rule 30(b)(6) Notice Concerning MPEG-2 and WMV-9/VC-1 Products). The Xbox 360 Console MPEG-2 Decoder is a software program that decodes MPEG-2 bit streams. The source code that Microsoft compiles to create the Xbox 360 Console MPEG-2 Decoder can be found at CCMS 0065988-0068982. (August 13, 2007 letter from Vyas). |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | The source code for the Xbox 360 Console MPEG-2 Decoder was originally provided to Microsoft by Intervideo. (June 2, 2006 Steinglass Deposition at 54, 70-71; April 28, 2006 Hung Deposition at 42-43). Intervideo created the Xbox 360 Console MPEG-2 Decoder source code by modifying public domain MPEG-2 source code developed by the MPEG Software Simulation Group (MSSG). (April 28, 2006 Hung Deposition at 42-45). As it must be in order to play back DVD video, the Xbox 360 Console MPEG-2 Decoder is compliant with the Main Profile of the MPEG-2 standard.<br><br>Microsoft also ships an MPEG-2 decoder with the Xbox 360 HD DVD player peripheral, also known as "Sapphire." (December 4, 2007 Bowra Deposition at 32-33, 48-50; June 2, 2006 Steinglass Deposition at 20). The source code that Microsoft compiles to create the Xbox 360 HD DVD MPEG-2 Decoder can be found at CCMS 0068983-0069404. (August 13, 2007 letter from Vyas to Stadnick). The Xbox 360 HD DVD MPEG-2 Decoder is also compliant with the Main Profile of the MPEG-2 standard. In fact, the Xbox 360 HD DVD MPEG-2 Decoder uses the same core MPEG-2 decoding algorithms as the Xbox 360 Console MPEG-2 Decoder. (December 4, 2007 Bowra Deposition at 37-38, 49-50). Accordingly, the analyses herein apply equally to the HD DVD MPEG-2 Decoder.<br><br>Microsoft also ships MPEG-2 decoders with the Media Center Edition ("MCE") Xbox 360 video game consoles for use with both the Vista operating system and the XP operating system. (December 4, 2007 Bowra Deposition at 50-51, 56). The Xbox 360 XP MCE MPEG-2 Decoder and the Xbox 360 Vista MCE MPEG-2 Decoder are also compliant with the Main Profile of the MEPG-2 standard. In fact, the Xbox 360 XP MCE MPEG-2 Decoder and the Xbox 360 Vista MCE MPEG-2 Decoder use the same core MPEG-2 decoding algorithms as the Xbox 360 Console MPEG-2 Decoder. (December 4, 2007 Bowra Deposition at 52, 56). Accordingly, the analyses herein apply equally to the Xbox 360 XP MCE MPEG-2 Decoder and the Xbox 360 Vista MCE MPEG-2 Decoder.<br><br>A computer that has the Xbox 360 Console MPEG-2 Decoder installed is an apparatus for decoding a compressed digital video signal, specifically for decoding a compressed MPEG-2 digital video signal. When decoding a compressed MPEG-2 digital video signal, the Xbox 360 Console MPEG-2 Decoder takes a compressed version of a video signal and reproduces |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | the original video signal (or at least a close approximation of the original signal). Along the way, the Xbox 360 Console MPEG-2 Decoder produces estimates of the original video signal in form of the motion compensated prediction signal used in P-Pictures and B-Pictures. A computer that has the Xbox 360 Console MPEG-2 Decoder installed therefore meets all limitation of the claim preamble. |
| a means for receiving a compressed digital video bit stream; and | The Xbox 360 Console MPEG-2 Decoder is capable of "receiving a compressed digital video bit stream" and therefore performs the function of this claim element of the Puri '878 Patent as construed by the Court. Any compliant MPEG-2 Main Profile decoder must perform this function, as mandated by the standard itself: "The decoding process input is one or more coded video bitstreams ..." (MPEG-2 Standard, p. 104, LUC 1093835).

The MPEG-2 Standard defines "coded video bitstream" as "A coded representation of a series of one or more pictures as defined in ITU-T Rec. H.262 ISO/IEC 13818-2." (MPEG-2 Standard, p. 2, LUC 1093735). Therefore, an MPEG-2 Main Profile decoder must contain electrical circuitry that receives the compressed digital video bit stream.

The Xbox 360 Console MPEG-2 Decoder source code contains routines that perform the function of receiving a compressed digital video bit stream. For example, the function main [CCMS_0065917 - CCMS_0065981] contains a pointer base_file.file to the file containing the input bit stream.

A computer with the Xbox 360 Console MPEG-2 Decoder installed therefore contains structure that performs the claimed function of "receiving a compressed digital bit stream" in the same way as the corresponding structure identified by the Court: input line 50 of the Puri '878 Patent (as shown in Fig. 2 and described at col. 14, lines 8-10). That is, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that provides a pathway for electrical signals representing the compressed digital bit stream to access circuitry for decoding the compressed digital bit stream.

Based on the aforementioned software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "receiving a compressed digital bit |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | stream." Both structures achieve the result of permitting downstream circuitry to access the compressed digital bit stream.<br><br>Therefore, a computer with the Xbox 360 Console MPEG-2 Decoder installed (including the Xbox 360 video game console) meets the limitations of this means-plus-function claim element literally, since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Xbox 360 Console MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Xbox 360 Console MPEG-2 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream. | A computer with the Xbox 360 Console MPEG-2 Decoder installed is capable of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant MPEG-2 Main Profile decoder must be capable of performing this function, as mandated by the MPEG-2 Standard.<br><br>Any compliant MPEG-2 Main Profile decoder must be capable of performing "motion compensated decoding," as construed by the Court, i.e., decoding a compressed video signal using data representing motion vectors that was produced and transmitted during the compression process. "The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture." (MPEG-2 Standard, p. vii, LUC 1093731).<br><br>Any compliant MPEG-2 Main Profile decoder must also be capable of performing motion compensated decoding "selectively," i.e., in a manner that selects from among two or more options, as well as "adaptively," i.e., in a manner that changes in response to the motion compensation type signal. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal. According to the MPEG-2 Standard, "There are two major classifications of the prediction mode: field prediction; and frame prediction. In field prediction, predictions are made independently for each field by using data from one or more previously decoded fields.  Frame prediction forms a prediction for the frame from one or more previously decoded frames." (MPEG-2 Standard, p. 70, LUC 1093802). "In addition to the major classification of field or frame prediction two special prediction modes are used: 16x8 motion compensation [. . .] Dual-prime." (MPEG-2 Standard, p. 71, LUC 1093803). Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes that must be supported when decoding frame pictures. (MPEG-2 Standard, p. 81, LUC 1071914). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code indicating the macroblock prediction type."  Code 01 corresponds to field-based prediction, code 10 to frame-based prediction. This confirms that the Main Profile of the MPEG-2 Standard supports motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream, both selectively and adaptively and in response to a motion compensation type signal, and that any compliant MPEG-2 Main Profile decoder must therefore be capable of performing the function of this claim element of the Puri '878 Patent.  (MPEG-2 Standard, pp. viii, LUC 1071831, 4-6, LUC 1071837 - LUC 1071839, 34, LUC 1071867, 57-58, LUC 1071890 - LUC 1071891, 61-64, LUC 1071894 - LUC 1071897, 69-83, LUC 1071902 - LUC 1071916, 122-26, LUC 1071955 - LUC 1071959).<br><br>A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 94, 92, 100C, 100A, 54, and 80. Section 7.6 "Motion Compensation" (LUC 1093801 - LUC 1093814) provides details of the required circuitry, including Figure 7-5 which shows an overview block diagram of the motion compensation process, including the two reference frame stores, prediction field/frame selection, and motion vector decoding from the bitstream using motion vector prediction, just like Fig. 2 of the Puri '878 Patent. Figures 7-6, 7-7 and 7-8 of the MPEG-2 Standard illustrate uni-directional field prediction, Figure 7-9 bi-directional field |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | prediction, Figure 7-10 uni-directional frame prediction, and Figure 7-11 bi-directional frame prediction, just like Figs. 3 and 4 of the Puri '878 Patent.<br><br>A computer installed with any compliant MPEG-2 Main Profile decoder switches between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal, where each macroblock comprises 16x16 luminance samples and the corresponding chrominance samples. A computer installed with any compliant MPEG-2 Main Profile decoder obtains the motion compensation type including the frame_motion_type from the compressed video bitstream by decoding and demultiplexing macroblock modes, as illustrated, e.g., in Section 6.2.5.1 "Macroblock modes" (MPEG-2 Standard, p 34, LUC 1093766). Any compliant MPEG-2 Main Profile decoder derives the motion compensation type information macroblock_motion_forward and macroblock_motion_backward from the block class macroblock_type. (MPEG-2 Standard, p. 57, LUC 1093789, Tables B.3 and B.4, p. 122-123, LUC 1093853 - LUC 1093854).<br><br>A computer installed with any compliant MPEG-2 Main Profile decoder decodes a differential motion vector and adds it to a motion vector prediction. "Motion vectors are coded differentially with respect to previously decoded motion vectors in order to reduce the number of bits required to represent them." (MPEG-2 Standard, p. 73, LUC 1093805). Section 7.6.3.1 entitled "Decoding the motion vectors" provides details. "Each motion vector component, vector'[r][s][t], shall be calculated by any process that is equivalent to the following one. Note that the motion vector predictors shall also be updated by this process. [...] vector'[r][s][t] = prediction + delta;" (MPEG-2 Standard, p. 74, LUC 1093806).<br><br>A computer installed with any compliant MPEG-2 Main Profile decoder generates a motion vector prediction that depends on the motion compensation type, as shown, for example, in Table 7-9 where the update of the motion vector predictors in frame pictures is shown to depend on the frame_motion_type signal. A computer installed with any compliant MPEG-2 Main Profile decoder obtains the differential motion vector delta by decoding the compressed video bitstream. Decoding proceeds via the signals |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | motion_code[r][s][t] and motion_residual[r][s][t] (MPEG-2 Standard, p. 35, LUC 1093767). "motion_code[r][s][t] and motion_residual[r][s][t] are fields recovered from the bitstream." (MPEG-2 Standard, p. 74, LUC 1093806). The Xbox 360 Console MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" as defined by the Court.<br><br>For example, the Xbox 360 Console MPEG-2 Decoder source code contains functions and routines that perform demultiplexing and decoding of macroblock modes to obtain the motion compensation type and differential motion vectors from the compressed video bit stream. The variable motion_type (corresponding to frame_motion_type of the MPEG-2 Standard) is extracted from the bit stream in function slice [CCMS_0065809-CCMS_0065818]; it can assume four values, MC_FIELD for field motion compensation, MC_FRAME for frame motion compensation, MC_16x8 for 16x8 motion compensation, MC_DMV for dual prime motion compensation. Differential motion vectors are demultiplexed and decoded, for example, in function Get_motion_code [CCMS_0065821 - CCMS_0065822]. A list of additional routines and functions that carry out demultiplexing and decoding of macroblock modes to obtain the motion compensation type and differential motion vectors from the compressed video bit stream is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Xbox 360 Console MPEG-2 Decoder source code also derives motion compensation type information, in particular the variables macroblock_motion_forward and macroblock_motion_backward of the MPEG-2 Standard, from the block class macroblock_type (corresponding to macroblock_type of the MPEG-2 Standard) in function form_prediction_frame [CCMS_0065964-CCMS_0065966]. A list of additional routines and functions that derive the motion compensation type information from the block class is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that generate a motion vector prediction that depends on the motion compensation type, and |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | adds this motion vector prediction to the decoded differential motion vector. These functions and routines include functions motion_vectors [CCMS_0065901] and decode_motion_vector [CCMS_0065901] that update motion vector predictors in three-dimensional array PMV and function decode_motion_vector [CCMS_0065901] to add the decoded differential motion vector to the motion vector prediction. The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that permit it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction. These functions and routines include function UpdatePictureBuffers [CCMS_0065951-CCMS_0065952] to access the arrays forward_reference_frame and backward_reference_frame.<br><br>The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including macroblock_motion_forward, macroblock_motion_backward, and frame_motion_type of the MPEG-2 Standard). These functions and routines include form_predictions [CCMS_0065963-CCMS_0065964] which is called by form_predictions_frame [CCMS_0065964-CCMS_0065965]. These functions respond to motion compensation type signals including variable motion_type which assume the value MC_FRAME for frame-based prediction and MC_FIELD for field-based prediction. A list of additional routines and functions that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switched on a macroblock basis, is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>Based on these software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that performs the claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" in substantially the same way as the corresponding structure identified by the Court: circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | 18 line 10); circuit 94 (as shown in Fig. 2 and the circuitry within circuit 94 as shown and described in Figs. 15, 16A, and 16B, and the description of circuit 94 and its internal circuitry set forth in col. 15 lines 11-28 and in col. 25 line 26 to col. 27 line 34); summing element 92; picture stores 100C and 100A; circuit 54 (as shown in Fig. 2, and as described in Fig. 12 and at col. 14 lines 5-68 and col. 24 lines 47-60); circuit 80 (as shown in Fig. 2 and as described at col. 15 lines 4-10); and including all interconnections of these elements. That is, a computer with the Xbox 360 Console MPEG-2 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation in response to a motion compensation type signal. This structure decodes motion vectors and — depending on the motion compensation type — produces estimates of either frames or fields of the original video signal.

Any minor differences between the ways in which the Xbox 360 Console MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field of video.

Therefore, a computer with the Xbox 360 Console MPEG-2 Decoder installed (including the Xbox 360 video game console) meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Xbox 360 Console MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Xbox 360 Console MPEG-2 Decoder installed infringes claim 13 of the Puri '878 Patent either |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | literally or under the doctrine of equivalents. |

b.     Claim 15

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| 15.  The apparatus of claim 13, in which the decoding means comprises: | |
| a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal; | A computer with the Xbox 360 Console MPEG-2 Decoder installed is capable of "producing an adaptive motion compensated estimate of a decoded video signal," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant Main Profile MPEG-2 decoder must be capable of performing this function, as mandated by the MPEG-2 Standard. More specifically, any compliant Main Profile MPEG-2 decoder must be capable of producing an adaptive motion-compensated estimate of a decoded video signal (i.e., a video signal that has been decoded) by generating a motion-compensated prediction signal for uni-directionally and bi-directionally predicted pictures.

"The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture." (MPEG-2 Standard, p. vii, LUC 1093731).

The motion-compensated estimate is "adaptive" as required by the claim language, i.e., it is produced in a manner that changes in response to the motion compensation type signal. The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal. According to the MPEG-2 Standard, "There are two major classifications of the prediction mode: field prediction; and frame prediction. In field prediction, predictions are made independently for each field by using data from one or more previously decoded fields. Frame prediction forms a prediction for the frame from one or more previously decoded frames." (MPEG-2 Standard, p. 70, LUC 1093802). "In addition to the major classification |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | of field or frame prediction two special prediction modes are used: 16x8 motion compensation [. . .] Dual-prime." (MPEG-2 Standard, p. 71, LUC 1093803). |

Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes that must be supported when decoding frame pictures. (MPEG-2 Standard, p. 81). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code indicating the macroblock prediction type." Code 01 corresponds to field-based prediction, code 10 to frame-based prediction. Therefore, any compliant MPEG-2 decoder must be capable of producing an adaptive motion compensated estimate of a decoded video signal, thereby performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, pp.viii, LUC 1071831, 4-6, LUC 1071837 - LUC 1071839, 57-58, LUC 1071890 - LUC 1071891, 69-73, LUC 1071902 - LUC 1071906, 79-83, LUC 1071912 - LUC 1071916).

A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 100C and 100A of the Puri '878 Patent. Section 7.6 "Motion Compensation" (LUC1093801 - LUC 1093814) provides details of the required circuitry, including Figure 7-5 which shows an overview block diagram of the motion compensation process, including the two reference frame stores, prediction field/frame selection, and motion vector decoding from the bitstream using motion vector prediction, just like Fig. 2 of the Puri '878 Patent. Figures 7-6, 7-7 and 7-8 of the MPEG-2 Standard illustrate uni-directional field prediction, Figure 7-9 bi-directional field prediction, Figure 7-10 uni-directional frame prediction, and Figure 7-11 bi-directional frame prediction, just like Figs. 3 and 4 of the Puri '878 Patent. A computer installed with any compliant MPEG-2 Main Profile decoder switches between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal, where each macroblock comprises 16x16 luminance samples and the corresponding chrominance samples.

As required by the claim language, the structure performing this function in a computer installed with any compliant MPEG-2 Main Profile decoder is responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors. As discussed above,

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Table 7-14 of the MPEG-2 Standard provides a comprehensive list of prediction modes that must be supported when decoding frame pictures (MPEG-2 Standard, p. 81, LUC 1071914). Table 6-17 shows a motion compensation type signal for frame pictures: "frame_motion_type -- This is a two bit code indicating the macroblock prediction type". Motion-compensated prediction in any compliant MPEG-2 Main Profile decoder is selectively responsive to frame motion vectors and field motion vectors. It selects from among two or more options, using either frame motion vectors or field motion vectors for a macroblock, but not both. For example, "mv_format is derived from field_motion_type or frame_motion_type as indicated in the Tables 6-17 and 6-18. mv_format indicates if the motion vector is a field-motion vector or a frame-motion vector." (MPEG-2 Standard, p. 58, LUC 1093790).<br><br>The Xbox 360 Console MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing an adaptive motion compensated estimate of a decoded video signal" as defined by the Court. The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that permit it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction.<br><br>These functions and routines include function UpdatePictureBuffers [CCMS_0065951-CCMS_0065952] to access the arrays  forward_reference_frame and backward_reference_frame. The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including macroblock_motion_forward, macroblock_motion_backward, and frame_motion_type of the MPEG-2 Standard).   These functions and routines include form_predictions [CCMS_0065963-CCMS_0065964] which is called by form_predictions_frame [CCMS_0065964-CCMS_0065965]. These functions respond to motion compensation type signals including variable motion_type which assume the value MC_FRAME for frame-based prediction and MC_FIELD for field-based prediction. Dependent on variable motion_type, |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | the vectors in three-dimensional array PMV are either used as field motion vectors or frame motion vectors.  A list of additional routines and functions that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switched on a macroblock basis, is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>Based on these software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that performs the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal" in the same way as the corresponding structure identified by the Court:  circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); and picture stores 100C and 100A; including interconnections of these elements.  That is, a computer with the Xbox 360 Console MPEG-2 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation, in response to a motion compensation type signal and either frame motion vectors or field motion vectors. In so doing, these apply either frame motion vectors or field motion vectors to reference frames or fields, thereby producing estimates of either frames or fields of the original video signal.<br><br>Any minor differences between the ways in which the Xbox 360 Console MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.<br><br>Based on the aforementioned software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal."  Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field video.<br><br>Therefore, a computer with the Xbox 360 Console MPEG-2 Decoder installed (including the Xbox 360 video game console) meets the limitations of this means-plus-function claim element literally since it performs the same function |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Xbox 360 Console MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Xbox 360 Console MPEG-2 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and | A computer with the Xbox 360 Console MPEG-2 Decoder installed is capable of "producing a decoded estimate error signal," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant MPEG-2 Main Profile decoder must be capable of performing this function, as mandated by the MPEG-2 Standard.

"The prediction error is further compressed using the Discrete Cosine Transform (DCT) to remove spatial correlation before it is quantised …." (MPEG-2 Standard, p. vii, LUC 1093731). "Depending on the type of the macroblock, motion vector information and other side information is encoded with the compressed prediction error in each macroblock. […] After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised." (MPEG-2 Standard, p. viii, LUC 1093732). The MPEG-2 decoder reverses those encoding processes as illustrated in Figure 7-1 of the MPEG-2 Standard. A computer installed with any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to the combination of circuits 54, 64, 66, 72, and 72A of the Puri '878 Patent. Figure 7-1 of the MPEG-2 Standard shows mandatory building blocks of an MPEG-2 Decoder. Clearly, the structure of any compliant MPEG-2 Main Profile Decoder is responsive to the compressed video bit stream, as required by the claim language.

Any compliant MPEG-2 Main Profile decoder must be capable of demultiplexing and VLC-decoding a compressed MPEG-2 video bitstream to produce quantized DCT coefficients. "A variable length coded representation of quantised DCT coefficients is transmitted as part of the coded video bitstream." (MPEG-2 Standard, p. 6, LUC 1093739). Variable-length decoding is described in details in Section 7.2.2 of the MPEG-2 Standard. "To summarise 7.2.2. The variable length |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | decoding process shall be equivalent to the following." (MPEG-2 Standard, p. 64, LUC 1093796). Any compliant MPEG-2 Main Profile decoder must be capable of sorting the DCT coefficients into an 8x8 array using one of two zig zag scanning orders. "Two scan patterns are defined. […] The scan patterns defined here are often referred to as 'zigzag scanning order'." (MPEG-2 Standard, p. 64, LUC 1093796).<br><br>Any compliant MPEG-2 Main Profile decoder must be capable of dequantizing the DCT coefficients, using a visibility matrix of predetermined scaling factors:<br><br>The two-dimensional array of coefficients, QF[v][u], is inverse quantised to produce the reconstructed DCT coefficients. This process is essentially a multiplication by the quantiser step size. The quantiser step size is modified by two mechanisms; a weighting matrix is used to modify the step size within a block and a scale factor is used in order that the step size can be modified at the cost of only a few bits (as compared to encoding an entire new weighting matrix). […] When 4:2:0 data is used two weighting matrices are used. One shall be used for intra macroblocks and the other for nonintra macroblocks.<br><br>(MPEG-2 Standard, p. 66, LUC 1093798). Any compliant MPEG-2 Main Profile decoder must be capable of performing an inverse DCT of block size 8x8 to reconstruct the prediction error. "Once the DCT coefficients, F[v][u] are reconstructed, an IDCT transform that conforms to the specifications of Annex A shall be applied to obtain the inverse transformed values f[y][x]." (MPEG-2 Standard, p. 69, LUC 1093801).<br><br>Like the Puri '878 Patent, the inverse DCT is performed on data organized as a field or a frame, and then converted from field blocks to macroblocks, or from frame blocks to macroblocks. "In frame pictures, where both frame and field DCT coding may be used, the internal organisation within the macroblock is different in each case. In the case of frame DCT coding, each block shall be composed of lines from the two fields alternately. […] In the case of field DCT coding, each block shall be composed of lines from only one of the two fields." (MPEG-2, p. 20, LUC 1093752) "dct_type - This is a flag indicating whether the macroblock is frame DCT coded or field DCT coded. If this is set to '1', the macroblock is field |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | DCT coded." (MPEG-2, p. 58, LUC 1093790). Figures 6-13 and 6-14 of the MPEG-2 Standard illustrate the block unformatting that the Xbox 360 Console MPEG-2 Decoder performs for field DCT coding and frame DCT coding. |

In sum, any compliant MPEG-2 Main Profile decoder must be capable of performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, pp.20-21, LUC 1071853 - LUC 1071854, 58, LUC 1071891, 61-69, LUC 1071894 - LUC 1071902, 82-83, LUC 1071915 - LUC 1071916, 119-120, LUC 1071952 - LUC 1071953).

The Xbox 360 Console MPEG-2 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing a decoded estimate error signal" as defined by the Court.

The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that perform demultiplexing and VLC-decoding of a compressed video bitstream to produce quantized DCT coefficients. These functions and routines include Decode_MPEG2_Non_Intra_Block [CCMS_0065789-CCMS_0065791]. A list of further functions and routines that perform demultiplexing and VLC-decoding of a compressed video bitstream is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that sort the DCT coefficients into an 8x8 array using one of two zig zag scanning orders. These functions and routines again include function Decode_MPEG2_Non_Intra_Block [CCMS_0065789-CCMS_0065791]. A list of further functions and routines that sort the DCT coefficients into an 8x8 array using one of two zig zag scanning orders is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that dequantize the DCT coefficients, using a visibility matrix of predetermined scaling factors. These functions and routines again include function Decode_MPEG2_Non_Intra_Block [CCMS_0065789-CCMS_0065791]. The matrix of scaling factors is contained in array qmat. A list of further functions and routines that dequantize the DCT coefficients, using a visibility matrix of

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | predetermined scaling factors, is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that perform an inverse DCT of block size 8x8 to reconstruct the prediction error. These functions and routines typically have idct or IDCT in their names. For speed optimization, different cases are distinguished. Typically, a row IDCT is carried out first, followed by a column IDCT. A list of further functions and routines that perform an inverse DCT of block size 8x8 to reconstruct the prediction error is contained in Appendix D to the December 14, 2007 Expert Report of Professor Bernd Girod.<br><br>The Xbox 360 Console MPEG-2 Decoder source code also contains functions and routines that perform block unformatting, dependent on the field/frame transform information included in the compressed bitstream for each macroblock. These functions and routines include slice [CCMS_0065809-CCMS_0065818]. The flag dct_type determines whether the decoded prediction error is unformatted according to a field transform or frame transform for luminance [CCMS_0065816] and chrominance [CCMS_0065817].<br><br>Based on these software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that performs the claimed function of "producing a decoded estimate error signal" in the same way as the corresponding structure identified by the Court: (as shown in Figs. 2, 7,12, 13, and 14 and as described at col.14 lines 5-68, at col. 19 lines 19-38, and at col. 24 line 47 to col. 25 line 25): circuit 54; circuit 64 (see Fig. 14 for internal circuitry); circuit 66 (see Fig. 13 for internal circuitry); circuit 72; and circuit 72A (see Fig. 7 for internal circuitry); and all interconnections between these elements. That is, a computer with the Xbox 360 Console MPEG-2 Decoder installed has structure capable of producing properly formatted prediction error blocks by variable length decoding quantized transform coefficients, performing an inverse zig-zag scan, dequantizing the coefficients, inverse transforming the coefficients, and performing reformatting so that the field/frame structure of the error block matches that of the predicted block. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Any minor differences between the ways in which the Xbox 360 Console MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial. |
| | Based on the aforementioned software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing a decoded estimate error signal." Both structures achieve the result of producing a block of decoded prediction error information. |
| | Therefore, a computer with the Xbox 360 Console MPEG-2 Decoder installed (including the Xbox 360 video game console) meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Xbox 360 Console MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Xbox 360 Console MPEG-2 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal. | A computer with the Xbox 360 Console MPEG-2 Decoder installed is capable of "producing a decoded video signal" and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant MPEG-2 decoder must be capable of performing this function, as mandated by the MPEG-2 Standard.

Any compliant MPEG-2 Main Profile decoder will also contain structure that is at least equivalent to summing element 74 of the Puri '878 Patent. This is shown, for example, in Figure 7-5 of the MPEG-2 Standard; a summing element adds prediction values p[y][x] and decoded prediction error f[y][x] to generate "decoded pels" d[y][x]. Any compliant MPEG-2 Main Profile decoder must therefore be capable of performing the function of this claim element of the Puri '878 Patent. (MPEG-2 Standard, p. 83, LUC 1071916).

The Xbox 360 Console MPEG-2 Decoder source code contains functions and routines that perform the function of "producing a decoded video signal" as defined by the Court. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Those functions and routines add prediction values and decoded prediction error to generate "decoded pels" and include Add_Block_Clear_C [CCMS_0065725] and Add_Block_Clear_VMX [CCMS_0065765-CCMS_0065766].

Based on these software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that performs the claimed function of "producing a decoded video signal" in the same way as the corresponding structure identified by the Court: (as shown in Fig. 2 and as described at col. 14 lines 50-68): summing element 74 and including all inputs and outputs of this element. That is, a computer with the Xbox 360 Console MPEG-2 Decoder installed has structure capable of combining prediction error blocks with predicted blocks to generate decoded blocks of the video, thereby reconstructing the decoded video signal on a block by block basis.

Any minor differences between the ways in which the Xbox 360 Console MPEG-2 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Xbox 360 Console MPEG-2 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing a decoded video signal." Both structures achieve the result of producing a block of decoded video signal.

Therefore, a computer with the Xbox 360 Console MPEG-2 Decoder installed (including the Xbox 360 video game console) meets the limitations of this means-plus-function claim element literally since it performs the same function ("producing a decoded video signal") using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Xbox 360 Console MPEG-2 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Xbox 360 Console MPEG-2 Decoder installed infringes claim 15 of the Puri '878 Patent either literally or under the doctrine of equivalents. |

### 3. WMV-9/VC-1 Decoding Products

#### a. Claim 13

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| 13. An apparatus for decoding a compressed digital video signal, comprising: | The Windows Vista operating system includes a WMV-9/VC-1 decoder ("the Vista VC-1 Decoder"). (November 14, 2007 Sirivara Deposition at 58). The Vista VC-1 Decoder is a software program that decodes VC-1 bit streams. The source code that Microsoft compiles to create the Vista VC-1 Decoder can be found at CCMS 000060041-0065515. (November 14, 2007 Sirivara Deposition at 54, 62, 87; CCMS 0065529 - CCMS 0065541). The Vista VC-1 decoder is compliant with the Advanced Profile of the VC-1 standard. (November 14, 2007 Sirivara Deposition at 96).

Microsoft also ships a VC-1 decoder with the Windows Media Player 11 software program. (November 14, 2007 Sirivara Deposition at 34-37). The source code that Microsoft compiles to create the WMP 11 VC-1 Decoder is the same as the source code that Microsoft compiles to create the Vista VC-1 Decoder. (November 14, 2007 Sirivara Deposition at 62, 87). In fact, the WMP 11 VC-1 Decoder uses the same core VC-1 decoding algorithms as the VC-1 decoder that shipped with Windows Media Player 10. (November 14, 2007 Sirivara Deposition at 93-94). Accordingly, the analyses herein apply equally to the WMP 10 and WMP 11 VC-1 Decoders.

Microsoft also ships a VC-1 decoder with the Xbox 360 video game console and the Xbox 360 HD DVD player peripheral. (November 7, 2007 Onders Deposition at 77-78). The source code that Microsoft compiles to create the Xbox 360 Console VC-1 Decoder can be found at CCMS 0050443-0054795. (November 14, 2007 Sirivara Deposition at 153-154; November 14, 2007 Sirivara Deposition at 102; CCMS 0065516 - CCMS 0065522). The source code that Microsoft compiles to create the Xbox 360 HD DVD VC-1 Decoder can be found at CCMS 0054796-0060040. (CCMS 0065522 - CCMS 0065529). The Xbox 360 Console VC-1 Decoder and the Xbox 360 HD DVD VC-1 Decoder are also compliant with the Advanced Profile of the VC-1 standard. (November 14, 2007 Sirivara Deposition at 101). In fact, the Xbox 360 Console VC-1 Decoder and the Xbox 360 HD DVD VC-1 Decoder use the same core VC-1 decoding algorithms as the Vista VC-1 Decoder. (November 7, 2007 Onders Deposition |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | at 78; November 14, 2007 Sirivara Deposition at 102). Accordingly, the analyses herein apply equally to the Xbox 360 Console VC-1 Decoder and the Xbox 360 HD DVD VC-1 Decoder.<br><br>Microsoft also ships VC-1 decoders with the Media Center Edition ("MCE") Xbox 360 video game consoles for use with both the Vista operating system and the XP operating system. (November 7, 2007 Onders Deposition at 77-78). The Xbox 360 XP MCE VC-1 Decoder and the Xbox 360 Vista MCE VC-1 Decoder are also compliant with the Advanced Profile of the VC-1 standard. In fact, the Xbox 360 XP MCE VC-1 Decoder and the Xbox 360 Vista MCE VC-1 Decoder use the same core VC-1 decoding algorithms as the Vista VC-1 Decoder. (November 7, 2007 Onders Deposition at 77-78; November 14, 2007 Sirivara Deposition at 110-111). Accordingly, the analyses herein apply equally to the Xbox 360 XP MCE VC-1 Decoder and the Xbox 360 Vista MCE VC-1 Decoder.<br><br>A computer that has the Vista VC-1 Decoder installed is an apparatus for decoding a compressed digital video signal, specifically for decoding a compressed VC-1 digital video signal. When decoding a compressed VC-1 digital video signal, the Vista VC-1 Decoder takes a compressed version of a video signal and reproduces the original video signal (or at least a close approximation of the original signal). Along the way, the Vista VC-1 Decoder produces estimates of the original video signal in form of the motion compensated prediction signal used in P-Pictures and B-Pictures. A computer that has the Vista VC-1 Decoder installed therefore meets all limitation of the claim preamble. |
| a means for receiving a compressed digital video bit stream; and | The Vista VC-1 Decoder is capable of receiving a compressed digital video bit stream and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. Any compliant VC-1 Advanced Profile decoder must perform this function, as shown, for example, in Figure 4 of the VC-1 Standard (LUC 1302582), where the decoding process starts by parsing the bitstream. Therefore, an VC-1 Advanced Profile decoder must contain electrical circuitry that receives the compressed digital video bit stream.<br><br>The Vista VC-1 Decoder source code performs the function of receiving a compressed digital video bit stream. For example, the input bitstream m_pInputBitstream is assigned to decoder input m_pbitstrmIn [CCMS_0063882, see also Appendix E to |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | the December 14, 2007 Expert Report of Professor Bernd Girod]. |
| | Based on these software routines, a computer with the Vista VC-1 Decoder installed contains structure that performs the claimed function of "receiving a compressed digital bit stream" in the same way as the corresponding structure identified by the Court: input line 50 of the Puri '878 Patent (as shown in Fig. 2 and described at col. 14, lines 8-10). That is, a computer with the Vista VC-1 Decoder installed has structure that provides an pathway for electrical signals representing the compressed digital bit stream to access circuitry for decoding the compressed digital bit stream. |
| | Based on the aforementioned software routines, a computer with the Vista VC-1 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "receiving a compressed digital bit stream." Both structures achieve the result of permitting downstream circuitry to access the compressed digital bit stream. |
| | Therefore, a computer with the Vista VC-1 Decoder installed meets the limitations of this means-plus-function claim element literally, since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Vista VC-1 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Therefore, the Vista VC-1 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream. | A computer with the Vista VC-1 Decoder installed is capable of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant VC-1 Advanced Profile decoder must be capable of performing this function, as mandated by the VC-1 Standard. |
| | Any compliant VC-1 Advanced Profile decoder must be capable of performing "motion compensated decoding," as construed by the Court, i.e., decoding a compressed video signal using data representing motion vectors that was |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | produced and transmitted during the compression process. "In interlace frame P pictures, each inter-coded macroblock shall be motion compensated in frame mode using either 1 or 4 motion vector(s), or in field mode using either 2 or 4 motion vectors." (VC-1 Standard, p. 297, LUC 1302874). "Macroblocks in interlace frame B pictures shall be one of 3 types: 1-MV, 2 Field MV, or Intra. [...] These modes shall be joint coded the same way as in interlace frame P pictures [...] Each MB may also predicted as forward, backward, direct or interpolated [...]. If a MB is of type 1-MV and either forward or backward, then it uses a single MV. If it is of type 1-MV and direct or interpolated, it uses 2-MVs. If it is of type 2 Field MV and either forward or backward predicted, then it uses 2-MVs. If it is of type 2 Field MV and direct or interpolated, then it uses 4-MVs." (VC-1 Standard, p. 317, LUC 1302894). Any compliant VC-1 Advanced Profile decoder must also be capable of performing motion compensated decoding "selectively," i.e., in a manner that selects from among two or more options, as well as "adaptively," i.e., in a manner that changes in response to the motion compensation type signal.

The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal. According to the VC-1 Standard, "Frame motion compensation treats a macroblock as a whole entity while field motion compensation treats a macroblock as composed of two separate fields. [...] The type of motion compensation / residual coding shall be jointly indicated for each macroblock through MBMODE and SKIPMB. [...] Macroblocks in interlace frame P pictures shall be one of 5 types: 1-MV, 2 Field MV, 4 Frame MV, 4 Field MV, and Intra. The first four types of macroblock shall be inter-coded while the last type shall be intra-coded. The macro block type shall be signaled by the MBMODE syntax element in the macroblock layer along with the skip bit. MBMODE shall jointly encode macroblock types along with various pieces of information regarding the macro block for different types of macroblock." (VC-1 Standard, p. 297, LUC 1302874). "Inter-coded macroblocks in B frames shall be one of four prediction modes: backward, forward, direct and interpolated. Additionally, field coded MBs shall have the ability to switch prediction modes from backward to forward, or forward to backward at the field level." (VC-1 Standard, p. 319, LUC 1302896). "At the MB level, the B frame syntax is also similar to P frame MB [...] These modes shall be joint coded |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | the same way as in interlace frame P pictures, with the MBMODE syntax element as defined in section 10.7.3.4." (VC-1 Standard, p. 317, LUC 1302894). This confirms that the Advanced Profile of the VC-1 Standard supports motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream, both selectively and adaptively and in response to a motion compensation type signal, and that any compliant VC-1 Advanced Profile decoder must therefore be capable of performing the function of this claim element of the Puri '878 Patent.<br><br>A computer installed with any compliant VC-1 Advanced Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 94, 92, 100C, 100A, 54, and 80. Figure 4 of the VC-1 Standard shows an overview block diagram of the motion compensated decoding for interlaced video, including a bitstream parsing block for demultiplexing, decoding of the motion vectors by motion vector prediction and VLC decoding of motion vector differences, motion compensation using different numbers of motion vectors per macroblock, and the decoded picture buffer which stores the previous and the next picture for uni-directional and bi-directional motion compensated prediction, just like Fig. 2 of the Puri '878 Patent. Section 10 "Interlace Decoding Process" of the VC-1 Standard (LUC 1302830 - LUC 1302906) provides details of the required circuitry. Figures 129, 131, and 132 illustrate uni-directional field prediction, Figure 130 uni-directional frame prediction, like in Fig. 3 of the Puri '878 Patent. Like in Fig. 4 of the Puri '878 Patent, the VC-1 Standard requires circuitry for forward motion compensation, backward motion compensation, or bi-directional motion compensation. "Inter-coded macroblocks in B frames shall be one of four prediction modes: backward, forward, direct and interpolated. Additionally, field coded MBs shall have the ability to switch prediction modes from backward to forward, or forward to backward at the field level." (VC-1 Standard, p. 319, LUC 1302896).<br><br>A computer installed with any compliant VC-1 Advanced Profile decoder switches between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal, where each macroblock comprises 16x16 luminance samples and the corresponding chrominance samples. A computer installed with any compliant VC-1 Advanced Profile decoder decodes a |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | differential motion vector and adds it to a motion vector prediction. Section 10.7.3.5 of the VC-1 Standard entitled "Motion Vector Predictors" provides details for decoding of interlace frame P pictures. "First, three candidate motion vectors for the current macroblock are gathered from its neighboring macroblocks. […] Second, the motion vector predictor(s) for the current macroblock shall be computed from the set of candidate motion vectors." (VC-1 Standard, p. 301, LUC 1302878). A computer installed with any compliant VC-1 Advanced Profile decoder generates a motion vector prediction that depends on the motion compensation type, as shown, for example, by the pseudo-code in Figures 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147 of the VC-1 Standard. <br><br> A computer installed with any compliant VC-1 Advanced Profile decoder obtains a differential motion vector by decoding the compressed video bitstream. "The MVDATA syntax elements contain motion vector differential information for the macroblock. Depending on the type of motion compensation and motion vector block pattern signaled at each macroblock, there shall be 0 to 4 MVDATA syntax elements per macroblock. […] The motion vector differential shall be decoded the same way as one reference field motion vector differential for field P picture […] " (VC-1 Standard, p. 315, LUC 1302892). "[…] each MVDATA or BLKMVDATA syntax element in the macroblock layer jointly encodes two parameters: 1) the horizontal motion vector differential component and 2) the vertical motion vector differential component. The MVDATA or BLKMVDATA syntax elements are each a variable length codeword followed by a fixed length codeword." (VC-1 Standard, p. 262, LUC 1302839). Figure 113 of the VC-1 Standard provides pseudo-code to decode differential motion vectors. <br><br> A computer installed with any compliant VC-1 Advanced Profile decoder obtains the motion compensation type from the compressed video bitstream by decoding and demultiplexing macroblock modes: "MBMODE jointly specifies a) the type of macroblock: either one of the 4 inter macroblock types (MVTYPEMB): 1-MV, 4 Frame MV, 2 Field MV, 4 Field MV, or the Intra macroblock type, b) types of transform for inter-coded macroblock: one of field or frame or zero coded blocks […] and c) whether there is differential motion vector for the 1-MV macroblock." (VC-1 Standard, p. 300, LUC 1302877). Macroblock mode decoding tables are provided in |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Section 11.4 "Interlace Pictures MB Mode Tables" of the VC-1 Standard (LUC 1302928 - LUC 1302936).

The Vista VC-1 Decoder source code contains functions and routines that, taken as a whole, perform the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" as defined by the Court.

For example, the Vista VC-1 Decoder source code contains functions and routines that perform demultiplexing and decoding of macroblock modes to obtain the motion compensation type based on the macroblock modes, as well as differential motion vectors from the compressed video bitstream. These functions and routines include DecodePMBModeInterlaceV2 [CCMS_0063273-CCMS_0063274] which decodes the motion compensation type information pmbmd->m_chMBMode to take on one of the values MB_1MV, MB_4MV, MB_FIELD, MB_FIELD4MV, or MB_INTRA. They also include decodeBMBOverheadInterlaceV2 which also decodes motion compensation type information pmbmd->m_mbType to take on one of the values FORWARD, BACKWARD, INTERPOLATE, DIRECT, or INTRAMBT [CCMS_0063131-CCMS_0063133]. Differential motion vectors are demultiplexed and decoded, for example, in function getDiffMV [CCMS_0064415]. A list of additional routines and functions that carry out demultiplexing and decoding of macroblock modes to obtain the motion compensation type and differential motion vectors from the compressed video bitstream is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also contains functions and routines that generate a motion vector prediction that depends on the motion compensation type, and adds this motion vector prediction to the decoded differential motion vector. These functions and routines include PredictMV [CCMS_0063412-CCMS_0063414] for motion vector prediction and ComputeMVfromDiffMV [CCMS_0064261-CCMS_0064262] for adding differential motion vector and motion vector prediction. A list of additional routines and functions that generate a motion vector prediction and add this motion vector prediction to the decoded differential motion vector is contained in Appendix E to the December 14, 2007 |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Expert Report of Professor Bernd Girod. |

The accused products text:

Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also permits it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction. For example, the previous picture is stored at m_ppxliRef0Y for luminance and m_ppxliRef0U and m_ppxliRef0V for chrominance, while the next picture is stored at m_ppxliRef1Y for luminance and m_ppxliRef1U and m_ppxliRef1V for chrominance. A list of data structures to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including MVTYPEMB and BMVTYPE of the VC-1 Standard). The unidirectional (forward or backward) motion compensation routines typically have the mnemonic MotionComp in their names. For example, function MotionCompFrameInterlaceV2 [CCMS_0063166-CCMS_0063167] performs frame motion compensation, while function MotionCompFieldInterlaceV2 [CCMS_0063167-CCMS_0063168] performs field motion compensation. They are selectively called, for example, for uni-directional prediction in routine decodePInterlaceV2 [CCMS_0063266-CCMS_0063273], depending on motion compensation type signal pmbmd->m_chMBMode, or for bi-directional prediction in routine decodeBInterlaceV2 [CCMS_0063088-CCMS_0063099], depending on motion type signals pmbmd->m_chMBMode and pmbmd->m_mbType. A list of functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switching between these different motion compensation modes on a macroblock basis, in response to a motion compensation type signal is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

Based on these software routines, a computer with the Vista VC-1 Decoder installed contains structure that performs the

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" in substantially the same way as the corresponding structure identified by the Court:  circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); circuit 94 (as shown in Fig. 2 and the circuitry within circuit 94 as shown and described in Figs. 15, 16A, and 16B, and the description of circuit 94 and its internal circuitry set forth in col. 15 lines 11-28 and in col. 25 line 26 to col. 27 line 34); summing element 92; picture stores 100C and 100A; circuit 54 (as shown in Fig. 2, and as described in Fig. 12 and at col. 14 lines 5-68 and col. 24 lines 47-60); circuit 80 (as shown in Fig. 2 and as described at col. 15 lines 4-10); and including all interconnections of these elements.  That is, a computer with the Vista VC-1 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation in response to a motion compensation type signal.  This structure decodes motion vectors and — depending on the motion compensation type — produces estimates of either frames or fields of the original video signal.<br><br>Any minor differences between the ways in which the Vista VC-1 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.<br><br>Based on the aforementioned  software routines, a computer with the Vista VC-1 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream."  Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field of video.<br><br>Therefore, a computer with the Vista VC-1 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court.  Even if the Vista VC-1 Decoder structure identified above somehow performs a function different than the function identified by the Court for |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Vista VC-1 Decoder installed infringes claim 13 of the Puri '878 Patent either literally or under the doctrine of equivalents. |

### b. Claim 15

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| 15. The apparatus of claim 13, in which the decoding means comprises: | |
| a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal; | A computer with the Vista VC-1 Decoder installed is capable of "producing an adaptive motion compensated estimate of a decoded video signal," and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant VC-1 Advanced Profile decoder must be capable of performing this function, as mandated by the VC-1 Standard.

More specifically, any compliant VC-1 Advanced Profile decoder must be capable of producing an adaptive motion-compensated estimate of a decoded video signal (i.e., a video signal that has been decoded) by generating a motion-compensated prediction signal for uni-directionally and bi-directionally predicted pictures. "In interlace frame P pictures, each inter-coded macroblock shall be motion compensated in frame mode using either 1 or 4 motion vector(s), or in field mode using either 2 or 4 motion vectors." (VC-1 Standard, p. 297, LUC 1302874). "Macroblocks in interlace frame B pictures shall be one of 3 types: 1-MV, 2 Field MV, or Intra. [...] Each MB may also predicted as forward, backward, direct or interpolated [...]." (VC-1 Standard, p. 317, LUC 1302894). The motion-compensated estimate is "adaptive" as required by the claim language, i.e., it is produced in a manner that changes in response to the motion compensation type signal.

The "motion compensation type signal" has been construed by the Court as a signal that identifies one of two or more available modes of motion compensation to be used in motion compensated decoding of a video signal. According to the VC-1 Standard, "Frame motion compensation treats a macroblock as a whole entity while field motion compensation treats a macroblock as composed of two separate fields. [...] Macroblocks in interlace frame P pictures shall be one of 5 types: 1-MV, 2 Field MV, 4 Frame MV, 4 Field MV, and |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Intra. The first four types of macroblock shall be inter-coded while the last type shall be intra-coded. The macro block type shall be signaled by the MBMODE syntax element in the macroblock layer along with the skip bit. MBMODE shall jointly encode macroblock types along with various pieces of information regarding the macro block for different types of macroblock." (VC-1 Standard, p. 297, LUC 1302874). "Inter-coded macroblocks in B frames shall be one of four prediction modes: backward, forward, direct and interpolated. Additionally, field coded MBs shall have the ability to switch prediction modes from backward to forward, or forward to backward at the field level." (VC-1 Standard, p. 319, LUC 1302896). "At the MB level, the B frame syntax is also similar to P frame MB […] These modes shall be joint coded the same way as in interlace frame P pictures, with the MBMODE syntax element as defined in section 10.7.3.4." (VC-1 Standard, p. 317, LUC 1302894). Therefore, any compliant VC-1 Advanced Profile decoder must be capable of producing an adaptive motion compensated estimate of a decoded video signal, thereby performing the function of this claim element of the Puri '878 Patent.<br><br>A computer installed with any compliant VC-1 Advanced Profile decoder will also contain structure that is at least equivalent to the combination of circuits 100, 100C and 100A of the Puri '878 Patent. Figure 4 of the VC-1 Standard shows an overview block diagram of the motion compensated decoding for interlaced video, including motion compensation using different numbers of motion vectors per macroblock and the decoded picture buffer which stores the previous and the next picture for uni-directional and bi-directional motion compensated prediction, just like Fig. 2 of the Puri '878 Patent. Section 10 "Interlace Decoding Process" of the VC-1 Standard (LUC 1302830 - LUC 1302906) provides details of the required circuitry. Figures 129, 131, and 132 illustrate uni-directional field prediction, Figure 130 uni-directional frame prediction, like in Fig. 3 of the Puri '878 Patent. Like in Fig. 4 of the Puri '878 Patent, a computer installed with any compliant VC-1 Advanced Profile decoder requires circuitry for forward motion compensation, backward motion compensation, or bi-directional motion compensation. "Inter-coded macroblocks in B frames shall be one of four prediction modes: backward, forward, direct and interpolated. Additionally, field coded MBs shall have the ability to switch prediction modes from backward to forward, or forward to backward at the field level." (VC-1 Standard, p. 319, LUC |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | 1302896). A computer installed with any compliant VC-1 Advanced Profile decoder switches between these different motion compensation modes on a macroblock basis, where each macroblock comprises 16x16 luminance samples and the corresponding chrominance samples.

As required by the claim language, the structure performing this function in a computer installed with any compliant VC-1 Advanced Profile decoder is responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors. As discussed above, MBMODE syntax of the VC-1 Standard determines the type of the motion compensation that is performed. Motion-compensated prediction in any compliant VC-1 Advanced Profile decoder is selectively responsive to frame motion vectors and field motion vectors. It selects from among two or more options, using either frame motion vectors or field motion vectors for a macroblock, but not both.
The Vista VC-1 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing an adaptive motion compensated estimate of a decoded video signal" as defined by the Court.

The Vista VC-1 Decoder source code permits it to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction. For example, as discussed above, the previous picture is stored at m_ppxliRef0Y for luminance and m_ppxliRef0U and m_ppxliRef0V for chrominance, while the next picture is stored at m_ppxliRef1Y for luminance and m_ppxliRef1U and m_ppxliRef1V for chrominance. A list of data structures to store and retrieve the previous picture and the next picture as references for uni-directional or bi-directional prediction is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also contains functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, capable of switching between these different motion compensation modes on a macroblock basis in response to a motion compensation type signal (including MVTYPEMB and BMVTYPE of the VC-1 Standard). The unidirectional (forward or backward) motion compensation routines typically have the mnemonic MotionComp in their names. For example, function |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | MotionCompFrameInterlaceV2 [CCMS_0063166-CCMS_0063167] performs frame motion compensation, while function MotionCompFieldInterlaceV2 [CCMS_0063167-CCMS_0063168] performs field motion compensation. They are selectively called, for example, for uni-directional prediction in routine decodePInterlaceV2 [CCMS_0063266-CCMS_0063273], depending on motion compensation type signal pmbmd->m_chMBMode, or for bi-directional prediction in routine decodeBInterlaceV2 [CCMS_0063088-CCMS_0063099], depending on motion type signals pmbmd->m_chMBMode and pmbmd->m_mbType. Depending on the motion compensation type, the quantities stored in m_pXMotion and m_pYMotion are used as field motion vectors or frame motion vectors. A list of functions and routines that perform uni-directional field prediction, bi-directional field prediction, uni-directional frame prediction, and bi-directional frame prediction, switching between these different motion compensation modes on a macroblock basis, in response to a motion compensation type signal is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

Based on these software routines, a computer with the Vista VC-1 Decoder installed contains structure that performs the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal" in the same way as the corresponding structure identified by the Court: circuit 100 (as shown in Fig. 2 and its internal circuitry as shown in Figs. 3, 4A, and 4B and as described at col. 15 line 22 to col. 18 line 10); and picture stores 100C and 100A; including interconnections of these elements. That is, a computer with the Vista VC-1 Decoder installed has structure capable of dynamically selecting between and applying different modes of motion compensation, in response to a motion compensation type signal and either frame motion vectors or field motion vectors. In so doing, these apply either frame motion vectors or field motion vectors to reference frames or fields, thereby producing estimates of either frames or fields of the original video signal.

Any minor differences between the ways in which the Vista VC-1 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Vista VC-1 Decoder installed contains structure that |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing an adaptive motion compensated estimate of a decoded video signal."  Both structures achieve the result of producing either a motion compensated estimate of a block of pixels from a frame of video or a motion compensated estimate of a block of pixels from a field of video.<br><br>Therefore, a computer with the Vista VC-1 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court.  Even if the Vista VC-1 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way.  Therefore, the Vista VC-1 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and | A computer with the Vista VC-1 Decoder installed is capable of "producing a decoded estimate error signal", and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court.  In fact, any compliant VC-1 Advanced Profile decoder must be capable of performing this function, as mandated by the VC-1 Standard.<br><br>"If the current macroblock is inter-coded, then the block layer consists of decoding the residual after motion compensation …." (VC-1 Standard, p. 316, LUC 1302893). Figure 59 of the VC-1 Standard illustrates the process of decoding an estimate error signal and adding it to the motion compensated prediction. "Figure 59 shows the steps for reconstructing Inter blocks. For illustration the figure shows the reconstruction of a block whose 8x8 error signal is coded with two 8x4 Transforms. The 8x8 error block can also be transformed with either two 4x8 Transforms, four 4x4 Transforms, or one 8x8 Transform." (VC-1 Standard, p. 284, LUC 1302861).<br><br>A computer installed with any compliant VC-1 Advanced Profile decoder will also contain structure that is at least equivalent to the combination of circuits 54, 64, 66, 72, and 72A of the Puri '878 Patent. The above-mentioned Figure 59 of the VC-1 Standard shows mandatory building blocks of a VC-1 Decoder. Clearly, the structure of any compliant VC-1 Advanced Profile Decoder is responsive to the compressed video bit stream, as required by the claim language. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Any compliant VC-1 Advanced Profile decoder must be capable of demultiplexing and VLC-decoding a compressed VC-1 video bitstream to produce quantized transform coefficients. "The steps required to reconstruct an inter-coded block shall be: 1) transform type selection, 2) sub-block pattern decode, 3) coefficient decode, 4) zigzag scan of coefficients, 5) inverse quantization, 6) inverse Transform, and 7) obtain predicted block via motion compensation and add predicted and error blocks." (VC-1 Standard, p. 284, LUC 1302861). Section 8.3.6.2.3 of the VC-1 Standard describes the "Coefficient Bitstream Decode."<br><br>Any compliant VC-1 Advanced Profile decoder must be capable of sorting the decoded transform coefficients into an array using one of several predefined zig zag scanning orders. "The one-dimensional array of quantized coefficients produced in the run-level decode process described above shall be scanned out into a two-dimensional array in preparation for the Inverse Transform. […] Each Transform type shall have an associated zigzag scan array. […] The zigzag scan arrays for some transform types are different between the interlace mode and progressive mode of the Advanced Profile. […] The scan arrays in the Advanced Profile depend on whether interlace or progressive mode is used." (VC-1 Standard, p. 158, LUC 1302735).<br><br>Any compliant VC-1 Advanced Profile decoder must be capable of dequantizing the transform coefficients "…the non-zero quantized AC coefficients reconstructed as described in the sections above shall be inverse quantized …". Any compliant VC-1 Advanced Profile decoder must be capable of performing an inverse transform of the dequantized transform coefficient to obtain the "decoded error estimate" of the Puri '878 Patent. "After reconstruction of the transform coefficients, the resulting 8 x 8 blocks shall be processed by a separable two-dimensional inverse transform of size 8 by 8 that is in accordance with Annex A." (VC-1 Standard, p. 136, LUC 1302713). "The inverse transform is similar, but not identical, to an IDCT." (VC-1 Standard, p. 417, LUC 1302994).<br><br>Like the Puri '878 Patent, the inverse transform is performed on data organized as a field or a frame, and then converted from field blocks to macroblocks, or from frame blocks to macroblocks. "In addition, the residual after motion |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | compensation may be coded in frame transform mode or field transform mode […] More specifically, the luma component of the residual data values shall be re-arranged according to fields if it is coded in field transform mode and shall remain unchanged if it is coded in frame transform mode." (VC-1 Standard, p. 297, LUC 1302874). In sum, any compliant VC-1 Advanced Profile decoder must be capable of performing the function of this claim element of the Puri '878 Patent.

The Vista VC-1 Decoder source code contains functions and routines that, taken as a whole, perform the function of "producing a decoded estimate error signal" as defined by the Court.

The Vista VC-1 Decoder source code contains functions and routines that perform demultiplexing and VLC-decoding of a compressed video bit stream to produce quantized transform coefficients, followed by sorting of the decoded transform coefficients into an array using one of several predefined zig zag scanning orders and dequantizing of the transform coefficients. These functions and routines include DecodeInverseInterBlockQuantize16 [CCMS_0062597-CCMS_0062603]. A list of additional related routines and functions are contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also contains functions and routines that perform an Inverse DCT-like transform of the dequantized transform coefficient to obtain a motion-compensated estimate error signal. For example, inverse transform routines are called, for example, in functions DecodePMB [CCMS_0064218-CCMS_0064228] and DecodeBMB [CCMS_0064377-CCMS_0064390]. The inverse transform routines consistently have the mnemonic IDCT in their name. A list of functions and routines that perform an Inverse DCT-like transform of the dequantized transform coefficient to obtain a motion-compensated estimate error signal are contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

The Vista VC-1 Decoder source code also contains functions and routines that perform block unformatting, dependent on the field/frame transform information included in the compressed bitstream for each macroblock. For example, the field/frame transform coding type information contained in m_chFieldDctMode determines whether the routine |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | AddErrorFrameInterlaceV2 or the routine AddErrorFieldInterlaceV2 is called in function decodePInterlaceV2 [CCMS_0063266-CCMS_0063273]. A list of additional functions and routines that perform block unformatting, dependent on the field/frame transform information included in the compressed bitstream for each macroblock are contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

Based on these software routines, a computer with the Vista VC-1 Decoder installed contains structure that performs the claimed function of "producing a decoded estimate error signal" in the same way as the corresponding structure identified by the Court:  (as shown in Figs. 2, 7,12, 13, and 14 and as described at col.14 lines 5-68, at col. 19 lines 19-38, and at col. 24 line 47 to col. 25 line 25): circuit 54; circuit 64 (see Fig. 14 for internal circuitry); circuit 66 (see Fig. 13 for internal circuitry); circuit 72; and circuit 72A (see Fig. 7 for internal circuitry); and all interconnections between these elements.  That is, a computer with the Vista VC-1 Decoder installed has structure capable of producing properly formatted prediction error blocks by variable length decoding quantized transform coefficients, performing an inverse zig-zag scan, dequantizing the coefficients, inverse transforming the coefficients, and performing reformatting so that the field/frame structure of the error block matches that of the predicted block.

Any minor differences between the ways in which the Vista VC-1 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Vista VC-1 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing a decoded estimate error signal."  Both structures achieve the result of producing a block of decoded prediction error information.

Therefore, a computer with the Vista VC-1 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court.  Even if the Vista VC-1 Decoder structure identified above somehow performs a |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way.  Therefore, the Vista VC-1 Decoder also meets the limitations of this means-plus-function element under the doctrine of equivalents. |
| a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal. | A computer with the Vista VC-1 Decoder installed is capable of "producing a decoded video signal" and therefore performs the function of this claim element of the Puri '878 Patent, as construed by the Court. In fact, any compliant VC-1 Advanced Profile decoder must be capable of performing this function, as mandated by the VC-1 Standard.

Any compliant VC-1 Advanced Profile decoder will also contain structure that is at least equivalent to summing element 74 of the Puri '878 Patent. This is shown, for example, in Figure 59 of the VC-1 Standard; a summing element adds an 8x8 block of motion-compensated prediction values and 8x8 block of prediction error values to generated a reconstructed block. The summing element is also shown in Figure 4 of the VC-1 Standard. Any compliant VC-1 Advanced Profile decoder must therefore be capable of performing the function of this claim element of the Puri '878 Patent.

The Vista VC-1 Decoder source code contains functions and routines that perform the function of "producing a decoded video signal" as defined by the Court.  Those functions and routines add motion-compensated prediction values and prediction error values to generated reconstructed pixel values have the mnemonic AddError in their name. A list of additional functions and routines that add motion-compensated prediction values and prediction error values to generate reconstructed pixel values is contained in Appendix E to the December 14, 2007 Expert Report of Professor Bernd Girod.

Based on these software routines, a computer with the Vista VC-1 Decoder installed contains structure that performs the claimed function of "producing a decoded video signal" in the same way as the corresponding structure identified by the Court:  (as shown in Fig. 2 and as described at col. 14 lines 50-68): summing element 74 and including all inputs and outputs of this element.  That is, a computer with the Vista VC-1 Decoder installed has structure capable of combining prediction error blocks with predicted blocks to generate decoded blocks of the video, thereby reconstructing the decoded video signal on a block by block basis. |

| U.S. Patent No. 5,227,878 ("Puri") | Accused Products |
|---|---|
| | Any minor differences between the ways in which the Vista VC-1 Decoder and the corresponding structure identified by the Court perform the claimed function are insubstantial.

Based on the aforementioned software routines, a computer with the Vista VC-1 Decoder installed contains structure that reaches the same result as the corresponding structure identified by the Court for performing the claimed function of "producing a decoded video signal." Both structures achieve the result of producing a block of decoded video signal.

Therefore, a computer with the Vista VC-1 Decoder installed meets the limitations of this means-plus-function claim element literally since it performs the same function ("producing a decoded video signal") using structure that is equivalent to the corresponding structure of the Puri '878 Patent identified by the Court. Even if the Vista VC-1 Decoder structure identified above somehow performs a function different than the function identified by the Court for this claim element, the functions do not differ in any substantial way. Accordingly, a computer with the Vista VC-1 Decoder installed infringes claim 15 of the Puri '878 Patent either literally or under the doctrine of equivalents. |

24.     A more detailed discussion of the operation of the elements of the Vista MPEG-2 Decoder, Xbox 360 MPEG-2 Decoder, and WMP-11/VC-1 Decoder that perform the method of claims 13 and 15 of the Puri '878 can be found in the December 14, 2007 expert report of Professor Bernd Girod.

### C.     Validity Of The Asserted Claims Of The Puri '878 Patent

25.     Microsoft contends that claims 13 and 15 of the Puri '878 Patent are rendered obvious by the prior art.  As an initial matter, Microsoft must prove by clear-and-convincing evidence that each of the references, disclosures, and alleged prior inventions upon which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extentMicrosoft can carry their burden on this issue, the asserted claims are not invalid in view of the art cited by Microsoft.

26.     MPT's validity positions are set forth in detail in the January 4, 2008 expert report of Professor Bernd Girod.  In summary, no prior art relied upon by Microsoft discloses motion

compensated interframe interpolation of pixel intensity information. Furthermore, none of the art cited by Microsoft, alone or in combination, renders obvious to one of ordinary skill in the art the inventions of claims 13 and 15 of the Puri '878 Patent.

27. A person of ordinary skill in the art of video compression would have had the equivalent of a Bachelor of Science degree in electrical engineering or a related field and 2 years experience working in the area of video compression systems.

28. Microsoft relies on U.S. Patent No. 5,091,782 ("Krause '782 Patent"). The Krause '782 Patent describes a hybrid coding system for interlaced video signals. With regard to claim 13, the system of the Krause '782 Patent does not use motion vector prediction, does not adaptively switch between framed-based and field-based motion compensation, and does not use both frame motion vectors and field motion vectors. With regard to claim 15, The Krause '782 Patent does not disclose "frame motion vectors and field motion vectors." The Krause '782 Patent also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal." Moreover, the Patent Office considered the Krause '782 Patent and determined that both claim 13 and claim 15 were patentable over its teachings.

29. Microsoft relies on Staffan Ericsson, "Fixed And Adaptive Predictors For Hybrid Predictive/Transform Coding" ("Ericsson 1985 Paper"). The Ericsson 1985 Paper (LUC 1047117-1047128) describes a comparative study simulating four different techniques for interframe prediction. The Ericsson 1985 Paper does not disclose adaptive switching between frame-based and field-based motion compensated prediction modes. Furthermore, the Ericsson 1985 Paper fails to disclose several elements of Puri '878 Patent claim 13, such as a means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream" as construed by the Court. Nor does the Ericsson 1985 Paper disclose any circuitry or structure identical or equivalent to that

required by the Court's construction.  The Ericsson 1985 Paper also fails to disclose several elements of Puri '878 Patent claim 15.  The Ericsson 1985 Paper does not disclose any "means responsive to frame motion vectors and field motion vectors" or any means that performs the function of "producing an adaptive motion compensated estimate of a decoded video signal" as construed by the Court.  Nor does the Ericsson 1985 Paper disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

30.     Microsoft relies on U.S. Patent No. 5,093,720 ("the Krause '720 Patent").  The Krause '720 Patent describes a motion estimation and compensation system for interlaced video signals.  The Krause '720 Patent fails to disclose several elements of Puri '878 Patent claim 13.  For example, the Krause '720 Patent fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream."  Nor does the Krause '720 Patent disclose any circuitry or structure identical or equivalent to that required by the Court's construction.  The Krause '720 Patent fails to disclose several elements of Puri '878 Patent claim 15.  For example, the Krause '720 Patent does not disclose "frame motion vectors and field motion vectors."  The Krause '720 Patent also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal."  Nor does the Krause '720 Patent disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

31.     Microsoft relies on DigiCipher HDTV System Description ("DigiCipher Description").  First, the inventors of the Puri '878 Patent conceived of their invention before August 22, 1991, when Digital Instruments Corporation allegedly proposed the DigiCipher Description to the FCC.  Second, the DigiCipher Description does not qualify as prior art.  A reference qualifies as a printed publication  only if it was actually disseminated or otherwise accessible so that interested persons of ordinary skill in the art could locate it through the exercise of reasonable diligence.  There

is no evidence that establishes that the DigiCipher Description was publicly available before the November 15, 1991 filing date of the Puri '878 Patent. Even if DigiCipher qualifies as prior art, the system of the DigiCipher Description does not use motion vector prediction, does not adaptively switch between framed-based and field-based motion compensation, and does not use both frame motion vectors and field motion vectors and thus fails to disclose several elements of Puri '878 Patent claim 13. Nor does the DigiCipher Description disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The DigiCipher Description also fails to disclose several elements of Puri '878 Patent claim 15. For example, the DigiCipher Description does not disclose "frame motion vectors and field motion vectors." The DigiCipher Description also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal." Nor does the DigiCipher Description disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

32. Microsoft relies on the MPEG 91/131 Document. The MPEG 91/131 Document appears to be a document prepared by researchers at Columbia University in connection with the MPEG-2 standardization process. The inventors of the Puri '878 Patent conceived of their invention before August 1991, when Columbia University allegedly presented the MPEG 91/131 Document at an MPEG-2 meeting. There is no evidence that the MPEG 91/131 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent. Moreover, the MPEG 91/131 Document is at best cumulative of art that was considered by the Patent Office during the prosecution of the Puri '878 Patent. The MPEG 91/131 Document is a four-paragraph document commenting on aspects of a hierarchical pyramidal coding system and referring to intraframe compression of error information either separately or jointly. The MPEG 91/131 Document does not use motion vector prediction, does not adaptively switch between framed-based

and field-based motion compensation types, does not use both frame motion vectors and field motion vectors and fails to disclose the functions or required structures of claims 13 and 15.

33. Microsoft relies on the MPEG 91/014 Document. The inventors of the Puri '878 Patent conceived of their invention before May 1991, when Columbia University allegedly presented the MPEG 91/014 Document at an MPEG-2 meeting. And there is no evidence that the MPEG 91/014 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent. The MPEG 91/014 Document is a two-page document commenting vaguely on aspects of field-based video coding discussed in previous submissions by the same authors. The MPEG 91/014 Document appears to refer to interframe predictive coding where the video signal is processed as fields (i.e., as succession of field pictures). The MPEG 91/014 Document does not use motion vector prediction, does not adaptively switch between framed-based and field-based motion compensation types, does not use both frame motion vectors and field motion vectors and fails to disclose the functions or required structures of claims 13 and 15.

34. Microsoft relies on a paper by Marzio Barbero, "Digital Coding Of HDTV Based On Discrete Cosine Transform" ("Barbero 1990 Paper"). The Barbero 1990 Paper describes a hybrid coding system for HDTV video signals. The system of the Barbero 1990 Paper does not use motion compensation, frame or field motion vectors, or motion vector prediction. It does not adaptively switch between framed-based and field-based motion compensation; nor does it adaptively switch between frame-based and field-based transform coding of prediction error. The Barbero 1990 Paper thus fails to disclose several elements of Puri '878 Patent claim 13. Nor does the Barbero 1990 Paper disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The Barbero 1990 Paper also fails to disclose several elements of Puri '878 Patent claim 15. For example, the Barbero 1990 Paper does not disclose "frame motion vectors and field motion vectors." The Barbero 1990 Paper also fails to disclose any means that is "responsive to a

1  motion compensation type" and performs the function of "producing an adaptive motion

2  compensated estimate of a decoded video signal." Nor does the Barbero 1990 Paper disclose any

3  circuitry or structure identical or equivalent to that required by the Court's construction.

4      35.    Microsoft relies on a paper by G. Barbieri, "A Modular And Flexible Video Codec

5  Architecture For Application To TV and HDTV" ("Barbieri 1989 Paper"). The Barbieri 1989 Paper

6  fails to disclose several elements of Puri '878 Patent claim 13. For example, the Barbieri 1989 Paper

7  discloses no "motion compensation type signal." The Barbieri 1989 Paper also fails to disclose any

8  means that performs the function of "selectively and adaptively performing motion compensated

9  decoding of frames of the compressed digital video bit stream and fields of the compressed video bit

10  stream." For example, the Barbieri 1989 Paper does not disclose changing between two or more

11  options in response to a motion compensation type signal, decoding video using data representing

12  motion vectors, or changing between frame-based and field-based motion-compensated prediction

13  modes. Nor does the Barbieri 1989 Paper disclose any circuitry or structure identical or equivalent

14  to that required by the Court's construction. The Barbieri 1989 Paper fails to disclose several

15  elements of Puri '878 Patent claim 15. For example, the Barbieri 1989 Paper does not disclose

16  "frame motion vectors and field motion vectors." The Barbieri 1989 Paper also fails to disclose any

17  means that is "responsive to a motion compensation type" that performs the function of "producing

18  an adaptive motion compensated estimate of a decoded video signal." Nor does the Barbieri 1989

19  Paper disclose any circuitry or structure identical or equivalent to that required by the Court's

20  construction.

21      36.    Microsoft relies on U.S. Patent No. 5,006,929 ("Barbero '929 Patent"). The Barbero

22  '929 Patent describes a method of compressing motion vector information wherein motion vectors

23  for individual blocks are differentially coded relative to a global motion vector corresponding to the

24  entire frame (or some collection of blocks). (col. 2:36-52). The Barbero '929 Patent describes no

25  details of any motion compensation method. The system of the Barbero '929 Patent does not

adaptively switch between framed-based and field-based motion compensation types, and does not use both frame motion vectors and field motion vectors. Nor does the system of the Barbero '929 Patent adaptively switch between frame-based and field-based transform coding of prediction error. The Barbero '929 Patent does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

37. Microsoft relies on U.S. Patent No. 4,710,810 ("Koga '810 Patent"). The Koga '810 Patent describes a motion compensated predictive coding system that does not employ transform coding of prediction error. The system of the Koga '810 Patent does not use multiple motion compensation types, does not adaptively switch between framed-based and field-based motion compensation types, and does not use both frame motion vectors and field motion vectors. Nor does the system of the Koga '810 Patent adaptively switch between frame-based and field-based transform coding of prediction error. The Koga '810 Patent does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

38. Microsoft relies on the August 1991 Draft MPEG-1 Standard. The August 1991 Draft MPEG-1 Standard was a preliminary version of the MPEG-1 Standard, which was formally published in 1993. The August 1991 Draft MPEG-1 Standard does not adaptively switch between framed-based and field-based motion compensation types, and does not use both frame motion vectors and field motion vectors. Nor does it switch between frame-based and field-based transform coding of prediction error. The August 1991 Draft MPEG-1 Standard does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

39. Microsoft relies on a paper by Atul Puri et. al., "Interframe Coding With Variable Block-Size Motion Compensation" ("Puri 1987 Paper"). The Puri 1987 Paper "compares several algorithms for motion-compensated interframe coding when either a fixed block-size, or a variable block-size block-matching technique is employed for motion estimation." Motion compensation can be performed either on 8x8 blocks or on 4x4 blocks. The paper does not consider interlaced video

signals, and motion compensation is therefore always frame-based. The system of the Puri 1987 Paper does not adaptively switch between framed-based and field-based motion compensation types, and does not use both frame motion vectors and field motion vectors. Nor does the system of the Puri 1987 Paper adaptively switch between frame-based and field-based transform coding of prediction error. The Puri 1987 Paper does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

40. Microsoft relies on a paper by Atul Puri et. al., "Adaptive Schemes For Motion Compensated Coding" ("Puri 1988 Paper"). The Puri 1988 Paper proposes "several variations on the popular motion-compensated interframe block-coding scheme." "Three schemes are described in this paper: (1) adaptive block-size motion compensation and coding, (2) multiple-transform coding, and (3) DCT and cluster (pel-domain) hybrid coding." The paper does not consider interlaced video signals, and motion compensation is therefore always frame-based. The system of the Puri 1988 Paper does not adaptively switch between framed-based and field-based motion compensation types, and does not use both frame motion vectors and field motion vectors. Nor does the system of the Puri 1988 Paper adaptively switch between frame-based and field-based transform coding of prediction error. The Puri 1988 Paper does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

41. Microsoft relies on U.S. Patent No. 5,428,693 ("Murakami '693 Patent"). The Murakami '693 Patent does not qualify as prior art. The inventors of the Puri '878 Patent conceived of their invention by spring 1991. The Murakami '693 Patent fails to disclose several elements of Puri '878 Patent claim 13. For example, the Murakami '693 Patent discloses no "motion compensation type signal." The Murakami '693 Patent also fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." For example, the Murakami '693 Patent does not disclose changing between two or more options in

response to a motion compensation type signal or changing between frame-based and field-based motion-compensated prediction modes.  Nor does the Murakami '693 Patent disclose any circuitry or structure identical or equivalent to that required by the Court's construction.  The Murakami '693 Patent fails to disclose several elements of Puri '878 Patent claim 15.  For example, the Murakami '693 Patent does not disclose "frame motion vectors and field motion vectors."  The Murakami '693 Patent also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal."  Nor does the Murakami '693 Patent disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

42.     Microsoft relies on U.S. Patent No. 5,539,466 ("Igarashi '466 Patent").  The Igarashi '466 Patent does not qualify as prior art.  The inventors of the Puri '878 Patent conceived of their invention by spring 1991.  The Igarashi '466 Patent also fails to disclose the elements of Puri '878 Patent claims 13 and 15.  For example, the Igarashi '466 Patent discloses no circuitry or structure identical or equivalent to that required by the Court's construction.

43.     Microsoft relies on the MPEG 91/214 Document.  The MPEG 91/214 Document was purportedly prepared by KDD in connection with the MPEG-2 standardization process.  The MPEG 91/214 Document does not qualify as prior art because the inventors of the Puri '878 Patent conceived of their invention well before October 31, 1991, when KDD allegedly proposed the MPEG 91/214 Document.  In addition, there is no evidence that the MPEG 91/214 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent.  The MPEG 91/214 Document fails to disclose the elements of Puri '878 Patent claim 13.  For example, the MPEG 91/214 Document discloses no circuitry or structure identical or equivalent to that required by the Court's construction.  The MPEG 91/214 Document fails to disclose the elements of

Puri '878 Patent claim 15.  For example, the MPEG 91/214 Document fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

44.    Microsoft relies on the MPEG 91/039 Document.  The MPEG 91/039 Document was purportedly prepared by Columbia University in connection with the MPEG-2 standardization process. But the MPEG 91/039 Document is not prior art to the Puri '878 Patent because the inventors of the Puri '878 Patent conceived of their invention well before November 1991, when Columbia University allegedly proposed the MPEG 91/039 Document.  Also, there is no evidence that the MPEG 91/039 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent.  The MPEG 91/039 Document also fails to disclose several elements of Puri '878 Patent claim 13.  For example, the MPEG 91/039 Document fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream."  The MPEG 91/039 Document proposes field-based prediction for compression of interlaced video and does not disclose changing between frame-based and field-based motion-compensated prediction modes.  Nor does the MPEG 91/039 Document disclose any circuitry or structure identical or equivalent to that required by the Court's construction.  The MPEG 91/039 Document fails to disclose several elements of Puri '878 Patent claim 15.  For example, the MPEG 91/039 Document does not disclose "frame motion vectors and field motion vectors."  The MPEG 91/039 Document also fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

45.    Microsoft relies on the MPEG 91/033 Document.  The MPEG 91/033 Document was purportedly prepared by Sony in connection with the MPEG-2 standardization process. But the MPEG 91/033 Document is not prior art to the Puri '878 Patent because the inventors of the Puri '878 Patent conceived of their invention well before November 1991, when Columbia University

1  allegedly proposed the MPEG 91/033 Document. Also, there is no evidence that the MPEG 91/033

2  Document was actually presented in public, disseminated to the public, or otherwise made accessible

3  to interested members of the public before the invention date, or even the filing date, of the Puri '878

4  Patent. The MPEG 91/033 Document also fails to disclose several elements of Puri '878 Patent

5  claim 13. For example, the MPEG 91/033 Document fails to disclose any means that performs the

6  function of "selectively and adaptively performing motion compensated decoding of frames of the

7  compressed digital video bit stream and fields of the compressed video bit stream." The MPEG

8  91/033 Document proposes field-based prediction for compression of interlaced video and does not

9  disclose changing between frame-based and field-based motion-compensated prediction modes. Nor

10  does the MPEG 91/033 Document disclose any circuitry or structure identical or equivalent to that

11  required by the Court's construction. The MPEG 91/033 Document fails to disclose several

12  elements of Puri '878 Patent claim 15. For example, the MPEG 91/033 Document does not disclose

13  "frame motion vectors and field motion vectors." The MPEG 91/033 Document also fails to

14  disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

15  

16    46. Microsoft relies on the MPEG 91/025 Document. The MPEG 91/025 Document was

17  purportedly prepared by Sony in connection with the MPEG-2 standardization process. But the

18  MPEG 91/025 Document is not prior art to the Puri '878 Patent because the inventors of the Puri

19  '878 Patent conceived of their invention well before November 1991, when Columbia University

20  allegedly proposed the MPEG 91/025 Document. Also, there is no evidence that the MPEG 91/025

21  Document was actually presented in public, disseminated to the public, or otherwise made accessible

22  to interested members of the public before the invention date, or even the filing date, of the Puri '878

23  Patent. The MPEG 91/025 Document also fails to disclose several elements of Puri '878 Patent

24  claim 13. For example, the MPEG 91/025 Document fails to disclose any means that performs the

25  function of "selectively and adaptively performing motion compensated decoding of frames of the

26  compressed digital video bit stream and fields of the compressed video bit stream." The MPEG

91/025 Document proposes field-based prediction for compression of interlaced video and does not disclose changing between frame-based and field-based motion-compensated prediction modes. Nor does the MPEG 91/025 Document disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The MPEG 91/025 Document fails to disclose several elements of Puri '878 Patent claim 15. For example, the MPEG 91/025 Document does not disclose "frame motion vectors and field motion vectors." The MPEG 91/025 Document also fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

47. Microsoft relies on the MPEG 91/217 Document. The MPEG 91/217 Document was purportedly prepared by Matsushita in connection with the MPEG-2 standardization process. But the MPEG 91/217 Document is not prior art to the Puri '878 Patent because the inventors of the Puri '878 Patent conceived of their invention well before November 1991, when Columbia University allegedly proposed the MPEG 91/217 Document. Also, there is no evidence that the MPEG 91/217 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent. The MPEG 91/217 Document also fails to disclose several elements of Puri '878 Patent claim 13. For example, the MPEG 91/217 Document fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." The MPEG 91/217 Document proposes field-based prediction for compression of interlaced video and does not disclose changing between frame-based and field-based motion-compensated prediction modes. Nor does the MPEG 91/217 Document disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The MPEG 91/217 Document fails to disclose several elements of Puri '878 Patent claim 15. For example, the MPEG 91/217 Document does not disclose "frame motion vectors and field motion vectors." The MPEG 91/217 Document also fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

48.     Microsoft relies on the MPEG 91/246 Document. The MPEG 91/246 Document was purportedly prepared by KDD in connection with the MPEG-2 standardization process. But the MPEG 91/246 Document is not prior art to the Puri '878 Patent because the inventors of the Puri '878 Patent conceived of their invention well before November 1991, when Columbia University allegedly proposed the MPEG 91/246 Document. Also, there is no evidence that the MPEG 91/246 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing date, of the Puri '878 Patent. The MPEG 91/246 Document also fails to disclose several elements of Puri '878 Patent claim 13. For example, the MPEG 91/246 Document fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." The MPEG 91/246 Document proposes field-based prediction for compression of interlaced video and does not disclose changing between frame-based and field-based motion-compensated prediction modes. Nor does the MPEG 91/246 Document disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The MPEG 91/246 Document fails to disclose several elements of Puri '878 Patent claim 15. For example, the MPEG 91/246 Document does not disclose "frame motion vectors and field motion vectors." The MPEG 91/246 Document also fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

49.     Microsoft relies on the MPEG 91/011 Document. The MPEG 91/011 Document was purportedly prepared by Katayama et al. in connection with the MPEG-2 standardization process. But the MPEG 91/011 Document is not prior art to the Puri '878 Patent because the inventors of the Puri '878 Patent conceived of their invention well before November 1991, when Columbia University allegedly proposed the MPEG 91/011 Document. Also, there is no evidence that the MPEG 91/011 Document was actually presented in public, disseminated to the public, or otherwise made accessible to interested members of the public before the invention date, or even the filing

date, of the Puri '878 Patent. The MPEG 91/011 Document also fails to disclose several elements of Puri '878 Patent claim 13. For example, the MPEG 91/011 Document fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." The MPEG 91/011 Document proposes field-based prediction for compression of interlaced video and does not disclose changing between frame-based and field-based motion-compensated prediction modes. Nor does the MPEG 91/011 Document disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The MPEG 91/011 Document fails to disclose several elements of Puri '878 Patent claim 15. For example, the MPEG 91/011 Document does not disclose "frame motion vectors and field motion vectors." The MPEG 91/011 Document also fails to disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

50. Microsoft relies on U.S. Patent No. 4,546,386 ("Matsumoto '386 Patent"). The Matsumoto '386 Patent describes an interframe DPCM video coder that does not employ transform coding of prediction error. The system of the Matsumoto '386 Patent does not adaptively switch between framed-based and field-based motion compensated prediction. The system of the Matsumoto '386 Patent also does not disclose decoding of motion vector differentials, nor does it disclose adaptive switching between frame-based and field-based transform coding of prediction error. The Matsumoto '386 Patent therefore fails to disclose several elements of Puri '878 Patent claim 13. Nor does the Matsumoto '386 Patent disclose any circuitry or structure identical or equivalent to that required by the Court's construction. The Matsumoto '386 Patent fails to disclose several elements of Puri '878 Patent claim 15. For example, the Matsumoto '386 Patent does not disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

51. Microsoft relies on Unpublished Japanese Patent Application S58-137379. Patent Application S58-137379 does not qualify as prior art. The inventors of the Puri '878 Patent

conceived of their invention by spring 1991. Patent Application S58-137379 fails to disclose several elements of Puri '878 Patent claim 13. For example, Patent Application S58-137379 discloses no "motion compensation type signal." Patent Application S58-137379 also fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." Nor does the Patent Application S58-137379 disclose any circuitry or structure identical or equivalent to that required by the Court's construction. Patent Application S58-137379 fails to disclose several elements of Puri '878 Patent claim 15. Patent Application S58-137379 also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal." Nor does Patent Application S58-137379 disclose any circuitry or structure identical or equivalent to that required by the Court's construction.

52. Microsoft relies on Unpublished Japanese Patent Application S59-128881. Patent Application S59-128881 does not qualify as prior art. The inventors of the Puri '878 Patent conceived of their invention by spring 1991. Patent Application S59-128881 fails to disclose several elements of Puri '878 Patent claim 13. For example, Patent Application S59-128881 discloses no "motion compensation type signal." Patent Application S59-128881 also fails to disclose any means that performs the function of "selectively and adaptively performing motion compensated decoding of frames of the compressed digital video bit stream and fields of the compressed video bit stream." Nor does the Patent Application S59-128881 disclose any circuitry or structure identical or equivalent to that required by the Court's construction. Patent Application S59-128881 fails to disclose several elements of Puri '878 Patent claim 15. Patent Application S59-128881 also fails to disclose any means that is "responsive to a motion compensation type" and performs the function of "producing an adaptive motion compensated estimate of a decoded video signal." Nor does Patent

1   Application S59-128881 disclose any circuitry or structure identical or equivalent to that required by

2   the Court's construction.

3       53. The fact that a particular video coding technique, in this case motion compensated

4   interpolation, could be combined with a variety of other techniques provides no reason to combine

5   any particular subset of those techniques, *let al*one a subset that embodies the limitations of Haskell

6   Claim 12.  A large number of beneficial video coding techniques were available at the time of the

7   invention of Claim 12 of the Haskell '226 patent.  Any attempt to form all possible combinations of

8   video coding techniques that had been reported as improving compression and/or video quality

9   would have gone far beyond a routine pursuit of a finite number of predictable solutions that would

10  place the invention of Claim 12 within the grasp of a person of ordinary skill in the art.  It would

11  have required more than common sense and knowledge of the prior art for a person of ordinary skill

12  to arrive at the invention of Claim 12.

13      54. The performance of a video decoder critically depends on the way the constituent

14  elements are combined and artfully optimized as a whole.  An efficient video coder cannot simply be

15  built by combining known building blocks. Among other problems, the performance of a certain

16  combination of elements can usually not be readily predicted but requires extended experimentation.

17      55. A person of ordinary skill would also not have been able to predict the performance of

18  the invention of claims 13 and 15 of the Puri '878 Patent.  The invention of claims 13 and 15 of the

19  Puri '878 Patent required extended experimentation and observation of the performance.

20      56. The cited prior art does not contain any teaching of combining such a structure with a

21  structure for adaptively switching between frame-based and field-based transform coding of

22  prediction error, such as the corresponding structure identified by the Court for the second means-

23  plus-function element of Puri '878 Patent Claim 15.  Theoretically, a person skilled in the art could

24  have attempted to form all possible combinations of video coding techniques that had been reported

25  as improving compression and/or video quality, using all possible structures for implementing those

techniques.  However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the inventions of claims 13 and 15 within the grasp of a person of ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the inventions of claims 13 and 15.

57. No interrelated teachings in the prior art would have provided a person of skill in the art with any reason to modify, combine, or supplement the teachings of the prior art to arrive at the inventions of claims 13 and 15.  The general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the inventions of claims 13 and 15 obvious.

58. No design incentives or market forces would have motivated a person of ordinary skill in the art to arrive at the invention of claims 13 and 15 of the Puri '878 Patent.

59. Products that use the invention of claims 13 and 15 of the Puri '878 Patent patent have been highly successful in the marketplace.  The claimed invention is used in numerous video coding standards, including MPEG-2, WMV-9, VC-1, and others.  The invention has contributed to the success of these products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bit streams.  Other video decoding technologies that do not use the claimed invention have not been as commercially successful.

60. Several of Lucent's licensing agreements specifically identify the Puri '878 Patent.  The Puri '878 Patent has been a focal point of negotiations for broader licenses with third parties.

**III.    Damages for Infringement of the Puri '878 Patent**

61.    The following section discusses MPT's assertions of facts regarding the damages it is owed by Microsoft's infringement of the Puri '878 Patent.  For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference the December 19, 2007 expert reports of Dr. Roger Smith and Mr. Wayne Hoeberlein.

62.     Lucent provided Microsoft with notice of its infringement of the Puri '878 Patent by at least May 12, 2003 when Lucent filed a counterclaim alleging that Microsoft infringed the '878 patent in *Microsoft Corp. v. Lucent Technologies, Inc. et al.*, Case No. 03-CV-0699 RMB (LAB). Microsoft was thus aware of its infringement on October 25, 2005, the date the USPTO issued a Certificate of Correction concerning the Puri '878 patent. At the latest, Lucent's re-filing of its infringement case under the Puri '878 patent provided effective notice for damages purposes under 35 U.S.C. § 287 on January 6, 2006, the date of this action.

63.     IBM was, and continues to be, very active in licensing patents and other intellectual property. IBM's patent licensing practices have become guideposts in the information handling industry and have formed the basis for the licensing practices of many other companies in the industry, including Lucent.

64.     IBM's licensing rates have been modified several times, but since the late 1980s they have been set, for information handling devices and systems, at 1% of the licensee's selling price of apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%. This 1% per patent concept has become a generally accepted standard in the industry.

65.     Lucent, headquartered in Murray Hill, New Jersey, is a global supplier of telecommunications technology and equipment. Lucent was formed in 1996 as a spin-off from AT&T and includes the world-renowned Bell Laboratories. Following the spin-off, Lucent became the owner of nearly 25,000 patents. The patents-in-suit are among the many patents resulting from research and development at Bell Laboratories.

66.     To support the pioneering work of Bell Laboratories, Lucent has spent billions of dollars in research and development each year. Lucent has an intellectual property department that acquires, manages and "creates value" from Lucent's broad portfolio of intellectual property. Lucent derives significant revenue from licensing its patents, including the patents-in-suit.

67.     Like IBM, Lucent and its predecessor, AT&T, have engaged in patent licensing in an organized way. This practice has varied to some extent over the years, and at the time of Lucent's formation, IBM's model had been selected. With the exception of some special programs, that practice has continued to the present day. With respect to Lucent's granting of licenses, Lucent generally requires its licensees to provide a royalty free grant back in substantially all patent licenses it grants. It is Lucent's policy to respect the IP rights of others. However, given the strength of Lucent's patent portfolio, it does not often enter into license agreements where it has to make a net payment to another entity.

68.     Microsoft produces and sells, among other things, operating systems and various other software programs that operate with computer systems. Microsoft has engaged in licensing of various intellectual property assets in conjunction with the operation of its businesses. License agreements produced by Microsoft in this action reveal that Microsoft was generally a grantee or, in the case of cross-licenses, the paying party.

69.     While Microsoft has entered into patent license agreements on an ad hoc basis, Microsoft has no standard licensing practice.  The policy currently in effect states that Microsoft will generally license its patents at "fair and reasonable terms" and that royalty rates will "follow industry norms."

70.     Lucent is not a competitor of Microsoft, but rather derives revenue by licensing patents in the field to manufacturers such as Microsoft and Microsoft's customers. Lucent's investment in research and technology, as well as the significant level of invention that emanated from its Bell Laboratories, were well known in the industry.

71.     Microsoft commenced infringing the Puri '878 Patent October 25, 2005 (the date the certificate of correction to the Puri '878 Patent issued) for operating systems that had features that utilized WMV-9/VC-1 video decoding. Microsoft also commenced infringing the Puri '878 Patent on or about November 2005 when it began selling the Xbox 360 video game console with features

that utilize MPEG-2 and WMV-9 video decoding. Microsoft yet again commenced infringing the '878 patent in late 2006 and early 2007 when it began selling the Windows Vista operating system that featured an MPEG-2 video decoder.

72. The *Georgia-Pacific* hypothetical negotiation is assumed to occur in the context of patents that are known to be infringed and valid. Although in real world negotiations the parties typically may compromise on a lesser royalty than would otherwise be applicable due to the possibility that the patents being discussed are either not infringed or invalid, in the hypothetical negotiation, no such discount is appropriate because the patents are assumed to be valid and infringed.

73. At the time of the hypothetical negotiation in or around October 2005, MPT did not exist. But Lucent, the owner of the patents at that time, had an established policy with respect to patent licensing. Specifically, it was Lucent's policy to grant licenses under its patents at rates of 1% of the fair market value of a covered product per patent up to a maximum of 5%. The policy contemplated that the licensee would make a royalty-free grant back of a patent license to Lucent.

74. Lucent would have commenced the hypothetical negotiation with a demand based on its 1% per patent model. Since one patent was involved, the rate would have been 1%. In accordance with Lucent's policy, this rate would have been offered subject to a royalty free license back to Lucent from the licensee at least under patents related to the patent in the grant out. Since the *Georgia-Pacific* methodology supposes only a one-way license, Lucent could be expected to have sought rates greater than 1% per patent. However, since the value of any patents the prospective licensee might have had in its portfolio that would have been of interest to Lucent is not known, a conservative assumption would be that 1% per patent would have been the starting point.

75. By the timeframe of the hypothetical negotiations, Lucent had formulated a licensing program for its MPEG-related patents, including the Puri '878 Patent. That program provided that Lucent's "MPEG essential" video coding patents would be licensed at 0.5% of the selling price of

complete products employing the patents, with a minimum royalty of $1.50 per product. The program also contemplated a five-year term license.

76.    In addition, Lucent licensed MPEG-related patents to several licensees. Although many of those agreements were cross-licenses not limited to the MPEG patents at issue here, they demonstrate demand for Lucent's MPEG patents.

77.    Microsoft has made substantial royalty payments for patent licenses. For example, Microsoft has agreed to pay substantial royalties, including running royalties, for rights under the patents of others.[2]

78.    In May of 1996, the MPEG LA consortium was formed to launch a program to license a pool of patents relating to the MPEG-2 standard. In 1997, MPEG LA began to license its MPEG-2 patent pool at a royalty rate, at the time, of $4.00 for each decoder consumer product using MPEG-2. Before the United States Department of Justice and the Federal Trade Commission, MPEG LA's CEO, Baryn Futa, stated that "[s]ince each patent is essential, the royalty rate and thus the value is the same whether a licensee uses one or more patents." Microsoft eventually licensed MPEG-2 technology from MPEG LA. The licensing history of Microsoft confirms that the rates under Lucent's MPEG program would not have been objectionable to Microsoft as a willing licensee.

79.    Video coding is one of the features that Microsoft has advertised to encourage purchases of, and upgrades to, its new Windows operating systems, including Windows Vista. The use by its customers of the Windows operating systems that contain the software relevant to the Lucent patents under consideration also has an effect of promoting sales of other Microsoft products.

---

[2] For specific details regarding patent license agreements entered into by Microsoft, see the December 19, 2007 expert report of Roger Smith.

Without operating systems including features such as Windows Media Player, Microsoft could lose part of the desktop and notebook computer system market. Microsoft would lose revenue not only from its Windows business, but the many software products that run on the Windows operating systems, such as Microsoft Office and Microsoft Works. Moreover, features of Microsoft Windows that provide DVD playback functionality, such as Windows Media Center Edition, help drive sales of other Microsoft products such as the Xbox 360.

80. Microsoft operating systems containing features and functionalities relevant to the patent-in-suit are widely sold. These features and functionalities are now considered "basic" to and an "important" feature of the operating system. Microsoft's sales of the Xbox 360 video game console also has the effect of promoting derivative or convoyed sales of other Microsoft products as well as the payment of royalties to Microsoft. For example, Microsoft makes money by selling games for the Xbox 360 video game console. In addition, Microsoft receives royalties from third-party game publishers under licenses whereby Microsoft permits them to design and sell their own games for the Xbox 360 video game console. Although the Xbox 360 video game console was released in November 2005, Microsoft's financial documents suggest that Microsoft has previously received many tens of millions of dollars from the sale of games for the Xbox 360 video game console. Without the sale of the Xbox 360 video game console, Microsoft would lose revenue from the sale of games for the Xbox 360 video game console.

81. Moreover, Microsoft makes money from selling more than a dozen accessories for the Xbox 360 video game console, including AV packs, controllers, memory units, hard drives and faceplates. Again, without the sale of the Xbox 360 video game console, Microsoft would stand to lose revenue from the sales of peripherals and accessories for the Xbox 360 video game console and revenue from subscription plans such as Xbox Live. In addition, Microsoft has noted that Xbox 360 drives Windows XP Media Center Edition adoption.

82.     Products using the technology disclosed in the Puri '878 Patent enjoy great commercial success, due in significant part to the existence of the features enabled by use of the patent.  The DVD playback capabilities of versions of Microsoft Windows having this capability, including Vista, were heavily promoted by Microsoft.  For example, Microsoft promoted the fact that Windows Media Player, which provided DVD playback capabilities, was a feature of Windows.  Windows Media Player has been a popular download, with Windows Media Player having been downloaded over 320 million times.  Microsoft similarly promoted another feature of Windows that provided DVD playback capabilities, Windows Media Center.

83.     Windows operating systems are extremely profitable for Microsoft.  Moreover, the Xbox 360 video game console enjoys great commercial success and popularity, due in significant part to the existence of the features enabled by use of the '878 Puri '878 Patent.  These sales facilitated the extremely high profits and sales figures for Windows Vista, Windows Media Player, and Xbox 360.[3]  Furthermore, Microsoft introduced the DVD playback feature into Vista and Xbox 360 in response to consumer and competitive demand.

84.     In order to be commercially successful, Microsoft's products needed to comply with the MPEG-2 standard and incorporate the Puri '878 Patent.  In particular, Microsoft regards MPEG-2 compliant features such as DVD playback as commercially important, as evident, for example, from the product offerings of Microsoft's customers and original equipment manufacturers, such as Dell and Gateway.  Microsoft has also promoted the importance of DVD playback and MPEG-2 capability, and has acknowledged both that it was important to have a DVD software solution operational with Windows systems and that there is no commercial alternative to MPEG-2 today.

---

[3] Exact sales and profitability numbers are included in the expert reports of Roger Smith and Wayne Hoeberlein.

85. Microsoft similarly regards WMV-9 as commercially important, and has incorporated WMV-9 capabilities into its products.

86. With respect to the Puri '878 Patent, MPT is entitled to damages adequate to compensate for Microsoft's infringement, but in no event less than a reasonable royalty. The appropriate reasonable royalty for Microsoft's infringement of the Puri '878 Patent, the bases therefor, and the calculations of that royalty are set forth in further detail in the expert reports of Roger Smith and Wayne Hoeberlein (along with any additional supplemental reports). Specifically, applying the relevant Georgia-Pacific factors in light of applicable licensing practices and policies, and in light of the documents and licenses produced by the parties in this action, the reasonable royalty adequate to compensate for Microsoft's infringement of the Puri '878 Patent should be calculated as a 0.5% royalty based on the selling price of the infringing system or $1.50 per unit, whichever is greater (based in particular on Lucent's MPEG-related licensing program). Alternatively, in the event that the entire market value rule is deemed to prevent the parties to the hypothetical negotiation from agreeing to their preferred rate and royalty base of the infringing device, the reasonable royalty should instead be calculated simply as a flat per-unit royalty of $1.50 per unit.

87. MPT also seeks an accounting of damages attributable to Microsoft's continuing infringement through and until entry of an injunction enjoining that infringement in this action, including any and all additional infringing products and periods not included in Microsoft's damages-related document productions to date. MPT also seeks pre-judgment and post-judgment interest on all damages and a compulsory ongoing reasonable royalty to be paid by Microsoft if the Court's judgment does not enjoin Microsoft's continued infringement.

88. No commercially acceptable noninfringing alternatives to the invention of Claims 13 and 15 of the Puri '878 patent have been available at any relevant time.

89.     The DigiCipher I codec was not a noninfringing alternative that the defendants could have selected as a "viable" and "adequate substitute" for MPEG-2 codecs in 1996. While the original DigiCipher codec (DigiCipher I) did not employ bidirectional prediction, the codec was later revised to include that functionality in accordance with the MPEG-2 Main Profile (DigiCipher II).

90.     DigiCipher I provided an inferior picture quality when compared to MPEG-2 video at the same bit-rate, largely due to its failure to implement bidirectional prediction. The superior image quality of MPEG-2 video led end users to prefer MPEG-2 over DigiCipher I which, in turn, led content providers to favor the MPEG-2 format. While Microsoft, Dell, and Gateway could theoretically have chosen to provide the DigiCipher I codec rather than an MPEG-2 codec in their products, that choice would have put them at a significant competitive disadvantage relative to their competitors who were providing MPEG-2 decoding capabilities.

91.     For the same reasons, the DigiCipher I codec was not a viable alternative to the WMV-9/VC-1 codec.

92.     Microsoft could not have developed a successful version of the WMV-9/VC-1 codec using a wavelet transform. While wavelet video coding is an active area of research, past attempts to develop wavelet video codecs that outperform DCT-based motion-compensated hybrid codecs have not been successful. No commercial video decoders using a wavelet transform exist today.

93.     MPT did not unreasonably delay in bringing suit against Microsoft from the time it first learned (or should have learned) of the infringement.  Any alleged delay was justified including due to by ongoing efforts by Lucent to reach licensing agreements with the parties and other third-parties, licensing efforts and other litigations involving Lucent's assertion of the patents. Microsoft has suffered no economic, evidentiary, or other prejudice as a result of any alleged delay.

**MICROSOFT'S PATENTS IN SUIT**

94.     Microsoft has accused Lucent of infringing U.S. Patent Nos. 5,438,433 (the Reifman '433 Patent); 5,764,913 (the Jancke '913 Patent); 5,917,499 (the Jancke '499 Patent); 6,565,608 (the

Fein '608 Patent); 5,941,947 (the Brown '947 Patent); 5,838,319 (the Guzak '319 Patent); 5,977,971 (the Guzak '971 Patent); 6,339,794 (the Bolosky '794 Patent); 6,438,217 (the Huna '217 Patent); and 6,412,004 (the Chen '004 Patent).  Microsoft has accused Alcatel-Lucent of infringing U.S. Patent Nos. 5,764,913; 5,838,319; 5,977,971; 6,339,794; 6,412,004; and 6,565,608.

## IV.    The Reifman '433 Patent

95. The following sections discuss Lucent's assertions of facts regarding the teaching of asserted claims 1 and 4 of the Reifman '433 Patent, the invalidity of the asserted claims, and Lucent's non-infringement of those claims.  For a fuller discussion of these topics, Lucent references the expert reports of Dr. Fouad Tobagi and Lucent's Final Invalidity Contentions.

### A.    The Reifman '433 Patent And Asserted Claims

96. The Reifman '433 Patent, entitled "System and Method for Facsimile Cover Page Storage and Use," issued on August 1, 1995, from an application dated March 31, 1994.  The Reifman '433 Patent claims priority to U.S. Application Ser. No. 73,511, filed June 7, 1993.  Microsoft has asserted that Lucent's AnyPath Messaging System ("AnyPath") product infringes claims 1 and 4 of the Reifman '433 Patent.  The purported invention of the Reifman '433 Patent "relates generally to a user interface for an intelligent facsimile machine (IFAX) and, more specifically to a system and method for controlling user interaction with the IFAX."  *See* Col. 1, ll. 10-13.  The asserted claims, however, relate more specifically to the storage and use of facsimile cover pages.  Asserted claims 1 and 4 of the Reifman '433 Patent read as follows:

> 1.  A method in a facsimile machine having a display and a user input device, for storage and use of a facsimile cover page, the method comprising the steps of:
>
> maintaining at least one facsimile cover page in a first storage location continuously accessible by any of a plurality of users of the facsimile machine;
>
> maintaining at least another facsimile cover page in a second storage location accessible by a selected one of said plurality of users, said selected user having a corresponding user identification;

sensing if a user inputs a user identification; and

enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user, said first storage area being continuously enabled for any of said plurality of users and said second storage area being enabled only when said sensed user identification corresponds to said user identification of said selected user identification of said selected user.

4. A method in a facsimile machine having a user input device for the storage and use of a facsimile cover page, the method comprising the steps of:

maintaining at least one facsimile cover page in a first storage location continuously accessible by any of a plurality of users of the facsimile machine;

maintaining at least another facsimile cover page in a second storage location accessible by a selected one of said plurality of users, said selected user having a corresponding user identification;

sensing if a user inputs a user identification;

enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user, said first storage area being continuously enabled for any of said plurality of users and said second storage area being enabled only when said sensed user identification corresponds to said user identification of said selected user identification of said selected user;

sensing a user input on the user input device to select a particular one of said stored cover pages from said first storage location or said second storage location if said user identification data corresponds to said selected one of said plurality of users;

selecting said particular cover page in response to said user input; and

transmitting said particular cover page as a cover page for a facsimile message.

97. The following terms used in claims 1 and 4 of the Reifman '433 Patent have been construed by the Court as follows:

| Reifman '433 Patent Claim Terms | Construction |
|---|---|
| "facsimile machine" (claims 1 and 4) | "an apparatus capable of sending and receiving copies using facsimile protocols established by the International Telegraph and Telephone Consultative Committee (CCITT)" |
| "display" (claims 1 and 4) | "a visual representation of data" |
| "facsimile cover page" (claims 1 and 4) | "a page containing information identifying a facsimile" |
| "first storage location" (claims 1 and 4) | "a memory location within the facsimile machine" |
| "continuously" (claims 1 and 4) | "without interruption" |
| "second storage location" (claims 1 and 4) | "a memory location in the facsimile machine, distinct from the first storage location" |
| "second storage area" (claims 1 and 4) | "a memory location in the facsimile machine, distinct from the first storage location" |
| "cover page for a facsimile message" (claim 4) | "a page containing information identifying a facsimile" |

D.I. 156 at 25-29.

98. All remaining terms used in claims 1 and 4 should be given their ordinary meaning as it would have been understood by one of ordinary skill in the art.

**B.     Invalidity**

99. Claims 1 and 4 of the Reifman '433 Patent are invalid as anticipated by U.S. Patent No. 5,267,047 ("Argenta") and/or WinFax Pro. In addition, claims 1 and 4 of the Reifman '433 Patent are rendered obvious by Argenta in combination with the prior art teachings, including AT&T Fax Attendant System and/or the IBM ImagePlus System (IBM SAA ImagePlus User's Guide). Furthermore, claims 1 and 4 of the Reifman '433 Patent are rendered obvious by WinFax Pro in combination with the prior art teachings, including NetWare 3.11 and/or NetWare 4.0.

**1.     U.S. Patent No. 5,267,047 to Argenta ("Argenta")**

100.    Claims 1 and 4 of the Reifman '433 Patent are invalid as anticipated by Argenta.

101.    The Argenta Patent was filed on April 30, 1991, before the invention(s) claimed in the Reifman '433 Patent, and therefore is prior art to the Reifman '433 Patent under 35 U.S.C. § 102(e)(2).

102.    Argenta teaches an apparatus capable of sending and receiving copies using facsimile protocols established by the CCITT.  *See, e.g.*, Argenta at Col. 2, ll. 35-45; Col. 20, ll. 35-37, 65-67. Therefore, Argenta teaches the facsimile machine of claims 1 and 4 of the Reifman '433 Patent as construed by the Court.

103.    Argenta further teaches storage and use of facsimile cover pages, as claimed in the Reifman '433 Patent:

> It is another object of the invention to provide an improved FAX server subsystem for an image archiving system which provides a plurality of cover sheet images and their associated overlay text which are stored on the DASD in the FAX server, to enable users throughout the image system to use customized cover sheets of their own personal design.

Argenta at Col. 5, ll. 3-9; *see also* Argenta at Col. 7, ll. 25-27.

104.    Argenta further teaches a facsimile machine having a "display" as construed by the Court and a "user input device":

> Step 1008: User Workstation requests FAX Addressee menu from Host (FIG. 12B).  Step 1010: Host sends FAX Addressee menu to User Workstation and records that User Workstation will be sending an output command to the Host to send a copy of MO:DCA Envelope 48 to the FAX Workstation. Step 1012: User Workstation selects the FAX Addressee menu option of using cover sheet 3 currently stored at the FAX Workstation, Cover Sheet C1 (FIG. 12B).

Argenta at Col. 22, ll. 3-12; *see also* Argenta at Col. 14, ll. 3-9 ("the fax workstation includes . . . a display and a keyboard adapter").  Therefore, Argenta teaches the "facsimile machine having a display and a user input device, for storage and use of a facsimile cover page" of claim 1 and the

"facsimile machine having a user input device for the storage and use of a facsimile cover page" of claim 4 of the Reifman '433 Patent.

105. Argenta further teaches continuous storage of a default facsimile cover page in a memory location within a facsimile machine, or Direct Access Storage Device ("DASD"). Argenta at Col. 16, ll. 1-6 ("In accordance with the invention, a plurality of cover sheet images and their associated overlay text are stored on the DASD 308 in the FAX workstation."); *see also* Argenta at Col. 16, ll. 46-48 ("Further, in accordance with the invention, previously stored cover sheet images at the FAX workstation 32 can be accessed from the DASD 308."), at Col. 20, ll. 53-60 (teaching that a default cover sheet can be used). Therefore, Argenta teaches the step of "maintaining at least one facsimile cover page in a first storage location continuously accessible by any of a plurality of users of the facsimile machine" required by claims 1 and 4 of the Reifman '433 Patent.

106. Argenta further teaches enabling users to use "customized cover sheets of their own design" that are stored on the facsimile machine. *See* Argenta at Col. 16, ll. 1-20; *see also* Argenta at Col. 21, ll. 55-58 (teaching that "cover sheets can be selectively accessed and used for individual FAX transmissions or batch mode transmissions"). The Court has construed "second storage location" as "a memory location in the facsimile machine, distinct from the first storage location." One of ordinary skill in the art would know that, when storing two pieces of information simultaneously, they must be stored in two different memory locations. Therefore, Argenta teaches "maintaining at least another facsimile cover page in a second storage location . . ." as required by claims 1 and 4 of the Reifman '433 Patent.

107. Claims 1 and 4 of the Reifman '433 Patent also require that the "at least another facsimile cover page" stored in "a second storage location" be "accessible by a selected one of said plurality of users, said selected users having a corresponding user identification." This requirement is inherently taught by Argenta. In addition, Argenta inherently teaches the remaining steps of the

Reifman '433 Patent: "sensing if a user inputs a user identification" and "enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user, said first storage area being continuously enabled for any of said plurality of users and said second storage area being enabled only when said sensed user identification corresponds to said user identification of said selected user identification of said selected user."

108.   Claim 4 of the Reifman '433 Patent further requires the following steps:

sensing a user input on the user input device to select a particular one of said stored cover pages from said first storage location or said second storage location if said user identification data corresponds to said selected one of said plurality of users;

selecting said particular cover page in response to said user input; and

transmitting said particular cover page as a cover page for a facsimile message.

109.   Argenta teaches enabling a user to access a particular cover page stored on the system and transmit it as a cover page for a facsimile:

Any of the cover sheets can be selectively accessed and used for individual FAX transmissions or batch mode transmission with distribution lists.  In addition, a default cover sheet is also stored in the FAX Workstation to be used in the event that no particular cover sheet is designated in the Data Field 60.

Argenta at Col. 20, ll. 54-60; *see also* Argenta Col. 22, ll. 3-12.

110.   Therefore, Argenta teaches these additional steps required by claim 4.  Alternatively, to the extent the Court might find that these steps are not explicitly taught by Argenta, they are inherently taught.

**2.     IBM ImagePlus**

111.   Claims 1 and 4 of the Reifman '433 Patent are invalid as obvious in light of Argenta and IBM ImagePlus.

112.   IBM ImagePlus teaches the use of "user profiles" that "contains the user ID."  IBM ImagePlus System View at 458.  IBM Image Plus further teaches a user profile that allows the

"sensing" of a user identification, and "[t]he user profile describes to WAF ["Workfolder Application Facility"] the functions available to that user, and allows WAF to restrict user access to queues, document types, and specific functions." *Id.* Therefore, IBM ImagePlus teaches the requirements of claims 1 and 4 that (1) "at least another facsimile cover page" stored in "a second storage location" be "accessible by a selected one of said plurality of users, said selected users having a corresponding user identification," and (2) "sensing if a user inputs a user identification."

113. IBM ImagePlus further teaches providing user identification to enable users access to certain documents stored on the system and to restrict users from access to other documents stored on the system. *See, e.g.*, IBM ImagePlus System View at 458 ("Document profiles identify and describe each type of document and the rules for management and usage of each document type. When new documents are scanned into the system by WAF, they are always assigned a document type. Based on the document type, WAF can make the following types of decisions: . . . [w]hich users can view documents of a particular type"). IBM ImagePlus further teaches that "Queue profiles define valid WAF work queues. Queues are of two types: (1) general queues, which are shared and can be accessed by anyone having access to a given queue class; and (2) user queues, which are specific to and accessible only by a specific user." *Id.* Therefore, IBM ImagePlus teaches the step of "enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user," required by claims 1 and 4 of the Reifman '433 Patent.

114. Furthermore, the IBM ImagePlus system was intended to be used with the inventions taught by Argenta. *See, e.g.*, Argenta at Col. 3, ll. 41-43; Col. 5, ll. 61-63; Col. 14, ll. 28-31. Therefore, the combination of Argenta and the IBM ImagePlus system renders Claims 1 and 4 of the Reifman '433 Patent obvious.

### 3. AT&T Fax Attendant

115. Claims 1 and 4 of the Reifman '433 Patent are invalid as obvious in light of Argenta and AT&T Fax Attendant.

116. AT&T Fax Attendant teaches providing subscribers with user identifications that determine their access and ability to create or modify a cover sheet. AT&T Fax Attendant further teaches that all subscribers, including "Service Administrators," may be provided with a login and password to access the system and that "Service Administrators" are already "subscribers to AUDIX Voice Power/FAX Attendant so that the system can identify them as authorized to make changes." The reference further teaches that subscribers may login (which may include a password) to access the Fax Response Administration menu and create or modify a coversheet (describing the process of logging into AT&T Fax Attendant). The reference also teaches providing subscribers with a log in account password to access the system and their mailbox:

## Logging In

To send and receive fax messages with FAX Attendant, you must first *log in* to FAX Attendant. The *Login* procedure is nothing more than dialing the FAX Attendant number and entering your voice or fax extension and your password. Through this procedure, FAX Attendant verifies that you are an authorized user and prevents others from using your account. Your System Manager will provide you with a telephone number and initial password to use.

AT&T Fax Attendant further teaches that once logged in, the administrator is allowed access to the "administration of the Fax Response Coversheet, (loading, viewing, printing, and enabling)" on the "Fax Response Cover Sheet Administration screen." The reference further teaches that additional personalized information can be supplied to cover sheets by the subscriber ("Designing the Fax Response Cover Sheet" and "Fax Coversheet Header Information"). Therefore, AT&T Fax Attendant teaches the requirements of claims 1 and 4 that (1) "at least another facsimile cover page" stored in "a second storage location" be "accessible by a selected one of said plurality of users, said selected users having a corresponding user identification," and (2) "sensing if a user inputs a user identification."

### 4. WinFax Pro

117. Claims 1 and 4 of the Reifman '433 Patent are invalid as anticipated by WinFax Pro.

118. WinFax Pro teaches an apparatus capable of sending and receiving copies using facsimile protocols established by the CCITT (illustrating dialing options and fax/modem setup). Therefore, WinFax Pro teaches the facsimile machine of claims 1 and 4 of the Reifman '433 Patent as construed by the Court.

119. WinFax Pro further teaches a facsimile machine having a "display" as construed by the Court and a "user input device":



Furthermore, because WinFax Pro can be run on Windows, one of ordinary skill in the art would have known that WinFax Pro utilizes a display and user input device. WinFax Pro further teaches providing the user with the ability to create, store, and use facsimile cover pages ("Cover Pages - Choose from over 100 witty cover page designs, or create your own with the built-in WinFax PRO Cover Page Designer."). Therefore, WinFax Pro teaches the "facsimile machine having a display and a user input device, for storage and use of a facsimile cover page" of claim 1 and the "facsimile machine having a user input device for the storage and use of a facsimile cover page" of claim 4 of the Reifman '433 Patent.

120.    WinFax Pro further teaches continuous storage of a plurality of facsimile cover pages in libraries (*i.e.*, memory locations) within a facsimile machine ("Each cover page is stored as a file with the extension .CVP.  You can group pages into cover page libraries for easy access.  The library displays a 'thumbnail' (a small bitmapped representation of each fax cover page, making it easy to select the one you want to use.") ("Cover page libraries - Assign descriptions to cover pages and organize them in libraries that can be easily referenced and viewed prior to sending a fax."). WinFax Pro further teaches at least one cover page accessible to all users without having to enter any identification, is available for fax transmissions ("WinFax lets you preface your fax with a cover page.  If you have not prepared one in another application, you can choose from the library of WinFax cover page designs or design your own using Cover Page Designer . . . WinFax comes complete with a cover page library ready for your use.").  The WinFax Pro User's Manual illustrates a default library of cover pages available to all users:




Therefore, WinFax Pro teaches the step of "maintaining at least one facsimile cover page in a first storage location continuously accessible by any of a plurality of users of the facsimile machine" required by claims 1 and 4 of the Reifman '433 Patent.

121.    WinFax Pro further teaches enabling users to use multiple cover page libraries in which the different cover pages, along with corresponding "thumbnails" are stored (allowing for a

plurality of cover page libraries).  The Court has construed "second storage location" as "a memory location in the facsimile machine, distinct from the first storage location."  One of ordinary skill in the art would have known that, when storing two pieces of information simultaneously, they must be stored in two different memory locations.  Therefore, WinFax Pro teaches "maintaining at least another facsimile cover page in a second storage location . . ." as required by claims 1 and 4 of the Reifman '433 Patent.

122.    WinFax Pro further teaches enabling a user to create and access personalized cover pages that are stored and accessible based upon the identification of a selected user ("WinFax PRO's Cover Page Designer provides you with a set of tools to create your own cover pages, or edit those included with the product.").  Therefore, WinFax Pro teaches that the "at least another facsimile cover page" stored in "a second storage location" be "accessible by a selected one of said plurality of users, said selected users having a corresponding user identification," as required by claims 1 and 4.

123.    Furthermore, to the extent the Court might find that the steps of claims 1 and 4 are not explicitly taught by WinFax Pro, they are inherently taught.

124.    Claim 4 of the Reifman '433 Patent further requires the following steps:

> sensing a user input on the user input device to select a particular one of said stored cover pages from said first storage location or said second storage location if said user identification data corresponds to said selected one of said plurality of users;
>
> selecting said particular cover page in response to said user input; and
>
> transmitting said particular cover page as a cover page for a facsimile message.

125.    WinFax Pro teaches enabling a user to select a particular cover page that is stored in the facsimile machine memory "libraries":

*WinFax can search for a specific cover page in your library and you can specify a default cover page to appear each time you send a fax... If you want to specify a different default, locate, or edit a specific cover page, or view your cover page library, click on the Select button. The Cover Page Library dialog appears showing a thumbnail of each cover page and displaying the file name of the current library on the dialog header... To select a cover page to send with your fax, click on the cover page thumbnail view and then OK.*

("Cover page libraries - Assign descriptions to cover pages and organize them in libraries that can be easily referenced and viewed prior to sending a fax"); ("to select cover pages to accompany faxes be sent, obtain the Cover Page Library dialog via the Send Fax dialog").

126.    WinFax Pro further teaches transmitting the cover page selected by the user as a cover page for a facsimile message.  Therefore, WinFax Pro teaches the additional steps required by claim 4.

127.    To the extent that the Court might find that WinFax Pro does not render the Reifman '433 Patent invalid as anticipated, WinFax Pro in combination with the prior art teachings render the Reifman '433 Patent invalid as obvious.

**5.    NetWare 3.11 and NetWare 4.0**

128.    Claims 1 and 4 of the Reifman '433 Patent are invalid as obvious in light of WinFax Pro and NetWare 3.11 and/or NetWare 4.0.

129.    NetWare 3.11 and NetWare 4.0 both teach the use of a user identification, such as a login or a password, to enable or restrict access to certain private or personal electronic files.  Novell NetWare 3.11; Novell NetWare 4.0.  Therefore, NetWare 3.11 and NetWare 4.0 both teach the steps of "sensing if a user inputs a user identification" and "enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user," as required by claims 1 and 4 of the Reifman '433 Patent.

**C.    Non-Infringement**

130.    Microsoft has accused Lucent's AnyPath product of infringing claims 1 and 4 of the Reifman '433 Patent.  Lucent's AnyPath product does not infringe claims 1 and 4 of the Reifman

'433 Patent, either literally or under the doctrine of equivalents, and Microsoft has not proffered sufficient evidence to meet its burden of proving such alleged infringement by a preponderance of the evidence.

131. Lucent's AnyPath product does not infringe claims 1 and 4 of the Reifman '433 Patent because AnyPath does not have a "display" as required by claim 1 or a "user input device" as required by claims 1 and 4. Any devices that may be used with AnyPath are not components of AnyPath, sold as part of AnyPath, or supplied by Lucent.

132. Claims 1 and 4 of the Reifman '433 Patent require the following steps:

> maintaining at least one facsimile cover page in a first storage location ***continuously accessible by any of a plurality of users*** of the facsimile machine;

> maintaining at least another facsimile cover page in a second storage location ***accessible by a selected one of said plurality of users***, said selected user having a corresponding user identification;

Reifman '433 Patent, claims 1 and 4 (emphasis added). Therefore, claims 1 and 4 require that a user who has not entered a user identification will have continuous access to the default cover page stored in the first storage location. Furthermore, claims 1 and 4 require that a user who has entered a user identification will have continuous access to the default cover page stored in the first storage location and must also have simultaneous access to a personalized cover sheet stored in the second storage location. The Court has construed "continuous" to mean "without interruption."

133. AnyPath does not satisfy these requirements. AnyPath subscribers can only access a default cover page when they have not specified a personalized user cover page. Likewise, AnyPath subscribers who have specified a personalized user cover page do not have access to the default cover page when sending a facsimile message. In order to use a default cover sheet when sending a fax in AnyPath, the user must erase their personal cover page and reinstate the default cover page. Therefore, the "facsimile cover page in a first storage location" in AnyPath is not "continuously accessible." Furthermore, the "facsimile cover page in a first storage location" in AnyPath and the

"at least another facsimile cover page in a second storage location" are not simultaneously "continuously accessible" and "accessible," respectively.  For at least these reasons Lucent's AnyPath product does not infringe claims 1 or 4 of the Reifman '433 Patent.

134.    Claims 1 and 4 of the Reifman '433 Patent further require "enabling access to said, second storage location only if said sensed user identification corresponds to said user identification of said selected user, said first storage area being continuously enabled for any of said plurality of users and said second storage area being enabled only when said sensed user identification corresponds to said user identification of said selected user identification of said selected user."  For the reasons discussed above, AnyPath does not have a "first storage area being continuously enabled" where a user has specified a personal user cover page.  Therefore, for at least this additional reason, Lucent's AnyPath product does not infringe claims 1 or 4 of the Reifman '433 Patent.

135.    Claim 4 of the Reifman '433 Patent further requires the following steps:

> sensing a user input on the user input device to select a particular one of said stored cover pages from said first storage location or said second storage location if said user identification data corresponds to said selected one of said plurality of users;
>
> selecting said particular cover page in response to said user input; and
>
> transmitting said particular cover page as a cover page for a facsimile message.

136.    AnyPath users, however, cannot make a selection between cover pages when sending a facsimile.  As discussed above, if an AnyPath user has specified a personalized cover page, when the user logs in and prints their facsimile message, their specified cover page is automatically used. AnyPath users do not have the option of selecting between multiple cover pages when sending a facsimile message.  Therefore, for at least these additional reasons, Lucent's AnyPath product does not infringe claim 4 of the Reifman '433 Patent.

## V.     The Jancke '913 Patent

137.     The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts regarding the teaching of asserted claim 6 of the Jancke '913 Patent, the invalidity of the asserted claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims.  For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference their their Final Invalidity Contentions and the expert reports of Dr. Richard Taylor and Dr. Martin Kaliski.

### A.     The Jancke '913 Patent And Asserted Claims

138.     The Jancke '913 Patent, entitled "Computer Network Status Monitoring System," issued on June 9, 1998, from an application dated April 5, 1996.  The purported invention of the '913 Patent is a computer network status monitoring system that obtains, concurrently displays, and dynamically updates a plurality of operational status icons representing nodes in a computer network.  Microsoft is asserting claim 6 of the '913 Patent against Lucent and Alcatel-Lucent.

139.     As set forth in the following claim charts, the method of asserted claim 6 was well-known to those of ordinary skill in the art at the time of the filing of the '913 Patent and would have been obvious to those of ordinary skill in the art.

140.     Asserted claim 6 of the Jancke '913 Patent reads as follows:

> 6. A method for monitoring and displaying status of a plurality of nodes in a computer network, said method comprising:
>
> monitoring an operational state of each of said plurality of nodes in said computer network;
>
> concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network;
>
> superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status icons;

dynamically updating said display of said operational state for each of said plurality of nodes; and

generating a hierarchical list of objects available from a user selected one of said plurality of nodes.

141.    The first element of claim 6 includes the step of monitoring a plurality of nodes in a computer network.

142.    The second element of claim 6 includes the step of concurrently generating a display of a plurality of operational status icons. The Court construed "operational status icon" to mean "an icon that represents operational status using something other than, or in addition to, a color or set of colors." The second element also requires that the operational status icons be indicative of a lowest detail view of the operational state of each of the corresponding network nodes. The Court construed "lowest detail view" to mean "view at the lowest level of detail available, where no lower level view of status is necessary." The second element also requires that the step of concurrently generating a display of operational status icons be operational from any one of said plurality of nodes in the computer network. The Court construed "any one of said plurality of nodes" to mean "every node in the network."

143.    The third element of claim 6 includes the step of superimposing at least one additional status indicator on the display on any one of the operational status icons so as to show compound operational status in a single viewed icon.

144.    The fourth element of claim 6 includes the step of dynamically updating the display for each of said plurality of nodes. The Court construed "each of said plurality of nodes" to mean "every node in the network." Furthermore, the Court construed "dynamically updating said display" to mean "dynamically updating the display without user intervention."

145.    The fifth element of claim 6 includes the step of generating a hierarchical list of objects from a user selecting any one node on the display.

**B.** **Invalidity**

146.    Claim 6 is invalid in view of the prior art listed in this section, either alone or in combination.

### 1.    Microsoft SQL Server 6.0 Enterprise Manager ("SQL-EM")

147.    The beta 3 and beta 4 ("the marketing beta") versions of SQL-EM were publicly available prior to April 5, 1995—more than one year prior to the filing of the patent application.  The beta version was distributed to over 2500 Microsoft customers, those customers spoke freely about the product in open-source publications, and Microsoft did nothing to enforce any non-disclosure arrangement it might have had with the customers and, in some cases, promoted customer disclosures regarding the operation of the beta version of SQL-EM.

148.    Microsoft has conceded that the beta 3 and 4 versions of Microsoft's SQL Server 6.0 Enterprise Manager, released greater than 1 year prior to the critical date, contain the elements disclosed in claim 6 of the Jancke '913 Patent.

### 2.    NetView

149.    The IBM NetView product is used to monitor and manage complex networks.  The NetView Version 2 Release 3 Graphic Monitor Facility ("NetView") offers an extensive graphical user interface for supporting the visualization of network status and drill-down to multiple levels of status detail.

150.    Claim 6 of the Jancke '913 Patent is invalid for obviousness in view of NetView as described in the following prior art documents: [1]  Karl D. Gottschalk, NetView Version 2 Release 3 Graphic Monitor Facility, IBM Systems Journal, vol. 31, no. 2, 1992, 223-251, [2]  J.H. Chou, et al., AIX NetView/6000 - IBM's Network Management Software Package, IBM Systems Journal, vol. 31, no. 2, 1992, 270-285, and [3]  D. Kanyuh, An Integrated Network Management Product, IBM Systems Journal, vol. 27, no. 1, 1988 in combination with [one or more of] the following references and the knowledge of one of ordinary skill in the art:

- [1]  International Technical Support Organization, <u>Dynamic Subarea and APPN Management Using NetView V3R1</u>, August 1995.

- [2] Robert W. Scheifler and Jim Gettys, <u>The X Window System,</u> ACM Transactions on Graphics, 1987 at 79.

- [3] Niall Mansfield, <u>The Joy of X</u> (1993).

| Jancke '913 Patent | Prior Art Analysis - NetView |
|---|---|
| 6. A method for monitoring and displaying status of a plurality of nodes in a computer network, said method comprising: | NetView provides a status monitoring system for a computer network as part of its network management services, as described in references [1] and [3]. |
| monitoring an operational state of each of said plurality of nodes in said computer network; | NetView provides for monitoring nodes in a network.  NetView may be used to monitor a wide variety of network types and network resources.  As Gottschalk describes, "As may be seen in Figure 1, the GMF Focal-Point Host contains two monitoring components:  NetView and NetView GMF Host Subsystem.  NetView is responsible for monitoring SNA resources, while NetView and NetView GMF Host Subsystem together are responsible for monitoring non-SNA resources.  SNA resources are nodes and links that communicate via protocols defined by IBM's Systems Network Architecture, or SNA …" (p. 227). |
| concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network; | NetView provides for concurrently generating a display of operational status icons indicative of a lowest detail view of the operational state of the corresponding nodes in the network, and this capability may be operational from any one of the nodes in the network. Gottschalk's Figure 15, for example, shows the aggregate status of networks in Atlanta, Dallas, and New York.  The status is shown by a colored icon (a circle with a star inside of it), with the color indicating the operational status of that network. Figure 2 of [1] shows one example configuration of NetView, wherein there are several client workstations, each of which depicts the status of the network.  To maximize convenience and efficiency, it would be obvious to one of ordinary skill in the art how to configure this system such that a NetView collection-point host and GMF server workstation would reside on each machine in the network, making the status display operational from any one of the nodes in the network. |
| superimposing at least one additional status indicator on said display of any | NetView can superimpose additional information on a display such that compound information is available for a node in a single viewable display. For example, in Figure 1 of [2] (appearing in the same issue of IBM Systems Journal) describing the AIX NetView/6000 product, a graphical |

| Jancke '913 Patent | Prior Art Analysis - NetView |
|---|---|
| one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status icons; | display is shown in which the status icons for networks (circles) and gateways (diamonds) are displayed. The icons are colored to indicate their current status. Additionally each icon is accompanied by a text label that provides additional information about that network or gateway. Such a text label could have equally been used to provide additional detail of the status of the network or gateway beyond what the color indicates, e.g. the last time transmission from that node or gateway was received.<br><br>To the extent NetView does not utilize a specific, superimposed operational status indicator on top of operational status icons, it would have been obvious to one of ordinary skill in the art, especially in light of the capabilities of graphical user interfaces at the time, such as X Windows (*See, e.g.*, [5], [6]), to support superimposing an additional status indicator on top of the display of operational status icons. |
| dynamically updating said display of said operational state for each of said plurality of nodes; and | NetView provides for dynamically updating the display of the operational state for each node. This is described, for example, in Gottschalk on page 231, left column, and also on page 236, right column, second paragraph "Status changes are sent automatically …" |
| generating a hierarchical list of objects available from a user selected one of said plurality of nodes. | NetView provides for generating a hierarchical list of objects available from a user selected node. For example, "If the user selects a backbone resource and asks for more detail, the user gets the view shown in the lower left-hand part of Figure 7, illustrating a group of boundary resources." ([1] at 234.)<br><br>The view in Figure 7 is displayed as a ring, but could just as easily have been drawn as a list. (*See also*, [1] at 237.) |

### 3. U.S. Patent No. 5,226,120 to Brown, et al. (the "'120 Patent")

151. The '120 Patent, entitled "Apparatus and Method of Monitoring a Local Area Network," was filed May 21, 1990, and issued July 6, 1993. The '120 Patent discloses a system for monitoring and displaying the status of a local area computer network as detailed in the December 7, 2007 Expert Report of Richard N. Taylor and the following claim chart.

152. Claim 6 of the Jancke '913 Patent are invalid for obviousness in view of the '120 Patent in view of the knowledge of one of ordinary skill in the art:

| Jancke '913 Patent | Prior Art Analysis - Brown '120 Patent |
|---|---|
| 6. A method for monitoring and displaying status of a plurality of nodes in a computer network, said method | The '120 Patent discloses a system for monitoring and displaying the status of a local area computer network. |

| | Jancke '913 Patent | Prior Art Analysis - Brown '120 Patent |
|---|---|---|
| 1 | comprising: | |
| 2<br>3<br>4 | monitoring an operational state of each of said plurality of nodes in said computer network; | The '120 Patent provides for monitoring nodes in a network. The patent discloses how network management modules are installed in the network and used to transmit status information so that the status may be displayed to an operator (1:60-2:53; 4:28-35). |
| 5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 | concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network; | The '120 Patent provides for concurrently generating a display of operational status icons indicative of a lowest detail view of the operational state of the corresponding nodes in the network. The '120 Patent, in Figure 3, shows a variety of icons indicating the status of nodes in an exemplary network. "The rectangular boxes depicted in the display are concentrator icons 34a-34e which represent the concentrators in the network." (6:20-23.) "Concentrator icon 34a displays various information regarding the status of concentrator 28 (FIG. 2). The chart recorder image displays the amount of message traffic received by the concentrator over time. The designation '000081000002' represents the concentrator identification or address. The designation 'Normal' indicates the overall status of the concentrator. The designation will change to indicate a fault or warning condition." (6:50-58.)<br>In the context of the '120 Patent, the computer network being monitored consists of hubs or concentrators. Visualizing and controlling these network nodes is performed by a user on a computer containing a control console adapter connected to the network (5:64-6:6) and functioning as a network management control console. Figure 1 shows how many computers can be connected to the hub network. For purpose of efficiency and convenience it would have been obvious to one of ordinary skill in the art to configure each of these computers to contain a control console adaptor and to function as a network management control console for displaying the network status. For example, a network could be configured with one network management control console computer linked to each hub; each (computer, hub) pair can then be considered a node in the network, and hence the concurrent generation and display would be operational from each node in the network. |
| 21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said | The '120 Patent discloses how additional status indicators can be superimposed on the operational status icons to provide additional status information. For instance, "FIG. 7 is an exemplary pop-up detailed view window 56 which is displayed when a concentrator is selected. Window 56 occupies a relatively small portion of the display screen, and the position of the window on the display can be changed as desired. The image which appears in window 56 represents the physical appearance of the front panel of the actual concentrator represented by icon 43." (8:41-48.) By popping up this window, the original status indicator could be overlaid.<br>To the extent that the '120 Patent does not show this additional information in a single viewable icon, it would have been obvious to one of ordinary skill in the art to do so. For example, the concentrator icons of Figure 2 are already compound; they show how one icon (the concentrator icon) consists of multiple "sub-icons," each of which indicates some information about the |

| Jancke '913 Patent | Prior Art Analysis - Brown '120 Patent |
|---|---|
| plurality of operational status icons; | concentrator, such as its status, its name, and its linkages to other network elements. For purpose of efficiency and convenience, one of ordinary skill in the art could add to the set of sub-icons already comprising the concentrator icon rather than popping up a new window to provide additional detail. |
| dynamically updating said display of said operational state for each of said plurality of nodes; and | The '120 Patent provides for dynamically updating the display of the operational state for each node. "The designation "Normal" indicates the overall status of the concentrator. The designation will change to indicate a fault or warning condition." 6:55-58. In a similar vein, Figures 21a, b, and c describe how the LED indicator status lights on the pop-up detail display of Figure 7 are dynamically updated. |
| generating a hierarchical list of objects available from a user selected one of said plurality of nodes. | The '120 Patent provides for generating a hierarchical list of objects available from a user selected node. Figure 3 shows, as part of the concentrator status icons, an element labeled 40, which is shown as a small triangle. Clicking this will cause the display to change to show the next level of concentrator icons in the hierarchy of concentrators to appear by scrolling into view. 6:32-49. Similarly, the information shown in Figure 7 is the information hierarchically available from a concentrator icon. The display of Figure 7 shows a depiction of the set of plug-in modules comprising a concentrator. |

### 4. Starkeeper II Network Management System ("StarKeeper")

153. StarKeeper was developed to manage cell relay networks, a type of computer network. It provides for network monitoring, performance reporting, and network building as detailed in the December 7, 2007 Expert Report of Richard N. Taylor and the following claim chart.

154. StarKeeper was described in a number of prior art printed publications including at the least the following articles:

[1] Daniel C. Becker, et al., StarKeeper II NMS - Management of a Cell Relay Network, AT&T Technical Journal, July/August 1994, p. 46-55.

[2] S.L. Arnold and Wilson, E., Extension and Evolution of Existing Network Management Systems Over a Seamless Inter-exchange of Host- and PC-based Processors, INFOCOM '90, Ninth Annual Joint Conference of the IEEE Computer and Communication Societies, 'The Multiple Facets of Integration.' Proceedings, IEEE, 3-7 Jun 1990, p. 63-68.

155. Claim 6 of the Jancke '913 Patent is invalid for obviousness in view of Starkeeper in view of the above references and the knowledge of one of ordinary skill in the art:

| | Jancke '913 Patent | Prior Art Analysis - StarKeeper |
|---|---|---|
| 1 2 3 4 5 | 6. A method for monitoring and displaying status of a plurality of nodes in a computer network, said method comprising: | StarKeeper provides a status monitoring system for a computer network, as well as a performance reporter and network builder. |
| 5 6 7 8 | monitoring an operational state of each of said plurality of nodes in said computer network; | StarKeeper provides for monitoring nodes (BNS-2000 data switches) in a network.  The system maintains a high-speed interface to each cell relay switch in the network, enabling it to monitor the status of the switches.  ([1], p. 47.) |
| 8 9 10 11 12 13 14 15 16 17 18 | concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network; | StarKeeper provides for concurrently generating a display of operational status icons indicative of a lowest detail view of the operational state of the corresponding nodes in the network. "With the StarKeeper II NMS Network Monitor, operators can see alarms displayed on a customized map of their region, as shown in Figure 1.  The alarms are shown as color-coded icons representing cities with aggregated equipment.  Double-clicking on one of these icons displays a detailed network map of that city." ([1], p. 53) This capability may be operational from any one of the nodes in the network. Becker shows, in Figure 3, how both the StarKeeper Graphics System and the StarKeeper Core System may be installed on the same machine.  The Figure also shows that there can be many machines running the Core and/or Graphics systems.  Hence a network monitoring configuration could be developed in which each workstation attached to the switches could be concurrently generating a status display. A network could be configured with one StarKeeper workstation (having both Graphics and Core) linked to each switch; each (workstation, switch) pair can then be considered a node in the network, and hence the concurrent generation and display would be operational from each node in the network. |
| 19 20 21 22 23 24 25 26 27 28 | superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of said plurality of operational status | "With the StarKeeper II NMS Network Monitor, operators can see alarms displayed on a customized map of their region, as shown in Figure 1.  The alarms are shown as color-coded icons representing cities with aggregated equipment.  Double-clicking on one of these icons displays a detailed network map of that city.  The resulting window shows a diagram of network elements, color-coded according to their alarm status. Double-clicking on a specific element icon opens another window, showing individual circuit packs with a color-coded status." ([1], p. 53.) To the extent that StarKeeper does not show this additional information in a single viewable icon, it would have been obvious to one of ordinary skill in the art to do so.  For instance, the network status window in the top-left of Figure 1 is already a compound status indicator: numerous rectangles are shown wherein the number of each of several types of alarms and notices are indicated.  Rather than popping up a new window to provide additional detail, such additional detail could be added by adding to the set of items already comprising the higher-level network status display.  To |

| Jancke '913 Patent | Prior Art Analysis - StarKeeper |
|---|---|
| icons; | the extent that this would make the presentation more efficient or compact there would be a motivation to add the information in this manner. It is just an aesthetic choice of data presentation; putting the information on the display one place versus another. |
| dynamically updating said display of said operational state for each of said plurality of nodes; and | StarKeeper provides for dynamically updating the display of the operational state for each node. "Network Monitor, a sample screen of which is shown in Figure 1, provides real-time network status displays and multi-tiered graphical representations of the network." ([1], p. 48.) Becker describes, e.g. on page 51, how the communication links are used to transmit "significant events," enabling status to be dynamically updated. Additional details describing how the state is dynamically maintained are provided in reference [2]. |
| generating a hierarchical list of objects available from a user selected one of said plurality of nodes. | StarKeeper provides for generating a hierarchical list of objects available from a user selected node. "With the StarKeeper II NMS Network Monitor, operators can see alarms displayed on a customized map of their region, as shown in Figure 1. The alarms are shown as color-coded icons representing cities with aggregated equipment. Double-clicking on one of these icons displays a detailed network map of that city. The resulting window shows a diagram of network elements, color-coded according to their alarm status. Double-clicking on a specific element icon opens another window, showing individual circuit packs with a color-coded status." ([1], p. 53.) |

## C.    Non-Infringement

156.    Microsoft has accused the VitalApps feature of Lucent's VitalSuite software of infringing claim 6 of the Jancke '913 Patent. Lucent denies that VitalApps or any portion of VitalSuite infringes the Jancke '913 Patent. Microsoft has not proffered sufficient evidence to prove infringement by a preponderance of the evidence.

157.    Microsoft's infringement contentions accuse the VitalApps Alarms | Summary heat chart of practicing the claimed method of claim 6. Microsoft cannot prove that the Alarms | Summary heat chart practices all the elements of claim 6 for at least the reasons listed in the following paragraphs.

158.    Lucent denies that the Alarms | Summary heat chart displays "operational status." The Alarms | Summary heat chart provides an aggregation of information about events that have transpired with respect to an application, but does not display the operational status of a node. Even

1    if the user drills down on a cell from the heat chart, the information provided does not indicate the

2    current operational status of a node.

3         159.    Lucent denies that Microsoft has evidence of a network where the Alarms | Summary

4    heat chart can be displayed on the VitalSuite Web Console on every element in a computer network.

5         160.    Lucent denies that the colored ovals on the Alarms | Summary heat chart are

6    superimposed status indicators as understood by one of ordinary skill in the art.  The Court has ruled

7    that an "operational status icon" is to be construed as "an icon that represents operational status

8    using something other than, or in addition to, a color or set of colors."  Lucent also denies that one of

9    ordinary skill in the art reading the '913 Patent would understand a colored icon as an icon

10   superimposed with color.  The patent superimposes one icon on top of another icon (in particular, the

11   zigzag, or lightning bolt, is superimposed on the traffic light); in VitalApps only a variety of ovals

12   are shown—there is no superimposition of one icon on top of another.

13        161.    Lucent denies that the VitalApps Alarms | Summary dynamically updates without any

14   user intervention.  The Alarms | Summary heat chart updates only *after* the user initiates the update

15   by clicking the "regenerate" button.

16        162.    Lucent denies that the Alarms | Summary heat chart, generates a hierarchical list of

17   objects available from a user-selected node.

18        163.    Because Lucent denies that its products directly infringe the Jancke '913 Patent, there

19   can be no indirect infringement.  But Lucent also denies that it has contributed to the infringement of

20   the Jancke '913 Patent by others.  Microsoft's experts have not sufficiently opined that any user of

21   VitalSuite practiced the method claimed in claim 6.  Moreover, Microsoft cannot prove that Lucent

22   induced infringement by others.  Lucent denies that it had "an affirmative intent to cause direct [use]

23   infringement" and/or "knowingly induced infringement and possessed specific intent to encourage"

24   such use infringement.  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

164. Microsoft has accused the Alcatel-Lucent OmniVista Air Control System and the OmniVista 2500/2700 of infringing claim 6 the Jancke '913 Patent. Alcatel-Lucent denies that OmniVista Air Control System or the OmniVista 2500/2700 infringes the Jancke '913 Patent.

165. Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that either Alcatel-Lucent or its customers have implemented the accused features of the OmniVista Air Control System ("Air Control System") in a manner that results in infringement of claim 6. At best, Microsoft can show no more than a theoretical possibility that Alcatel-Lucent or its customers implemented these features, which is insufficient for a finding of infringement. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). For this reason alone, Microsoft cannot prove that Alcatel-Lucent either directly infringed the Jancke '913 Patent or induced infringement by others through its sale of the Air Control System. Direct infringement cannot be inferred from circumstantial evidence alone in this case: the only asserted claim covers a method, and sale of an apparatus that is merely capable of performing the claimed process does not infringe that claim. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993). Concluding that Alcatel-Lucent customers directly infringed claim 6 would be "too speculative a leap," given that Microsoft has no evidence that any Alcatel-Lucent customers actually performed the claimed method and that Alcatel-Lucent did not disseminate instructions explicitly teaching each and every step of the patented method together with an apparatus whose only use is to practice the claimed method. *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007). Moreover, because Alcatel-Lucent also did not have "an affirmative intent to cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Further, even if Alcatel-Lucent or its customers implemented the Air Control System as alleged, the Air Control System would not infringe claim 6.

166.   Claim 6 requires "concurrently generating a display of a plurality of operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes in said computer network, said step of concurrently generating being operational from any one of said plurality of nodes in said computer network."  Given the Court's construcion of "any one of said plurality of nodes in said computer network" as "every node in the network," an infringing entity must be able to generate the required display of operational status icons from every node in the network.  Microsoft's expert, Dr. Adam Porter, has conceded that only installations in which the Air Control Client is operating at every node can possibly infringe.  Putting aside Microsoft's inability to show that Alcatel-Lucent or its customers installed the Air Control System such that the Air Control Client operates at every node, the Air Control System cannot generate the claimed display from every node in the network.  Microsoft has identified a display of icons relating to wireless access points as the display of "operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes," but the wireless access points cannot generate a display.  Microsoft's expert, Dr. Porter, has not offered an equivalents analysis that addresses the "concurrently generating" step.  However, the addition of a client computer system to the wireless access point is not an insubstantial difference.  At a minimum, a system that relies on a laptop or a desktop to generate the required display, rather than the node itself, operates in a different way than a system that can generate the display from the node itself.  Further, the claimed display must be of "operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes."  The Air Control System does not generate such a display because an end user can click on an icon to find more operational status information.

167.   Claim 6 further requires "superimposing at least one additional status indicator on said display of any one of said plurality of operational status icons such that compound operational status information for a single one of said plurality of nodes is available in a single viewable one of

said plurality of operational status icons."  The Air Control System does not perform this "superimposing" step because it does not combine different images to form a single icon containing compound operational status information.  Rather, as confirmed by Alcatel-Lucent's source code examination, the Air Control System uses pre-defined single images from a library for the icon display.  Alcatel-Lucent contends that a system that does not create icons through an act of superimposition at run time does not infringe literally or under the doctrine of equivalents; that is, a system that does not perform an act of superimposing is substantially different from one that does perform such an act.  With respect to infringement under the doctrine of equivalents, the applicants added the "superimposing" limitation during prosecution for the sole reason of overcoming a prior-art rejection.  Alcatel-Lucent contends that a system that displays icons with compound status information without performing an act of superimposition is entirely foreseeable given the mutability of icons.  Because the amendment adding the "superimposing" step is more than tangentially related to the equivalent in question—a system that does not superimpose—Microsoft is precluded from arguing that the Air Control System infringes claim 6 under the doctrine of equivalents.  Regardless of how the icons are created, however, the image Microsoft has identified as an "additional status indicator" does not provide any additional status information beyond what is already available through the image Microsoft has identified as the "operational status icon."

168.    Finally, claim 6 requires "generating a hierarchical list of objects available from a user selected one of said plurality of nodes."  Microsoft cannot prove that the Air Control System performs this step, given that the "hierarchical list" it identified is neither "hierarchical" nor a list of objects that are "available from a user selected one of said plurality of nodes."  The list is not displayed in a hierarchical form as disclosed by the specification.  Moreover, the alleged "objects" are not available from any one node; they are entire subnetworks or networks of nodes.

169.    Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that either Alcatel-Lucent or its customers have implemented the accused OmniVista

2500/2700 product in such a way that it would perform the steps of claim 6. Microsoft therefore cannot prove that Alcatel-Lucent induced infringement of the '913 Patent through its sale of the OmniVista 2500/2700. A mere showing of a theoretical possibility that Alcatel-Lucent or its customers implemented these features is insufficient for a finding of infringement. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). Again, merely selling a product that is capable of performing a claimed method does not infringe that claim. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993). Further, direct infringement by Alcatel-Lucent customers cannot be merely inferred from circumstantial evidence, as Alcatel-Lucent did not disseminate instructions explicitly teaching each and every step of the patented method together with an apparatus whose only use is to practice that method. *E-Pass*, 473 F.3d at 1222. Microsoft cannot prove that Alcatel-Lucent induced others to infringe for the additional reason that Alcatel-Lucent did not have "an affirmative intent do cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Further, even if Alcatel-Lucent or its customers implemented the OmniVista 2500/2700 as alleged, the OmniVista 2500/2700 would not infringe claim 6.

170. Because claim 6 requires that every node be able to generate the claimed display, Microsoft has accused only a version of the OmniVista 2500/2700 that is a capable of multi-user installations, the OmniVista 2540 product, of infringing that claim. Microsoft cannot now claim that other, single-user versions of the OmniVista 2500/2700 product infringe. However, even the OmniVista 2540 must be installed in a manner such that multiple users can access the same server before Microsoft's infringement theories can apply. Microsoft cannot show that Alcatel-Lucent or its customers configured an OmniVista 2540 system in such a fashion so that it generates the accused display at every node in the network. Moreover, the OmniVista 2540 cannot generate the *claimed* display at every node in the network because the accused display shows icons relating to devices such as switches, which cannot generate a display. Microsoft's expert, Dr. Porter, has not

offered an equivalents analysis that addresses the "concurrently generating" step. However, connecting a client computer system to a switch in order to generate the display is not an insubstantial difference. At a minimum, a system that relies on a laptop or a desktop to generate the required display, rather than the node itself, operates in a different way than a system that can generate the display from the node itself. Further, the claimed display must be of "operational status icons each indicative of a lowest detail view of said operational state of a corresponding one of said plurality of nodes." The OmniVista 2540 does not generate such a display because an end user can click on an icon to find more operational status information.

171. The OmniVista 2540 does not perform the "superimposing" step of claim 6 because it does not combine different images to form a single icon containing compound operational status information. Rather, as confirmed by Alcatel-Lucent's source code examination, the OmniVista 2540 uses pre-defined single images from a library for the icon display. Alcatel-Lucent contends that a system that does not create icons through an act of superimposition at run-time does not infringe literally or under the doctrine of equivalents—a system that does not perform an act of superimposing is substantially different from one that does perform such an act. Alcatel-Lucent contends that Microsoft is precluded from proving infringement under the doctrine of equivalents for the reasons discussed above with respect to the Air Control System. Regardless of how the icons are created, however, the image Microsoft has identified as an "additional status indicator" for the OmniVista 2540 does not provide any additional information beyond what is already available through the image Microsoft has identified as the "operational status icon."

172. Microsoft cannot prove that the OmniVista 2540 performs the last step of claim 6. The "hierarchical list" Microsoft identified is not a list of objects that are "available from a user selected one of said plurality of nodes." The alleged "objects" are the nodes themselves, and thus are not "available from" a particular node. To the extent Microsoft argues that the OmniVista 2540 lists "components of nodes," and that this is equivalent to the last step of claim 6, Alcatel-Lucent

contends that a list of nodes or components of nodes is at least a substantially different result from generating a list of objects available from a node.

173.    For all of these reasons, neither the Air Control System nor the OmniVista 2540 infringe the only asserted claim of the '913 Patent, claim 6.  Finally, Microsoft cannot expand its infringement allegations at trial to cover any other Alcatel-Lucent products for this patent, as it has not identified any other Alcatel-Lucent products as infringing this patent at any point in this case.

## VI.    The Jancke '499 Patent

174.    The following sections discuss Lucent's assertions of facts regarding the teaching of asserted claims 13, 23, and 29 of the Jancke '499 Patent, the invalidity of the asserted claims, and Lucent's non-infringement of those claims.  For a fuller discussion of these topics, Lucent references the expert reports of Dr. Richard Taylor and Lucent's Final Invalidity Contentions.

### A.    The Jancke '499 Patent And Asserted Claims

175.    The Jancke '499 Patent, entitled "Interactive Graph Display System," issued on June 29, 1999, from an application dated April 5, 1996.  Microsoft is asserting claims 13, 23, and 29 of the '499 Patent against Lucent.  The purported invention of the '499 Patent is storing a series of present values, generating a graph of the values, dynamically updating the graph as the values change, superimposing additional information upon user input.  As set forth in the attached claim charts, the methods disclosed in claims 13, 23, and 29 were well-known to those of ordinary skill in the art at the time of the filing of the '499 Patent and would have been obvious to those of ordinary skill in the art.

176.    Asserted claim 13 reads as follows:

> 13. A method for displaying an interactive graph, said method comprising:
>
> storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements;

generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements;

dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user;

generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and

overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic.

177. The first element of claim 13 includes the step storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements. The Court construed "in real time" to mean "when new information becomes available."

178. The second element of claim 13 includes the step of generating a graph primitive comprised of one or more display elements. The Court construed "display element" as "an individual data entity capable of being displayed as a self contained piece of information in a graph primitive."

179. The third element of claim 13 includes the step of dynamically updating the display in real time, independent of any human intervention. The Court construed "in real time" to mean "when new information becomes available." The Court also interpreted "dynamically updating said plurality of display elements in said display" to mean "updating the display elements in the display without user intervention."

180. The fourth element of claim 13 includes the step of generating a display of display element detail in response to a user input.

181. The fifth element of claim 13 includes the step of overlaying two or more display elements in a graph primitive such that one of the display elements overlaid on top of the other display element is distinguishable by a unique characteristic.

182. Asserted claim 23 reads as follows:

> 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising:
>
> storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements;
>
> generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements;
>
> dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; and
>
> generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command.

183. The first element of claim 23 includes the step storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements. The Court construed "in real time" to mean "when new information becomes available."

184. The second element of claim 23 includes the step of generating a graph primitive comprised of one or more display elements. The Court construed "display element" as "an individual data entity capable of being displayed as a self contained piece of information in a graph primitive."

185. The third element of claim 23 includes the step of dynamically updating the display in real time, independent of any human intervention. The Court construed "in real time" to mean "when new information becomes available." The Court also interpreted "dynamically updating said plurality of display elements in said display" to mean "updating the display elements in the display without user intervention."

186. The fourth element of claim 23 includes the step of generating a display of display element detail—in addition to the existing display element detail—in response to a user input.

187.    Asserted claim 29 reads as follows:

29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising:

storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements;

scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements;

overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic;

generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements;

dynamically updating said plurality of display elements in said display; and

generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command.

188.    The first element of claim 29 includes the step storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements.  The Court construed "in real time" to mean "when new information becomes available."

189.    The second element of claim 29 includes the step of scaling the display elements based on a predetermined scale.

190.    The third element of claim 29 includes the step of overlaying two or more display elements in a graph primitive such that one of the display elements overlaid on top of the other display element is distinguishable by a unique characteristic.

191.     The fourth element of claim 29 includes the step of includes the step of generating a graph primitive comprised of one or more display elements.  The Court construed "display element"

as "an individual data entity capable of being displayed as a self contained piece of information in a graph primitive."

192.    The fifth element of claim 29 includes the step of dynamically updating the display in real time, independent of any human intervention.  The Court construed "in real time" to mean "when new information becomes available."  The Court also interpreted "dynamically updating said plurality of display elements in said display" to mean "updating the display elements in the display without user intervention."

193.    The sixth element of claim 29 includes the step of overlaying two or more display elements in a graph primitive such that one of the display elements overlaid on top of the other display element is distinguishable by a unique characteristic.

**B.    Invalidity**

194.    Claims 13, 23, and 29 are invalid in view of the prior art listed in this section, either alone or in combination.

**1.    Mike Foley, et al., An Object-based Graphical User Interface for Power Systems, IEEE Transactions on Power Systems, vol. 3, no. 1, Feb. 1993 at 97.  ("Foley")**

195.    Claims 13, 23, and 29 of the Jancke '499 Patent are anticipated by the Foley article. Foley describes a graphical user interface that may be used as a front-end for electrical power system simulation and control.  The GUI provides for multiple views of the power system; additional details for selected objects are available as pop-up dialog boxes.  The system generates an interactive graph that is updated dynamically as the database of values reflecting the state of the power system change. Claims 13, 23, and 29 are anticipated by the Foley article.

196.    The invalidity of the '499 Patent in view of Foley is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Richard N. Taylor:

| U.S. Patent 5,917,499 | Prior Art Analysis—Foley |
|---|---|
| 13. A method for | Foley, et al. describes a method for providing an interactive graph on a |

| | U.S. Patent 5,917,499 | Prior Art Analysis—Foley |
|---|---|---|
| 1 | | |
| 2 | displaying an interactive graph, said method comprising: | display, as described in the cited paper and illustrated in Figures 1 and 2. |
| 3 | | |
| 4 | storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | Foley, et al. stores a sequence of present values in a memory when they become available for each of plurality of display elements.  The display elements in Foley's system show, for instance, the configuration and state of an electric power system. "The data on the diagrams is linked to the application being monitored.  Dynamic data fields are continuously updated to show the current state of the application." (p. 99). |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | Foley, et al. generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements.  In Foley's system one graph primitive shows the configuration of an electric power substation in a diagrammatic style called a "system one-line diagram". (*See, e.g.* Figs 1-2.) Such diagrams are composed of multiple elements which correspond to devices in the substation.  Creation of such diagrams is described, e.g., on pages 101 and 102. |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | Foley, et al., dynamically updates the display elements in the display without user intervention. As Foley states "The displays can then be used by putting the GUI in simulation mode, in which objects are linked to and send messages to/from a periodically changing data base like that of an energy management system or an operator training simulator." (p. 97).  Similarly, on page 99, "The data on the diagrams is linked to the application being monitored.  Dynamic data fields are continuously updated to show the current state of the application." |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and | Foley, et al., generates a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command.  For example, this is achieved in Foley's system by double-clicking on a selected object.  "The double-click action is used to pop-up selected object's dialog boxes to display and alter an object's attributes.  A pop-up attribute box for a breaker object is shown in Figure 1. This dialog box shows the equipment name and allows the user to open or close the breaker and set its normal condition." (p. 99). |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | overlaying at least two display elements within said at least one graph primitive wherein each of | Foley, et al., overlays at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic.  The Foley system includes a procedure for automatically creating a "one-line diagram" that represents the equipment in a substation.  An example use of that procedure is illustrated in Figure 6 (p. 101).  Several overlays of display elements are shown, having |
| 26 | | |
| 27 | | |
| 28 | | |

| | U.S. Patent 5,917,499 | Prior Art Analysis—Foley |
|---|---|---|
| 1 | | |
| 2 | said at least two display elements are distinguishable by a unique display characteristic. | unique display characteristics.  Figure 7 shows how the same substation can be drawn but removing some of the overlays. |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | See the corresponding element in claim 13. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | dynamically updating said plurality of display elements in said display in real time independent of any intervention | See the corresponding element in claim 13. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | U.S. Patent 5,917,499 | Prior Art Analysis—Foley |
|---|---|---|
| 1 | | |
| 2 | by a human user; | |
| 3 | and generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 9 | 29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| 19 | storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements; | See the corresponding element in claim 13. |
| 23 | scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements; | Foley, et al., provides for scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements. The presence of this element is indicated by several statements in the paper, for example: Page 99: "Zooming this display reveals more or less detail of the system." The essence of zooming is to rescale displayed objects according to the changed size of the display. Page 99: "A dynamic declutter/redetail algorithm is used to keep the display as readable as possible at any size." Techniques for maintaining readability as size changes includes scaling of objects, including scaling an object's size to |

| | U.S. Patent 5,917,499 | Prior Art Analysis—Foley |
|---|---|---|
| 1 | | |
| 2 | | zero (i.e. sliding display of that object in a particular view). |
| 3 | | Page 101: "Functions are provided to scale and rotate individual objects, or entire displays." |
| 4 | overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic; | See the corresponding element in claim 13. |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | 197. | |
| 26 | | |
| 27 | | |
| 28 | | |

2.      **U.S. Patent No. 5,581,677 (the '677 Patent) to Myers et al**

198.    The '677 Patent is entitled "Creating Charts and Visualizations by Demonstration," was filed Apr. 22, 1994, and issued Dec. 3, 1996.  The '677 Patent describes a system and method to automatically produce a display chart from example graphics and data values.  The '677 Patent anticipates claims 13, 23 and 29 of the '499 Patent.

199.    The invalidity of the '499 Patent in view of the '677 Patent is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Richard N. Taylor:

| U.S. Patent 5,917,499 | Prior Art Analysis—Myers Patent |
|---|---|
| 13. A method for displaying an interactive graph, said method comprising: | The '677 Patent describes a method for providing an interactive graph on a display. The interactive graph is illustrated, for example, in Figures 2a and 3a. The interactive graph is used to determine how to layout (visualize) data linked to the graph. |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | The '677 Patent stores a sequence of present values in a memory when they become available for each of plurality of display elements.  In the '677 an example usage of the invention is described in which spreadsheet data is laid out by the user using the interactive graph.  The '677 discloses a computer with a CPU (Fig. 6) and describes an interface engine which stores user input as it is entered.  (*See, e.g.*, col. 11:24-55.)  The data ultimately depicted in the interactive graph are found in an associated spreadsheet; the spreadsheet data is depicted using, e.g. in Figure 2a, a bar graph.  The invention is capable of using other display elements. |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | The '677 Patent generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements. In the '677, for example, Figure 2a shows a graph comprised of multiple bar graphs, each of which corresponds to data in the associated spreadsheet. |
| dynamically updating said plurality of display elements in said display in real time independent of | The '677 Patent dynamically updates the display elements in the display without user intervention.  As the '677 states, "The display is updated to reflect any changes in the data values."  (col. 2:49-50.)  At col. 10:62-64 it is stated "If the data changes, the system automatically updates the chart to reflect the changed data values."  Claim 6 states further, "The visualization method of claim 1 wherein the programmable data processing system further performs the step of updating the display chart when any of the plurality of |

| U.S. Patent 5,917,499 | Prior Art Analysis—Myers Patent |
|---|---|
| any intervention by a human user; | data values changes." |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and | The '677 Patent generates a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. This can be seen, for instance, in the '677 in Figure 2a wherein the range of spreadsheet data associated with the bar graphs is displayed. (col. 10:22-25.) "To avoid clutter, the link boxes are usually removed from the screen once they have been filled, but a user may choose to bring back all or selected link boxes if needed." (*See also* [2], Color Plate 2(a)-(b).) |
| overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. | The '677 Patent overlays at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. In Figure 2a the two bar graphs overlap; they are distinguished by color in Reference [2], in "Myers, Color Plate 1". Other possibilities for overlap are also illustrated in the patent, such as in Figure 4 where stars and circles are used to indicate different data values (9:17-18). Figure 4 depicts a circle and a star icon overlapping a line in a line graph. If the data values represented by the star and circle were equal, the icons would overlap. |
| 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| storing a sequence of present values in a memory as they occur in real time for each of | See the corresponding element in claim 13. |

| U.S. Patent 5,917,499 | Prior Art Analysis—Myers Patent |
|---|---|
| plurality of display elements; | |
| generating at least one graph primitive on a display wherein at least one graph primitive is comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | See the corresponding element in claim 13. |
| and generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, | See the corresponding element in claim 13. |

| | U.S. Patent 5,917,499 | Prior Art Analysis—Myers Patent |
|---|---|---|
| | said method comprising: | |
| | storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements; | See the corresponding element in claim 13. |
| | scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements; | The '677 Patent provides for scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements.  For example, in col. 8:56-58, "The system uses the size of the example axes, or if there are no axes, the size of the current window, to be the size of the maximum range."  The system also allows the user to provide arbitrary pictures to be used in place of, for example bar charts.  In such cases "The size of the pictures are then adjusted appropriately." (9:59-60) In other words, they are scaled by some predetermined procedure.  Claim 26 indicates further support for the provision of scaling in the system. |
| | overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic; | See the corresponding element in claim 13. |
| | generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| | dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |
| | generating a superimposed | See the corresponding element in claim 13. |

| U.S. Patent 5,917,499 | Prior Art Analysis—Myers Patent |
|---|---|
| display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | |

### 3.      SQL Server 6.0 with Microsoft Performance Monitor

200.    SQL Server 6.0, which includes SQL Server 6.0 Enterprise Manager with the Microsoft Performance Monitor, is a database management program which includes a graphical user interface portal named SQL Enterprise Manager allowing a database administrator to administer multiple database servers.  The Microsoft Performance Monitor displays a graph of real-time performance statistics and database parameters.

201.    The invalidity of the '499 Patent in view of SQL Server 6.0 with Microsoft Performance Monitor is more particularly explained in the following claim charts and in the December 7, 2007 Expert Report of Richard N. Taylor.  The following references are relevant to this chart:

[1] David Solomon, et al., SQL Server 6 Unleashed (1996).

[2] Mark Spenik & Orryn Sledge, Microsoft SQL Server DBA Survival Guide, 1996.

[3] Microsoft SQL Server 6.0 Administrator's Companion (1995)

[4] Operating copy of SQL Server 6.0.

| U.S. Patent No. 5,917,499 | Prior Art Analysis—SQL Server 6.0 with Microsoft Performance Monitor |
|---|---|
| 13. A method for displaying an interactive graph, said method comprising: | SQL Server Performance Monitor describes a method for providing an interactive graph on a display, as can be seen in [1], Chapter 32; [2], Chapter 17; and [3], Chapter 19. |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—SQL Server 6.0 with Microsoft Performance Monitor |
|---|---|
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | SQL Server Performance Monitor stores a sequence of present values in a memory as they occur in real time for each of plurality of display elements. The performance monitor monitors several performance objects with associated counters that measure the operation of SQL Server 6.0. The counters are updated in real time as the underlying values change. (*See, e.g.,* [1] at 770-71, [2] at 356, and [3] at 624-625.) |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | SQL Server Performance Monitor generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements. The performance monitor generates a graph that presents the monitored data and may include multiple display elements. (*See, e.g.,* [3] at 624; [2] at 359.) |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | SQL Server Performance Monitor dynamically updates the multiple display elements in real time independent of any intervention by a human user. The performance monitor updates the graphical display as information becomes available, making it possible to get up-to-the minute activity and performance statistics about SQL Server 6.0. (*See, e.g.,* [3] at 621.) For example, the graph displays shown in Fig. 17.4 of reference [2] and p. 624 of reference [3] automatically update as time progresses, such that data is available immediately to the user via the performance monitor. (*See, e.g.,* [3] at 622.) |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and | SQL Server Performance Monitor can display an additional level of detail for at least one display element in response to a user input command. For instance, when a counter is selected, the performance monitor displays the last data point collected, the average value, a minimum value, a maximum value, and the time elapsed during this monitor session at the bottom of the screen [4]. It would have been well within the capability of one skilled in the art at the time of the invention to put this information in a superimposed display. For example, the performance monitor uses a superimposed pop-up box to display chart and line data when a particular counter is selected by the user. (*See, e.g.,* [1], Fig. 32.1; [2], Fig. 17.3.) Moreover, it was well known to in the art (*see, e.g.,* Foley, et al.) to superimpose additional information on a graphical display. |
| overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are | SQL Server Performance Monitor overlays at least two display elements within the graph wherein each are distinguishable by a unique display characteristic. The performance monitor displays several display elements at once, distinguishable by both line color and thickness. (*See, e.g.,* [1], Fig. 32.1; [2], Fig. 17.3.) The performance monitor can be configured to display any available counter. (See, *e.g.,* [3] at 624.) |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—SQL Server 6.0 with Microsoft Performance Monitor |
|---|---|
| distinguishable by a unique display characteristic. | |
| 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | See the corresponding element in claim 13. |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | See the corresponding element in claim 13. |
| and generating a superimposed | See the corresponding element in claim 13. |

| | U.S. Patent No. 5,917,499 | Prior Art Analysis—SQL Server 6.0 with Microsoft Performance Monitor |
|---|---|---|
| 1 | | |
| 2 | display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | 29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements; | See the corresponding element in claim 13. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements; | SQL Server Performance Monitor scales each of the display elements according to a predetermined scale. The performance monitor generates graphs which have scaling information. (*See, e.g.*, [2], Fig. 17.4; [3] at 624.) The scaling information includes a value or ratio over time. (*See, e.g.*, [3], at 624.) |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | overlaying at least two display elements within said graph primitive wherein | See the corresponding element in claim 13. |
| 27 | | |
| 28 | | |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—SQL Server 6.0 with Microsoft Performance Monitor |
|---|---|
| each of said at least two display elements are distinguishable by a unique display characteristic; | |
| generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |

### 4.    ParaGraph

202.    ParaGraph is a graphical display system for visualizing the behavior and performance of parallel programs.

203.    ParaGraph was described in a number of printed publications including at the least the following publications relevant to the below chart:

[1] B. Ries, et al., "The Paragon Performance Monitoring Environment," Proceedings of the 1993 ACM/IEEE Conference on Supercomputing, 1993.

1

2

[2] M.T. Heath and Finger J.E., "ParaGraph: A tool for Visualizing Performance of Parallel Programs," User Guide, Sept. 1, 1994.

3

[3] M.T. Heath and Etheridge J.A., "Visualizing the Performance of Parallel Programs," IEEE Software, 1991.

4

5

[4] Ian Foster, Designing and Building Parallel Programs. 1st ed., 1995.

6

7

[5] Ewing Lusk, Performance Visualization for Parallel Programs, Theoretica Chimica Acta, vol. 84, 1993 at 377.

8

9

204.    The invalidity of the '499 Patent in view of SQL Server 6.0 with Microsoft Performance Monitor is more particularly explained in the following claim chart and in the

10

December 7, 2007 Expert Report of Richard N. Taylor.

11

12

| U.S. Patent No. 5,917,499 | Prior Art Analysis—ParaGraph |
|---|---|
| 13. A method for displaying an interactive graph, said method comprising: | ParaGraph describes a method for providing an interactive graph on a display, as described in [2] and as illustrated in [3]. ParaGraph provides a visual animation of the behavior of a parallel program. |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | ParaGraph stores a sequence of present values in a memory when they become available for each of plurality of display elements. ParaGraph normally runs using a tracefile of events captured from the execution of a parallel program, but "the design of the package does not rule out the possibility that the data for the visualization could be arriving at the graphical workstation as the parallel program executes on the parallel machine." ([2] at 4.) |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | ParaGraph generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements. ParaGraph provides numerous display choices for visualizing and animating the behavior of the parallel program as indicated by the events captured from the program's execution. Two options, for example, are "utilization count" and Gantt chart displays. (*See, e.g.*, [2], Fig. 1.) These displays show processor utilization behavior, as it varies over time. |
| dynamically updating said plurality of display elements in said display in | ParaGraph dynamically updates the display elements in the display without user intervention. The purpose of ParaGraph is to provide the user with understanding of the behavior of the parallel program, and does this in part by providing visual depictions of aspects of the program's behavior by showing how, e.g., processor utilization varies over time. (*See, e.g.*, [3] at |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—ParaGraph |
|---|---|
| real time independent of any intervention by a human user; | 29.)  Thus the utilization chart and the Gantt chart displays change as time proceeds, without user action required. "Some of the displays change in place dynamically as events occur, with execution time in the original run represented by simulation time in the replay." ([2] at 17.) |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and | ParaGraph can provide multiple displays, describing the program's behavior, concurrently.  The displays may provide different levels of detail of the same information.  Thus, the utilization chart provides aggregate information on processor utilization, whereas the Gantt chart provides additional detail of this processor utilization information on a per-processor basis.  Since ParaGraph is based on the X Windows system, these multiple displays may be superimposed. <br> Further, it would have been obvious to one of ordinary skill in the art to enable the "popping up" of the Gantt chart display from a double-click on a part of the utilization chart display.  For example, the Upshot system, a similar, comparable parallel program visualization system to ParaGraph, provides for generation of an additional level of detail display by clicking on a part of the Gantt chart.  (*See* [4] plates 10 (ParaGraph) and 11 (Upshot).) <br> In Upshot, "[o]ne can also mouse-click on specific events to pop up data boxes that show the rest of the data logged in the event." ([5] at 380,¶ 4.2.)  Furthermore, the fact that the Foster reference includes color plates of both the Upshot and Paragraph systems, on the same page, adjacent to one another, provides, to one of ordinary skill in the art, the suggestion to combine those elements. |
| overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. | ParaGraph overlays at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic.  ParaGraph's many displays contain numerous display elements.  The space-time diagram, for example, uses solid or blank horizontal lines to depict processor activity, while colored slanted lines depict communication activity, with the two types of lines crossing.  (*See, e.g.*, [2] at 22; [3] at 35.)  The two types of display elements are distinguished by, at least, whether they are horizontal (processor lines) or slanted (message lines). |
| 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method | See the corresponding element in claim 13. |

| | U.S. Patent No. 5,917,499 | Prior Art Analysis—ParaGraph |
|---|---|---|
| 1 | | |
| 2 | steps for displaying an interactive graph, said method comprising: | |
| 3 | | |
| 4 | | |
| 5 | storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | See the corresponding element in claim 13. |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | See the corresponding element in claim 13. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | and generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | 29. A program storage device readable by a | See the corresponding element in claim 13. |
| 28 | | |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—ParaGraph |
|---|---|
| computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | |
| storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements; | See the corresponding element in claim 13. |
| scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements; | ParaGraph provides for scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements. The scaling limits of ParaGraph are discussed in reference [2], page 42.  For example, "Most of the displays scale up well to a level of 512 or 1024 processors on a normal sized workstation screen, but at this point they are down to representing each processor by a single pixel (or pixel line), and hence cannot be scaled any further in their current form."  (*Id.*) Thus, the scale is determined by the number of processors to be portrayed and the number of pixels available for the display. |
| overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic; | See the corresponding element in claim 13. |
| generating at least one graph primitive on a display wherein said at least one | See the corresponding element in claim 13. |

136

| U.S. Patent No. 5,917,499 | Prior Art Analysis—ParaGraph |
|---|---|
| graph primitive is a graph comprised of said plurality of display elements; | |
| dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |

**5.**     **U.S. Patent No. 5,432,932 to Chen et al. and U.S. Patent No. 5,438,468 to Chen et al (collectively, the "Chen Patents")**

205.    The '932 Chen Patent is entitled "Creating Charts and Visualizations by Demonstration," was filed Oct. 23, 1992, and issued Jul. 11, 1995.  The '468 Chen Patent is entitled "System and Method for Concurrent Recording and Displaying of system Performance Data," was filed Oct. 23, 1992, and issued Jan. 9, 1996.

206.    The Chen Patents disclose the "xmperf" program suite, which is primarily concerned with the continuous monitoring of the utilization of resources in a computer system.

207.    The invalidity of the '499 Patent in view of the Chen Patents is more particularly explained in the following claim chart and in the December 7, 2007 Expert Report of Richard N. Taylor:

| U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|

| U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|
| 13. A method for displaying an interactive graph, said method comprising: | Chen describes a method for providing an interactive graph on a display, which can be used for performance monitoring of a computer system. Chen discloses a performance tool, its related application programming interfaces and daemon, which are designed for interactive selection of performance statistics across a network of computer systems, control of the flow of performance data, and monitoring of the remote host(s) performance in live graphs. (*See, e.g.*, '932 Patent, col. 2:66-3:4.) |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | Chen stores a sequence of present values in a memory when they become available for each of plurality of display elements.  Computer system performance values that may be stored and displayed in Chen include process memory utilization and CPU utilization, such as illustrated in Figure 12e. "The data display subsystem's 40 main responsibility is to display the performance data in the format described by the configuration subsystem 30, and to display it as soon as it is received from either the playback subsystem 50 or the data value receiver subsystem 60." ('932 Patent, col. 9:55-59.  "All of these operations can be done while the instruments are receiving data from the data supplier(s) and the display views are updated in real time (live).  Data values of the same primary style can also be stacked and unstacked without disturbing the reception of data." ('932 Patent, col. 23:29-34.) |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | Chen generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements.  A variety of graphs may be generated by Chen, as may be seen in Figures 12c, 12d, and 12e. |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | Chen dynamically updates the display elements in the display without user intervention. As new data becomes available the graphs dynamically change, with the old values being shifted by a pre-specified number of pixels as each reading of values is received. ('932 Patent, col. 24:56-57). "Recording graphs have a time scale with the current time to the right.  The values plotted are moved to the left as new readings are received." ('932 Patent, col. 23:35-39.) |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display | Chen can provide multiple displays, called "instruments", each describing detailed aspects of the monitored program's behavior, concurrently, within a single window called a "console".  Figure 12e illustrates four instruments within one console.  Additional instruments can be added to a console, in response to a user input command, as described in columns 31-32.  Chen specifically chose to prevent overlap of the instruments, as described in 32:1-15.  It is thus obvious that such overlap could have been allowed. Moreover, since Chen was knowledgeable of the Motif graphical user |

| | U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|---|
| 1 | | |
| 2 | elements in response to a user input command; and | interface to present information on the display ('932 Patent, col. 29:18-21; 100:3-14), and since Motif supports, for example, pop-up menus from selecting a displayed component, it would have been obvious to one of ordinary skill in the art to provide for generating a superimposed display of at least one level of display element detail based upon user selection of a display element. |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. | Chen overlays at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. An example of this can be seen in Figure 12e, element 249. The patent refers to this capability as "stacking". As the '932 Patent says in 24:36-46, "The concept of stacking allows data values to be plotted 'on top of' each other. Stacking works only for values that use the primary style. To illustrate, think of a bar graph where the kernel-cpu and user-cpu time are plotted as stacked. If at one point in time the kernel-cpu is 15% and the user-cpu is 40%, then the corresponding bar will go from 0-15% in the color of kernel-cpu, and from 16-55% in the color used to draw user-cpu. If it is desired to overlay this graph with the number of page-in requests, one could do so by letting this value use the skyline graph style, for example." |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | See the corresponding element in claim 13. |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | generating at least one graph primitive on a | See the corresponding element in claim 13. |
| 28 | | |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|
| display wherein said at least one graph primitive is comprised of said plurality of display elements; | |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | See the corresponding element in claim 13. |
| and generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| storing a sequence of present values in | See the corresponding element in claim 13. |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|
| a memory as they occur in real time for each of a plurality of display elements; | |
| scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements; | Chen provides for scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements. Scaling is discussed several places in the '932, for example. When adding an instrument to a console, for instance, Chen states (31:16-28), "1. It is checked if there is enough space to create an instrument with a height of 24% of the console. The space must be available in the entire width of the console. If this is the case, a new instrument is created in the space available. 2. If enough space is not available, the existing instruments in the console are resized to provide space for the new instrument. Then the new instrument is created at the bottom of the console. 3. If the new instrument has a height less than 100 pixels, the console is resized to allow the new instrument to be 100 pixels high." Further discussion of the scaling of the data within an instrument is found at '932 Patent col. 27:1-6. |
| overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic; | See the corresponding element in claim 13. |
| generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—Chen Patents |
|---|---|
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |

### 6. U.S. Patent No. 5,375,199 to Harrow (the "'199 Patent")

208. The '199 Patent, entitled "System Monitoring Method Including a Graphical User Interface to View and Manipulate System Information," was filed Jun. 4, 1991, and issued Dec. 30, 1994.

209. The '199 Patent describes a system for the monitoring and visualization of data from a computer system.

210. The invalidity of the '499 Patent in view of the '199 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report of Richard N. Taylor:

| U.S. Patent No. 5,917,499 | Prior Art Analysis—'199 Patent |
|---|---|
| 13. A method for displaying an interactive graph, said method comprising: | The '199 Patent describes a method for providing an interactive graph on a display. The display portrays data from a computer system, and which may change dynamically as new data becomes available. The graph is illustrated in Figures 13a and 13b, for example. |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | The '199 Patent stores a sequence of present values in a memory when they become available for each of plurality of display elements. "Upon receiving the pre-selected information transmitted from the monitored system, the processor of the display device stores the information in the memory associated with the display device. Once received, this information can be immediately displayed directly on the display device or it can be stored and retrieved for displaying later by the user. In either case, the information is recorded, i.e., stored in the memory or on a disk drive associated with the display device." col. 3:20-28. |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—'199 Patent |
|---|---|
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | The '199 Patent generates at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements. "Once received, this information can be immediately displayed directly on the display device or it can be stored and retrieved for displaying later by the user." col. 3:23-26. An illustration of such display is in Figure 13a. |
| dynamically updating said plurality of display elements in said display in real time independent of any intervention by a human user; | The '199 Patent dynamically updates the display elements in the display without user intervention. When the disclosed invention is used to examine real-time information, the display is dynamically updated to show the new information as it is made available. This activity is described, for example, in cols. 8:36-54 and 10:33-54. |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command; and | The '199 Patent provides for a superimposed display of "alarm thresholds", as indicated by item 202 in Figures 13a and 13b. If a monitored data value falls within the user-specified threshold, an alarm goes off. "Once a value or a range of values is set indicating that an alarm is to be set off or some action is to take place, the values are stored within the X Window System. Stored along with these values are addresses to routines that would be invoked to perform the tasks required to sound an alarm or perform action such as taking a network disk offline when excessive errors are occurring when reading or writing to the network disk." 23:46-53. To the extent the '199 Patent does not describe a "superimposed" display, it would be obvious to one of ordinary skill in the art to generate a superimposed display to provide additional details about the alarm condition. For example, the X Windows system contained the functionality necessary to display the details of the specific monitored event triggering the alarm: the monitored data is available, the X Window system is being used (hence supporting overlayed and pop-up displays), one form of overlay is already used in the system (the horizontal alarm bar slider), and one of the routines associated with the values could be designed to generate the superimposed display. (*See, e.g.,* Scheifler & Gettys, p. 79.) |
| overlaying at least two display elements within said at least one graph primitive wherein each of said at least two display elements are | The '199 Patent overlays at least two display elements within said at least one graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic. Figures 13a and 13b show examples: the vertical bars are overlaid with the horizontal alarm bar, and the both the horizontal and vertical bars overlay a grid of lines. Furthermore, the '199 Patent teaches that the bars can be rescaled to add more data to each film screen. "Dragging a delineation mark in a first direction narrows the space occupied by each piece of information represented on the "film portion" of the first interactive icon, thereby |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—'199 Patent |
|---|---|
| distinguishable by a unique display characteristic. | increasing the amount of information displayed through the "magnifying glass portion" of the first interactive icon." 4:52-57. For purposes of effectiveness and convenience, one of ordinary skill in the art would configure the disclosed system such that each vertical bar has some minimum width (for visibility purposes) so that as the delineation mark is dragged past some threshold, the frame would be drawn with overlapping vertical bars, thus maintaining a minimum width of the bars but still allowing more information to be displayed in the frame. |
| 23. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| storing a sequence of present values in a memory as they occur in real time for each of plurality of display elements; | See the corresponding element in claim 13. |
| generating at least one graph primitive on a display wherein said at least one graph primitive is comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display in | See the corresponding element in claim 13. |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—'199 Patent |
|---|---|
| real time independent of any intervention by a human user; | |
| and generating a superimposed display of at least one additional level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |
| 29. A program storage device readable by a computer, said program storage device tangibly embodying instructions executable by said computer to perform method steps for displaying an interactive graph, said method comprising: | See the corresponding element in claim 13. |
| storing a sequence of present values in a memory as they occur in real time for each of a plurality of display elements; | See the corresponding element in claim 13. |
| scaling each of said plurality of display elements according to a predetermined scale for each of | The '199 Patent provides for scaling each of said plurality of display elements according to a predetermined scale for each of said plurality of display elements. The '199 Patent also allows for this initial scale to be changed by the user. col. 4:42-48.  "The user interface of the present invention allows a user to alter the scale of the variable represented by the axis which in turn alters, i.e., magnifies or reduces, the amount of data |

| U.S. Patent No. 5,917,499 | Prior Art Analysis—'199 Patent |
|---|---|
| said plurality of display elements; | displayed on the 'film portion' of the first interactive icon under the 'magnifying glass portion' of the first interactive icon." |
| overlaying at least two display elements within said graph primitive wherein each of said at least two display elements are distinguishable by a unique display characteristic; | See the corresponding element in claim 13. |
| generating at least one graph primitive on a display wherein said at least one graph primitive is a graph comprised of said plurality of display elements; | See the corresponding element in claim 13. |
| dynamically updating said plurality of display elements in said display; and | See the corresponding element in claim 13. |
| generating a superimposed display of at least one level of display element detail for any one of said plurality of display elements in response to a user input command. | See the corresponding element in claim 13. |

## C.     Non-Infringement

211.    Microsoft has accused the VitalApps feature of Lucent's VitalSuite software of infringing claims 13, 23, 29 of the '499 Patent.  Lucent denies that VitalApps or any portion of

VitalSuite infringes the '499 Patent.  Nor has Microsoft proffered sufficient evidence to prove infringement by a preponderance of the evidence.

212.    Microsoft's contends the VitalApps Alarms | Summary heat chart practices the claimed methods of claim 13, 23, and 29.  Microsoft cannot prove that the Alarms | Summary heat chart practices all the elements of the asserted claims for at least the reasons contained in the following numbered paragraphs.

213.    Lucent denies that the Alarms | Summary heat chart stores a sequence of present values in real-time. VitalSuite uses a  multi-tier, multi-database structure wherein data that originates from a network device, gets stored in a polling server, then an aggregation server, then in a master server, and then ultimately summarized and presented to the user via the Web Console.  At each step a delay is induced between the time when the value is available and when the value is ultimately stored.

214.    Lucent denies that the Alarms | Summary heat chart consists of a graph primitive containing display elements.  There is no "for each" correspondence between the data stored (application use on an individual VitalAgent) and the data represented in the ovals in the Alarms | Summary heat chart (aggregations of application performance data from all VitalAgents in a specified domain).  The Alarms | Summary heat cell ovals do not correspond to the stored information and thus cannot be a resulting "display element" on the graphical display.  Furthermore, the heat cell ovals are not individual data entities or segments, bars, or plots within a graph primitive.

215.    Lucent denies that the Alarms | Summary heat chart dynamically updates in real-time. In order to refresh the Alarm | Summary heat chart, a user must first click the "regenerate" button on the display.  The information underlying the Alarms | Summary heat chart is not displayed to the user until the VitalSuite Web Console is refreshed.  Thus, an event could happen, be detected, and be stored but the display would not contain the available information until the screen gets refreshed.

216.    Lucent denies that the Alarms | Summary heat chart overlays at least two display elements within the at least one graph primitive which are distinguishable by a unique display characteristic.  Microsoft is unable to show the existence of two different display elements overlaid on top of one another.  The heat chart ovals themselves clearly do not overlap.  Lucent further denies that one of ordinary skill in the art would understand ovals that change color and size to overlay one another.

## VII.    The Fein '608 Patent

217.    The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts regarding the teaching of asserted claims 7, 15, 21, and 25 of the Fein '608 Patent, the invalidity of the asserted claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims.  For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference their their Final Invalidity Contentions and the expert reports of Dr. Paul Clark and Dr. Martin Kaliski.

### A.    The Fein '608 Patent And Asserted Claims

218.    The Fein '608 Patent, entitled "Method and System for Customizing Alert Messages," issued on May 20, 2003, from an application dated December 18, 1998.  Microsoft is asserting claims 7, 15, 21, and 25 of the '608 Patent against Lucent.  The purported invention of the '608 Patent is to provide custom content that supplements static content displayed in an alert message in response to detecting a predetermined condition and then displaying that custom content to the user of a software program module.

219.    Asserted claim 7 is dependent on claims 1, 2, and 3 of the '608 Patent and is directed toward a method of performing several method steps in order to monitor and display custom content in response to a predetermined condition to a user of a software program module.

220.    Claim 1 of the Fein '608 Patent reads as follows:

1. A computer-implemented method for providing information
regarding one of a plurality of predetermined conditions associated

with operation of a program module on a computer, comprising the steps of:

detecting one of the predetermined conditions;

accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the program module; and

presenting the custom content.

221.    Claim 1 relates to a method of providing custom information concerning a predetermined condition associated with the operation of a program module on a computer, the custom content representing information defined by a party other than the manufacturer of the program module.

222.    Claim 2, which depends from claim 1, adds the following additional limitation: "displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module." As set forth in the attached claim charts, however, the automatic display of a static message in response to detecting a predetermined condition was known in the art prior to the alleged invention of claim 2 of the Fein '608 Patent, and also would have been obvious to one of ordinary skill in the art.

223.    Claim 3, which depends from claim 2, adds the following additional limitations to claim 2: "wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content." As set forth in the claim charts, however, the use of a control object such as a hyperlink which, when selected, accesses an information source to access custom content was known in the art prior to the alleged invention of claim 3 of the Fein '608 Patent, and also would have been obvious to one of ordinary skill in the art.

224.   Asserted claim 7, which depends from claim 3, adds the following additional limitations to claim 3:

> 7.  The computer-implemented method of claim 3 wherein the step of accessing the information source comprises the steps of:
>
> launching a browser in response to selecting one of the control objects of the alert message; and
>
> using the browser to access the custom content maintained at the information source by opening a hyperlink to the information source.

225.   As set forth in the attached claim charts, however, launching a browser in response to selecting a control object such as a hyperlink, and using the browser to access and display custom content maintained at a local or remote information source by opening a hyperlink to the information source was also known in the art prior to the alleged invention of claim 3 of the Fein '608 Patent, and also would have been obvious to one of ordinary skill in the art.

226.   Asserted claim 15 of the Fein '608 Patent reads as follows, and is invalid for the same reasons that claims 1, 2, and 3 are invalid, and for the additional reason that the use of a remote information source was known in the art, as set forth in the attached claim charts:

> 15. computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of:
>
> detecting one of a plurality of predetermined conditions;
>
> displaying the alert message in response to the detected predetermined condition, the alert message comprising the static content and at least one control object;
>
> responsive to selection of one of the control objects, accessing an information source that maintains the custom content, wherein the information source is located separately from the local machine; and
>
> displaying the custom content to present supplemental information that is related to the detected predetermined condition.

227.   Asserted claim 21, which depends from claim 15, adds the following additional limitations to claim 15, and is invalid for the same reasons that claims 1-3, 7 and 15 are invalid, as set forth in the below claim charts:

> 21.  The computer-implemented method of claim 15, wherein the step of accessing an information source that maintains the custom content comprises:
>
> obtaining an identifier that identifies the information source; and
>
> launching a browser; and
>
> using the browser to view the custom content maintained at the information source by opening a hyperlink including the identifier.

228.   Asserted claim 25 of the Fein '608 Patent reads as follows, and is invalid for the same reasons that claims 1-3, 7, 15, and 21 are invalid, as set forth in the below claim charts:

> 25. A computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of:
>
> detecting one of a plurality of predetermined conditions;
>
> displaying the alert message in response to the detected predetermined condition;
>
> opening a hyperlink from the alert message to access an external information source that maintains the custom content, the external information source operating in a location separate from the local machine;
>
> displaying the custom content to present supplemental information that is related to the detected predetermined condition.

**B.     Invalidity**

**1.     HP OpenView**

229.   Claims 7, 15, 21, and 25 of the Fein '608 Patent would have been obvious in view of the April 1996 version of HP OpenView Network Node Manager ("OpenView") (*see* HP OpenView, Using Network Node Manager, April 1996, HP000679, and HP OpenView, A Guide to Scalability and Distribution to Network Node Manager, April 1996, HP000507, which are

themselves prior art), in combination with one or more of the following prior art references (see claim chars below) to of one of ordinary skill in the art:

- U.S. Patent No. 5,845,120 ("Reddy"), issued December 1, 1998, LUCENT0004048.

- Robert Lord, *Help File Web Links: Embedding URL Links in Windows Help Files*, published in Dr. Dobb's Journal, July 1996, LUCENT0011713.

- Microsoft HTML Help 1.0 released in August 1997, and which is described in Steven Wexler, *Official Microsoft HTML Help Authoring Kit* (1998), LUCENT0011849.

- HP Help System Version 3.0, which is described in LUCENT0140124.

- U.S. Patent No. 6,005,569 ("Breggin"), filed January 15, 1997 and issued December 21, 1999, LUCENT0140933.

- U.S. Patent No. 4,800,485 ("Ackroff"), issued January 24, 1989, LUCENT0158104.

- U.S. Patent No. 5,581,684 ("Dudzik"), issued December 3, 1996, LUCENT0158197.

- IBM Technical Disclosure Bulletin, "Method for Dynamically Generating Error Messages," August 1991, LUCENT 0011794

230.    One of ordinary skill in the art would have been led to combine these references with OpenView given their similar subject matter (customizable help and error messages), the nature of the problem to be solved (customizing error and help messages to provide more useful information to the user), and the advantages taught by the prior art (using a separate local or remote information source to store custom error and help information that can be accessed through a browser, where the custom information can be authored by the user to provide greater versatility). Furthermore, these combinations would have been a predictable combination of familiar elements according to their known functions, leading to predictable results.

231.    The invalidity of the '608 Patent in view of OpenView is more particularly explained in the following claim chart and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 1 | HP OpenView (April 1996) ("OpenView") |
|---|---|
| 1. A computer-implemented method for providing information regarding one of a plurality of predetermined conditions associated with operation of a program module | OpenView is a network monitoring system that provides information concerning predetermined conditions (referred to as events) on a network, including conditions |

| | |
|---|---|
| on a computer, comprising the steps of: | associated with the operation of OpenView itself.  (*See, e.g.,* Using Network Node Manager, April 1996, pgs. 6-2-6-4.) |
| detecting one of the predetermined conditions | OpenView detects predefined conditions and generates event notifications when one of those conditions occurs.  (*See, e.g.,* Using Network Node Manager, April 1996, pgs. 6-2 - 6-4.) |
| accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the program module | Event notifications may be customized by the user through the use of a Popup Notification function.  (*See, e.g.,* Using Network Node Manager, April 1996, pgs. 1-7-1-8, 6-2-6-4.) When the user right clicks on the event notification message, the database that maintains the custom information will be accessed.  (*See, e.g.,* Using Network Node Manager, April 1996, pgs. 6-7, 6-10, 6-25-6-30.)  It is also possible to customize the event notification message itself.  (*See, e.g.,* Using Network Node Manager, April 1996, pgs. 1-7-1-8, 6-2-6-4, A-23, B-8.) |
| and presenting the custom content. | When a custom Popup Notification is used, the custom content will be displayed on the screen when the even notification message is right clicked.  (*See, e.g.,* Using Network Node Manager, 1996, pgs. 6-7, 6-10, 6-25-6-30.) When customized event notification messages are used, the custom content will be displayed when the Events Browser is launched.  (*See, e.g.,* Using Network Node Manager, 1996, pgs. 6-7, 6-10, 6-25-6-30, A-38, B-8.) |
| **Claim 2** | |
| 2. The computer-implemented method of claim 1 further comprising the step of displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module. | OpenView through a command for automatic action can cause the Events Browser to be automatically launched and display a static events notification message prior to accessing the information source, in response to detecting the event.  (*See, e.g.,* Using Network Node Manager, 1996, pgs. 6-7, 6-10, 6-25-6-30.)  When a default message is used, the static content can be defined by HP.  (*See, e.g.,* Using Network Node Manager, 1996, pgs. 6-5-6-10, B-8.)  It would also have been obvious to one of ordinary skill in the art to display a static alert message to the user in response to detecting an error first and give the user the option to find out more information by accessing the custom content after displaying |

| | the static content. For example, Reddy and Lord both disclose the use of links to custom information in a notification message to provide a system user with additional information. (*See, e.g.,* Reddy, col. 6, lns. 1-6; Lord, pg. 78.) Additionally, on-line help systems were well known in the art (*see, e.g.,* HTML Help 1.0 Aug 1997 and HP Help System), including online help systems that include customer-definable help. (*See, e.g.,* Breggin, Abstract; Ackroff, Summary of Invention; Dudzik, Summary of the Invention.) One of ordinary skill in the art would have been led to combine these references with OpenView, because the references recognize the advantages of providing custom information that supplements an error or help messages. Further, this capability was present in Windows NT 3.1 and even earlier Unix systems. |
|---|---|
| **Claim 3** | |
| 3. The computer-implemented method of claim 2, wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content. | When Popup Notifications are used, the events message itself acts as a control object which when right clicked will cause the database to be accessed and the custom content to be displayed in the Popup Notification. (*See, e.g.,* Using Network Node Manager, 1996, pgs. 6-7, 6-10, 6-25-6-30.) This would also have been obvious to one of ordinary skill in the art. For example, Reddy and Lord both disclose the use of hyperlinks that are selected to access the custom information stored in an information source. (*See, e.g.,* Reddy, col. 6, lns. 36-42; Lord, pg. 78.) As discussed above, one of ordinary skill in the art would have been led to combine Reddy and/or Lord with OpenView. |
| **Claim 7** | |
| 7. The computer-implemented method of claim 3 wherein the step of accessing the information source comprises the steps of: | |
| launching a browser in response to selecting one of the control objects of the alert message; | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message. (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.) Also, Web based on line help is provided by HP as a standard service for OpenView. As discussed above, it would have been obvious to use a browser to display the custom |

| | |
|---|---|
| | information instead of a Popup Notification. OpenView also contains an Events Browser. Using Network Node Manager, 6-25. |
| and using the browser to access the custom content maintained at the information source by opening a hyperlink to the information source. | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message to view custom content.  (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.)   Also, Web based on line help is provided by HP as a standard service for OpenView.  As discussed above, it would have been obvious to use a browser to display the custom information instead of a Popup Notification. |
| **Claim 15** | |
| 15. computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | *See* preamble of claim 1. |
| detecting one of a plurality of predetermined conditions; | *See* detecting step of claim 1. |
| displaying the alert message in response to the detected predetermined condition, the alert message comprising the static content and at least one control object; | *See* claim 2. |
| responsive to selection of one of the control objects, accessing an information source that maintains the custom content, wherein the information source is located separately from the local machine; and | *See* claim 3.  OpenView supports both local and remote information sources.  For example, if the user is running a remote management console, then the events database would be located separately on the NNM Management Station.  (*See, e.g., HP OpenView, A Guide to Scalability and Distribution for Network Node Manager*, 1996, pg. 1-11.)  The use of a remote information source would also have been obvious to one of ordinary skill in the art.  For example, Lord disclose launching a browser to a remote Web site in response to selecting a link in an alert message.  (*See, e.g.,* Lord, pg. 78; *see also* Wexler, pg. 98-99.) |
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | *See* the accessing and presenting steps of claim 1.  It would also have been obvious to one of ordinary skill in the art to display the custom content using the browser, as discussed above. |
| **Claim 21** | |
| 21. The computer-implemented method of claim 15, wherein the step of accessing an information source that maintains the custom content comprises: | |

| obtaining an identifier that identifies the information source; and | When the user right clicks on the event notification message, OpenView will necessarily obtain an identifier that identifies the Popup Notification message in the database.  It would have been obvious to one of ordinary skill in the art in view of the prior art to use a hyperlink that includes an identifier of the information source, such as a file name (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6.) |
| launching a browser; and | *See* launching step of claim 7. |
| using the browser to view the custom content maintained at the information source by opening a hyperlink including the identifier. | *See* using step of claim 7. |
| **Claim 25** | |
| 25. A computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | *See* preamble of claim 1. |
| detecting one of a plurality of predetermined conditions; | *See* detecting step of claim 1. |
| displaying the alert message in response to the detected predetermined condition; | *See* claim 2. |
| opening a hyperlink from the alert message to access an external information source that maintains the custom content, the external information source operating in a location separate from the local machine; | *See* claim 3.  OpenView supports both local and remote information sources.  For example, if the user is running a remote management console, then the events database would be located separately on the NNM Management Station.  (*See, e.g., HP OpenView, A Guide to Scalability and Distribution for Network Node Manager*, 1996, pg. 1-11.)  The use of a remote information source would also have been obvious to one of ordinary skill in the art.  For example, Lord disclose launching a browser to an remote Web site in response to selecting a link in an alert message.  (*See, e.g.,* Lord, pg. 78; *see also* Wexler, pg. 98-99.) |
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | *See* the accessing and presenting steps of claim 1.  It would also have been obvious to one of ordinary skill in the art to display the custom content using a browser, as discussed above. |

## 2.    IBM Technical Disclosure Bulletin

232.    Claims 7, 15, 21, and 25 of the Fein '608 Patent are claims 7, 15, 21, and 25 of the

Fein '608 Patent are obvious in view of the IBM Technical Disclosure Bulletin titled "Method for

Dynamically Generating Error Messages" dated August 1991 in combination with the following

references and the knowledge of one of ordinary skill in the art:

- U.S. Patent No. 5,845,120 ("Reddy"), issued December 1, 1998, LUCENT LUCENT0004048.

- HP OpenView Network Node Manager ("OpenView"), which was released by Hewlett Packard no later than April 1996, and which is described in Using Network Node Manager, HP000679.

- Robert Lord, *Help File Web Links:  Embedding URL Links in Windows Help Files*, published in Dr. Dobb's Journal, July 1996, LUCENT0011713.

- Microsoft HTML Help 1.0 released in August 1997, and which is described in Steven Wexler, *Official Microsoft HTML Help Authoring Kit* (1998), LUCENT0011849.

- U.S. Patent No. 6,005,569 ("Breggin"), filed January 15, 1997 and issued December 21, 1999, LUCENT LUCENT0140933.

- U.S. Patent No. 4,800,485 ("Ackroff"), issued January 24, 1989, LUCENT0158104.

- U.S. Patent No. 5,581,684 ("Dudzik"), issued December 3, 1996, LUCENT0158197.

233.    One of ordinary skill in the art would have been led to combine these references with

the IBM Technical Disclosure Bulletin given their similar subject matter (customizable help and

error messages), the nature of the problem to be solved (customizing error and help messages to

provide more useful information to the user), and the advantages taught by the prior art (using a

separate local or remote information source to store custom error and help information that can be

accessed through a browser, where the custom information can be authored by the user to provide

greater versatility).  Furthermore, these combinations would have been a predictable combination of

familiar elements according to their known functions, leading to predictable results.

234.    The invalidity of the '608 Patent in view of the IBM Technical Disclosure Bulletin is

more particularly explained in the following claim charts, and in the December 7, 2007 Expert

Report of Paul C. Clark:

| Claim 1 | IBM Technical Disclosure Bulletin |
|---|---|
| 1. A computer-implemented method for providing information regarding one of a | The IBM Technical Disclosure Bulletin discloses a system and method for generating |

| | |
|---|---|
| plurality of predetermined conditions associated with operation of a program module on a computer, comprising the steps of: | error messages in response to error conditions that occur on computers in a network: "Establishing a self identifying parameter that associates a numeric value for indexing into a file can define an array of statements describing the error conditions." |
| detecting one of the predetermined conditions | The IBM Technical Disclosure Bulletin discloses detecting predetermined error conditions in computers on a network, such as undeliverable mail in a mail system: "These different mail systems may have different codes and messages for undelivered messages. This article describes a method by which an existing software system can dynamically generate new messages and error codes. A new error message may be needed to handle a new connection to a network that generates different messages and errors." This file would then be accessed to retrieve the custom content. |
| accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the program module | The IBM Technical Disclosure Bulletin discloses the use of an indexed file of error messages that can be modified by users of the system to create custom error messages: "Thus, to add new error messages, a file would be modified and no shipment of new code is needed." |
| and presenting the custom content. | The IBM Technical Disclosure Bulletin discloses presenting the custom error message to the user: "This technique permits the native system to generate the actual error condition to the user rather than an error message of the native system which may be an inaccurate description." |
| **Claim 2** | |
| 2. The computer-implemented method of claim 1 further comprising the step of displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module. | It would have been obvious to one of ordinary skill in the art to  display this static information first and give the user the option to find out more information by accessing the custom content after displaying the static content. For example, Reddy and Lord both disclose the use of links to custom information in a notification message to provide a system user with additional information. (*See, e.g.,* Reddy, |

| | Abstract; Lord, pg. 78.)  Additionally, on-line help systems were well known in the art (*see, e.g.,* HTML Help 1.0 and HP Help System), including online help systems that include customer-definable help.  (*See, e.g.,* Breggin, Abstract; Ackroff, Summary of Invention; Dudzik, Summary of the Invention.)  One of ordinary skill in the art would have been motivated to combine these references with the IBM Technical Disclosure Bulletin, because the references recognize the advantages of providing custom information that supplements error or help messages.  Further, this capability was present in Windows NT 3.1 and even earlier Unix systems. |
|---|---|
| **Claim 3** | |
| 3. The computer-implemented method of claim 2, wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content. | It would have been obvious to one of ordinary skill in the art in view of the prior art to include in an alert message a control object such as a hyperlink that links to custom content.  For example, both Reddy and Lord disclose error and help messages that include a hyperlink that can be clicked on to display custom information.  (*See, e.g.,* Reddy, Abstract, Fig. 5; Lord, pg. 78.) |
| **Claim 7** | |
| 7. The computer-implemented method of claim 3 wherein the step of accessing the information source comprises the steps of: | |
| launching a browser in response to selecting one of the control objects of the alert message; | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message.  (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.)  As discussed above, it would have been obvious to one of ordinary skill in the art to include a hyperlink in an event notification message. |
| and using the browser to access the custom content maintained at the information source by opening a hyperlink to the information source. | It would have been obvious to one of ordinary skill in the art in view of the prior art to use browser technology to access and display the custom information stored in an indexed file.  For example, Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message.  (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.) |
| **Claim 15** | |
| 15. computer-implemented method for providing custom content that supplements | The IBM Technical Disclosure Bulletin discloses a system and method for generating |

| | | |
|---|---|---|
| | static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | custom error messages in response to error conditions that occur on software products running on computers in a network: "Establishing a self identifying parameter that associates a numeric value for indexing into a file can define an array of statements describing the error conditions." |
| | detecting one of a plurality of predetermined conditions; | The IBM Technical Disclosure Bulletin discloses detecting predetermined error conditions in computers on a network, such undeliverable mail in a mail system: "These different mail systems may have different codes and messages for undelivered messages. This article describes a method by which an existing software system can dynamically generate new messages and error codes. A new error message may be needed to handle a new connection to a network that generates different messages and errors." |
| | displaying the alert message in response to the detected predetermined condition, the alert message comprising the static content and at least one control object; | As discussed above, it would have been obvious to one of ordinary skill in the art to display this static information first and give the user the option to find out more information by clicking on a link or other control object in the notification. |
| | responsive to selection of one of the control objects, accessing an information source that maintains the custom content, wherein the information source is located separately from the local machine; and | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message. (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.) As discussed above, it would have been obvious to one of ordinary skill in the art to include a hyperlink in an event notification message.<br><br>The IBM Technical Disclosure Bulletin relates to a computer network, and thus the indexed file containing the custom content can be stored on any computer in the network. Furthermore, it would have been obvious to one of ordinary skill in the art to make use of a network or other remote database to store custom error messages. For example, as discussed above, in HP OpenView custom information may be stored remotely. Lord further teaches that custom content may located remotely on the world wide web. (*See, e.g.,* Lord, pg. 78.) |

| | |
|---|---|
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | The IBM Technical Disclosure Bulletin discloses presenting the custom error message to the user:  "This technique permits the native system to generate the actual error condition to the user rather than an error message of the native system which may be an inaccurate description." |
| **Claim 21** | |
| 21. The computer-implemented method of claim 15, wherein the step of accessing an information source that maintains the custom content comprises: | |
| obtaining an identifier that identifies the information source; | As discussed above, it would have been obvious to one of ordinary skill in the art to use a control object such as a hyperlink that links to custom content. The hyperlink identifies the information source from which the custom information will be obtained. |
| and launching a browser; and using the browser to view the custom content maintained at the information source by opening a hyperlink including the identifier. | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message to view the custom content. (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.) As discussed above, it would have been obvious to one of ordinary skill in the art to include a hyperlink in an error message. |
| **Claim 25** | |
| 25. A computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | The IBM Technical Disclosure Bulletin discloses a system and method for generating custom error messages in response to error conditions that occur on software products running on computers in a network: "Establishing a self identifying parameter that associates a numeric value for indexing into a file can define an array of statements describing the error conditions." |
| detecting one of a plurality of predetermined conditions; | The IBM Technical Disclosure Bulletin discloses detecting predetermined error conditions in computers on a network, such undeliverable mail in a mail system:  "These different mail systems may have different codes and messages for undelivered messages. This article describes a method by which an existing software system can dynamically generate new messages and error codes.  A new error message may be needed to handle a new connection to a network that generates different messages and errors." |

| displaying the alert message in response to the detected predetermined condition; | As discussed above, it would have been obvious to one of ordinary skill in the art to display this static information first and give the user the option to find out more information by clicking on a link or other control object in the notification. |
|---|---|
| opening a hyperlink from the alert message to access an external information source that maintains the custom content, the external information source operating in a location separate from the local machine; | Lord and Reddy both disclose launching a browser in response to selecting a link in an alert message. (*See, e.g.,* Lord, pg. 78; Reddy, col. 6, lns. 1-6; *see also* Nielsen, abstract.) As discussed above, it would have been obvious to one of ordinary skill in the art to include a hyperlink in an event notification message. |
| | The IBM Technical Disclosure Bulletin relates to a computer network, and thus the indexed file containing the custom content can be stored on any computer in the network. Furthermore, it would have been obvious to one of ordinary skill in the art to make use of a network or other remote database to store custom error messages. For example, as discussed above, in HP OpenView custom information may be stored remotely from the user's computer. Lord further teaches that custom content may located remotely on the world wide web. (*See, e.g.,* Lord, pg. 78.) |
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | The IBM Technical Disclosure Bulletin discloses presenting the custom error message to the user: "This technique permits the native system to generate the actual error condition to the user rather than an error message of the native system which may be an inaccurate description." |

### 3. U.S. Patent No. 5,845,120 to Reddy ( the "'120 Patent")

235. Claims 7, 15, 21, and 25 of the Fein '608 Patent are rendered obvious by U.S. Patent No. 5,845,120 ("Reddy") filed September 19, 1995 and issued December 1, 1998, in combination with one or more references identified below or the knowledge of one of ordinary skill in the art:

- HP OpenView Network Node Manager ("OpenView"), which was released by Hewlett Packard no later than April 1996, and which is described in Using Network Node Manager, HP 000671.

- Robert Lord, *Help File Web Links: Embedding URL Links in Windows Help Files*, published in Dr. Dobb's Journal, July 1996, LUCENT0011713.

- Microsoft HTML Help 1.0 released in August 1997, and which is described in Steven Wexler, *Official Microsoft HTML Help Authoring Kit* (1998), LUCENT LUCENT0011849.

- U.S. Patent No. 6,005,569 ("Breggin"), filed January 10, 1997 and issued December 21, 1999, LUCENT0140933.

- U.S. Patent No. 4,800,485 ("Ackroff"), issued January 24, 1989, LUCENT0158104.

- U.S. Patent No. 5,581,684 ("Dudzik"), issued December 3, 1996, LUCENT0158197.

236.    One of ordinary skill in the art would have been led to combine these references with Reddy given their similar subject matter (customizable help and error messages), the nature of the problem to be solved (customizing error and help messages to provide more useful information to the user), and the advantages taught by the prior art (using a separate local or remote information source to store custom error and help information that can be accessed through a browser, where the custom information can be authored by the user to provide greater versatility). Furthermore, these combinations would have been a predictable combination of familiar elements according to their known functions, leading to predictable results.

237.    The invalidity of the '608 Patent in view of the Reddy '120 Patent is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 1 | Reddy '120 Patent |
|---|---|
| 1. A computer-implemented method for providing information regarding one of a plurality of predetermined conditions associated with operation of a program module on a computer, comprising the steps of: | Reddy discloses a system and method for providing error messages in response to a compiler error on a computer. (*See, e.g.,* Abstract.) |
| detecting one of the predetermined conditions | The Reddy system detects a compile error. (*See, e.g.,* Fig. 6, item 610; col. 3, lns. 39-42.) |
| accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the | The Reddy system accesses via selection of a link an information source, such as help files, containing custom information. (*See, e.g.,* col. 4, lns. 35-41; col. 6, lns. 32-42; Figure 5.) Reddy suggests that the custom information |

| | |
|---|---|
| program module | may be authored by a third party through its reference to HTML commands (*see, e.g.,* col. 3, lns. 53-57), and it would have been obvious to one of ordinary skill in the art that the information can be custom information defined by a party other than the manufacturer program module. For example, Lord discloses that links to web pages on the world wide web may be included in help files. (*See, e.g.,* Lord, pg. 78; *see also* Breggin, Abstract; Ackroff, Summary of the Invention.) One of ordinary skill in the art would have been motivated to combine these references with Reddy, because the references recognize the advantages of providing custom information that supplements error or help messages. |
| and presenting the custom content. | The Reddy system displays the information described by the link information. (*See, e.g.,* col. 6, lns. 36-42.) |
| **Claim 2** | |
| 2. The computer-implemented method of claim 1 further comprising the step of displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module. | In the Reddy system the error message containing static content is displayed in response to an error before the link is selected. (*See, e.g.,* Fig. 5.) |
| **Claim 3** | |
| 3. The computer-implemented method of claim 2, wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content. | Reddy discloses the use of links or glyphs in the error messages which can be selected to access the additional custom content in the information source. (*See, e.g.,* Fig. 5, items 522, 512, 520; col. 4, lns. 35-41; col. 6, lns. 36-42.) |
| **Claim 7** | |
| 7. The computer-implemented method of claim 3 wherein the step of accessing the information source comprises the steps of: | |
| launching a browser in response to selecting one of the control objects of the alert message; | Reddy discloses launching a help viewer in response to selecting the link in the error message. (*See, e.g.,* col. 6, lns. 1-6.) It would also have been obvious to one of ordinary skill in the art to use a Web browser to display |

| | custom information, particularly in view of the explicit references to HTML. |
|---|---|
| and using the browser to access the custom content maintained at the information source by opening a hyperlink to the information source. | Reddy discloses using a help viewer to display the custom content.  It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |
| **Claim 15** | |
| 15. computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | Reddy discloses a system and method for providing error messages in response to a compiler error on a computer (*see, e.g.,* Abstract), where the error messages have static content and custom content. |
| detecting one of a plurality of predetermined conditions; | The Reddy system detects a compile error. (*See, e.g.,* Fig. 6, item 610; col. 3, lns. 39-42.) |
| displaying the alert message in response to the detected predetermined condition, the alert message comprising the static content and at least one control object; | Reddy discloses displaying an alert message in response to detection of a compiler error, where the alert message has static content and a control object such as a link or glyph.  (*See, e.g.,* Fig. 5, items 522, 512, 520; col. 4, lns. 35-41; col. 6, lns. 36-42.) |
| responsive to selection of one of the control objects, accessing an information source that maintains the custom content, wherein the information source is located separately from the local machine; and | Reddy discloses launching a help viewer in response to selecting the link in the error message in order to view custom content. (*See, e.g.,* col. 4, lns. 35-41;  col. 6, lns. 1-6 and 36-42; Figure 5.)  Lord discloses that the custom content may be located separately, such as on the world wide web and viewed with a browser.  (*See, e.g.,* Lord, pg. 78.) It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | Reddy discloses using a browser (help viewer) to display the custom content.  (*See, e.g.,* col. 6, lns. 1-6.) |
| **Claim 21** | |
| 21. The computer-implemented method of claim 15, wherein the step of accessing an information source that maintains the custom content comprises: | |
| obtaining an identifier that identifies the information source; | Reddy discloses obtaining an identifier  that identifies the information source, such as a help file index.  (*See, e.g.,* col. 3, lns. 51-62; |

| | col. 6, lns. 32-35.) |
|---|---|
| and launching a browser; | Reddy discloses launching a help viewer in response to selecting the link in the error message. (*See, e.g.,* col. 6, lns. 1-6.)  It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |
| and using the browser to view the custom content maintained at the information source by opening a hyperlink including the identifier. | Reddy discloses using a help viewer to display the custom content. (*See, e.g.,* col. 6, lns. 1-6.)  It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |
| **Claim 25** | |
| 25. A computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine, comprising the steps of: | Reddy discloses a system and method for providing error messages in response to compiler error on a user's computer (*see, e.g.,* Abstract), where the error messages have static content and custom content. |
| detecting one of a plurality of predetermined conditions; | The Reddy system detects a compile error. (*See, e.g.,* Fig. 6, item 610; col. 3, lns. 39-42.) |
| displaying the alert message in response to the detected predetermined condition; | Reddy discloses displaying an alert message in response to detection of a compiler error.  (*See, e.g.,* Fig. 5, items 522, 512, 520; col. 4, lns. 35-41; col. 6, lns. 36-42.) |
| opening a hyperlink from the alert message to access an external information source that maintains the custom content, the external information source operating in a location separate from the local machine; | Reddy discloses launching a help viewer in response to selecting the link in the error message to access an information source that contains custom content. (*See, e.g.,* col. 6, lns. 1-6.)  Lord discloses that the custom content may be located separately from the local machine, such as on an external world wide web site. (*See, e.g.,* Lord, pg. 78.)  It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |
| displaying the custom content to present supplemental information that is related to the detected predetermined condition. | Reddy discloses using a help viewer to display the custom content. (*See, e.g.,* col. 6, lns. 1-6.)  It would also have been obvious to one of ordinary skill in the art to use a Web browser to display custom information, particularly in view of the explicit references to HTML. |

**C.     Non-Infringement**

238.     Microsoft has accused the VitalApps feature of Lucent's VitalSuite software of infringing claims 7, 15, 21, and 25 of the '608 Patent. Lucent denies that VitalApps or any portion of VitalSuite infringes the '608 Patent. Nor has Microsoft proffered sufficient evidence to prove infringement by a preponderance of the evidence.

239.     Lucent denies that VitalSuite performs the preamble of claim 1, which is "[a] computer implemented method for providing information regarding one of a plurality of predetermined conditions associated with the operation of a program module on a computer, comprising the steps of." VitalSuite allows users to view information regarding predetermined conditions that are detected by VitalAgent clients, not predetermined conditions associated with the operation of VitalAgent clients.

240.     Lucent denies that VitalSuite performs the second step of claim 1, accessing an information source that maintains custom content in response to detecting one of the predetermined conditions, the custom content representing information defined by a party other than the manufacturer of the program module. Lucent contends this step requires that the information source be accessed in response to detecting the predetermined condition. VitalSuite cannot access the information source without user intervention. The information source is accessed in response to a user clicking a hyperlink, not in response to detecting a predetermined condition. Additionally, in order to display the custom content, the user would need to click on the tab that causes the diagnosis and prescription information to be presented to the user.

241.     Lucent denies that VitalSuite performs the preamble or the additional step of claim 2, "displaying an alert message in response to detecting one of the predetermined conditions and prior to accessing the information source, the alert message comprising static content defined by the manufacturer of the program module." Because user action is required for the event row to be

displayed, the display is not "in response to detecting." Further, even if user intervention were permissible, event rows are still not added to the Alarms/Applications in response to detecting a predetermined condition. Rather, event rows are added to the Alarms/Applications page when the information is received from the Help master server in response to a query from the Alarms/Applications page.

242. Lucent denies that VitalSuite can perform the additional elements of claim 3, "wherein the alert message further comprises at least one control object, and wherein the step of accessing an information source comprises selecting one of the control objects of the alert message and linking to the information source to access the custom content." As discussed above, the event rows are not displayed in response to detecting one of the predetermined conditions, and therefore cannot be the claimed alert messages. Thus, VitalSuite does not have the required control object, and therefore cannot have these additional elements.

243. Lucent denies that VitalSuite performs the preamble or the additional steps of claim 7. Claim 7 requires "launching a browser in response to selecting one of the control objects of the alert message." VitalSuite does not contain the required alert message or control object. Moreover, when the user clicks on the hyperlink in an event row, a browser is not launched. Rather a browser window, which does not include the typical functionality of a browser, is opened. And even if this window could somehow be considered a browser, this step is still not performed because the Web Console runs inside a browser such as Internet Explorer, and thus the browser is already launched. The window that is opened by clicking the hyperlink in the event row is in the same program, and thus is not launched.

244. Lucent denies that VitalSuite performs the preamble of claim 15, namely, a "computer-implemented method for providing custom content that supplements static content displayed in an alert message for a software program module running on a local machine."

245. Lucent denies that VitalSuite performs the second step of claim 15, namely, "displaying the alert message in response to the detected predetermined condition, the alert message comprising the static content and at least one control object." Because VitalSuite cannot perform the preamble of claim 15, there is no alert message. And because there is no alert message, there is necessarily no control object, and therefore VitalSuite cannot perform the third step of claim 15, namely, "responsive to selection of one of the control objects, accessing an information source that maintains the custom content, wherein the information source is located separately from the local machine."

246. Lucent denies that VitalSuite performs the fourth step of claim 15 because there is no control object that can be selected to access an information source that maintains the custom content, wherein the information source is located separately from the local machine. Additionally, user intervention is required to display the identified custom content, as discussed above.

247. Lucent denies that VitalSuite performs the elements of claim 21 because no information source is accessed in response to selecting a control object in an alert message as required by claim 15. And, as discussed above in connection with claim 7, VitalSuite cannot perform the second additional step of claim 21, namely, "launching a browser." Finally, because VitalSuite does not contain the required browser, it cannot perform the third additional step of claim 21, namely, "using the browser to view the custom content maintained at the information source by opening a hyperlink including the identifier."

248. Lucent denies that VitalSuite performs the elements of claim 2 because VitalSuite cannot perform the preamble of claim 25 for the same reasons it cannot perform the preamble of claim 1. VitalSuite cannot perform the second step of claim 25 because, as discussed above in connection with claim 2, the event row is not displayed in response to detecting a predetermined condition. VitalSuite cannot perform the third step of claim 25 because the Help master server is internal to the network on which VitalSuite would be running, there is no external information

source.  Finally, VitalSuite cannot performed the fourth step of claim 25 because no external information source is accessed in response to selecting a control object in an alert message. Additionally, user intervention is required to display the identified custom content, as discussed above.

249.    Microsoft has accused the Alcatel-Lucent OmniVista Air Control System of infringing claims 7, 15, 21, and 25 of the '608 Patent. Alcatel-Lucent denies that OmniVista Air Control System infringes the '608 Patent.

250.    Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that either Alcatel-Lucent or its customers have implemented the accused features of the Air Control System in a manner that results in infringement of the asserted claims of the '608 Patent. Because Microsoft can show no more than a theoretical possibility that Alcatel-Lucent or its customers implemented these features, which is insufficient for a finding of infringement, Microsoft cannot prove that Alcatel-Lucent either directly infringed the '913 Patent or induced infringement by others through its sale of the Air Control System. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003).  Direct infringement by Alcatel-Lucent customers cannot be inferred from circumstantial evidence alone in this case:  each asserted claim of the '608 Patent covers a method, and sale of an apparatus that is merely capable of performing the claimed processes does not infringe those claims. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993). Concluding that Alcatel-Lucent customers directly infringed the '608 Patent would be "too speculative a leap" because Microsoft has no evidence that any Alcatel-Lucent customers actually performed the claimed methods and Alcatel-Lucent did not disseminate instructions explicitly teaching each and every step of the patented method together with an apparatus whose only use is to practice the claimed method. *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007).  Moreover, because Alcatel-Lucent also did not have "an affirmative intent to cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to

encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Further, even if Alcatel-Lucent or its customers implemented the Air Control System as alleged, the Air Control System would not infringe the asserted claims of the '608 Patent.

251. Microsoft asserts that the Air Control System infringes independent method claims 1, 15, and 25 and dependent method claims 2, 3, 7, and 21. Each of the independent claims requires "detecting . . . predetermined conditions." The preamble of independent claim 1 defines "predetermined conditions" as conditions that are "associated with operation of a program module." The Court did not construe the phrase "associated with operation of a program module." The plain and ordinary meaning of this phrase would require that a "predetermined condition" be a condition that occurs as a result of the execution of the program module. The program module disclosed in the '608 Patent, Microsoft Word 97 program, generates an alert message when it attempts to print but fails. Therefore, the example error condition only occurs as a result of operations performed by the program module, Microsoft's Word 97 program. In contrast, the Air Control System does not detect predetermined conditions associated with operation of a program module. The Rogue APs, coverage holes, and security violations Microsoft identified as predetermined conditions are conditions that occur in the network generally, not conditions associated with a program module, and are merely monitored by the Air Control System. The program module of the Air Control System does not execute code that would generate a Rogue AP, a coverage hole, or a security violation. The Air Control System program module is independent of these conditions of the network. For instance, a Rogue AP exists in the network with or without execution of the Air Control System. Thus, conditions of the network are not the same as or equivalent to errors within a program module. The Air Control System therefore does not practice the method claimed in claim 1. For the reasons stated above with respect to independent claim 1, the Air Control System does not meet the requirements of dependent claims 2, 3, and 7.

252.    Independent claims 15 and 25 also require "static content" and "custom content." The Court did not construe "static content" or "custom content." The preamble of claim 15 provides a limitation to the meaning of "custom content" in that it requires that the "custom content" "supplement static content displayed in an alert message." The Air Control System does not provide "custom content" in an alert message that is supplemented by "static content." Rather, the Air Control System displays dynamically updated information. Microsoft has identified an indicator of the "counts of the number and type of alarm" as the alleged "static content." This counter constitutes dynamic data in that the Air Control System dynamically updates. Also, the display of rogue types does not satisfy the claim requirement of "static content." A "Rogues" indicator is displayed in the bottom left corner of the Air Control System. The number within the Rogues indicator is dynamically updated by the Air Control System. The "rogue types" Microsoft also identified as "static content" are not displayed as part of the "alert message." To see the rogue types, the user must click the Rogues indicator. As a result, the information displayed as "rogue types" also cannot be the "static content" as required by the claim language.

253.    Other information displayed by the Air Control System also does not constitute "static content" supplementing "custom content," as it is not displayed in the alert message Microsoft identified in its infringement allegations. The color-coded indicator is not "static content." The color-coded indicator displays a dynamically updated number when the Air Control System receives notification of detection of a rogue AP from an Alcatel switch or appliance. This *dynamically updated* data is not "static content" as required by the claim language. For the reasons stated above with respect to independent claim 15, the Air Control System does not meet the requirements of dependent claim 21.

254.    For these reasons, the Air Control System therefore does not infringe the asserted claims of the '608 Patent. Microsoft cannot expand its infringement allegations at trial to cover any

other Alcatel-Lucent products for this patent, as it has not properly identified any other Alcatel-Lucent products as infringing this patent during this case.

## VIII.   The Brown '947 Patent

255.    The following sections discuss Lucent's assertions of facts regarding the teaching of asserted claims 22, 24, and 59 of the Brown '947 Patent, the invalidity of the asserted claims, and Lucent's non-infringement of those claims.  For a fuller discussion of these topics, Lucent references the expert reports of Dr. Paul Clark and Lucent's Final Invalidity Contentions.

### A.    The Brown '947 Patent And Asserted Claims

256.    The Brown '947 Patent, entitled "System And Method For Controlling Access To Data Entities In A Computer Network," issued on August 24, 1999, from an application dated August 18, 1995.  The alleged invention of the '947 relates to a method of controlling access, such as read or write access, to resources in a large-scale computer network, such as an online services network.

257.    Microsoft is asserting claims 22, 24, and 59 of the Brown '947 Patent in this action.  Claims 22 and 24 depend from claim 21, which is not asserted.  Claim 21 of the Brown '947 Patent reads as follows:

> 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of:
>
> identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and
>
> identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories.

258.    Claim 21 relates to a method of determining access rights of a user of a computer system with respect to a plurality of data entities in the system, where access rights are specified on a

user-group basis with respect to predefined categories (also referred to herein as groups, sets, classes, etc.), of data entities. As set forth in the attached claim charts, however, access control on a user-group and data-entity-group basis was known in the art prior to the alleged invention of claim 21 of the Brown '947 Patent, and also would have been obvious to one of ordinary skill in the art.

259. Claim 22, which depends from claim 21, further requires that the two steps of claim 1 be performed by accessing a relational database stored on a server. As set forth in the attached claim charts, however, the use of a relational database to store access rights information was also known in the art prior to the alleged invention of claim 22 of the Brown '947 Patent, and also would have been obvious to one of ordinary skill in the art.

260. Claim 24, which depends from claim 21, includes the additional steps of "determining a specific data entity category in which a specific data entity falls" and "determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity." As set forth in the attached claim charts, however, these additional steps were also known in the art prior to the alleged invention of claim 24 of the Brown '947 Patent, and also would have been obvious to one of ordinary skill in the art.

261. Claim 59 claims a relational database containing access rights information in a particular three-table structure:

> 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities of a computer network, said plurality of data entities subdivided into a plurality of categories, said database comprising:
>
> a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups;
>
> a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and

a third table which contains, for a least one of said users, a
user-specific access rights list that specifies special rights for a
respective user, said user-specific access rights list stored in
association with said plurality of category identifiers.

262.    As set forth in the claim charts, however, such a relational database schema would have been obvious to one of ordinary skill in the art at the time of the alleged invention of claim 59 of the Brown '947 Patent.

**B.      Invalidity**

    **1.      U.S. Patent No. 5,263,158 to Janis (the '158 Patent)**

263.    Claims 22, 24, and 59 of the Brown '947 Patent are anticipated or rendered obvious by U.S. Patent No. 5,263,158 ("Janis")[4], issued on November 16, 1993, in combination with one or more of the following prior art references (see claim charts below) to of one of ordinary skill in the art.

- Windows NT 3.1( released July 12, 1993), which is described in Helen Custer, *Inside Windows NT* (1993), Robert Cowart, *Windows NT Unleashed First Edition* (1994), Craig Stintson, *Running Windows NT Version 3.1* (1994), Windows NT Advanced Server (Version 3.1), *Concepts Planning Guide*, Windows NT Advanced Server (Version 3.1), *System Guide*, Windows NT Advanced Server (Version 3.1), *Remote Access Service*, Windows NT Advanced Server (Version 3.1), *Network Operations Quick Reference*, Windows NT Advanced Server (Version 3.1), *Roadmap*.  Each of the foregoing documents also constitutes prior art.

- U.S. Patent No. 5,113,499, issued May 12, 1992.

- U.S. Patent No. 4,805,099 issued February 14, 1989.

- U.S. Patent No. 4,829,427, issued May 9, 1989.

- U.S. Patent No. 4,918,593, issued April 17, 1990.

---

[4] In addition, U.S. Patent Nos. 5,263,157 and 5,263,165 are patents issued to the same inventor as the Janis '158 Patent, which were issued on the same day and contain substantially similar disclosures and therefore invalidate claims 22, 24, and 59 for the same reasons

- U.S. Patent No. 5,089,985, issued February 18, 1992.

- U.S. Patent No. 5,689,708, filed March 31, 1995 and issued November 18, 1997.

- IBM OS/2 LAN Server 4.0, which is described in IBM OS/2 LAN Server *Network Administrator Reference Volume 3: Network Administrator Tasks* (1994), and in the IBM LAN Server Source Book. These publications are also prior art.

- Novell NetWare 4.01, which is described in Cheryl C. Currid, *Novell's Guide to NetWare 4.01 Networks* (1993). This publication is also prior art.

- Sandhu, *Access Control: Principles and Practice*, IEEE Communications Magazine 1994.

- Sandhu, *Role-based access control: a multi-dimensional view*, Computer Security Applications Conference, 1994, Proceedings.

264.    The invalidity of the '947 Patent in view of the Janis '158 Patent is more particularly explained in the following claim charts and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 21 | U.S. Patent No. 5,263,158 ("Janis") |
|---|---|
| 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of: | Janis discloses a system and method for determining user access rights with respect to a plurality of data entities (resource objects) of a computer system. (*See, e.g.,* Abstract; col. 2, ln. 43 - col. 3, ln. 6.) |
| identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and | In Janis, "any attempted access of a resource object . . . will automatically result in a query by the associated resource manager to one or more Reference Monitor applications to determine whether or not the access requested will be permitted." (Col. 4, ln. 68-col. 5, ln. 5.) The access rights query can specify a particular resource object or a selected user: "Next, block 76 illustrates a query to one or more Reference Monitor applications which may exist within the distributed data processing system to determine whether or not an access control profile exists for the resource object or user in question." (*See, e.g.,* col. 6, lns. 3-8.) <br><br> An access control profile may contain information on groups of users. (*See, e.g.,* col. 4, lns. 44-53.) When the access control information is based on groups of users, the Janis system will necessarily identify the group or groups to which the user belongs in order to determine the user's access rights. User- |

| | group-based access control was also well known in the art. (*See, e.g.,* NetWare 4.01 guide, 339; OS/2 Lan Server Guide, pgs. 117-19; Sandhu, *Access Control: Principles and Practice*, IEEE Communications Magazine 1994, at 45-47 ("Sandhu I"); Sandhu, *Role-based access control: a multi-dimensional view*, Computer Security Applications Conference, 1994, Proceedings, at 55 ("Sandhu II").) |
| --- | --- |
| | In any system where access control is based on user groups, the system will necessarily perform this step. This step would also have been obvious to one of ordinary skill in the art. |
| identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories. | In Janis, access control profiles may contain access control information on sets (*i.e.,* categories) of resource objects. (*See, e.g.,* col. 4, lns. 44-53.) When the access control information is based on groups of users and sets of resource objects, the Janis system will necessarily identify at least one set of resource objects the user has access to by virtue of being a member of a user group, for example when it retrieves the user's access control profile. Object-group-based access control was also well known in the art. (*See, e.g,* OS/2 Lan Server Guide, pgs. 140, 424; Sandhu I at 47; Sandhu II at 60.) In any system where access control is based on groups of resources, the system will necessarily perform this step. This step would also have been obvious to one of ordinary skill in the art. |
| **Claim 22** | |
| 22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. | The access control profile information, including user group and resource object group information, are stored in a database on the Reference Monitor (server) of the network, which provides security services. The database may be a relational database. Relational databases and their advantages were well known and widely used prior to the Brown '947 Patent (*see, e.g.,* U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6; Sandhu I at 43.) To the extent Janis does not |

| | |
|---|---|
| | specifically disclose a relational database, the use of a relational database on a server in connection with the Janis system would have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of relational databases and their use in access control. (*See also* U.S. Patent No. 5,689,708, col. 8, ln. 10-15.) |
| **Claim 24** | |
| 24. The method according to claim 21, further comprising the steps of: | |
| determining a specific data entity category in which a specific data entity falls; and | When the access control profile contains access control information based on sets of objects, the Janis system will necessarily determine which group the requested resource object falls into in order to determine if the user has access rights to that resource object. (*See, e.g.,* col. 4, lns. 44-53; col. 6, lns. 3-19.) Performing such a step is a system where access control is based on object groups would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to which a particular object in an object-group-based system, a determination must be made as to which group(s) the specific object belongs. (*See, e.g.,* OS/2 LAN Server Guide, pgs. 140, 424; Sandhu II at 60.) |
| determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity. | When the access control profile contains access control information based on groups of objects, the Janis system will necessarily determine whether the group to resource object requested by the user belongs is one of the object groups to which the user has access and thereby determine whether the user may access the requested resource object. (*See, e.g.,* col. 4, lns. 44-53; col. 6, lns. 3-19.) Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to a object-group in an object-group-based system, a determination must be made as to whether the particular group is one of the groups to which the user has access. |
| **Claim 59** | |
| 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities | Janis discloses a database on the Reference Monitor that stores access control profiles that contain access rights of users for a plurality of |

| | |
|---|---|
| of a computer network, said plurality of data entities subdivided into a plurality of categories, said database comprising: | resource objects on a computer network that may be organized into sets (categories). (*See, e.g.,* col. 4, lns. 44-53.) The database may be a relational database. Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.,* U.S. Patent Nos. 4,805,099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6; Sandhu I at 43.) To the extent Janis does not specifically disclose a relational database, the use of a relational database in connection with the Janis system would have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of relational databases and their use in access control. (*See also* U.S. Patent No. 5,689,708, col. 8, ln. 10-15.) Moreover, at the time of the alleged invention of the Brown '947 Patent, like today, relational databases were the most prevalent types of databases. |
| a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups; | When the access control information is arranged by user groups and a relational database is used, the database will contain a table that maps users to the user groups that the users are members of. (*See, e.g.,* col. 4, lns. 44-53.) This would also have been obvious to one of ordinary skill in the art, since in a user-group based system a mechanism to map users to user groups is required. |
| a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and | When the access control information is arranged by user groups and sets of resource objects and a relational database is used, the database will contain a table that contains access rights for the groups stored in association with identifiers that identify the resource object groups to which the user groups may have access. (*See, e.g.,* col. 4, lns. 44-53.) Each set of resource objects must have an associated identifier so that the system can identify the sets. This would also have been obvious to one of ordinary skill in the art, since in an object-group-based system there must be a mechanism to map user groups to object groups. |
| a third table which contains, for a least one of said users, a user-specific access rights list that | In Janis, access rights may also be specified on a user-specific basis. (*See, e.g.,* col. 4, lns. 44- |

| specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers. | 53.) When the access control profiles also contain user-specific access rights and a relational database is used, the database will contain a table that specifies rights of the user with respect to the sets of resource objects to which the user has access. (*See, e.g.,* col. 4, lns. 44-53.) This would also have been obvious to one of ordinary skill in the art, since in a system where access rights are specified on a user-specific basis there must be a way to map users to their access rights. |

### 2. OS/2 LAN Server

265. Claims 22, 24, and 59 of the Brown '947 Patent are anticipated or rendered obvious by IBM OS/2 LAN Server 4.0 ("LAN Server"), which was released as early as 1994 and which is described in IBM OS/2 LAN Server *Network Administrator Reference Volume 3: Network Administrator Tasks* (1994), LUCENT0021724, and in the IBM LAN Server Source Book, which are themselves prior art.

266. One or more of the following prior art references may be combined with LAN Server to render obvious one or more of claims 22, 24, and 59:

- U.S. Patent No. 5,263,158, issued November 16, 1993.

- U.S. Patent No. 5,113,499, issued May 12, 1992.

- U.S. Patent No. 4,805,099 issued February 14, 1989.

- U.S. Patent No. 4,829,427, issued May 9, 1989.

- U.S. Patent No. 4,918,593, issued April 17, 1990.

- U.S. Patent No. 5,089,985, issued February 18, 1992.

- U.S. Patent No. 5,689,708, filed March 31, 1995 and issued November 18, 1997.

- Sandhu, *Access Control: Principles and Practice*, IEEE Communications Magazine 1994.

- Sandhu, *Role-based access control: a multi-dimensional view*, Computer Security Applications Conference, 1994, Proceedings.

267. The invalidity of the '947 Patent in view of the IBM OS/2 LAN Server is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 21 | IBM OS/2 LAN Server |
|---|---|
| 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of: | IBM OS/2 LAN Server 4.0 ("LAN Server") implements a method of determining user access rights with respect to a plurality of data entities (*e.g.,* files) of a computer system. (*See, e.g.,* OS/2 Lan Server 4.0 Guide ("Guide"), Chapter 5.) |
| identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and | LAN Server allows access rights to be specified on a user-group basis. (*See, e.g.,* Guide, Chapter 3, 117-124) "When a user attempts to use a resource, LAN Server searches for that user ID in the resource's access control profile, checking first the user access profile and then the group access profile." (Guide at 119; *see also* Figure 21.) "The programs checks to see if the user belongs to any of the groups profiled in the group access profile and, if so, what access permissions are given to those groups." *Id.* LAN Server thus identifies at least one user group of which the user is a member, where the group is part of a predefined set of user groups.<br><br>In any system where access control is based on user groups, the system will necessarily perform this step. This step would also have been obvious to one of ordinary skill in the art. |
| identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories. | In LAN Server, access right may be granted to directories, which are groups, or categories, of data entities. (*See, e.g.,* Guide at 89-102; IBM LAN Server Source Book at 95.) When a user attempts to access a directory, Lan Server will identify whether the user is a member of a group with predetermined access to that group. (*See, e.g.,* Guide, 119-121.)<br><br>In any system where access control is based on groups of resources, the system will necessarily perform this step. This step would also have been obvious to one of ordinary skill in the art. |

| Claim 22 | |
| --- | --- |
| 22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. | LAN Server includes a Domain Control Database that contains access control information and that is accessed when a user attempts to access a resource.  (*See, e.g.,* 119, 424.)  This database may also be a relational database.  Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6; Sandhu I at 43.)  To the extent LAN Server did not use a relational database, the use of a relational database in connection with LAN Server would have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of relational databases and their use in access control.  (*See also* U.S. Patent No. 5,689,708, col. 8, ln. 10-15.) |
| Claim 24 | |
| 24. The method according to claim 21, further comprising the steps of: | |
| determining a specific data entity category in which a specific data entity falls; and | In LAN Server, when user group access rights are granted to directories and a user attempts to access a file in a directory, LAN Server will determine which directory the file is in when it searches for an access control profile.  (*See, e.g.,* Guide at 122.). |
| determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity. | In LAN Server, when a user attempts to access a directory, LAN server will determine whether the user has access to that directory by virtue of being a member of a particular group (*See* Guide, 123 and Figure 21).  Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to a object-group in an object-group-based system, a determination must be made as to whether the particular group is one of the groups to which the user has access. |
| Claim 59 | |
| 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities of a computer network, said plurality of data entities subdivided into a plurality of | LAN Server includes a Domain Control Database that contains access control information for data entities (*e.g.*, files) subdivided into categories (*e.g.*, directories). (*See, e.g.,* 119, 424.)  The database may be a |

| | |
|---|---|
| categories, said database comprising: | relational database. Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6; Sandhu I at 43.) Thus, the use of a relational database in connection with LAN Server would have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of relational databases and their use in access control. (*See also* U.S. Patent No. 5,689,708, col. 8, ln. 10-15.) Moreover, at the time of the alleged invention of the Brown '947 Patent, like today, relational databases were the most prevalent type of databases. |
| a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups; | When the access control information is arranged by user groups and a relational database is used, the database will contain a table that maps users to the user groups that the users are members of. This would also have been obvious to one of ordinary skill in the art, as discussed above in connection with Janis |
| a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and | When the access control information is arranged by user groups and sets of resource objects (*e.g.*, directories) and a relational database is used, the database will contain a table that contains access rights for the groups stored in association with identifiers that identify the resource object groups to which the user groups may have access. Each set of resource objects must have an associated identifier so that the system can identify the sets. This would also have been obvious to one of ordinary skill in the art as discussed above in connection with Janis. |
| a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers. | LAN Server also permits access rights to be specified on a user-specific basis. (*See* Guide, pgs. 117-24.) When user-specific access rights information is specified and a relational database is used, the database will contain a table that specifies rights of the user with respect to the sets of resource objects to which the user has access. This would also have been obvious to one of ordinary skill in the art, as discussed above in connection with Janis. |

### 3.  Microsoft Windows NT 3.1

268.    Claims 22, 24, and 59 of the Brown '947 Patent are  anticipated or rendered obvious by Windows NT 3.1, which was released on or about July 12, 1993.  The operation of Windows NT 3.1 is described in, for example, Helen Custer, *Inside Windows NT* (1993), Robert Cowart, *Windows NT Unleashed First Edition* (1994), Craig Stintson, *Running Windows NT Version 3.1* (1994), Windows NT Advanced Server (Version 3.1), *Concepts Planning Guide*, Windows NT Advanced Server (Version 3.1), *System Guide*, Windows NT Advanced Server (Version 3.1), *Remote Access Service*, Windows NT Advanced Server (Version 3.1), *Network Operations Quick Reference*, Windows NT Advanced Server (Version 3.1), *Roadmap*, each of which is also prior art to the Brown '947 Patent.

269.    One or more of the following prior art references and the knowledge of one of ordinary skill in the art may be combined with Windows NT 3.1 to render obvious one or more of claims 22, 24, and 59:

- U.S. Patent No. 5,263,158, issued November 16, 1993.

- U.S. Patent No. 5,113,499, issued May 12, 1992.

- U.S. Patent No. 4,805,099 issued February 14, 1989.

- U.S. Patent No. 4,829,427, issued May 9, 1989.

- U.S. Patent No. 4,918,593, issued April 17, 1990.

- U.S. Patent No. 5,089,985, issued February 18, 1992.

- U.S. Patent No. 5,689,708, issued November 18, 1997.

- IBM OS/2 LAN Server 4.0, which is described in IBM OS/2 LAN Server *Network Administrator Reference Volume 3: Network Administrator Tasks* (1994), and in the IBM LAN Server Source Book.  These publications are also prior art.

- Novell NetWare 4.01, which is described in Cheryl C. Currid, *Novell's Guide to NetWare 4.01 Networks* (1993).  This publication is also prior art.

- Sandhu, *Access Control:  Principles and Practice*, IEEE Communications Magazine 1994.

- Sandhu, *Role-based access control: a multi-dimensional view*, Computer Security Applications Conference, 1994, Proceedings.

270.    The invalidity of the '947 Patent in view of Windows NT 3.1 operating system is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 21 | Windows NT 3.1 |
|---|---|
| 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of: | Windows NT 3.1 determines access rights of users of a computer system with respect to data entities (such as objects and files). (*See, e.g.,* Custer, pgs. 74-81, 323-24; Concepts and Planning Guide, pgs. 25-79; Cowart, pg. 66.) |
| identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and | Windows NT 3.1 allows for group-based access control, where users can be members of a pre-defined set of user groups. (*See, e.g.,* Stinson, pgs. 317-23; *see also* Windows NT Advanced Server Version 3.1 System Guide, pg., 361, 373-74.) The access token created by the primary domain controller identifies the groups to which the user belongs. (*See, e.g.,* Custer, pgs. 74-81.) Furthermore, group-based access control was well-known in the art prior and was available in prior network operating systems such as NetWare and IBM OS/2 Lan Server. (*See, e.g.,* NetWare 4.01 guide, 339; OS/2 Lan Server Guide, pgs. 117-19.) Group-based access control is also disclosed in Janis. (*See, e.g.,* col. 4, lns. 44-53; col. 6, lns. 3-19.) It would thus have been obvious to one of ordinary skill in the art to use group-based access control to obtain increased efficiency. |
| identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories. | Windows NT 3.1 will use the security descriptor to determine an object or object type to which the user has access. (*See., e.g.,* Cowart, pg. 66; Custer, pgs. 59, 74-81). Windows NT 3.1 supports different object types, and access rights may be based on object types. (*See, e.g.*, Custer, pgs. 52-59.) In Windows NT 3.1 access can also be controlled to directories, which are groups of files, or to domains, which are groups of objects such a printers, files, directories, etc. (*See, e.g.,* Windows NT Advanced Server Version 3.1 |

| | |
|---|---|
| | System Guide, pg., 94-103, 407-411.)  Further, in Janis, access control rights may be defined based on sets (*i.e.*, categories) of resource objects.  (See, e.g., col. 2, lns. 52-59; col. 4, lns. 44-53.)  It would have been obvious to one of ordinary skill to implement access control on a resource-group basis for increased efficiency. |
| **Claim 22** | |
| 22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. | The primary domain controller maintains a database for the network that includes user groups and controls access to groups of domain resources such as directories.  (*See, e.g.,* Concepts and Planning Guide, pgs. 3, 29; System Guide, 446; Custer, pg. 323.)  This database maps users to user groups and also identifies user group permissions with respect to directories and domains, which are categories of data entities.  (*Id*; *see also* Windows NT Advanced Server Version 3.1 System Guide, pg., 94-103, 361, 373-74, 407-411.)  The database may be a relational database. Furthermore, relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6.)  Thus, it would have been obvious to one of ordinary skill in the art to use a relational database to perform these steps in view of the known advantages and efficiencies of relational databases. |
| **Claim 24** | |
| 24. The method according to claim 21, further comprising the steps of: | |
| determining a specific data entity category in which a specific data entity falls; and | In Windows NT 3.1, when a user attempts to access a resource that is a member of a data entity category, for example a file in a directory, the system will necessarily determine what directory the file is in.  (*See, e.g.,* Custer. pg. 59, 74-81; Cowart, pg. 66.)  Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to an object in an object-group-based system, a determination must be made as to what group |

| | | |
|---|---|---|
| 1 | | the object is a member of. |
| 2 3 4 5 6 7 | determining whether said at least one data entity category to which said user has access includes specific data entity category, to thereby determine whether said user has access to said specific data entity. | In Windows NT 3.1, the system will determine whether the data entity category that the user is attempting to access, for example a directory, is one to which the user has access rights. (*See, e.g.*, Cowart, pg. 66; Custer, pgs. 74-81; Concepts and Planning Guide, pgs. 102-109.) This would also have been obvious to one of ordinary skill in the art, since in an object-group-based system it would be necessary to determine whether a particular object group is a group to which the user has access. |
| 8 | **Claim 59** | |
| 9 10 11 12 13 14 15 16 17 18 19 20 21 22 | 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities of a computer network, said plurality of data entities subdivided into a plurality of categories, said database comprising: | As the Brown '947 Patent itself admits, Windows NT uses a relational database for storing access rights for data entities (*e.g.*, files) subdivided into categories (*e.g.*, directories). (*See, e.g.*, col. 7, lns. 49-52, 61-65.) The database may be accessed using SQL, which is a language for defining, updating, and querying relational databases. Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.*, U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6; Sandhu I at 43.) Thus, the use of a relational database for access control would have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of relational databases and their use in access control. (*See also* U.S. Patent No. 5,689,708, col. 8, ln. 10-15.) Moreover, relational database were the most prevalent types of databases at the time of the alleged invention of the Brown '947 Patent. |
| 23 24 25 26 | a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups; | When the access control information is arranged by user groups and a relational database is used, the database will contain a table that maps users to the user groups that the users are members of. This would also have been obvious to one of ordinary skill in the art, as discussed above in connection with Janis. |
| 27 28 | a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of | When the access control information is arranged by user groups and sets of resource objects (*e.g.*, directories) and a relational |

| members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and | database is used, the database will contain a table that contains access rights for the groups stored in association with identifiers that identify the object groups to which the user groups may have access. Each object group must have an associated identifier so that the system can identify the group. This would also have been obvious to one of ordinary skill in the art as discussed in connection with Janis. |
| --- | --- |
| a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers. | Windows NT 3.1 allows access permissions to be granted on a user-specific basis. (See, e.g., System Guide, pg., 361.) When access permissions are granted on a user-specific basis and a relational database is used, the database will contain a table that specifies rights of the user with respect to the sets of resource objects to which the user has access. This would also have been obvious to one of ordinary skill in the art as discussed in connection with Janis. |

### 4. Access Control: Principles and Practice ("Sandhu I")

271. Claims 22, 24, and 59 of the Brown '947 Patent are anticipated or rendered obvious by Sandhu, Access Control: Principles and Practice ("Sandhu"). One or more of the following prior art references and the knowledge of one of ordinary skill in the art may be combined with Sandhu to render obvious one or more of claims 22, 24, and 59:

- U.S. Patent No. 5,263,158, issued November 16, 1993.

- U.S. Patent No. 5,113,499, issued May 12, 1992.

- U.S. Patent No. 4,805,099 issued February 14, 1989.

- U.S. Patent No. 4,829,427, issued May 9, 1989.

- U.S. Patent No. 4,918,593, issued April 17, 1990.

- U.S. Patent No. 5,089,985, issued February 18, 1992.

- U.S. Patent No. 5,689,708, filed March 31, 1995 and issued November 18, 1997.

- IBM OS/2 LAN Server 4.0, which is described in IBM OS/2 LAN Server *Network Administrator Reference Volume 3: Network Administrator Tasks* (1994), and in the IBM LAN Server Source Book. These publication are also prior art.

- Novell NetWare 4.01, which is described in Cheryl C. Currid, *Novell's Guide to NetWare 4.01 Networks* (1993). This publication is also prior art.

272.   The invalidity of the '947 Patent in view of Sandhu I is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 21 | Access Control:  Principles and Practice ("Sandhu I") |
|---|---|
| 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of: | Sandhu I discloses methods of determining access rights of users of computer systems with respect to a plurality of objects (data entities) of the system.  (*See, e.g.,* Figure 1.) |
| identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and | Sandhu I discloses specifying user access rights based on groups as well as roles, where a role is a type of user group.  (*See, e.g.,* Sandhu I at 46.)  "The user playing a role is allowed to execute all accesses for which the role is authorized.  In general a user can take on different roles on different occasions.  Also the same role can be played by several users, perhaps simultaneously." *Id.*  In such a system, the system will necessarily determine at least one user group or role of which a user is a member, where the user group or role is part of a predefined set of user groups or roles. This step would also have been obvious to one of ordinary skill in the art, for the reasons previously discussed. |
| identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories. | Sandhu I also discloses the use of object classes (data entity categories), where access rights are granted on the basis of object classes rather than specific objects.  "Analagously, a classification should be provided for objects. For example, generally a clerk will need to have access to the bank accounts, and a secretary will have access to the letters and memos (or some subset of them).  Objects could be classified according to their type (e.g., letters manuals) or to their application area (e.g., commercial letters, advertising letters). Access authorizations of roles should then be on the basis of object classes, not specific objects)."  (Sandhu I at 47.)  Where object classes are used, the system will necessarily identify at least one object class (data entity |

| | |
|---|---|
| | category) to which a user has access by virtue of being a member of a user group or role, where the object class is part of a predefined set of object classes. This step would also have been obvious to one of ordinary skill in the art, for the reasons previously discussed. |
| **Claim 22** | |
| 22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. | Sandhu I discloses that access rights may be stored in a relational database. (Sandhu I at 43.) Furthermore, relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.*, U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6.) Thus, it would have been obvious to one of ordinary skill in the art to use a relational database to perform these steps in view of the known advantages and efficiencies of relational databases. |
| **Claim 24** | |
| 24. The method according to claim 21, further comprising the steps of: | |
| determining a specific data entity category in which a specific data entity falls; and | When access rights are based on user groups and object classes, and a user attempts to access a particular object, the system of Sandhu I will necessarily determine the object class into which the object falls. Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to an object in an object-group-based system, a determination must be made as to what group the particular object is in. |
| determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity. | When access rights are based on user groups and object classes, and a user attempts to access a particular object in an object class, the system of Sandhu I will necessarily determine whether that object class is an object class to which the user has access. Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to an object-group in an object-group-based system, a determination must be made as to whether the particular group is one of the groups to |

| | |
|---|---|
| | which the user has access. |
| **Claim 59** | |
| 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities of a computer network, said plurality of data entities subdivided into a plurality of categories, said database comprising: | Sandhu I discloses that access rights may be stored in a relational database. (Sandhu I at 43.)  Furthermore, relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.*, U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6.)  Thus, it would have been obvious to one of ordinary skill in the art to use a relational database in view of the known advantages and efficiencies of relational databases. |
| a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups; | When the access control information is arranged by user groups and a relational database is used, the database will contain a table that maps users to the user groups that the users are members of.  This would also have been obvious to one of ordinary skill in the art, as discussed above in connection with Janis. |
| a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and | When the access control information is arranged by user groups and object classes and a relational database is used, the database will contain a table that contains access rights for the groups stored in association with identifiers that identify the resource object groups to which the user groups may have access.  Each object class must have an associated identifier so that the system can identify the class.  This would also have been obvious to one of ordinary skill in the art, as discussed above in connection with Janis. |
| a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers. | Sandhu I also disclosed user-specific access rights.  (See, e.g., Sandhu I at 43.) When access rights are specified on a user-specific basis and a relational database is used, the database will contain a table that specifies rights of the user with respect to the object classes to which the user has access.  This would also have been obvious to one of ordinary skill in the art as discussed in connection with Janis. |

### 5.  UNIX

273.  Claims 22, 24, and 59 of the Brown '947 Patent are anticipated or rendered obvious by versions of the UNIX operating system released prior to August 1995, including System V, which was released as early as 1989.  The UNIX operating system is described, for example, in Thomas and Farrow, *UNIX Administration Guide for System V* (1989), UNIX Time-Sharing System, and System V Interface Definition, Fourth Edition, Volume 1 (1995), and RFC 1094, each of which is prior art as well.One or more of the following prior art references and the knowledge of one of the ordinary skill in the art may be combined with UNIX to render obvious one or more of claims 22, 24, and 59:

- U.S. Patent No. 5,263,158, issued November 16, 1993.

- U.S. Patent No. 5,113,499, issued May 12, 1992.

- U.S. Patent No. 4,805,099 issued February 14, 1989.

- U.S. Patent No. 4,829,427, issued May 9, 1989.

- U.S. Patent No. 4,918,593, issued April 17, 1990.

- U.S. Patent No. 5,089,985, issued February 18, 1992.

- U.S. Patent No. 5,689,708, issued November 18, 1997.

- IBM OS/2 LAN Server 4.0, which is described in IBM OS/2 LAN Server *Network Administrator Reference Volume 3: Network Administrator Tasks* (1994), and in the IBM LAN Server Source Book.  These publications are also prior art.

- Novell NetWare 4.01, which is described in Cheryl C. Currid, *Novell's Guide to NetWare 4.01 Networks* (1993).  This publication is also prior art.

274.  The invalidity of the '947 Patent in view of UNIX is more particularly explained in the following claim charts, and in the December 7, 2007 Expert Report of Paul C. Clark:

| Claim 21 | UNIX |
|---|---|
| 21. A method of determining the access rights of a user of a computer system with respect to a plurality of data entities of the computer system, comprising the steps of: | The UNIX operating system, which has been in public use since the 1970's, when configured with the NFS protocol employs a method of determining the access rights of users of a computer system with respect to a |

| | |
|---|---|
| | plurality of files (data entities) of the system. (*See, e.g.,* UNIX Time-Sharing System, Section III; System V Administration Guide, pgs. 460-465; RFC 1094.) |
| identifying at least one user group of which said user is a member, said at least one user group being part of a predefined set of user groups; and | UNIX allows user access rights to be specified on the basis of predefined user groups. (*See, e.g.,* System V Interface Definition, Fourth Edition, Volume 1, pg. 30; System V Administration Guide, pgs. 460-465.) When user initiates a process and attempts to access a file, UNIX will necessarily identify what group the user is a member of. This step would also have been obvious to one of ordinary skill in the art, as previously discussed. |
| identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories. | UNIX allows user access rights to be specified on the basis of directories, which are predefined data entity categories. (System V Administration Guide, pgs. 460-46.5) These directories could be network mounted using the NFS protocol. When a user attempts to access a file in a directory, UNIX will necessarily determine if the user has access rights with respect to the directory in which the file is located. This step would also have been obvious to one of ordinary skill in the art, as previously discussed. |
| **Claim 22** | |
| 22. The method according to claim 21, wherein said steps of identifying at least one user group and identifying at least one data entity category each comprise accessing a relational database stored on a server of a computer network. | Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.,* U.S. Patent Nos. 4,805,099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6.) Further, UNIX uses a relational database to store user and group access information (System V Administration Guide, pgs. 46-47.) Thus, it would have been obvious to one of ordinary skill in the art to use and access a relational database in performing the steps of claim 21 in view of the known advantages and efficiencies of relational databases. |
| **Claim 24** | |
| 24. The method according to claim 21, further comprising the steps of: | |

| | |
|---|---|
| determining a specific data entity category in which a specific data entity falls; and | In UNIX, when access rights are based on user groups and directories, and a user attempts to access a particular file within a particular directory, UNIX will necessarily determine what directory the file is in. Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to an object in an object-group-based system, a determination must be made as to group the object belongs to. |
| determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity. | In UNIX, when access rights are based on user groups and directories, and a user attempts to access a particular file within a particular directory, after UNIX determines what directory the file it is in, it will necessarily determine if the directory is a directory to which the user has access rights. Performing such a step would also have been obvious to one of ordinary skill in the art, since in order to determine access rights with respect to a object-group in an object-group-based system, a determination must be made as to whether the particular group is one of the groups to which the user has access. |
| **Claim 59** | |
| 59. A relational database for storing access rights data which specifies access rights of users with respect to a plurality of data entities of a computer network, said plurality of data entities subdivided into a plurality of categories, said database comprising: | Use of a relational database would have been obvious to one of ordinary skill in the art. Relational databases and their advantages were well known and widely used prior to Brown '947 Patent (*see, e.g.,* U.S. Patent Nos. 4,805, 099, 4,829,427, 4,918,593, and 5,089,985), and were even used to provide access control. (*See, e.g.,* U.S. Patent No, 5,113,499, col. 8, ln. 66-col. 9, line 6.) Further, UNIX uses a relational database to store user and group access control information. (System V Administration Guide, pgs. 46-47.) Thus, it would have been obvious to one of ordinary skill in the art to use a relational database for access control in view of the known advantages and efficiencies of relational databases. |
| a first table that maps users to user groups, at least one of said users being a member of multiple of said user groups; | UNIX contains a relational database table that maps users to user groups (/etc/group). (System V Administration Guide, pgs. 46-47.) |
| a second table which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of | When the access control information is arranged by user groups and groups of resources (*e.g.,* directories) and a relational |

| members of a respective user group, said group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities; and | database is used, the database will contain a table that contains access rights for the groups stored in association with identifiers that identify the resource groups to which the user groups have access. Each group of resources must have an associated identifier so that the system can identify the groups. This would also have been obvious to one of ordinary skill in the art, as discussed above. |
|---|---|
| a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers. | When the access control profiles also contain user-specific access rights and a relational database is used, the database will contain a table that specifies rights of the user with respect to the object groups to which the user has access. This would also have been obvious to one of ordinary skill in the art. |

### C. Non-infringement

275. Microsoft accuses Lucent's NavisAccess software of infringing claims 22, 24, and 59 of the Brown '947 Patent. Lucent denies it directly or indirectly infringes, nor has it ever directly or indirectly infringed, claims 22, 24, and 59 of the Brown '947 Patent. NavisAccess is not capable of performing all of the steps of claims 22 and 24, nor does it contain the claimed relational database of claim 59. Moreover, there is no evidence that Lucent ever performed any of the claimed steps, and therefore there is no evidence that Lucent ever directly infringed claims 22 and 24.

276. Lucent denies NavisAccess infringes claim 21 (from which claims 22 and 24 each depend) because NavisAccess does not use two different categories of data entities to which access rights can purportedly be granted. The ability to specify user access rights with respect to features as a whole through the use of a wildcard has never been implemented in NavisAccess. NavisAccess has never had the ability to specify such a wildcard through the front-end User Manager. And because access rights cannot be specified with respect to features as a whole in NavisAccess, NavisAccess cannot perform the second step of claim 21.

277. Lucent also denies that device groups are categories of data entities as required by claim 21. The devices managed by NavisAccess are DSL and dial-in network access servers such

as Stinger, TNT, and APX devices, which are host computers, specifically excluded from the Court's definition of "data entity." Accordingly, a group of devices cannot be a category of data entities. And even if devices could be considered data entities, the second step of claim 21 still cannot be performed in NavisAccess. This is because access rights in NavisAccess are specified at the device level, not the group level.

278.     Because the claim 21 step of "identifying at least one data entity category to which said user has access by virtue of being a member of said at least one user group, said at least one data entity category being part of a predefined set of data entity categories" cannot be performed in NavisAccess, then that step is also not performed by accessing a relational database, as required by claim 22.

279.     Lucent also denies that NavisAccess infringes claim 24 because the step of "determining a specific data entity category in which a specific data entity falls" cannot be performed by NavisAccess. First, as discussed above, access rights are not specified on data-entity-category basis in NavisAccess. Thus, when a user selects a particular feature function, for example, NavisAccess does not determine the feature to which that feature function belongs. Rather, in NavisAccess, the presence of a feature function in the user menu means that NavisAccess has determined that the user has access to that particular feature function by virtue of being a member of a particular user group. Second, because the second step of claim 21 and the first step of claim 24 are not performed, the second step of claim 24, namely, "determining whether said at least one data entity category to which said user has access includes said specific data entity category, to thereby determine whether said user has access to said specific data entity," is not performed either.

280.     Lucent also denies that NavisAccess infringes claim 59 because NavisAccess does not have the second and third tables of claim 59. The second table of claim 59 is a table "which contains, for each of said user groups, a group-based access rights list that specifies group-based access rights of members of a respective user group, said group-based access rights list stored in

association with a plurality of category identifiers that identify said categories of data entities." As discussed above, however, it is not possible to specify access rights to data entity categories in NavisAccess. Thus, there is no table that stores a group-based access rights list stored in association with a plurality of category identifiers that identify said categories of data entities. NavisAccess also does not have the third table of claim 59: "a third table which contains, for a least one of said users, a user-specific access rights list that specifies special rights for a respective user, said user-specific access rights list stored in association with said plurality of category identifiers." In NavisAccess, it is not possible specify access rights on a user-specific basis, as discussed above.

281. Microsoft has offered no evidence of direct or indirect infringement of claims 22 and 24. Microsoft has offered no evidence that Lucent itself has used NavisAccess in the allegedly infringing manner, to the extent NavisAccess could even operate as suggested. And there is no evidence of contributory infringement by Lucent. NavisAccess was not especially made or especially adapted for use in an infringement of the Brown '947 Patent, and NavisAccess is clearly capable of substantial noninfringing uses. There is also no evidence that any of Lucent's customers have ever used NavisAccess in the allegedly infringing manner suggested by Dr. Kelly, to the extent NavisAccess could even operate as suggested. Finally, there is no evidence of induced infringement by Lucent. There is no evidence of any intent by Lucent to induce its customers to infringe claims 22 and 24 of the Brown '947 Patent.

282. Microsoft had asserted the '947 Patent against Alcatel-Lucent, but has since failed to provide any expert opinion that an Alcatel-Lucent product infringes that patent. Microsoft is therefore precluded from presenting any such expert testimony at trial. Alcatel-Lucent denies that it infringes the '947 Patent and considers this issue abandoned.

IX. The Guzak '319 Patent

283. The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts regarding the teaching of asserted claims 12 and 17 of the Guzak '319 Patent, the invalidity of the

asserted claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims. For a fuller

discussion of these topics, Lucent and Alcatel-Lucent reference the expert reports of Dr. Nathaniel

Polish and their Final Invalidity Contentions.

**A.     The Guzak '319 Patent And Asserted Claims**

284.    U.S. Patent No. 5,838,319 (the "Guzak '319 Patent"), entitled System Provided Child

Window Control For Displaying Items in a Hierarchical Fashion, issued on November 17, 1998 as a

continuation of a December 13, 1994 application (Ser. No. 355,408), which was abandoned.

Microsoft asserted claims 12 and 17 of the '319 Patent against Lucent's VitalSuite product. On

February 28, 2008, the Court granted Lucent's motion for summary judgment of noninfringement of

the '319 Patent. As a consequence, all claims for infringement of the '319 Patent against Lucent

have been dismissed. Microsoft is asserting claims 12 and 17 of the '319 Patent against Alcatel-

Lucent. There are four inventors named on the '319 Patent: Christopher J. Guzak, Jeffrey L.

Bogdan, George H. Pitt III, and Chee Heng Chew. The '319 Patent claims a particular type of

software — a control — that is provided as a system resource that may be used by other software —

application programs. (Guzak '319 Patent, Abstract.) The control of the '319 Patent allows

application programs that make use of its capabilities to display to a user a hierarchical list of items

that may be expanded and collapsed to display more or less information available from the

application program.

285.    Asserted claim 12 of the Guzak '319 Patent is dependent on claim 11, which reads as

follows:

> 11. In a computer system having an output device and an input device,
> a method comprising the steps of:
>
> displaying a hierarchical tree of items having at least two levels of
> items on the output device as part of a window control;
>
> in response to a user using the input device, selecting one of the items
> displayed in the hierarchical tree of items; and

expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items.

286.   The preamble of claim 11 provides for a method being carried out in a computer system that includes an input device such as a keyboard or mouse and an output device such as a monitor.  The Court construed "computer system to mean "a system containing one or more computers."

287.   The first element of claim 11 includes the step of displaying a hierarchical tree of items as part of a window control.  The Court construed "window control" to mean "computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control."  The first element of claim 11 also requires that the hierarchical tree contain at least two levels of items.

288.   The second element of claim 11 includes the step of selecting one of the items in the tree in response to user input.

289.   The third element of claim 11 includes the step of expanding the list of items in response to user input so that an additional level of items, which previously was hidden from view, is displayed.  The third element also requires that the expansion occur independently of selection such that the expansion can occur without selection of the item to be expanded.

290.   Asserted claim 12 reads as follows:

12.  The method of claim 11 where the computer system includes application programs and wherein the child window control is a system resource for use by the application programs.

291.   Claim 12 requires that the computer system include application programs.  The Court construed "application program" to mean "a program that puts the resources and capabilities of a computer to use."  Claim 12 also requires that the child window control is a system resource for use by the application programs.  The Court construed "child window control" to mean "computer code

along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control." The Court originally construed "system resource for use by the application programs" to mean "a system resource for use by any application program in the computer system." The Court subsequently construed "system resource for use by the application programs" as "a system resource for use by all application programs in the computer system."

292. Asserted claim 17 is dependent on claim 16, which reads as follows:

16. In a computer system having an output device and an input device, a method comprising the steps of:

displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control;

in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and

collapsing the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the collapsing occurs in response to a user action that does not result in another selection of one of the items.

293. The preamble of claim 16 provides for a method being carried out in a computer system that includes an input device such as a keyboard or mouse and an output device such as a monitor. The Court construed "computer system to mean "a system containing one or more computers."

294. The first element of claim 16 includes the step of displaying a hierarchical tree of items as part of a child window control. The Court construed "child window control" to mean "computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control." The first element of claim 16 also requires that the hierarchical tree contain at least two levels of items.

295. The second element of claim 16 includes the step of selecting one of the items in the tree in response to user input.

296. The third element of claim 16 includes the step of collapsing the list of items in response to user input so that an additional level of items, which previously was hidden from view, is displayed. The third element also requires that the collapse occur independently of selection such that the collapse can occur without selection of the item to be collapsed.

297. Asserted claim 17 reads as follows:

> 17. The method of claim 16 where the computer system includes application programs and wherein the child window control is a system resource for use by the application programs.

298. Claim 17 requires that the computer system include application programs. The Court construed "application program" to mean "a program that puts the resources and capabilities of a computer to use." Claim 17 also requires that the child window control is a system resource for use by the application programs. The Court construed "child window control" to mean "computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control." The Court originally construed "system resource for use by the application programs" to mean "a system resource for use by any application program in the computer system." The Court subsequently construed "system resource for use by the application programs" as "a system resource for use by all application programs in the computer system."

## B. Invalidity

299. Claims 12 and 17 are invalid in view of the prior art listed in this section, either alone or in combination.

### 1. Digital Equipment Corporation's Hierarchical Information Management System

300.    Digital Equipment Corporation's Hierarchical Information Management System is described in U.S. Patent No. 5,230,072 (the "'072 Patent"), which was filed on May 17, 1991 and issued on July 20, 1993.  The '072 Patent describes a system for use with a computer system that "includes an applications program, a user interface and a hierarchy management system."  ('072 Patent, Abstract.)  The applications program organizes the information associated with it in a hierarchical fashion, the hierarchy management system receives hierarchical information from the application program and transmits the hierarchical information to the user interface for display to a user.  (*Id.*, col. 2, ll.15-30.)

301.    The invalidity of the asserted claims of the Guzak '319 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents.  The following references are relevant to this chart:

- U.S. Patent No. 5,230,072 (the "'072 Patent"), July 20, 1993

- Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide </u>(1993), pp. 1-18 to 1-20, 2-10 to 2-14;

- Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) pp. 29, 32;

- Que Corporation, <u>Using the Macintosh with System 7 </u>(1992), pp. 117-118 figs. 4.9, 4.1.

- Charles Petzold. <u>Programming Windows 3.1</u> (1992), Chapter 6

| Guzak '319 Patent | Prior Art Analysis - U.S. Patent No. 5,230,072 |
|---|---|
| 11. In a computer system having an output device and an input device, a method comprising the steps of: | In the '072 Patent, an outline control displays hierarchical information on a computer system's output device and responds to user actions through a computer input device. (*See, e.g.*, col. 3, ll. 23-25.) |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control; | The hierarchical information system in the '072 Patent allows computer programs to display multiple levels of hierarchical information in a way that graphically illustrates the parent-child relationships between the items on different levels of the hierarchy.  (*See, e.g.*, col. 2, ll. 11-30.)  The outline control |

| | | |
|---|---|---|
| 1 | | transmits hierarchical information from applications to the output device "in a manner such that the relative locations of said received outline items on said display means render apparent to user parent-child relationships" (Col. 31, ll. 7-47.) The '072 Patent refers to this window control as a "widget control module" that can be used in multiple instances throughout an applications program. (*See, e.g.*, col. 3, ln. 42 - col. 4, l. 6.) Applications may use this control within "a portion of the applications program's window in which the hierarchical information system may display the hierarchical information" (Col. 4, ll. 35-44.) The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | "[T]he user, using an input device, such as a keyboard or a mouse, as an event initiator, may perform various selection operations in connection with various items of hierarchy information" (*See, e.g.*, col. 3, ll. 24-27.) |
| | expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | The '072 Patent discloses that its hierarchical information system "may expand or collapse the displayed portion of the hierarchy, so that items under a selected item, for example, may be displayed (if hidden) or hidden (if displayed) on the display." (*See, e.g.*, col. 3, ll. 23-41.) The system may "perform an expansion operation to display the items of hierarchy in the next level depending from the selected item. Alternatively, . . . it may perform a collapse operation in which it removes the items from the display." (*See, e.g.*, col. 5, ll. 37-47.) The use of such an expanding step would also have been obvious to one of ordinary skill in the art in view of the numerous existing hierarchical information systems employing this approach (*See, e.g.*, Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993) (LUCENT0136581-0136831), pp. 1-18 to 1-20, 2-10 to 2-14; Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) (LUCENT0136200-0136287), pp. 29, 32; Que Corporation, <u>Using the Macintosh with System 7</u> (1992) (LUCENT0137738-0138201), pp. 117-118 figs. 4.9, 4.10.) One of ordinary skill in the art would have been motivated to combine these references with the '072 Patent given their |

| | similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of hierarchical trees. |
|---|---|
| 12. The method a claim 11 where the computer system includes application programs and wherein the child window control is a system resource for use by the application programs. | The '072 Patent outline control may he "adapted for use in conjunction with any of a plurality of differing applications program means." (*See, e.g.*, col. 21, ll. 22-27.) It requests and receives outline information from any of these multiple application programs and displays this information on the computer's output device. (*See, e.g.*, col. 21, ll. 22-34.) Furthermore, the outline control may have multiple instances within the same program. (*See, e.g.*, col. 3, ll. 42-52.) The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992. According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls." (*Id.* at CCMS_027646.) One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource. |
| 16. In a computer system having an output device and an input device, a method comprising the steps of: | In the '072 Patent, a outline control displays hierarchical information on a computer system's output device and responds to user actions through a computer input device. (*See, e.g.*, col. 3, ll. 23-25.) |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control; | The hierarchical information system in the '072 Patent allows computer programs to display multiple levels of hierarchical information in a way that graphically illustrates the parent-child relationships between the items on different levels of the hierarchy. (*See, e.g.*, col. 2, ll. 11-30.) The outline control transmits hierarchical information from applications to the output device "in a manner such that the relative locations of said received outline items on said display means render apparent to said user parent-child relationships" (Col. 31, ll. 7-47.) The '072 Patent refers to this child window control as a "widget control module" that can be used in multiple instances throughout an applications program. (*See, e.g.*, col. 3, l. 42 - col. 4, l. 6.) Applications may use this control within "a portion of the applications program's window in which the hierarchical information system may display the hierarchical information" (Col. 4, ll. 35-44.) The use of window controls would also have been obvious to one of ordinary skill in the art |

| | | |
|---|---|---|
| 1 | | in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 7 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | "[T]he user, using an input device, such as a keyboard or a mouse, as an event initiator, may perform various selection operations in connection with various items of hierarchy information" (*See, e.g.*, col. 3, ll. 24-27.) |
| 9 | collapsing the hierarchical tree of items independently of the selecting so that one of the level of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items. | The '072 Patent discloses that its hierarchical information system "may expand or collapse the displayed portion of the hierarchy, so that items under a selected item, for example, may be displayed (if hidden) or hidden (if displayed) on the display." (*See, e.g.*, col. 3, ll. 23-41.) The system may "perform an expansion operation to display the items of hierarchy in the next level depending from the selected item. Alternatively, . . . it may perform a collapse operation in which it removes the items from the display." (*See, e.g.*, col. 5, ll. 37-47.) The use of such a collapsing step would also have been obvious to one of ordinary skill in the art in view of the numerous existing hierarchical information systems employing this approach (*See, e.g.*, Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993) (LUCENT0136581-0136831), pp. 1-18 to 1-20, 2-10 to 2-14; Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) (LUCENT0136200-0136287), pp. 29, 32; Que Corporation, <u>Using the Macintosh with System 7</u> (1992) (LUCENT0137738-0138201), pp. 117-118 figs. 4.9, 4.10.) One of ordinary skill in the art would have been motivated to combine these references with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of hierarchical trees. |
| 23 | 17. The method of claim 16 wherein the computer system includes application programs and wherein the child window control is a system resource for use by the application programs. | The '072 Patent outline control may be "adapted for use in conjunction with any of a plurality of differing applications program means." (*See, e.g.*, col. 21, ll. 22-27.) It requests and receives outline information from these multiple application programs and displays this information on the computer's output device. (*See, e.g.*, col. 21, ll. 22-34.) Furthermore, the outline control may have multiple instances within the same program. (*See, e.g.*, col. 3, ll. 42-52.) The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known |

description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992. According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls." (*Id.* at CCMS_027646.) One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource.

## 2. Apple Corporation's Macintosh System 7 Finder Feature

302. Apple Corporation's Macintosh System 7 ("System 7") was publicly used in this country more than one year prior to the filing date of the '319 Patent. System 7 was, at the time, considered a significant upgrade to the Macintosh operating system and introduced a number of new features including an improved ability to review and manage documents or files stored on a computer system using the Finder function. In System 7, files are organized into folders and sub-folders, much the same way other operating systems like DOS or Windows use directories and sub-directories. System 7 allowed a user to view a hierarchical list of files stored in memory of Macintosh computers. System 7 allows users to modify files, such as documents generated in a particular application program and stored with that application program, while the files are displayed in a hierarchical list and communicates the modification to the application.

303. The invalidity of the asserted claims of the Guzak '319 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents. The following references are relevant to this chart:

- Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) pp. 29, 32;

- Que Corporation, <u>Using the Macintosh with System 7</u> (1992), pp. 117-118 figs. 4.9, 4.1

1  • Operating copy of Macintosh System 7

2  • Charles Petzold. Programming Windows 3.1 (1992), Chapter 6.

3  • U.S. Patent No. 5,230,072 (the "'072 Patent"), July 20, 1993

| Guzak '319 Patent | Prior Art Analysis - Macintosh System 7 Finder Feature |
|---|---|
| 11. In a computer system having an output device and an input device, a method comprising the steps of: | "The Finder remains the centerpiece of the Macintosh in System 7, providing the desktop on which you manage all your disks and files, and launch your application programs." (*See, e.g.*, Danuloff, p. 21.)<br><br> |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control; | The Finder windows in System 7 allow users to "see the contents of any number of folders, and even several levels of folders, in a single window.  This feature is known as outline display . . . ." (*See, e.g.*, Danuloff, p. 29.)<br><br><br><br>The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of Programming Windows 3.1 by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to |

| | | |
|---|---|---|
| 1 2 3 | | users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with Finder feature in System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 4 5 6 7 8 9 10 11 12 13 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | Users can select an item or items by "clicking on their icons with the Finder's arrow cursor." (*See, e.g.*, Danuloff, p. 32.)<br><br> |
| 14 15 16 17 18 19 20 21 22 23 24 25 | expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | System 7 users may click on a triangle on the computer's output device with a mouse "and the display of the folder will expand to show the files and folders inside." (*See, e.g.*, Danuloff, p. 29.) In contrast, to select an items in the hierarchical tree, users click on the item's icon. (*See, e.g.*, Danuloff, p. 32.) An expand or collapse operation does not result in the selection of any item in the hierarchy. (*See, e.g.*, Que Corp., pp. 117-118 figs. 4.9, 4.10).<br><br> |
| 26 27 28 | 12. The method of claim 11 where the computer system includes application programs and wherein the child window control is a system resource for | System 7 is an operating system that uses the Finder outline control as a system resource. This control enables System 7 to allows users to open multiple child windows, each with their own hierarchical views. (*See, e.g.*, Que Corp., p. 118.) The use of this control as a system resource available to other |

| | |
|---|---|
| use by the application programs. | application programs would also have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of sharing common controls between applications and in view of other hierarchical information display controls implemented as system resources prior to the Guzak '319 Patent. (*See, e.g.*, the '072 Patent, col. 21, ll. 22-34; IBM C/C++- Tools: User Interface Class Library Guide Version 2.0 (May 1993) (LUCENT0138678-0138986); IBM C/C++ Tools: C++ Class Libraries Reference Summary (March 1993) (LUCENT0138498-0138612).) One of ordinary skill in the art would have been motivated to combine these references with System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of common controls by applications and the use and advantages of hierarchical trees. The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992. According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls." (*Id.* at CCMS_027646.) One of ordinary skill in the art would have been motivated to combine this reference with System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource. |
| 16. In a computer system having an output device and an input device, a method comprising the steps of: | "The Finder remains the centerpiece of the Macintosh in System 7, providing the desktop on which you manage all your disks and files, and launch your application programs." (*See, e.g.*, Danuloff, P. 21.) |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control; | The Finder child window control in System 7 allow users to "see the contents of any number of folders, and even several levels of folders, in a single window. This feature is known as outline display . . . ." (*See, e.g.*, Danuloff, p. 29.)<br><br>The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with |

| | | |
|---|---|---|
| 1 | | Finder Feateute of System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 2 | | |
| 3 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | Users can select an item or items by "clicking on their icons with the Finder's arrow cursor." (*See, e.g.*, Danuloff, p. 32.) |
| 4 | | |
| 5 | |  |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | collapsing the hierarchical tree of items independently of the selecting so that one of the level of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items. | System 7 users may click on a triangle on the computer's output device with a mouse "and the display of the folder will expand to show the files and folders inside." (*See, e.g.*, Danuloff, p. 29.)  In contrast, to select an items in the hierarchical tree, users click on the item's icon. (*See, e.g.*, Danuloff, p. 32.)  An expand or collapse operation does not result in the selection of any item in the hierarchy. (*See, e.g.*, Que Corp., pp. 117-118 figs. 4.9, 4.10). |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | |  |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | 17. The method of claim 16 wherein the computer system includes application programs and wherein the child window control is a system resource for use by the application programs. | System 7 is an operating system that uses the Finder outline control as a system resource.  This control enables System 7 to allows users to open multiple child windows, each with their own hierarchical views. (*See, e.g.*, Que Corp., p. 118.) The use of this control as a system resource available to other application programs would also have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of sharing common controls between applications |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| | and in view of other hierarchical information display controls implemented as system resources prior to the Guzak '319 Patent. (*See, e.g.,* the '072 Patent, col. 21, ll. 22-34; IBM C/C++- Tools: User Interface Class Library Guide Version 2.0 (May 1993) (LUCENT0138678-0138986); IBM C/C++ Tools: C++ Class Libraries Reference Summary (March 1993) (LUCENT0138498-0138612).) One of ordinary skill in the art would have been motivated to combine these references with System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of common controls by applications and the use and advantages of hierarchical trees. The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992.  According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls." (*Id.* at CCMS_027646.)  One of ordinary skill in the art would have been motivated to combine this reference with System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource. |

### 3.    XTree For Windows

304.    Another program that provided users the ability to manage files and to display files in a hierarchical tree was XTree for Windows, which was publicly used in this country as of August 1992, and is, therefore, prior art to the '319 Patent.  XTree for Windows was designed to run on a typical computer system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software. (*See, e.g.*, User's Guide, p. x.)

305.    The invalidity of the asserted claims of the Guzak '319 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents.  The following references are relevant to this chart:

- Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993), pp. 1-18 to 1-20, 2-10 to 2-14; Executive Systems Inc., XTree for Windows User's Guide (1992) pp. 1-16 to 1-18, 2-13 to 2-17

- Operating copies of XTree for Windows

- Charles Petzold. <u>Programming Windows 3.1</u> (1992), Chapter 6

- U.S. Patent No. 5,230,072 (the "'072 Patent"), July 20, 1993

| Guzak '319 Patent | Prior Art Analysis - XTree For Windows |
|---|---|
| 11. In a computer system having an output device and an input device, a method comprising the steps of: | XTree for Windows was designed to run on a typical computer system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software. (*See, e.g.*, User's Guide, p. x.)<br> |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control; | XTree for Windows includes a child window control that allows it to display hierarchical trees of information that can be viewed and manipulated by the user. This control graphically represents multiple levels of hierarchical information in a manner that clearly illustrates the relationships between the items at different levels in the hierarchy. (*See, e.g.*, User's Guide, p. 2-2.) This control is used by XTree for Windows in child windows that it calls Tree Windows. (*See, e.g.*, *id.*)<br> |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | | The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with XTree for Windows given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | XTree for Windows allows users to select a file via "several methods and commands," including the use of a mouse or keyboard input device. (*See, e.g.*, User's Guide, pp. 1-18 to 1-19.)<br><br> |
| 18<br>19<br>20<br>21<br>22<br>23 | expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | The XTree for Windows User's Guide clearly distinguishes between operations for selecting items, for example, by clicking on the item, (*see, e.g.*, pp. 1-18 to 1-20) and operations for expanding or collapsing the tree of items, for example, by clicking on the level expansion buttons or clicking on the + or – symbol icons next to items in the hierarchical list. (*See, e.g.*, pp. 2-10 to 2-14) Expanding or collapsing any branch of the tree has no impact on which item is currently selected. The same item remains selected both before and after the expand or collapse operation. |

24
25
26
27
28

| 12. The method of claim 11 where the computer system includes application programs and wherein the child window control is a system resource for use by the application programs. | XTree for Windows is an application program that uses the XTree for Windows child window control.  The control is used to allow users to "open as many Tree Windows as [they] need." (See, e.g., Users Guide, p. 2-2.) The use of this control as a system resource available to other application programs would also have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of sharing common controls between applications and in view of other hierarchical information display controls implemented as system resources prior to the Guzak '319 Patent.  (*See, e.g.*, the '072 Patent, col. 21, ll. 22-34; IBM C/C++- Tools: User Interface Class Library Guide Version 2.0 (May 1993) (LUCENT0138678-0138986); IBM C/C++ Tools: C++ Class Libraries Reference Summary (March 1993) (LUCENT0138498-0138612).) One of ordinary skill in the art would have been motivated to combine these references with XTree given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of common controls by applications and the use and advantages of hierarchical trees. The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992.  According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls."  (*Id.* at CCMS_027646.)  One of ordinary skill in the art would have been motivated to combine this reference with XTree given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource. |
| 16. In a computer system | XTree for Windows was designed to run on a typical computer |

| | |
|---|---|
| having an output device and an input device, a method comprising the steps of: | system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software.  (*See, e.g.*, User's Guide, p. x.)  |

| | | |
|---|---|---|
| 1 2 3 4 5 | displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control; | XTree for Windows includes a child window control that allows it to display hierarchical trees of information that can be viewed and manipulated by the user. This control graphically represents multiple levels of hierarchical information in a manner that clearly illustrates the relationships between the items at different levels in the hierarchy.  (See, e.g., User's Guide, p. 2-2.) This control is used by XTree for Windows in child windows that it calls Tree Windows.  (*See, e.g., id.*) |
| 6 7 8 9 10 11 12 | |  |
| 13 14 15 16 17 18 19 20 | | The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of Programming Windows 3.1 by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls.  One of ordinary skill in the art would have been motivated to combine this reference with XTree for Windows given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 21 22 23 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | XTree for Windows allows users to select a file via "several methods and commands," including the use of a mouse or keyboard input device.  (*See, e.g.*, User's Guide, pp. 1-18 to 1-19.) |



collapsing the hierarchical tree of items independently of the selecting so that one of the level of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items.

The XTree for Windows User's Guide clearly distinguishes between operations for selecting items, for example, by clicking on the item, (*see, e.g.*, pp. 1-18 to 1-20) and operations for expanding or collapsing the tree of items, for example, by clicking on the level expansion buttons or clicking on the + or – symbol icons next to items in the hierarchical list. (*See, e.g.*, pp. 2-10 to 2-14) Expanding or collapsing any branch of the tree has no impact on which item is currently selected. The same item remains selected both before and after the expand or collapse operation.

| 17. The method of claim 16 wherein the computer system includes application programs and wherein the child window control is a system resource for use by the application programs. | XTree for Windows is an application program that uses the XTree for Windows child window control. The control is used to allow users to "open as many Tree Windows as [they] need." (*See, e.g.*, Users Guide, p. 2-2.) The use of this control as a system resource available to other application programs would also have been obvious to one of ordinary skill in the art in view of the known advantages and efficiencies of sharing common controls between applications and in view of other hierarchical information display controls implemented as system resources prior to the Guzak '319 Patent. (*See, e.g.*, the '072 Patent, col. 21, ll. 22-34; IBM C/C++ Tools: User Interface Class Library Guide Version 2.0 (May 1993) (LUCENT0138678-0138986); IBM C/C++ Tools: C++ Class Libraries Reference Summary (March 1993) (LUCENT0138498-0138612).) One of ordinary skill in the art would have been motivated to combine these references with XTree given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of common controls by applications and the use and advantages of hierarchical trees. The use of child window controls as a system resource would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992. According to <u>Programming for Windows 3.1</u>, applications programmers can avoid creating customized child window controls for their applications by making use of "several predefined window classes (and window procedures) that your program can use to create child window controls." (*Id.* at CCMS_027646.) One of ordinary skill in the art would have been motivated to combine this reference with XTree given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of providing child window controls as a system resource. |

## C.    Non-Infringement

306.    Microsoft accused the Domain Tree feature of Lucent's VitalSuite software of infringing claims 12 and 17 of the '319 Patent. On February 28, 2008, the Court granted Lucent's motion for summary judgment for non-infringement of claims 12 and 17 of the Guzak '319 Patent. No claims against Lucent based on the '319 patent remain in the case.

307. Microsoft has accused the Alcatel-Lucent OmniVista 2500/2700, the OmniStack 6300, and the 1300 CMC of infringing claims 12 and 17 of the '319 Patent. Alcatel-Lucent denies these products infringe the '319 Patent.

308. Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that Alcatel-Lucent customers have implemented the accused features of the OmniVista 2500/2700 in a manner that results in infringement of the asserted claims of the '319 Patent. Because Microsoft can show no more than a theoretical possibility that Alcatel-Lucent customers implemented these features, which is insufficient for a finding of infringement, Microsoft cannot prove that Alcatel-Lucent induced infringement by others of either patent through its sale of the OmniVista 2500/2700. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). Moreover, because Alcatel-Lucent also did not have "an affirmative intent do cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

309. Microsoft accuses the 1300 CMC of infringing claims 12 and 17 of the '319 patent. Microsoft cannot prove infringement of any of the asserted claims of the '319 patent because Microsoft has no evidence even a single use of the 1300 CMC in the United States. Furthermore, Claims 12 and 17 of the '319 patent require that the claimed method take place in "computer system [that] includes application programs and wherein the child window control is a system resource for use by the application programs." (Order Regarding Claim Construction and Summary Judgment Motion for U.S. Patent Nos. 5,838,319 and 5,977,971 (The Guzak Patents) Doc No. 182 at 10-11.) The Court has construed "system resource for use by the application programs" as "a system resource available for use by all application programs in the computer system." Microsoft cannot show that the allegedly infringing portions of the 1300 CMC are "available for use by *all* application programs in the computer system," as required by the Court. (*Id.* (emphasis added).)

## X. The Guzak '971 Patent

310. The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts regarding the teaching of asserted claims 2 and 3 of the Guzak '971 Patent, the invalidity of the asserted claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims. For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference the expert reports of Dr. Nathaniel Polish and their Final Invalidity Contentions.

### A. The Guzak '971 Patent And Asserted Claims

311. U.S. Patent No. 5,977,971 (the "Guzak '971 Patent"), entitled Tree View Control, issued on November 2, 1999 and claims priority to a December 13, 1994 application. There are four inventors named on the '971 Patent: Christopher J. Guzak, Jeffrey L. Bogdan, George H. Pitt III, and Chee Heng Chew. The '971 Patent claims a particular type of software — a control — that may be used by other software — application programs. (Guzak '971 Patent, Abstract.) The control of the '971 Patent allows application programs that make use of its capabilities to display to a user a hierarchical list of items that may be expanded and collapsed to display more or less information available from the application program. (*Id.*)

312. Asserted claim 2 of the Guzak '971 Patent reads as follows:

> 2. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising:
>
> displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control;
>
> in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and
>
> expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items.

313. The preamble of claim 2 provides for a computer-readable medium such as a Diskette, CD-ROM, or DVD containing software which when run on a computer system that includes an input device such as a keyboard or mouse and an output device such as a monitor performs a method. The Court construed "computer system to mean "a system containing one or more computers."

314. The first element of claim 2 includes the step of displaying a hierarchical tree of items as part of a child window control. The Court construed "child window control" to mean "computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control." (*Id.* at 64.) The first element of claim 2 also requires that the hierarchical tree contain at least two levels of items.

315. The second element of claim 2 includes the step of selecting one of the items in the tree in response to user input.

316. The third element of claim 2 includes the step of expanding the list of items in response to user input so that an additional level of items, which previously was hidden from view, is displayed. The third element also requires that the expansion occur independently of selection such that the expansion can occur without selection of the item to be expanded.

317. Asserted claim 3 reads as follows:

> 3. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising:
>
> displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control;
>
> in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and
>
> collapsing the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the collapsing occurs in response to a user action that does not result in another selection of one of the items.

318.     The preamble of claim 3 provides for a computer-readable medium such as a Diskette, CD-ROM, or DVD containing software which when run on a computer system that includes an input device such as a keyboard or mouse and an output device such as a monitor performs a method.  The Court construed "computer system to mean "a system containing one or more computers."

319.     The first element of claim 3 includes the step of displaying a hierarchical tree of items as part of a child window control.  The Court construed "child window control" to mean "computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control."  (*Id.*)  The first element of claim 11 also requires that the hierarchical tree contain at least two levels of items.

320.     The second element of claim 3 includes the step of selecting one of the items in the tree in response to user input.

321.     The third element of claim 3 includes the step of collapsing the list of items in response to user input so that an additional level of items, which previously was hidden from view, is displayed.  The third element also requires that the collapse occur independently of selection such that the collapse can occur without selection of the item to be collapsed.

**B.     Invalidity**

322.     Claims 2 and 3 are invalid in view of the prior art listed in this section, either alone or in combination.

**1.     Digital Equipment Corporation's Hierarchical Information Management System**

323.     Digital Equipment Corporation's Hierarchical Information Management System is described in U.S. Patent No. 5,230,072 (the "'072 Patent"), which was filed on May 17, 1991 and issued on July 20, 1993.  The '072 Patent describes a system for use with a computer system that "includes an applications program, a user interface and a hierarchy management system."  ('072

Patent, Abstract.) The applications program organizes the information associated with it in a hierarchical fashion, the hierarchy management system receives hierarchical information from the application program and transmits the hierarchical information to the user interface for display to a user. (*Id.*, col. 2, ll.15-30.)

324. The invalidity of the asserted claims of the Guzak '971 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents. The following references are relevant to this chart:

- U.S. Patent No. 5,230,072 (the "'072 Patent"), July 20, 1993

- Executive Systems Inc., XTree for Windows Version 1.5 User's Guide (1993), pp. 1-18 to 1-20, 2-10 to 2-14;

- Craig Danuloff, Up and Running with Mac System 7 (1991) pp. 29, 32;

- Que Corporation, Using the Macintosh with System 7 (1992), pp. 117-118 figs. 4.9, 4.1

- Charles Petzold. Programming Windows 3.1 (1992), Chapter 6

| Guzak '971 Patent | Prior Art Analysis - U.S. Patent No. 5,230,072 |
|---|---|
| 2. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising: | The '072 Patent discloses "hierarchical information management system" software that can be run on "[d]igital data processing systems, or computer systems." (*See, e.g.,* col. 1, ll. 18-22,; col. 2, ll. 11-14.) Within this system, an outline control displays hierarchical information on a computer system's output device and responds to user's actions through a computer input device. (*See, e.g.,* col. 3, ll. 23-25.) |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control; | The hierarchical information system in the '072 Patent allows computer programs to display multiple levels of hierarchical information in a way that graphically illustrates the parent-child relationships between the items on different levels of the hierarchy. (*See, e.g.,* col. 2, ll. 11-30.) The outline control transmits hierarchical information from applications to the output device "in a manner such that the relative locations of said received outline items on said display means render apparent to said user parent-child relationships" (Col. 31, ll. 7-47.) The '072 Patent refers to this window control as a "widget control module" that can be used in multiple instances throughout an applications program. (*See, e.g.,* col. 3, ln. 42 - |

| | | |
|---|---|---|
| 1–8 | | col. 4, l. 6.) Applications may use this control within "a portion of the applications program's window in which the hierarchical information system may display the hierarchical information" (Col. 4, ll. 35-44.) The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 9–11 | in a response to a user using the input device, selecting one of the items display in the hierarchical tree of items; and | "[T]he user, using an input device, such as a keyboard or a mouse, as an event initiator, may perform various selection operations in connection with various items of hierarchy information" (*See, e.g.*, col. 3, ll. 24-27.) |
| 12–24 | expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | The '072 Patent discloses that its hierarchical information system "may expand or collapse the displayed portion of the hierarchy, so that items under a selected item, for example, may be displayed (if hidden) or hidden (if displayed) on the display." (*See, e.g.*, col. 3, ll. 23-41.) The system may "perform an expansion operation to display the items of hierarchy in the next level depending from the selected item. Alternatively, . . . it may perform a collapse operation in which it removes the items from the display." (*See, e.g.*, col. 5, ll. 37-47.) The use of such an expanding step would also have been obvious to one of ordinary skill in the art in view of the numerous existing hierarchical information systems employing this approach (*See, e.g.*, Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993) (LUCENT0136581-0136831), pp. 1-18 to 1-20, 2-10 to 2-14; Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) (LUCENT0136200-0136287), pp. 29, 32; Que Corporation, <u>Using the Macintosh with System 7</u> (1992) (LUCENT0137738-0138201), pp. 117-118 figs. 4.9, 4.10.) One of ordinary skill in the art would have been motivated to combine these references with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of hierarchical trees. |
| 25–28 | 3. A computer-readable medium having computer-executable instructions, which when executed in a computer system having an output device and an input | The '072 Patent discloses "hierarchical information management system" software that can be run on "[d]igital data processing systems, or computer systems." (*See, e.g.*, col. 1, ll. 18-22,; col. 2, ll. 11-14.) Within this system, an outline control displays hierarchical information on a computer system's output device and responds to user's actions through a computer input device. |

| | | |
|---|---|---|
| 1 | device, performs a method comprising: | (*See, e.g.,* col. 3, ll. 23-25.) |
| 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 | displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control; | The hierarchical information system in the '072 Patent allows computer programs to display multiple levels of hierarchical information in a way that graphically illustrates the parent-child relationships between the items on different levels of the hierarchy. (*See, e.g.,* col. 2, ll. 11-30.) The outline control transmits hierarchical information from applications to the output device "in a manner such that the relative locations of said received outline items on said display means render apparent to said user parent-child relationships" (Col. 31, ll. 7-47.) The '072 Patent refers to this child window control as a "widget control module" that can be used in multiple instances throughout an applications program. (*See, e.g.,* col. 3, l. 42 - col. 4, l. 6.) Applications may use this control within "a portion of the applications program's window in which the hierarchical information system may display the hierarchical information" (Col. 4, ll. 35-44.) The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls. |
| 17 18 19 | in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | "[T]he user, using an input device, such as a keyboard or a mouse, as an event initiator, may perform various selection operations in connection with various items of hierarchy information" (*See, e.g.,* col. 3, ll. 24-27.) |
| 20 21 22 23 24 25 26 27 28 | collapsing the hierarchical tree of items independently of the selecting so that one of.. the levels of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items. | The '072 Patent discloses that its hierarchical information system "may expand or collapse the displayed portion of the hierarchy, so that items under a selected item, for example, may be displayed (if hidden) or hidden (if displayed) on the display." (*See, e.g.,* col. 3, ll. 23-41.) The system may "perform an expansion operation to display the items of hierarchy in the next level depending from the selected item. Alternatively, . . . it may perform a collapse operation in which it removes the items from the display." (*See, e.g.,* col. 5, ll. 37-47.) The use of such a collapsing step would also have been obvious to one of ordinary skill in the art in view of the numerous existing hierarchical information systems employing this approach (*See, e.g.,* Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993) (LUCENT0136581-0136831), pp. 1-18 to 1-20, 2-10 to 2-14; Craig Danuloff, <u>Up and Running with Mac System 7</u> |

| | (1991) (LUCENT0136200-0136287), pp. 29, 32; Que Corporation, <u>Using the Macintosh with System 7</u> (1992) (LUCENT0137738-0138201), pp. 117-118 figs. 4.9, 4.10.)  One of ordinary skill in the art would have been motivated to combine these references with the '072 Patent given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of hierarchical trees. |
|---|---|

### 2.    Apple Corporation's Macintosh System 7 Finder Feature

325.    Apple Corporation's Macintosh System 7 ("System 7") was publicly used in this country more than one year prior to the filing date of the Guzak '971 Patent.  System 7 was, at the time, considered a significant upgrade to the Macintosh operating system and introduced a number of new features including an improved ability to review and manage documents or files stored on a computer system using the Finder function.  In System 7, files are organized into folders and sub-folders, much the same way other operating systems like DOS or Windows use directories and sub-directories.  System 7 allowed a user to view a hierarchical list of files stored in memory  of Macintosh computers.  System 7 allows users to modify files, such as documents generated in a particular application program and stored with that application program, while the files are displayed in a hierarchical list and communicates the modification to the application.

326.    The invalidity of the asserted claims of the Guzak '971 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents.  The following references are relevant to this chart:

- Craig Danuloff, <u>Up and Running with Mac System 7</u> (1991) pp. 29, 32;

- Que Corporation, <u>Using the Macintosh with System 7 </u>(1992), pp. 117-118 figs. 4.9, 4.1

- Macintosh System 7

- Charles Petzold. <u>Programming Windows 3.1</u> (1992), Chapter 6

| | Guzak '971 Patent | Prior Art Analysis - Macintosh System 7 Finder Feature |
|---|---|---|
| 1 | | |
| 2–12 | 2. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising: | System 7 was a version of computer system software designed to be executed on Macintosh computer systems.  (*See, e.g.,* Que Corp., p. 1.)  "The Finder remains the centerpiece of the Macintosh in System 7, providing the desktop on which you manage all your disks and files, and launch your application programs." (*See, e.g.,* Danuloff, p. 21.)  |
| 13–22 | displaying a hierarchical tree of items having at least two levels of items on the output device as part of a window control; | The Finder windows in System 7 allow users to "see the contents of any number of folders, and even several levels of folders, in a single window.  This feature is known as outline display . . . ." (*See, e.g.,* Danuloff, p. 29.)  |
| 23–28 | | The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls.  One of ordinary skill in the art would have been motivated to combine this reference with Finder feature in System 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and |

| | |
|---|---|
| | advantages of child window controls. |
| in a response to a user using the input device, selecting one of the items display in the hierarchical tree of items; and | Users can select an item or items by "clicking on their icons with the Finder's arrow cursor." (*See, e.g.*, Danuloff, p. 32.)  |
| expanding the hierarchical tree of items independently of the selecting so that an additional level of items is displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | System 7 users may click on a triangle on the computer's output device with a mouse "and the display of the folder will expand to show the files and folders inside." (*See, e.g.*, Danuloff, p. 29.) In contrast, to select an items in the hierarchical tree, users click on the item's icon. (*See, e.g.*, Danuloff, p. 32.) An expand or collapse operation does not result in the selection of any item in the hierarchy. (*See, e.g.*, Que Corp., pp. 117-118 figs. 4.9, 4.10).  |
| 3. A computer-readable medium having computer-executable instructions, which when executed in a computer system having an output device and an input device, performs a method comprising: | System 7 was a version of computer system software designed to be executed on Macintosh computer systems. (*See, e.g.,* Que Corp., p. 1.) "The Finder remains the centerpiece of the Macintosh in System 7, providing the desktop on which you manage all your disks and files, and launch your application programs." (*See, e.g.*, Danuloff, P. 21.) |
| displaying a hierarchical tree of items having at least two levels of items on the output | The Finder child window control in System 7 allow users to "see the contents of any number of folders, and even several levels of folders, in a single window. This feature is known as outline |

| | | |
|---|---|---|
| 1 | device as part of a child window control; | display . . . ." (*See, e.g.*, Danuloff, p. 29.) |
| 2 | | The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of |
| 3 | | the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which |
| 4 | | was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such |
| 5 | | controls. One of ordinary skill in the art would have been motivated to combine this reference with Finder Feature of System |
| 6 | | 7 given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and |
| 7 | | advantages of child window controls. |
| 8 | in response to a user using the input device, selecting | Users can select an item or items by "clicking on their icons with the Finder's arrow cursor." (*See, e.g.*, Danuloff, p. 32.) |
| 9 | one of the items displayed in | |
| 10 | the hierarchical tree of items; and |  |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | collapsing the hierarchical tree of items independently of | System 7 users may click on a triangle on the computer's output device with a mouse "and the display of the folder will expand to |
| 18 | the selecting so that one of | show the files and folders inside." (*See, e.g.*, Danuloff, p. 29.) In |
| 19 | the levels of items of the hierarchical tree that was | contrast, to select an items in the hierarchical tree, users click on the item's icon. (*See, e.g.*, Danuloff, p. 32.) An expand or |
| 20 | displayed in the displaying step is no longer displayed as | collapse operation does not result in the selection of any item in the hierarchy. (*See, e.g.*, Que Corp., pp. 117-118 figs. 4.9, 4.10). |
| 21 | part of the hierarchical tree | |
| 22 | on the output device in response to a user action that |  |
| 23 | does not result on another selection of one of the items. | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

### 3. XTree For Windows

327. Another program that provided users the ability to manage files and to display files in a hierarchical tree was XTree for Windows, which was publicly used in this country as of February 1993, and is, therefore, prior art to the '971 Patent. XTree for Windows was designed to run on a typical computer system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software. (*See, e.g.*, User's Guide, p. x.)

328. The invalidity of the asserted claims of the Guzak '971 Patent is more particularly explained in the following claim chart, and in the December 7, 2007 Expert Report Of Nathaniel Polish Regarding The Invalidity Of the Guzak '319 and '971 Patents. The following references are relevant to this chart::

- Executive Systems Inc., <u>XTree for Windows Version 1.5 User's Guide</u> (1993), pp. 1-18 to 1-20, 2-10 to 2-14;

- XTree for Windows

- Charles Petzold. <u>Programming Windows 3.1</u> (1992), Chapter 6

| Guzak '971 Patent | Prior Art Analysis - XTree For Windows |
|---|---|
| 2. A computer-readable medium having computer-executable instructions, which, when executed in a computer system having an output device and an input device, performs a method comprising: | XTree for Windows is a computer software program designed to run on a typical computer system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software. (*See, e.g.*, User's Guide, p. x.)  |
| displaying a hierarchical tree of items having at least two levels of items on the output | XTree for Windows includes a child window control that allows it to display hierarchical trees of information that can be viewed and manipulated by the user. This control graphically represents |

<table>
<tr><td>1</td><td>device as part of a window control;</td><td>multiple levels of hierarchical information in a manner that clearly illustrates the relationships between the items at different levels in the hierarchy. (*See, e.g.*, User's Guide, p. 2-2.) This control is used by XTree for Windows in child windows that it calls Tree Windows. (*See, e.g.*, *id.*)</td></tr>
</table>



The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of Programming Windows 3.1 by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with XTree for Windows given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls.

<table>
<tr><td>in a response to a user using the input device, selecting one of the items display in the hierarchical tree of items; and ,</td><td>XTree for Windows allows users to select a file via "several methods and commands," including the use of a mouse or keyboard input device. (*See, e.g.*, User's Guide, pp. 1-18 to 1-19.)</td></tr>
</table>



<table>
<tr><td>expanding the hierarchical tree of items independently of the selecting so that an additional level of items is</td><td>The XTree for Windows User's Guide clearly distinguishes between operations for selecting items, for example, by clicking on the item, (*see, e.g.*, pp. 1-18 to 1-20) and operations for expanding or collapsing the tree of items, for example, by clicking on the</td></tr>
</table>

| | |
|---|---|
| displayed as part of the hierarchical tree of items on the output device such that the expanding occurs in response to a user action that does not result in another selection of one of the items. | level expansion buttons or clicking on the + or – symbol icons next to items in the hierarchical list. (*See, e.g.*, pp. 2-10 to 2-14) Expanding or collapsing any branch of the tree has no impact on which item is currently selected. The same item remains selected both before and after the expand or collapse operation.<br><br> |
| 3. A computer-readable medium having computer-executable instructions, which when executed in a computer system having an output device and an input device, performs a method comprising: | XTree for Windows is a computer software program designed to run on a typical computer system having input and output devices, specifically those running the Microsoft Windows 3.1 operating system software. (*See, e.g.*, User's Guide, p. x.)<br><br> |
| displaying a hierarchical tree of items having at least two levels of items on the output device as part of a child window control; | XTree for Windows includes a child window control that allows it to display hierarchical trees of information that can be viewed and manipulated by the user. This control graphically represents multiple levels of hierarchical information in a manner that clearly illustrates the relationships between the items at different levels in the hierarchy. (See, e.g., User's Guide, p. 2-2.) This control is used by XTree for Windows in child windows that it calls Tree Windows. (*See, e.g., id.*) |



The use of window controls would also have been obvious to one of ordinary skill in the art in view of the well known description of the use of child window controls in Chapter 6 of <u>Programming Windows 3.1</u> by Charles Petzold (CCMS_027645-708.), which was published by Microsoft in 1992, and which taught that information could be displayed to users by the use of such controls. One of ordinary skill in the art would have been motivated to combine this reference with XTree for Windows given their similar subject matter, the nature of the problem to be solved, and the teachings of the prior art concerning the use and advantages of child window controls.

| in response to a user using the input device, selecting one of the items displayed in the hierarchical tree of items; and | XTree for Windows allows users to select a file via "several methods and commands," including the use of a mouse or keyboard input device. (*See, e.g.*, User's Guide, pp. 1-18 to 1- 19.) |

| | |
|---|---|
| collapsing the hierarchical tree of items independently of the selecting so that one of the levels of items of the hierarchical tree that was displayed in the displaying step is no longer displayed as part of the hierarchical tree on the output device in response to a user action that does not result on another selection of one of the items. | The XTree for Windows User's Guide clearly distinguishes between operations for selecting items, for example, by clicking on the item, (*see, e.g.*, pp. 1-18 to 1-20) and operations for expanding or collapsing the tree of items, for example, by clicking on the level expansion buttons or clicking on the + or – symbol icons next to items in the hierarchical list. (*See, e.g.*, pp. 2-10 to 2-14) Expanding or collapsing any branch of the tree has no impact on which item is currently selected. The same item remains selected both before and after the expand or collapse operation.  |

## C.    Non-Infringement

329.    Microsoft has accused the Domain Tree feature of Lucent's VitalSuite software of infringing claims 2 and 3 of the Guzak '971 Patent. Lucent denies that the Domain Tree feature or any other feature of VitalSuite infringes the Guzak '971 Patent. Nor has Microsoft proffered evidence to prove infringement by a preponderance.

330.    Microsoft's infringement contentions point to VitalSuite's Domain Tree chart as the sole example of practicing the claimed method of claims 2 and 3. Microsoft cannot prove that the Domain Tree feature practices all of the elements of claims 2 and 3 for at least the following reasons.

331.    Lucent denies that the Domain Tree function displays a hierarchical tree of items on the output device as part of a window control or computer code along with an accompanying graphical representation, that sends notification messages to a parent window, when events, like user input, occur within the window control. The VitalSuite Domain Tree is accessed via, and is displayed in, a web browser, which Microsoft has identified as the parent window. Lucent denies that the web browser is a parent window to the Domain Tree, denies that the Domain Tree is

displayed within a window control, and also denies that the Domain Tree computer code sends any messages to the web browser when events like user input occur within the Domain tree.

332. Microsoft has not proved that any user of VitalSuite has practiced the methods claimed in claims 2 and 3. Absent proof of direct infringement of the Guzak '971 Patent, VitalSuite cannot indirectly infringe. Moreover, Microsoft cannot prove that Lucent induced infringement by others. Lucent denies that it had "an affirmative intent to cause direct [use] infringement" or "knowingly induced infringement and possessed specific intent to encourage" such infringement. *DSU Medical*, 471 F.3d at 1306.

333. Microsoft has accused the Alcatel-Lucent OmniVista 2500/2700, OmniStack 6300, and 1300 CMC of infringing claims 2 and 3 of the Guzak '971 Patent. Alcatel-Lucent denies that these products infringe the Guzak '971 Patent.

334. Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that Alcatel-Lucent customers have implemented the accused features of the OmniVista 2500/2700 in a manner that results in infringement of claims 2 and 3 of the '971 patent. Because Microsoft can show no more than a theoretical possibility that Alcatel-Lucent customers implemented these features, which is insufficient for a finding of infringement, Microsoft cannot prove that Alcatel-Lucent induced infringement by others of either patent through its sale of the OmniVista 2500/2700. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). Moreover, because Alcatel-Lucent also did not have "an affirmative intent do cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

335. Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that Alcatel-Lucent customers have implemented the accused features of the 1300 CMC in a manner that results in infringement of the asserted claims of the '971 patent. Because Microsoft

1   can show no more than a theoretical possibility that Alcatel-Lucent customers implemented these

2   features, which is insufficient for a finding of infringement, Microsoft cannot prove that Alcatel-

3   Lucent induced infringement by others of either patent through its sale of the 1300 CMC.  *See, e.g.*,

4   *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003).  Moreover, because Alcatel-

5   Lucent also did not have "an affirmative intent do cause direct infringement," and did not

6   "knowingly induce[] infringement and possess[] specific intent to encourage" infringement,

7   Microsoft cannot prove that Alcatel-Lucent induced others to infringe.  *DSU Med. Corp. v. JMS Co.,*

8   *Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

9

10          336.    Microsoft accuses the 1300 CMC of infringing claims 2 and 3 of the '971 patent.

11   Even assuming that the acts of the 1300 CMC as alleged by Microsoft could satisfy claims 2 and 3

12   of the '971 patent, which Alcatel-Lucent does not concede, Microsoft cannot prove infringement of

13   any of the asserted claims of the '917 patent because Microsoft has no evidence of a 1300 CMC

14   being operated in the alleged manner in the United States.  Microsoft has no evidence of even single

15   use of the 1300 CMC in the United States.

16

17          337.    Microsoft accuses the OmniStack 6300 of infringing claims 2 and 3 of the '971

18   patent.  Each of these claims includes a child window control limitation: "displaying a hierarchial

19   tree of items having at least two levels of items on the output device as part of a child window

20   control."  The Court construed "child window control" as "computer code along with an

21   accompanying graphical representation, that sends notification messages to a  parent window, when

22   events, like user input, occur within the window control."  The accused user interface of the

23   OmniStack 6300 is accessed by a user running a web browser on a computer other than the

24   OmniStack 6300.  Microsoft's expert, alleges that the user's browser window is the parent window.

25   When a user clicks on the accused portion of the user interface, however, the user's computer sends

26   a message to the OmniStack 6300and not to the parent window, as required by the Court's

27

28

1   interpretation of this claim. For at least this reason, the OmniStack 6300 does not meet the

2   limitation of claims 2 and 3 of the '971 patents.

3       338.    Microsoft cannot prove by a preponderance of the evidence (circumstantial or

4   otherwise) that Alcatel-Lucent customers have implemented the accused features of the OmniVista

5   2500/2700 in a manner that results in infringement of the asserted claims of the '971 Patent.

6   Because Microsoft can show no more than a theoretical possibility that Alcatel-Lucent customers

7   implemented these features, which is insufficient for a finding of infringement, Microsoft cannot

8   prove that Alcatel-Lucent induced infringement by others of either patent through its sale of the

9   OmniVista 2500/2700. *See, e.g.*, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir.

10  2003). Moreover, because Alcatel-Lucent also did not have "an affirmative intent do cause direct

11  infringement," and did not "knowingly induce[] infringement and possess[] specific intent to

12  encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe.

13  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

14  **XI.    The Bolosky '794 Patent**

15      339.    The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts

16  regarding the asserted claims 30 and 33 of the Bolosky '794 Patent, the invalidity of the asserted

17  claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims. For a fuller discussion

18  of these topics, Lucent and Alcatel-Lucent reference their Final Invalidity Contentions and the expert

19  reports of Dr. Fouad Tobagi and Dr. Martin Kaliski.

20      **A.    The Bolosky '794 Patent And Asserted Claims**

21      340.    The Bolosky '794 Patent, entitled "Wire Protocol for a Media Server System," issued

22  on January 15, 2002, from an application dated December 8, 1995. Microsoft asserted that Lucent

23  and Alcatel-Lucent infringe claims 30 and 33. Lucent was awarded summary judgment of non-

24  infringement of claim 30. The alleged invention of the '794 patent is directed to "facilitating

efficient and useful communications between clients and multimedia servers" across computer networks. '794 Patent, Col. 1, ll. 20-24.

341. Asserted claim 30 of the Bolosky '794 Patent reads as follows:

> 30. In a distributed system having a media server for storing files holding data of multiple media, a client for requesting service from the media server, a control connection between the media server and the client for passing control information between the media server and the client and a data connection for passing data between the media server and the client, a method comprising the steps of:
>
> sending a write request message from the client to the media server over the control connection using a first transport protocol, said write request message requesting that data from the client be written into a file at the media server;
>
> sending a write request acknowledgment message from the media server to the client over the control connection to acknowledge the write request message;
>
> forwarding the data to be written from the client to the media server over the data connection using a second transport protocol distinct from the first transport protocol; and
>
> writing the forwarded data into the file at the media server.

342. Asserted claim 33 of the Bolosky '794 patent reads as follows:

> 33. In a distributed system having a media server storing files holding data of multiple media, a computer system comprising:
>
> a control connection generator for creating a bidirectional control connection between the media server and the computer system to enable control information to be passed between the media server and the computer system, the control connection utilizing a first transport protocol; and
>
> a data connection generator for creating a bidirectional data connection between the media server and the computer system to enable data to be passed between the media server and the computer system, the data connection using a second transport protocol distinct from the first transport protocol.

343. The following terms used in claim 33 of the '794 patent have been construed by the Court as follows:

| '794 Patent Claim Terms | Construction |
|---|---|
| "media server" | "shared entity for storing multimedia data for transport to and from clients" |
| "control connection" | "connection that facilitates exchange of control information" |
| "data connection" | "connection that facilitates exchange of data between the media server and the client" |
| "transport protocol" | "any standard protocol that is designed to operate in the fourth layer of the OSI reference model (and the second highest layer in the four and five layer TCP/IP reference models), for example, TCP, UDP, etc." |
| "write request message" | "a request message that requests that data from the client be written into a file on the media server." |
| "write request acknowledgment message" | "message that acknowledges that the write request was received." |

344.   All remaining terms used in Claim 33 should be given their ordinary meaning as it would have been understood by one of ordinary skill in the art.

**B.     Invalidity**

345.   Asserted claims 30 and 33 of the '794 Patent are invalid in view of the prior art listed in this section, either alone or in combination.

**1.     The Networked Video Jukebox ("Crutcher")**

346.   Claims 30 and 33 of the '794 Patent are invalid as anticipated by Crutcher, or, alternatively, as rendered obvious by Crutcher in combination with other prior art teachings.

347.   The following prior art references are relevant to this chart:

- [1] Laurence Crutcher, *The Networked Video Jukebox*, IEEE, Vol. 4, No. 2, April 1994 ("Crutcher").

- [2] Leffler *et al.*, *A 4.2bsd Interprocess Communications Primer* ("Leffler").

- [3] K. Sollins, *The TFTP Protocol (Revision 2)* ("TFTP Protocol")

| Claim 30 | Crutcher |
|---|---|
| In a distributed system having a media server | The "HP series 400 Unix workstation" |

| | |
|---|---|
| for storing files holding data of multiple media, | corresponds to the '794 "media server" as construed by the Court, because it is "configured as a video and audio file server." Figure 1 of Crutcher further illustrates the configuration of the Video Jukebox, with the HP Workstation with video and audio file storage. |
| a client for requesting service from the media server, | The "standard 386 PC *client*" disclosed in Crutcher is a personal computer with an Intel 80386 microprocessor, which has been used as the central processing unit (CPU) of many personal computers since 1986. See also FIG. 1 (depicting a "Standard 386/25 MHz PC"). As shown in Figure 1, the 386 PC contains a video codec and audio codec for consuming the multimedia data, as well as a display screen and speakers for rendering the data to the user. |
| a control connection between the media server and the client for passing control information between the media server and the client and | Crutcher teaches the use of two different connections between the media server and the client: one for control and one for data. *See* Crutcher at 110 ("The protocol architecture comprises two stacks, the data stack and the signaling stack, as illustrated in FIG. 5"). First, it discloses a control connection between the media server and the client for passing control information between the media server and the client. The "signalling stack is responsible for application-level services and *connection management.*" *Id.* at 110. Crutcher explains this control connection in further detail: "the signalling stack requires reliable end-to-end communication and therefore uses TCP connections for the transfer of control information." *Id.* at 111; *see also* FIG. 5 (illustrating the two connections). |
| a data connection for passing data between the media server and the client, a method comprising the steps of: | Second, it discloses a data connection for passing data between the media server and the client. The "data stack is responsible for *sending and receiving data* in real-time." *Id.* at 110. Crutcher describes the data connection, stating that the data stack "uses UDP datagrams." *Id.* at 111; *see also* FIG. 5 (illustrating the two connections). |
| sending a write request message from the client to the media server over the control connection using a first transport protocol, said write request message requesting that data from the client be written into a file at | Claim 30 of the '794 patent further discloses "sending a write request message from the client to the media server." Nothing in Crutcher limits the disclosed technology to only reading. One of ordinary skill in the art |

| the media server; | would be motivated to include a write request that requests that data be written to a file. Indeed, the reference specifically states that the same system can be used to record at the client. *See* Crutcher at 105 ("Thus, the PC is used to ***record*** clips…"). A "play" command in Crutcher equates to a ***read request*** from the client to the media server and therefore one of ordinary skill in the art would know that a "record" command would correspond to a ***write request***. Crutcher discloses a ***read*** request from the client to the media server. *Id.* at 111 ("play<clip_name>"). So a simple "record<clip_name>" would equate to a write request.

To the extent that Crutcher does not disclose a write request message, the addition of such a message would be obvious in view of Sollins, TFTP Revision 2. The TFTP protocol provides for writing a file from a local host (client) over a connection to a remote host (server). TFTP Protocol at 2. To effect this objective, the TFTP protocol provides for a write request message:

    4. Initial Connection Protocol

    ***A transfer is established by sending a request (WRQ to write onto a foreign file system***, or RRQ to read from it), and receiving a positive reply, an acknowledgment packet for write, or the first data packet for read. In general an acknowledgment packet will contain the block number of the data packet being acknowledged.

TFTP Revision 2 at 4.

Claim 30 of the '794 patent also requires that the write request message and the write request acknowledgment message are sent on the control connection. One of ordinary skill in the art would understand that the use of acknowledgment messages is inherent in any control protocol to ensure that the remote system is ready for data transfer. Also, |

| | |
|---|---|
| | according to Crutcher (and the TFTP Protocol), the transport protocol used to request to record to the server is transferred by the control connection. One of ordinary skill in the art would know that control information is sent on the control connection, and data information is sent on the data connection, regardless of direction (playing or recording).

Claim 30 of the '794 patent also requires that the write request message and the write request acknowledgment message are sent on the control connection. The protocol disclosed by Crutcher requires that signaling or control messages, such as write request and write request acknowledgment are sent on the control connection utilizing the TCP Protocol. *See* Crutcher at 111, FIG 5. |
| sending a write request acknowledgment message from the media server to the client over the control connection to acknowledge the write request message; | Claim 30 of the '794 patent further discloses "sending a write request acknowledgment message from the media server to the client… to acknowledge the write request message." As explained above, in Crutcher, a read request message from the client to the media server is described as a "play<clip_name>." Crutcher at 111. Because the play command equates to a read request from the media server, one of ordinary skill in the art would know that a "record<clip_name>" service equates to a write request. A write request *acknowledgment* message necessarily follows a write request message, because one of ordinary skill in the art would know that the use of acknowledgement messages is inherent in any control protocol on the *write* side so that the sender knows that the act of recording can occur (the sender cannot write to the server unless it is told it can). In other words, an acknowledgment for a read request would be redundant because playback of the requested stream is acknowledgment enough. Conversely, a write request requires acknowledgment so that the client knows that the media server is ready to record.

To the extent that Crutcher does not disclose a write request acknowledgment message, such a message would be obvious in view of the |

TFTP protocol. The TFTP protocol provides for writing a file from a local host (client) over a connection to a remote host (server). The TFTP Revision illustrates the necessity for an acknowledgment for a write request message:

> 4. Initial Connection Protocol
>
> A transfer is established by sending a request (WRQ to write onto a foreign file system, or RRQ to read from it), and receiving a positive reply, ***an acknowledgment packet for write***, or the first data packet for read. In general an acknowledgment packet will contain the block number of the data packet being acknowledged.

TFTP Revision 2 at 4. Thus, when reading, an acknowledgment is unnecessary, as the actual receiving the first data packet confirms that the request has been received. When writing, an acknowledgment is necessary, so that the client can know that the act of recording can commence.

Claim 30 of the '794 patent also requires that the write request message and the write request acknowledgment message are sent on the control connection. The protocol disclosed by Crutcher requires that signaling or control messages, such as write request and write request acknowledgment are sent on the control connection utilizing the TCP Protocol. *See* Crutcher at 111, FIG 5.

| | |
|---|---|
| forwarding the data to be written from the client to the media server over the data connection using a second transport protocol distinct from the first transport protocol; and | Claim 30 also requires that the data be forwarded from the client to the media server and written into the file at the media server. Crutcher also discloses this element, explaining that once a clip is recorded, it is "then transferred to the server for storage." Crutcher at 105.<br><br>Claim 30 also requires that the data be transferred over the data connection using a second transport protocol distinct from the first transport protocol. The protocol disclosed by Crutcher requires that data is sent over a data connection utilizing the UDP protocol, which |

| | |
|---|---|
| | is distinct from the TCP protocol used by the control connection. *See* Crutcher at 111, FIG 5. |
| writing the forwarded data into the file at the media server. | One of ordinary skill in the art would understand that when a file is transferred into a system, it is written into a file. *See* Crutcher at 105 (explaining that once a clip is recorded, it is "then transferred to the server for storage.") |
| **Claim 33** | **Crutcher** |
| In a distributed system having a media server storing files holding data of multiple media, | The "HP series 400 Unix workstation" corresponds to the '794 "media server" as construed by the Court, because it is "configured as a video and audio file server." Figure 1 of Crutcher further illustrates the configuration of the Video Jukebox, with the HP Workstation with video and audio file storage. |
| a computer system comprising: | The "standard 386 PC" disclosed in Crutcher is a personal computer with an Intel 80386 microprocessor, which has been used as the central processing unit (CPU) of many personal computers since 1986. See also FIG. 1 (depicting a "Standard 386/25 MHz PC"). |
| a control connection generator | Crutcher discloses a control connection generator, explaining that "[a]t the top layer of the signalling stack, the application layer," the service of "initiat[ing] a control connection to the server" is provided. Crutcher at 111, FIG. 5. |
| for creating a bidirectional control connection between the media server and the computer system | Crutcher explains that the "control and data protocols are built directly on top of HP's DOS Arpa sockets product. This provides Berkeley sockets network services on a PC." Crutcher at 108. For both the control and data connections, Berkeley sockets provide bidirectional connections. The data connection described in Crutcher utilizes UDP datagram sockets. Id. at 111. As discussed in Leffler, a "datagram socket supports bidirectional flow of data which is not promised to be sequenced, reliable, or unduplicated." Leffler at 3. The signaling connection described in Crutcher utilizes a TCP socket, which forms a stream oriented connection. Crutcher at 111; see also Leffler at 4 (explaining that a stream socket utilizes TCP). Leffler explains that a "stream socket provides for the bidirectional, reliable, sequenced, and unduplicated flow of data |

| | |
|---|---|
| | without record boundaries." Leffler at 3. |
| to enable control information to be passed between the media server and the computer system, the control connection | Crutcher teaches the use of two different connections between the media server and the computer system: one for control and one for data. See Crutcher at 110 ("The protocol architecture comprises two stacks, the data stack and the signaling stack, as illustrated in FIG. 5"). Crutcher discloses a control connection between the media server and the computer system for passing control information between the media server and the computer system. The "signalling stack is responsible for application-level services and connection management." Id. at 110. Crutcher explains this control connection in further detail: "the signalling stack requires reliable end-to-end communication and therefore uses TCP connections for the transfer of control information." Id. at 111. |
| utilizing a first transport protocol; and | Crutcher discloses two separate transport protocols: TCP and UDP. The control connection, or "signalling stack," "requires reliable end-to-end communications and therefore uses TCP connections for the transfer of control information" while the data stack "uses UDP datagrams." Crutcher at 111. Figure 5 illustrates the two connections and their distinct transport protocols: |
| a data connection generator | Crutcher discloses a data connection generator, explaining that the application layer employs the services of the call layer to open one or more data connections. Crutcher at 111 ("To play or stop a clip, the application layer employs the services of the call layer. The following services are provided at this layer:<br>* create_call<channel[n]>. The call comprises all of the channels required by the application, with all relevant details describing the channels, such as the quality of service of each component"). |
| for creating a bidirectional data connection between the media server and the computer system. | Crutcher discloses a bidirectional data connection between the media server and the computer system. Crutcher discusses that the "control and data protocols are built directly on top of HP's DOS Arpa sockets product. This provides Berkeley sockets network services on a PC." Crutcher at 108. For both the control and data connections, Berkeley sockets provide |

| | bidirectional connections. The data connection described in Crutcher utilizes UDP datagram sockets. Id. at 111. As discussed in Leffler, a "datagram socket supports bidirectional flow of data which is not promised to be sequenced, reliable, or unduplicated." Leffler at 3. The signaling connection described in Crutcher utilizes a TCP socket, which forms a stream oriented connection. Crutcher at 111; see also Leffler at 4 (explaining that a stream socket utilizes TCP). Leffler explains that a "stream socket provides for the bidirectional, reliable, sequenced, and unduplicated flow of data without record boundaries." Leffler at 3. |
|---|---|
| the data connection utilizing a second transport protocol distinct from the first transport protocol. | Crutcher discloses two separate transport protocols: TCP and UDP. The control connection, or "signalling stack," "requires reliable end-to-end communications and therefore uses TCP connections for the transfer of control information" while the data stack "uses UDP datagrams." Crutcher at 111. Figure 5 illustrates the two connections and their distinct transport protocols: |

## 2. The Public Use Of Microsoft's Tiger

348. Claim 33 of the '794 Patent is invalid as obvious in view of the Microsoft's Tiger System ("Tiger"), as publicly demonstrated by Microsoft in May 1994, as well as in view of prior art teachings.

349. The filing date of the '794 Patent is December 8, 1995. Therefore, the May 1994 public use of Microsoft's Tiger is prior art.

350. Tiger is an embodiment of the '794 Patent. 9/21/2007 First Supp. Response to Alcatel-Lucent Interrogatory No. 3. In May 1994, Tiger was demonstrated by Microsoft at the following presentation and described in the following press accounts: DVD: Microsoft Tiger Announcement - Westin Seattle, May 17, 1994 (CCMS127669) ("DVD: Tiger Announcement"); Martin Wolk, "Microsoft Demonstrates Tiger System," Reuters, May 18, 1994; O. Casey Corr, "Staking a Claim to a Stretch of Digital Asphalt -- Microsoft Showing its Stripes with Introduction

of 'Tiger'", The Seattle Times, May 18, 1994 at D1 and Scott Mace, "Microsoft Tiger Multimedia

Server Provides Video to Desktops" InfoWorld at 24, May 23, 1994.

351.    The following references are relevant to this chart:

- [1] DVD: Microsoft Tiger Announcement - Westin Seattle, May 17, 1994 (CCMS127669)

  ("DVD: Tiger Announcement")

- [2] 9/21/2007 First Supp. Response to Alcatel-Lucent Interrogatory No. 3.

- [3] 11/27/07 Transcript of the Deposition of Richard Rashid

- [4] 11/28/07 Transcript of the Deposition of Steven P. Levy

- [5] 12/14/07 Transcript of the Deposition of William J. Bolosky

- [6] 1/11/08 Transcript of the Deposition of Jan de Rie

- [7] Douglas C. Schmidt, *Transport System Architecture Services for High-Performance*

  *Communications Systems*, IEEE J. Sel. Areas Comm., Vol. 11, No. 4, pp. 489-506 (May 1993)

  ("Schmidt") (LUCENT0580982)

| Claim 33 | Microsoft's Tiger System |
|---|---|
| In a distributed system having a media server storing files holding data of multiple media, a computer system comprising: | Tiger has a "media server" that stores multimedia data, e.g., video data. DVD: Tiger Announcement (CCMS127669) (demonstrating various Tiger server configurations on Compaq and Intel servers streaming a Star Trek movie to multiple client displays); Levi Tr. at 35:14-36:9 (explaining that the Tiger server included cubs for storing data and a controller -- the cubs and the controller could exist on the same server or co-exist on separate machines). The configuration described by Levi (Levi Tr. at 35:14-36:9) is exactly the same as the preferred embodiment of the media server found in the '794 patent. *See* '794 patent, Col. 3:43-60 & FIG. 1 (describing the media server as consisting of a controller 14 and a media storage unit 16, which consists of cubs, 22A, 22B and 22C). <br><br> Tiger has at least one computer system upon which a client resides, that is capable of requesting service from a media server and |

| | consuming data from a media server. DVD: Tiger Announcement (CCMS127669) (demonstrating multiple client displays rendering Star Trek and explaining that the clients comprise **Compaq personal computers**); Levi Tr. at 101:4-102:4 (explaining that at the Tiger announcement, he believed "there was more than one client" and "more than one **computer system** running client software") |
|---|---|
| a control connection generator for creating a bidirectional control connection between the media server and the computer system to enable control information to be passed between the media server and the computer system, the control connection utilizing a first transport protocol; and | The computer system utilizes a control connection generator to generate bidirectional control connections to pass control information between the computer system and the controller portion of the Tiger server, as confirmed through Levi's testimony:<br><br>    Q. So the client -- *there was a control channel between the client and the controller* to select a movie over?<br><br>    A. *Yes. Correct.*<br>Levi Tr. at 69:8-18; *see also* de Rie Tr. at 32:2-34:15. The control connection established between the computer system and the controller portion of the media server is exactly like the preferred embodiment of the wire protocol found in the '794 patent. *See* '794 patent, Col. 3:53-57 & FIG. 1 (describing the control link connection between the computer system 12 and the controller 14); Col. 3:65-4:2 (describing the client as a viewer to computer system 12).<br><br>At the time of the May 1994 Tiger announcements, the control connection for Tiger utilized the TCP transport protocol, as a first transport protocol. Levi Tr. at 103:13-19 (acknowledging that the control connection used at the Tiger announcement ("demo at the Westin") included a control connection using TCP). This is exactly as disclosed in the '794 patent. *See* '794 patent, Col. 4:11-13 (describing the use of TCP for the control connection).<br><br>The control connection was bidirectional. CCMS_028665-672 at CCMS_028668-670 ("Iceberg Functional Specification") (explaining that "the CMS controller was formerly referred |

| | |
|---|---|
| | to as the *Tiger Controller*," and "*Control traffic*…is bidirectional between the CMS and its clients") (emphasis in the original). |
| a data connection generator for creating a bidirectional data connection between the media server and the computer system to enable data to be passed between the media server and the computer system, the data connection using a second transport protocol distinct from the first transport protocol. | The computer system utilizes a data connection generator to create data connections to pass data between the cubs of the Tiger server and the computer system:<br><br>Q. ***So the data funnel included a multipoint-to-point connection?***<br><br>A. ***Yes.***<br><br>…<br><br>Q. You said that the data funnel included a multipoint-to-point connection. What else did it include?<br><br>A. ***The purpose of the data funnel was to take data from the multiple machines and get it to the client.***<br><br>Q. And the multiple machines were the Cubs?<br><br>A. Correct.<br><br>Levi Tr. at 51:7-22. Levi's description of the data funnel, as a multipoint-to-point connection between the cubs and the client, is exactly as described in the preferred embodiment of the '794 patent. *See* '794 patent, Col. 3:57-60 & FIG. 1 (describing the data funnel connection between the cubs and the client computer system 12); Col. 4:20-23 ("It should be appreciated that the data funnel is a multipoint-to-point connection that connects each of the cubs 22A, 22B and 22C to computer system 12").<br><br>At the time of the Tiger announcement, the data funnel connection utilized the UDP protocol as a second transport protocol, which is distinct from TCP, the first transport protocol. Levi Tr. at 103:13-19 (acknowledging that at time of the Tiger announcement the transport protocol utilized by the data funnel connection was UDP and the transport protocol utilized by the control connection was TCP); Levi Tr. at 54:3-9 (explaining that the "primary transport protocol that we used was UDP" for the data funnel); Levi Tr. at 71:9-21 (explaining that the primary transport protocol for the control connection was TCP). |

The data connection utilized by Tiger was not bidirectional, because the data funnel was not capable of receiving data from the computer system; however, it would have been obvious to one of ordinary skill in the art to make the data connection bidirectional, as Microsoft suggested at the May 1994 Tiger announcement:

> The **Tiger architecture is actually symmetric**, and by that we mean that **its equally capable of writing data into it while its taking data out of it** … It has the **capability to allow video data as well as audio data to be recorded** and then shared by many people and then sent on. So you can think of **video mail systems**….

DVD: Tiger Announcement at 37:00 (CCMS127669) (remarks of Craig Mundie).

As Microsoft's expert has admitted, one option for forming UDP data connections, known to persons of ordinary skill in the art at the time of the Tiger demonstration, was to use an application layer interface known as "sockets." *See* 12/21/07 Modestino Rebuttal Rep. at 33 ("It is hard to imagine any client/server networked application, including real-time multimedia communication systems, which would not make use of socket interfaces between the application and transport layers"); *see also* Levi Tr. at 34:2-16 (explaining that **sockets** is one "built-in mechanism[] within the operating system" for achieving communications between different physical machines).

Moreover, a person of ordinary skill in the art would recognize that UDP sockets are inherently capable of bidirectional operation as well. *See, e.g.*, Schmidt at 500 ("**[S]ockets allow bidirectional communications** of arbitrary amounts of data between unrelated processes on local and remote host. … **A socket is a typed object that represents a bidirectional end-point of communication.**"). Thus, the use of Tiger with a bidirectional UDP data connection would have been obvious in view of Microsoft's suggestion that Tiger be used bidirectional manner, and with the teaching of Schmidt that UDP sockets inherently provide bidirectional

| | |
|---|---|
| | data connections. |

## C. Non-Infringement

352. Microsoft has accused the AnyPath Messaging System ("Any Path") of infringing Claim 33 of the '794 Patent.[5] Lucent denies that AnyPath infringes the '794 Patent. Nor has Microsoft proffered evidence to prove infringement by a preponderance.

353. Lucent denies AnyPath infringes Claim 33 because AnyPath does not include a "computer system" as required by the claim. Rather, AnyPath simply supports end-user devices, that could include a "computer system," which customers must obtain separately through third parties. Accordingly, Lucent's AnyPath does not include a "computer system."

354. Lucent denies that AnyPath infringes Claim 33 because the claim requires "a control connection generator for creating a bidirectional control connection between the media server and the computer system to enable control information to be passed between the media server and the computer system…." Claim 33 of the '794 patent requires that the computer system disclosed in the patent comprises a control connection generator — not the media server. In identifying AnyPath as the control connection generator — having already identified AnyPath as the media server of the '794 Patent, Microsoft fails to identify the computer system that has such a control connection generator.

355. Lucent denies that AnyPath infringes Claim 33 because the claim requires "a data connection generator for creating a bi-directional data connection between the media server and the computer system to enable data to be passed between the media server and the computer system, the data connection using a second transport protocol distinct from the first transport protocol."

---

[5] Microsoft also accused the AnyPath system of infringing claim 30 of the '794 Patent. The Court granted Lucent's summary judgment motion of non-infringement of claim 30.

Microsoft contends that the ***media server*** has a data connection generator. Claim 33, however, requires that the ***computer system*** has a data connection generator for establishing a data connection to the media server.

356. Because Lucent denies that its products directly infringe the '794 Patent, there can be no indirect infringement. Lucent also denies that it has contributed to the infringement of the '794 Patent by others. Microsoft cannot prove that Lucent induced infringement by others. Lucent denies that it had "an affirmative intent to cause direct [use] infringement" and/or "knowingly induced infringement and possessed specific intent to encourage" such use infringement. *DSU Medical*, 471 F.3d at 1306.

357. Microsoft has also accused the Alcatel-Lucent 8788 MRP of infringing claims 30 and 33 of the '794 patent. Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that either Alcatel-Lucent or its customers have implemented the accused features of the 8788 MRP in a manner that results in infringement of the claim 30 of the '794 patent. Because Microsoft can show no more than a theoretical possibility that Alcatel-Lucent or its customers implemented these features, which is insufficient for a finding of infringement, Microsoft cannot prove that Alcatel-Lucent either directly infringed the '794 patent or induced infringement by others through its sale of the 8788 MRP. See, e.g., *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). Microsoft has failed to obtain any evidence that any Alcatel-Lucent customers actually used the 8788 MRP in the United States; thus Microsoft cannot show that Alcatel-Lucent customers in the United States performed the method of claim 30. Moreover, Microsoft cannot prove that Alcatel-Lucent used, consummated a sale of, or manufactured an 8788 MRP unit in the United States that qualifies as an infringing act under 35 U.S.C. § 271 and results in infringement of claim 33. Alcatel-Lucent further believes that Microsoft cannot prove by a preponderance of the evidence that Alcatel-Lucent imported an 8788 MRP unit into the United States that infringes claim 33.

358. Even if Microsoft could show that Alcatel-Lucent sold in (or made in, offered for sale in) the United States an 8788 MRP, Microsoft cannot demonstrate direct infringement of claim 30 by Alcatel-Lucent or its customers: claim 30 covers a method, and sale (or manufacture, offer for sale, or even an importation) of an apparatus that is merely capable of performing the claimed processes does not infringe those claims. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (1993). Alcatel-Lucent also did not disseminate instructions in the United States that explicitly teach each and every step of the patented method together with an apparatus whose only use is to practice the claimed method, making an inference of infringement from a sale improper. *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007). Microsoft thus cannot demonstrate that either Alcatel-Lucent or its customers infringed claim 30.

359. Moreover, because Alcatel-Lucent also did not have "an affirmative intent do cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Finally, even if Alcatel-Lucent or its customers implemented the 8788 MRP as alleged, the 8788 MRP would not infringe the asserted claims of the '794 patent.

360. Claim 30 requires "a media server for storing files holding data of multiple media, a client for requesting service from the media server, a control connection between the media server and the client for passing control information between the media server and the client and a data connection for passing data between the media server and the client." Claim 30 further requires "sending a write request acknowledgment message from the media server to the client over the control connection to acknowledge the write request message; forwarding the data to be written from the client to the media server over the data connection using a second transport protocol distinct from the first transport protocol." The Court has construed "transport protocol" as "any standard protocol that is designed to operate in the fourth layer of the OSI reference model (and the second

highest layer in the four and five layer TCP/IP reference models), for example, TCP, UDP, etc."
Moreover, the Court has found that internal communications not involving the client are not relevant
to claim 30, "since that claim necessarily involves communications between a client and a media
server." (Order on Motions for Summary Judgment (Docket No. 347) at 50.) Claim 30 "implicate[]
communications only between . . . the media server and the client." (*Id.*)

361. Similarly, Claim 33 requires, "a control connection generator for creating a
bidirectional control connection between the media server and the computer system to enable control
information to be passed between the media server and the computer system, the control connection
utilizing a first transport protocol; and a data connection generator for creating a bidirectional data
connection between the media server and the computer system to enable data to be passed between
the media server and the computer system, the data connection using a second transport protocol
distinct from the first transport protocol."

362. The 8788 MRP does not infringe claims 30 and 33 at least because the data and
control connections do not use distinct transport protocols as required by the claim. Instead, the data
and control connections of the 8788 MRP use the same transport protocol: UDP. Microsoft's expert,
Dr. Modestino associates the control connection with a Session Initiation Protocol ("SIP")
connection and the data connection with a Real Time Protocol ("RTP") connection. Microsoft's
expert identifies the claimed "media server" as the 8788 MRP and the claimed "computer system" as
an "end user device such as a telephone , including a PC soft phone or videophone." As discussed
above, the SIP and RTP connections identified by Microsoft's expert both use the UDP transport
protocol.

363. Microsoft argues that a SIP communication over TCP between two sub-components
of the 8788 MRP, the Session Initial Protocol Call Control Function ("SIP CCF") and the SIP
Subsystem ("SIP SS") satisfies the "control connection" limitation of claims 30 and 33. Again,
communications that do not involve a client do not fall within the scope of claim 30, "since that

claim necessarily involves communications between a client and a media server," (Order on Motions for Summary Judgment (Docket No. 347) at 50.), making these alleged SIP over TCP communications irrelevant to claim 30 (and insufficient to support a finding of infringement). Even assuming that the 8788 MRP uses SIP over the TCP transport protocol for internal communications, these communications cannot satisfy the limitation in claim 33 requiring "a control connection generator" because the internal communication is not between "media server and the computer system.," as required by that claim.

364.   Microsoft also argues that the control connection of the 8788 MRP uses the TCP transport protocol because the SIP standards document states that "[a]ll SIP elements MUST implement UDP and TCP." CCMS_039408. The SIP standard does not show that the control connection utilizes TCP as required by the claim, as Microsoft alleges. First, Microsoft has no evidence that the 8788 MRP complies with the specific portion of the SIP standard quoted above. Rather, the record evidence contradicts that assertion. Instead, Microsoft relies on general statements regarding the 8788 MRP's SIP compliance. Second, even assuming that the 8788 MRP was fully compliant with the SIP specification cited by Microsoft, which Alcatel-Lucent does not concede, there is no proof that the 8788 MRP would ever use TCP for its control connection. This is because the SIP standard document goes on to specify under what conditions a SIP element will use TCP. CCMS_039408. Microsoft has not shown that these conditions are ever satisfied during the operation of the 8788 MRP.

365.   The preamble of Claim 30 requires that the claimed method be practiced "[i]n a distributed system having a media server for storing files holding data of *multiple media*." Claim 33 includes a similar requirement. With respect to this limitation in Claim 30, Dr. Modestino makes a conclusory statement that the media server component of the Alcatel 8788 Media Resource Platform, termed the Alcatel 8688 Media Resource Function, "stor[es] files holding data of multiple media." Earlier version of the 8788 MRP, however, included only audio functionality. These versions would

not satisfy the "multiple media" requirement of claim 30 and 33. Microsoft has not produced any evidence showing which versions of the 8788 MRP correspond to any alleged acts of infringement in the United States. Without such evidence, Microsoft cannot show that this limitation of claim 30 and 33 is satisfied.

366. Microsoft's expert argues that the 8788 MRP satisfies claims 30 and 33 under the doctrine of equivalents, if it does not literally infringe. As discussed above, however, the claims specifically require the use of "distinct" transport protocols. The 8788 MRP's use of the same transport protocol for the control and data connections is substantially different from the claimed "distinct" transport protocols. Also, the use of audio only by certain versions of the 8788 MRP is substantially different from the use of "multiple media" as required by the claims.

For these reasons, the 8788 MRP therefore does not infringe the asserted claims of the '794 patent. Microsoft cannot expand its infringement allegations at trial to cover any other Alcatel-Lucent products for this patent, as it not properly identified any other Alcatel-Lucent products as infringing this patent during this case.

## XII.    The Huna '217 Patent

367. The following sections discuss Lucent's assertions of facts regarding the teaching of asserted claims 1, 8, 14 and 37 of the Huna '217 Patent, the invalidity of the asserted claims, and Lucent's non-infringement of those claims. For a fuller discussion of these topics, Lucent references the expert reports of Dr. Fouad Tobagi and Lucent's Final Invalidity Contentions.

### A.    The Huna '217 Patent And Asserted Claims

368. The Huna '217 Patent, entitled "Apparatus and method for future transmission of device-independent messages," issued on August 20, 2002, from an application dated March 11, 1999. Microsoft is asserting claims 1, 8, 14 and 37 of the '217 Patent against Lucent and Alcatel-Lucent. The alleged invention of the '217 Patent is a messaging system for sending a message to a receiving device that is coupled to either a telephony-centric network or a data-centric network.

369.    Asserted claim 1 of the Huna '217 Patent reads as follows:

> 1. An apparatus for sending a message to a receiving device, the receiving device coupled to either a data-centric network or a telephony-centric network, the apparatus comprising:
>
> a message server, configured to translate the message into a format compatible with the receiving device, and to initiate delivery of the message at a delivery time;
>
> a data-centric network server, coupled to said message server, configured to transmit the message over the data-centric network, wherein, if the receiving device is addressable over the data-centric network, then said data-centric network server delivers the message to the receiving device;
>
> and a telephony-centric network server, coupled to said data-centric network server, configured to interface said data-centric network server to the telephony-centric network, wherein, if the receiving device is addressable by the telephony-centric network, then said telephony-centric network server receives the message from said data-centric network server and delivers the message to the receiving device over the telephony-centric network.

370.    The Court has construed "data-centric network" as "a network that carries digital data, primarily to facilitate information exchange among computers and computer peripherals. Examples include distributed computer networks such as the Internet." D.I. 156 at 21. Other examples of distributed computer networks could also meet the limitation of a "data-centric network." "Data-centric networks" are characterized by their ability to transmit information as data packets.

371.    The Court has construed "telephony-centric network" as "a network that carries telephony information such as voice, fax, page messages, and the like, primarily to facilitate information exchange among telephony devices." D.I. 156 at 21. A "telephony-centric network" is different from a "data-centric network" because it establishes a circuit connection as opposed to sending data packets.

372.    The Court has construed "message server" as "a computer that both provides services for processing messages and contains translation logic and software." D.I. 156 at 22.

373.    The Court has construed "delivery" as "transmission." D.I. 156 at 22.

374. The Court has construed the term "data-centric network server" to mean "a computer connected to a data centric network that provides services over the data-centric network." D.I. 156 at 22. A "data-centric network server" allows a computer to be connected to and communicate over a data-centric network. It enables the computer to send and receive data as required by the data-centric network. Because a computer can perform more than one function, the services that the "data-centric network server" must perform do not need to be performed by a computer other than the computer being served.

375. The Court has construed the term "addressable" to mean "capable of being identified." D.I. 156 at 22.

376. The Court has construed "telephony-centric network server" as "a computer connected to a telephony-centric network that provides services over the telephony-centric network." D.I. 156 at 23.

377. Asserted claim 8 of the Huna '217 Patent and its chain of dependency read as follows:

> 2. The apparatus as recited in claim 1, wherein the receiving device comprises a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer.
>
> 4. The apparatus as recited in claim 2, wherein the receiving device is addressed by accessing an internet protocol (IP) address over the data-centric network.
> 5. The apparatus as recited in claim 4, wherein said IP address is accessed using TCP/IP protocol.
>
> 6. The apparatus as recited in claim 5, wherein the message is supplied to the message server by an originator.
>
> 8. The apparatus as recited in claim 6, wherein said originator supplies the message in text or voice form from an originating device that is addressable over the data-centric network.

378. Asserted claim 14 of the Huna '217 Patent and its chain of dependency read as follows:

2. The apparatus as recited in claim 1, wherein the receiving device comprises a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer.

14. The apparatus as recited in claim 2, wherein the message is delivered to the receiving device in voice format as an electronic voice file.

379.    Asserted claim 37 of the Huna '217 Patent reads as follows:

37. A system for sending a message at a specified delivery time to a receiving device, the system comprising:

a message scheduler, configured to initiate delivery of the message at the specified delivery time;

a message server, coupled to said message scheduler, configured to translate the message into a format that is compatible with the receiving device;

a data-centric network server, coupled to said message server, configured to transmit the message;

a data-centric network, coupled to said data-centric network server, configured to route the message from said data-centric network server to either the receiving device or a telephony-centric network server, wherein, if the receiving device is addressable over a telephony-centric network, then said data-centric network routes the message to said telephony-centric network server.

380.    The Court has construed "message scheduler" to mean "hardware or software that resides on one or more of the servers and determines when to send messages with future delivery times."  D.I. 156 at 24.

**B.    Invalidity**

381.    Asserted claims 1, 8, 14 and 37 are invalid in view of the prior art listed in this section, either alone or in combination.

**1.    U.S. Patent No. 6,055,240 to Tunnicliffe**

382.    Asserted claims 1, 8, 14, and 37 are invalid, as anticipated by U.S. Patent No. 6,055,240 to Tunnicliffe ("Tunnicliffe") or, alternatively, as rendered obvious by Tunnicliffe in combination with the prior art teachings.

383.    The '217 Patent and Tunnicliffe are both directed toward providing messages in different formats over different networks. Tunnicliffe discloses a "message management system that uses one or more intelligent agents" aimed at serving different type devices connected to different networks. The message management system converts between different formats, and delivering the messages at convenient times to receiving devices. *See, e.g.,* FIG. 2; Col. 7, ll. 10-13 ("The agent or assistant 3 then automatically converts the message to the required display format and displays the message at a convenient time"). Likewise, the '217 Patent is directed toward "sending a message to a receiving device, at a future delivery time where the receiving device is coupled to either a telephony-centric network or a data-centric network." *See, e.g.,* Col. 4, ll. 25-29.

384.    In the "Background of the Invention," Tunnicliffe explicitly notes that there are "known systems for converting between message formats such as voice, E-mail, and fax." Col. 1, ll. 53-55. Tunnicliffe addresses the problems of determining the most efficient time and format for sending a messages to user devices that are connected to different types of networks. In so doing, Tunnicliffe presumes the existence of different network types that are interconnected and different device types connected to these networks that can communicate with each other using communication techniques that are appropriate for these networks and using formats that are appropriate for these devices and these networks. Additionally, Tunnicliffe contemplates that it would be advantageous to implement functions on a server, as opposed to a user terminal, because it "would be cheaper to implement and maintain on the server 25 rather than on many individual terminals." Col. 7, ll. 40-52. Another advantage would be that charging for the service would be easier to calculate because the system is centralized. *Id.*

### a.    Claim 1

385.    Claim 1 of the '217 Patent requires "[a]n apparatus for sending a message to a receiving device." Tunnicliffe teaches sending a message to a receiving device. Tunnicliffe discloses a terminal that "is able to send and receive messages, to and from the communications

network 2." Col. 4, ll. 60-63.  The terminal could be a telephone, fax machine, or computer. *See, e.g.,* Col. 4, ll. 59-61.

386.    Additionally, claim 1 of the '217 Patent requires that "the receiving device [is] coupled to either a data-centric network or a telephony-centric network."  Tunnicliffe explicitly teaches that the receiving device is coupled to a data-centric network or a telephony-centric network. According to Tunnicliffe, receiving devices are connected to

> a public telephone system 26, third party service 27, the Internet 28, a short message
> service 29 and other supporting telecommunications systems as necessary (not
> shown). This system of connections (shown in FIG. 2) in the communications
> network is just one example. Other combinations and connections between
> components could be used.

387.    Col. 5, ll. 44-50.  Additionally, "[o]ther terminals are provided in the communications network 2, for example as part of the public telephone system 26 or the Internet 28."  Col. 5, ll. 57-59.  Figure 2 of Tunnicliffe shows this configuration:



*Fig. 2*

388.    Claim 1 additionally requires "a message server, configured to translate the message into a format compatible with the receiving device."  Tunnicliffe discloses an "agent" and associated facilities which meet the limitations of the message server.  This agent and facilities are a computer

that provides services for processing messages and contains translation logic and software.  The agent is comprised of "software such as a knowledge based system." *See, e.g.,* Col. 7, ll. 41-42.  The intelligent agent can be located on a computer or server on "the communications network 2."  *See, e.g.,* Col. 4, l. 67 - Col. 5, l. 1.  "For example, the user may subscribe to a personal message management service provided within the network 2."  Col. 5, ll. 1-3.  Additionally, a "node" in the communications network can store messages and contain the agent, along with all of the facilities that the agent uses, such as a translation function.  *See, e.g.,* Col. 5, ll. 29-34.  While Tunnicliffe shows one embodiment of the agent being located at the server 25, the agent is not limited to this location.  Tunnicliffe states:

> This system of connections (shown in FIG. 2), in the communications network is just one example.  Other combinations and connections between components could be used.  In this example, the communications network is heterogeneous in nature, which is typically the case.  That is many different types of component and service provider go to make up the network.  The network is also a distributed system in the sense that there is no overall control or management of the system; rather organization[sic] is effected locally at nodes or components in the network.  Other terminals are provided in the communications network 2, for example as part of the public telephone system 26 or the Internet 28.

389.    Col. 5, ll. 49-59.

390.    One of ordinary skill in the art would have known that the term "node" indicates a host or server component, not merely a network switch or router.  As such, the agent and its associated facilities could be located on any one of numerous host nodes located throughout the Internet.

391.    Additionally, Tunnicliffe teaches that the agent located on the node makes use of translation facilities on the node that exist to perform the translation:

> Incorporated within the terminal **1** and/or the communications network **2** is a facility to convert between message formats, such as voice, email, fax, short message service (SMS) and web-pages. The agent **3** can make use of these facilities to automatically convert between message formats, in order to send or display messages in a preferred format. For example, the user may compose the message in a convenient format e.g. voice and then the agent automatically converts the voice format message to fax for cost efficient sending. Messages can also be stored, prior to display or being sent, either in the terminal **1** and/or at a node in the communications network **2**. The agent **3** makes use of a facility for automatically sending stored messages (either on or off-line). This enables messages to be sent at cost-

Col. 5, ll. 19-34.  Tunnicliffe discloses that "the agent 3 is then able to manage messages on behalf of the user. For example, this can involve determining which formats and times at which to send messages in order to keep costs low whilst ensuring delivery, and taking account of sender and receiver message formats." *See, e.g.,* Col. 5, ll. 4-14.  The agent takes into account many different parameters, adjusts the message accordingly, and then "automatically converts between message formats, in order to send or display messages in a preferred format." *See, e.g.,* Col. 6, ll. 25-64. "The agent or assistant 3 then automatically converts the message to the required display format and displays the message at a convenient time."  Col. 7, ll. 10-13.

392.    Claim 1 of the '217 Patent also requires that the message server "initiate delivery of the message at a delivery time."  Tunnicliffe shows that the agent initiates delivery of the message at a delivery time.  "The agent 3 makes use of a facility for automatically sending stored messages (either on or off-line). This enables messages to be sent at cost-effective times and/or according to priority.  For example, a batch of messages could be sent to reduce costs."  Col. 5, ll. 21-38.  The agent takes into account many factors and determines an appropriate time to send the message.  *See, e.g.,* Col. 6 l. 20 to Col. 7, l. 25.  Tunnicliffe shows:

> It is also preferred that the method further comprises the step of determining, on the basis of the information, time(s) at which to send the message(s). This provides the advantage that times for sending the messages can be easily and quickly determined in order to achieve for example cost efficiency and/or optimum transmission times.

Preferably the method further comprises the step of converting the message(s) to the determined format for sending. This simplifies operation for the user who is able to leave the system whilst it converts the messages to a cost efficient and preferred format for sending.

393. Col. 3, ll. 25-35.

The agent and all of the facilities available to the agent on the "node" perform the functions of the "message server."

394. Claim 1 further requires a "data-centric network server, coupled to said message server, configured to transmit the message over the data-centric network, wherein, if the receiving device is addressable over the data-centric network, then said data-centric network server delivers the message to the receiving device." Tunnicliffe teaches sending messages to computers that are addressable over the Internet, which is a data-centric network. *See, e.g.,* Col. 4, ll. 59-64 ("For example, the terminal 1 could be a telephone, a fax machine or a computer. Using the terminal 1 the user is able to send and receive messages, to and from the communications network 2. The communications network 2 includes terminals for other users"). Tunnicliffe teaches that the functions of the "message server" could be located at a node on the Internet and sends messages through the Internet. Because the components that perform the functions of the "message server" are on a node on the Internet and are capable of communicating over the Internet (a "data-centric network") one of ordinary skill in the art would recognize that the node must have "data-centric network server" functions. Without this component, the node would not be able to communicate with the data-centric network. As such, the components that perform the functions of the "message server" are coupled to a "data-centric network server." Consequently, when the components that perform the functions of the "message server" send a message to a computer connected to the Internet, a data-centric network server delivers the message. As Tunnicliffe Figure 2 (as modified) demonstrates the components that perform the functions of the "message server" are coupled to a "data-centric network server:"



FIG. 2 (as modified).

395.   Claim 1 requires a "a telephony-centric network server, coupled to said data-centric network server, configured to interface said data-centric network server to the telephony-centric network."  Tunnicliffe teaches a "telephony-centric network server, configured to interface said data-centric network server to the telephony-centric network."  Tunnicliffe teaches using a server that interfaces many different types of networks, including the Internet and the public telephone system. The "server 25 that in turn provides connections into a public telephone system 26, third party service 27, the Internet 28, a short message service 29 and other supporting telecommunications systems as necessary."  Col. 5, ll. 43-47.  The server 25 acts as a gateway, allowing communication between the telephony-centric network and the Internet.  Since the node, which contains the components that perform the functions of the "message server" and "data-centric network server," is located on the Internet, it is interfaced through the server 25 to the public telephone system. Tunnicliffe Figure 2 (as modified) illustrates a server that interfaces many different types of networks, including the Internet and the public telephone system:

FIG. 2 (as modified).

396.     Claim 1 of the '217 Patent also requires that "if the receiving device is addressable by the telephony-centric network, then said telephony-centric network server receives the message from said data-centric network server and delivers the message to the receiving device over the telephony-centric network."  As discussed above, the node on the Internet containing the "message server" and "data-centric network server" sends the message over the data-centric network to the server 25.  As shown above, acting as a gateway, the server 25 then sends the message to the receiving device over the "telephony-centric network."

### b.     Claim 8

397.     Claim 8 of the '217 Patent depends from claims 2, 4, 5, and 6, and, therefore, incorporates the limitations of those claims.  Claim 2 requires that the receiving device comprise "a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer."  Tunnicliffe discloses that the receiving device "could be a telephone, a fax machine or computer."  Col. 4, ll. 60-61.

398.     Claim 4 states that the receiving device "is addressed by accessing an internet protocol (IP) address over the data-centric network."  Claim 5 requires that the "IP address is

accessed using TCP/IP protocol." Tunnicliffe teaches that the sending device or receiving device may be a computer connected to the Internet. *See, e.g.,* Col. 4, ll. 56-64 ("A user or subscriber to a communications network has a terminal 1 (as shown in FIG. 1) for connection into the communications network 2. For example, the terminal 1 could be a telephone, a fax machine or a computer. Using the terminal 1 the user is able to send and receive messages, to and from the communications network 2"); Col. 5, ll. 39-59 and FIG. 2:

> As shown in FIG. 2, the communications network 2 can incorporate many different types of component. In the situation that the terminal 21 is a mobile telephone, this can be linked with a base transceiver 23 as shown in FIG. 2. The base transceiver 23 is linked (via a base station 24) to a server 25 that in turn provides connections into a public telephone system 26, third party service 27, the Internet 28, a short message service 29 and other supporting telecommunications systems as necessary (not shown).

Although not explicitly stated, one of ordinary skill in the art would have known that, because the receiving device receives data over the Internet, it must be addressed by an Internet protocol (IP) address and be accessed by TCP/IP.

399.     Claim 6 requires that "the message is supplied to the message server by an originator." Claim 8 itself states that "the originator supplies the message in text or voice form from an originating device that is addressable over the data-centric network." Tunnicliffe teaches that an originating device may supply a voice message over the data-centric network to the message server. *See, e.g.,* Col. 6, ll. 21-26 ("A user or subscriber 5 constructs messages to be sent in one of a variety of formats. For example, the user may prefer to construct all messages in voice formats"). This message is sent to the components that perform the function of the "message server" located on the node on the Internet. *See, e.g.,* Col. 6, ll. 22-26 ("The constructed messages are then stored, for example, on the terminal 1. The agent or assistant 3 then assimilates all or some of the following information"); *see also* Col. 5, ll. 21-30:

> Incorporated within the terminal 1 and/or the communications network 2 is a facility to convert between message formats, such as voice, email, fax, short message service (SMS) and web-pages. The agent 3 can make use of these facilities to automatically convert between message formats, in order to send or display messages in a preferred format. For

example, the user may compose the message in a convenient format e.g. voice and then the agent automatically converts the voice format message to fax for cost efficient sending.

### c.    Claim 14

400.    Claim 14 depends on claim 2, and, therefore, incorporates the limitations of that claim.  To the extent claim 2 has been addressed above, that discussion is incorporated by reference here and applies equally to claim 14.

401.    Claim 14 additionally requires that "the message is delivered to the receiving device in voice format as an electronic voice file."  Tunnicliffe teaches that messages may be delivered to a receiving device in voice format.  *See, e.g.,* Col. 5, ll. 21-26 ("Incorporated within the terminal 1 and/or the communications network 2 is a facility to convert between message formats, such as voice, email, fax, short message service (SMS) and web-pages.  The agent 3 can make use of these facilities to automatically convert between message formats, in order to send or display messages in a preferred format").  Tunnicliffe also teaches converting the message into a required format and sends the message to a receiving device, which could include a computer.  *See, e.g.,* Col. 6, ll. 60-63 ("The agent or assistant 3 then automatically converts the message to the required format and sends the message at the determined time"); Col. 4, ll. 60-61 ("For example, terminal 1 could be a telephone, a fax machine or a computer").  Tunnicliffe teaches converting any message type into a format receivable by any receiving device.  Because a computer can only receive data in electronic format, one of ordinary skill in the art would have known that when a computer receives a voice message it is an electronic voice file.

### d.    Claim 37

402.    Claim 37 has many of the same limitations as claim 1.  To the extent claim 1 has been addressed above, that discussion is incorporated by reference here and applies equally to claim 37.

403.    Claim 37 of the '217 patent also requires a message scheduler responsible for initiating "delivery of the message at the specified delivery time."  Tunnicliffe teaches that existing

1   facilities ("provisions for automatically sending messages") and an agent on the node, which are

2   components of the "message server," initiate delivery of a message at a delivery time. *See, e.g.,* Col.

3   5, ll. 60-62; FIG. 2 ("[A]n intelligent agent 3 is incorporated either within the terminal 21 or for

4   example in a server 25 in the communications network"). As taught by Tunnicliffe,

5

6   > The agent **3** is provided with, or obtains for itself, information about its environment, the communications network **2** and the user **5**. This information can be information about costs, or how busy certain parts of the network are and information about the user, such as past behaviours and preferences for message formats. On the basis of this information, the agent **3** is then able to manage messages on behalf of the user. For example, this can involve determining which formats and times at which to send messages in order to keep costs low whilst ensuring delivery, and taking account of sender and receiver message formats. The agent **3** also determines how best to prioritise and display received messages. It is also possible for the agent **3** to act on behalf

13  Col. 5, ll. 4-14. The agent can send the message at a later time that is calculated to be most efficient.

14  *See, e.g.,* Col. 6, ll. 20-63. Tunnicliffe shows that a message may be sent at a "cost effective time"

15  or "according to priority." Col. 5, ll. 34-36. Also, the system takes into account different variables

16  to determine the appropriate delivery time. *See, e.g.,* Col. 6, ll. 24-64. Subsequently, the system

17  determines a "convenient time to send the message." Col. 6, l. 60; Col. 7, ll. 7-18. Tunnicliffe shows

18  that the agent can be performed by software. *See, e.g.,* Col. 7, ll. 40-45 ("The agent 3 may comprise

19  software such as a knowledge based system"). As discussed above, the "message server" on a node

20  on the Internet also contains the same components that perform the "message scheduler" and,

21  therefore, the "message scheduler" resides on and is coupled to the "message server."

22      404.    To the extent that Tunnicliffe does not explicitly show a user-specified future delivery

23  time, it would have been obvious to those of ordinary skill in the art at the time of the invention to

24  modify Tunnicliffe to include a user specified future delivery time. User-specified future delivery

25  times for a message was well known in the art prior to the date that the '217 Patent was filed. *See,*

26  *e.g.,* Jones U.S. Patent No. 5,193,110 ("Jones '110"), Levac U.S. Patent No. 5,872,926 ("Levac

27  '926"). Tunnicliffe itself contemplates determining the most cost efficient time to send a message,

28

takes into account numerous sending parameters, and sending a message according to priority, all of which augment a message's normal delivery time. *See, e.g.,* Col. 5, ll. 10-38. Additionally, Jones '110 teaches the future delivery of messages. *See, e.g.,* Jones at Col. 18, ll. 2-25. Furthermore, Levac shows using message parameters to determine the appropriate "runtime," which could be at a future time. *See, e.g.*, Levac at Col. 3, l. 61 - Col. 4, l. 23. Finally, the '217 Patent itself recognizes that user specified future delivery times were well known in the art. *See, e.g.*, Col. 10, ll. 55-67. Thus, to the extent Microsoft asserts that Tunnicliffe does not specifically disclose a user specified future delivery time, one of ordinary skill in the art would have found sufficient motivation to combine this feature with the messaging system of Tunnicliffe because of, among other reasons, the known advantages and efficiencies of future message scheduling and that these references involve solving a problem similar to Tunnicliffe.

405. The "data-centric network" of claim 37 must also connect the telephony-centric network server to the data-centric network server. When the receiving device is addressable over the "telephony-centric network," the "data-centric network server" first sends the message over the "data-centric network" to the "telephony-centric server." Tunnicliffe teaches that the "telephony-centric network server" and "data-centric network server" are coupled by a "data-centric network." As discussed above, the components that perform the function of the "message server" are on a node on the Internet. The node also performs the function of the "data-centric network server" because it is capable of transmitting data over the Internet, a "data-centric network." The node containing the "data-centric network server" is connected to the server 25, which performs the function of the "telephony-centric network server." Because the server 25 and the node are connected over the Internet, the "data-centric network" routes the message to the "telephony-centric network server."



Tunnicliffe FIG. 2 (as modified).

## 2. U.S. Patent No. 6,233,318 Picard *et al.*

406.     Asserted claims 1, 8, 14, and 37 are invalid, as anticipated by U.S. Patent No. 6,233,318 ("Picard") or, alternatively as rendered obvious by Picard in combination with the prior art teachings.

407.     Like in the '217 Patent, Picard is addressed to unified messaging. Col. 1, ll. 15-20. This messaging is performed "not only through a public switched telephone network using a telephone but also over a data network, such as the Internet or an intranet, using a personal computer." *See* Abstract. The object of the invention of Picard is to provide messaging over not only a telephone network, but also over a data network. *See, e.g.,* Col. 1, ll. 55-60. Additionally, the '217 touts the delivery of messages "to all recipients over communication channels that are transparent to the message originator" as an inventive aspect. *See, e.g.,* Col. 6, ll. 15-23. Picard provides and discloses this same transparency to the user. *See, e.g.,* Col. 3, ll. 55-60. Picard discloses:

**e. The ability to perform data type conversions automatically, in support of transparent multi-terminal user access, or upon subscriber explicit request**

Col. 3, ll. 57-59.  Furthermore, Picard discloses a number of network configurations and that several of the embodiments are "not intended to be a definitive and complete representation of the actual software architecture of the IMS [integrated mailbox systems (IMSs)]."  Col. 14, ll. 5-9.  Picard acknowledges that different network architectures are well known in the art.

408.    Furthermore, Picard also emphasizes using a distributed architecture to deploy a "virtual" integrated mailbox or a "real" integrated mailbox.  *See, e.g.*, Col. 4, ll. 30-52.  These mailbox systems allow connectivity between a variety of systems, including other IMS.  *See, e.g.*, Col. 4, ll. 22-30; 55-67.  Picard teaches the interconnectivity and interaction between multiple IMS systems to provide "world-wide connectivity for IMS subscribers."  *See, e.g.*, Col. 12, ll. 59-60.  As explicitly stated, "[I]t also has downward-compatible enhancements for interworking with other systems, so that multiple Boston Technology IMS clusters become essentially connected in near real-time."  Col. 12, ll. 59-63.

409.    The '217 Patent further discloses that "message transmission scheduling logic are resident in the servers according to the present invention rather than being resident in originating and receiving devices."  Col. 14, ll. 5-10.  The '217 Patent notes that this is a significant improvement.  Picard, as prior art, notes this same ability.  Picard states:

> It is another object of the present invention to provide a system in which the message service provider does not need to supply the user with any client application software.

Col. 2, ll. 23-25.

### a.    Claim 1

410.    Claim 1 of the '217 Patent requires "[a]n apparatus for sending a message to a receiving device."  Additionally, claim 1 requires that "the receiving device [is] coupled to either a data-centric network or a telephony-centric network."  Picard teaches a system and a method of

1  sending messages to a receiving device that is coupled to either a data-centric network or a

2  telephony-centric network.  Picard explicitly states that "[i]t is an object of the present invention to

3  provide a system that allows a subscriber to access stored messages over not only a telephone

4  network but also over a network such as the Internet or an intranet."  Col. 1, ll. 57-67.

6       FIG. 4 illustrates the system/network architecture for either the real or virtual
       integrated mailbox and integrated message system (IMS). As illustrated, the system
7       architecture 100 allows access by a telephone 102 through a public switched
       telephone network (PSTN) 104 to the integrated messaging system 106 either directly
8       or through a modem 108. Access by a personal computer 109 can also be
       accomplished through the PSTN 104. Access by a personal computer 110 through the
9       Internet 112 using a modem 114 is also provided.

10  Col. 6, ll. 11-19.



FIG. 4 (as modified).  Picard further teaches that multiple IMSs can be interconnected over a "data-

centric network."  Picard demonstrates that:

For interfacing with external VMSs, or between Boston
Technology, Inc. IMS platforms, AMIS-D is preferred. The
55 X.400 technology is also usable for interworking with other
X.400 mail systems, allowing connectivity through X.400
administrations to many e-mail users. Since almost all X.400
public mail systems have Internet connectivity, this is a
preferred approach to providing world-wide connectivity for
60 IMS subscribers.
   When external MSs do not have X.400 interfaces, MIME/
SMTP protocols are the next most preferred choice, both for
Internet connectivity and for connection to corporate LAN
mail gateways.

Col. 12, ll. 54-65.  Additionally, it is stated that two identical IMSs can be interconnected by a "data-centric network."  *See, e.g.*, Col. 14, ll. 25-32 ("The Boston Technology, Inc. Digital Messaging Network Version II (DMN II) T product 133 provides store-and-forward communication with other MSs, including other Boston Technology IMSs or VMSs, other vendor's VMSs, and external EMSs").

411.    Claim 1 additionally requires "a message server, configured to translate the message into a format compatible with the receiving device."  Picard shows a computer for processing messages that contains translations logic and software as required by claim 1.  "The present invention has the ability to receive, send, and store messages of several data types including voice, facsimile . . . ."  Col. 6, ll. 29-34.  A "multimedia message store 132" is used to store and process messages.  *See, e.g.,* Col. 14, ll. 20-25; FIG. 5.  The message store is internally connected to the voice application 131, which "accommodates multimedia messages and data conversions, for example text-to-speech and text-to-facsimile."  Col. 14, ll. 15-20; FIG. 5.  Picard teaches the ability to perform "conversions automatically."  *See* Col. 3, ll. 55-60; Col. 18, ll. 15-55.  The "multimedia message store" and the conversion components perform the function of the "message server" of the '217 Patent.



FIG. 5 (as modified).

412.    Claim 1 of the '217 Patent also requires that the message server "initiate delivery of the message at a delivery time."  Picard teaches that the system sends notifications, which can include delivery of the message itself.  *See, e.g.,* Col. 11, ll. 28-59.  Picard teaches transmitting the message to the receiving device and initiating delivery at a delivery time when the subscriber chooses to access their messages.  *See, e.g.,* Col. 2, ll. 33-51.  Picard states that the present invention "provides comprehensive notification delivery capabilities."  Col. 11, ll. 43-45.

413.    Claim 1 of the '217 Patent requires a "data-centric network server."  This "data-centric network server" is coupled to the "message server" and provides messages to receiving devices connected over the data centric network.  Picard shows the use of an HTTP server or IPU 146 to provide a message over the Internet, which is a "data-centric network."  *See, e.g.,* Col. 14, ll. 33-43 ("The subscriber PC access functions reside in the APU 150 for dialup access, and in the NIU (IPU 146) for network access.  Both instances of this set of functions are essentially the same, except that the datalink protocols are different").  When a user connects to the messaging system over the Internet, the IPU/HTTP server delivers the message to the computer over the data network using the

TCP/IP protocol.  *See e.g.*, Col. 14, ll. 37-52.  Additionally, Picard shows that NIU(IPU) can

interface other identical IMSs over a "data-centric network."  *See, e.g.*, Col. 12, ll. 44-64 ("It also

has downward-compatible enhancements for interworking with other systems, so that multiple

Boston Technology IMS clusters become essentially connected in near real-time").  The components

of the NIU(IPU) perform the function of the "data-centric network server."  This "data-centric

network server" is coupled to the components that perform the functions of the "message server."

*See, e.g.,* FIGS. 4 & 5.



FIG. 5 (as modified).

414.    Claim 1 further requires the user of a "telephony-centric network server."  The

"telephony-centric network server" must  be "coupled to said data-centric network server,

configured to interface said data-centric network server to the telephony-centric network, wherein, if

the receiving device is addressable by the telephony-centric network, then said telephony-centric

network server receives the message from said data-centric network server and delivers the message

to the receiving device over the telephony-centric network."  Picard teaches transmitting messages to

a receiving device coupled to a telephony-centric network.  Figures 5 and 6 teach the use of a

"digital switch matrix," "dialup interface 130," and "winsock 142" that perform the functions of the "telephony-centric network server."  *See, e.g.,* FIGS. 5 & 6; Col. 14, ll. 10-14 ("The dialup interfaces 130 in the APUs 150 have drivers for access to conventional DSP hardware, providing voice interface functions (V), facsimile modem capabilities (F), data modem capabilities (D) and VoiceView voice/data modem capabilities (V/D)").  These components provide a gateway between the telephone network and the Internet.  The "dialup interface," "digital matrix switch," and the "winsock," performing the functions of the "telephony-centric network server," provide the message to the receiving device over the "telephony-centric network."



FIG. 5 (as modified).



FIG. 6 (as modified).

### b.    Claim 8

415.    Claim 8 of the '217 Patent depends on claims 2, 4, 5, and 6, and, therefore, incorporates the limitations of those claims.  Claim 2 requires that the receiving device comprise "a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer."  Picard teaches that the originating device may be a telephone, a personal computer, a personal digital assistant, a cellular telephone, or a pager.  *See, e.g.*, Col. 4, ll. 10-15.

416.    Claim 4 states that the receiving device "is addressed by accessing an internet protocol (IP) address over the data-centric network."  Additionally, claim 5 requires that the "IP address is accessed using TCP/IP protocol."  Picard also shows connecting a receiving device through the Internet using TCP/IP.  *See, e.g.*, FIG. 4.

417.    Claim 6 requires that "the message is supplied to the message server by an originator."  Claim 8 states that "the originator supplies the message in text or voice form from an originating device that is addressable over the data-centric network."  Picard teaches that an originator that is addressable over the "data-centric network" supplies a text or voice message.  *See, e.g.,* Col. 2, ll. 33-51.

### c.     Claim 14

418.    Claim 14 depends on claim 2, and, therefore, incorporates the limitations of that claim.  To the extent claim 2 has been addressed above that discussion is incorporated by reference here and applies equally to claim 14.

419.    Claim 14 requires that "the message is delivered to the receiving device in voice format as an electronic voice file."  Picard teaches that messages may be delivered to a receiving device in voice format.  *See,* e.g., Col. 2, ll. 33-51.  Picard states that:

> The system provides voicemail access over the telephone network, indicating message number, etc. with the ability to play messages to the telephone user.  For text type messages, such as facsimile and e-mail, the system converts the text into speech and plays the speech to the telephone user. The system allows a personal computer user to obtain the data network access using an Internet browser. The browser is used to access information about the messages stored and is used to download and play the messages via data streaming in the case of a voice or video messages or view the messages in the case of text type messages, such as facsimile and e-mail.

*Id.* Picard shows the use of .wav files.  *See, e.g.,* Col. 8, ll. 13-14 ("Examples would be MIME messages containing audio/wav body parts, or .WAV files").  Finally, Picard teaches that the originating device may be a telephone, a personal computer, a personal digital assistant, a cellular telephone, or a pager.  *See, e.g.*, Col. 4, ll. 10-15.

### d.     Claim 37

420.    Claim 37 has many of the same limitations as claim 1.  To the extent claim 1 has been addressed above, that discussion is incorporated by reference here and applies equally to claim 37.

421.    Claim 37 of the '217 Patent requires a message scheduler responsible for initiating "delivery of the message at the specified delivery time."  Picard teaches the ability to initiate the delivery of a message at a delivery time.  The system sends notifications, which can include the delivery of the message itself.  *See, e.g.,* Col. 11, ll. 28-59.  Picard teaches transmitting the message to the receiving device and initiating delivery at a delivery time when the subscriber chooses to access his or her messages.  *See, e.g.,* Col. 2, ll. 33-51.

422.    To the extent that Microsoft contends that Picard does not explicitly show a user-specified future delivery time, it would have been obvious to those of ordinary skill in the art at the time of the invention to modify Picard to include a user-specified future delivery time.  A user-specified future delivery time for a message was well known in the art prior to the date that the '217 Patent was filed.  *See, e.g.,* Jones U.S. Patent No. 5,193,110 ("Jones '110"), Levac U.S. Patent No. 5,872,926 ("Levac '926").  Additionally, Picard explicitly incorporates by reference Jones '110, which teaches future delivery of messages.  *See, e.g.,* Col. 18, ll. 2-25.  Furthermore, Levac shows using message parameters to determine the appropriate "runtime," which could be at a future time. *See, e.g.*, Col. 3, l. 61 - Col. 4, l. 23.  Finally, the '217 Patent itself recognizes that a user specified future delivery times were well known in the art.  *See, e.g.*, Col. 10, ll. 55-67.  Thus, to the extent Picard does not specifically disclose a user specified future delivery time, one of ordinary skill in the art would have found sufficient motivation to combine this feature with the messaging system of Picard because of, among other reasons, the known advantages and efficiencies of message scheduling and that these references involve solving a problem similar to Picard.

423.    Claim 37 requires a "message server," coupled to the message scheduler, that can convert messages into different formats.  As discussed above, because the "message scheduler" resides in the components equivalent to the "message server," it is coupled to and resides on the "message server."

424.    The "data-centric network" of claim 37 must also connect the "telephony-centric network server" to the "data-centric network server."  When the receiving device is addressable over the "telephony-centric network," the "data-centric network server" first sends the message over the data-centric network to the "telephony-centric server."  As discussed in Paragraphs 98-101 of my report, Picard explicitly states that multiple identical IMS systems may be connected to allow for "world-wide connectivity for IMS subscribers."  *See, e.g.*, Col. 12, ll. 44-64.  This connection is established through the "data-centric network" over an X.400 connection.  *See, e.g.*, FIG. 4 & 5; Col.

12, ll. 44-64; Col. 14, ll. 25-32.  When a message stored on one IMS that is connected to the  "data-centric network" is to deliver a message to a device that is connected to a second IMS by a "telephony-centric network," the first IMS provides the message over the "data-centric network" to the second IMS.  *Id.* ("The Boston Technology, Inc. Digital Messaging Network Version II (DMN II) T product 133 provides store-and-forward communication with other MSs, including other Boston Technology IMSs or VMSs, other vendor's VMSs, and external EMSs").  Subsequently, the "telephony-centric network server" of the second IMS receives the message and sends the message to the receiving device.

### 3.     U.S. Patent No. 5,987,100 to Fortman *et al.* ("Fortman")

425.     Asserted claims 1, 8, and 14 are invalid, as anticipated by the Fortman 5,987,100 Patent ("Fortman") or, alternatively, rendered obvious by Fortman in combination with the prior art teachings.

426.     Fortman discloses a messaging center capable of storing messages and converting the messages into different formats.  *See, e.g.*, Col. 2, ll. 39-44.  In the "Background of the Invention," Fortman acknowledges:

> The trend in the telecommunications industry is toward providing a wide variety of information and communication services, or messaging services, over various communications networks to remote subscribers having diverse analog and digital communications equipment.

427.     Col. 1, ll. 12-16.

Additionally, Fortman discusses several features of messaging systems that were well known in the prior art.  In his discussion of U.S. Patent No. 5,497,373 Hulen ("'373 Hulen"), Fortman shows that messaging systems connected to various analog and digital networks were known in the art.  *See,* Col. 1, l. 55 - Col. 2, l. 5.  These can include a telephone network and packet switched networks.  *Id.* Fortman also shows that converting messages on a server was well known in the prior art. Col. 2, ll. 1-26.

### a. Claim 1

428.    Claim 1 of the '217 Patent requires "[a]n apparatus for sending a message to a receiving device. Claim 1 also requires that a receiving device is "coupled to either a data-centric network or a telephony-centric network." Fortman teaches that a variety of communications devices can be connected to a messaging system over a variety of network types:

> Subscribers of the universal mailbox service connect to the network via a variety of telecommunications equipment through analog, digital, and Internet lines, and wireless connections. The subscriber equipment includes, but is not limited to, group 1, 2, 3 facsimile machine **2110**, Plain Old Telephone System (POTS) telephone **2120**, Analog Display Services Interface (ADSI) telephone **2130**, group 4 facsimile machine **2140**, ISDN telephone **2150**, computer terminal **2160**, Personal Communications Services (PCS) wireless telephone **2170**, PCS mobile telephone **2180**, and analog/digital cellular telephone **2190**. ADSI telephone **2130** might include group 3 facsimile machine **2132** and printer **2134** connected thereto.

Col. 3, ll. 50-64.

429.    Additionally, claim 1 requires a "message server," which is a computer for processing messages and contains translation software and logic. Fortman teaches a "service provider," a "subscriber mailbox," and a "message translator" that are internally connected. *See, e.g.*, FIG. 3. These components perform the function of the "message server" of the '217 Patent. The "service provider" processes incoming messages and stores the messages on the "subscriber mailbox." *See e.g.*, Col. 7, ll. 5-19. The "message translator" performs the necessary format conversions for different data types. *See, e.g.*, Col. 5, ll. 55-62. Many different data-type conversions are possible.

20

TABLE 2

| RETRIEVAL DEVICE TRANSLATOR | POTS Phone | ADSI Phone | Fax | Computer | Pager |
|---|---|---|---|---|---|
| Plain telephone | None. | Message information can be provided in ADSI text format. Voice to ADSI text used for hearing impaired service. | Voice to text to Fax graphics, and Message information. | Voice to sound file (and to text for hearing impaired), and message information. | Message information only. |
| Fax machine | Fax graphics to text to voice. | Fax graphics to ADSI text. | None. | Fax graphics to computer graphics, and message information. | Message information only. |
| ADSI telephone | None for voice. ADSI text to voice. | None. | ADSI text to Fax graphics. | ADSI text to text. | Message information only. |
| Computer | Text to voice. | Text to ADSI text. | Text to Fax graphics. | None. | Message information only. |
| Pager | Text to voice. | Text to ADSI text. | Text to Fax graphics. | None. | None. |

Col. 6, Table 2. The "service provide," "subscriber mailbox," and "message translator" perform the functions of the "message server" of the '217 Patent.



FIG. 3 (as modified).

430.    The "message server" of the '217 Patent is also required to initiate the delivery of a message at a delivery time.  Fortman further teaches that the subscriber mailbox notifies the subscriber of a pending message, which could include sending the actual message to the subscriber. *See, e.g.*, Col. 5, ll. 42-59 (". . . including notifying the subscriber using a message waiting light or tone, or by sending part or all of the message to the subscriber as notification");  *see also* Col. 7, ll. 5-19 ("The subscriber notification may include a message waiting light . . . or the message itself delivered to the subscriber's ADSL telephone, pager, fax, or computer (Table 1)").  "If the message is already in the retrieval format, then service provider 3200 sends the message to the subscriber"); *see also* Col. 7, ll. 62-64.  Fortman teaches that a variety of notification types are possible.  Because the system can deliver a message, immediately or at a user's request, the system initiates the delivery of the message at a delivery time:

TABLE 1

| RETRIEVAL DEVICE | POTS Phone | ADSI Phone | Pager | Fax | Computer |
|---|---|---|---|---|---|
| NOTIFICATION TYPES | >Phone call<br>>Message waiting light<br>>Message waiting tone. | >Phone call<br>>Message waiting light<br>>Message waiting tone<br>>Display message information on screen<br>>Download message to phone (for non-voice messages). | >Deliver the message. | >Deliver the message. | >Audible or visual alert on screen<br>>Deliver the message. |

Col. 5, Table 1.

431.    Claim 1 requires a "data-centric network server."  This "data-centric network server"
is coupled to the "message server" and provides messages to receiving devices connected over the
data centric network.  Fortman teaches the use of an "interface" that performs the function of the
"data-centric network server" of the '217 Patent.  The "interface" of Fortman "connects universal
mailbox 2300 to various telecommunications networks, including the PTN and the Internet."  Col. 4,
ll. 19-21.  The "interface" contains "transceivers … detectors … and selectors. *See, e.g.*, Col. 4, ll.
23-25.  Fortman teaches that:

> Transceivers 4100 interface with the various networks, including the PTN and the
> Internet, and exchange signals with the subscriber equipment to permit subscribers to
> store, retrieve, and respond to messages in universal mailbox 2300, and to permit
> universal mailbox 2300 to notify the subscribers of pending messages awaiting
> retrieval.

Col. 4, ll. 24-30.  The interface, therefore, provides messages to receiving devices connected over
the Internet, which is a "data-centric network."  Fortman shows that the interface is coupled to the
components that perform the function of the "message server."  *See, e.g.*, FIG. 3.



FIG. 3 (as modified).

432.    Claim 1 further requires the user of a "telephony-centric network server." The "telephony-centric network server" must be "coupled to said data-centric network server, configured to interface said data-centric network server to the telephony-centric network, wherein, if the receiving device is addressable by the telephony-centric network, then said telephony-centric network server receives the message from said data-centric network server and delivers the message to the receiving device over the telephony-centric network." As discussed above, Fortman contemplates the use of an "interface." The "interface" further performs the functions of the "telephony-centric network server." The "interface" allows messages to be sent from the components that perform the function of the "message server" to receiving devices connected to the telephone network. *See, e.g.*, Col. 4, ll. 24-30. Additionally, because the interface contains both the

"telephony-centric network server" and the "data-centric network server," these components are coupled.  Because the components are part of the same interface, the "telephony-centric network server" and the "data-centric network server" can transmit data to each other and interact with the same stored information:



FIG. 3 (as modified).

### b.      Claim 8

433.    Claim 8 of the '217 Patent depends from claims 2, 4, 5, and 6, and, therefore, incorporates the limitations of those claims.  Claim 2 requires that the receiving device comprise "a telephone, a facsimile machine, a pager, a smart pager, a cellular telephone, a personal digital assistant, or a desktop computer."  Fortman teaches that the receiving device can be telephones, computers, and facsimile machines.  *See, e.g.*, Col. 3, l. 55 - Col. 4, l. 6.

434.    Claim 4 states that the receiving device "is addressed by accessing an internet protocol (IP) address over the data-centric network."  Additionally, claim 5 requires that the "IP address is accessed using TCP/IP protocol."  Since the computer in Fortman is connected to the Internet, one of ordinary skill in the art would have recognized that it uses the TCP/IP protocol and has an IP address.  *See, e.g.*, FIG. 2; Col. 4, ll. 7-21.

435.    Claim 6 requires that "the message is supplied to the message server by an originator."  Claim 8 itself states that "the originator supplies the message in text or voice form from an originating device that is addressable over the data-centric network."  Picard teaches that an originator, that is addressable over the "data-centric network," supplies a text or voice message.  *See, e.g.,* Col. 2, ll. 33-51.  Fortman teaches that a computer may send an email message over the Internet to the "e-mail server."  *See, e.g.*, 4, ll. 10-15; 45-67.  The "email server" is part of the "service provider," which is a component that performs part of the functions of the "message server" of the '217 Patent.  *See, e.g.*, FIG. 3.

### c.    Claim 14

436.    Claim 14 depends on claim 2, and, therefore, incorporates the limitations of that claim.  To the extent claim 2 has been addressed above, that discussion is incorporated by reference here and applies equally to claim 14.

437.    Claim 14 requires that "the message is delivered to the receiving device in voice format as an electronic voice file."  Fortman teaches converting a voice message to a "sound file" for retrieval by a computer.  *See, e.g*., Col. 6, Table 2 ("voice to sound file").  Fortman also teaches that the receiving device can be telephones, computers, and facsimile machines.  *See, e.g.*, Col. 3, l. 55 - Col. 4, l. 6.

### C.    Non-Infringement

438.    Microsoft has accused the AnyPath Messaging System ("AnyPath") of infringing asserted claims 1, 8, 14 and 37 of the '217 Patent.  Lucent denies that AnyPath infringes the '217 Patent.  Nor has Microsoft produced evidence to prove infringement by a preponderance.

### 1.    Claim 1

439.    Lucent denies that it infringes claim 1 because the accused AnyPath lacks at least the following elements:

### a.    "data-centric network" and "data-centric network server"

440.    Asserted claim 1 requires a "data-centric network" that delivers messages to devices addressable by a data-centric network.  The term "data-centric network" has been construed by the Court as "a network that carries digital data, primarily to facilitate information exchange among computers and computer peripherals."  Examples include "distributed computer networks such as the Internet."

441.    Microsoft contends that the message server ("MS") of AnyPath "is the data-centric network server because it is coupled to the message server identified above, and further delivers the message to the recipient's computer."   Microsoft has provided no support for this statement or given any indication of how the recipient's computer is reachable over the data-centric network.  Lucent denies that the recipient's computer is reachable over the data-centric network.

442.    An AnyPath that does not deliver a message to a recipient's computer through the Internet does not send such a message over the data-centric network, as required by asserted claim 1.  Therefore, any such AnyPath Messaging Systems cannot infringe claim 1 of the '217 Patent because there are no receiving devices that receive data from the data-centric network server over the "data-centric network," as required by the claim.

### b.    "message server"

443.    Asserted claim 1 of the '217 Patent requires at least three servers: the telephony-centric network server, message server, and a data-network server.  Any reference to translation that occurs on a "telephony-centric network server" cannot be considered as occurring in the "message server" of the '217 Patent.  Lucent denies that AnyPath includes "a message server" that both translates a message into a receiving format and initiates delivery of the message as required by claim 1 for the following reasons:

444.    First, the only server in AnyPath that initiates delivery of the message at a specified time is the MS.

445.     Second, the RS or TS components of AnyPath that perform transcoding or translation cannot be considered to meet the requirements of the claim element pertaining to the "message server." In AnyPath, once a message is sent to the RS or TS, it is subsequently transmitted to the recipient and does not return to the MS (where, according to Microsoft, the "data-centric network server" resides). Any function that is performed in one server cannot arbitrarily be considered to meet the requirement pertaining to the functionalities of another server.

446.     Further, Microsoft provides no evidence that the AnyPath MS translates a message into a format compatible with the receiving device as required by the claim. Asserted claim 1 of the '217 Patent requires that the message server contain "translation logic and software" to "translate the message into a format compatible with the receiving device." Microsoft contends that "transcoding" is a type of translation. Additionally, Microsoft contends that AnyPath can compress a message in the MS. Even assuming that the MS performs some type of "transcoding," this is performed for the purposes of storage, not for the purpose of translating it into a format that is compatible with the receiving device, as required by asserted claim 1 of the '217 Patent. Thus, because claim 1 requires that the "message server" both perform translation and initiate the delivery of the message, AnyPath does not have a "message server" as that term has been construed by the Court.

447.     Additionally, Microsoft provides no evidence that the AnyPath MS performs conversion or transcoding at all, and Lucent denies that it does. As discussed previously, the AnyPath ML converts the message into a compressed CELP file and deposits the message in the MS using SMTP. Therefore, the evidence demonstrates that the message is merely deposited in the AnyPath's MS in the format sent by the ML. Moreover, Microsoft admits that any other compression performed occurs at the telephony server and not the message server.

448.     Finally, Microsoft contends that the limitation and construction of "message scheduler" is also contained in claim 1; however, only claim 37 requires the additional element of the "message scheduler."

### 2.      Claim 8

449.    Because Lucent does not infringe asserted claim 1, it also does not infringe asserted claim 8, which is dependent on claim 1.

### 3.      Claim 14

450.    Because Lucent does not infringe asserted claim 1, it also does not infringe asserted claim 8, which is dependent on claim 1.

### 4.      Claim 37

451.    Claim 37 contains many of the same limitations as asserted claim 1.  To the extent that these limitations are the same, the analysis for claim 1 is incorporated herein.

452.    In addition, Lucent does not infringe asserted claim 37 because of at least the additional following reasons.

#### a.      "data-centric network" and "data-centric network server"

453.    Claim 37 also requires a "data-centric network" that delivers the messages to devices addressable by a data-centric network.  Microsoft contends that this limitation is met by AnyPath when its MS (containing the "data-centric network server") sends a message to a recipient's computer over the Internet, which is a data-centric network.  However, an AnyPath that does not deliver a message to a recipient's computer through the Internet does not send such a message over the data-centric network, as required by claim 37.   Thus, to the extent that AnyPath systems do not connect a recipient's computer through the Internet, these systems do not send a message to a device addressable over the data-centric network, as required by claim 37.  Therefore, these APMS cannot infringe claim 37, either directly or under the doctrine of equivalents, because there are no receiving devices that receive data from the data-centric network server over the "data-centric network."

#### b.      "message scheduler"

454.    Claim 37 requires a "message scheduler" that has been construed by the Court as "hardware or software that resides on one or more of the servers and determines when to send

messages with future delivery times." The "one or more of the servers" must be one of the servers already identified by the claims and by the patent disclosure. It cannot be a newly invoked, separate, and unidentified server that contains the "message scheduler." For example, the "message scheduler" could reside on the "message server," but it cannot be on a separate, additional server. Accordingly, Lucent denies that "all computers in Lucent APMS [AnyPath] that execute translation logic or include message scheduling logic are collectively a 'message server' according to the Court's construction."

455.     Asserted claim 37 also requires "a message server, coupled to said message scheduler, configured to translate the message into a format that is compatible with the receiving device." Additionally, Microsoft contends that the AnyPath MS is also the "data-centric network server." However, claim 37 requires that the "data-centric network server" be "configured to transmit the message." While designating the RS or TS as the "message server" (because they perform some type of translation) would still couple it to the "data-centric network server," this would preclude the "data-centric network server" from transmitting messages to receiving devices. In AnyPath, once a message is sent to the RS or TS, it is subsequently transmitted to the recipient and does not return to the MS (where the "data-centric network server" resides according to Microsoft). The AnyPath RS or TS, therefore, cannot be considered the "message server."

456.     Consistent with the above analysis the AnyPath MS must be the "message server." Moreover, as also explained above, the APMS MS does not translate a message into a format compatible with the receiving device, and, therefore, Lucent denies that the MS "translate[s] a message into a format that is compatible with the receiving device" as required by asserted claim 37. Accordingly, AnyPath does not infringe claim 37.

## 5.     Indirect Infringement

457.     Because Lucent denies that its products directly infringe the '217 Patent, there can be no indirect infringement. But Lucent also denies that it has contributed to the infringement of the

'217 Patent by others. Microsoft has not established that any user of AnyPath used the apparatus claimed in claims 1, 8, 14 and 37. Moreover, Microsoft cannot prove that Lucent induced infringement by others. Lucent denies that it had "an affirmative intent to cause direct [use] infringement" and/or "knowingly induced infringement and possessed specific intent to encourage" such use infringement. *DSU Medical*, 471 F.3d at 1306.

## XIII. The Chen '004 Patent

458.     The following sections discuss Lucent's and Alcatel-Lucent's assertions of facts regarding the teaching of asserted claims 1, 25, 26, and 29 of the Chen '004 Patent, the invalidity of the asserted claims, and Lucent's and Alcatel-Lucent's non-infringement of those claims. For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference their their Final Invalidity Contentions and the expert reports of Dr. Fouad Tobagi and Dr. Martin Kaliski.

### A.     The Chen '004 Patent And Asserted Claims

459.     The Chen '004 Patent, entitled "Metaserver for a multimedia distribution network," issued on June 25, 2002, from an application dated March 27, 1997. Microsoft is asserting claims 2, 25, 26 and 29 of the '004 Patent against Lucent and Alcatel-Lucent. The '004 Patent is directed to a metaserver method and apparatus for the monitoring and selection of an eligible multimedia server, using a selection algorithm, for servicing a client request for a multimedia stream.

460.     Claim 1 of the Chen '004 Patent, upon which asserted claim 2 is based, patent reads as follows:

> 1. In at least one metaserver at one level of management, each said metaserver having a processor and a memory, a method for assigning a plurality of multimedia servers configured to provide data streams for a plurality of client computers, each said client computer being coupled to each said metaserver at the same level of management and to each said multimedia server via a network, each said client computer including a video and audio display device, each said metaserver memory configured to store a metaserver database that includes information about the data streams stored in at least one of said multimedia servers, said method comprising:

receiving a request for a multimedia stream from one of said client computers;

monitoring the status of each said multimedia server and the status of said network;

selecting from the metaserver database at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm; and

communicating a name of said at least one eligible multimedia server to said client computer.

461. Claim 1 requires a metaserver and a multimedia server for performing the method steps. The Court construed "multimedia server" as a "shared entity for storing multimedia (e.g. audio and video data) for servicing clients." D.I. 156 at 17.

462. Asserted claim 2 is based on claim 1, wherein the said selection algorithm is a minimum cost algorithm that at a minimum considers: multimedia content, current load, geographic location, and a network distance from said at least one multimedia server to said client computer.

463. Asserted claim 2 of the Chen '004 Patent reads as follows:

2. The method of claim 1, wherein selecting further includes: using a minimum cost algorithm as said selection algorithm; choosing a set of parameters including multimedia content, current load, geographic location, and a network distance from said at least one multimedia server to said client computer; and

applying said minimum cost algorithm to said set of parameters.

464. The contentions of fact set forth for claim 1 of the Chen '004 Patent apply to the corresponding limitations of asserted claims 25, 26 and 29.

465. Asserted claim 25 of the Chen '004 Patent reads as follows:

25. A method comprising:

receiving a request for a multimedia stream from one of a number of client computers;

monitoring the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the number of multimedia servers;

selecting from a database having information about data streams stored in at least one of the multimedia servers at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm; and

communicating a name of said at least one eligible multimedia server to the one of the number of client computers.

466.    Asserted claim 26 of the Chen '004 Patent reads as follows:

26. A metaserver comprising:

a receiver configured to receive a request for a multimedia stream from one of a number of client computers;

a monitor configured to monitor the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the multimedia servers;

a selector configured to select from a database at least one eligible multimedia server that stores the requested multimedia stream using a selection algorithm; and

a transmitter configured to transmit the name of said at least one eligible multimedia server to the one of the number of client computers.

467.    Asserted claim 29 of the Chen '004 Patent reads as follows:

29. A computer readable medium having computer-executable instructions comprising:

receiving a request for a multimedia stream from one of a number of client computers;

monitoring the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the number of multimedia servers;

selecting from a database at least one eligible multimedia server that stores the requested multimedia stream using a selection algorithm, the database having information about data streams stored on at least one multimedia server; and

communicating a name of said at least one eligible multimedia server to the one of the number of client computers.

**B.     Invalidity**

468.     Claims 2, 25, 26 and 29 are invalid in view of the prior art listed in this section, either alone or in combination.

**1.     Media Banks**

469.     Claims 2, 25, 26, and 29 of the '004 Patent are invalid as anticipated by A. Lippman and R. Kermode, "Media Banks: Entertainment and the Internet" ("Lippman 1996").  The '004 Patent also would have been obvious in view of the prior art teachings.

470.     Both the '004 Patent and the Lippman 1996 article teach the same technology with the same purpose.  The '004 Patent is directed to eliminating the bottleneck problem associated with the limited speed of a single multimedia server, reducing the network congestion, and increasing the fault tolerance of the whole system.  Similarly, the system described in the Lippman 1996 article seeks to "[m]aintain[ ] continuity from distributed resources in the face of errors, sporadic system availability, and variable demand." Lippman 1996 at 273.

471.     The descriptions of the Media Banks components within Lippman 1996 are at least as specific and often more so than the descriptions of similar components found within the '004 Patent.

**a.     Claim 1**

472.     Asserted claim 2 is dependent on claim 1, which is invalid for the following reasons:

473.     Claim 1 requires a metaserver. The Court has construed "metaserver" as a "computer system that manages at least one multimedia server, that is logically (or conceptually) separate from at least one multimedia server, and that maintains a metaserver database."  D.I. 156 at 16.  Lippman 1996 discloses a "directory server" which serves the same functionality as the metaserver disclosed in the '004 Patent: "the directory server… provides a directory service for finding out where an object is located."  Lippman 1996 at 279.  It is separate from the multimedia servers and maintains a metaserver database.  *See id*. at FIGS. 7 (disclosing a "meta-data database") & 11 (showing separate metaservers ("directory servers") and multimedia servers ("object servers")).

474. Claim 1 of the '004 Patent requires a multimedia server. The Court has construed "multimedia server" as a "shared entity for storing multimedia (e.g. audio and video data) for servicing clients." D.I. 156 at 17. Lippman 1996 discloses at least one "object server" that is configured to provide the same functionality as the multimedia server and provide data streams for a plurality of client computers. Lippman 1996 at 279 ("The second kind [of server] is the object server on which the actual data is stored"); *id.* at 282 (discussing the "ability of the object server to serve the actual object data"). The objects delivered by the object servers are multimedia data. Lippman 1996 at 276 ("the actual data for the video clip are not stored with the meta-data. Instead, they are stored in the second part, and referenced from the meta-data part"); *see also id.* at FIG. 17.

475. Claim 1 describes that each client computer must be coupled to the metaserver and to the multimedia servers via a network. One of ordinary skill in the art would understand that the '004 Patent's requirement that, "[i]n at least one metaserver at one level of management" permits one or more metaservers, and, if there is more than one metaserver in the system, they exist at the same level of management. Likewise, Lippman 1996 allows for multiple directory servers at one level of management. Lippman 1996 at 281-82 ("the object server first attempts to find a directory server from a local list of possible directory servers").

476. Lippman 1996 discloses a client computer as required by all of the asserted claims. The Court has construed "client computer" as "a computer that accesses shared network resources provided by another computer (called a server)." D.I. 156 at 17. Lippman 1996 also teaches that each client be connected via a network to the directory server(s) and object server(s). *See, e.g., id.* at FIG. 11 (illustrating communication between client and servers via a network); *see also id.* 273 (contemplating communication over the Internet); 275 (discussing global interconnection via a network).

477. The '004 Patent further requires that each client computer include a video and audio display device. Likewise, Lippman 1996 discloses clients as including a video and audio display

1    device. *See* Lippman 1996 at Fig. 17 (displaying a Mosaic browser client with multimedia playback

2    support).

3        478.    Claim 1 of the '004 Patent discloses that each metaserver memory is configured to

4    store a metaserver database that includes information about the datastreams stored in at least one of

5    said multimedia servers.  The Court has construed "information about the data streams" as

6    "information used in managing a multimedia server or servers."  D.I. 156 at 17.  Lippman 1996

7    discloses each of these claim limitations.  The meta-data database in Figure 7 corresponds to the

8    metaserver database in the metaserver memory required by the '004 Patent.  The meta-data database

9    includes information about the data streams stored in at least one of said object servers that is used to

10   manage the multimedia servers (information such as presence, current state, NUID, etc.). *See*

11   Lippman 1996 at 282 ("When a directory server requests an update from an object server, it stores

12   the result in a meta-data database, and, at the very minimum, stores the NUID for each object in a

13   database keyed on the name of the object"); *see also id.* at 280 ("they inform the directory server of

14   their presence, [and] their current state").  Figure 6 depicts an NUID (a "network unique identifier"),

15   which reflects specific information about what is stored in the object servers, including the unique

16   identifier of the object, the port number, and host name of the website.

17       479.    Claim 1 of the '004 Patent requires "receiving a request for a multimedia server

18   stream from one of said client computers."  In Lippman 1996, a request is made by the client to the

19   directory server.  The client computer first requests an object.  *See* Lippman 1996 at 285 ("The

20   application issues a request to the Media Bank client libraries requesting the location of objects with

21   a name that matches" the desired object).  Lippman 1996 provides that "[c]lients wishing to access

22   the Media Bank initially do so through the object meta-data interface module." *Id.* at 281.  As shown

23   in Figure 7, the object meta-data interface module as part of the directory server.  The meta-data

24   interface module "takes the client's request… and then extracts and queries the meta-data database

25   on the client's behalf." *Id.* at 281.

480. Claim 1 of the '004 Patent requires "monitoring the status of each said multimedia server and the status of said network." The Court's construction of "monitoring the status of each said multimedia server and the status of said network" is "the process of communicating with each multimedia server to receive from each multimedia server its status information, and determining the status of the network." D.I. 156 at 18. This means two things: 1) the process of the metaserver communicating with each multimedia server to receive from each multimedia server the multimedia server's status information, and 2) the process of the metaserver determining the status of the network. The directory server disclosed in Lippman 1996 does both of these things. First, the directory server communicates with the object servers to receive each multimedia server's status information. As an illustration, Lippman 1996 explains that "Media Bank directory servers provide a number of additional services," including "[t]he ability to detect dead or unresponsive object servers and remove references to them when responding to requests to resolve object names." Lippman 1996 at 279. In detecting dead object servers, the directory server garners information of object servers' "presence [and] their current state." *Id.* at 280-81. Similarly, the directory server provides "the facilities to manage the computational load between servers capable of serving equivalent objects." *Id.* at 279-80. Second, the directory servers determine the status of the network. *See id.* at 279 ("the Media Bank… [m]anages the load of both computation and network usage across the servers of the Media Bank and the network links that connect them" ).

481. Claim 1 of the '004 Patent requires "selecting from the metaserver database at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm." In the Lippman 1996 article, the meta-data interface module "takes the client's request… and then extracts and queries the meta-data database on the client's behalf." Lippman 1996 at 281. The directory server responds to a client request with a list of objects that match the request. *Id.* at 285. This step is depicted in Figure 8, in which the directory server responds to the client's request with a list of objects, including the names of the host object servers upon which the object is located. *Id.* at

1  FIG. 8; 281 (describing the directory server's response to a client's request for the "t2-movie-

2  browser" object); FIG. 11 (illustrating the "list of matching objects"); 285 ("[t]he directory server

3  will return a list of objects that match (Figure 11, top)"). Moreover, the act of selection is

4  demonstrated when the "Media Bank directory servers provide… [t]he ability to detect dead or

5  unresponsive object servers and remove references to them when responding to requests to resolve

6  object names." Lippman 1996 at 279. Thus, directory servers are responsible for selecting eligible

7  from ineligible object servers. *See id.* at 285 (describing the process of returning the list of objects

8  that match the client request). The algorithm used to select the at least one eligible multimedia

9  server is a selection algorithm. The Court has construed "selection algorithm" as an "algorithm (a

10  sequence of well defined mathematical operations) used to select a list of eligible multimedia servers

11  based on a cost to the system of providing the requested service." D.I. 156 at 18. As shown in

12  Figure 8, the directory server computes the cost in terms of "average load" and multimedia content.

13  Average load, in particular, is a parameter contemplated by the preferred embodiment of the

14

15  selection algorithm in the '004 Patent. *See* Col. 7:56; 7:66-8:7. Moreover, A person of ordinary

16  skill in the art would have known what mathematical steps were necessary to compute average load.

17

18          482.    Claim 1 of the '004 Patent requires "communicating a name of said at least one

19  eligible multimedia server to said client computer." Lippman 1996 also discloses this step. Upon

20  receiving a request for objects that match the requested media streams, the directory server

21  communicates the name ("host") of at least one object server to the client, as demonstrated by

22  Lippman 1996 at FIG. 8. Thus, "the directory server… return[s] a list of objects that match" the

23  client's request. *Id.* at 285. The "best object (with the others in the backup-info field)" are then

24  returned to the client application. *Id.*

25

26                          **b.     Claim 2**

27          483.    Asserted claim 2 requires a "selection algorithm" (from claim 1) that is a "minimum

28  cost algorithm" applied to a chosen set of parameters. The Court has construed the term "minimum

cost algorithm" as "a sequence of well defined mathematical operations for determining the cost to the system for a particular multimedia server or servers to provide a data stream to a particular client and for selecting the multimedia server that can provide the data stream at minimum cost."  D.I. 156 at 19.  In the '004 Patent, the "multimedia content" and "current load" are two of chosen parameters used by the minimum cost algorithm. '004 Patent, Col. 12:14-17.  The Court construed the term "current load" as "a measure of the amount of processing a computer system is currently performing in servicing client requests."  D.I. 156 at 19.  Figure 8 demonstrates that the directory server responds with the average load for different object servers.  Because the directory server contains the "facilities to manage the computational load between servers capable of serving equivalent objects," Lippman 1996 at 280, the disclosed selection algorithm is also a minimum cost algorithm.  The process of determining and comparing the load of object servers involves mathematical operations.  Then, a "desired object with ordered list of equivalent alternatives" of eligible object servers (*e.g.*, those that store the desired multimedia stream) is returned.  Lippman 1996 at FIG. 11.  Thus, in negotiating access to a media stream, the directory server returns the object with the lowest "current load" and back-up object equivalents.  *See also* Lippman 1996 at 288 (discussing the *backup-info* field of the returned object, that "contains a list of alternative equivalent objects that may be used in lieu of the parent object").  Likewise, the returned list is sorted according to video format.  *See id.* at 285 ("Upon receiving this list, the Media Bank client then sorts the objects in the reply according to the user's preferences and also a number of system preferences (e.g., the preferred video format is MJPEG, or motion JPEG, because the client has an MPEG card)").  Thus, "multimedia content" (in this case, the video format) is a parameter considered by the minimum cost algorithm disclosed in Lippman 1996.  The objects in the list are ordered with the lowest cost object first, and an object having a higher cost as a "backup alternative."  This list is therefore ordered by cost, where the cost is determined based, at least, on the multimedia content and the amount of processing that the computer system (i.e., the multimedia servers) are currently performing in servicing client requests.

484.    In the '004 Patent, the "geographic location" is one of the chosen parameters used by the minimum cost algorithm. '004 Patent, Col. 12:14-17.  The application of a minimum cost selection algorithm to a set of parameters including a geographic location is well known and would have been obvious to a person of ordinary skill in the art at the time of filing of the '004 Patent.  This is exemplified, for example, by Carter and Crovella, who disclose the use of a minimum cost algorithm which is applied to a chosen set of parameters that include, at least, the geographic location.  Carter and Crovella, Dynamic Server Selection using Bandwidth Probing in Wide-Area Networks (March 18, 1996) at 2 (discussing Gwertzman and Seltzer, The Case for Geographical Push-Caching (1995)) ("Gwertzman and Seltzer propose a replication technique (and presumed server assignment) based on geographical distance . . .").

485.    In the '004 Patent, the "network distance" is one of the chosen parameters used by the minimum cost algorithm. '004 Patent Col. 12:14-17.  The application of a minimum cost selection algorithm to a set of parameters including a network distance is well known and would have been obvious to a person of ordinary skill in the art at the time of filing of the '004 Patent.   This is exemplified, for example, by Guyton and Schwartz, who disclose using a minimum cost algorithm as a selection algorithm.  *See, e.g.,* Guyton and Schwartz, Locating Nearby Copies of Replicated Internet Services, 1995 ACM 0-89791-711-1 (1995) at 296 ("[i]n this paper we have analyzed techniques for locating nearby server replicas in an internetwork, with the overall goal of minimizing long-haul traffic").  Carter and Crovella, discussed above, refer to Guyton and Schwartz's minimum cost selection algorithm.  *See* Carter and Crovella, at 3 (discussing Guyton and Schwartz).  The minimum cost algorithm of Guyton and Schwartz is applied to a chosen set of parameters that includes at least a network distance.  For example, Guyton and Schwartz, in determining server assignment, consider a hop count "as the basic distance metric."  Guyton and Schwartz, at 290.

486.    A person of ordinary skill in the art would have been motivated to combine the teachings of Littman 1996, Guyton and Schwartz, Carter and Crovella, and Gwertzman and Seltzer

to obtain the four parameters required by asserted claim 2, because, among other reasons, each of the references is directed to the same problem: the selection of a server based on a minimum cost algorithm.

### c.    Claim 25

487.    Asserted claim 25 recites method steps that correspond to those claim 1, except without the requirement that the steps be performed by a metaserver, however, because this only broadens claim 1, the invalidity analysis of claim 1 applies with at least as much force to the steps of claim 25.

### d.    Claim 26

488.    Claim 26 is directed towards a metaserver apparatus comprising a receiver, monitor, selector and transmitter.  The apparatus of claim 26 provide the same functionality as the method steps of claim 1, therefore, the analysis of claim 1 is incorporated here.

489.    Specifically, claim 26 requires "a receiver" that receives a request for a multimedia stream from the client.  Figure 7 of the Lippman 1996 article discloses this same apparatus.  In Figure 7, the directory server contains a "receiver" (*i.e.* the object meta-data interface module) that is configured to receive the client's request for a multimedia object from the client.  Lippman 1996 at 281 ("Clients wishing to access the Media Bank initially do so through the object meta-data interface module.  This module takes the client's request… and then extracts and queries the meta-data database on the client's behalf").

490.    Claim 26 also requires a "monitor" in the metaserver.  Figure 7 of Lippman 1996 illustrates the "remote server interface" within the directory server, which s same function as the monitor in the '004 Patent.  The remote system interface is a module within the directory server that permits the object servers and directory servers to communicate so that the object servers can "inform the directory server of their presence, their current state, and make requests for directory service via regular remote procedure calls (RPCs)."  Lippman 1996 at 280-81.  Thus, the system

disclosed in Lippman 1996 is configured to monitor the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the multimedia servers.

491.     In addition, Lippman 1996 discloses both a "selector" and "transmitter" that are equivalent to the "selector" and "transmitter" in claim 26 of the '004 Patent.  The directory server contains a "selector" (within the "object meta-data interface module") that selects at least one eligible object server from among all of the object servers using a selection algorithm. *See* Lippman 1996 at 279, 281.  The directory server also contains a "transmitter" (within the object meta-data interface) for communicating the name of at least one object server ("host") to the client.  *See id.* at 281; FIG. 8; *see also id.* at 285 and FIG. 11 ("The directory server will return a list of objects that match" the client's request).

### e.     Claim 29

492.     Claim 29 of the '004 Patent is invalid as anticipated by Lippman 1996 or, alternatively, rendered obvious by the Lippman 1996 article in combination with the prior art teachings.  The analysis for the limitations of claim 29 contain that correspond to those of claim 1, is the same and incorporated here.

493.     In addition, claim 29 requires a "computer readable medium."  Lippman 1996 discloses a computer readable medium.  First, the directory server is, by definition, a "server."  A server is a computer-system on a network that responds to commands from a client. *Microsoft Press Computer User's Dictionary* 314 (1998).  Thus, the directory server is implemented on a computer system with a computer-readable medium containing computer-executable instructions.  Second, Lippman 1996 discusses the future version of the system being usable on software modules.  *See* Lippman 1996 at 283 ("Ongoing work is being undertaken to create the next revision of MBDP ["media bank data protocol"] that will shift from TCP/IP to multicast UDP (user datagram protocol) as the primary means for delivering object data").

494.     To the extent that Lippman 1996 fails to explicitly disclose the claim element of a "computer readable medium," "The Distributed Media Bank" (1994) ("Lippman 1994") describes the same system described in Lippman 1996. The implementation of Lippman's 1996 system in executable on a computer-readable medium is confirmed by the Lippman 1994 reference containing a description of the very same system. Lippman 1994 at 103 ("The prototype Media Bank will be distributed to workstations and PC's scattered throughout the Media Laboratory").

## C.     Non-Infringement

495.     Microsoft has accused the Accelerate Solution of infringing asserted claims 2, 25, 26 and 29 of the '004 Patent. Lucent denies that the Accelerate Solution infringes the Chen '004 Patent. Accelerate Solution was a marketing term used by Lucent to described a wide variety of voice over IP products, including the Feature Server 3000 and VitalSuite.

496.     Specifically, Microsoft accuses the combination of the Feature Server 3000 product and the VitalSuite product, both of which are optional products sold under the Accelerate Solution marketing umbrella, as forming the structure or steps necessary for infringement. Lucent denies that Feature Server 3000 alone or in combination with VitalSuite infringes the asserted claims of the '004 Patent. Nor has Microsoft proffered evidence to prove infringement by a preponderance.

497.     Microsoft asserts that the Alcatel-Lucent 8788 MRP infringes 2, 25, 26, and 29 of the '004 Patent. Alcatel-Lucent denies that the 8788 MRP infringes the '004 Patent.

### 1.     Claims 1, 25, 26, 29

498.     Microsoft's infringement contentions rely on the Feature Server 3000 Media Server ("Media Server") as providing the "multimedia server" required by all of the asserted claims. Lucent denies that a Media Server is a multimedia server consistent with the Court's claim construction and the '004 Patent. The Court has ruled that a multimedia server is a "shared entity for storing multimedia…." The Media Server does not store multimedia; therefore, it cannot be a multimedia server as required by the asserted claims 2, 25, 26 and 29.

499.     Microsoft points to the Network Server's "Selection Algorithm" as providing the steps or structure required by the asserted claims for "selecting … at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm; …."  Lucent denies that the Selection Algorithm meets this limitation, because, as Microsoft admits, the alleged multimedia server does not store the requested multimedia stream until after it is selected.

500.     Microsoft contends that the alleged metaserver[6] is a combination of the Feature Server 3000 Application Server ("Application Server") and Network Server ("Network Server"), and VitalSuite.  This supercedes Microsoft's original contention that the Network Server is the alleged metaserver.

501.     Microsoft's infringement contentions rely on the optional VitalSuite product as providing the "monitoring" steps or structure required by all of the asserted claims.[7]  Microsoft cannot prove that VitalSuite provides the monitoring functionality for at least the following reasons:

502.     Lucent denies the VitalSuite is capable of providing monitoring functionality, because it is a stand-alone product that does not return monitoring information to the Network Server, which is the portion of the alleged metaserver allegedly responsible for selection of eligible multimedia servers in the asserted claims.

503.     Lucent denies that Microsoft has evidence that VitalSuite and Feature Server 3000 were ever used, sold or tested together to form an infringing system.

---

[6]  Claims 1 and 26 require a metaserver.  Claim 29 requires a computer readable medium having computer executable instructions, which Microsoft alleges is satisfied by the alleged metaserver.  Claim 25 does not require a metaserver.

[7]  Microsoft originally contended that Network Server, and, alternatively, VitalSuite provided the monitoring functionality.  However, Microsoft supplemented its expert report to contend that VitalSuite alone provides the monitoring functionality.

504.    Lucent denies that the Network Server alone provides the monitoring functionality without reliance on VitalSuite.  Microsoft cannot prove that the Network Server satisfies the monitoring limitation because the evidence proffered by Microsoft merely indicates that the Network Server provides SNMP data to an "upstream" or "northbound" monitoring system, not that it monitors "the status of each … multimedia server and the … network," as required by the claims.

505.    Microsoft contends that the Network Server includes a "database having information about data streams stored in at least one of the multimedia servers."[8]  Lucent denies that the Network Server includes such a database because the Media Server, the alleged multimedia server, does not store data streams.

506.    Microsoft has also accused the Alcatel-Lucent Open Media Suite ("OMS") of infringing claims 2, 25, 26, and 29 of the '004 patent.  Even assuming that the OMS could perform each step of independent method claims 2 and 25, which Alcatel-Lucent does not concede, Microsoft cannot prove by preponderance of the evidence (circumstantial or otherwise) that even one OMS performed each step of those claims in United States.  An Alcatel-Lucent subsidiary developed the OMS abroad; the OMS has never been sold in the United States.  Microsoft has no evidence that even a single OMS in the United States was configured or operated as alleged by Microsoft.

507.    Claim 1, from which claim 2 depends, requires, "selecting from the metaserver database at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm."  Similarly, Claim 25 requires "selecting from a database having information about data streams stored in at least one of the multimedia servers at least one eligible multimedia server storing the requested multimedia stream using a selection algorithm."  The Court has defined

---

[8]    Claim 25.  Alternative formulations of this requirement are: a "database" (claims 26 and 29) and a "metaserver database that includes information about the data streams stored in at least one of said multimedia servers" (claim 1).

"selection algorithm" as an "algorithm (a sequence of well defined mathematical operations) used to select a list of eligible multimedia servers based on a cost to the system of providing the requested service." As shipped, the redirection function of the OMS is disabled. Only an example placeholder algorithm is provided to the customer. The example placeholder algorithm is a simplistic algorithm that considers only the port number of the user. It does not consider any factors such as "a cost to the system of providing the service," as required by the Court's construction of "selection algorithm." For the OMS to operate as required by claims 2 and 25, the customer must create an algorithm to implement the "selection algorithm," as construed by this Court. As shipped, the OMS therefore cannot meet the "selecting" limitations of claims 2 and 25. *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117 (Fed. Cir. 2002) ("Accordingly, in order to infringe the [asserted patent], the code underlying an accused fantasy football game must be written in such a way as to enable a user of that software to utilize the function of awarding bonus points for unusual plays such as out-of-position scoring, without having to modify that code."). Moreover, because Microsoft does not have any evidence that customers in the United States actually created the required algorithm, Microsoft cannot demonstrate that the OMS has, at any time, satisfied the "selecting" limitations of claims 2 and 25 in the United States.

508. Claim 1, from which claim 2 depends, further requires "monitoring the status of each said multimedia server and the status of said network." Similarly, claim 25 requires "monitoring the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the number of multimedia servers." As described above, the redirection feature of the OMS is disabled by default and only a example placeholder algorithm is provided. The placeholder algorithm does not monitor multimedia servers or of a network. For the OMS to operate as required by claims 2 and 25, the customer must create an algorithm to implement the "monitoring" step of claims 2 and 25, and Microsoft has no evidence that customers in the United

States created such an algorithm.  The OMS therefore cannot meet the "monitoring" limitations of claims 2 and 25.  *Id.*

509.    Microsoft cannot show cannot show "communicating a name of said at least one eligible multimedia server to said client computer" as required by claims 2 and 25 at least because the OMS fails to select "at least one eligible multimedia server" as described above.

510.    Claim 2 requires, in part "using a minimum cost algorithm as a said selection algorithm."  The Court has construed the term "minimum cost algorithm" as "a sequence of well defined mathematical operations for determining the cots to the system for a particular multimedia server or servers to provide a data stream to a particular client and for selecting the multimedia server that can provide the data stream at minimum cost."  D.I. 156 at 19.  Claim 2 further requires, in part, "choosing a set of parameters including multimedia content, current load, geographic location, and a network distance from said at least one multimedia server to said client computer."  Claim 2 further requires, in part, "applying said minimum cost algorithm to said set of parameters."  The OMS does not meet these limitation for the reasons discussed above with respect to the "selecting" step in claims 1 and 25.

511.    Even if Alcatel-Lucent had a customer in the United States for the OMS, which is not the case, Microsoft cannot prove by a preponderance of the evidence (circumstantial or otherwise) that an Alcatel-Lucent customer implemented the accused features of the OMS in a manner that results in infringement of the asserted claims 2 and 25 of the '004 patent.  Because Alcatel-Lucent did not have "an affirmative intent do cause direct infringement," and did not "knowingly induce[] infringement and possess[] specific intent to encourage" infringement, Microsoft cannot prove that Alcatel-Lucent induced others to infringe.  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

512.    Microsoft's expert argues that OMS satisfies claims 2 and 25 under the doctrine of equivalents, if it does not literally infringe.  As noted above, however, by default and without the

1   addition of a user-supplied algorithm, the OMS does not perform the "monitoring" and "selecting"

2   steps of the claims. Not only is OMS's complete failure to perform these actions substantially

3   different from those claimed steps, but the doctrine of equivalents is not applicable to those elements

4   entirely missing from the accused device or method. *See, e.g.*, *Warner –Jenkinson Co. v. Hilton*

5   *Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

6       513.    With respect to claim 26, even assuming that the OMS comprises "a metaserver"

7   configured according to the limitations of claim 26 of the '004 patent, which Alcatel-Lucent does not

8   concede, Microsoft cannot prove by preponderance of the evidence (circumstantial or otherwise) that

9   even a single OMS, configured according to limitations of claim 26, was ever made, use, sold,

10  offered for sale, or imported into the United States by Alcatel-Lucent or anyone else. Likewise, with

11  respect to claim 29, even assuming that the OMS comprises a "computer readable medium having

12  computer-executable instructions" with all limitations required by 29, which Alcatel-Lucent does not

13  concede, Microsoft cannot prove by preponderance of the evidence (circumstantial or otherwise) that

14  even a single OMS, configured according to limitations of claim 29, was ever made, use, sold,

15  
16  offered for sale, or imported into the United States by Alcatel-Lucent or anyone else. As discussed

17  above, Microsoft has no evidence of even a single OMS configured as alleged by Microsoft in the

18  
19  United States.

20      514.    Claim 26 requires, in part, "a selector configured to select from a database at least one

21  eligible multimedia server that stores the requested multimedia stream using a selection algorithm."

22  Similarly, claim 29 requires, in part, "a computer readable medium having computer-executable

23  instructions comprising: . . . selecting from a database at least one eligible multimedia server that

24  stores the requested multimedia stream using a selection algorithm, the database having information

25  about data streams stored on at least one multimedia server." The OMS does not meet these

26  
27  limitations for the reasons presented above with respect to the "selecting" steps of claims 2 and 25.

28

515.    Claim 26 requires, in part, "a monitor configured to monitor the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the multimedia servers."  Similarly, claim 29 requires, in part, "a computer readable medium having computer-executable instructions comprising: . . . monitoring the status of each of a number of multimedia servers and the status of a network coupling the number of client computers and the number of multimedia servers."  The OMS does not meet these limitations for the reasons presented above with respect to the "monitoring" steps of claims 2 and 25.

516.    Claim 26 requires, in part, "a transmitter configured to transmit the name of said at least one eligible multimedia server to the one of the number of client computers."  Similarly, claim 29 requires, in part, "a computer readable medium having computer-executable instructions comprising: . . . communicating a name of said at least one eligible multimedia server to the one of the number of client computers."  The OMS does not meet these limitations for the reasons presented above with respect to the "communicating a name" steps of claims 2 and 25.

517.    Microsoft's expert argues that OMS satisfies claims 26 and 29 under the doctrine of equivalents, if it does not literally infringe.  As noted above, however, by default and without the addition of a user-supplied algorithm, the OMS entirely lacks the "selector," "monitor," and "transmitter" of claim 26 and further lacks the computer-executable instructions for "monitoring," "selecting," and "transmitting" of claim 29.  Again, the doctrine of equivalents is not applicable to those elements entirely missing from the accused device or method.  *See, e.g.*, *Warner –Jenkinson Co. v. Hilton Davis Chem. Co.*,  520 U.S. 17, 29 (1997).

518.    For these reasons, the OMS does not infringe the asserted claims of the '004 patent. Microsoft cannot expand its infringement allegations at trial to cover any other Alcatel-Lucent products for this patent, as it not properly identified any other Alcatel-Lucent products as infringing this patent during this case.

### 2. Claim 2

519.    Lucent does not infringe asserted claim 2 of the '004 Patent, because it does not infringe claim 1, upon which claim 2 depends.

520.    In addition, Microsoft contends that the alleged metaserver performs the additional steps of asserted claim 2.  Specifically, Microsoft contends that the alleged Network Server Selection Algorithm considers at least the required parameters: multimedia content, current load, geographic location and a network distance.  Lucent denies the alleged Selection Algorithm considers anything other than geographic location and a statically distributed load table that is provisioned by an administrator.

### 3. Indirect Infringement

521.    Because Lucent denies that its products directly infringe the '004 Patent, there can be no indirect infringement.  Lucent also denies that it has contributed to the infringement of the '004 Patent by others.  Microsoft's experts have not specifically opined that any user of Accelerate practices the steps or structure required by asserted claims 2, 25, 26, and 29.   Moreover, Microsoft cannot prove that Lucent induced infringement by others.  Lucent denies that it had "an affirmative intent to cause direct [use] infringement" and/or "knowingly induced infringement and possessed specific intent to encourage" such use infringement. *DSU Medical*, 471 F.3d at 1306.

## XIV.   Damages for infringement of the Microsoft Patents-in-Suit

522.    The following section discusses Lucent's and Alcatel-Lucent's assertions of facts regarding the possible damages exposure of Lucent and Alcatel accused products in light of Microsoft's counterclaim patents-in-suit.  For a fuller discussion of these topics, Lucent and Alcatel-Lucent reference the January 9, 2008 expert reports of Mr. Roger Smith and Mr. Wayne Hoeberlein.

523.    With respect to the Microsoft Patents-in-Suit, Microsoft put Lucent on notice as of May 15, 2006, the date Microsoft filed its counterclaims against Lucent.

524.    With respect to the Microsoft Patents-inSuit, Microsoft has stipulated that Alcatel-Lucent did not have actual notice of infringement of the '319, '608, and '913 Patents until December 9, 2004, and that Alcatel-Lucent did not have actual notice of infringement of the '971 Patent until February 9, 2007.

525.    Microsoft has also stipulated that it is not seeking damages from Alcatel-Lucent in connection with any of its patent infringement claims related to the '794 and '004 Patents.  As a result, the only relief available to Microsoft for those claims is an injunction.

526.    Microsoft has not offered any credible evidence to support its damages claims against Lucent and Alcatel-Lucent.  The single source of Microsoft's damages evidence is through Dr. Ryan Sullivan, Microsoft's purported expert.  Dr. Sullivan's reasonable royalty opinions and analysis, however, represent an extreme departure from industry standards, ignore the record evidence about the parties' licensing practices, defy logic, and cannot be considered credible evidence for any jury to consider.

## POINTS OF LAW

**XV.    Issues On Which Plaintiff Multimedia Patent Trust and Counterclaim Plaintiff Microsoft Bear The Burden Of Proof**

    **A.    Infringement**

        **1.    Direct Infringement**

527.    35 U.S.C. §  271(a) states:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

528.    Infringement is a question of fact.  *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001); *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1541 (Fed. Cir. 1992).  "The [patent owner] has the burden of proving infringement by a preponderance of

1  the evidence." *Id.*; *see Seal-Flex, Inc. v. Athletic Track & Court Construction*, 172 F.3d 836, 842

2  (Fed. Cir. 1999).

3      529.    The claims of the patent define the scope of the patented invention. "'The claims . . .

4  provide the concise formal definition of the invention.'" *Corning Glass Works v. Sumitomo Elec.*

5  *U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989) (quoting *Autogiro Co. of Am. v. United States*,

6  384 F.2d 391, 395-96 (Ct. Cl. 1967)). The claims provide "the metes and bounds of the right which

7  the patent confers on the patentee to exclude others from making, using, or selling the protected

8  invention." *Corning Glass Works*, 868 F.2d at 1257.

9

10     530.    "It is well-established that each claim in a patent constitutes a separate invention."

11 *Union Oil Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 1003 (Fed. Cir. 2000); *Jones v. Hardy*,

12 727 F.2d 1524, 1528 (Fed. Cir. 1984). "A patent is infringed if a single claim is infringed." *Intervet*

13 *Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050,1055 (Fed. Cir. 1989). "A determination of patent

14 infringement under 35 U.S.C. § 271(a) requires a two step analysis — first, the language of the

15 claim at issue must be interpreted to define its proper scope and, second, the evidence before the

16 Court must be examined to ascertain whether the claim has been infringed, whether the claim 'reads

17 on' the accused product or process. The first inquiry is a question of law for the Court while the

18 second is a question of fact." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics,*

19 *Inc.*, 976 F.2d at 1559, 1570 (Fed. Cir. 1992).

20

21     531.    A patent claim defines the scope of a patentee's statutory protection. *Playtex*

22 *Products, Inc. v. Procter & Bamgle Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005). The proper

23 construction of terms and phrases within a patent claim is a question of law. *See Markman v.*

24 *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The

25 Court's construction governs the jury's ultimate determination of whether the patent claim has been

26 infringed. *Id.* Here, the Court has issued claim-construction Orders for the Puri '878 Patent. (D.I.

27 156.)

28

532.    "After claim construction, the next step in an infringement analysis is comparing the properly construed claims with the allegedly infringing devices.  This comparison is a question of fact." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1369 (Fed. Cir. 2001) (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000)); *see also Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999) ("The second step of the infringement analysis, i.e., comparing the properly construed claims to the device accused of infringing, is a question of fact.").

533.    Infringement occurs when each limitation of a properly interpreted claim is found in the accused product or process.  *Seal-Flex*, 172 F.3d at 842; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir. 1992), *abrogated on other grounds*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc).  "It is axiomatic that the parameters of a patent right are defined by the claims of the patent, and that if the accused matter falls within the claims, literal infringement is made out."  *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F. Supp. 397, 405 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990).

534.    "Infringement . . . is determined by comparing an accused product not with a preferred embodiment described in the specification . . . but with the properly and previously construed claims in suit."  *SRI Intern. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).  "[C]laims are infringed, not specifications."  *Id.*  The Federal Circuit has repeatedly stated that "it is error for a Court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."  *Zenith Lab., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994); *Intervet Am.*, 887 F.2d at 1055.

535.    To establish infringement of a "means plus function" claim under 35 U.S.C. § 112, paragraph 6, the patentee must prove:  (1) that the accused product performs the function recited in each "means plus function" claim limitation; and (2) that the accused product does so using a

structure that is identical or equivalent to the structure disclosed in the specification for performing the claimed function, as construed by the Court. *Cytologix Corp, v. Ventana Med. Sys.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005); *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1222 (Fed. Cir. 1996); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 83 F.2d 931, 933-34 (Fed. Cir. 1987). An accused device literally infringes a means-plus-function claim when it performs the identical function claimed by the patented invention and contains at least an equivalent structure for performing that function. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998) (quoting *Pennwalt Corp. v. Durand-Wyland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (en banc)). A device that does not literally infringe because it performs a function equivalent, rather than identical to the claimed function, or contains an equivalent structure arising after the patent filing date, infringes under the doctrine of equivalents. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1381-82 (Fed. Cir. 2001). Where the functions are identical and the equivalent structure existed when the patent was filed, "the doctrine of equivalents collapses into the § 112, ¶ 6 analysis." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1379 (Fed. Cir. 2004) (quoting *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1319-21 (Fed. Cir. 1999)) (internal quotation marks omitted).

536.    The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function. *Odetics Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) (emphasis added). The Federal Circuit has also repeatedly "upheld determinations of equivalence on the ground that hardware and software implementations of a component of an invention are interchangeable substitutes." *Interactive Pictures*, 274 F.3d at 1383.

537.    If each element recited in the claims is found in the accused product, the manufacturer of the accused product cannot avoid infringement merely by adding additional

elements. *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (quoting *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983)) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment."). "Making improvements on a patented invention by adding features to a claim device beyond those recited in the patent does not avoid infringement." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004); *see also Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) (citation omitted), *cert. denied*, 469 U.S. 924 (1984) ("An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent."). Similarly, an accused method "does not avoid literally infringing a method claim . . . simply because it employs *additional* steps." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001) (emphasis in original) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)). The structure is viewed as a whole — its individual elements are not claim limitations. *Odetics Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the ***overall*** structure corresponding to the claimed function.") (emphasis added).

538. Additionally, an accused product infringes even if it does not always infringe when it is used. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998) ("Even assuming that Nu-Kote's video establishes that its cartridge will not infringe under a particular set of controlled circumstances . . . this has little bearing on whether its cartridge will avoid infringement under other foreseeable operating conditions.")

539. "An accused product that 'imperfectly' or 'sometimes, but not always' embodies a claimed element or method nonetheless infringes." *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 741, 743 (W.D. Mich. 1999) (quoting *Bell Communications Research Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995)), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) ("That the machine was not operated in its optimum mode is inconsequential: imperfect practice of an invention does not avoid infringement.").

540. "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). Equivalence is found where there are "insubstantial differences" between the accused product or process and the elements of the patent claims. *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517 (Fed. Cir. 1996), *rev'd on other grounds*, 520 U.S. 17 (1997); *see also Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003). "[T]he proper time for evaluating equivalence . . . is at the time of infringement, not at the time the patent was issued." *Warner-Jenkinson*, 520 U.S. at 37. "The better view . . . is that intent plays no role in the application of the doctrine of equivalents." *Id.* at 36.

541. 35 U.S.C. §271(f) states:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not

a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

### 2. Inducement of Infringement

542. 35 U.S.C. § 271(b) states:

Whoever actively induces infringement of a patent shall be liable as an infringer.

543. To establish liability under Section 271(b), a patent holder must prove that once the defendant knew of the patent they "'actively and knowingly aid[ed] and abet[ed] another's direct infringement.'" *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*) (quoting *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)) (emphasis in original). To prove inducement, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Id.* at 17 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)) (emphasis in original). "The requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs.*, 850 F.2d at 669; *see also Drexelbrook Controls v. Magnetrol Intern., Inc.*, 720 F.Supp. 397, 407 (D. Del. 1989). "'While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.'" *DSU*, 471 F.3d at 1305 (quoting *Water Tech.*, 850 F.2d at 668.)

544. In order to induce infringement "the actions of the party said to have been induced to infringe [must] constitute direct infringement." *Johns Hopkins Univ. v. Cellpro,* 894 F. Supp. 819, 835 (D. Del. 1995). Direct infringement, however, may be inferred from circumstantial proof. *Moleculon Research*, 793 F.2d at 1272 (holding that patentee satisfied its burden of showing direct infringement with circumstantial evidence of extensive sales and dissemination of an instruction sheet teaching the patented method); *Oxford Gene Tech.*, 444 F. Supp. 2d at 464 (citing *Moleculon*

*Research*, citing *Moleculon Research, v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)); *nCube v. Sea Change Int'l, Inc.*, 313 F. Supp. 2d 361, 375 (D. Del. 2004) (same); *Lucent Techs. Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 208-09 (D. Del. 2001) (finding that evidence of sales of the accused products and distribution of product manuals containing instructions on how to configure the products in an infringing manner constituted adequate circumstantial evidence that there was direct infringement).

### 3.   Contributory Infringement

545.   35 U.S.C. § 271(c) states in pertinent part:

> Whoever . . . sells . . . a component, . . . manufacture, . . . or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

546.   To establish contributory infringement under Section 271(c), only proof of a defendant's knowledge, and not intent, that his activity causes infringement is required. *See Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990). Section 271(c) further requires a showing that a product useful in carrying out a patented method is not a staple article suitable for substantial noninfringing use. *See Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 803 F.2d 1170 (Fed. Cir. 1986). Additional functions in a patented device which are performed simultaneously with the patented method do not substantiate a non-infringing use for the purposes of § 271(c). *Imagexpo L.L.C. v. Microsoft Corp.,* 284 F. Supp. 2d 365, 368 (E.D. Va. 2003). Though proof of "direct infringement is essential to proving contributory infringement," *Refac Int'l, Ltd. v. IBM*, 798 F.2d 459, 460 (Fed. Cir. 1986), as with inducing infringement, such proof may be circumstantial in nature. *See Moleculon Research,* 793 F.2d at 1272.

### XVI. Issues On Which Defendant Microsoft and Counterclaim Defendants Lucent and Alcatel-Lucent Bear The Burden Of Proof

#### A. Validity

547. 35 U.S.C. § 282 states in pertinent part:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

548. "A patent is presumed valid." *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999). "One who challenges a patent's validity must prove invalidity by clear and convincing evidence." *Id.* (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) ("Because the claims of a patent are afforded a statutory presumption of validity, overcoming the presumption of validity requires that any facts supporting a holding of invalidity must be proved by clear and convincing evidence."). "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are highly probable." *Intel Corp., v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (other citation omitted).

549. "[T]he burden of persuasion is and remains always upon the party asserting invalidity." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir. 1984) (emphasis in original). "The presumption of validity is never . . . weakened," *ACS Hospital Sys., Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (emphasis in original), and "remains intact and on the challenger through the litigation, and the clear and convincing standard does not change." *Hybritech Inc. v. Monclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986). "It is not necessary that a district Court declare a patent 'valid.' In a proper case, it is

necessary only to hold that the patent challenger failed to carry the burden assigned to it by 35 U.S.C. § 282." *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984); *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 1996 WL 621830, at *5 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000).

550.    Defendant's burden is "especially heavy" when the art relied on at trial was considered by the Patent Office. *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001). In that case, the party asserting invalidity "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *Id.* (citing *American Hoist & Derrick Co.*, 725 F.2d at 1359).

### 1.    Anticipation

551.    Anticipation is a question of fact that must proved by clear and convincing evidence. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995). The burden of proving anticipation by clear and convincing evidence rests with the party asserting invalidity. *See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151 (Fed. Cir. 2004).

552.    "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 'must demonstrate, among other things, identity of invention.'" *Minnesota Mining & Mfg. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir. 1992). "Identity of invention is a question of fact, and one who seeks such a finding must show that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice." *Id.*

553.    "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. . . . There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of

the invention. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) (citations omitted). "Every element of the claimed invention must be literally present [in the single prior art reference], arranged as in the claim . . . . The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citation omitted). "[A]nticipation does not permit an additional reference to supply a missing claim limitation." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002). Absence from the reference of any claimed element negates anticipation. *Atlas Powder Co. v. E.I. DuPont De Nemours*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984).

554. "A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Amgen Inc. v. Hoescht Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

555. "For a prior art reference to anticipate a claim, the reference must disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). "Although this disclosure requirement presupposes the knowledge of one skilled in the art of the claimed invention, that presumed knowledge does not grant a license to read into the prior art reference teachings that are not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Id.* "Every element of the claimed invention must be literally present [in a single prior art reference], arranged as in the claim. The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citations omitted). "An anticipating reference must describe the patented subject matter with sufficient clarity

and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." *Crown Operations Int'l Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

### a. Pre-Filing Date of Invention

556.    A patent is presumed valid and an infringer bears the burden of establishing invalidity of the patent. *Innovative Scuba Concepts, Inc.* v. *Feder Industries, Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994). The date when a patent application is filed is presumed to be the date of invention. *Wang Lab., Inc. v. Mitsubishi Elec. Am. Inc.*, 30 U.S.P.Q.2d 1241, 1246 (C.D. Cal. 1993). However, when an infringer cites a reference with an effective date prior to the patentee's application date in order to show invalidity of the patent, and the patentee claims a pre-filing date of invention in order to avoid the cited reference, the infringer must prove by clear and convincing evidence that the patentee is not entitled to the pre-filing date of invention. *Mahurkar* v. *C.R. Bard Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996); *Innovative Scuba Concepts, Inc. v. Feder Inds, Inc.*, 26 F.3d, 1112 1115 (Fed. Cir. 1994). A patentee is entitled to a date of conception as a date of the invention if it is established that the inventor acted with due diligence in reducing the invention to practice. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

557.    Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill in the art would be necessary to reduce the invention to practice, without unduly extensive research and experimentation. *Sewall v. Walters*, 21 F.3d 411, 415 (Fed Cir. 1994).

558.    A patentee seeking to refute invalidity by proving earlier conception must only "offer evidence showing he invented the subject matter of his patent before the publication date of the [asserted prior art]." *Mahurkar v. C.R. Bard., Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996). The

Federal Circuit adheres to the "rule of reason" and "totality of the circumstances" standard for corroborating evidence. *E.g., Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). "The rule suggests a reasoned examination, analysis and evaluation of all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached . . . . The rule of reason, however, does not dispense with the requirement for some evidence of independent corroboration." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985). When assessing corroborating evidence, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195. "Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001).

559.    "'In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations . . . and (2) he determined that the invention would work for its intended purpose.'" *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)). "Constructive reduction to practice occurs when a patent application on the claimed invention is filed." *Hybritech*, 802 F.2d at 1376.

### b.    35 U.S.C. § 102(a),(b)

560.    "[U]nder Section 102(a), a document is prior art only when published before the invention date." *Mahurkar*, 79 F.3d at 1576. To constitute a publication, a document must be publicly accessible. A document is publicly accessible if it is "'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.'" *Brucklemeyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citations omitted).

561.    In addition to identity of invention, anticipation [under § 102] requires that the prior art reference must be enabling, thus 'placing the allegedly disclosed matter in the possession of the public.'" *Am. Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 109 (D. Del. 1989) (citation omitted).

562.    A person is not entitled to a patent if "the invention was…in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). "[I]n order to invalidate a patent based on prior knowledge or use [under § 102(a)], that knowledge or use must have been available to the public." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) . "[P]rior knowledge or use by others may invalidate a patent under § 102(a) if the prior knowledge or use was accessible to the public." *Id.* Conversely, "an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under § 102(b), barring him from obtaining a patent." *Id.* (citing *Egbert v. Lippman*, 104 U.S. 333, 336 (1881)). Whether the invention is on sale or in public use before the "critical date" (*i.e.*, one year before the filing date) is ultimately a legal determination based on the underlying fact issues. *Ferag AG v. Quipp, Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995).

563.    Public use includes "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Cummins-Allison Corp. v. Glory Ltd.*, No. 03-CV-358 (TJW), 2005 WL 2012259, at *3 (E.D. Tex. Aug. 22, 2005) (quoting *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)); *see In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983). "[Courts] look to the totality of the circumstances when evaluating whether there has been a public use within the meaning of § 102(b)." *Netscape Comm'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002)  Those circumstances include "the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use...." *Netscape*, 295 F. 3d at 1320.  Commercial exploitation is also a clear indication of public use. *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 390 (Fed. Cir. 1984)  "The presence or absence of a

confidentiality agreement is not dispositive of the public use issue" but is simply a factor to be considered. *Bernhardt, LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004). Further, the experimental use defense "is unavailable to a patentee when the evidence presented does not establish that he was conducting a bona fide experiment." *Netscape*, 295 F.3d at 1322.

564.    Under Section 102(b), any description of the claimed invention in a printed publication prior to the critical date, *i.e.*, one year before the effective filing date of the patent, is a statutory bar. *See* 35 U.S.C. § 102(b).  Courts apply the same standards for determining whether a document is a printed publication and whether an invention is described in a printed publication under both 35 U.S.C. § 102(a) and § 102(b). *See, e.g.*, 2-6 Chisum on Patents § 6.02[4] (2006).

565.    In determining whether a reference qualifies as a "printed publication" under § 102(b), "the key inquiry is whether or not a reference has been made 'publicly accessible.'" *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004).  "[A]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *In re Elsner*, 381 F.3d 1125, 1131 (Fed. Cir. 2004), *quoting Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988).  Where the public accessibility of a student thesis is at issue, Courts look not only to whether the thesis was shelved in a public library, but also whether the thesis was "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989); *Ajinomoto Co. v. Archer-Daniels-Midland Co.* 1998 WL 151411, *38 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.")

566.    .

### 2.    Obviousness

567.    35 U.S.C. § 103 states in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the

> prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. patentability shall not be negatived by the manner in which the invention was made.

568.  Obviousness is a question of law based upon underlying questions of facts. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991).  In addition to patents and printed publications, a device in public use or on-sale for purposes of § 102(b) can also constitute a reference under § 103 against the claimed invention. *LaBounty Mfg. v. Int'l Trade Comm'n*, 958 F.2d 1066,  1071 (Fed. Cir. 1992)

569.  "Invalidity based on obviousness of a duly issued patent must be established by clear and convincing evidence." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1555 (Fed. Cir. 1995); *Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007).  "Throughout the obviousness determination, a patent retains its statutory presumption of validity, see 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001); *Takeda*, 492 F.3d at 1355.

570.  The underlying factual issues to be considered in an obviousness analysis include "four general types, all of which must be considered by the trier of fact:  (1) the scope and content of the prior art;  (2) the level of ordinary skill in the art;  (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l, Ltd. v. Solutia Inc.*. 289 F.3d 1367, 1376 (Fed. Cir. 2002).  The United States Supreme Court reaffirmed the primacy of those factors in determining whether a patent is invalid for obviousness. *See KSR Int'l. Co. v. Teleflex Inc.*, --- U.S. ---, 127 S. Ct. 1727, 1734 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).  "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the

1  level of ordinary skill in the pertinent art resolved.  Against this background the obviousness or

2  nonobviousness of the subject matter is determined." *Id.* (quoting *Graham v. John Deere Co.*, 383

3  U.S. 1, 17-18 (1966)).

4  571.  "[W]hen the prior art teaches away from combining certain known elements,

5  discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 127

6  S.Ct. at 1740 (citing *United States v. Adam*, 383 U.S. 39 (1966)).

7  572.  "[R]ejections on obviousness grounds cannot be sustained by mere conclusory

8  statements; instead, there must be some articulated reasoning with some rational underpinning to

9  support the legal conclusion of obviousness." *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d

10  977, 988 (Fed. Cir. 2006)).  The Supreme Court in *KSR* "acknowledged the importance of

11  identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to

12  combine the elements in the way the claimed new invention does' in an obviousness determination."

13  *Takeda*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at 1731).  "This is so

14  because inventions in most, if not all, instances rely upon building blocks long since uncovered, and

15  claimed discoveries almost of necessity will be combinations of what, in some sense, is already

16  known." *KSR*, 127 S.Ct. at 1741; *see also In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000).

17  ("[I]dentification in the prior art of each individual part claimed is insufficient to defeat patentability

18  of the whole claimed invention.").  Indeed, "a patent composed of several elements is not proved

19  obvious merely by demonstrating that each of its elements was, independently, known in the prior

20  art." *KSR*, 127 S. Ct. at 1731.  That is, decomposing an invention into its constituent elements,

21  finding each element in the prior art, and then claiming that it is easy to reassemble these elements

22  into the invention, is a forbidden *ex post* analysis.  *E.g.*, *In re Fritch* , 972 F.2d 1260, 1265-66

23  (Fed. Cir. 1992).

24  573.  "Such secondary considerations as commercial success, long felt but unsolved needs,

25  failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of

the subject matter sought to be patented." *KSR*, 127 S. Ct. at 1734 (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985). "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). "The commercial response to an invention is significant to determinations of obviousness, and is entitled to fair weight." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). "The rationale for giving weight to the so-called 'secondary considerations' is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Id.*

574. "When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention. The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness. The burden of proof as to this connection or nexus resides with the patentee." *Id.* at 1392.

575. "In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus . . . . A *prima facie* case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Id.*

576.    "When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . . It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id.* at 1393.

577.    "[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision maker must consider the obviousness of the new structure in this light.  Such objective indicia as commercial success, or filling an existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

578.    "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n.*, 988 F.2d 1165, 1178 (Fed. Cir. 1993).

579.    "Nonobviousness is suggested by the failure of others to 'find a solution to the problem which the patent[s] in question purport[ ] to solve.  Such evidence shows indirectly the presence of a significant defect [in the prior art] . . . .'" *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed. Cir. 1991) (citation omitted).

## XVII.  Issues on Which Defendant Microsoft Bears The Burden Of Proof

### A.    Enforceability

#### 1.    Equitable Estoppel

580.    Equitable estoppel is an "equitable defense[], committed to the sound discretion of the trial court." *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1292 (Fed. Cir. 1992) (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028 (Fed. Cir. 1992)).  An accused infringer asserting equitable estoppel as a bar to the patentee's suit must establish that:  (1) the patentee, through misleading conduct, led the alleged infringer to reasonably infer that the

patentee did not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relied on that conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1371 (Fed. Cir. 2001); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028 (Fed. Cir. 1992). "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiffs known acquiescence" that the defendant can continue its allegedly infringing activities. *Aukerman*, 960 F.2d at 1043-44. "Reliance . . .is essential to equitable estoppel." *Id*. at 1042. "To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with" his or her activity. *Id*. at 1043. "Finally, the trial court must, even where the three elements of equitable estoppel are established, take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit." *Id.*

## 2. Inequitable Conduct

581. To establish that inequitable conduct occurred in the prosecution of a patent, the party raising the issue must prove by clear and convincing evidence that: (1) the information is material; (2) the knowledge of the information and its materiality can be charged to the patent applicant; and (3) the patent applicant's failure to disclose the information (or submission of false information) resulted from an intent to mislead the United States Patent and Trademark Office ("PTO"). *See Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988); *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F.Supp.2d 484, 489 (D. Del. 2003) (JJF). Inequitable conduct is an equitable defense; thus, the ultimate question of whether inequitable conduct has occurred is a question for the Court, not a jury. *See Kingsdown Medical*, 863 F.2d at 876.

582. The post-1992 duty of disclosure is set forth in 37 C.F.R. 1.56 and requires disclosure of certain information that is "material" to patentability. "[I]nformation is material to patentability

when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability." 35 C.F.R. § 1.56

583.    But a reference cannot be considered material if it is merely cumulative to other references that were already before the examiner, *i.e.*, "if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the USPTO." *See Regents of University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997); *Scripps Clinic & Research Foundation v. Genetech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("A reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct.") *See Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.,* 1996 WL 680243, at *6 (N.D.Ill. 1996) (holding references cited in another reference already before the Examiner to be cumulative).

584.    Additionally, "[a] party alleging that a patent is unenforceable because of the patentee's failure to disclose material information to the PTO must offer clear and convincing evidence that the patentee intended to mislead the PTO.  [citation omitted]  The omission must be made with the specific intent to mislead, not merely from carelessness in the performance of a duty." *Speedplay Inc. v. Bebop Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000); *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Without a factual basis to establish a threshold level of deceitful intent, the inequitable conduct analysis is at an end.").

585.    Intent to deceive cannot be inferred solely from the fact that information was not disclosed to the examiner; there must be an independent factual basis for a finding of deceptive intent. *See Catalina Lighting, Inc v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288-89 (Fed. Cir. 2002);

*C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998) ("Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner.").

### 3. Laches

586. The equitable issue of laches is for the Court, not the jury, to decide. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992).

587. Laches is an equitable defense, the application of which falls within the sound discretion of the Court. *Aukerman*, 960 F.2d at 1028. To establish laches, the defendant must prove by a preponderance of the evidence that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant. *Id.* at 1032. A successful laches defense bars only pre-filing damages. *Id.* at 1028

588. Because laches is an equitable defense, Courts have "borrowed" the six-year damages limitation period set out in 35 U.S.C. § 286 as a guideline for determining when a claim should be equitably barred. *Id.* at 1034. The six-year limitation period for laches begins with a patentee's actual or constructive knowledge of the alleged infringement and then counts forward. *Id.* If the patentee had knowledge of the infringement more than six years before bringing suit, the law imposes a rebuttable presumption of laches which "has the effect of shifting the burden of going forward with evidence, not the burden of persuasion." *Id.* at 1028. "Elimination of the presumption . . . mean[s] that the presumption of laches plays no role in the ultimate decision. The facts of unreasonable delay and prejudice then must be proved and judged on the totality of the evidence presented." *Id.* at 1038. The burden of going forward with the evidence and the burden of persuasion rest on the defendant. *Id.* at 1038-39.

589. Any "delay" in filing suit must be measured from the point in time when the patentee knew or should have known of the infringement, not merely the accused products. *Aukerman*, 960 F.2d at 1032; *Metro. Wire Corp. v. Falcon Prods. Inc.*, 528 F. Supp. 897, 902 & n.4 (E.D. Pa. 1981)

(knowledge of accused products by corporate employees not relevant to laches where it could not be shown that employees had "detailed knowledge" of the patent-in-suit and basis for claim of infringement).

590.    If the presumption of laches arises, "the patentee may offer proof directed to rebutting the laches factors. Such evidence may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both.

591.    The Federal Circuit imposes a duty upon Courts to "consider and weigh any justification offered by the plaintiff for its delay" in filing an infringement suit. *Id.* at 1033. The Federal Circuit has recognized "negotiations with the accused" infringer and considered the "extent of infringement" to determine whether the patentee's delay was justifiable. *Id.*

592.    It is well settled that bilateral licensing negotiations, that are progressing and appear to have a fair chance of success, excuse a patentee's delay in filing suit. *Id.* at 1033; *RCA Corp. v. Data Gener. Corp.*, 701 F. Supp. 456, 476 (D. Del. 1988). Accordingly, the laches period for the duration of negotiations is tolled and excluded from the calculation of the laches period. *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 127-28 (D. Mass. 1993), *aff'd without op.*, 26 F.3d 140 (Fed. Cir. 1994); *Valutron N.V. v. NCR Corp.*, 33 U.S.P.Q. 2d 1986, 1991-93 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993).

593.    The second element of laches requires that the defendant demonstrate that it suffered "material prejudice" as a result of the plaintiff's alleged delay in filing suit. *Aukerman*, 960 F.2d at 1033. The prejudice may be either economic or evidentiary. *Id.*

594.    To establish material economic prejudice, the defendant must prove that there is a nexus between its investment and the plaintiff's alleged delay in filing suit. "[T]he court's inquiry is not whether there is evidence of capital investment. Rather, the key is whether there is a nexus between the delay and the infringer's decision to expand the infringing activity. . . . *No economic prejudice can be established if this nexus is absent.*" *ABB Robotics, Inc. v. GMFanuc Robotics*

*Corp.*, 828 F. Supp. 1386, 1395 (E.D. Wis. 1993) (emphasis added), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995) (reversing summary judgment of laches because the District Court did not require proof of a nexus between the investment and the delay); *Minco. Inc. v. Combustion Eng'g. Inc.*, 903 F. Supp. 1204, 1221 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) (denying laches where defendant unable to show expenditures attributable to delay, as opposed to routine business expansion); *Northern Telecom Inc. v. Datapoint Corp.*, 23 U.S.P.Q.2d 1881, 1893 (N.D. Tex. 1992); *see also Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992); *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1408 (N.D. Ill.1996). Moreover, damages arising from the alleged infringer's continuing sales of the challenged device that would have been avoided by an earlier suit do not establish material prejudice. To prove economic harm, a mere change in position by investing in production of the challenged device during the period of delay is insufficient. "If such damages necessarily constituted prejudice, then practically every patent claim would establish material prejudice." *Id.* "It is not enough that the alleged infringer changed his position — i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet*, 972 F.2d at 1294; *see also Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 (Fed. Cir. 1990) (no economic prejudice shown because the defendant would have continued the development and sales activities regardless of what the patentee "did or did not do"), *overruled in part on other grounds, Aukerman,* 960 F.2d 1020 (Fed. Cir. 1992).

595. Courts consistently reject a defendant's laches defense when "the party which advances the defense of laches is responsible for the delay or contributes substantially to it." *Potash Co. of Am. v. International Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *see also Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*, 708 F. Supp. 1423, 1439 (D. Del. 1989)

(laches denied "where the one asserting the defense of laches was responsible for the plaintiff's delay"); *Coleman*, 619 F. Supp. at 955.

### 4.    Unclean Hands

596.    The defendant then has the burden to demonstrate the plaintiff's inequitable conduct and must also demonstrate that the plaintiff's inequitable conduct is immediately and necessarily related to the equity that the plaintiff seeks in the litigation. *Bio-Technology Gen. CgM. v. Genentech, Inc*., 80 F.3d 1553, 1565 (Fed. Cir. 1996). The unclean hands doctrine applies only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. *Id.*

## XVIII. Damages

### A.    Damages

597.    35 U.S.C. § 284 states in pertinent part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

598.    The assessment of damages is a question of fact, and is decided by the jury when trial is to a jury. "Section 284 imposes no limitation on the types of harm resulting from infringement that the statute will redress. The section's broad language awards damages for any injury as long as it resulted from the infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

599.    Under 35 U.S.C. § 284, a patentee is entitled to damages from an infringer adequate to compensate for the infringement, but in no event less than a reasonable royalty. "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1554 (Fed. Cir. 1995). "The hypothetical negotiation requires the court to envision the

1  terms of a licensing agreement reached as the result of a supposed meeting between the patentee and

2  the infringer at the time infringement began." *Id.*

3    600.    The following evidentiary facts may be relevant to the determination of the amount of

4  a reasonable royalty for a patent license:  (1) the royalties received by the patentee for the licensing

5  of a patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the

6  licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the

7  license, as exclusive or non-exclusive or as territory restricted or non-restricted; (4) the licensor's

8  established policy and marketing program to maintain his patent monopoly by not licensing others to

9  use the invention or by granting licenses under special conditions designed to preserve that

10  monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they

11  are competitors or inventor/promoter; (6) the extent of derivative or convoyed sales for either the

12  licensee or licensor; (7) the duration of the patent and the term of the license; (8) the established

13  profitability of the product made under the patent; (9) the utility and advantages of the patent

14  property over the old modes or devices, if any, that had been used for working out similar results;

15  (10) the nature of the patented invention including the character of the commercial embodiment and

16  the benefits to those who have used the invention; (11) the extent to which the infringer has made

17  use of the invention; (12) the portion of the profit or of the selling price that may be customary in the

18  particular business or in comparable businesses to allow for the use of the invention or analogous

19  inventions; (13) the portion of the realizable profit that should be credited to the invention as

20  distinguished from non-patented elements, the manufacturing process, business risks, or significant

21  features or improvements added by the infringer; (14) the opinion testimony of qualified experts,

22  and; (15) the amount that a licensor and a licensee would have agreed upon if both had been

23  reasonably and voluntarily trying to reach an agreement.  *Unisplay S.A. v. American Elec. Sign Co.*,

24  69 F.3d 512, 517 n.7 (Fed. Cir. 1995) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*,

25  318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

601.    "A party that induces or contributes to infringement is jointly and severally liable with the direct infringer for all general damages." *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001); *see also Glenayre Elec., Inc. v. Jackson*, 443 F.3d 851, 858-89 (Fed. Cir. 2006). ("Where a patentee alleges that a manufacturer contributes to and induces infringement by its customers simply because it sells infringing products to its customers, damages assessed for indirect infringement normally will be the same as damages that would be assessed had the patentee sued and obtained a judgment against the customers….Indeed, in most cases damages assessed for indirect infringement will be equal to damages assessed for the underlying direct infringement.")

602.    The entire market value rule "permits recovery of damages based on the value of the entire apparatus containing several features, where the patent related feature is the basis for customer demand." *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999).  However, "the Federal Circuit has not strictly required that the [patented] feature be the "only" basis for consumer demand. (D.I. 347, Feb. 12, 2008 Summ. J. Order 31.)  "The entire market value rule is appropriate where both the patented and unpatented components together are 'analogous to components of a single assembly,' 'parts of a complete machine,' or 'constitute a functional unit,' but not where the unpatented components have essentially no functional relationship to the patented invention.'" *Tec Air*, 192 F.3d at 1362 (citing *Rite-Hite*, 56 F.3d at 1550).

603.    Once damages are quantified, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  Similarly, post-judgment interest should be awarded under 28 U.S.C. § 1961.

604.    It is "standard practice" in patent infringement actions to order a post-verdict accounting for any infringing sales not included in the jury's verdict. *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* No. CV-S-97-1383-EJW, 2001 WL 34778689, at *18 (D. Nev. Aug. 2, 2001);

*see also IMX, Inc. v. Lendingtree, LLC,* No. Civ.03 1067 SLR, 2007 WL 1232184, at *2 (D. Del. April 25, 2007) (ordering accounting for defendant's continued infringing activities during trial); *Lisle Corp., v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *1 (N.D. Ill. April 7, 2004) (granting plaintiff's request to include an accounting for sales through injunction); *Itron, Inc. v. Benghiat*, No. Civ.99-501 (JRT/FLN), 2003 WL 22037710, at *15 (D. Minn. Aug. 29, 2003) ("Courts 'routinely grant motions for further accounting' where the jury did not consider certain periods of infringing activity."); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 748 (W.D. Mich. 1999) (granting accounting for period between the verdict and entry of a permanent injunction). In determining the amount of supplemental damages, Courts apply the reasonable royalty rate determined by the jury in reaching the verdict. *See id.* at 747.

605.    35 U.S.C. § 283 provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any rights secured by patent, on such terms as the court deems reasonable." *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct 1837, 1839 (U.S. 2006). To obtain a permanent injunction, the patentee must satisfy a four-factor test, demonstrating: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

606.    Courts have granted a compulsory license where the defendant continues to infringe the patents-in-suit following the judgment, and under circumstances in which a permanent injunction was said to be inappropriate. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985) (affirming district Court grant of a compulsory license at jury-determined royalty rate for continuing sales); *Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974) (affirming district Court grant of a compulsory license in form of royalties); *Voda v. Cordis*

*Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at *6 (W.D. Okla. Sept. 5, 2006) (finding that where the defendant continues to infringe post-verdict, the Court must fashion a remedy for the continuing harm to the patentee); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 441 (E.D. Tex. 2006) (finding that the patentee could be compensated for Microsoft's future infringement by calculating a reasonable royalty for Microsoft's continued use).  The Courts have recognized that the rate of such a license can easily be determined where the jury has made a clear determination of the reasonable royalty due to the infringement.  *z4 Techs, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 442 (E.D. Tex. 2006) (finding that the calculation of future damages can be based on the same reasonable royalty calculation used by the jury at trial and by referring to Microsoft's internal records showing sales of infringing products); *Voda*, 2006 WL 2570614, at *6 (finding that post-verdict damages are "simple mathematical calculations based on defendant's sales" and ordering defendant to file quarterly sales reports); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16, 2006) (finding that the patentee's losses from defendant's postjudgment sales of infringing products can be remedied by monetary damages in accordance with the reasonable royalty set by the jury); *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-16 (Fed. Cir. 2007).

###    B.    Notice

607.    "35 U.S.C. § 287 prescribes that, on penalty of having their damages limited to times subsequent to actual notice, patentees and their agents shall mark any "patented *article*," thereby giving notice "to the public that the same is patented."  (Emphasis added)  In addition to the clear language of the statute, it is, as noted by the district Court, also settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983).

608.    "The criteria for actual notice under [35 U.S.C.] § 287(a) are not coextensive with the criteria for filing a declaratory judgment action.  These statutory purposes are distinct, serve different

1  policies, and are governed by different laws. The requirement of actual notice under § 287(a) is

2  designed to assure that the recipient knew of the adverse patent during the period in which liability

3  accrues, when constructive notice by marking is absent.  Actual notice may be achieved without

4  creating a case of actual controversy in terms of  28 U.S.C. § 2201."  *SRI Int'l, Inc. v. Advanced*

5  *Tech. Lab., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

6      609.    "It is not controlling whether the patentee threatens suit, demands cessation of

7  infringement, or offers a license under the patent."  *Id.*  "The offering of a license is actual notice."

8  *Ralston Purina Co. v. Far-Mar-Co*, 772 F.2d 1570, 1577 (Fed. Cir. 1985).  "Thus, the actual notice

9

10  requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and

11  the activity that is believed to be an infringement, accompanied by a proposal to abate the

12  infringement, whether by license or otherwise."  *SRI*, 127 F.3d at 1470.  "When the patentee has

13  notified a perceived infringer of a specified patent that a license may be needed, the sufficiency of

14  the notice under § 287(a) is not negated if the proposed remedy is a license instead of cessation of

15  activity."  *Id.*

16

17      **C.    Microsoft is Not Entitled to a Jury Trial on Certain Issues**

18      610.    Because Microsoft is seeking only equitable relief—and not damages—from Alcatel-

19  Lucent for the alleged infringement relating to the 8788 MRP and Open Media Suite products,

20  Microsoft's infringement claims regarding these products must be tried to the Court, not a jury.  The

21  Federal Circuit has held that where a plaintiff claims infringement, but abandons its claim for

22  damages, seeking only injunctive relief, it is not entitled to a trial by jury.  *In re Tech. Licensing*

23  *Corp.*, 423 F.3d 1286, 1289-91 (Fed. Cir. 2005); *Tegal Corp v. Tokyo Electron Am., Inc.*, 257 F.3d

24  1331, 1339-41 (Fed. Cir. 2001) (holding that there was no right to a jury trial when the patentee

25  dropped its claims for damages and sought only injunctive relief against a defendant asserting an

26  invalidity affirmative defense).  Microsoft must, therefore, try its claims for infringement of the '794

27  and '004 patents against Alcatel Lucent to the Court.

28

### D.   Microsoft is Not Entitled to an Injunction on Certain Issues

611.   There is no basis for the injunction Microsoft seeks against Alcatel-Lucent with respect to the '794 and '004 patents.  Microsoft cannot make the necessary showing required for an injunction.  Specifically, Microsoft cannot demonstrate (1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between Alcatel-Lucent and Microsoft, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S.Ct. 1837, 1839 (2006).  The Court should, therefore, deny Microsoft's requests for an injunction agaisnt Alcatel-Lucent.

### E.   Attorneys' Fees

612.   The patent statute authorizes the Court "in exceptional cases" to award "reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.  A Court may hold a case "exceptional" even when the infringer is not found to be willful.  For example, in *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989), the Federal Circuit held that the specific District Court did not commit clear error in finding the case "exceptional" because of the infringer's "strategy of vexatious activity."  *Id.* at 1551-53.

### ABANDONED ISSUES

613.   Multimedia Patent Trust has not abandoned any issues raised by its pleadings.

614.   Lucent has withdrawn its laches defense upon Microsoft's stipulation that it was not seeking pre-notice damages from Lucent.  Lucent has not abandoned any other issues.

615.   Alcatel-Lucent has not abandoned any issues raised by its pleadings.

616.   Microsoft has abandoned its claim that Alcatel-Lucent infringes the '947 Patent.

**WITNESSES TO BE OFFERED BY MULTIMEDIA PATENT TRUST, LUCENT, AND ALCATEL-LUCENT**

617.    Multimedia Patent Trust, Lucent, and Alcatel-Lucent incorporate by reference *Multimedia Patent Trust's, Lucent's, and Alcatel-Lucent's Combined Trial Witness List*, filed concurrently herewith.

**EXHIBITS TO BE OFFERED BY MULTIMEDIA PATENT TRUST, LUCENT, AND ALCATEL-LUCENT**

618.    Multimedia Patent Trust, Lucent, and Alcatel-Lucent incorporate by reference *Multimedia Patent Trust's, Lucent's, and Alcatel-Lucent's Combined Trial Exhibit List*, filed concurrently herewith.

Dated:  March 3, 2008

By:        s/David A. Hahn
David A. Hahn, SBN 125784
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
James E. Marina (admitted *pro hac vice*)
Michael P. Stadnick (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Attorneys for *Multimedia Patent Trust, Lucent Technologies Inc., and Alcatel-Lucent*